## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| Council for Medicare Choice;<br><br>Fort Worth Association of Health Underwriters, Inc.; and<br><br>Vogue Insurance Agency LLC,<br><br>          Plaintiffs,<br><br>    v.<br><br>United States Department of Health and Human Services;<br><br>Centers for Medicare and Medicaid Services;<br><br>Xavier Becerra, in his official capacity as Secretary of Health and Human Services; and<br><br>Chiquita Brooks-LaSure, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services,<br><br>          Defendants. | Case No. 4:24-cv-446 |

## **COMPLAINT**

## INTRODUCTION

1.      The Centers for Medicare and Medicaid Services ("CMS") regulates the compensation that Medicare Advantage ("MA") and Medicare Part D prescription drug plans pay to independent agents and brokers who help beneficiaries select and enroll in the plan that is right for them.  CMS's current regulations set fixed caps on the payments health plan carriers make to agents and brokers for each successful enrollment.  In addition to these payments, carriers reimburse third-party firms for the vital services they provide to agents and brokers in connection with the enrollment process—including fielding and recording beneficiaries' calls; developing technology such as plan-comparison tools that agents deploy in the field; assisting agents and brokers with obtaining necessary licenses, certifications, and trainings; and launching marketing campaigns.  CMS has never previously attempted to dictate or cap carriers' payments for these administrative services.

2.      Instead, for more than a decade, CMS has recognized that these sorts of administrative service payments are not "compensation" and thus fall outside of CMS's statutory authority to regulate the "use of compensation" for enrollments.  42 U.S.C. § 1395w-21(j)(2)(D); *see Medicare Program Revisions*, 73 Fed. Reg. 54,226, 54,239/1 (Sept. 18, 2008); *Medicare and Medicaid Programs; Contract Year 2022 Changes*, 86 Fed. Reg. 5,864, 5,993/3-94/1 (Jan. 19, 2021).  CMS has therefore permitted carriers to pay firms the fair-market value of their services.  42 C.F.R. § 422.2274(a)(i), (d)(1)(ii), (e)(1)-(2).  In reliance on the expectation of fair-market payments, an entire industry has built up to provide these services to agents and brokers.  Agents and brokers, in turn, have relied on these vital services to help millions of MA and Part D beneficiaries make informed choices between plans, contributing to the success of these critical programs.

1

3.     Now, however, CMS has dramatically changed course and asserted radical new authority to set fixed rates—without any regard for fair-market value—for the wide range of administrative payments that it previously acknowledged were not "compensation."  Based on that purported authority, CMS has hastily promulgated a new rule (the "Compensation Rule"). *Medicare Program; Changes for Contract Year 2025*, 89 Fed. Reg. 30,448 (Apr. 23, 2024).[1]  The Rule's key provision (the "Fixed Fee") limits the total, combined payments that carriers can make for *all* administrative services at an arbitrarily derived rate that CMS has not even attempted to justify with market data or analysis.  *Id.* at 30,829/1-3 (§§ 422.2274(a)), 422.2274(e)(2)).  CMS calculated that rate without any effort to measure the value or cost of providing the numerous perfectly legitimate and valuable administrative services firms currently perform for carriers, precisely because CMS acknowledges that it's too "difficult for us to accurately capture" the value of those services.  *Id.* at 30,625/3.  And CMS has done all of this to solve a non-existent problem— allegedly growing administrative payments that CMS believes may affect agents' and brokers' incentives—that CMS has never seriously attempted to demonstrate with any evidence or data.  Indeed, the entire rule is premised on supposed complaints, reports, market surveys, and other data that CMS referenced in its notice of proposed rulemaking and final rule but has never disclosed or subjected to public scrutiny.

4.     The obvious consequence of CMS's careless and unauthorized venture into the uniquely challenging area of government ratemaking—for services CMS concedes it does not understand—is that under the new rule, firms that provide these essential administrative services are forbidden from earning a fair-market return for those services.  Without payment for those

---

[1] A copy of the Final Rule is attached as Exhibit 1 to this Complaint.  A separate copy excerpting relevant portions of the Final Rule is attached as Exhibit 2.

services, firms will have to cut the services they provide to save costs and may even be forced to exit the industry. Without access to these services, the individual agents and brokers who engage with beneficiaries will have fewer resources available to help them enroll Americans in the right plan. And all that, in turn, will undercut beneficiaries' access to robust plan options. If firms have less money to invest in contracting with carriers or to invest in contracting with agents and brokers, then firms will have fewer plans to provide to fewer agents and brokers—and fewer people offering fewer plans means less beneficiary choice. Meanwhile, the market will depend more heavily on carriers to sell only their own plans directly to individuals, in lieu of agents and brokers offering a wide variety of plans from multiple carriers for beneficiaries to consider.

5.    Further exacerbating these problems, the Compensation Rule also introduces a brand-new prohibition on the contract terms that health plan carriers may offer to third-party firms or individual agents and brokers (the "Contract-Terms Restriction"). Carriers must "ensure that no provision of a contract with an agent, broker, or other [third-party marketing organization] has a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." 89 Fed. Reg. at 30,829/2 (§ 422.2274(c)(13)). CMS, recognizing that it was adopting an open-ended, capacious prohibition that would leave everyone scratching their heads, purported to provide examples of contractual terms that "likely" fall on the wrong side of the line. *Id.* at 30,621/1. In a move that it did not preview in the proposed rule, CMS proclaimed that "bonuses for hitting volume-based targets for sales of a plan" are "likely" impermissible. *Id.* Overnight, legitimate business practices that have been in place for years and have not been understood to be compensation would be redlined out of business-to-business contracts.

3

6.      Plaintiffs represent a broad spectrum of firms and individuals throughout the industry that will feel the acute consequences of these provisions.  Plaintiff the Council for Medicare Choice represents some of the largest independent, third-party firms that contract with multiple MA and Part D health plan carriers and either employ individual agents directly or provide administrative services to a network of independent-contractor agents or brokers.  Because the Council's members contract with multiple carriers, they provide *carrier-agnostic* administrative services to the individual agents and brokers on the ground selling plans.  Plaintiff Fort Worth Association of Health Underwriters, Inc. ("NABIP–Fort Worth"), the Fort Worth chapter of the National Association of Benefits and Insurance Professionals ("NABIP"), likewise represents field marketing organizations ("FMOs") that provide administrative service to their affiliated agents and brokers.  Under the Rule, members of the Council and NABIP–Fort Worth could not receive market-rate payments for these services, eliminating a significant percentage of their business— in some cases, more than one-third of their total revenue (not profit).  Meanwhile, some members are *already* losing money on a year-to-year basis and cannot afford these drastic revenue cuts.  As a result, the Rule would drive some Council and NABIP–Fort Worth members out of business.  One major firm (Assurance, a former Council member) has already folded.  And others that manage to survive would perform fewer of—or none of—the valuable administrative services they perform currently, and will have to contract with fewer carriers, offer fewer plans, and spend less money ensuring that beneficiaries are enrolled in the best health plan for them.

7.      NABIP–Fort Worth's members also include individual agents and brokers and brokerage agencies such as Plaintiff Vogue Insurance Agency LLC ("Vogue").  These agents and brokers cannot themselves provide all of the administrative services that they to look to firms— such as FMOs—to provide.  If the Rule takes effect, therefore, many agents and brokers would

lack access to the resources they need to effectively serve beneficiaries and to satisfy their legal obligations under State law and CMS's own regulations, forcing them to suspend their services. Vogue, for example, would cease selling MA and Part D plans.  And those that remain will have fewer support services available to help beneficiaries select and enroll in the plans that best meet their needs.

8.     This disaster is the product of a regulation that is fundamentally flawed.  As an initial matter, the Fixed Fee is unauthorized and unlawful.  As noted above, the Rule's government price-fixing—a power that Congress grants sparingly—is an unprecedented and unlawful expansion of CMS's statutory authority to regulate the "use of compensation."  42 U.S.C. § 1395w-21(j)(2)(D).  CMS also flunked fundamental notice-and-comment requirements under the Administrative Procedure Act ("APA") by building its regulation on an impermissibly concealed and deficient factual record.

9.     Moreover, the Rule is arbitrary and capricious because CMS: changed its position regarding what payments constitute "compensation" without a reasoned explanation or acknowledgment of reliance interests engendered by its prior interpretations; failed to substantiate its assertion that a problem even exists; failed to grapple with or attempt to measure the Rule's disastrous consequences on firms, agents, brokers, and beneficiaries; relied on concerns about purported competitive balance that are not authorized by statute; failed to explain adequately why it declined to adopt more reasonable alternatives; and failed to engage with comments, including from the Council and NABIP–Fort Worth's parent organization, NABIP.  *See generally* Council for Medicare Choice Comment Letter (Jan. 5, 2024) ("CMC Comment Letter"), www.regulations.gov/comment/CMS-2023-0187-1656; NABIP Comment Letter (Jan. 5, 2024) ("NABIP Comment Letter"), www.regulations.gov/comment/CMS-2023-0187-3079.

10.    Other flaws permeate each of the Rule's two provisions at issue here.  For example, CMS's Fixed Fee raises the compensation limit by $100 per initial enrollee, but that amount does not reflect any attempt to study the actual costs of the administrative services that the $100 increase is meant to cover.  Instead, CMS arbitrarily picked a number near the bottom of the range proposed by commenters because CMS thought it was just too difficult to quantify the actual cost of services.  Meanwhile, it remains unclear whether the Fixed Fee even applies to firms, as opposed to individual agents and brokers—an issue the Court should resolve either by striking the Fixed Fee for lack of clarity or by declaring that it does not apply to firms.

11.    The Contract-Terms Restriction, meantime—which unambiguously applies to firms—is unconstitutionally vague, was not a logical outgrowth of the proposed rule, and is not supported by a reasoned explanation.

