**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| Council for Medicare Choice, *et al.*, | Case No. 4:24-cv-446-O |
| Plaintiffs, | |
| v. | **Relief Requested by July 10, 2024** |
| United States Department of Health and Human Services, *et al.*, | |
| Defendants. | **Hearing Requested** |

**Plaintiffs' Brief In Support Of
Motion For Preliminary Injunction And Stay Of Effective Date**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 3

    I.    CMS Currently Regulates The "Use Of Compensation" For Agents And Brokers Who Help Medicare Advantage And Part D Beneficiaries Select Plans ................................................................................................. 3

    II.    CMS Proposes A New Rule That Asserts Authority To Fix Prices For Administrative Services And Proposes Vague New Restrictions On Contracts ............................................................................................ 5

    III.    Brushing Aside The Public Comments And Record Evidence, CMS Hastily Promulgates A Final Rule Adopting Its Proposal Virtually Unchanged ......................................................................................... 8

ARGUMENT ....................................................................................................... 9

    I.    Plaintiffs Are Likely To Succeed On The Merits ................................. 11

        A.    The Fixed Fee Is Unlawful ....................................................... 11

            1.    The Rule Exceeds CMS's Statutory Authority And, At Minimum, CMS Failed To Explain Its New Understanding Of Its Statutory Powers ............................................... 11

            2.    CMS's Failure To Substantiate Its Reasons For The Rule And Subject Its Evidence To Public Scrutiny Is Arbitrary And Capricious And Violates The Requirements Of Notice-And-Comment Rulemaking ...................................... 13

            3.    The $100 Fixed Fee Increase Is Arbitrary And Capricious ......... 16

        B.    The Contract-Terms Restriction Is Unlawful .......................... 19

        C.    Applying The Rule To Contract Year 2025 Is Unlawful ........................ 20

    II.    The Rule Will Irreparably Harm Plaintiffs And Their Members ....................... 21

    III.    The Balance Of The Equities And Public Interest Support A Preliminary Injunction ............................................................................................ 25

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 (2019)................................................................15

*Barrett v. United States*,
   205 F. Supp. 307 (S.D. Miss. 1962)........................................12

*Book People, Inc. v. Wong*,
   91 F.4th 318 (5th Cir. 2024)....................................................10

*Business Roundtable v. SEC*,
   647 F.3d 1144 (D.C. Cir. 2011)...............................................19

*Calumet Shreveport Refining, LLC v. EPA*,
   86 F.4th 1121 (5th Cir. 2023)..................................................14

*Career Colls. & Sch. of Texas v. DOE*,
   98 F.4th 220 (5th Cir. 2024)...............................................22, 24

*Chamber of Commerce of U.S. v. SEC*,
   85 F.4th 760 (5th Cir. 2023) .........................7, 13, 14, 15, 17, 19

*Comcast Corp. v. FCC*,
   579 F.3d 1 (D.C. Cir. 2009).....................................................18

*DeFranceschi v. Seterus, Inc.*,
   2016 WL 6496323 (N.D. Tex. Aug. 2, 2016)..........................22

*Desoto Gen. Hosp. v. Heckler*,
   766 F.2d 182 (5th Cir. 1985)..........................................14, 15, 16

*DHS v. Regents of Univ. of Cal.*,
   140 S. Ct. 1891 (2020)..............................................................13

*Digit. Realty Tr., Inc. v. Somers*,
   583 U.S. 149 (2018)..................................................................12

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016)..................................................................13

*Farmers Union Cent. Exchange, Inc. v. FERC*,
   734 F.2d 1486 (D.C. Cir. 1984)...............................................17

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012)..................................................................20

*Laffey v. Nw. Airlines, Inc.*,
   746 F.2d 4 (D.C. Cir. 1984)......................................................17

ii

# TABLE OF AUTHORITIES

**Page(s)**

*Mexican Gulf Fishing Co. v. Dep't of Commerce,*
  60 F.4th 956 (5th Cir. 2023) ...............................................................14, 15, 16, 21

*Mexichem Fluor, Inc. v. EPA,*
  866 F.3d 451 (D.C. Cir. 2017) .........................................................................21

*Mock v. Garland,*
  75 F.4th 563 (5th Cir. 2023) .............................................................................20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ..............................................................................................9

*Nat'l Fuel Gas Supply Corp. v. FERC,*
  468 F.3d 831 (D.C. Cir. 2006) .........................................................................14

*Nken v. Holder,*
  556 U.S. 418 (2009) ...........................................................................................25

*Owner-Operator Indep. Drivers Ass'n v. FMCSA,*
  494 F.3d 188 (D.C. Cir. 2007) ................................................................7, 13, 15

*R.J. Reynolds Vapor Co. v. FDA,*
  65 F.4th 182 (5th Cir. 2023) .............................................................................24

*Rest. Law Ctr. v. DOL,*
  66 F.4th 593 (5th Cir. 2023) .............................................................................24

*In re Reynolds Inv. Co.,*
  130 F.2d 60 (3d Cir. 1942)................................................................................12

*S. Union Co. v. Mo. Pub. Serv. Comm'n,*
  289 F.3d 503 (8th Cir. 2002) ...........................................................................11

*Sierra Club v. FERC,*
  38 F.4th 220 (D.C. Cir. 2022) ..........................................................................17

*Spirit Airlines, Inc. v. DOT,*
  997 F.3d 1247 (D.C. Cir. 2021) .......................................................................18

*State v. Biden,*
  10 F.4th 538 (5th Cir. 2021) .......................................................................13, 16

*Tex. Bankers Ass'n v. Office of Comptroller,*
  2024 WL 1349308 (N.D. Tex. 2024)................................................................25

*Texas Ass'n of Mfrs. v. CPSC,*
  989 F.3d 368 (5th Cir. 2021) ...........................................................................20

*Texas v. EPA,*
  829 F.3d 405 (5th Cir. 2016) ...........................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. MSHA,*
   925 F.3d 1279 (D.C. Cir. 2019) ..................................................................20

*VanDerStok v. Garland,*
   86 F.4th 179 (5th Cir. 2023) ......................................................................13

*W. Coal Traffic League v. STB,*
   998 F.3d 945 (D.C. Cir. 2021) ....................................................................18

*Wages & White Lion Invs., LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ..............................................................10, 24

*Wages & White Lion Invs., LLC v. FDA,*
   90 F.4th 357 (5th Cir. 2024) ......................................................................13

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ....................................................................................19

## Statutes

5 U.S.C. § 705 ..........................................................................................3, 10

11 U.S.C. § 649 ............................................................................................12

15 U.S.C. § 1665d(a) ....................................................................................11

15 U.S.C. § 1665d(c) ....................................................................................11

29 U.S.C. § 207(e)(2) ..................................................................................13

42 U.S.C. § 1395w-4(a) ..............................................................................11

42 U.S.C. § 1395w-4(b) ..............................................................................11

42 U.S.C. § 1395w-21(j)(2)(D) ..........................................1, 4, 11, 12, 13, 19

42 U.S.C. § 1395w-23(a)(1)(H) ..................................................................11

42 U.S.C. § 1395w-104(*l*)(2) ....................................................................1, 5

## Regulations

42 C.F.R. § 422.62(a)(2)(iii) ......................................................................21

42 C.F.R. § 422.2274 ..............................................................................5, 12

42 C.F.R. § 422.2274(a) ........................................................................3, 5, 8

42 C.F.R. § 422.2274(c) ..........................................................................3, 8

# TABLE OF AUTHORITIES

**Page(s)**

42 C.F.R. § 422.2274(d) ...................................................................................................3, 5