12.    Making bad provisions worse, CMS chose an unreasonable effective date.  The Rule's challenged provisions are applicable to plans whose coverage begins in contract year 2025, which starts on January 1, 2025.  89 Fed. Reg at 30,621/3.  CMS acknowledges that industry stakeholders prepare for the open enrollment period for such plans at least by October 1, 2024.  *Id.* But in reality, Plaintiffs are preparing for the 2025 contract year right now, because the enrollment cycle for the 2025 plan year is well underway.  By law, carriers must submit bids to CMS to offer plans with 2025 coverage by June 3, 2024; those bids must bake in the cost of carriers' payments for enrollments and administrative services.  So Plaintiffs are negotiating contracts with carriers and making crucial business decisions *right now* without clarity about how and to what extent the rule affects them.  That is unworkable.

13.    For all these reasons, the Rule's Fixed Fee and Contract-Terms Restriction must be vacated and set aside under the APA.  In the meantime, to prevent the looming and irreversible

harms that will be caused by the Rule, Plaintiffs intend to move imminently for a preliminary injunction or other appropriate expedited relief to preserve the status quo while Plaintiffs' claims are litigated on the merits.

## PARTIES

14.     Plaintiff Council for Medicare Choice (the Council) is a Texas nonprofit corporation headquartered in Austin, Texas.  The Council's members are unaffiliated insurance agency, brokerage, and field-marketing organizations that help individuals purchase health plans. These members include:  eHealth; e-TeleQuote; and SelectQuote.

15.     Plaintiff Fort Worth Association of Health Underwriters, Inc. (NABIP–Fort Worth) is a Texas nonprofit corporation that has its principal place of business in Fort Worth, Texas. NABIP–Fort Worth is the Fort Worth chapter of NABIP.  Like its parent organization, NABIP–Fort Worth represents licensed health insurance agents, brokers, and firms such as FMOs.

16.     Plaintiff Vogue Insurance Agency LLC (Vogue) is a Texas corporation that is headquartered and has its principal place of business in Arlington, Texas.  Vogue is a brokerage firm that employs individual agents and brokers who provide health insurance policies throughout Texas.

17.     Members of the Council and NABIP–Fort Worth include third-party firms (such as FMOs and telesales companies) that provide administrative services vital to the MA and Part D enrollment process.  These members currently receive more administrative payments than the Rule's Fixed Fee permits because the cost of providing those services and their fair value in the marketplace exceed the Rule's Fixed Fee.  And their contracts currently contain terms that the Rule's Contract-Terms Restriction prohibits, such as bonuses based on enrollment volume.  If the Rule's changes take effect, these members will not be able to receive adequate, fair-market payments for all of the administrative services they provide, and they will have to renegotiate or

7

change their contracts.  These members will therefore lose revenue, be forced to change their business practices or provide services below cost, and incur compliance costs.  They also likely will reduce the administrative services they currently offer to beneficiaries.

18.     NABIP–Fort Worth's members also include individual agents and brokers, as well as brokerage agencies such as Plaintiff Vogue.  Those members, including Vogue, work with and rely upon FMOs that provide administrative services to those members and their  agents and brokers.  Indeed, those members, including Vogue, could not afford to pay for all of the administrative services that are necessary and that FMOs provide to their agents and brokers.  Without an FMO providing all of those administrative services, Vogue, similar members, and their agents and brokers would have fewer resources available to help them enroll beneficiaries in the right plan that best meets their health care needs.

19.     Based on these injuries, Vogue has individual standing to bring this action.  The Council and NABIP–Fort Worth have associational standing to bring this lawsuit on behalf of their members because: at least one of each of their members has Article III standing; the interests that these organizations seek to protect are germane to their organizational purpose of promoting firms, agents, and brokers, and the proven value they provide to plans and to beneficiaries; and neither the claims asserted nor the relief requested in this lawsuit requires the participation of these organizations' individual members.

20.     Defendant HHS is a federal executive department subject to the APA.

21.     Defendant CMS is an administrative agency within HHS.

22.     Defendant Xavier Becerra is Secretary of Health and Human Services.  The Secretary is a signatory to the Rule.  89 Fed. Reg. at 30,848.  He is sued in his official capacity.

23.     Defendant Chiquita Brooks-LaSure is Administrator of CMS.  The Administrator approved the Compensation Rule.  89 Fed. Reg. at 30,812/1.  She is sued in her official capacity.

## JURISDICTION AND VENUE

24.     This action arises under the APA, 5 U.S.C. §§ 500 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. § 2201.  This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

25.     The Compensation Rule is final agency action subject to judicial review as provided by the APA.  5 U.S.C. § 704.

26.     Venue is proper because this is an action against agencies of the United States and officers of the United States; no real property is involved; and Plaintiffs NABIP–Fort Worth and Vogue have their principal places of business in and therefore reside in this judicial district.  28 U.S.C. § 1391(c)(2), (e)(1)(C).

## ALLEGATIONS

I.    **Legal and Factual Background**

A.    **Firms Provide Vital Services That Assist Individual Insurance Agents And Brokers To Connect Beneficiaries With The Appropriate Medicare Advantage And Part D Plans For Their Needs**

27.     Medicare Advantage ("MA") is a thriving market for eligible Americans that want to obtain health care coverage.  As a private alternative to Medicare, it permits beneficiaries to join specific health care plans with options better tailored to their individual needs.  Unlike traditional Medicare, beneficiaries typically must see in-network physicians, but plans include extra benefits absent from traditional Medicare (like vision, hearing, and dental benefits), and plans typically cap yearly out-of-pocket expenses, which are uncapped in traditional Medicare.  As a result, Medicare Advantage expands beneficiary choice—helping to explain its booming popularity in recent years.  The average MA beneficiary now has access to 43 distinct plans—the largest number of options

9

ever.  MA enrollment has steadily climbed over the past two decades and now includes over 30 million beneficiaries (more than traditional Medicare), with an eight-percent jump in enrollments from 2022 to 2023 alone.

28.     Medicare Part D is a federal program that assists seniors and disabled Americans with paying for prescription drugs.  Similar to MA, Congress designed Part D as a private-sector solution that uses market competition to ensure affordable and efficient access to drug coverage. Private drug plan carriers contract with CMS to offer subsidized coverage on an annual basis.  The average Part D beneficiary has access to 24 district plans, and about 50 million individuals have enrolled in Part D plans.

29.     MA and Part D plans reach beneficiaries in a number of ways.  Some health plan carriers use their own employees to sell only those carriers' own plans directly to beneficiaries. Conversely, other health plan carriers contract with third parties to sell plans, including individual agents and brokers engaged as independent contractors, and third-party firms that either employ individual agents directly or provide administrative services to a network of independent-contractor agents.  Some of those third-party individuals and firms may contract exclusively with a single carrier to sell that carrier's plan, while others may contract with and sell multiple carrier's plans.[2]

30.     The Council and NABIP–Fort Worth represent many of these third-party firms that contract with multiple carriers.  They include (1) digital marketing firms, (2) telesales companies, and (3) field marketing organizations (FMOs).  By contracting with multiple health plans and remaining carrier-agnostic, many of these third-party firms create cost-effective networks that give

_____

[2] This Complaint uses the terms "agent" and "broker" to refer to *individuals* who sell health plans directly to the beneficiaries, and uses the terms "firms" or "entities" to refer to third-party companies that employ or contract with individuals who sell plans.

individual agents a broader array of health plans to offer to beneficiaries. These firms and other similar third parties thus help carriers distribute their plans to new audiences, help beneficiaries access more plans, and help agents and brokers "demystify the stressful process of choosing a health plan" for individuals. CMS, *Agents and Brokers in the Marketplace* at 1 (2020), tinyurl.com/2afffcyf.

31.     Plaintiff NABIP–Fort Worth also represents agents and brokers—the boots on the ground and licensed individuals answering the phones—who rely on the vital services that firms provide. Agents and brokers operating as independent contractors often rely on FMOs to connect with various carriers. Third-party firms also furnish agents and brokers with needed telephone and computer support services, assist in fielding customer calls and assessing their needs, and develop or license technology such as plan-comparison tools that agents and brokers deploy in the field. Agents and brokers also rely on third-party firms' assistance to help them comply with the complex regulatory web governing Medicare Advantage—including the legion rules and regulations that CMS has established—and obtain necessary licenses, certificates, and training.

32.     None of these services is free, so appropriate payments are vital to the smooth functioning of this system. When carriers contract with firms (such as members of the Council and NABIP–Fort Worth), carriers generally agree to certain payments for the valuable administrative services provided by FMOs, telesales centers, and other similar firms. Those firms must obtain adequate payment to offset their considerable investments in labor, technology, training, oversight, overhead, and other costs. Likewise, agents and brokers may incur costs that are not covered by an employer or FMO, such as travel or venue costs. All of these activities are crucial to the steadily growing MA and Part D markets and all the advantages they provide to beneficiaries.

33.     By law, MA and Part D plans are offered on an annual, calendar-year basis.  Each year, carriers submit "bids" to the government detailing the terms of their plans by the first Monday of June of the year before the bids will take effect (*e.g.*, June 3, 2024 for the 2025 contract year), as required by CMS regulations.  42 C.F.R. §§ 422.254(a)(1), 423.265(b)(1), 423.272(b).  Open enrollment then begins that October (*e.g.*, October 15, 2024 for the 2025 contract year), and plans take effect the following January (*e.g.*, January 1, 2025 for the 2025 contract year).  42 C.F.R. §§ 422.62(a)(2)(iii), 423.38(b)(3); CMS, Medicare Open Enrollment (last visited April 20, 2024), https://tinyurl.com/2u353n9n.  Plans typically negotiate payment terms for agents, brokers, and other third parties prior to the June deadline for bid submission, and carriers continue to execute contracts through June.