42 C.F.R. § 422.2274(e) ................................................................................................3, 5, 8

42 C.F.R. § 423.38(b)(3) ...................................................................................................21

42 C.F.R. § 423.2274 ...........................................................................................................5

42 C.F.R. § 423.2274(a) .......................................................................................................3

42 C.F.R. § 423.2274(c) .......................................................................................................3

42 C.F.R. § 423.2274(d) .......................................................................................................3

42 C.F.R. § 423.2274(e) ....................................................................................................3, 6

42 C.F.R. § 1761(b)(4)(B) ..................................................................................................11

## Rulemakings

*Medicare Program; Changes for Contract Year 2025*,
    89 Fed. Reg. 30,448 (Apr. 23, 2024) ...............................1, 2, 5, 8, 9, 14, 15, 17, 18, 19, 20, 21

*Medicare Program; Contract Year 2025 Changes*,
    88 Fed. Reg. 78,476 (Nov. 15, 2023)................................................5, 6, 7, 8, 19, 20

*Medicare Program CY2022 Changes*,
    86 Fed. Reg. 5,864 (Jan. 19, 2021) ...........................................................12, 13

*Medicare Program Revisions*,
    73 Fed. Reg. 54,226 (Sept. 18, 2008) ............................................1, 5, 11, 12, 13

## Other Authorities

*Compensation*, Black's Law Dictionary 854 (8th ed. 2004) ...........................................12

*Use*, Black's Law Dictionary (8th ed. 2004) .................................................................12

## INTRODUCTION

The Centers for Medicare and Medicaid Services ("CMS") has finalized a hastily assem-
bled rule to dramatically upend the thriving markets for Medicare Advantage and Part D plans.
CMS is authorized to set "guidelines" to "ensure that the ***use of compensation*** creates incentives
for agents and brokers to enroll individuals in the [Medicare Advantage] plan that is intended to
best meet their health care needs."   42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added); *see id.*
§ 1395w-104(*l*)(2) (applying same to Part D).  CMS initially acted within the limits of this author-
ity by using it only to regulate how compensation is "use[d]"—not the amount of that compensa-
tion.  *See Medicare Program Revisions*, 73 Fed. Reg. 54,226, 54,239/1 (Sept. 18, 2008).  CMS
subsequently switched course, however, and began capping how much plans could compensate
the individual agents and brokers who enroll Americans in plans.

CMS's new rule—the "Compensation Rule"—takes this overreach further.  For 15 years,
CMS has applied its price caps only to "compensation" for enrollments, exempting "administrative
payments" for services such as training agents and brokers, launching marketing campaigns, and
developing technology like plan-comparison tools.  But the Compensation Rule now re-labels ad-
ministrative payments as compensation, subjects them to the same price cap as compensation for
enrollments, converts that price *cap* into a *fixed fee*, and arbitrarily raises that fixed fee by just
$100 to account for the whole segment of the industry that now would be squeezed into CMS's
price-fixing regime.  *Medicare Program; Changes for Contract Year 2025*, 89 Fed. Reg. 30,448
(Apr. 23, 2024).  The Rule also prohibits certain contractual terms, such as volume-based bonuses
for firms that provide additional or more effective services.

None of these changes is authorized by CMS's authority to regulate how compensation is
"use[d]."  And CMS's $100 cap increase was plucked from thin air without accounting for the
costs of providing many perfectly legitimate and valuable administrative services for which plans

1

currently pay firms. Despite comment letters providing preliminary cost estimates and urging CMS to collect more data, CMS never even attempted to study these costs. It simply asserted that quantifying them would be too difficult, so it arbitrarily picked one of several competing recommendations from commenters without any explanation or evidentiary support.

CMS's asserted *need* for capping administrative payments was itself a gossamer fabrication. CMS said it had received "complaints" that administrative payments were increasing rapidly and skewing agents' and brokers' incentives to enroll individuals in the right plans. But CMS never disclosed those complaints or tried to substantiate them with evidence. And CMS ignored commenters' contrary evidence indicating that payments are *not* increasing and that, in any event, firms' own financial success depends on enrolling Americans in the right health plan long-term.

The Rule's most immediate problem is its timing. CMS adopted the Rule last month, and it will govern payments and contracts for the plan year commencing January 1, 2025. CMS described this as leaving a "narrow timeline" for implementing the Rule. 89 Fed. Reg. at 30,621/3. That is a gross understatement. The annual enrollment period for 2025 plans begins October 15, and preparation for that period is already well underway. For example, firms that help carriers market their plans are developing print ads and TV commercials for which they must reserve production capacity and distribution channels months in advance of peak advertising periods such as October of an election year. They also hire new classes of agents and support staff each enrollment season, and must decide months in advance how many to hire. Firms finalize these critical business and investment decisions by mid-July so they have time to train agents and staff, purchase ad space, and produce commercials before the enrollment period begins. And these decisions hinge on whether the Rule remains in effect. If it does, then firms, anticipating that they will receive lower amounts of administrative payments, will reduce their marketing and hiring budgets, and

will earn less revenue—a loss they cannot recover.  Agents and brokers, too, are feeling time pressure.  They must decide whether to obtain certifications to sell plans in July, and those decisions will be affected by the Rule's validity.

Left unchecked, the Rule will force some firms out of business and force others to slash the services they offer beneficiaries.  One major firm has already exited the industry.  And as those firms scale back their services or withdraw from the industry altogether, brokerages and individual agents and brokers will be unable to pick up the slack.  These agents and brokers cannot themselves provide all of the administrative services they currently receive from firms.  Without those services, many agents and brokers would lack access to the resources they need to effectively serve beneficiaries, and others would suspend their services.  Some will stop selling Medicare Advantage and Part D plans altogether.

This Court should preliminarily enjoin the agency's unlawful, arbitrary, and capricious Rule—specifically, its provisions amending 42 C.F.R. §§ 422.2274(a), (c), (d), (e), and 423.2274(a), (c), (d), (e)—and "postpone the effective date" of these provisions pending review of the merits, 5 U.S.C. § 705.  No matter the remedy, Plaintiffs respectfully request a ruling by no later than July 10 to prevent irreparable harm, to ensure adequate opportunity for appellate relief, and to provide the industry with time to prepare for Contract Year 2025 consistent with this Court's ruling.

## BACKGROUND

## I.   CMS Currently Regulates The "Use Of Compensation" For Agents And Brokers Who Help Medicare Advantage And Part D Beneficiaries Select Plans

Medicare Advantage ("MA") is a private alternative to traditional Medicare.  Medicare Part D is a private market for prescription drug plans.  Both programs are thriving, with 30 million and 50 million beneficiaries, respectively, and a wide range of distinct plans to choose from (43

per beneficiary on average for MA, and 24 for Part D).  App. 126, 143.  These programs' remarkable success depends on independent agents and brokers who help beneficiaries choose the best plans for their needs.  It also depends on third-party firms that employ or contract with those agents and brokers to provide them the administrative services they need to succeed.  App. 6.