**B.      CMS Regulates Compensation For Medicare Advantage And Part D Enrollment Pursuant To The Social Security Act**

34.     The Social Security Act—which governs eligibility for, election of, and enrollment in plans—grants the HHS Secretary limited authority to regulate how carriers compensate agents and brokers for enrolling beneficiaries in MA and Part D plans.  The statute directs the Secretary to "establish limitations with respect to ... [t]he use of compensation other than as provided under guidelines established by the Secretary."  42 U.S.C. § 1395w-21(j)(2)(D).  "Such guidelines," in turn, "shall ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." *Id.*; *see also id.* § 1395w-104(*l*)(2) (incorporating Section 1395w-21(j)(2)(D) by reference into Part D requirements).

35.     CMS has purported to exercise this authority by promulgating elaborate regulations governing agent-and-broker compensation.  The relevant regulations, which are identical in material respects, are codified at 42 C.F.R. § 422.2274 (governing MA organizations) and 42

C.F.R. § 423.2274 (governing Part D sponsors, which can include MA organizations).  For ease of reference, this Complaint generally cites the MA regulations, *e.g.*, 42 C.F.R. § 422.2274, but Plaintiffs' allegations and claims apply equally to the Part D regulations, *e.g.*, *id.* § 423.2274.

36.    CMS's current regulations distinguish between two types of payments, which are subject to different requirements.

37.    For payments for enrollments, the regulations use the term "compensation."  42 C.F.R. § 422.2274(a), (d).  The definition of "compensation" includes payments "relating to the sale or renewal of a plan or product offered by an MA organization," *id.* § 422.2274(a)(i), but "does not include":  (1) "[p]ayment of fees to comply with State appointment laws, training, certification, and testing costs"; (2) "[r]eimbursement for mileage to, and from, appointments with beneficiaries"; and (3) "[r]eimbursement for actual costs associated with beneficiary sales appointments such as venue rent, snacks, and materials," *id.* § 422.2274(a)(ii)(A)-(C).  CMS's longstanding position is that such reimbursements and fees simply "are … not considered compensation."  *Medicare Program Revisions*, 73 Fed. Reg. at 54,239/1.

38.    "Compensation" for enrollments is regulated through strict price caps that dictate the maximum "compensation" plans can pay to "independent agents and brokers."  42 C.F.R. § 422.2274(d)(2)-(3).  The 2024 cap for most markets is $611 per each MA initial enrollment, plus $306 for each year the enrollment is renewed.  *See* 89 Fed. Reg. at 30,621/2.  Carriers may pay compensation "at or below" those rates, 42 C.F.R. § 422.2274(d)(2), meaning the current regulations set a price ceiling but not a price floor.

39.    The regulation does not define the terms "agent," "broker," or "independent agents and brokers."  42 C.F.R. § 422.2274(d).  Carriers have nonetheless historically applied the regulation's price caps equally to all payments for enrollments, whether made directly to

13

individuals who sell health plans to beneficiaries or made to third-party companies that employ or contract with those individuals.

40.     For "[p]ayments other than compensation," the current regulations use the term "administrative payments."   42 C.F.R. § 422.2274(e).   Administrative payments include "payments made for services other than enrollment of beneficiaries (for example, training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments)."   *Id.*

41.     The current regulations do not set specific price caps for administrative payments. Instead, they merely provide that administrative payments "must not exceed the value of those services in the marketplace."  42 C.F.R. § 422.2274(e)(1).  So long as that requirement is satisfied, administrative payments "can be based on enrollment."  *Id.* § 422.2274(e)(2).

## II.     The Compensation Rule

### A.     CMS Hastily Proposes To Subject Administrative Payments To The Regulation's Fixed Fee And To Impose New Restrictions On Contract Terms

42.     CMS issued its Proposal in November 2023.  *Medicare Program; Contract Year 2025 Policy and Technical Changes*, 88 Fed. Reg. 78,476 (Nov. 15, 2023).[3]  The 60-day comment period ran through the middle of the annual enrollment period—one of the busiest times of the year for industry members—and three federal holidays (Thanksgiving, Christmas, and New Years), closing on January 5, 2024.  *Id.* at 78,476/1.  Yet CMS declined multiple requests to extend the comment period by a reasonable amount of time, 89 Fed. Reg. at 30,456/2-3, even as it proposed (sometimes in unclear terms) to overhaul its existing approach to compensation and administrative payments in two principal respects.

---

[3] A copy of the Proposal is attached as Exhibit 3 to this Complaint.  A separate copy excerpting relevant portions of the Proposal is attached as Exhibit 4.

43.   <u>The Fixed Fee</u>:  The Proposal's first change was to expand the current regulation's limits on compensation to include administrative payments that CMS previously did not consider to be compensation.  CMS thus proposed to redefine "compensation" to include all three categories of payments that were previously expressly excluded from the definition of that term: (A) "[p]ayment of fees to comply with State appointment laws, training, certification, and testing costs"; (B) "[r]eimbursement for mileage to, and from, appointments with beneficiaries"; and (C) "[r]eimbursement for actual costs associated with beneficiary sales appointments such as venue rent, snacks, and materials," 88 Fed. Reg. at 78,624/1.  CMS also proposed to include in that definition "[a]ny other payments made to an agent or broker that are tied to enrollment, related to an enrollment in an MA plan or product, or for services conducted as a part of the relationship associated with the enrollment into an MA plan or product."  *Id*.

44.   Additionally, rather than permit administrative payment for these services up to their full "value ... in the marketplace," 42 C.F.R. § 422.2274(e)(1), the proposal specified that "administrative payments" would be "included in the calculation of enrollment-based compensation," and therefore subject to the regulation's fixed dollar-amount limit for each enrollment.  88 Fed. Reg. at 78,624/2.

45.   The regulation also proposed to transform the current *cap* into a *fixed* price by requiring compensation "at" the specified dollar amount, 88 Fed. Reg. at 78,624/1-2, rather than "at or below" that amount as under the current regulations, 42 C.F.R. § 423.2274(e)(2).

46.   CMS's purported justification of the rule rested on three premises:  (1) There has been a "steep increase" in the amounts of administrative payments; (2) "some" plans "may" have used those payments "to circumvent the regulatory limits on enrollment compensation"; and (3) the increase in payment amounts creates "questionable financial incentives" for agents and brokers

that "could" or "may" result in agents and brokers steering individuals toward plans that do not best meet their needs.  88 Fed. Reg. at 78,552/2-3, 78,553/2, 78,555/3.

47.     None of those supposed premises was backed in the Proposal by any proof.  Instead, the Proposal relied primarily on unspecified complaints, reports, and studies that CMS failed to disclose, including:  (1) supposed "complaints" from "State partners, beneficiary advocacy organizations, and MA plans" about the levels of agent and broker compensation; (2) alleged "reports that some larger FMOs are more likely to contract with large national plans rather than smaller regional plans"; and (3) "market surveys and information gleaned from oversight activities" supposedly showing that payments "for training and testing and other administrative tasks for agents and brokers selling some MA plans seem to significantly outpace payments for similar activities made by other MA plans."  88 Fed. Reg. at 78,552/2, 78,553/2, 78,555/3.  For other assertions—like CMS's premise that administrative payments "appear to be increasing"— CMS cited no support whatsoever.  *Id.* at 78,477/3.  And in the handful of instances where CMS did cite and disclose evidence, it was unreliable.  Indeed, the principal authority CMS actually disclosed in the Proposal—a research article by the Commonwealth Fund—relied mainly on personal anecdotes from a survey of just 29 agents and brokers and an inapt comparison between MA plans to Medigap plans.  88 Fed. Reg. 78,554/1 & nn.136-37, 78,555 n.140; *see* CMC Comment Letter at 27-28.  Likewise, CMS repeatedly asserted that "beneficiary" complaints about agents and brokers had increased based on data from a cherrypicked and outdated period—2020 to 2021, 88 Fed. Reg. at 78,552/3, in the middle of the COVID-19 pandemic—without disclosing any complaint data; considering more recent, available data; analyzing broader trends over time; or accounting for other context that might have contributed to the complaints.  CMC Comment Letter at 28-30.

48.     To account for the cost of the administrative services that would now be included in the limitation on compensation, CMS purported to raise the limit by $31 per initial MA enrollment.  88 Fed. Reg. at 78,556/2-3.  CMS acknowledged that it based the $31 increase on its examination of only three particular services (training, testing, and recording services), which it picked because the fees for those services are easy to quantify.  *Id.* at 78,596/2.  CMS proposed to eliminate *all* reimbursement for the numerous other costs that third-party firms incur to provide administrative services necessary for enrollment—including "customer service" and "operational overhead" costs acknowledged in the current regulations, 42 C.F.R. § 422.2274(e)(1), as well as technology, hardware and software, customer relationship management systems, agent recruitment, agent management, marketing, quality assurance, and data security, CMC Comment Letter at 40-43; NABIP Comment Letter at 5-7.  Even as to the three services that CMS considered, moreover, CMS understated the cost of service because it ignored other costs associated with those services, such as purchasing equipment to record calls or obtaining state licenses that CMS acknowledges are mandatory.  CMC Comment Letter at 44-45.

49.     As in the current regulation, CMS proposed to apply its amended price restriction only to "independent agents and brokers."   422 C.F.R.  § 422.2274(d)  (stating that the "compensation requirements only apply to independent agents and brokers"); *see* 88 Fed. Reg. at 78,624/2 (not proposing to amend the applicability of current § 422.2274(d)).  But as before, CMS did not define "agent," "broker," or "independent agents and brokers," and did not specify whether the Fixed Fee would apply only to payments made directly to individual agents or brokers, or whether it would apply also to payments to firms that employ or contract with those individuals.