Plaintiffs Council for Medicare Choice ("Council") and the Fort Worth Association of Health Underwriters, Inc. ("NABIP–Fort Worth")—a chapter of the National Association of Benefits and Insurance Professionals ("NABIP")—represent some of the largest of those firms.  They include telesales centers, digital marketing firms, and third-party marketing organizations ("TPMOs") or field-marketing organizations ("FMOs").  App. 7.  All of them contract with *multiple* health plan carriers and provide *carrier-agnostic* support services to agents and brokers.  App. 7; *e.g.*, App. 221.  For example, Council members and NABIP–Fort Worth member firms field beneficiaries' calls, develop technology—like plan-comparison tools—that agents deploy in the field, and launch marketing campaigns.  App. 7.  In turn, agents and brokers—including individual members of NABIP–Fort Worth such as Plaintiff Vogue Insurance Agency ("Vogue"), a brokerage company that employs individual agents—have relied on these vital administrative services to help millions of MA and Part D beneficiaries make informed choices between plans.

Providing these services costs money.  Firms must invest in technology; buy software and hardware; recruit and train agents; develop marketing campaigns; implement data-security systems; and more.  App. 41-44.  Given these heavy costs, many member firms of the Council and NABIP–Fort Worth already operate on slim margins or have not reached profitability.  App. 46.

Since 2008, the Social Security Act has authorized CMS to set "guidelines" to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the [MA] plan that is intended to best meet their health care needs."  42 U.S.C. § 1395w-21(j)(2)(D); *id.*

4

§ 1395w-104(*l*)(2) (applying same to Part D).  CMS's existing regulations impose strict price caps on the "compensation" carriers may pay to "independent agents and brokers," 42 C.F.R. § 422.2274(d)(2)-(3)—currently, $611 for new enrollments, 89 Fed. Reg. at 30,621/2.[1]  But CMS limits what counts as compensation.  Under the current rules, "[c]ompensation" includes only "remuneration relating to the sale or renewal of a plan or product," 42 C.F.R. § 422.2274(a)(i), but expressly does "*not* include" "[p]ayment of fees to comply with" State regulations or "[r]eimbursement" for "actual costs" associated with beneficiary sales.  *Id.* § 422.2274(a)(ii).  CMS has consistently recognized that those latter payments are not "compensation."  73 Fed. Reg. at 54,239/1.

CMS separately regulates "[p]ayments other than compensation," which the current regulations call "administrative payments."  42 C.F.R. § 422.2274(e).  That includes all "payments made for services other than enrollment of beneficiaries"—"for example, training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments."  *Id.* § 422.2274(e)(1).  Such payments are not subject to CMS's price limits even when they are "based on enrollment."  *Id.* § 422.2274(e)(2).  Instead, CMS requires only that they do not exceed "the value of those services in the marketplace."  *Id.* § 422.2274(e)(1)-(2).  Council members and NABIP–Fort Worth member firms have long structured their business models in reliance on the expectation of fair-market payments for their services.  *E.g.*, App. 21, 221, 228.

## II.   CMS Proposes A New Rule That Asserts Authority To Fix Prices For Administrative Services And Proposes Vague New Restrictions On Contracts

Despite MA and Part D's success, CMS unexpectedly proposed sweeping new requirements late last year to immediately restructure the industry's practices for reimbursing administrative services.  *Medicare Program; Contract Year 2025 Changes*, 88 Fed. Reg. 78,476

---

[1] CMS's regulations for MA, 42 C.F.R. § 422.2274, and Part D, *id.* § 423.2274, are materially identical.  This brief cites the MA regulations, but the arguments apply equally to Part D.

(Nov. 15, 2023) ("Proposal").  CMS rushed out this Proposal based on unidentified and unsub-stantiated complaints about administrative payments that CMS claimed to have received from "State partners, beneficiary advocacy organizations, and MA plans." *Id*. at 78,552/2.  The Proposal sought to dramatically expand CMS's compensation regulations in two ways.

*First*, CMS's proposed "**Fixed Fee**" sought for the first time to subject administrative ser-vices to the price limit on compensation by redefining "compensation" to include all administrative payments.  88 Fed. Reg. at 78,554/3-56/3.  To account for those services, CMS proposed to raise the allowable fee by just $31 per initial enrollment—CMS's estimate of the cost of providing training, test, and recording services only.  *Id*. at 78,556/2-3.  But CMS denied any additional payment for the myriad other services affected because it found them not "predictable" enough to quantify.  *Id*. at 78,596/3.  CMS did not deny that the other services exist, and are valuable and appropriate; nor did it undertake added diligence to better ascertain what those services are or what they cost.  It simply proposed not to allow payment for the services, due to its limited knowledge of the market.

CMS also turned its price *cap* into a *fixed* price by requiring payment "at" the specified amount, 88 Fed. Reg. at 78,624/1-2, rather than "at or below" it, 42 C.F.R. § 423.2274(e)(2).

*Second*, the "**Contract-Terms Restriction**" sought to bar any contract provision between plans and firms, agents, or brokers that has "a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent's or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary."  88 Fed. Reg. at 78,624/2. To clarify that vague proposal, CMS provided "[e]xamples" of prohibited terms, all of which fo-cused on schemes to circumvent existing compensation limits—*e.g.*, "bonuses or additional pay-ments" from plans to firms that are "passed on to agents or brokers based on enrollment volume."

*Id.* at 78,443/3.

Under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 706, CMS was required to support its proposal with evidence; make that evidence available for public comment; and give a reasoned explanation for its choices. *E.g.*, *Chamber of Commerce of U.S. v. SEC*, 85 F.4th 760, 774-77 (5th Cir. 2023); *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007). Here, CMS's action rested on three premises: (1) administrative payments are "increasing"; (2) some plans "may have used" those payments to "circumvent" limits on enrollment compensation; and (3) the increase in payments creates "questionable financial incentives" for agents and brokers. 88 Fed. Reg. at 78,552/2-3, 78,553/2, 78,555/3. But CMS failed to support any of these premises. For some, it did not cite *anything*. For others, it referred only to supposed "complaints," "reports," "market surveys," and "information gleaned from oversight activities" that it failed to identify or submit to public scrutiny. *Id*. The limited evidence CMS did offer was deeply flawed—*e.g.*, an article summarizing personal anecdotes from a small survey of agents and brokers, and undisclosed data about beneficiary complaints during an arbitrarily picked period in the middle of the Covid pandemic (2020-2021). *Id.* at 78,552/2-3, 78,554/1 & nn.136-37, 78,555 n.140; *see* App. 28-31.