50.     The Contract-Terms Restriction:  The Proposal also introduced vague new restrictions on plans' contracts with agents, brokers, and third-party marketing organizations.  88

Fed. Reg. at 78,624/2.  Specifically, CMS proposed to require MA organizations to "[e]nsure that no provision of a contract with an agent, broker, or other [third-party marketing organization] has a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary."  *Id.*

51.     To give content to this otherwise vague requirement, CMS provided several "[e]xamples of" contract terms that it intended to prohibit.  88 Fed. Reg. at 78,554/3.  These examples generally targeted contract terms that might serve as workarounds to existing compensation requirements, such as contract terms that "provide for bonuses or additional payments from an MA organization[n] to an FMO *with the explicit or implicit understanding that the money be passed on to agents or brokers* based on enrollment volume in plans sponsored by that MA organization[n]."  *Id.* (emphasis added).  Nowhere did CMS suggest, however, that it understood the proposed Contract-Terms Restriction to rewrite broadly how plans calculate and structure administrative payments to firms.

52.     <u>Effective Date</u>:  CMS proposed to make its Fixed Fee and Contract-Terms Restriction applicable "beginning in contract year 2025."  88 Fed. Reg. at 78,554/3 (Contract-Terms Restriction); 78,624/2 (Fixed Fee).  But that proposal left ambiguous how it would apply to administrative payments that carriers agreed *before 2025* to pay but are *in fact paid* in 2025 (*e.g.*, a contractual agreement executed in June 2024 for payments in January 2025).  The proposal also left unclear whether the provisions would apply to plans executed in *calendar year 2024* for *contract year* 2025, or only to plans executed in calendar year 2025 for contract year 2025 or later.

18

**B.**     **Commenters Strenuously Object To The Amended Fixed Fee And Contract-Terms Restriction, Raising Concerns That The Proposed Rule Is Vague And Unsupported, Exceeds CMS's Authority, And Will Have Devastating Effects On The Industry And The Beneficiaries It Serves**

53.     In response to the Proposal, commenters, including the Council and NABIP, raised a comprehensive set of objections.  CMC Comment Letter at 1-53; NABIP Comment Letter at 1-13.

54.     Most fundamentally, commenters emphasized that if applied not only to individual agents and brokers but also to third-party firms that employ or contract with those individuals, the Proposal would inflict devastating harms on firms, brokerages, and individual agents and brokers—including the Council and NABIP–Fort Worth members—and, in turn, harm beneficiaries.  By effectively barring carriers from paying fair-market value for the administrative services that firms provide, the Proposal would eliminate a significant percentage of firms' business—for some firms, more than one-third of their total revenue (not profit).  CMC Comment Letter at 45; *see also* NABIP Comment Letter at 7-8 (explaining that carriers typically pay NABIP member FMOs "between $200 and $300 per beneficiary" for administrative services).  With their revenue streams drying up, many firms would be forced to either curtail the essential services they provide or exit the MA industry entirely.  CMC Comment Letter at 2, 45.  Fewer firms and fewer administrative services, in turn, would mean fewer resources for individual agents, brokers, and small brokers, such as Vogue and other NABIP–Fort Worth members.  Some of the administrative services currently provided by third-party firms would be moved in-house and provided by carriers, which would make it more difficult for individual agents and brokers to represent multiple carriers' plans.  NABIP Comment Letter at 8.  Other administrative services simply would not be provided at all.  All of that, in turn, would undercut beneficiaries' access to robust plan options.  CMC Comment Letter at 46; NABIP Comment Letter at 4, 8.  The Proposal thus posed an

19

existential threat to a large and critical segment of the agent-and-broker industry that has played a direct role in MA's remarkable success.

55.     As to the proposed Fixed Fee, the Council first asked CMS to clarify several aspects of the proposal, including:  (1) whether the Fixed Fee would apply to plans' payments to Council members and other third-party firms, or whether it was limited solely to plans' payments to *individual* agents and brokers; and (2) whether the proposal would apply to contracts and plans executed in calendar 2024 for contract year 2025, or only to contracts and plans executed in calendar year 2025 for contract year 2025 or later.  CMC Comment Letter at 12-16.

56.     The Council and other commenters then identified several flaws in the Fixed Fee proposal, including that:  (1) the Fixed Fee exceeded CMS's statutory authority because it went beyond regulation of the "use of compensation," 42 U.S.C. § 1395w-21(j)(2)(D); *see* CMC Comment Letter at 16-22, 51-53; (2) CMS had failed to adequately study the purported problem, CMC Comment Letter at 23-24; (3) CMS failed to disclose the evidentiary basis for its premises and subject them to public comment, *id.* at 24-27; (4) CMS failed to substantiate its concerns about administrative payments with reliable or relevant evidence, *id.* at 27-40; (5) CMS's proposal to raise the compensation limit by just $31 per initial enrollment arbitrarily excluded numerous vital administrative services and undervalued even those few services that CMS had included, *id.* at 40-44; and (6) because industry participants could not reasonably be expected to continue providing vital administrative services at a loss, the Proposed Rule could be a death knell for a vital segment of the MA and Part D industry and could reduce rather than enhance choice for beneficiaries, *id.* at 45-48; *see also* NABIP Comment Letter at 5-10.

57.     Commenters recommended that CMS either abandon the proposal, extend the comment period and further study the problem, or consider more modest alternatives to the Fixed

Fee, including:  (1) enforcing existing rules that prevent consumer confusion and prohibit administrative payments that exceed fair-market value; (2) adopting a tailored solution targeting specific practices; or (3) at a minimum, increasing the compensation limit to reflect the fair-market value of all administrative services.  CMC Comment Letter at 48-51; *see also* NABIP Comment Letter at 3, 8.

58.    Commenters further explained that the proposed Contract-Terms Restriction was flawed for many of the same reasons as the proposed Fixed Fee, as well as because the Proposal included impermissibly vague language that would chill industry participants' ability to provide legitimate services for legitimate payments, and would raise constitutional due process and fair notice problems.  CMC Comment Letter at 51-53; NABIP Comment Letter at 3.

59.    Many commenters, including other third-party firms and plans, voiced similar concerns about both the Fixed Fee and the Contract-Terms Restriction.  *See, e.g.*, Greenberg Traurig Comment Letter (Jan. 5, 2024), www.regulations.gov/comment/CMS-2023-0187-3036; SelectQuote Comment Letter at 4 (Jan. 5, 2024), www.regulations.gov/comment/CMS-2023-0187-3027; BlueCross BlueShield Association Comment Letter at 17 (Dec. 22, 2023), www.regulations.gov/comment/CMS-2023-0187-2493.

### C.    CMS Promulgates The Rule Virtually Without Change

60.    Despite commenters' objections, CMS finalized the Rule largely as-is.

61.    First, CMS carried forward its Fixed Fee proposal to fundamentally redefine "compensation" to include both remuneration and administrative payments.  89 Fed. Reg. at 30,829/1, 3 (§ 422.2274(a), (e)); *see also id.* at 30,622/1-2.  Compensation, as newly defined, would also be subject to a "uniform" standard, and plans could neither pay above or below that prescribed amount.  *Id.* at 30,623/2.  As support for the Fixed Fee, CMS continued to rely on the same premises backed only by the same unspecified "complaints," "reports," "market surveys,"

"information gleaned from oversight activities," and outdated data regarding beneficiary complaints that CMS had failed to disclose in the Proposal, and still failed to disclose in the Final Rule—as well as the same flawed Commonwealth Fund article cited in the Proposal.  *Id.* at 30,617/3, 30,618/1, 30,619/3 n.154, 30,617/3, 30,618/3.

62.   CMS made only one change to the Fixed Fee:  It increased the compensation limit by $100 per initial enrollee, rather than, as proposed, by $31.  89 Fed. Reg. at 30,626/2.  CMS's only justification for choosing its new number of $100 was that an unspecified group of commenters "suggested" that $100 "would be an appropriate starting point and reflects the minimum monthly costs of necessary licensing and technology costs."  *Id.* at 30,626/1.  But CMS never explained whether those commenters' position was reasonable or supported by data.  Instead, CMS "believe[d]" that the $100 increase would "provide agents and brokers with sufficient funds ... to continue providing adequate service to Medicare beneficiaries."  *Id.* at 30,626/2-3.

63.   Meanwhile, CMS did little to dispel the ambiguity that commenters, including the Council, had flagged about the Fixed Fee's scope.  The Fixed Fee leaves in place the current regulatory provision specifying that CMS's "compensation requirements only apply to independent agents and brokers," 42 C.F.R. § 422.2274(d); *see* 89 Fed. Reg. at 30,829/1-3.  But the Final Rule still does not define "agent," "broker," or "independent agents and brokers," leaving uncertain whether those terms include firms like the Council members, and NABIP–Fort Worth's FMO members, that employ or contract with individual agents and brokers.  CMS's preamble to the Rule does not resolve the uncertainty.  CMS stated that the Fixed Fee is "limited to independent agents and brokers" rather than Third Party Marketing Organizations ("TPMOs") "more generally."  89 Fed. Reg. at 30,626/1.  But on the other hand, CMS stated that the Fixed Fee does not limit payments "to a TPMO who is not an independent agent or broker for activities that are

not undertaken as part of an enrollment by an independent agent or broker," *id.* at 30,626/1-2, suggesting that some of those third party marketing organizations might qualify as "independent agents or brokers" who are subject to the rule, and that CMS might later attempt to apply the Fixed Fee to those TPMOs or to payments for administrative services made "as part of an enrollment." *Id*.