CMS gave commenters just 60 days to respond to its Proposal—amidst 3 federal holidays and the MA and Part D open-enrollment period, the industry's busiest period of the year—and ignored requests to extend the comment period or further study the problem. Industry's comments and objections, including from the Council and NABIP, were extensive. *E.g.*, App. 2-54, 56-72, 82, 108. Commenters asked CMS to clarify the Contract-Terms Restriction and explain how the Rule would apply to contracts predating its effective date. App. 13-17. They challenged the Rule as lacking statutory authority, procedurally flawed, and arbitrary and capricious. *E.g.*, App. 9-54.

And some Plaintiffs warned that applying the Rule to their members—and depriving firms of fair-market value for the vital services they provide—would devastate the industry:  Members would be forced to exit the market or severely curtail their services, reducing the plan options available to beneficiaries and their ability to make informed choices among those options.  App. 46-49; *see also* App. 213-14 (explaining that carriers typically pay FMOs "$200 [to] $300 per beneficiary").

**III.     Brushing Aside The Public Comments And Record Evidence, CMS Hastily Promulgates A Final Rule Adopting Its Proposal Virtually Unchanged**

CMS finalized the Fixed Fee, 89 Fed. Reg. at 30,829/1-3 (§ 422.2274(a), (e)), and Contract-Terms Restriction, *id.* at 30,829/2 (§ 422.2274(c)(13)), largely as proposed, based on the same flawed premises and information as the Proposal, *see id.* at 30,617/3, 30,618/1-3, 30,619/3 n.154.  The sole substantive change to either proposal was to increase the fixed fee by $100 (rather than $31) per initial enrollee.  *Id.* at 30,626/1-3.  The agency did not disclose any additional evidence, defend the evidence it did cite against commenters' critiques (including those from the Council and NABIP), or respond to commenters' warnings that the Rule would devastate an industry built on the expectation of fair-market payments.  *Id.* at 30,618/1, 30,619/3 & nn.154-55, 30,621/2, 30,802/1.  And it conceded that it still lacked the data to understand the costs of administrative services.  *Id.* at 30,625/3.

Meanwhile, CMS purported to clarify the Contract-Terms Restriction—without changing the proposed regulatory text—by listing additional examples in the preamble to the Rule that dramatically expanded the reach of the restrictions.  Whereas the Proposal's examples targeted volume-based bonuses only to the extent firms "passed [them] on to agents or brokers," 88 Fed. Reg. at 78,554/2, the Final Rule dropped the restriction, targeting all "bonuses for hitting volume-based targets for sales of a plan"—even, apparently, if paid to *firms* only, solely for administrative services, and not passed on to individual agents and brokers, 89 Fed. Reg. at 30,621/1.

The Rule applies beginning with contract year ("CY") 2025, *i.e.*, January 1, 2025, 89 Fed. Reg. at 30,621/3.  CMS has stated that "existing" requirements "will continue to apply" before open enrollment for CY2025 begins in October 2024.  *Id.*  But the Rule's application to contracts for CY2025 that were finalized before the Rule was promulgated remains unclear.

## ARGUMENT

Unless courts enforce the "strict and demanding" "requirements for administrative action," an agency "can become a monster which rules with no practical limits."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).  The APA thus requires agencies to stay within Congress's prescribed boundaries, give the public a meaningful opportunity to participate in the rulemaking process, respond to commenters' input, and support their decisions with substantial evidence and a reasoned explanation.  CMS flouted each of those obligations.

CMS's new Compensation Rule asserts unprecedented authority to institute government price-fixing in place of fair-market rates for a range of valuable administrative services, with no acknowledgment that this power grab is a change of course.  CMS did this to address a non-existent problem—its unsubstantiated suspicions that administrative payments are growing, are used to circumvent existing payment caps, and skew agents' and brokers' incentives.  It supported these suspicions only with undisclosed or unreliable data, and ignored contrary evidence.  And its solution—fixing payment for these vital services at $100 without even studying their actual cost or market value—is the definition of arbitrary rate-setting.  CMS's new Contract-Terms Restriction is also unduly vague, and the examples CMS belatedly offered to add clarity are too little too late.

These provisions will apply to the 2025 contract year, but they will have effects much sooner.  Months in advance of the Rule's October 1, 2024, compliance date, firms must make critical decisions about how many print advertisements and TV commercials they can afford to produce and run.  They also decide how many agents and brokers they can afford to hire to assist

with enrollments; the number of agents they hire, in turn, influences the number of support staff they hire to assist the agents with regulatory compliance and other matters. All of those investment decisions depend on budgets that are heavily affected by whether or not the Rule goes into effect. Firms need certainty by mid-July to complete the planning and contracting that must be in place by the October enrollment period. If the Rule is not enjoined, moreover, firms will be forced to curtail valuable services or exit the industry altogether—harms that will cascade down to agents and brokers, who depend on firms for vital administrative services, and ultimately to beneficiaries, who will have fewer plans to choose from and fewer resources available to help them make the right choice.

These circumstances satisfy the test for a preliminary injunction: Plaintiffs are "likely to succeed on the merits" and "likely to suffer irreparable harm," and the "balance of equities" and "public interest" favor an injunction. *Book People, Inc. v. Wong*, 91 F.4th 318, 336 (5th Cir. 2024). They also satisfy the test to "postpone" the Rule's "effective date" to permit further "judicial review," 5 U.S.C. § 705, because the requirements for a stay mirror the preliminary injunction standard, *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 242, 254 (5th Cir. 2023). A stay of the effective date, which temporarily "removes the source of the [government's] authority to act" and acts as a "temporary form of vacatur," would appropriately maintain the status quo pending this Court's decision on the merits of Plaintiffs' claims. *Id.*; *see also Wages & White Lion Inv., L.L.C. v. FDA*, 16 F.4th 1130, 1135-36 (5th Cir. 2021).

I.      **Plaintiffs Are Likely To Succeed On The Merits**

    A.      **The Fixed Fee Is Unlawful**

        1.      **The Rule Exceeds CMS's Statutory Authority And, At Minimum, CMS Failed To Explain Its New Understanding Of Its Statutory Powers**

Congress gave CMS authority to establish guidelines to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). The Fixed Fee exceeds that authority in two ways.

***First***, CMS lacks authority to dictate the rates plans pay firms, agents, or brokers. It is authorized to regulate only how compensation is "use[d]," 42 U.S.C. § 1395w-21(j)(2)(D), not the amount of compensation. CMS's first regulation implementing the statute respected this limit, and regulated only "how compensation is disbursed ... and what qualifies as compensation," while declining to set "specific dollar values" on the *rate* of compensation. 73 Fed. Reg. at 54,239/1. Since then, however, CMS has unlawfully switched to setting rates, which the Rule expands.

"Rate regulation" is a controversial, difficult, and "complex process." *S. Union Co. v. Mo. Pub. Serv. Comm'n*, 289 F.3d 503, 507 (8th Cir. 2002). When Congress confers ratemaking authority, it does so unambiguously, and typically delineates factors the agency must consider when making rates. *E.g.*, 15 U.S.C. §§ 1665d(a), (c) (authorizing CFPB to regulate the "amount" of credit-chart charges and fees), 717c(a), 717c(f)(3) (similar authorization to FERC). The same is true when granting HHS and CMS ratemaking authority. *E.g.*, 42 U.S.C. § 1395w-4(a)(1)(A)-(B), (b) (capping payments to physicians at the lesser of "the actual charge for the service" or the price set under a "fee schedule"); *id.* § 1395w-23(a)(1)(H) (authority to "determine … a per capita rate of payment" for Medicare+Choice organization); *id.* § 1761(b)(4)(B) (authority to "prescribe maximum allowable levels for administrative payments that reflect the costs of" operating schools).