64.     CMS also finalized the Contract-Terms Restriction as proposed without any change to the proposed regulatory text.  89 Fed. Reg. at 30,829/2 (§ 422.2274(c)(13)); *see also id.* at 572. But CMS expanded the examples of prohibited contract terms included in the preamble to the Proposal.  For example, the Proposal suggested that CMS planned to prohibit contract terms that plans might use to end-run existing compensation restrictions on agents and brokers, such as "terms that provide for bonuses or additional payments from an MA organizations to an FMO *with the explicit or implicit understanding that the money be passed on to agents or brokers* based on enrollment volume."  88 Fed. Reg. at 78,554/3 (emphasis added).  But in the preamble to the Final Rule, CMS took a much broader approach, stating that "bonuses for hitting volume-based targets for sales of a plan" would "likely run afoul" of the Contract-Terms Restriction.  89 Fed. Reg. at 30,621/1.  The Rule thus targets plans' volume-based bonuses *to firms* generally, even when those firms do *not* pass them through to individual agents or brokers.

65.     The Rule applies beginning with contract year 2025 (*i.e.*, January 1, 2025).  89 Fed. Reg. at 30,621/3.  As CMS admitted, that is a "narrow timeline between finalization of this rule and the time at which" agents and brokers begin preparing for contract year 2025, which CMS asserted is October 1, 2024.  *Id.*; *see also id.* at 30,623/1-2.  Yet CMS failed to clarify the Rule's application to arrangements that predate October 2024 but relate to the 2025 contract year.  CMS stated that "existing" requirements "will continue to apply" before October 1, 2024—"meaning

that ... arrangements between MAOs and TPMOs or agents that are not in compliance with our proposals will not be subject to remedial action for activities engaged in before October 1, 2024, even if they were related to 2025 contract year plans." *Id.* at 30,621/3. CMS did not expressly clarify whether that means, for example, that contracts executed *before* October 1, 2024, and providing for administrative payments to be paid *during or after* contract year 2025, would be permissible or, rather, subject to remedial action.

### III.    The Compensation Rule Is Unlawful And Should Be Set Aside

66.    The Compensation Rule's Fixed Fee and the Contract-Terms Restriction—as well as the January 1, 2025, effective date for those provisions—should all be set aside because they are unlawful and contravene the Administrative Procedure Act in multiple ways.

### A.    The Rule's Fixed Fee Is Contrary To Law And Violates the Administrative Procedure Act

67.    The Fixed Fee is unlawful. It is unclear in its application; exceeds CMS's statutory authority; is infected by several procedural errors; and is arbitrary and capricious for multiple reasons.

#### 1.    The Fixed Fee Is Arbitrary And Capricious Because CMS Failed To Clarify Whether It Applies To Firms Or Only To Individuals

68.    At the threshold, the Fixed Fee provision is flawed because CMS failed to adequately respond to the Council's request that CMS clarify whether the provision applies to firms. The Compensation Rule amends the definition of "compensation" in 42 C.F.R. § 422.2274(a), and the provisions capping compensation for enrollments and renewals, *id.* § 422.2274(d)(2)-(3), but leaves in place the current provision specifying that these "compensation requirements only apply to independent agents and brokers," *id.* § 422.2274(d). However, the Final Rule does not define "agent," "broker," or "independent agents and brokers," leaving

uncertain whether those terms include firms like the Council's members and NABIP–Fort Worth's members that employ or contract with individual agents and brokers.

69.     The regulation's text suggests that it might not apply to firms.  A separate provision of the regulation that the Compensation Rule did not change specifies that MA organizations may "only pay agents or brokers who meet the requirements in [§ 422.2274](b)," which enumerates licensing and testing requirements that only *individuals* can meet.  42 C.F.R. § 422.2274(b)(1)-(3), (d)(1)(i).  Despite this provision, however, carriers historically have applied the regulation's price caps equally to all payments for enrollments, whether made to individuals directly or to third-party companies that employ or contract with those individuals.  If the current regulation can be applied to firms, there is nothing in the operative provisions of the Compensation Rule that would alter that result.

70.     This lingering uncertainty is untenable for firms, including member firms of the Council and NABIP–Fort Worth that are hurtling toward the 2025 contract year without an understanding of what administrative payments they may lawfully receive from carriers.  And this uncertainty is existential.  If the Fixed Fee applies to firms, they will no longer be paid for many of their administrative services.  Many firms are already losing money on an annual basis, and the Fixed Fee would eliminate a significant revenue stream—in some cases, more than one-third of revenue (not profit).  CMC Comment Letter at 45.

71.     Given the potentially devastating impact of the Rule on firms, the Council asked CMS to "make its intent clearer."  CMC Comment Letter at 14.  Yet CMS failed to make any corresponding change to *the Rule* to clarify whether it applies to firms.  CMS instead included vague language in *the preamble* that "this proposal, and all agent broker compensation rules at § 422.2274(d) are limited to independent agents and brokers, and do not extend to TPMOs more

generally." 89 Fed. Reg. at 30,626/1. From a distance, CMS's statement suggests that remuneration and administrative payments from plans to firms are not subject to the Fixed Fee. But CMS's one-paragraph response (couched in a mere preamble that is not codified) is cold comfort. Existing regulations define third-party marketing organizations ("TPMOs") to mean "**organizations** and individuals, including independent agents and brokers, who are compensated to perform lead generation, marketing, sales, and enrollment related functions as a part of the chain of enrollment." 42 C.F.R. § 422.2260. So when the Rule says that CMS's policy does not limit payments "from an MAO to a TPMO who is not an independent agent or broker for activities that are not undertaken as part of an enrollment by an independent agent or broker," 89 Fed. Reg. at 30,626/1, one potential implication is that the Rule *does* limit payments from a plan to TPMOs engaged in enrollment activities or non-TPMO firms.

72.    CMS's refusal to clarify the Rule's scope is arbitrary and capricious, and grounds to hold unlawful and set aside the Fixed Fee. At a minimum, the Court should declare that the Fixed Fee does *not* affect carriers' ability to make payments to FMOs, telesales companies, and other third-party entities (whether licensed or unlicensed), as Plaintiffs believe was CMS's intent. *See* 28 U.S.C. § 2201 (authorizing courts to "declare the rights and other legal relations of any interested party").

### 2.    The Fixed Fee Exceeds CMS's Statutory Authority

73.    The Fixed Fee also exceeds CMS's statutory authority in three ways.

74.    *First*, CMS lacks authority to fix the amounts of compensation that carriers pay to agents and brokers. Because rate regulation is a controversial and complex process, Congress confers ratemaking authority expressly when it intends to do so. But here, Congress simply instructed the Secretary to regulate "the *use* of compensation" to ensure that compensation is used to "creat[e] incentives for agents and brokers to enroll individuals in the Medicare Advantage plan

that is intended to best meet their health care needs."  42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added).  CMS therefore has statutory authority to regulate how compensation is "use[d]"—not to regulate the *amount* of compensation provided.  *Id.*

75.    This understanding is informed by CMS's first agent-broker compensation rule, which established "guidelines specifying how compensation is disbursed ... and what qualifies as compensation," but *declined* to set "specific dollar values" on the *rate* of compensation.  *Medicare Program Revisions*, 73 Fed. Reg. at 54,239/1.  CMS had it right then, and is wrong now.

76.    *Second*, the amended Fixed Fee exceeds CMS's statutory authority because it purports to treat payments for "mileage," "actual costs," state-certification costs, and other administrative payments as "compensation."  89 Fed. Reg. at 30,829/1-2 (§ 422.2274(a)(E)-(H)).  Compensation typically refers to a payment for services, not a reimbursement for costs incurred in rendering that service (such as "actual costs" the broker incurs, state certification fees, or overhead).

77.    Here again, CMS's approach is an about-face from its own longstanding understanding of the term "compensation."   When CMS first determined "what qualifies as compensation," it agreed that reimbursements and fees simply "are … not considered compensation."  *Medicare Program Revisions*, 73 Fed. Reg. at 54,239/1.  And when CMS added the operative provision about administrative payments, it agreed that an administrative payment is a payment "*other than compensation* because the payment is not for the sale or renewal of a policy."  86 Fed. Reg. at 5,993/3-94/1 (emphasis added).

78.    *Third*, at a minimum, "compensation" does not include payments *to firms*.  Compensation is typically understood to include payments *to individuals*, such as a salary and bonuses (and, perhaps, other payments).  The statute tracks that basic distinction: Guidelines about

"the use of compensation" should "creat[e] incentives *for agents and brokers*" to enroll beneficiaries in appropriate plans. 42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added).

### 3.      CMS's Rulemaking Process Was Procedurally Flawed

79.      CMS's rulemaking bore all the hallmarks of a rush to implement a predetermined result, regardless of the merits, commenters' objections, or the evidence in the record. *See supra* ¶¶ 42-65. The Rule therefore falls short of the APA's requirements in multiple, independent ways.

80.      *First*, CMS failed to disclose in its proposal and subject to public scrutiny during the comment period—or even in the Final Rule—any of the supposed "complaints," "reports," "market surveys," "information gleaned from oversight activities," and data regarding beneficiary complaints underlying the purported premises of the Fixed Fee. 89 Fed. Reg. at 30,617/3, 30,618/1, 30,619/3 n.154, 30,617/3, 30,618/3. CMS's failure "to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary" undermines the notice-and-comment process and is therefore a "serious procedural error" under the APA. *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007); *see* 5 U.S.C. § 553(b)-(c) (an agency's rulemaking process must give "interested persons an opportunity to participate").

81.      *Second*, CMS repeatedly posits numerous key assumptions without citing or even mentioning any supporting evidence. For example, CMS "believe[s]" that contracts between FMOs and MA plans "can trickle down to influence agents and brokers." 89 Fed. Reg at 30,620/1. But CMS did not cite any data supporting that belief. Either CMS had evidence (and improperly failed to disclose it), or—more likely—lacked evidence (and improperly failed to substantiate its Rule).