By contrast, § 1395w-21(j)(2)(D) says nothing about ratemaking and omits anything resembling the detailed list of factors that Congress typically provides when authorizing agencies to set prices.  It merely permits CMS to regulate the "use" of compensation, meaning "the application or employment" of compensation, *Use*, Black's Law Dictionary (8th ed. 2004).  By using different language from rate regulation statutes, Congress "intended a difference in meaning." *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161 (2018).  That is, CMS can regulate *how* plans employ compensation, not the *amount* of compensation.  Otherwise, the word "use" would be superfluous.

**Second**, the Fixed Fee makes this problem worse by setting rates for administrative payments that CMS has long recognized—since it first promulgated § 422.2274—"are not considered compensation."  73 Fed. Reg. at 54,239/1; *Medicare Program CY2022 Changes*, 86 Fed. Reg. 5,864, 5,993/3-94/1 (Jan. 19, 2021) (administrative payments—*e.g.*, for health-risk assessments—are "other than compensation because" they are "not for the sale or renewal of a policy").

CMS's prior interpretation is correct.  As courts have long recognized, "compensation"—in its ordinary usage—refers to payment for services rendered, not a reimbursement for costs incurred in rendering that service. *E.g.*, *Barrett v. United States*, 205 F. Supp. 307, 308 (S.D. Miss. 1962) ("[R]eimbursements do not represent compensation for services but represent reimbursements for out-of-pocket expenses."); *see also Compensation*, Black's Law Dictionary 854 (8th ed. 2004) ("compensation" means "remuneration and other benefits received in return for services rendered, esp[ecially] salary or wages").  Congress has also distinguished between "compensation for services rendered *or* reimbursement for costs and expenses incurred," *In re Reynolds Inv. Co.*, 130 F.2d 60, 61 n.1 (3d Cir. 1942) (quoting former 11 U.S.C. § 649) (emphasis added), and has evinced its understanding that "reimburs[ements]" are "not" compensation for overtime pay, for

example, 29 U.S.C. § 207(e)(2).  CMS's flip-flop is thus an "impermissible extension of the stat-utory text approved by Congress."  *VanDerStok v. Garland*, 86 F.4th 179, 189 (5th Cir. 2023).

The statutory context reinforces that conclusion.  Congress authorized CMS to regulate compensation to create incentives for "agents and brokers" regarding "enroll[ment]," 42 U.S.C. § 1395w-21(j)(2)(D)—not regarding the other tasks that agents and brokers perform and that firms support.

Even if CMS's new (unexplained) interpretation were lawful, it must "display awareness that it *is* changing position" and "take into account" any "reliance interests" its prior interpretation may have engendered.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  CMS did neither.  The Rule never mentions CMS's prior understanding that administrative payments are "not considered compensation" or are payments "other than compensation."  73 Fed. Reg. at 54,239/1; 86 Fed. Reg. at 5,993/3-94/1.  CMS's "unexplained inconsistency" alone is a "reason for holding an interpretation to be an arbitrary and capricious change."  *Encino Motorcars*, 579 U.S. at 222.  Moreover, CMS never "assess[ed]" whether there were reliance interests or weighed them against "competing policy concerns."  *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020).  It simply ignored comments that the Rule would gut longstanding business models.  App. 46.  That too "warrants vacatur."  *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 381, 384 (5th Cir. 2024).

### 2.   CMS's Failure To Substantiate Its Reasons For The Rule And Subject Its Evidence To Public Scrutiny Is Arbitrary And Capricious And Violates The Requirements Of Notice-And-Comment Rulemaking

Agencies must make policy in a rational manner.  They must show they are addressing a "genuine proble[m]," and that their proposed solution is "adequately substantiated."  *Chamber of Commerce*, 85 F.4th at 777.  Agencies must also "reveal portions of the technical basis for a pro-posed rule in time to allow for meaningful commentary" from the public.  *Owner-Operator*, 494

F.3d at 199.  Moreover, an agency cannot rely on "flawed" evidence, *Desoto Gen. Hosp. v. Heckler*, 766 F.2d 182, 185 & n.5 (5th Cir. 1985), "cherry-pick only the statistics it likes," *State v. Biden*, 10 F.4th 538, 556 n.5 (5th Cir. 2021), "fail to address statistics that already exist in th[e] record," *id.*, nor adopt a rule that runs "counter to the evidence before" it, *Calumet Shreveport Refining, LLC v. EPA*, 86 F.4th 1121, 1140 (5th Cir. 2023).  Finally, an agency must "provide a response" to legitimate comments and contrary evidence, *Chamber of Commerce*, 85 F.4th at 774—otherwise, the "'opportunity to comment is meaningless,'" *Mexican Gulf Fishing Co. v. Dep't of Commerce*, 60 F.4th 956, 972 (5th Cir. 2023).

CMS flouted these bedrock requirements.  To start, CMS failed to substantiate its justifications for the Fixed Fee.  Indeed, for two key premises—that administrative payments "are rapidly increasing" and that "overall payments to agents and brokers" can vary from plan to plan, 89 Fed. Reg. at 30,618/1, 30,621/2—CMS cited nothing at all.  It just stated them as facts.  CMS thus failed to "adequately substantiat[e]" that a "genuine proble[m]" exists.  *Chamber of Commerce*, 85 F.4th at 777.  "Professing that [a rule] ameliorates a real industry problem but then citing no evidence demonstrating that there is in fact an industry problem is not reasoned decisionmaking." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006) (Kavanaugh, J.).

For its remaining premises—that some plans "may have used" administrative payments to "circumvent" limits on enrollment compensation, 89 Fed. Reg. at 30,622/3, and that these payments create "questionable financial incentives" for agents and brokers, *id.* at 30,618/1—CMS mainly cited non-public "complaints," "reports," "market surveys," and "information gleaned from oversight activities" that it has never identified or publicly disclosed.  *Id.* at 30,617/3, 30,618/1, 30,619/3 n.154, 30,617/3, 30/618/3.  But refusing to "reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary" is a "serious procedural error" that

violates the APA's notice-and-comment-rulemaking requirement.  *Owner-Operator*, 494 F.3d at

199.  The public loses the chance to provide input, and the agency loses the "chance to avoid errors

and make a more informed decision."  *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019).

The Council and other stakeholders called this out in their rulemaking comments, App. 25-26, 62,

but CMS did not even bother to respond.

  The limited evidence CMS *did* disclose is flimsy, and once again CMS failed to "provide

a response" to legitimate criticisms.  *Chamber of Commerce*, 85 F.4th at 774.  For example, CMS

cited a Commonwealth Fund "research articl[e]" purportedly showing that MA plans offer "higher

payments" for administrative services.  89 Fed. Reg at 30,619/3; *see also id.* nn.154-55, 30,622/2

n.157.  But the article does not support that proposition.  The Commonwealth Fund merely sur-

veyed 29 agents and brokers in online focus groups and reported that "most ... recalled receiving

higher commissions" under MA than under Medigap (a form of private supplemental insurance).