82.      *Third*, and relatedly, CMS failed adequately to analyze the Rule's impact. CMS openly conceded, for example, that it "lacked the data" to quantify the Rule's "economic effects" on the industry. 88 Fed. Reg. at 78,610/3-11/1. And even after commenters informed CMS that

28

the Rule would put "long-term profitability for current business models even further out of reach" in a vital segment of the industry, CMC Comment Letter at 45; *see also* NABIP Comment Letter at 7-8, CMS never even attempted to quantify or study adequately the financial consequences of its Rule.

83.     *Fourth*, in the handful of instances where CMS *does* cite and disclose evidence, it is impressionistic and unreliable.  For example, the Rule repeatedly cites a "research articl[e]" from the Commonwealth Fund.  89 Fed. Reg at 30,619/3 & nn.154-55, 30,622/2 n.157.  But that article inaptly compared commissions in MA plans to commissions in Medigap plans and, in any event, unreliably collected anecdotes from just 29 agents and brokers.  Additionally, CMS asserts that "complaints" about the enrollment process have increased in recent years.  *Id.* at 30,618/1.  But CMS failed to examine whether these complaints were well-founded, whether factors other than purported administrative payment increases caused them, or whether the data on which it relied was representative.  And CMS failed to respond to the commenters' criticisms of this evidence, or to contrary evidence presented by commenters.  The Rule, in short, was not the sort of science- and evidence-based decisionmaking that is the proper domain of a federal agency regulating millions of health care plans.

### 4.     The Fixed Fee Is Arbitrary And Capricious

84.     The Fixed Fee is also substantively flawed because CMS failed to engage in the reasoned decisionmaking required by the APA.

85.     *First*, even if CMS had statutory authority to promulgate the Fixed Fee, CMS's new reading of "compensation" is an unexplained change in agency position that undermines Plaintiffs' reliance interests on CMS's prior interpretation.  For fifteen years, companies—Council and NABIP–Fort Worth members included—structured their contracts with carriers, secured loans, and even based their initial public offerings on the understanding that expenses and administrative

payments are not "compensation" subject to restrictive caps, but instead are other payments that can be recouped at market rates. Those reliance interests were built in part on CMS's rules confirming that administrative payments and reimbursements are "not considered compensation" or are payments "other than compensation." 73 Fed. Reg. at 54,239/1; 86 Fed. Reg. at 5,993/3-94/1; *see supra* ¶¶ 2, 37, 77. In the Final Rule, CMS did not display awareness that it was changing its position regarding the meaning of the term "compensation," did not explain reasonably why it believed its new interpretation of that term was permissible under the statute, did not provide good reasons for its new policy, did not address the reliance interests engendered by its current system that allows administrative payments and reimbursements up to fair-market value, and did not take into account the devastating economic consequences of undermining those reliance interests. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

86.     *Second*, the Rule is a solution in search of a problem. CMS asserts that the Rule is necessary because: (1) it "appear[s]" that administrative payments are "increasing," 89 Fed. Reg. at 30,449/3; (2) some plans "may have used" those payments to "circumvent" existing regulatory limits on enrollment compensation, *id.* at 30,622/3; and (3) the increase in payments creates "questionable financial incentives" for agents and brokers, *id.* at 30,618/1.

87.     Yet CMS has not adequately supported any of these premises. In practice, administrative payments are not steeply increasing—and to the extent they've risen at all, it's because of a series of recent CMS rules imposing more labor-intensive and costly requirements on firms. CMC Comment Letter at 31-33. Moreover, carriers' administrative payments to firms reflect genuine services for genuine value. In fact, administrative payments cannot be used to "circumvent" existing rules on agent and broker compensation, 89 Fed. Reg. at 30,449/3, 30,622/2-3, 30,623/1, because administrative payments "must not exceed the value of those services in the

30

marketplace," 42 C.F.R. § 422.2274(e)(1).  And as a real-world matter, administrative payments to firms do not create "questionable financial incentives" for agents and brokers.  89 Fed. Reg. at 30,618/1.  Council and NABIP–Fort Worth members, for example, make significant upfront expenditures to enroll a beneficiary that are not worth it financially unless the beneficiary remains a long-term customer—so they have every reason to offer a diverse array of plans to a beneficiary and to enroll individuals in the specific health plan that best meets their needs.  CMC Comment Letter at 35-38.  When CMS decided to stray well outside the core of its statutory mandate to regulate the use of compensation to create financial incentives for *individual* "agents and brokers," 42 U.S.C. § 1395w-21(j)(2)(D), by regulating payments to *firms*, it needed to provide clear evidence that those payments actually affected agents' and brokers' incentives.

88.     Given the reality of these market forces, CMS can only speculate that increases in administrative payments "are likely to influence which MA plan an agent encourages a beneficiary to select," 89 Fed. Reg. at 30,618/1, or that "it is likely that" paying FMOs for leads and for enrollments is "having th[e] effect" of influencing agents or brokers, *id.* at 30,620/1.  In turn, CMS can only guess whether its Rule will even accomplish its aims.  CMS "believe[s]" that by making compensation amounts universal, "agents and brokers will *hopefully* be free from undue influence to enroll beneficiaries in one plan over another."  89 Fed. Reg. at 30,623/2 (emphasis added).  Hopes and dreams are not the stuff of reasoned decisionmaking.

89.     *Third*, CMS grounds its rule on improper considerations that the Rule will not achieve.  CMS claims that the Rule promotes "competition and consumer choice," consistent with the current Administration's "policy goals," by establishing a "[l]evel playing field" among large and small plans.  89 Fed. Reg. at 30,618/3, 30,619/1.  However laudable that objective might be in other contexts, it is not a proper consideration here.  Congress gave CMS one goal:  to "creat[e]

incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). That provision says nothing about government-mandated parity between large carriers and small carriers.

90.     In any event, the Rule is anticompetitive. As things stand, plan carriers compete by offering different administrative payments for services—up to fair-market value. 42 C.F.R. § 422.2274(e). Conversely, firms compete by providing the best services at the most reasonable prices. The Rule's decision to prescribe a "universal" compensation amount, 89 Fed. Reg. at 30,623/2, places an artificial ceiling and floor on plans that neuters, rather than promotes, competition. Price-fixing is not competition.

91.     *Fourth*, the Rule arbitrarily raises the compensation limit by $100 per initial enrollee. CMS acknowledged that the $31 increase it originally proposed was "too low." 89 Fed. Reg. at 30,625/3. But it offered no evidentiary basis for concluding that $100 was adequate either. Rather than engage in the rigorous analysis that is required in the rare instances where Congress authorizes an agency to engage in price setting, CMS acknowledged that it would be "extremely difficult" to "accurately capture" these costs, *id.* at 30,625/3, so it arbitrarily picked $100 simply because "[s]everal commenters" had "suggested" that number as a "starting" point, *id.* at 30,626/1. Yet CMS never identified the comments on which it was relying, cited any evidence or analysis from those comments supporting a $100 increase, nor assessed which competing recommendations most reflected real-world costs. Nor did it subject those comments recommending a $100 increase to any scrutiny. Put simply, CMS never did the careful analysis that a federal agency with ratemaking authority is required to conduct when it sets prices. CMS's arbitrary choice between commenters' recommendations was not reasoned decisionmaking.

92.     *Fifth*, CMS failed adequately to consider the Fixed Fee's devastating impact on the industry and on beneficiary choice.  In the Proposal, CMS conceded that it "lack[ed] the data to quantify th[e] effects" on agents, brokers, plans, Medicare beneficiaries, and firms.  88 Fed. Reg. at 78,610/3.  Although CMS did not dispute commenters who pointed out the "lack of any cost analysis," CMS scored the Rule "as having no cost" impact and no "adverse effect, either on TMPOs, FMOs, or independent brokers."  89 Fed. Reg. at 30,802/1.  CMS's sole rationale was that the Rule "transfers funds currently being allocated to administrative [payments] to compensation in a transparent and uniform manner."  *Id.*  But that is false.  The entire rationale for the Rule was to limit payments that CMS claimed (without justification) were excessive and distorting the system.  It cannot then claim, when addressing this economic impact, that funds are merely being "transfer[red]."  The Rule would wipe out firms' revenue streams by undervaluing the services CMS purported to account for.  CMC Comment Letter at 45; NABIP Comment Letter at 4.  Many firms would go out of business or scale back the valuable services they provide.  CMC Comment Letter at 45; NABIP Comment Letter at 4.  Companies like Vogue would be unable to afford or perform those administrative services in the vacuum left by firms.  Individual agents and brokers, similarly, would be unable to perform those administrative services for themselves.  In turn, beneficiaries would suffer because firms, agents, and brokers would have fewer resources to offer them robust plan options and support for choosing the right plan.  CMC Comment Letter at 46.  So CMS was wrong to pretend that it was simply re-labeling fungible money.  At a minimum, CMS's concession that it lacked the data required to quantify the Rule's effects based on evidence, rather than supposition, is an independent error.

93.     *Sixth*, CMS had no need to go as far as it did because there were obvious, viable alternatives.  CMC Comment Letter at 48-51.  For example, CMS expressed concerns about

beneficiaries being "confused" while talking to agents or brokers.  89 Fed. Reg. at 30,618/1.  But existing regulations prohibit plans from engaging in activities that "confuse" beneficiaries.  42 C.F.R. § 422.2262(a).  CMS could simply enforce those and other recently promulgated regulations designed to prevent beneficiary confusion.  Similarly, to the extent CMS has concerns about specific practices used to circumvent the compensation limits—such as "golf parties, trips, and extra cash" paid to agents in exchange for enrollments, 89 Fed. Reg. at 30,617/3—CMS could simply enforce its current regulations, which already count "bonuses," "gifts," and "prizes or awards" as compensation, 42 C.F.R. § 422.2274(a)(i)(B)-(D).