App. 164, 170.  That anecdotal evidence is neither statistically valid nor relevant, and the MA-to-

Medigap comparison in no way shows that MA payments are increasing (much less at troubling

rates).  App. 28, 63.  Nor did the study analyze payments *to firms* at all.  This "flawed" study is

"woefully inadequate" to support CMS's upheaval of a thriving industry.  *Desoto*, 766 F.2d at 185

& n.5.  At minimum, CMS had to "provide a response" to the Council pointing out these flaws.

*Chamber of Commerce*, 85 F.4th at 774; *see Mexican Gulf*, 60 F.4th at 972 (agency "violate[d] the

APA" because it "did not address" an issue raised by comments); App. 28-29; 89 Fed. Reg at

30,619/3 & nn.154-55.

  CMS similarly speculated that skewed "financial incentives" had driven an increase in ben-

eficiary "complaints" about the enrollment process from 2020 to 2021.  89 Fed. Reg. at 30,618/1.

But CMS never justified its choice of that unrepresentative period—the height of COVID-19, App.

30—when more data was available.  Commenters explained that the pandemic likely influenced the number of complaints to CMS in 2020, App. 30, because CMS adopted a "number of flexibilities" for MA plans (*e.g.*, notification waivers), App. 196.  But CMS never responded; it cited no evidence of a larger, continuing trend; it never presented the complaint data it considered; and it ignored comments demonstrating that complaints have "gone down each year since 2021."  App. 30; *see also* App. 63.  None of this constitutes reasoned decisionmaking.  *See Desoto*, 766 F.2d at 185 & n.5; *Mexican Gulf*, 60 F.4th at 972.

Other record evidence further undercuts CMS's shaky foundation.  Commenters reported that "administrative payments are *not* steeply increasing," or even "keeping pace with inflation."  App. 33.  And firms have strong incentives to offer a diverse array of plans so participants can select the plan that best suits their long-term needs.  Even under current regulations, firms cannot recoup the costs of the services they provide in a single year—they profit only if beneficiaries renew their enrollments, generating additional annual payments—so they must connect beneficiaries to appropriate plans to profit.  App. 36.  Further, firms that are Council and NABIP–Fort Worth members provide *carrier-agnostic* services, like call support or plan-comparison tools, that avoid favoring any particular plan.  App. 38.  Meanwhile, the individual agents and brokers who interact with beneficiaries are wholly unaware of—and thus unaffected by—carriers' payments to firms.  App. 38.  Perhaps these reasons are why, in a survey of MA beneficiaries, "[m]ost of the participants who used brokers did not seem bothered" about agents' potential "financial incentives."  App. 38.  CMS simply ignored this record evidence.  By adopting a rule that runs "counter to the evidence" before it, *Calument*, 86 F.4th at 1140, and failing to address this evidence even though it was "already … in th[e] record," *Biden*, 10 F.4th at 556 n.5, CMS violated the APA.

### 3.     The $100 Fixed Fee Increase Is Arbitrary And Capricious

CMS compounded its error by raising its new fixed fee by just $100 to account for the

16

value of the numerous administrative payments that the Rule now subjects to that limit.  89 Fed. Reg. at 30,626/2.  In the limited areas where Congress has authorized agencies to set prices, agencies typically set rates based on the "cost of providing services" plus "a reasonable return on investment," *Sierra Club v. FERC*, 38 F.4th 220, 228-29 (D.C. Cir. 2022)—a process that requires "elaborate economic models" and "voluminous records" of data, *Laffey v. Nw. Airlines, Inc.*, 746 F.2d 4, 21 (D.C. Cir. 1984), *overruled on other grounds*, 857 F.2d 1516 (D.C. Cir. 1988); *see, e.g.*, *Farmers Union Cent. Exchange, Inc. v. FERC*, 734 F.2d 1486, 1491-94 (D.C. Cir. 1984) (describing FERC "ratemaking formula[s]" for capturing pipeline service costs and rates of return based on evidence compiled in 76 days of hearings).  CMS's novel foray into ratemaking for administrative services was the diametric opposite.

To start, CMS never even attempted to account for the cost of the vast majority of vital services that commenters identified.  App. 43-44.  The $100 purports to provide "sufficient funds" for "necessary administrative tools and trainings" and "appointment fees."  89 Fed. Reg. at 30,626/3.  But it ignores overhead; technology to power quote engines; software and hardware for call routing; hiring and training agents; marketing campaigns; data security systems, and many others, thus guaranteeing that firms will be left to provide those services at a loss.  App. 43-44, 211-13.  CMS claimed it would be "extremely difficult" to "accurately capture" the full costs of these services, 89 Fed. Reg. at 30,625/3, so it did not even try.  But "[i]nsisting" that the costs "are unquantifiable in spite of ... suggestions to the contrary" is not "reasoned decisionmaking."  *Chamber of Commerce*, 85 F.4th at 776.  And if CMS truly could not quantify these services' costs, it should have refrained from ratemaking altogether, rather than risk destroying a necessary industry.

Selecting $100 for the few services CMS did consider was equally arbitrary.  In lieu of the

17

rigorous economic modeling and voluminous records that agencies with *actual* ratemaking authority consider, CMS simply polled commenters and purported to pick the "majority" recommendation, without ever analyzing whether the comments it relied on were supported by evidence. 89 Fed. Reg. at 30,625/3. But "agency rulemaking is [not] a democratic process by which the majority of commenters prevail by sheer weight of numbers." *W. Coal Traffic League v. STB*, 998 F.3d 945, 950 n.4 (D.C. Cir. 2021). CMS's selection among commenters' "competing proposals" without "rationally analyz[ing] the various issues" is the very essence of arbitrary and capricious rulemaking. *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1256 (D.C. Cir. 2021) (vacating agency decision "embracing a 'middle-of-the-road approach'" without reasoned explanation). So, too, is plucking a number out of the air to impose a limit on industry without a "satisfactory explanation." *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) (vacating 30% market-share cap on cable operators).

Even if CMS's headcounting were relevant, the record does not bear out CMS's claims. When CMS says that the "majority" of commenters recommended rates "beginning at $100," 89 Fed. Reg. at 30,625/3-626/1, it means that most suggested rates *above* $100. CMS claimed "[s]everal commenters" suggested $100. *Id.* But it never identified them, and Plaintiffs' review of the record has identified a single comment that squarely recommended a $100 limit—a bare-bones comment with no supporting data or explanation, App. 192—as well as an anonymous, four-sentence comment speculating that "[p]erhaps $100 *to $200*" might "cover the costs of doing business and providing agents support," App. 123 (emphasis added). By contrast, the Council provided concrete cost estimates of specific services, App. 42-44, and NABIP explained that carriers typically pay FMOs "between $200 and $300 per beneficiary," which reflects current fair-market rates, App. 213.