94.    CMS acknowledged these alternatives and stated it would "consider" them as grounds for *additional* regulations in "future rulemaking."  89 Fed. Reg. at 30,626/3.  But CMS never considered these options in the manner they were offered: as *alternatives* to proceeding with the flawed Fixed Fee.

95.    *Seventh*, CMS repeatedly declined even to engage with comments pointing out the Proposal's many flaws.  For example, the Council explained that CMS should not move forward without disclosing the evidence and information on which the Rule rests and supporting its key assumptions with evidence.  CMC Comment Letter at 22-30; *see supra* ¶ 56.  The Rule does not acknowledge these concerns or explain why they were not justified.  Similarly, the Council pointed out that CMS's reasons for its Proposal rested on speculation and were in fact undermined by record evidence.  CMC Comment Letter at 31-37.  The Rule does not address these concerns or the evidence that the Council and other commenters brought to the agency's attention.  CMS's failure to respond to these comments violated the APA.

**B.    The Rule's Contract-Terms Restriction Is Unlawful**

96.    The Compensation Rule's Contract-Terms Restriction separately prohibits contracts that have the "direct or indirect effect of creating … incentive[s] that would reasonably

be expected to inhibit an agent or broker's ability to objectively assess and recommend [health] plan[s]." 89 Fed. Reg. at 30,829/2 (§ 422.2274(c)(13)).  Several of the flaws described above apply with equal force here and justify vacatur of the Contract-Terms Restriction, including: CMS's failure to comply with the APA's notice-and-comment and other procedural requirements; its failure to substantiate its concerns; its improper competition-based theory; its failure to consider the Rule's effect on the industry, including firms that provide administrative services (including Council members and NABIP–Fort Worth's FMO members) and the brokerages and individual agents and brokers that rely on those services (including Vogue and NABIP–Fort Worth's other members); its failure to consider reasonable alternatives; and its failure to address substantial comments.  *See supra* ¶¶ 80-95.

97.    There are also several additional flaws specific to the Contract-Terms Restriction. Each independently requires vacatur.

98.    *First*, the Contract-Terms Restriction exceeds CMS's statutory authority to regulate the "use" of "compensation."  42 U.S.C. § 1395w-21(j)(2)(D).  Like the Fixed Fee, applying the Contract-Terms Restrictions to administrative payments exceeds CMS's authority because those payments are not "compensation" under the ordinary meaning of that term.  *See supra* ¶¶ 76-77. But the Contract-Terms Restriction also sweeps in contractual provisions that are not related to payment at all.  If, for example, a contract's duration or notice-of-termination provisions were deemed to have an impermissible effect for *any* reason, those provisions would apparently be unlawful—even though they have nothing to do with the compensation of agents or brokers for enrolling an individual in Medicare Advantage.

99.    *Second*, the Contract-Terms Restriction is impermissibly vague on its face, and CMS's attempt to clarify it in the preamble to the Final Rule is insufficient (and came too late) to

save it. A "vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). The Rule's Contract-Terms Restriction is so broad, so open-ended, that it violates due process. The Rule would prohibit any contract term that "has a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." 89 Fed. Reg. at 30,829/2 (§ 422.2274(c)(13)). That text produces only confusion. Are *non-financial* incentives covered? Is *any* inhibition sufficient to trigger this prohibition, or only inhibitions material enough to change a beneficiary's choice of health plan? And just how indirect can effects be? It will be impossible for plans, third-party firms, agents, and brokers to settle upon a single understanding of what makes a contract impermissible. That will chill many legitimate business practices.

100.    CMS recognized the "importan[ce]" of a "clear" Contract-Terms Restriction. 89 Fed. Reg. at 30,620/3. So it attempted to backfill the regulation, providing in the Rule's preamble "example[s]" of contract terms that "would likely violate" the Rule. *Id.* at 30,620/3-21/1. But CMS did not codify these examples in the regulatory text, so they are not binding law. The operative language remains the vague standard that CMS tacitly recognized cannot be discerned. Moreover, CMS hedged even as to the examples it gave, stating only that the identified practices would "likely"—not *certainly*—violate the Rule, and adding that everything "depend[ed] on the facts and circumstances." *Id.* Accordingly, the Contract-Terms Restriction is too vague to satisfy due process rights. It is therefore "contrary to constitutional right," 5 U.S.C. § 706(2)(B), and "not in accordance with law," *id.* § 706(2)(A).

101.    *Third*, to the extent CMS's examples of "likely" unlawful contract terms are relevant, the Rule is not a "logical outgrowth" of the Proposal. *Texas Ass'n of Mfrs. v. CPSC*, 989 F.3d 368, 382 (5th Cir. 2021). Even if there is no "substantive change in the text of the Proposed

Rule and the Final Rule," an agency violates the logical outgrowth requirement where, for example, there is a "change in the justification for" the proposal and the final rule. *Id.*

102.    Most egregiously, CMS's Proposal suggested that it was considering limiting volume-based bonuses, but only if plans used them to end-run existing compensation restrictions on agents and brokers by agreeing "that the money be passed on to agents or brokers based on enrollment volume." 88 Fed. Reg. at 78,554/3. The Rule pivoted sharply. Now, all "bonuses for hitting volume-based targets for sales of a plan" would "likely run afoul" of the Contract-Terms Restriction. 89 Fed. Reg. at 30,621/1. Without the pass-through qualifier, the Rule bans such bonuses wholesale. Because of that change, the Rule's broad prohibition is not "alike in kind" to the Proposal's modest statement, and Plaintiffs were prejudiced because they had no reason to "comment on the expanded rule." *Mock v. Garland,* 75 F.4th 563, 584, 586 (5th Cir. 2023).

103.    CMS cannot have it both ways. The APA does not allow an agency to propose a vague, open-ended rule and then try to clarify it by surprising the public with non-binding examples that commenters never had the chance to address in their submissions to the agency.

104.    *Fourth*, the Contract-Terms Restriction is arbitrary and capricious. As an initial matter, the Contract-Terms Prohibition is unnecessary and purports to respond to problems that CMS never shows exist. Among other contract terms, CMS targets volume-based bonuses. *See* 89 Fed. Reg. at 30,621/1. It does so because, in CMS's view, "volume-based bonuses" would "*likely* have the indirect effect of creating an incentive for the TPMO to prioritize sales of one plan over another based on those financial incentives and not the best interests of the enrollees." *Id.* (emphasis added). But CMS does not adequately substantiate that concern. CMS never attempts to analyze whether volume-based bonuses are widespread, whether they materially influence firms or agents, and whether that influence is good or bad. Without answering those questions, CMS

37

has no idea whether those terms cause third-party entities to prioritize some plans over others. Because CMS has not shown that volume-based bonuses are "genuine problems," there is "no rational basis" for the Rule to generally outlaw them. *Chamber of Commerce of U.S. v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023).

105.    In truth, volume-based bonuses are reasonable and do not create impermissible financial incentives—which Plaintiffs could have explained to CMS if CMS had provided the required notice that it was targeting these contract terms.  Volume-based bonuses to firms reflect payment for more services provided or more effective services.   For example, plans might rationally pay firms providing call-recording transcription services based on volume because that firm's services are more valuable if they record 100 calls instead of a handful.  Similarly, plans might pay firms providing marketing services based on volume because that firm's services are materially more valuable if the marketing is effective enough to enroll 100 beneficiaries instead of a handful.  These are economically rational decisions.  And especially for Council members—who contract with *multiple* carriers and therefore are *carrier-agnostic*—volume-based bonuses do not cause them to preferentially provide their services to one plan over another.

106.    Even if CMS had shown that there was a problem that needs fixing, its solution is irrational.  To start, CMS's examples are internally inconsistent.  CMS says plans can *contract* with agents who represent some but not all plans, but that it is impermissible for plans to include in their contracts *a provision* that an agent will represent some but not all plans.  89 Fed. Reg. at 30,620/3-21/1.  CMS admits that the incentives are the same in each case.  *See id.* at 30,620/3 (admitting that agents are "inherently more likely to enroll beneficiaries into the plan(s) with which" they contracted).  It is irrational to treat those two circumstances differently when the

38

relevant statutory consideration—"incentives" for enrolling an individual in the best health care plan, 42 U.S.C. § 1395w-21(j)(2)(D)—is the same in both circumstances.

107.    Further still, CMS applies its logic to contract terms in incoherent ways.  If contracts providing for an agent to represent only one plan are impermissible because such payments tilt the agent's incentives toward the plan they represent, 89 Fed. Reg. at 30,620/3, then CMS cannot explain rationally why contractual volume-based bonuses are prohibited *even if* multiple plans offer those bonuses on the same terms, *id.* at 30,621/1.

108.    CMS further undercuts the very goals it seeks to achieve by limiting market-based competition while claiming that it seeks to "deter anti-competitive practices" in the MA marketplace.  89 Fed. Reg. at 30,619/1.  As discussed above, volume-based bonuses tether payment for a service to the amount of services provided and the effectiveness of those services. The firm gets paid more for providing more or better services.  That is *pro*-competitive.  Volume-based bonuses ensure that effective firms make more money, which in turn drives competitors into the marketplace and incentivizes innovation and efficiency.  Beneficiaries ultimately win, because third-party firms compete to provide the best services for them.  But CMS's volume-based bonus restriction puts an end to that.

**C.    The Rule's Effective Date Is Unworkable And Undermines Reliance Interests**

109.    At a minimum, the Rule's relevant effective date should be set aside to prevent significant disruption to market participants.