CMS also ignored the consequences of withholding adequate payment for these services. In its Proposal, CMS conceded that it "lack[ed] the data to quantify the [Rule's] effects" on the industry. 88 Fed. Reg. at 78,610/3. But rather than obtain and analyze that data, CMS conceded the "lack of any cost analysis" in the Final Rule, too. 89 Fed. Reg. at 30,802/1. Commenters had made clear that the Rule would drive firms out of the industry or force them to sharply curtail services, depriving beneficiaries of the informed choices that CMS purports to be protecting in the Rule. App. 46-47. CMS's failure to "provide a response" to those concerns, *Chamber of Commerce*, 85 F.4th at 774, and its "duck[ing] [of] serious evaluation of the costs that could be imposed upon companies" by the Rule, *Business Roundtable v. SEC*, 647 F.3d 1144, 1152 (D.C. Cir. 2011), just adds to the Rule's arbitrariness.

### B.      The Contract-Terms Restriction Is Unlawful

The Contract-Terms Restriction fails for many of the reasons as the Fixed Fee. It applies to contract terms—including administrative payments—that are not "compensation," and thus fall outside of CMS's authority. And it was driven by the same unsubstantiated suspicions, undisclosed evidence, and blithe disregard for regulatory effects. It also fails for two independent reasons.

*First*, CMS unlawfully based the Restriction on extra-statutory aims that it had no "textual commitment of authority … to consider." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The Restriction targets so-called "anti-competitive" contract terms based on vague "policy goals" of "promot[ing] a fair, open, competitive marketplace." 89 Fed. Reg. at 30,618/3, 30,621/1. But CMS has no authority to regulate competition; its sole relevant power is to regulate the "use of compensation" to "creat[e] incentives" for enrollment in the best plan. 42 U.S.C. § 1395w-21(j)(2)(D). In any event, mandating one-size-fits-all contracts is the antithesis of competition.

*Second*, the Contract-Terms Restriction is impermissibly vague, and CMS's attempt to clarify it in the Rule's preamble is too little and too late to save it. The regulation's text broadly

prohibits any contract term that "has a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." 89 Fed. Reg. at 30,829/2. But that text leaves regulated entities to guess what terms CMS believes would create those incentives. It thus "fails to provide ... fair notice of what is prohibited," and "is so standardless that it authorizes or encourages seriously discriminatory enforcement," so the regulation is "impermissibly vague" in violation of due process. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Recognizing the "importanc[e]" of "clear" rules, CMS attempted to backfill the regulation's vague text by offering "examples" of prohibited conduct in the preamble. 89 Fed. Reg. at 30,620/3-30,621/1. But "the preamble ... lacks the force and effect of law," *United States v. MSHA*, 925 F.3d 1279, 1284 n.2 (D.C. Cir. 2019), so it is no substitute for a clear regulation. And if the preamble *is* relevant, then it violates the "logical outgrowth" doctrine because the examples "change[d]" in unanticipated ways. *Texas Ass'n of Mfrs. v. CPSC*, 989 F.3d 368, 381 (5th Cir. 2021). The Proposal targeted volume-based bonuses *only* if they were "passed on to agents or brokers," 88 Fed. Reg. at 78,554/2, but the Final Rule proclaimed that *all* "bonuses for hitting volume-based targets for sales of a plan" are likely prohibited, 89 Fed. Reg. at 30,620/3-30,621/1. Because the Rule's prohibition is not "alike in kind" to the Proposal, firms had no reason to "comment on the expanded rule" by, for example, explaining that volume-based bonuses kept by firms reflect genuine payment for additional or more effective services. *Mock v. Garland,* 75 F.4th 563, 584, 586 (5th Cir. 2023). CMS cannot evade notice and comment by proposing an open-ended rule and then giving it a meaning *after* the comment period that unexpectedly expands its scope.

### C.    Applying The Rule To Contract Year 2025 Is Unlawful

At minimum, the Court should preliminarily enjoin the Rule's application to the 2025 contract year, 89 Fed. Reg. at 30,621/3, because that effective date violates the APA.

20

CY2025 begins January 1, 2025, and open enrollment will begin October 15, 2024, but the annual enrollment cycle is already well underway.  42 C.F.R. §§ 422.62(a)(2)(iii), 423.38(b)(3); App. 153, 156.  Carriers are currently discussing contracts with firms, and negotiations and terms must be finalized sufficiently in advance of the October enrollment period for firms to complete their preparations, App. 15, 222, 225, 229-30, 234.  Firms, agents, and brokers are in the midst of preparing for the start of the enrollment period and must make investments now—including in hiring and marketing—based on their expected contracts with carriers.  App. 224-25, 231.

CMS conceded—with significant understatement—that this leaves a "narrow timeline between finalization of this rule and the time at which" carriers must finalize their payment terms for CY2025.  89 Fed. Reg. at 30,621/3.  CMS's preamble thus purports to grant a safe harbor: "[E]xisting" requirements "will continue to apply" before October 1, 2024, so contracts "that are not in compliance" with the Rule "will not be subject to remedial action for activities engaged in before October 1, 2024, even if they were related to 2025 contract year plans."  *Id*.  But exempting "activities engaged in before October 1," *id.*, leaves CMS room to challenge *payments* made after October 1 even if those payments are made pursuant to pre-October 1 contracts.

CMS's safe harbor is thus illusory.  It leaves in place the exact ambiguity that the Council complained about in its comment.  App. 15-16.  Further, as the Council warned, App. 15-16, CMS would violate due process guarantees if it were to deprive firms after-the-fact of payments that carriers agreed to make at a "time when [CMS] said it was lawful" to do so.  *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 462 (D.C. Cir. 2017).  CMS's refusal to "respond to significant issues raised by public comments" about the status of an entire subset of contracts is arbitrary and capricious.  *Mexican Gulf Fishing*, 60 F.4th at 972.

## II.    The Rule Will Irreparably Harm Plaintiffs And Their Members

Under this Court's "sliding scale" approach, merely "some likelihood of success" on the

merits is sufficient where, as here, the equitable factors "weigh strongly in favor of an injunction." *DeFranceschi v. Seterus, Inc.*, 2016 WL 6496323, at *2 (N.D. Tex. Aug. 2, 2016) (O'Connor, J.). Absent preliminary relief, the Rule will inflict significant irreparable harm on firms (including Council and NABIP–Fort Worth members) and brokerages and agents (including Vogue).

Most imminently, firms must make "significant business decisions" by mid-July that will be affected by the Rule. App. 224; *see also* App. 231. For example, firms hire agents and support staff each year to help with the busy enrollment period beginning in October. App. 224-25, 231-32. By mid-July, firms need to solidify their hiring plans so they can onboard agents by August, with sufficient time to train them before enrollments begin. App. 224-25, 231-32. Similarly, firms market carriers' plans to beneficiaries to inform them of plan options. App. 232-33. By mid-July, firms need to decide how much money to invest in these marketing activities so that they have sufficient lead time to send materials to printers with limited capacity, purchase ad space that gets more expensive by the day, and film television commercials that take two months to shoot. App. 232-33. If the Rule remains in effect in mid-July, therefore, firms will hire fewer agents than usual and shrink their marketing budgets. App. 225, 231-32. These "necessary alterations in operating procedures" constitute irreparable harm. *Career Colls. & Sch. of Texas v. DOE*, 98 F.4th 220, 237 (5th Cir. 2024) (irreparable harm where agency action forced plaintiff to abandon business plans). With these restrictions, firms in turn will reach and assist fewer beneficiaries and earn less revenue. App. 233.