110.    The Rule broadly takes effect on June 3, 2024.  89 Fed. Reg. at 30,448/1.  The Rule's Fixed Fee and Contract-Terms Restriction apply beginning with contract year 2025—that is, January 1, 2025.  *See* 89 Fed. Reg. at 30,829/1-3 (§ 422.2274(a)), 1250 (§ 422.2274(c)(13)), 1251 (§ 422.2274(e)(2)).  CMS conceded this leaves an admittedly "narrow timeline between finalization of this rule and the time at which" agents and brokers must, as a practical matter, begin

39

implementing these changes.  *Id.* at 30,621/3; *see also id.* at 30,623/1.  So CMS purported to grant a safe harbor for activities taken before October 1, 2024.  *Id.* at 30,621/3.  But that does not adequately address the problem.  As the Council explained back in January 2024, carriers "already ha[d] agreed" to make renewal-based payments in 2025 or later for enrollments that precede the Rule's effective date.  CMC Comment Letter at 14.

111.    Moreover, Plaintiffs are preparing for contract year 2025 right now—well before the October 1, 2024, date on which CMS apparently believes the industry gets moving.  By law, on June 3, 2024, carriers will submit bids identifying the structure, pricing, and cost-sharing for their plans.  Carriers typically negotiate payment terms for agents, brokers, and firms prior to the June deadline and execute contracts around the same time, continuing through June.  Plaintiffs thus need more than the five weeks provided by CMS to sort out the Rule's details, figure out which of their contracts and payments are impacted, and make business decisions based on that information.  That is an important aspect of the problem, but CMS failed adequately to consider it.

112.    Additionally, CMS failed to clarify whether the Rule would limit, for example, contracts or agreements executed before October 1, 2024 (and potentially before CMS even published the Rule) that provide for payments to be made *during or after* contract year 2025.  *See supra* ¶ 65.  If CMS were to deprive the Council's and NABIP–Fort Worth's members and other firms after-the-fact of administrative payments that carriers agreed to pay at a time when CMS said it was lawful to do so, this retroactive application would violate due process guarantees.

113.    The Rule's effective date is unlawful and should be vacated.  At a minimum, the Court should stay the Rule's effective date until no sooner than contract year 2026.  *See* 5 U.S.C.

§ 705 (authorizing a court to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings").

## COUNT I
### (Without Statutory Authority and Contrary to Law)
### (against all Defendants)

114.   Plaintiffs incorporate the above allegations by reference.

115.   The Compensation Rule exceeds CMS's statutory authority.

116.   The Fixed Fee exceeds CMS's authority because (1) CMS has no statutory authority to set compensation rates; (2) administrative payments and reimbursements are not "compensation"; and (3) "compensation" does not encompass payments to firms.

117.   The Contract-Terms Restriction also exceeds CMS's statutory authority because: (1) CMS has no authority to regulate contract provisions about administrative payments and reimbursements, because such payments are not "compensation"; (2) CMS has no authority to regulate contract provisions about carriers' payments to firms; and (3) the Rule prohibits contractual terms that are not related to payment at all.

118.   Accordingly, the Rule is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A), and is in excess of statutory jurisdiction, authority, or limitations, in violation of 5 U.S.C. § 706(2)(C).

## COUNT II
### (Notice and Comment)
### (against all Defendants)

119.   Plaintiffs incorporate the above allegations by reference.

120.   The Rule violates notice-and-comment procedural requirements.  *See* 5 U.S.C. § 553(b)(3), (c).  Among other things, CMS: (1) failed to gather necessary information and data before issuing its Proposal and submit that information and data to public scrutiny; (2) relied on

undisclosed evidence and information; and (3) adopted a final rule that was not a logical outgrowth of the proposed rule.

121.    Accordingly, the Rule is without observance of procedure required by law, in violation of 5 U.S.C. § 706(2)(D).

## COUNT III
### (Arbitrary and Capricious)
### (against all Defendants)

122.    Plaintiffs incorporate the above allegations by reference.

123.    The Fixed Fee is arbitrary and capricious.  Among other things, CMS: (1) failed to clarify whether the Fixed Fee applies to firms, including Council and NABIP–Fort Worth members; (2) failed to support numerous key assumptions with any evidence; (3) based its assertions on unreliable studies and complaints; (4) did not substantiate its purported concerns; (5) acted for regulatory purposes not authorized by statute; (6) adopted an underinclusive and irrational purported solution; (7) failed adequately to consider the rule's impacts; (8) failed to acknowledge and provide good reasons for not adopting alternative solutions; (9) failed to consider and address relevant comments; and (10) changed the agency's position regarding what payments constitute compensation without acknowledgment of the change or a reasoned explanation for it.

124.    The Contract-Terms Restriction is likewise arbitrary and capricious.  Among other things, CMS: (1) failed to support numerous key assumptions with any evidence; (2) based its assertions on unreliable studies and complaints; (3) did not substantiate its purported concerns; (4) considered policy concerns not authorized by statute; (5) failed adequately to consider the rule's impacts, including its economic effects; (6) failed to acknowledge and provide good reasons for not adopting alternative solutions; (7) failed to consider and address relevant comments; (8) is unduly vague; and (9) adopted a restriction that is irrational and internally inconsistent.

125.    The Rule's application to Contract Year 2025 is also arbitrary and capricious. CMS's purported safe harbor for conduct predating October 1, 2024 is illusory because it leaves in place the exact ambiguity the Council identified and asked for clarity about in its comment. Further, CMS refused to respond to comments raising due process concerns when applying the Rule to deprive firms after-the-fact of administrative payments.   And CMS adopted an unreasonable and unworkable effective date that leaves regulated entities, including Council members, too little time to adjust to the Rule's new requirements.

126.    Accordingly, the Rule is arbitrary and capricious and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

**COUNT IV**
**(Declaratory Judgment)**
**(against all Defendants)**

127.    Plaintiffs incorporate the above allegations by reference.

128.    The Compensation Rule is unclear in at least two respects:  (1) CMS failed to clarify whether the Fixed Fee applies to payments to firms that employ or contract with individual agents and brokers, or whether it applies only to payments made directly to those individuals; and (2) CMS failed to clarify whether the Compensation Rule applies to contracts and plans executed in calendar 2024 for contract year 2025, or only to contracts and plans executed in calendar year 2025 for contract year 2025 or later.

129.    Plaintiffs believe the correct reading of the Compensation Rule is that:  (1) it applies to payments made directly to individuals; and (2) it does not apply to contracts or agreements executed before October 1, 2024, including when those contracts or agreements provide for payments to be made during or after contract year 2025.  The Rule is not clear on its face, however, and CMS has failed to adequately respond to commenters' request to clarify these issues.

43

130.    That lingering uncertainty is untenable for Plaintiffs, including Council and NABIP–Fort Worth members.  They are hurtling toward the 2025 contract year without a clear understanding of what administrative payments carriers may lawfully pay them, and starting in October, they will be subject to "remedial action" if they guess wrong.  89 Fed. Reg. at 30,621/3. Firms, including Council and NABIP–Fort Worth members, are therefore put to the choice:  either yield to CMS's ambiguous regulations and discontinue payments they believe they are entitled to receive, or continue accepting those payments but face a credible prosecution risk depending on how CMS interprets the Rule.

131.    Accordingly, the Court should declare the parties' rights and hold that (1) the Fixed Fee provisions of the Rule do not apply to firms, including members of the Council and NABIP– Fort Worth, and (2) the Fixed Fee and Contract-Terms Restriction do not apply to contracts or agreements to make payments that were executed or agreed to prior to October 1, 2024, or, at a minimum, prior to the Final Rule's effective date.

**PRAYER FOR RELIEF**

132.    Plaintiffs pray that this Court:

    a.    Declare that the Fixed Fee and the Contract-Terms Restriction violate the APA; hold those provisions invalid, contrary to law, arbitrary and capricious, and otherwise unlawful; and set aside and vacate them;

    b.    Issue preliminary and permanent injunctions prohibiting Defendants from implementing, administering, acting upon, or enforcing the Rule's challenged provisions against Plaintiffs or their members;

    c.    Issue all process necessary and appropriate to postpone the Rule's effective date to maintain the status quo pending the conclusion of this case;

    d.    Declare that the Fixed Fee provisions of the Rule do not apply to firms, including firms that are members of the Council and NABIP–Fort Worth;

    e.    Declare that the Fixed Fee and Contract-Terms Restriction do not apply to contracts or agreements to make payments that were executed or agreed to prior to October 1, 2024, or, at a minimum, prior to the Final Rule's effective date.

    f.    Award Plaintiffs costs and reasonable attorneys' fees as appropriate; and

    g.    Grant Plaintiffs such further and other relief as this Court deems just and proper.

Dated:  May 15, 2024                    Respectfully submitted,

                                        /s/   Allyson N. Ho

Allyson N. Ho                           Eugene Scalia (*pro hac vice* forthcoming)
Texas Bar No. 24033667                  Matthew S. Rozen  (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP             Aaron M. Smith  (*pro hac vice* forthcoming)
2001 Ross Avenue, Suite 2100            M. Christian Talley  (*pro hac vice* forthcoming)
Dallas, TX  75201                       GIBSON, DUNN & CRUTCHER LLP
Telephone: (214) 698-3100               1050 Connecticut Avenue, N.W.
Facsimile: (214) 571-2971               Washington, D.C.  20036
aho@gibsondunn.com                      Telephone: (202) 955-8500
                                        Facsimile: (202) 467-0539
                                        escalia@gibsondunn.com
Charles W. Fillmore                     mrozen@gibsondunn.com
Texas Bar No. 00785861                  asmith3@gibsondunn.com
THE FILLMORE LAW FIRM LLP               ctalley@gibsondunn.com
201 Main Street, Suite 700
Fort Worth, TX  76102
Telephone: (817) 332-2351
chad@fillmorefirm.com