Agents and brokers, too, are feeling a time crunch. In June and July, they must obtain certifications from carriers to sell those carriers' plans. App. 241. Without clarity about the Rule's applicability to Contract Year 2025, agents and brokers will be forced either to forgo certifications

(and potentially miss business opportunities if the Court later enjoins the Rule) or to obtain certi-fications (and potentially waste money and time if the Rule ultimately takes effect and forces them to stop selling plans).  App. 242.

More broadly, the Rule will force carriers to commit to administrative payments that fail to adequately cover firms' costs of providing administrative services.  Carriers currently pay firms, including members of the Council and NABIP–Fort Worth, fair-market value for those services. App. 221-22.  Combined with the compensation paid for enrollments, those payments exceed the Fixed Fee.  App. 222-23.  Some carriers also pay firms on a per-volume basis, App. 223, which the Rule's preamble says the Contract-Terms Restriction would prohibit, *see supra* at 8, 20.  Pro-hibiting these payments would deprive firms of revenues—in "some cases, more than one-third of their total revenue (not profit)," App. 46—and prevent them from recovering fair-market value. App. 222-23.  As the Council warned CMS, some Council members are "already losing money on a year-to-year basis"; "many Council members would go out of business" because of the Rule; and others would have to limit their services.  App. 46; *see also* App. 222-23.  One firm (Assurance, a former member of the Council) has already folded.  App. 223.

These consequences for firms that provide administrative services will also harm broker-ages such as Vogue and individual agents who rely on those services.  These agents and brokers do not have the resources and infrastructure to provide all of the vital administrative services them-selves.  App. 237.  If the Rule takes effect, therefore, many agents and brokers would lack access to the resources they need to effectively serve beneficiaries and to satisfy their legal obligations under State law and CMS's own regulations, forcing a contraction in their services.  App. 236-39. Vogue, for example, would cease selling MA and Part D plans.  App. 241.  And those that remain will have fewer support services available to help beneficiaries select and enroll in the plans that

23

best meet their needs.  App. 230.

Firms' lost revenues are "likely unrecoverable" because HHS and CMS "enjoy sovereign immunity for any monetary damages."  *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).  The unrecoverable loss of "annual revenu[e]" is an irreparable harm.  *E.g.*, *id.*; *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 194 (5th Cir. 2023).  And "[e]ven assuming the financial costs are recoverable" through some other mechanism after litigation if Plaintiffs prevail, they still establish irreparable harm because the "financial injury" in the interim is "*substantial*," *Wages & White Lion*, 16 F.4th at 1142, and "threatens the very existence of [their] business[es]," *Texas v. EPA*, 829 F.3d 405, 434 n.41 (5th Cir. 2016).  For those that survive, the Rule will force them to "alte[r]" their "business operations" by scaling back administrative services or not providing MA and Part D plans at all.  *Career Colls.*, 98 F.4th at 237.

Finally, "complying with [an agency rule] later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs," *Wages & White Lion*, 16 F.4th at 1142, and this case is no exception.  Council members, NABIP–Fort Worth members, and Vogue are already incurring compliance costs as they negotiate with carriers that are seeking to modify their contracts to conform to the Rule.  App. 222, 223-24.  And as the October 15 enrollment period approaches, it will become increasingly difficult to renegotiate any terms that may need to be changed to ensure compliance with the Rule or that, alternatively, firms may be able to obtain from carriers once the Rule is enjoined or vacated.  App. 226, 234.  Firms will also have to institute significant record-keeping changes to track their administrative payments against the new Fixed Fee.  App. 224; *see also* App. 240-41.  Spending unrecoverable time and money "to comply with [a] rule" that is likely unlawful is irreparable injury.  *Rest. Law Ctr. v. DOL*, 66 F.4th 593, 598, 600 (5th Cir. 2023).

Judicial intervention before July 10 is needed to prevent these harms and preserve the status

quo—at a minimum, for Contract Year 2025.

### III.  The Balance Of The Equities And Public Interest Support A Preliminary Injunction

Finally, the balance of equities and public interest—which "merge" here, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—favor a preliminary injunction.  As firms exit the market or contract with fewer carriers, agents, and brokers, App. 46, 222-23, brokers and individual agents will have fewer plans to offer and fewer administrative services available to help them enroll beneficiaries. In turn, beneficiaries will have fewer and less-informed choices, App. 47, undercutting MA and Part D programs that are currently "working well." *Tex. Bankers Ass'n v. Office of Comptroller*, 2024 WL 1349308, at *11 (N.D. Tex. 2024).  Moreover, many firms and brokerages predominantly serve lower-income, rural, and disabled individuals, so the Rule would harm those who *most* need help to select the best plan.  App. 48.

Conversely, preliminarily enjoining the Rule will harm no one because CMS has never substantiated the supposed concerns that animated the Rule.  *See supra*, at 13-16.  Nor would anyone be harmed by the modest delay of temporary relief that preserves—at least for Contract Year 2025—industry practices that have resulted in record-high MA and Part D enrollment and beneficiaries who are satisfied with the way things work now.  *See supra*, at 3-4, 16; App. 38 (noting that a "majority" of beneficiaries believed they "made the right choice" of plan in 2023). In any event, the equities and public interest favor an injunction to prevent CMS's likely "'perpetuation of unlawful agency action.'"  *R.J. Reynolds*, 65 F.4th at 195.  That alone is sufficient.

### CONCLUSION

The Court should preliminarily enjoin, and postpone the effective date of, the challenged provisions of the Rule.

Dated:  May 21, 2024                    Respectfully submitted,


                                        */s/   Allyson N. Ho*

Allyson N. Ho                           Eugene Scalia (*pro hac vice*)
Texas Bar No. 24033667                  Matthew S. Rozen  (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP             Aaron M. Smith  (*pro hac vice*)
2001 Ross Avenue, Suite 2100            M. Christian Talley  (*pro hac vice*)
Dallas, TX  75201                       GIBSON, DUNN & CRUTCHER LLP
Telephone: (214) 698-3100               1050 Connecticut Avenue, N.W.
Facsimile: (214) 571-2971               Washington, D.C.  20036
aho@gibsondunn.com                      Telephone: (202) 955-8500
                                        Facsimile: (202) 467-0539
Charles W. Fillmore                     escalia@gibsondunn.com
Texas Bar No. 00785861                  mrozen@gibsondunn.com
H. Dustin Fillmore III                  asmith3@gibsondunn.com
Texas Bar No. 06996010                  ctalley@gibsondunn.com
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX  76102
Telephone: (817) 332-2351
chad@fillmorefirm.com
dusty@fillmorefirm.com


                    *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 21, 2024, I caused the foregoing motion to be filed with the Clerk for the U.S. District Court for the Northern District of Texas through the ECF system.  Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.


*/s/ Allyson N. Ho*
Allyson N. Ho