**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| Council for Medicare Choice, *et al.*,<br><br>            Plaintiffs,<br><br>     v.<br><br>United States Department of Health and Human Services, *et al.*,<br><br>            Defendants. | Civil Action No. 4:24-cv-446-O |

**APPENDIX TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND STAY OF EFFECTIVE DATE**

Plaintiffs Council for Medicare Choice, Fort Worth Association of Health Underwriters, Inc., and Vogue Insurance Agency, LLC respectfully submit this appendix in support of their Motion for Preliminary Injunction and Stay of Effective Date.  *See* L.R. 7.1(i).

| Ex. | Document | Pages |
|---|---|---|
| 1. | Council for Medicare Choice Comment Letter (Jan. 5, 2024), https://www.regulations.gov/comment/CMS-2023-0187-1656 | App. 001–App. 054 |
| 2. | Greenberg Traurig Comment Letter (Jan. 5, 2024), www.regulations.gov/comment/CMS-2023-0187-3036 | App. 055–App. 077 |
| 3. | SelectQuote Comment Letter (Jan. 5, 2024), www.regulations.gov/comment/CMS-2023-0187-3027 | App. 078–App. 090 |
| 4. | BlueCross BlueShield Association Comment Letter (Dec. 22, 2023), www.regulations.gov/comment/CMS-2023-0187-2493 | App. 091–App. 121 |
| 5. | Anonymous Comment (Nov. 29, 2023), https://www.regulations.gov/comment/CMS-2023-0187-0162 | App. 122–App. 124 |
| 6. | Nancy Ochieng, *Medicare Advantage in 2023: Enrollment Update and Key Trends*, KFF (Aug. 9, 2023), https://tinyurl.com/ykajezk5 | App. 125–App. 141 |
| 7. | Center for Medicare Advocacy, *Medicare Enrollment Numbers* (June 29, 2023), https://tinyurl.com/ynzb2zfy | App. 142–App. 146 |

| Ex. | Document | Pages |
|-----|----------|-------|
| 8. | KFF, *The Average Medicare Beneficiary has a choice of 43 MA plans and 24 Part D plans* (Nov. 10, 2022), https://tinyurl.com/bdd8hjh9 | App. 147–App. 151 |
| 9. | CMS, *Medicare Open Enrollment* (last visited April 20, 2024), https://tinyurl.com/2u353n9n | App. 152–App. 154 |
| 10. | CMS Press Release, *Biden-Harris Administrative Prepares to Kick Off Medicare Open Enrollment* (Oct. 13, 2023), https://tinyurl.com/29wx4j6f | App. 155–App. 160 |
| 11. | Commonwealth Fund, *The Challenges of Choosing Medicare Coverage: Views from Insurance Brokers and Agents* (Feb. 28, 2023), https://tinyurl.com/2s3hcr7w | App. 161–App. 171 |
| 12. | Excerpt of CMS, *Part C – Medicare Advantage and 1876 Cost Plan Expansion Application*, CY2025 Application Instructions (2024), https://tinyurl.com/bde7nh5h | App. 172–App. 183 |
| 13. | Avalere, *2024 Part D Bid Cycle Introduces New Considerations for Stakeholders* (July 21, 2022), https://tinyurl.com/4cc446pf | App. 184–App. 189 |
| 14. | Association of Agents with Integrity Comment Letter (Dec. 28, 2023), https://www.regulations.gov/comment/CMS-2023-0187-0374 | App. 189–App. 194 |
| 15. | CMS Updated Guidance re: COVID-19 (Apr. 19, 2020), https://tinyurl.com/26bwaae2 | App. 195–App. 205 |
| 16. | National Association of Benefits and Insurance Professionals ("NABIP") Comment Letter (Jan. 5, 2024), https://www.regulations.gov/comment/CMS-2023-0187-3079 | App. 206–App. 219 |
| -- | Declaration of Craig Uchytil, e-TeleQuote Insurance, Inc. (May 20, 2024) | App. 220–App. 226 |
| -- | Declaration of Robert Rees, eHealthInsurance Services, Inc. (May 20, 2024) | App. 227–App. 234 |
| -- | Declaration of Audra Sullivan, Vogue Insurance Agency LLC (May 21, 2024) | App. 235–App. 242 |

Dated:  May 21, 2024                    Respectfully submitted,

                                        /s/   Allyson N. Ho

Allyson N. Ho                           Eugene Scalia (*pro hac vice*)
Texas Bar No. 24033667                  Matthew S. Rozen  (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP             Aaron M. Smith  (*pro hac vice*)
2001 Ross Avenue, Suite 2100            M. Christian Talley  (*pro hac vice*)
Dallas, TX  75201                       GIBSON, DUNN & CRUTCHER LLP
Telephone: (214) 698-3100               1050 Connecticut Avenue, N.W.
Facsimile: (214) 571-2971               Washington, D.C.  20036
aho@gibsondunn.com                      Telephone: (202) 955-8500
                                        Facsimile: (202) 467-0539
Charles W. Fillmore                     escalia@gibsondunn.com
Texas Bar No. 00785861                  mrozen@gibsondunn.com
H. Dustin Fillmore III                  asmith3@gibsondunn.com
Texas Bar No. 06996010                  ctalley@gibsondunn.com
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX  76102
Telephone: (817) 332-2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

                    *Counsel for Plaintiffs*

# EXHIBIT 1

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Tel 202.955.8500
gibsondunn.com

Eugene Scalia
Direct: +1 202.955.8210
Fax: +1 202.530.9606
EScalia@gibsondunn.com

January 5, 2024

*Submitted via Regulations.gov*

Office of the Secretary
U.S. Department of Health and Human Services
330 Independence Avenue, S.W.
Washington, D.C.  20201

Centers for Medicare & Medicaid Services
Attention: CMS-4205-P
7500 Security Boulevard
Baltimore, MD 21244

Re:     *Medicare Program; Contract Year 2025 Policy and Technical Changes*,
        File Code CMS-4205-P; Docket No. CMS-2023-0187; RIN 0938-AV24

To the Office of the Secretary:

The Council for Medicare Choice (the "Council" or "CMC") respectfully submits these comments in response to the Proposal entitled *Medicare Program; Contract Year 2025 Policy and Technical Changes*, 88 Fed. Reg. 78,476 (Nov. 15, 2023).  The Council appreciates the opportunity to comment on the Proposed Rule's agent- and broker-compensation provisions, which would be implemented by the Centers for Medicare & Medicaid Services ("CMS"), *see id.* at 78,624/1-2, 78,628/3 (proposing amendments to 42 C.F.R. §§ 422.2274, 423.2274).[1]

The Council is a nonprofit corporation representing many of the largest unaffiliated insurance agency, brokerage, and field-marketing organizations ("FMOs") with an established record in the industry.  The Council's members help millions of individuals purchase health plans of all types, including Medicare Advantage ("MA") and Medicare Part D prescription drug plans, by connecting carriers and beneficiaries through a variety of business models.  That unique role in the Medicare system makes Council members essential to sustaining enrollment in the MA program and matching individuals with the right health plans for their needs.

The Proposed Rule, however, threatens these vital services by:  (1) expanding CMS's existing limits on compensation to encompass a range of administrative service payments that CMS previously did not consider to be "compensation"; (2) dramatically reducing the payments that agents and brokers can receive for these services to far below their fair-market value and even far below actual cost; and (3) imposing vague additional limitations on carriers' contracts with agents, brokers, and third-party marketing organizations.  *See* 88 Fed. Reg. at 78,554/3-56/3.  The full scope of these proposed changes is not clear from the Proposal.  But

---

[1] This letter refers to the proposed rule's text as the "Proposed Rule," and CMS's preamble and proposed rule text collectively as the "Proposal."

Abu Dhabi · Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles
Munich · New York · Orange County · Palo Alto · Paris · Riyadh · San Francisco · Singapore · Washington, D.C.

App.002

GIBSON DUNN

January 5, 2024
Page 2

if applied broadly, these changes would pose an existential threat to large segments of the agent and broker industry and would require many of the Council's members to either exit the industry or significantly curtail the essential services they provide to carriers and beneficiaries, including to the low-income and disabled beneficiaries who are most in need of the services Council members provide.  The result would be to severely undercut CMS's stated—and statutorily mandated—goal of expanding MA and Medicare Part D enrollment and enabling beneficiaries to identify and select the plans that will "best meet their health care needs."  42 U.S.C. § 1395w-21(j)(2)(D).

For these reasons and others, the Council urges CMS to reconsider the Proposed Rule. At a minimum, before embarking on a course that could devastate the industry and undermine Congress's directives, CMS owes it to the public and the industry to carefully and deliberately study whether a problem even exists, disclose to the public and solicit comment on the data and evidence on which CMS intends to rely, and explore a range of reasonable solutions rather than the flawed approach set forth in the Proposal.  CMS should therefore suspend this rulemaking, collect the information it needs, make that information available for public review, and—if justified—re-propose an appropriate rule with a fresh comment period.  At the very least, CMS should extend the comment period to no sooner than 90 days after the date on which all necessary information is disclosed, including information submitted to the agency in response to this proposal.

**Section I** of this letter provides background on the industry.  **Section II** of this letter addresses the Proposed Rule's provisions governing compensation rates and administrative payments.  88 Fed. Reg. at 78,554/3-56/3, 78,624/1-2 (proposing amended 42 C.F.R. § 422.2274(a), (d), (e)).  **Section III** addresses the Proposed Rule's provisions governing limitations on contracts.  *Id.* at 78,554/3, 78,624/2 (proposing amended 42 C.F.R. § 422.2274(c)(5)).[2]

We hope that you find this letter helpful.  Please let us know, of course, if we can provide additional information.

---

[2] For ease of reference, this comment letter generally cites the regulations governing MA plans. *E.g.*, 42 C.F.R. § 422.2274.  But the Council's comments apply equally to the regulations governing Part D plans.  *E.g.*, *id.* § 423.2274.

**GIBSON DUNN**

January 5, 2024
Page 3

## Table of Contents

I.  Background ................................................................................................................. 5

II.  The Proposed Rule's compensation-rate and administrative-payment provisions are
fundamentally flawed. ............................................................................................... 7

   A.  The Proposed Rule is unduly ambiguous in multiple respects. ................................. 12

   B.  The Proposed Rule's compensation provisions exceed and are inconsistent with
CMS's statutory authority. ...................................................................................... 16

      1.  CMS has no authority to impose caps on the amounts of compensation paid
to firms, agents, or brokers. ................................................................................ 16

      2.  Administrative payments and reimbursements are not "compensation." .......... 19

      3.  "Compensation" does not encompass payments to firms. ................................. 21

   C.  CMS should not move forward without careful study and a sufficient
opportunity for public review of the Proposal's evidentiary basis. ......................... 22

      1.  CMS's current notice period does not provide adequate opportunity for
CMS to study the perceived problem. ................................................................ 23

      2.  CMS improperly relies on undisclosed evidence and information. ................... 24

      3.  CMS fails to support numerous key assumptions with any evidence. .............. 25

      4.  CMS relies on unreliable studies and "complaints." ........................................ 27

      5.  CMS improperly intends to collect and rely on additional data that
stakeholders cannot review or comment on. ...................................................... 30

   D.  CMS's reasons for redefining and capping compensation do not withstand
scrutiny. .................................................................................................................. 31

      1.  The Proposed Rule responds to a purported problem about skewed financial
incentives that does not exist. ............................................................................. 31

         a.  Administrative payments are not steeply increasing. .................................. 31

         b.  Administrative payments are genuine payments for vital services, not
end-runs around compensation caps. ......................................................... 33

         c.  Administrative payments do not incentivize agents and brokers to
advise beneficiaries against their interests. ............................................... 35

      2.  CMS's competition-based reasoning is impermissible and misguided. ........... 38

      3.  CMS's proposed increase to the compensation caps rests on an arbitrarily
incomplete and undervalued list of services. .................................................... 40

GIBSON DUNN

January 5, 2024
Page 4

E.    The Proposed Rule would restrict beneficiaries' choices by driving many firms, agents, and brokers out of business or forcing them to curtail significantly their services, narrow their offerings, or serve fewer clients............................................ 45

F.    Alternative, reasonable solutions would address the agency's stated concerns........ 48

1.    CMS could enforce existing rules that prevent consumer confusion and payments that exceed fair-market value. .......................................................... 48

2.    CMS could target specific practices that purportedly run afoul of current compensation requirements. .............................................................................. 49

3.    CMS could modify the compensation cap to account for all administrative services. .......................................................................................................... 50

III.  CMS's proposed limitation on contract provisions should be withdrawn or clarified.... 51

**GIBSON DUNN**

January 5, 2024
Page 5

## I.     Background

Medicare Advantage is a thriving market for eligible Americans that want to obtain health care coverage.  Indeed, "Medicare Advantage enrollment has been on a steady climb for the past two decades" and now includes over 30 million beneficiaries, with an eight-percent increase in enrollments between 2022 and 2023 alone.  Nancy Ochieng et al., *Medicare Advantage in 2023: Enrollment Update and Key Trends*, KFF (Aug. 9, 2023), https://tinyurl.com/ykajezk5.   In 2023, enrollments in Medicare Advantage exceeded enrollments in traditional Medicare for the first time ever.  *Id.*

Medicare Advantage functions as a private alternative to traditional Medicare.  Under traditional Medicare, nearly all physicians participate, but coverage is more limited and there is no annual cap on beneficiaries' out-of-pocket expenses.  Dena Bunis, *The Big Choice: Original Medicare vs. Medicare Advantage*, AARP (June 29, 2023), http://tinyurl.com/37hjka97.  Under Medicare Advantage, by contrast, beneficiaries can join specific health care plans with options better tailored to their individual needs.  Beneficiaries typically must see in-network physicians, but plans include extra benefits absent from traditional Medicare (like vision, hearing, and dental benefits), and plans typically cap yearly out-of-pocket expenses.  *See id.*;  *Compare Original Medicare & Medicare Advantage*, Medicare.gov (last visited Dec. 19, 2023), http://tinyurl.com/3cf8z5uw.  As a result, Medicare Advantage expands beneficiary choice—helping to explain its booming popularity in recent years.  Beneficiaries can obtain greater and more tailored benefits for less cost by selecting from a "menu" of private alternatives.  AARP, *The Big Choice*, *supra*.  As of today, the average beneficiary now "has access to 43 Medicare Advantage plans, the largest number of options ever."  KFF, *Medicare Advantage in 2023*, *supra*.

Those MA plans reach beneficiaries in a number of ways.  Some health plan carriers use their own employees to sell plans directly to beneficiaries.  These carrier-employed agents typically draw "a regular salary" plus incentives or bonuses for each policy sold, but they sell *only* that carrier's plans irrespective of what may be in the beneficiary's best interest.  The Hartford, *Captive Agent vs. Independent Agent* (last visited Dec. 19, 2023), https://www.thehartford.com/independent-agent/captive-agent-vs-independent-agent. Conversely, other health plan carriers contract with third parties to sell plans, including individual agents and brokers engaged as independent contractors, and third-party firms that either employ individual agents directly or provide administrative services to a network of independent-contractor agents.  *Id*.  Some of those third-party individuals and firms may contract exclusively with a single carrier to sell that carrier's plan, while others may be

**GIBSON DUNN**

January 5, 2024
Page 6

unaffiliated with any one carrier and sell multiple carriers' plans. These third-party firms perform a critical role to connect carriers, agents and brokers, and beneficiaries.[3]

The Council's members are many of the largest of these unaffiliated, third-party firms that contract with multiple carriers. They include: (1) digital marketing firms, which launch marketing campaigns for plans; (2) telesales companies, which contract with carriers to sell and service MA plans over the phone; and (3) FMOs, which build a broad network by contracting with multiple carriers offering health plans so they can offer those plans to independently contracted or employed agents and brokers who advise beneficiaries on the best available health plan for their needs. By contracting with multiple health plans and remaining carrier-agnostic, many of these third-party firms create cost-effective networks that give individual agents a broader array of health plans to offer to beneficiaries. Council members and other similar third parties thus help carriers distribute their plans to new audiences, help beneficiaries access more plans, and help agents and brokers "demystify the stressful process of choosing a health plan" for individuals. CMS, *Agents and Brokers in the Marketplace* at 1 (2020), tinyurl.com/2afffcyf.

Agents and brokers—the boots on the ground and licensed individuals answering the phones—rely on the vital services that Council members and similar firms provide. Employed agents and brokers rely on their employers, whereas agents and brokers operating as independent contractors often rely on FMOs, to connect with the various carriers who wish to reach beneficiaries. Council members likewise furnish agents and brokers with needed telephone and computer support services, assist in fielding customer calls and assessing their needs, and develop or license technology such as plan-comparison tools that agents and brokers deploy in the field. Agents and brokers also rely on Council members' assistance to help them comply with the complex regulatory web governing Medicare Advantage—including the legion rules and regulations that CMS has established.

None of these services is free, so appropriate payments are vital to the smooth functioning of this system. When carriers contract with third parties such as Council members, carriers generally agree to certain payments for the valuable administrative services provided by FMOs, telesales centers, and other similar firms. Council members and other organizations must obtain adequate payment to offset their considerable investments in labor, technology, training, oversight, overhead, and other costs. Likewise, agents and brokers may incur costs that are not covered by an employer or FMO, such as when they travel around the country, set up venues to interact with potential enrollees, and explain plan options in person and in detail.

---

[3] This comment letter uses the terms "agent" and "broker" to refer to *individuals* who sell health plans—the licensed individuals who conduct enrollments and are the feet on the street or person on the phone. By contrast, this comment uses terms such as "firms" or "entities" to refer to third-party companies that employ or contract with individuals who sell plans, even if those firms or entities are licensed as agents or brokers.

**GIBSON DUNN**

January 5, 2024
Page 7

Properly incentivizing all of these activities is crucial to support the steadily growing Medicare Advantage market and all the advantages it provides to beneficiaries.

Ultimately, carriers, agents and brokers, Council members, and similar firms throughout the industry are all working toward a common goal: providing beneficiaries the best experience and access to the best health care plans possible. Given the explosion in beneficiary choice and beneficiaries' ability to rapidly disenroll from plans they do not like, industry participants have powerful disincentives not to market subpar or ill-fitting plans to beneficiaries. The self-correction facilitated by a highly competitive, saturated market is swift and certain. That is why, at the end of the day, most beneficiaries attest that this process helped them select "the right choice" for their individual needs. Meredith Freed et al., *What Do People with Medicare Think About the Role of Marketing, Shopping for Medicare Options, and Their Coverage?*, KFF (Sept. 20, 2023), https://tinyurl.com/4ryrxra2.

## II.    The Proposed Rule's compensation-rate and administrative-payment provisions are fundamentally flawed.

The Proposed Rule's principal change to CMS's agent- and broker-compensation regulations would be to upend how plans pay for critical administrative services. Under current regulations, MA organizations must follow compensation requirements that "only apply to independent agents and brokers" who meet CMS's licensing and training requirements, which include meeting all state licensing requirements. 42 C.F.R. § 422.2274(d); *see also id.* § 422.2274(b), (d)(1). CMS imposes a cap on "compensation" related to enrollment, *id.* § 422.2274(d)(2)-(3), but narrowly defines that term to include commissions, bonuses, gifts, prizes, and awards, *id.* § 422.2274(a)(i). Certain reimbursements and fees are excluded from this definition. *Id.* § 422.2274(a)(ii).

Plans can also provide "administrative payments" outside of the compensation caps for "services other than enrollment of beneficiaries," up to the "value of those services in the marketplace." 42 C.F.R. § 422.2274(e)(1). As examples of these administrative services, the current regulations list "training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments." *Id.* Administrative payments "can be based on enrollment" so long as payments are "at or below the value of those services in the marketplace." *Id.* § 422.2274(e)(2). Often, third-party entities (such as Council members), not individual agents, receive these payments.

The Proposal, by contrast, would redefine "compensation" to include administrative fees and reimbursements—subjecting them for the first time to CMS's ceiling levels on enrollment-based compensation. 88 Fed. Reg. at 78,554/3-56/3. The Proposal would also transform the cap on compensation into a fixed payment by changing the regulation from permitting compensation "at or below" the amount determined by CMS to permitting compensation only "at" that amount. *Compare* 42 C.F.R. § 423.2274(e)(2), *with* 88 Fed. Reg.

**App.008**

**GIBSON DUNN**

January 5, 2024
Page 8

at 78,624/1-2.[4]   Although CMS would raise this compensation amount for MA initial enrollments by $31 (from $601 to $632) per enrollee to account for a small, cherry-picked subset of the administrative services provided to carriers—certain training and testing services, as well as recording—CMS did not otherwise attempt to reflect in the Proposed Rule's new compensation rates the value of the many other administrative services provided by agents, brokers, and the firms they work with.  *See id.* at 78,556/2-3.

As an initial matter, it is unclear whether the Proposal would subject administrative payments to FMOs, telesales companies, and other similar third-party entities—as opposed to individual agents and brokers on the ground—to the compensation caps.  CMS should clarify that such payments are *not* subject to the caps.

To the extent the Proposed Rule's changes apply to FMOs, telesales companies, and other third parties, however, the Proposal would essentially eliminate *any* payment for many of the essential administrative services that Council members currently provide at market rates, including:  providing access to numerous carriers' plans and specific product training regarding those plans, providing telephone and computer support services, taking customer calls and routing them to agents and brokers as leads, developing technology that facilitates plan comparisons, purchasing hardware, conducting direct-mail or social media marketing campaigns, and more.  These provisions would force many Council members to exit the business.  Those that remain will have to operate at a loss if they continue to provide carrier access, marketing, support-service, and other administrative services.  And without these services, beneficiaries will be presented with fewer plan options and will receive less help determining which of those options they should choose.  That result is at odds with Congress's mandate to create incentives to sign up individuals for the plan that best meets their health care needs.  42 U.S.C. § 1395w-21(j)(2)(D).

The Council is specifically concerned about the following aspects of the Proposed Rule's provisions governing administrative payments and compensation rates.

- **Section II.A:**  At the threshold, the Proposal is unclear in several respects.  As the Council reads the Proposal, carriers' administrative payments to third-party firms, including licensed or unlicensed FMOs and telesales companies—as opposed to direct payments to individual agents and brokers—would *not* be subject to CMS's compensation caps.  But the Proposal is opaque about whether such administrative payments are subject to CMS's compensation requirements, and that lack of clarity generates untenable uncertainty for Council members.  If CMS moves forward with its Proposal, CMS should clarify that the proposed change to Section 422.2274(e)(2) applies only to administrative payments made by carriers to

---

[4] This comment letter nonetheless refers to CMS's proposed fixed-payment regime as a "cap" to emphasize its effect of prohibiting any greater compensation.

**GIBSON DUNN**

January 5, 2024
Page 9

individual agents or brokers.  If CMS intended otherwise—or will finalize a rule stating otherwise—applying the rule to firms would only exacerbate the host of legal and policy problems caused by the rule.  CMS should also clarify the Proposed Rule's effect on renewal-based payments for enrollments that precede Section 422.2274(e)(2)'s effective date, and should make clear that the Proposed Rule is not intended to regulate the payments that third-party firms, as opposed to carriers, make to individual agents and brokers they may employ or with whom they may contract.

- **Section II.B:**  The Proposed Rule's regulation of administrative payments would be an unprecedented and unlawful expansion of CMS's statutory authority. Congress gave the Secretary power to regulate "the use of compensation" to create incentives for agents and brokers to enroll individuals in the plans that best meet their health care needs.  42 U.S.C. § 1395w-21(j)(2)(D).  CMS thus has authority to regulate the purposes for which agents and brokers are compensated and the form compensation takes, but it has no statutory authority to set the dollar amount of compensation permitted—a power that Congress grants sparingly and that agencies like CMS are particularly ill-equipped to wield.  As CMS has recognized all along, moreover, administrative payments are *not* compensation, and CMS thus lacks statutory authority to regulate them.  And at a minimum, CMS lacks authority to regulate administrative payments to firms, as opposed to individuals, under the ordinary meaning of "compensation."

  Council members have so far not objected to CMS's existing compensation caps because they were limited to payments for enrollment and were tied to the "[f]air market value" of each enrollment.  42 C.F.R. § 422.2274(a).  But a decision by CMS to expand those caps to include payments for administrative services without permitting firms to recover the fair-market value of those services would prompt legal challenges to the Proposed Rule that would implicate the authority already asserted by CMS in its current regulations.

- **Section II.C:**  Even if CMS is inclined to defend the expansive new authority it asserts in the Proposed Rule, it should not—and cannot—do so without further study and an opportunity for commenters to meaningfully address the rule's evidentiary basis.  CMS rushed out its proposal without any meaningful effort to study the payment practices it seeks to regulate, understand the purported problem it claims to be addressing, or identify potential solutions based on objective data. It has made only the most cursory effort, if that, to study how administrative payments are structured, whether those services are necessary, or whether any firm could afford to provide them without compensation at market rates.  Moreover, the Proposal is built on an impermissibly concealed and deficient factual record. CMS repeatedly refers to evidence that it has not made available to the public.  At other

**GIBSON DUNN**

January 5, 2024
Page 10

times, CMS asserts factual propositions without citing anything in support.  And CMS solicits data from commenters that CMS presumably intends to use to finalize the rule, without giving stakeholders the opportunity to review and comment on such data.  For each of these reasons, the Council and other commenters have yet to receive a genuine, adequate opportunity to subject the Proposed Rule's assumption to public scrutiny.  CMS should therefore withdraw the Proposed Rule's compensation provisions because of these grave procedural deficiencies.  Alternatively, CMS should suspend this rulemaking, collect the information it needs, make available the evidence it relies on, and—if justified—re-propose a revised rule with a fresh comment period.  At a minimum, CMS should extend the comment period to no sooner than 90 days after the date on which all necessary information is disclosed, including information sent to the agency in response to this proposal.

- **Section II.D:**   CMS's asserted justifications for eliminating administrative payments do not withstand scrutiny for at least three reasons.  *First*, CMS's proposal is a solution in search of a problem.  Accounting for inflation, administrative payments are *not* steeply increasing, and any increase would be justified because CMS has mandated additional services and its regulations have made other services more labor-intensive or technology-dependent over time.  Moreover, administrative payments are not a means of circumventing limits on compensation for enrollments.  Instead, administrative payments reflect fair-market value for vital and legitimate services provided by FMOs, telesales companies, and other firms supporting individual agents and brokers.  Nor do administrative payments to firms influence agents and brokers (who do not receive those payments) or Council members (who sell plans in droves from carriers that offer lower administrative payments), as demonstrated by studies showing that beneficiaries are not bothered when agents or brokers have purported financial incentives to enroll them in an MA plan.  In fact, Council members and similar firms benefit financially when beneficiaries stay with a plan for years, so they have every reason to ensure that individuals are enrolled in the right plan from the start.  Some carriers also spread out administrative payments over several years or make additional administrative payments for persistent enrollment to ensure that third-party firms help beneficiaries find the right plans from the start.  CMS's concerns about questionable financial incentives thus rest on unsupported and incorrect premises.  *Second*, CMS's assertion that its Proposed Rule is necessary to promote industry competition is not a statutorily authorized consideration, nor will the Proposed Rule promote competition.  In fact, if applied broadly, it will eliminate broad swaths of the industry.  In any event, artificial price caps are the antithesis of healthy marketplace competition.   *Third*, CMS's proposed $31 per-initial-enrollment increase to its payment limits does not come close to fully reimbursing Council members for the full suite of administrative services they provide to both

**GIBSON DUNN**

January 5, 2024
Page 11

new and renewing enrollees. CMS should abandon its Proposal, which has no basis in reality and will, contrary to Congress's and CMS's stated goals, result in worse outcomes for beneficiaries and less competition.

- **Section II.E:** Especially if applied broadly, the Proposed Rule will have disastrous consequences, including for beneficiaries. If Council members and other similar firms are prohibited from recovering the fair-market value for the administrative services that they provide, many will lose so much revenue that long-term profitability will be out of reach, forcing them to exit the market entirely. Those that survive will severely curtail the services they provide, contract with fewer carriers, and carry fewer plans. And carriers, in turn, will fill these gaps by selling their plans—and only their plans—through their own employees and captive independent agents in the market. All of this is bad for beneficiaries—including low-income and disabled beneficiaries who most need help from Council members, agents, and brokers to select a suitable plan. They will have fewer plan options, not more. They will have fewer resources to help them choose the right plan, not more. And they will have fewer opportunities to enroll at all, not more. The Proposed Rule, in short, would upend an industry and undercut Congress's goal of encouraging incentives to get individuals enrolled in the plans that best meet their health care needs.

- **Section II.F:** CMS's approach is made more puzzling because CMS could have addressed its concerns—if such concerns were validated after collecting more information about administrative payments—by investigating administrative payments and, if proven to be necessary, enforcing existing regulations or by regulating the *use* of compensation, as Congress authorized. For example, CMS could enforce existing requirements aimed at preventing consumer confusion and keeping administrative payments at fair-market value. CMS also could have targeted specific practices that CMS believes are genuine end-runs around CMS's existing regulations, such as organizations improperly classifying certain bonuses as administrative payments—if CMS determined that such practices actually were occurring after collecting more information. If CMS nevertheless insists on regulating administrative payments and has the regulatory authority to do so, then it must ensure that *all* administrative services are reflected in the value of the rule's compensation cap. But CMS either failed to explain its rationale for rejecting these alternatives or did not consider them at all.

CMS should not, and cannot, proceed with the Proposed Rule.

**App.012**

**GIBSON DUNN**

January 5, 2024
Page 12

### A.      The Proposed Rule is unduly ambiguous in multiple respects.

The Proposal contains several ambiguities regarding:  (1) its application to carriers' administrative payments to firms, as opposed to individual agents and brokers; (2) its effect on renewal-based payments for enrollments that precede 2025; and (3) its application to third-party firms' payments to individual agents and brokers.  The Proposal's lack of clarity makes it difficult for the Council to fully and accurately assess and comment on the Proposal.  It also counsels against adopting the Proposal at all.  At a minimum, CMS must clarify the following issues before proceeding.

**1.**  As an initial matter, it is unclear whether the Proposed Rule's limitations on administrative payments would apply to the Council's members and other FMOs, telesales companies, and similar third-party firms—or whether it is instead limited to regulating administrative payments to individual agents and brokers.  Council members believe that the Proposed Rule is best read as *not* applying to administrative payments to firms (even if those firms are licensed as agents or brokers), and *only* applying to payments to individuals.  But the Proposal's opacity generates untenable uncertainty for Council members moving forward.  To the extent CMS proceeds with its Proposal, CMS should clarify its intent and confirm that the Proposal does not apply to FMOs, telesales companies, and similar firms, regardless of whether those entities are licensed as agents or brokers.  If CMS meant otherwise, then CMS would need to engage with the many legal and policy problems that would result from applying the Proposal to firms and that the Council identifies throughout this comment letter.

Under the Proposed Rule, administrative payments will be "included in the calculation of enrollment-based compensation" starting in 2025.  88 Fed. Reg. at 78,624/2 (proposed 42 C.F.R. § 422.2274(e)(2)).  But under another provision of the regulation that CMS does not propose to change, the "compensation requirements only apply to independent agents and brokers"—not firms.  42 C.F.R. § 422.2274(d).  That regulation further provides that MA organizations may "only pay agents or brokers who meet the requirements in paragraph (b) of this section," and paragraph (b) enumerates licensing and testing requirements that only individuals can meet.  *Id.* § 422.2274(b)(1)-(3), (d)(1)(i).  Likewise, the Proposal treats "agents and brokers" as distinct from third-party entities.  The Proposal's limitations on contract terms, for example, expressly applies to contracts "with an agent, broker, *or other* [*third-party marketing organization*]."  88 Fed. Reg. at 78,624 (proposing 42 C.F.R. § 422.2274(c)(5)) (emphasis added).  As Council members read the Proposed Rule, therefore, CMS would subject administrative payments to the compensation caps *only* when carriers make those payments directly to the individuals on the ground selling plans.  Conversely, carriers could continue to make administrative payments to FMOs, telesales companies, and other third-party entities for their services without those payments counting toward compensation limits.

That distinct treatment of individuals and firms makes sense.  FMOs, telesales companies, and other firms do not interact directly with beneficiaries or make plan

**GIBSON DUNN**

January 5, 2024
Page 13

recommendations.  They instead typically provide carrier-agnostic support for the agents and brokers who interact with the beneficiaries and make those recommendations.  When plans pay these firms, therefore, those payments do not create the kinds of adverse incentives that CMS has identified as concerning because such administrative payments do *not* go to individual agents and brokers.

The Council's reading is also in accord with CMS's preamble.  CMS states that its "proposals . . . are focused on payments and compensation made to agents and brokers."  88 Fed. Reg. at 78,553/1.  CMS separately states that it "is *also* concerned about" payments from MA plans to third-party marketing organizations, including FMOs, and requests comments about how it can "*further* ensure that payments made by MA plans to FMOs do not undercut" the Proposal.  *Id.* at 78,553/1-2 (emphases added).  These statements indicate that CMS excluded administrative payments to FMOs and other third parties from the Proposal's compensation caps, even if CMS might decide to study such payments for purposes of a separate rulemaking.

But CMS has left room for lingering uncertainty.  CMS would subject "administrative payments" to the enrollment-based compensation cap, without specifying whether CMS meant administrative payments *to anyone* or only administrative payments *to individual agents and brokers*.  88 Fed. Reg. at 78,624/2 (proposed 42 C.F.R. § 422.2274(e)(2)).  CMS also does not define "agent" or "broker," even though a definition would make clear it is not (improperly) using those terms in a way that might be construed broadly enough to encompass FMOs, telesales companies, and other third-party entities.[5]

That lack of clarity is untenable.  Some carriers might continue to make administrative payments to Council members, but other carriers might stop making administrative payments either because they (incorrectly) interpret the Proposed Rule or out of an abundance of caution.  Council members, in turn, would exit the business or, for those that survive, have to choose between continuing to offer administrative services to carriers that do not pay for them or discontinuing those services.  So some Council members would have to close up shop, while others would operate some services at a loss.  Either way, the result would be harmful to beneficiaries, who would lose out on various valuable administrative services.

---

[5] By contrast, when CMS promulgated its initial compensation rule, it defined "independent brokers or agents" to encompass only individuals:  "By 'independent brokers or agents' we mean contracted brokers or agents, whether they sell for one plan, multiple plans, or work through a Field Marketing Organization (FMO), general agent (GA), or other similar subcontracted marketing organizations."  *Medicare Program Revisions*, 73 Fed. Reg. 54,226, 54,238/1 (Sept. 18, 2008).  But CMS did not define this specific term in the Proposal.  Nor has CMS otherwise defined "agent" or "broker" in current regulations or the Proposal.  *See* 42 C.F.R. § 422.2.

**GIBSON DUNN**

January 5, 2024
Page 14

Council members' experience with other recent rulemakings highlights the dangers of an ambiguous rule.  For example, when CMS issued a rule requiring a 48-hour cooling off period in between appointment scoping calls and agent meetings with beneficiaries, *see Medicare Program; Contract Year 2024 Policy and Technical Changes*, 88 Fed. Reg. 22,120, 22,122/3 (Apr. 12, 2023), carriers interpreted CMS's (misguided) requirements in different ways, subjecting Council members to uneven and varying carrier-imposed preferences for a rule that CMS never justified in the first place.  The Proposal's opacity invites similar problems by opening the door to carriers interpreting the compensation provisions in different ways.

To be clear, the Council believes that CMS has proposed—and intended to propose—a rule in which carriers' ability to make administrative payments to FMOs, telesales companies, and other third-party entities (whether licensed or unlicensed) is unaffected.  But CMS cannot adopt a rule that leaves its requirements uncertain.  If CMS proceeds with its rulemaking, the Council requests that CMS make its intent clearer.  To the extent CMS intended or now decides to subject all administrative payments to compensation requirements, however, the Proposal would exacerbate the host of additional legal and policy problems that will be discussed in Sections II.B through II.F.

**2.**  Another point of uncertainty is how the Proposal would apply in 2025 or later to renewal-based administrative payments tied to enrollments that precede Section 422.2274(e)(2)'s effective date.  The Proposed Rule states that "[b]eginning in 2025," administrative payments are included in the calculation of enrollment-based compensation.  88 Fed. Reg. at 78,624/2 (proposed 42 C.F.R. § 422.2274(e)(2)).  But it is unclear whether that provision would subject to the cap administrative payments that carriers agreed *before* 2025 to pay but are *in fact paid* in 2025 or later, such as renewal-based payments for plans in which beneficiaries initially enrolled before Section 422.2274(e)(2)'s effective date and renewed after Section 422.2274(e)(2)'s effective date.  It is also unclear whether that provision would apply to plans executed in *calendar year* 2024 for *plan year* 2025, or only to plans executed in calendar year 2025 for plan year 2025 or later.

Council members believe that CMS has proposed to apply its new rule only prospectively—i.e., to administrative payments that carriers agree after plan year 2025 to pay.  Otherwise, CMS would create constitutional concerns.  Carriers already have agreed, and will continue to agree, to make renewal-based payments in 2025 or later for enrollments that precede Section 422.2274(e)(2)'s effective date.  And those payments would be for services that either have already been rendered or were already contractually required to be rendered.  Carriers and firms therefore have and will have accounted for those payments in their business plans.  CMS would violate due process guarantees if it were to deprive firms after-the-fact of administrative payments that carriers agreed to pay at a "time when [CMS] said it was lawful" to do so.  *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 462 (D.C. Cir. 2017) (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012)).

**GIBSON DUNN**

January 5, 2024
Page 15

Should CMS proceed with the Proposed Rule, therefore, it should clarify the Proposal to make clear that it does not impact administrative payments tied to renewals of plans in which beneficiaries enrolled prior to plan year 2025. If CMS were instead to clarify that it meant to impact such administrative payments, then it would have to grapple with the due process concerns described above and other legal and policy problems described in the remainder of this comment.

**3.** Finally, CMS should make clear that the Proposal would not require third-party firms, as opposed to carriers, to make standardized compensation payments to individual agents and brokers.

Under current regulations, MA organizations may pay individual agents and brokers compensation "at or below" the fair-market value amount calculated by CMS. 42 C.F.R. § 422.2274(d)(2). Third-party firms can also pay individual agents or brokers that they employ or contract with, and some firms pay amounts *below* the compensation cap. But the Proposed Rule would remove the "at or below" language, and instead provide that MA organizations "may pay compensation *at*" fair-market value. 88 Fed. Reg. at 78,624/2 (emphasis added) (proposed 42 C.F.R. § 422.2274(d)(2)).

As Council members read the Proposed Rule, the mandatory and uniform payment amount would apply only to *carriers*' payments to individual agents and brokers—not to *third-party firms*' payments to individual agents and brokers. Section 422.2274(d)(2) applies only to "MA organizations," which are defined elsewhere to mean public or private risk-bearing entities that are certified by CMS as meeting MA contract requirements. 42 C.F.R. § 422.2. CMS also described its Proposal as setting a "single" compensation rate "for all *plans*." 88 Fed. Reg. at 78,554/2-3 (emphasis added). But other statements create confusion. For example, CMS suggests that its Proposal would result in agents and brokers being paid the "same amount either from the MA plan directly or by an FMO." *Id.* at 78,555/1.

The Council requests that CMS make clear that the uniform payment requirement does not apply to third-party firms such as FMOs, telesales companies, and other similar entities. But if CMS intended otherwise, the Council urges CMS to reconsider. Forcing Council members to pay the exact same amount to every agent or broker that they employ or contract with—in some cases, at an hourly rate—regardless of the individual's performance or contributions, removes their flexibility to adjust compensation depending on what their business models and market forces support. And compelling firms to pay to their own employees or independent contractors a government-prescribed amount that cannot fluctuate by a single dollar would be the antithesis of competition. *See infra*, at 39. Given these disastrous consequences, CMS should confirm that the Council is correct in reading the Proposal as requiring only carriers, not third-party firms, to make standardized payments to individual agents and brokers. If CMS disagrees with the Council's reading, then CMS must

**GIBSON DUNN**

January 5, 2024
Page 16

explain its reasons for taking a contrary approach despite the problems articulated above and elsewhere in this comment.

> **B.    The Proposed Rule's compensation provisions exceed and are inconsistent with CMS's statutory authority.**

CMS's proposal to subject administrative payments to price caps would represent an indefensible expansion of its authority under Section 1851(j)(2)(D) of the Social Security Act. Section 1851(j)(2)(D) provides:

> The Secretary shall establish limitations with respect to at least the following: … The use of compensation other than as provided under guidelines established by the Secretary.  Such guidelines shall ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs.

42 U.S.C. § 1395w-21(j)(2)(D).  As its plain text reflects, that provision grants the Secretary a limited authority to regulate the "use" of "compensation."  A grant of authority to regulate the "use" of compensation, however, is not a grant of authority to regulate the *amount* of compensation provided.  As CMS has long recognized, moreover, reimbursement for administrative services rendered is not "compensation," 42 C.F.R. § 422.2274(e), so CMS has no authority to regulate it.  And the term "compensation" ordinarily refers only to payments to individuals, so CMS cannot use its authority over "compensation" to regulate carriers' arm's-length payments to firms.

> **1.    CMS has no authority to impose caps on the amounts of compensation paid to firms, agents, or brokers.**

CMS has statutory authority to regulate how compensation is "use[d]"—not to regulate the *amount* of compensation provided. 42 U.S.C. § 1395w-21(j)(2)(D).  CMS's first regulation on this issue got it right.  *See Medicare Program Revisions*, 73 Fed. Reg. 54,226 (Sept. 18, 2008).  There, CMS established "guidelines specifying how compensation is disbursed, whether an agent receives a new or renewal compensation, and what qualifies as compensation."  *Id.* at 54,239/1; *see also id.* at 54,238/2 (describing CMS's approach to "compensation structure").  Yet CMS initially *declined* to set "specific dollar values" on the *rate* of compensation.  *Id.* at 54,239/1.  In other words, CMS regulated the "use of" compensation by dictating *how* it was deployed, without dictating how *much* plans could compensate for services.

Just months later, CMS went astray by setting price caps (at "fair market value") for compensation tied to enrollments.  *Medicare Program; Compensation Plans*, 73 Fed. Reg. 67,406 (Nov. 14, 2008).  CMS recognized that capping compensation at a specific rate was a "significant change in approach."  *Id.* at 67,408/2, 67,409/1-2.  Yet CMS never explained at

**App.017**

**GIBSON DUNN**

January 5, 2024
Page 17

the time—nor has it ever explained since—how regulating the *rate* of compensation is consistent with Congress's statutory directive to regulate the "use" of compensation. *See*, *e.g.*, *Medicare Program*, 76 Fed. Reg. 54,600, 54,622/2 (Sept. 1, 2012); *Medicare Program; Contract Year 2015 Changes*, 79 Fed. Reg. 29,844, 29,862/3 (May 23, 2014).

Council members have not objected to these regulations because of their comparatively limited nature. CMS's price caps were limited to enrollment services, rather than reimbursement for administrative services or marketing expenses, so CMS's rules at least permitted agents, brokers, and the firms they worked with to recover market rates for their services. But CMS's new proposal would cast off those constraints by subjecting nearly everything—including legitimate "compensation" *and* administrative payments—to hard caps, making it effectively impossible to recoup those expenses. None of that is authorized by the statute, because none of that regulates the "use" of compensation.

Congress's deliberately qualified wording about the *use* of compensation stands in contrast to Congress's general practice of conferring regulatory authority to set rates of compensation only in clear and explicit text. "Rate regulation," after all, is a controversial and "complex process." *S. Union Co. v. Mo. Pub. Serv. Comm'n*, 289 F.3d 503, 507 (8th Cir. 2002); *cf. DoorDash, Inc. v. City of New York*, 2023 WL 6118229, at *12-23 (S.D.N.Y. Sept. 19, 2023) (holding that a "price-setting regulation" that "capped" commission rates one company charged another was plausibly unconstitutional). Congress accordingly does not lightly—or cryptically—confer that power.

Instead, when Congress intends to confer ratemaking authority, it does so expressly. For instance, Congress expressly directed that the Consumer Financial Protection Bureau may regulate "[t]he *amount* of any penalty fee or charge that a [credit] card issuer may impose," and then expressly designated four factors that the agency must consider in determining that amount. 15 U.S.C. § 1665d(a), (c) (emphasis added). Similarly, Congress empowered the Federal Energy Regulatory Commission to regulate prices for natural-gas storage "at market-based rates," and then directed the agency to consider multiple factors such as whether the rates are "just," "reasonable," "not unduly discriminatory," and not "preferential." *Id.* §§ 717c(a), 717c(f)(3).

So, too, in other portions of the Social Security Act itself. In the section of the Act immediately following the compensation provision at issue here, Congress empowered the Secretary to "establish separate *rates* of payment to … Medicare+Choice organization[s]" regarding individuals with end-stage renal disease. 42 U.S.C. § 1395w-23(a)(1)(H) (emphasis added). Elsewhere in the Act, Congress directed the Secretary to "determine … a per capita *rate* of payment" to certain plans that enroll individuals in risk-sharing contracts. *Id.* § 1395mm(a)(1)(A) (emphasis added). Even more striking is the Act's treatment of payments to physicians. *See id.* § 1395w-4. Congress expressly mandated caps on physician compensation at the lesser of "the actual charge for the service" or the price determined under

**GIBSON DUNN**

January 5, 2024
Page 18

a "fee schedule" that CMS is authorized to promulgate. *Id.* § 1395w-4(a)(1)(A)-(B). The statute then sets forth sprawling instructions for how to establish fee schedules "for all physicians' services" in covered areas. *Id.* § 1395w-4(b).

By contrast, Section 1395w-21(j)(2)(D) makes no mention of ratemaking and omits anything resembling the detailed list of factors that Congress typically includes when authorizing agencies to set prices—including in other provisions of the Social Security Act. All of those express conferrals of rate-regulation power demonstrate that Congress's distinct choice here stopped short of empowering the Secretary to regulate the rate of compensation through caps. Where Congress includes such express authority in one portion of a statute but omits it in another, Congress presumptively "intended a difference in meaning." *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161 (2018); *see also Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1192 (9th Cir. 2023) (express provision of ratemaking authority in one portion of a statute counseled against reading another portion of the statute to silently encompass it). CMS cannot claim authority to set rates for MA firms based on briefly worded power to regulate the "use of compensation" when, for example, Congress elsewhere gave CMS an express and intricate roadmap to set rates for physicians.

CMS's approach is not only an unnatural reading of the statute, but it leaves the critical statutory term "use" superfluous with no independent work to perform, contrary to the "presumption" against "superfluous" statutory terms. *McDonnell v. United States*, 579 U.S. 550, 569 (2016). If Congress had meant to empower CMS to regulate *any* aspect of compensation, it easily could have said that the "Secretary shall establish limitations *on* compensation" or "shall limit compensation" or even "set rates of compensation," rather than framing a limitation on the *use* of compensation.

Moreover, the power to price-fix payments here is a "major" decision for which CMS lacks "clear congressional authorization." *West Virginia v. EPA*, 142 S. Ct. 2587, 2614 (2022) (quotation marks omitted). CMS has claimed "expansive" power to set rates for all kinds of services in an "industry constituting a significant portion of the American economy." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–62 (2000); *see supra*, at 5 (noting that Medicare Advantage has 30 million enrollees). To pull off that move, CMS would need more than "merely plausible" or "colorable" textual arguments. *West Virginia*, 142 S. Ct. at 2609. The authority to regulate the use of compensation is too thin a reed to support CMS's broad Proposed Rule. *See id.*; *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023); *NFIB v. Dep't of Labor*, 595 U.S. 109, 117, 119 (2022) (per curiam). To conclude otherwise would risk opening many other industries to government price-fixing based on thin authority—a step that courts would rightly hesitate to endorse.

Finally, the Proposed Rule opens the door to constitutional non-delegation problems that are better avoided. Interpreting Section 1395w-21(j)(2)(D) as authorizing CMS to regulate the purposes for which agents and brokers are compensated is an appropriately "narrow

GIBSON DUNN

January 5, 2024
Page 19

constructio[n]" of a statute that "might otherwise be thought to be unconstitutional," and should be favored. *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989). But if Section 1395w-21(j)(2)(D) were to grant CMS broad freedom to regulate payments in this industry as it sees fit, it would violate the non-delegation doctrine. *See* U.S. Const. art. I, § 1. On that reading, Congress neither set forth "an intelligible principle to which the [agency] is directed to conform," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (quotation marks omitted), nor "ma[de] the policy decisions" while leaving CMS "with only details to fill up," *Gundy v. United States*, 139 S. Ct. 2116, 2136, 2143 (2019) (Gorsuch, J., dissenting).

CMS's proposal to extend its cap to administrative payments and reimbursements thus takes a bad idea and makes it worse. If CMS forges ahead with the Proposed Rule, the Council will have no choice but to challenge CMS's authority to set *any* price caps.[6]

## 2. Administrative payments and reimbursements are not "compensation."

CMS's Proposed Rule also exceeds CMS's authority under Section 1395w-21(j)(2)(D) because it purports for the first time to treat reimbursements for "mileage," "actual costs," state-certification costs, and administrative payments (like overhead and training costs) as "compensation." 88 Fed. Reg. at 78,624/1. That approach is an about-face from CMS's own longstanding understanding of that term and is at odds with the ordinary meaning of "compensation."

When CMS first promulgated Section 422.2274 and determined "what qualifies as compensation," it agreed that reimbursements and fees simply "are … not considered compensation." *Medicare Program Revisions*, 73 Fed. Reg. at 54,239/1. And when CMS added the operative provision about administrative payments, it agreed that an administrative payment (for a health-risk assessment, as an example) is a payment "*other than compensation* because the payment is not for the sale or renewal of a policy." 86 Fed. Reg. at 5,993/3-94/1 (emphasis added). Tellingly, administrative payments were not even excluded from CMS's preexisting definition of compensation. *See* 42 C.F.R. § 422.2274(a)(i). Rather, administrative payments were treated as an entirely separate kind of payment placed into an entirely separate subsection. *Id.* § 422.2274(e). Both rules rested on the understanding that "compensation" is not a limitless concept that encompasses every payment from a plan to an

---

[6] CMS also has never justified its decision to limit administrative payments—which are not compensation, *see infra*, at 19-20—to "the value of those services in the marketplace." 42 C.F.R. § 422.2274(e)(1), (2). When CMS promulgated that subsection, it did not point to a source of statutory authority. *See Medicare Programs; Contract Year 2022 Changes*, 86 Fed. Reg. 5,864, 5,993/3-94/1 (Jan. 19, 2021). Accordingly, CMS's ability to impose upper limits on administrative payments would also be called into question if it insists on imposing price-specific caps on compensation.

**GIBSON DUNN**

January 5, 2024
Page 20

agent, broker, or firm. Now, in a blink, CMS would "includ[e] in the definition of compensation" administrative payments, reimbursements, and fees. 88 Fed. Reg. at 78,555/2.

CMS had it right the first time. Its long-held view accords with the statute's ordinary meaning. Everyday speakers would not understand the term "compensation" in an employment-related context to encompass reimbursements or administrative payments. "Compensation" instead typically refers to a payment for services, not a reimbursement for costs incurred in rendering that service (such as "actual costs" the broker incurs, state certification fees, or overhead). For instance, an attorney's "compensation" (*i.e.*, salary for performing legal services) is distinct from a reimbursement the attorney may receive from her firm for the cost of purchasing a legal treatise.

Consistent with everyday usage, Congress has historically distinguished between "compensation" and "reimbursement," rather than considering them interchangeable terms. *See, e.g.*, *In re Reynolds Investing Co.*, 130 F.2d 60, 61 n.1 (3d Cir. 1942) (statute expressly encompassed "compensation for services rendered *or* reimbursement for costs and expenses incurred" (quoting 11 U.S.C. § 649) (emphasis added)). Similarly, the Fair Labor Standards Act provides that "reimburs[ements]" are "not" compensation, and therefore are not included in the calculation of an employee's "regular rate" for purposes of overtime payments. 29 U.S.C. § 207(e)(2); *see also* 29 C.F.R. § 778.217(a) (reimbursement for reasonable expenses "is not compensation for services rendered"). Given this traditional distinction between compensation and reimbursements, it would be incongruous for Congress's Medicare statute to sweep in administrative payments and reimbursements as "compensation."

CMS's new reading of "compensation" would also pull the rug out from under an industry that has relied on CMS's correct, longstanding interpretation. The reliance interests threatened by CMS's proposal cannot be understated: An entire industry has developed around the understanding of "compensation" that CMS has adhered to for fifteen years. Companies with thousands of employees—Council members included—have designed their business models on the assumption that expenses and administrative payments are not "compensation" subject to restrictive caps, but instead are other payments that can be recouped at market rates. Those businesses structured their contracts with carriers on that assumption, secured loans on it, and even based their initial public offerings on it. Their business model is predicated on the understanding that CMS cannot simply regulate them out of existence by lopping off a significant portion of their revenue based on a newfound statutory interpretation. Those "serious reliance interests … must be taken into account" by an agency in evaluating whether to change positions. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quotation marks omitted). And they strongly counsel against modifying CMS's approach in the expansive manner set forth in the Proposal.

GIBSON DUNN

January 5, 2024
Page 21

### 3.   "Compensation" does not encompass payments to firms.

Even if administrative payments to individual agents and brokers may qualify as "compensation" in certain circumstances, administrative payments to Council members and other third-party firms do not.  Any attempt to extend the compensation caps to FMOs, telesales companies, and other firms would be unauthorized and unnecessary.

*First*, the ordinary meaning of "compensation" does not extend to payments from MA organizations to third-party firms such as FMOs at all.  No one would naturally think that a business earns "compensation," rather than yearly "revenue" or "profits."  That is because "compensation" in an employment-related context is typically understood to include payments *to individuals* akin to a salary and bonuses (and, perhaps, other payments).  "Compensation" means "payment for services," especially "wages or remuneration."  Webster's New World College Dictionary 289 (2d ed. 1970).  Individuals, not firms, are paid wages.  And remuneration, in turn, means payments to "a person," not payments from one company to another company for discrete services.  *Id.* at 1202; *cf. Lazarus v. Chevron U.S.A., Inc.*, 958 F.2d 1297, 1302 (5th Cir. 1992) (attorneys' fees "not payable to the employee . . . cannot constitute compensation within the plain meaning" of that term).

The statute tracks that basic distinction.  Congress provided that guidelines about "the use of compensation" should "creat[e] incentives *for agents and brokers*" to enroll beneficiaries in appropriate plans.  42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added).  If "compensation" were intended to sweep in not only payments to individuals but also payments to firms, Congress would not have used the limited language that it chose.  CMS would overstep its legislative mandate if it were to regulate administrative payments made to firms, as opposed to individuals.

*Second*, administrative payments to Council members and other firms do not raise the same policy concerns as payments to individuals.  Council members and other firms are not advising individual beneficiaries which plans to enroll in.  Nor are Council members telling individual agents and brokers which plans to sell.  Instead, Council members typically provide carrier-agnostic support services to agents and brokers, such as making and receiving calls, developing technology, and providing training.  *See supra*, at 8.  Accordingly, when carriers make administrative payments to Council members for their services, those payments do not affect which plans beneficiaries select: the payments do not flow down to the individual agents and brokers selling plans to beneficiaries, and Council members who have already received payment for services rendered have no financial motivation to influence the decisions of those individual agents and brokers.  *See infra*, at 35-36.

CMS suggests only once, and without support, that payments to firms might create incentives to enroll individuals in particular plans.  CMS vaguely asserts its "belie[f]" that when plans pay FMOs for generating leads and then give leads to the FMO's agents, those contractual terms between carriers and FMOs "can trickle down to influence agents and

App.022

GIBSON DUNN

January 5, 2024
Page 22

brokers" that receive the leads.  88 Fed. Reg. at 78,554/2.  But CMS fails to support that belief with anything more than conjecture.  *See id.*; *infra*, at 36-37.  In any event, CMS's concern with one particular business model does not suggest that CMS should be concerned about administrative payments to *all* third-party firms—particularly firms that *solely* provide administrative services wholly divorced from the merits of underlying plans, such as tech-support or call-center services.  CMS should not press an aggressive and dubious reading of the statute in the absence of a clear policy justification.

> **C.      CMS should not move forward without careful study and a sufficient opportunity for public review of the Proposal's evidentiary basis.**

Even if CMS is inclined to defend the expansive new authority it asserts in the Proposal, it should not, and lawfully cannot, exercise that authority without further study and without giving the public a meaningful chance to review and comment on the evidence and data that CMS relies upon.  To ensure public participation and reasoned agency responses to public comment, the Administrative Procedure Act ("APA") requires that agencies follow a "logical and rational" rulemaking process, *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quotation marks omitted), that gives "interested persons an opportunity to participate," 5 U.S.C. § 553(b), (c).

Instead of the rational process envisioned by the APA, CMS's rulemaking bears the unfortunate hallmarks of a rush to implement a predetermined result.  CMS published this highly significant proposal on November 15, during the annual open enrollment period, which is one of the busiest times of the year for industry members.  The comment period spanned three federal holidays and closed less than a week after New Year's Day, which further restricted the Council's ability to assess the rulemaking.  Yet CMS declined to extend the comment period by a reasonable period that would give stakeholders the necessary time to provide meaningful input.

CMS's rushed rulemaking timeline falls short of the APA's requirements in multiple, independent ways.  To start, it provides no opportunity for CMS to study and understand the purported problem it claims to be addressing and to identify potential solutions based on objective data.  Instead, CMS has put forward a half-baked proposal supported by evidence ranging from nothing to rumor to unreliable data—nearly all of which CMS hid from public view.  The Proposal bases key assumptions about the industry on vaguely referenced complaints and studies, yet fails to disclose or identify those sources in any meaningful way that would allow commenters to understand what evidence CMS relies upon.  For other key assumptions, the Proposal simply fails to cite *any* evidence or data—disclosed or undisclosed—for support.  And the smattering of identifiable evidence that CMS does cite is unreliable and overstated.  Finally, CMS improperly attempts to backfill these evidentiary gaps by sourcing information from commenters in the first instance that other commenters will have no chance to review or discuss.

**GIBSON DUNN**

January 5, 2024
Page 23

Any one of these problems is reason enough for CMS to rethink its haphazard approach to this rulemaking. Collectively, they compel a change of course. CMS thus should suspend the current rulemaking, complete the data collection necessary for a reasoned rulemaking, make that information available for public comment and only then determine whether to proceed with a new notice of proposed rulemaking and a fresh comment period that would permit commenters to weigh in meaningfully on the Proposal's factual underpinnings. At a minimum, CMS should extend the comment period to no sooner than 90 days after the date on which all necessary information is disclosed, including information sent to the agency in response to this proposal.

> **1.    CMS's current notice period does not provide adequate opportunity for CMS to study the perceived problem.**

The first predicable consequence of CMS's rushed rulemaking process is that CMS does not seem to understand the industry its Proposed Rule targets. CMS's premise is that a problem needs fixing because (1) there has been a "steep increase" in administrative payments; (2) "some" plans "may" have used those payments "to circumvent the regulatory limits on enrollment compensation"; (3) that supposed practice creates "questionable financial incentives" for agents and brokers; and (4) those incentives "could" or "may" result in agents and brokers steering individuals toward plans that do not best meet those individuals' needs. 88 Fed. Reg. at 78,552/2-3, 78,553/2, 78,555/3. But practices plans "may" have used, and "questionable" incentives that "could" create adverse outcomes, *id.* are not an adequate basis to regulate. Before CMS restructures this industry, it must take the time to examine the practices and incentives it seeks to curtail and determine whether they actually exist and actually result in the harmful outcomes about which CMS speculates.[7]

Instead, CMS has made no apparent effort to study how administrative payments are structured for most industry participants, why payments are structured that way, whether the corresponding services are necessary, how much they cost to provide, or whether anyone could afford to provide them (or could do without them) if they were not reimbursed at market rates or at all. Of the myriad administrative services that agents and brokers provide to plans, for example, CMS identifies only three—certain training and testing services, as well as recording—whose cost it considers sufficiently "predictable" to quantify and thus to warrant an increase in CMS's cap on compensation. 88 Fed. Reg. at 78,596/2. But when an agency elects to place a cap on payments for an entire broad category of services, it does not have the luxury of considering only those costs it finds "predictable" (much less to do so without providing the affected industry participants adequate notice and opportunity to participate in

---

[7] CMS also should study the effects of its many recently issued changes on industry stakeholders before deciding whether yet another regulatory requirement is necessary. *E.g.*, CMS, *Value-Based Insurance Design Model Calendar Year 2024* (2023) (issuing guidelines for various communications and marketing materials), http://tinyurl.com/bdp5ddu8.

**GIBSON DUNN**

January 5, 2024
Page 24

the rulemaking).  To the extent that, after proper rulemaking, costs for various services remain "[un]predictable," that is a powerful reason to impose no cap at all, and certainly does not justify *making no account* for costs the government knows exists but feels unqualified to "predict."  This assertion is therefore a tacit admission that CMS lacks sufficient data to quantify the cost of other administrative services, and thus lacks any basis to determine whether agents and brokers are receiving fair payment for those services.

CMS openly concedes, moreover, that it "lack[s] the data" to quantify the Proposed Rule's "economic effects" on plans, firms, agents, brokers, and beneficiaries.  *Id.* at 78,610/3-11/1.  Given the Proposed Rule's potentially catastrophic consequences for MA and Medicare Part D plan enrollment levels and the ability for beneficiaries to make informed choices about enrollment, *see infra* at 45-48, CMS should obtain that data before it decides whether and how to regulate in this area.  Indeed, it is folly—and plainly arbitrary and capricious—for an agency to engage in price regulation while admitting ignorance about the costs its chosen price covers, and about the economic impact the price will have.  What is price-setting about, if not determining the underlying costs and the impacts the price will have?

These problems were all avoidable.  CMS had the option of requesting relevant information from stakeholders *before* proposing a rule that would effect an industry-wide sea change—an approach that CMS has previously followed.  *See, e.g.*, *Request for Information; Episode-Based Payment Model*, 88 Fed. Reg. 45,872 (July 18, 2023); CMS, *Request for Information: Transforming Clinical Practices* (2014), tinyurl.com/fysheab3.  CMS further asserts that it has "authority to collect detailed information from MA" carriers. 88 Fed. Reg. at 78,478/1.  CMS should not forge ahead in the admitted absence of critical data without employing available information-gathering processes and then sharing such data publicly for stakeholder review and comment.

> ### 2.  CMS improperly relies on undisclosed evidence and information.

As part of the APA's notice-and-comment requirements, all agencies have the "duty to identify and make available technical studies and data that [they] ha[ve] employed in reaching the decisions to propose particular rules."  *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007) (quotation marks and citation omitted) (applying 5 U.S.C. § 553(b)(3), (c)).  And where an agency omits some of the "critical factual material" and analyses from a proposed rule, it must disclose that material and provide further "opportunity to comment." *Chamber of Commerce v. SEC*, 443 F.3d 890, 900-01 (D.C. Cir. 2006).  "An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary."  *Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 199 (quotation marks and citation omitted).

Despite those principles, the Proposal repeatedly refers to complaints, reports, or studies that purportedly support CMS's key premises—yet fails to disclose the relevant source or make that information available for review.  For example, the Proposal states that CMS has

**GIBSON DUNN**

January 5, 2024
Page 25

"received complaints [about administrative payments] from a host of different organizations, including State partners, beneficiary advocacy organizations, and MA plans" about the levels of agent and broker compensation. 88 Fed. Reg. at 78,552/2. But CMS does not cite or otherwise disclose those complaints. Similarly, the Proposal states that CMS has "received reports that some larger FMOs are more likely to contract with national plans, negatively impacting competition." *Id.* at 78,553/2. CMS does not disclose those reports or even specify which reports it is invoking. Likewise, CMS claims that "according to recent market surveys and information gleaned from oversight activities, payments purportedly for training and testing and other administrative tasks for agents and brokers selling some MA plans seem to significantly outpace payments for similar activities made by other MA plans, . . . ." *Id.* at 78,555/3. Here again, CMS does not disclose those surveys or the "information" from oversight activities on which the Proposal relies.

CMS's reliance on non-public information violates the APA's requirement that agencies must publicly disclose the data and analysis on which their rulemaking is based. Without identifying what complaints, reports, surveys, and oversight information it is talking about, CMS leaves commenters unable to assess whether the purported evidence says what CMS claims it does, whether it is reliable, and whether it can justify CMS's proposal.

> **3.    CMS fails to support numerous key assumptions with any evidence.**

In addition to vaguely invoking undisclosed "studies," "complaints," and "information," the Proposal repeatedly posits numerous key assumptions without citing or even mentioning any relevant, supporting evidence. That is improper.

Agencies "must explain the assumptions and methodology" underlying a proposed rule. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 535 (D.C. Cir. 1983) (quotation marks omitted). An agency's failure to "provide [any] evidence supporting" a proposition is therefore a "dereliction of [its] fundamental procedural obligation" to consider "the potential negative consequences" of a rule. *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 45 (D.D.C. 2020).

Here, the Proposal's frequent omission of citations or supporting evidence frustrates the notice-and-comment process and violates those procedural safeguards. The Council (and other commenters) have no way of knowing whether CMS's assertions are backed by supporting evidence and, if they are, whether that evidence was soundly or arbitrarily chosen to support CMS's proposal. As a result, the public is stripped of the opportunity to discuss the data or information that CMS believes supports its decisionmaking.

Several parts of the Proposal exemplify these critical omissions. To provide a non-exhaustive list of examples:

**App.026**

**GIBSON DUNN**

January 5, 2024
Page 26

- CMS asserts that it has "learned" that "additional payments [to agents and brokers] appear to be increasing." 88 Fed. Reg. at 78,477/3; *see also id.* at 78,552/2 ("CMS has observed that such payments have created an environment, not dissimilar to … 2008, where the amounts being paid for activities that do not fall under the umbrella of 'compensation,' are rapidly increasing."). CMS cites no sources backing what it purports to have "learned" or "observed" about those increases, nor does it attempt to quantify those purported increases or indicate whether they persist after adjusting for inflation. CMS also does not specify whether the increases are in the *degree* of remuneration, or the *kinds* of activities for which payments are made. Nor does it address the key question whether the purported problem involves increased payments to individual agents and brokers, or to firms too. And CMS nowhere attempts to compare any increases in the MA context with increases in the ordinary Medicare context.

- CMS asserts that "complaints" about beneficiary confusion have "escalated at a pace that mirrors the growth of administrative or add-on payments." 88 Fed. Reg. at 78,552/3. CMS cites nothing supporting that assertion nor to demonstrate that the current "pace" of complaints is problematic, rather than merely higher than before. And it does not attempt to explain whether that relationship is causal, correlative, or coincidental, or whether it is a reflection of the growth in MA plans as a whole.

- As for FMOs that are paid both for marketing (*i.e.*, leads generated) and brokering (*i.e.*, enrollments), CMS asserts that it "believe[s] it is likely that these arrangements are having" the effect of influencing agents or brokers in determining which plan meets a beneficiary's needs. 88 Fed. Reg. at 78,554/2. It likewise "believe[s]" that current contracts between FMOs and MA plans "can trickle down to influence agents and brokers." *Id.* CMS provides no concrete evidence or data to support either assertion.

- CMS posits that "some MA organizations are paying for things such as travel or operational overhead on a 'per enrollment' basis." 88 Fed. Reg. at 78,554/1. CMS provides some hypothetical "example[s]"—like reimbursement of travel costs multiplied by the number of enrollments at a single event—but does not cite any evidence to show that this practice exists, much less that it is prevalent. *Id.*

- CMS acknowledges that under the Proposed Rule, agents and brokers will be "unable to directly recoup administrative costs such as overhead or lead purchasing," but simply asserts based on assumed enrollment levels that it does not "believe" there to be a "large risk" of agents and brokers failing "to recoup their administrative costs." 88 Fed. Reg. at 78,556/1. Yet CMS does not attempt to quantify the amount of administrative costs the Proposed Rule will make

**GIBSON DUNN**

January 5, 2024
Page 27

impossible to recoup or determine whether and to what extent the inability to recoup those costs will disincentivize agents' and brokers' enrollment activities.

If CMS has evidence that supports the propositions it advances, CMS must disclose it and give stakeholders the opportunity to comment on it. Failing to make available the underlying data that motivated the Proposal "in time to allow for meaningful commentary" transforms "what should be a genuine interchange" into "mere bureaucratic sport." *Connecticut Light & Power Co. v. NRC*, 673 F.2d 525, 530-31 (D.C. Cir. 1982). If, on the other hand, CMS lacks evidence to support those propositions, then its views about both the existence and scope of the problems it purports to identify and the likely effects of the proposed countermeasures are mere speculation, and fall short of the APA's requirement that an agency base its decisions on "substantial evidence." 5 U.S.C. § 706(2)(E). "Professing that [a rule] ameliorates a real industry problem but then citing no evidence demonstrating that there is in fact an industry problem is not reasoned decisionmaking." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006). Either way, the Proposal is incompatible with the "reasoned decisionmaking" agencies are required to employ. *Michigan*, 576 U.S. at 750 (quotation marks omitted).

### 4. CMS relies on unreliable studies and "complaints."

In the handful of instances where CMS *does* cite and disclose evidence, a review of that evidence indicates that it is impressionistic and unreliable. Two prominent examples illustrate the problem.

*First*, the Proposal repeatedly cites a so-called "research articl[e]" from the Commonwealth Fund. 88 Fed. Reg. 78,554/1 & nn.136-37, 78,555 n.140. But even taking the Commonwealth Fund's article at face value, it provides scant support for the Proposal. The article reports that "most brokers and agents in the focus groups recalled receiving higher commissions"—"sometimes much higher"—for enrolling people in MA plans compared to Medigap. *See* Faith Leonard et al., *The Challenges of Choosing Medicare Coverage: Views from Insurance Brokers and Agents*, The Commonwealth Fund (Feb. 28, 2023), http://tinyurl.com/h749x9at. But that compares apples and oranges: MA plans have more enrollment periods than Medigap plans. That, in turn, creates more opportunities for individuals to enroll or disenroll in MA plans, more enrollment and disenrollment work for third parties servicing MA plans, and ultimately higher costs to sell and service MA plans than Medigap plans. MA plans pay third parties commensurately higher rates to cover for those increased costs. In any event, the fact that some agents and brokers *sometimes* (how often, the article does not say) received higher commissions (how much higher, the article does not say) falls far short of proving that MA plan payments "have significantly outpaced the market rates for similar services" in non-MA markets. 88 Fed. Reg. at 78,554/1.

The Commonwealth Fund's research methods also provide little reason to expect that its conclusions represent systemic trends in the industry. The Commonwealth Fund asked just

**GIBSON DUNN**

January 5, 2024
Page 28

*twenty-nine* agents and brokers to share personal anecdotes about enrolling beneficiaries in Medicare plans. Leonard, *Challenges of Choosing Medicare Coverage*, *supra*. The survey gives no indication of how the participants were selected nor any basis to conclude that they constitute a representative and statistically significant sample of the *100,000* or more agents and brokers that CMS estimates operate in the United States. 88 Fed. Reg. 78,597/2 & Table J5. Anecdotes from the field are not the kind of empirical or scientific evidence that CMS should use to make important health care decisions that affect "more than 100 million people." CMS, *Data & Research* (last accessed Dec. 15, 2023), https://www.cms.gov/data-research. Neither CMS nor the Commonwealth Fund adequately explains why personal recollections from a handful of agents or brokers can be extrapolated to support industry-wide changes affecting at least 100,000 other participants. For that matter, neither CMS nor the Commonwealth Fund even explains whether certain anecdotes were representative of agents and brokers *in the focus group*. *See, e.g.*, Leonard, *Challenges of Choosing Medicare Coverage*, *supra* ("One broker recalled" a high fee, one "focus group participant" described what he or she "*think*[*s*]" was needed to obtain a bonus, and "[s]ome brokers described" purported concerns about beneficiaries' plan coverage).

*Second*, CMS's assertions rest heavily on vague concerns that its hotlines have received an increasing number of "complaints" about the enrollment process in recent years—but CMS's reliance on these complaints is pockmarked with open questions and unreliability. 88 Fed. Reg. at 78,552/3. As an initial matter, Medicare's enrollment rules create an incentive for some beneficiaries to lodge complaints because doing so can grant them additional flexibility to switch plans outside of Medicare's open enrollment period, artificially inflating the number of complaints that CMS receives. Beneficiaries ordinarily may disenroll or switch plans only during the annual open period. See CMS, Medicare Open Enrollment (last visited Dec. 15, 2023), https://tinyurl.com/53ydrz2x. But beneficiaries can also switch plans during special enrollment periods that open at other points in the year under a variety of circumstances, including when an individual demonstrates that the plan failed to provide services or when the beneficiary meets any other conditions that CMS specifies. *See* 42 C.F.R. § 422.62(b)(1)-(27); Medicare, *Special Enrollment Periods* (last visited Dec. 15, 2023), tinyurl.com/544mxh34. CMS at least should have studied whether special enrollment periods caused or contributed to any rise in the number of complaints that CMS received—and disclosed the complaints so that the public could look for themselves.

CMS also relies on an increase in complaints in a single year—from 2020 to 2021— yet fails to account for broader context. CMS does not quantify the increase in complaints over the span of multiple years (for example, 2008 to 2021). Similarly, while 2021 data was the "most recent data available" *last* year, 88 Fed. Reg. at 78,552/2 (citing data from *Medicare Program; Contract Year 2023 Policy and Technical Changes*, 87 Fed. Reg. 27,704 (May 9, 2022)), it presumably is not the most recent data available *now*. And more recent data may show a different picture, because CMS promulgated rules in 2022 and 2023 targeting the kinds of misleading communications that might result in complaints. *See Medicare Program;*

GIBSON DUNN

January 5, 2024
Page 29

*Contract Year 2024 Changes*, 88 Fed. Reg. at 22,234 (adding provision about misleading communications); *Medicare Program; Contract Year 2023 Policy and Technical Changes*, 87 Fed. Reg. 27,704 (May 9, 2022) (adding standard disclaimer requirements).  Further still, CMS's 2022 rule acknowledged that it was "unable to say that every one of the complaints" received in 2021 was the "result of [third-party marketing organization] marketing activities," 87 Fed. Reg. at 27,707/1, so it is unclear how many additional complaints that CMS received in 2021 were even relevant to the issues CMS is raising now.[8]  Nor is it clear how many complaints CMS concluded were valid and whether CMS correctly made those determinations. For Council members who reported complaints, the percentage of founded complaints is generally between 10 and 20 percent, further suggesting that it makes little sense for CMS to simply recite the raw number of total complaints in a single year as evidence of a purported problem.  Without further study by CMS—or at least disclosure of the complaints for public analysis—it is impossible to know whether any increase in complaints from 2020 to 2021 was a pure anomaly, a consequence of growth in MA plans as a whole, or representative of larger trends with respect to the payment issues addressed in the Proposal.

Data from 2020 and 2021 also may have been skewed by the COVID-19 pandemic.  In the spring of 2020, CMS adopted guidance that gave MA organizations a "number of flexibilities" during the COVID-19 pandemic.  CMS, *Information Related to Coronavirus Disease 2019* at 1 (Apr. 21, 2020), https://tinyurl.com/ypz3jvmv.  For example, MA plans could limit cost-sharing, waive certain notification requirements, adopt mid-year benefits changes, and delay certain disenrollments.  *Id.* at 1-5.  These abrupt changes may have influenced the number of complaints that CMS received in 2020.  Yet CMS does not even acknowledge this possibility, much less study it.  88 Fed. Reg. at 78,552/2.[9]

Although CMS has failed to share complaint data from each of 2022 and 2023 (even though it obviously has this data), it is the experience of some Council members that complaints to Medicare, as a percentage of enrollments, have gone down each year since 2021.

---

[8] CMS's counting of complaints in 2022 was unclear, to say the least.  In its proposed rule, CMS asserted that it received "39,617" marketing-related complaints in 2021 and "15,497" in 2020.  *Medicare Program; Contract Year 2023 Policy and Technical Changes*, 87 Fed. Reg. 1,842, 1,845/1 (Jan. 12, 2022).  But later, CMS claims that misleading activities "related to" third-party marketing organizations resulted in "hundreds" of complaints.  *Id.* at 1,901/2.

[9] There is also reason to believe that CMS's system double-counts complaints.  A beneficiary may lodge complaints with his or her plan, and the plan in turn must report those complaints to CMS.  *See* 42 C.F.R. § 422.516(a).  A beneficiary may also lodge complaints with CMS directly.  *See generally* CMS, *Parts C & D Enrollee Grievances Guidance* (Aug. 3, 2022), tinyurl.com/5athu7a3.  But CMS has no system for reconciling these duplicative complaints, so CMS may be counting the same beneficiary's same problem twice, artificially inflating the number of complaints that CMS claims it received.

**GIBSON DUNN**

January 5, 2024
Page 30

Therefore, CMS cannot justify its proposal on an alleged increase in complaints because complaints are decreasing, not increasing. And part of the reason for the decrease is that firms like Council members are investing more resources in robust compliance programs, funded by administrative payments. Taking those payments away, or reducing them, is likely to cause an increase in complaints.

These methodological concerns with the Commonwealth Fund research article and the (undisclosed) complaints show why the Council and other stakeholders cannot simply take CMS for its word that the problems CMS invokes are real. It is critical for CMS to disclose "the technical studies and data" on which it relied in deciding "to propose particular rules." *Conn. Light & Power Co.*, 673 F.2d at 530; *see supra*, at 24-27. Without disclosing such data and studies, the public is deprived of the chance for meaningful input, and the agency is deprived of the "chance to avoid errors and make a more informed decision." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019). CMS's citations to unreliable sources suggest that the Proposal is an attempt to paper over a pre-determined and arbitrary outcome, as opposed to the sort of science- and evidence-based decisionmaking that is the proper domain of a federal agency.

### 5.     CMS improperly intends to collect and rely on additional data that stakeholders cannot review or comment on.

Because the Proposal rests largely on speculation, unsupported assertions, and low-quality information, the agency invites commenters to backfill missing information needed to legitimate critical aspects of the Proposal. For instance, CMS requests that commenters inform it how many agents are even involved in selling health plans (admitting that the Proposal rests on assumptions about that figure) and admits it does "not have any data" on the percentage of new enrollments who use agents and brokers. 88 Fed. Reg. at 78,597/Table J5. These missing data will be the basis upon which CMS calculates the amount by which the compensation cap should be increased to account for certain administrative services that CMS deems appropriate. *Id.* CMS also concedes that it "lack[s] the data to quantify" the Proposed Rule's potential economic effects on all the key players in a giant industry serving millions of beneficiaries: carriers, firms, agents, and brokers. *Id.* at 87,610/3.

Such an admittedly incomplete and crude assessment of the Proposed Rule's impact falls far short of what the APA requires—particularly for a rulemaking as consequential as this one. The purpose of notice-and-comment rulemaking is to give the public "an opportunity to be heard," which "affords the agency a chance to avoid errors and make a more informed decision." *Allina Health Servs.*, 139 S. Ct. at 1816. Commenters have the legal right to know—*before* they prepare and file comments on the proposal—the evidence on which CMS will rely to take final agency action. Agencies cannot simply posit a problem based on admitted speculation, solicit key information during the comment period that commenters have no chance to see, and fill in the blanks in the final rule.

**GIBSON DUNN**

January 5, 2024
Page 31

Because assembling the relevant information *after* the comment period is legally improper, the appropriate solution is for CMS to withdraw the Proposed Rule. If it does not withdraw the rule, CMS should suspend this rulemaking, complete the data collection and analysis necessary to support crafting a properly calibrated rule, and make that information available to the public. CMS then could consider whether to re-propose the rule in light of that additional data and analysis. *See Conn. Light & Power Co.*, 673 F.2d at 531. At a minimum, CMS should extend the comment period to no sooner than 90 days after the date on which all information is collected and disclosed.

> **D.    CMS's reasons for redefining and capping compensation do not withstand scrutiny.**

Had CMS studied the industry, it would have learned that no problem exists to justify CMS's sweeping changes to the way agents, brokers, and the firms that employ or provide services to them are paid. After years of allowing plans to pay for administrative services at market rates, CMS now proposes to set rates for a very limited list of certain administrative services and to effectively eliminate any payment for myriad other valuable administrative services. *See* 88 Fed. Reg. at 78,554/3-56/2. But agents and brokers already have financial incentives to enroll individuals in the plan that best meets their needs, and CMS has not come close to proving otherwise. Nor has CMS shown that the Proposed Rule promotes competition, even if that were a permissible consideration. Further still, CMS's proposed $31 increase to the compensation cap arbitrarily fails to account for many administrative services and drastically undervalues those few services for which CMS does attempt to account. CMS should abandon its proposal, which is a classic "solution in search of a problem" that should go no further than it already has. *District of Columbia v. Dep't of Agriculture*, 444 F. Supp. 3d 1, 31 (D.D.C. 2020).

> **1.    The Proposed Rule responds to a purported problem about skewed financial incentives that does not exist.**

CMS's Proposal asserts that "action" is needed based on three premises: (1) there has been a "steep increase" in administrative payments; (2) "some" plans "may" have used those payments "to circumvent the regulatory limits on enrollment compensation"; and (3) the increase in payments creates "questionable financial incentives" for agents and brokers that "could" or "may" result in agents and brokers steering individuals toward plans that do not best meet their needs. 88 Fed. Reg. at 78,552/2-3, 78,553/2, 78,555/3. CMS has not supported adequately or explained reasonably any of these premises, much less all of them. To the contrary, evidence and logic refute the Proposal's assertions.

> **a.    Administrative payments are not steeply increasing.**

CMS has not supported its threshold premise that there have been troubling "shifts in the MA industry" with respect to how agents, brokers, and the firms that employ or provide

**GIBSON DUNN**

January 5, 2024
Page 32

services to them are paid. 88 Fed. Reg. at 78,552/1. CMS claims that there has been a "steep increase" in plans' administrative payments. *Id.* at 78,552/2, 78,553/2. And CMS claims that "overall payments to agents and brokers can vary significantly" from plan to plan. *Id.* at 78,555/1. As discussed above, however, CMS cites no evidence (or any source at all) to support these purported facts. *See supra*, at 24-27.

Moreover, in many Council members' experiences, administrative payments are *not* steeply increasing. In practice, plans often fix administrative payments for multiple years before raising them to reflect natural changes in the costs of providing administrative services or types of administrative services that firms are capable of providing. But many of the Council's members have reported that these administrative payments are *not* keeping pace with inflation, and may have been close to stagnant for nearly 10 years in certain instances.

At the same time, there would be ample justification for administrative payments to increase because the demands on agents and brokers have greatly increased—in large part due to CMS. Council members have long provided some administrative services that have now become more labor-intensive or costly because of CMS regulations, such as meetings with potential enrollees that are now longer than ever because of CMS-required disclosures and disclaimers. *Medicare Program; Contract Year 2024 Changes*, 88 Fed. Reg. at 22,122-203. Similarly, CMS has promulgated rules that require FMOs to coordinate approval from multiple carriers for multi-plan marketing materials and then file those marketing materials with CMS. *See* 42 C.F.R. § 422.2261(a). As many commenters previewed to CMS when those rules were promulgated, shepherding that process from start to finish with multiple carriers involved is labor-intensive and costly. To comply with CMS's regulations, Council members have had to assemble from scratch new teams staffed by multiple employees working full-time on these tasks alone. Likewise, CMS has required third parties to comply with additional oversight and reporting requirements and record video conferences with beneficiaries. *Medicare Program; Contract Year 2023 Policy and Technical Changes*, 87 Fed. Reg. at 27,707/1-3. And CMS has required a 48-hour waiting period between a scoping appointment and a meeting with a beneficiary, creating more travel and documentation costs for the industry and placing obstacles before beneficiaries to obtain the plan that best meets their needs. *Medicare Program; Contract Year 2024 Changes*, 88 Fed. Reg. at 22,247/1-48/3. To cover these additional costs, Council members need additional payment. Yet CMS did not stop to look in the mirror before asserting that "shifts in the … industry" warrant further action. 88 Fed. Reg. at 78,552/1.

Even if CMS's statements are taken at face value, CMS must further analyze its own propositions to understand if they are meaningful or not. For example, how do the increases compare to ordinary inflation-based increases? Over how much time have payments increased, and at what rate? Are all MA organizations' payments increasing, or only some? Are payments increasing or varying for all types of administrative services and activities, or only some? By how much do payments purportedly vary from plan to plan, and how have those

**GIBSON DUNN**

January 5, 2024
Page 33

variations changed over time?  How do any of these answers in the MA context compare to the ordinary Medicare context?  And most important, of course, what evidence exists that those payments are incentivizing agents and brokers to offer plans that do not "best meet" customers' needs, 42 U.S.C. § 1395w-21(j)(2)(D), when agents themselves typically do not share in the administrative payments made by MA organizations?  The Council cannot undertake this analysis for CMS, because CMS has not disclosed the evidence on which it relies.  *See supra*, at 24-27.  But analyzing these and other questions are important to understand properly whether the established industry structure needs to be revamped or, rather, left alone.  CMS missed these "important aspect[s] of the problem," and must take them into account in any final rule.  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

> **b.  Administrative payments are genuine payments for vital services, not end-runs around compensation caps.**

CMS also has not supported its second premise:  that "some" plans "may" have used administrative payments "to circumvent the regulatory limits on enrollment compensation." 88 Fed. Reg. at 78,555/3.  Plans offer administrative payments to reimburse firms for the valuable services they provide at their fair-market value, not to artificially inflate compensation for enrollments.

Council members and others in their industry perform a variety of administrative services, including:  provide telephone and computer support services to agents and brokers on the ground;  field customer calls, assess their needs, and connect them to agents and brokers; develop technology that helps agents, brokers, and beneficiaries compare plans;  conduct direct-mail or social media marketing of plans;  perform health risk assessments to gauge the beneficiary's specific needs;  and on the list goes.

These services empower agents and brokers to perform their work delivering plans to beneficiaries.  For example, many small agencies lack the technology to fully comply with CMS's call-recording requirements without assistance from firms.  As another example, individual agents may use an FMO's sophisticated plan-comparison software to help potential enrollees easily shop for plans.

Carriers could in theory do some of this work themselves.  But FMOs and telesales companies, including Council members, have expertise and economies of scale that allow them to provide these services more efficiently and at lower cost than if plans performed this work in-house.  Outsourcing administrative services thus helps lower the cost of operating a plan, reducing premiums.  It also allows FMOs and telesales companies to provide tailored services to beneficiaries that carriers simply cannot provide given the sheer quantity of members. Because the "independent agent/FMO model affords the agent the ability to spend the time needed with their clients," seniors are "more satisfied" with their understanding of plan

**GIBSON DUNN**

January 5, 2024
Page 34

coverage when they receive assistance from agents than from carriers directly.  Deft Research, *The Value of the Health Insurance Agent/FMO Model* at 4-5 (Dec. 22, 2023).

Carriers pay these intermediary firms for this valuable work.  Importantly, these are genuine payments in exchange for value—not payments to "circumvent" rules on agent and broker compensation, as CMS claims.  88 Fed. Reg. at 78,555/2.  In fact, administrative payments *must* be genuine.  By rule, administrative payments "must not exceed the value of those services in the marketplace."  42 C.F.R. § 422.2274(e)(1).  As CMS explained just two years ago, plans must "limit these payments to the amounts that would be fairly negotiated on the open market."  *Medicare Programs; Contract Year 2022 Changes*, 86 Fed. Reg. at 5,994/1.  Administrative payments are further limited by CMS's medical loss ratio restrictions, which provide that 85 percent of plan resources must be used for patient care.  *See* 42 C.F.R. § 422.2410(b).  Plans' administrative and marketing payments to agents and brokers (and profit and all other administrative costs) must therefore fit within the remaining 15% of plans' resources, setting a natural upper boundary on the amount of administrative payments.  Accordingly, plans do not enjoy unchecked power to dole out administrative payments, but rather are limited to prices dictated by supply, demand, and regulations.

That is why CMS misses the mark when, for example, it criticizes plans for paying agents and brokers to conduct health risk assessments.  *See* 88 Fed. Reg. at 78,555/2.  Health risk assessments are valuable services because they help plans deliver better coverage and preventative care that lowers long-term costs.  CMS complains that agents and brokers are not health care providers, *id.* at 78,555/3, but agents and brokers are specially trained to perform these assessments.  (In fact, FMOs and firms that employ agents provide that training—yet another valuable administrative service for which they need payment—whereas carriers' captive employees who perform HRAs are not required to be licensed and may not receive the same level of training.)  Moreover, these assessments often take place during initial enrollment meetings because it is a guaranteed opportunity to have conversations about the beneficiary's health needs early in the process at a convenient time—*i.e.*, when that beneficiary is already on the phone discussing potential enrollment, rather than in a subsequent visit on some unknown date.  Additionally, for an HRA to "really make a difference," the assessment must be completed properly and followed up appropriately—steps that Council members are particularly well suited to take.  *See* Brian Schilling, *Health Risk Assessments: What You Don't Know Can Cost You*, The Commonwealth Fund (last visited Dec. 27, 2023), http://tinyurl.com/5hf8fxrz.  And a "successful HRA is far more complex than meets the eye"; building the capability to provide HRAs directly can "blo[w]" a "budget sky high," while contracting out that service to experts with resources in place (such as Council members) can result in better HRAs at more predictable costs.  Wellsource, *Build vs. Buy: Which Health Risk Assessment Approach is Right for You?* (last visited Dec. 27, 2023), http://tinyurl.com/yjsv8n28.  So this service is worth far more than CMS gives it credit by pegging its fair-market value at "$12.50 per hour."  88 Fed. Reg. at 78,555/2.  That estimate also overlooks the opportunity cost of diverting the time and attention of a highly trained agent

**GIBSON DUNN**

January 5, 2024
Page 35

or broker—who could otherwise make $601 per enrollee—to perform HRAs. *See id.* at 78,554/3. And in any event, if CMS truly believes that a single carrier's $125 health risk assessment payment "is not consistent with market value," *id.* at 78,555/3, then CMS could enforce the rule on its books—rather than speculating that "some" plans "may" have used administrative payments to circumvent compensation limits. *Id.*

> **c.    Administrative payments do not incentivize agents and brokers to advise beneficiaries against their interests.**

Finally, CMS has not supported its conclusion that an increase in administrative payments creates "questionable financial incentives" for agents and brokers that "could" result in agents and brokers steering individuals toward plans that benefit agents' and brokers' pockets, rather than meeting individuals' health needs. 88 Fed. Reg. at 78,552/2. Industry stakeholders currently have every reason to ensure that agents and brokers enroll individuals in the health plan that best meets their health care needs. 42 U.S.C. § 1395w-21(j)(2)(D). CMS's contrary assertions are belied by evidence and do not withstand scrutiny.

**1.**  Agents, brokers, and the firms they work with presently have strong incentives to give beneficiaries a "robust set of health insurance options." 88 Fed. Reg. at 78,477/3. To recruit potential customers agents and brokers need to offer a diverse array of plans to a beneficiary. That's Shopping 101: An individual looking to enroll in an MA plan is more likely to find one he or she is happy with if presented with multiple options. Accordingly, it would seldom make financial sense for firms or individuals to contract with only one carrier or to sell only one plan. Market-wide evidence demonstrates that current industry practices have created a healthy MA market: The "typical beneficiary has a choice of 43 Medicare Advantage plans as an alternative to traditional Medicare for 2024," which is "more than double the number of plans offered in 2018." KFF, *With Medicare Open Enrollment Underway, Beneficiaries Typically Will Have a Choice* (Nov. 8, 2023) ("KFF *Beneficiary Choice* Study"), tinyurl.com/2p82mcxv. Under CMS's regulations, therefore, the "market is attractive to both enrollees and insurers." *Id.*

Council members also have strong incentives to enroll beneficiaries in the plan that *best* meets their needs out of the available options. Council members make significant upfront expenditures to enroll a beneficiary. They may incur marketing costs to find a potential beneficiary interested in enrolling in an MA plan. They then spend significant resources matching beneficiaries with plans. For some Council members, that means labor-intensive meetings with beneficiaries for hours at a time to discuss the individuals' needs. For others, that means developing costly technology that helps beneficiaries compare plans and efficiently enroll in the one they choose. Then Council members may incur paperwork and administrative costs to complete the enrollment process. All told, the initial payment for a new enrollment alone is not sufficient to recoup these costs. Instead, Council members reap financial rewards only if the beneficiary remains a long-term customer. In fact, some carriers spread out

**App.036**

**GIBSON DUNN**

January 5, 2024
Page 36

administrative payments over multiple years, or make additional payments for persistent enrollments, specifically to ensure that firms match beneficiaries with the right plan from the start.  People do not remain long-term customers, of course, unless they are satisfied with the plan they selected.  Agents, brokers, and their employers and FMOs thus have every reason to get it right the first time and enroll individuals in a health plan that will make—and keep—the individual happy.

These incentives are sharpened by the fact that beneficiaries have many opportunities to change course if agents or brokers initially recommend the *wrong* plan.  As discussed above, beneficiaries may disenroll or switch plans for any reason during the annual open enrollment period, and may also disenroll during special enrollment periods that open at other times in the year under certain conditions.  *See supra*, at 27-28.  When beneficiaries disenroll, Council members lose money—either through contractual penalties triggered by disenrollment, 42 C.F.R. § 422.2274(d)(5), or the loss of future revenue they would have earned if a beneficiary remained with the plan.  Because the price of disenrollment wipes out their previous efforts to enroll a beneficiary, agents, brokers, and their employers and FMOs are motivated to ensure the beneficiary selects the right plan for his or her needs from the start.

An unhappy beneficiary might also cost agents and brokers the chance for other business.  Individuals can refer their co-workers, friends, or other acquaintances to agents or brokers for potential enrollment, and CMS approves this practice.  *See* 42 C.F.R. § 422.2274(f).  But agents, brokers, and the firms they work with must maintain their reputation to increase the chances of receiving a referral.  And to maintain their reputation, they must ensure that beneficiaries they have worked with—*i.e.*, the people who make the referrals—are satisfied with their MA plan.  This is another reason why the Council's members already have strong incentives to ensure that individuals are enrolled in the health plan that best meets their needs.

**2.**    CMS provides no actual evidence that any administrative-payment increases or variations have resulted in agents or brokers recommending plans that they otherwise would not recommend.  *See supra*, at 24-30.  All CMS has is conjecture:  Increases in administrative payments "are likely to influence which MA plan" an agent or broker recommends; increases in payments "may" have an "undue influence" on agents and brokers; paying FMOs for leads and for enrollments "is likely" to influence agents or brokers in which plans is recommended. 88 Fed. Reg. at 78,552/2-3, 78,553/2, 78,554/2.  CMS's because-I-said-so reasoning does not justify its course of action.  Agency "'judgment[s] must be based on some logic and evidence, not sheer speculation.'"  *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (citation omitted).

Because it has no direct evidence, CMS attempts to support its conclusion collaterally. CMS cites a 2021 increase in "the number of beneficiary complaints related to marketing" and the agency's review of an unknown number of recorded marketing calls in which beneficiaries

**App.037**

**GIBSON DUNN**

January 5, 2024
Page 37

were "clearly confused." 88 Fed. Reg. at 78,552/2-3. But as discussed above, CMS's reliance on this purported increase in complaints is shaky at best because the 2021 data do not account for any broader context. *See supra*, at 28-29. Additionally, evidence about consumer *confusion* does not support CMS's notion that consumers are enrolled in a health plan that does not serve their health care needs. They are two separate issues. And CMS has already addressed the former by promulgating marketing rules to "reduce the incidence of confusing and misleading marketing activities." *Medicare Program; Contract Year 2023 Changes*, 87 Fed. Reg. at 27,823/1; *see also Medicare Program; Contract Year 2024 Changes*, 88 Fed. Reg. at 22,234 (adding provision about misleading marketing). Further still, individuals have natural incentives to lodge complaints so that they can switch their plans during "special election" periods throughout the year. 42 C.F.R. § 422.62(b)(3); *see supra*, at 28. These incentives could drive up the number of complaints that CMS receives. CMS at least has to study the issue before relying on marketing-related complaints to make grand conclusions about agent and broker incentives.

While the Proposal cites to no relevant data, on-point evidence undermines CMS's invented problem. A "majority" of surveyed individuals confirmed that they "made the right choice" of MA plan. Meredith Freed et al., *What Do People with Medicare Think About the Role of Marketing, Shopping for Medicare Options, and Their Coverage?*, KFF (Sept. 20, 2023), https://tinyurl.com/4ryrxra2. Moreover, "when asked if they had concerns" about agents' or brokers' "potential biases or financial incentives to enroll them in a Medicare Advantage plan," "[m]ost of the participants who used brokers did not seem bothered" at all. *Id.* Consumers "prefer for people to make their money" and "don't care what" agents and brokers get paid as long as the consumers get what they need. *Id.*

Even on its own terms, moreover, the Proposal does not make sense. CMS speculates that payments to "FMOs" can "trickle down to influence agents and brokers," 88 Fed. Reg. at 78,554/2, but current payment structures insulate agents and brokers from participating in or receiving administrative payments. When agents contract with FMOs or telesales companies, the carrier typically pays the *entity* (the FMO or telesales company) administrative payments for administrative services; *individual agents* operating as independent contractors receive enrollment-based compensation for the sale, and those operating as employees are paid wages, but either way, the individual does not receive administrative payments. In Council members' experiences, agents and brokers are simply unaware of carriers' administrative payments. For example, one Council member operates a website allowing agents and brokers to compare plans, and that website is carrier-agnostic. The agent can use the website to evaluate plans' features, but the agent has no insight into or vested interest in what payments each carrier is making to the firm. More generally, Council members construct sales processes that are predicated on a robust analysis of a beneficiary's needs and a plan's ability to meet those needs—not on which carrier's plan will eventually be sold. Because agents and brokers do

**GIBSON DUNN**

January 5, 2024
Page 38

not receive the administrative payments, they have no reason to care whether administrative payments to FMOs or other firms have "increased" generally or vary by plan. *Id.* at 78,552/3.[10]

CMS also does not explain why agents, brokers, or the firms they work with might act differently simply because they are receiving "increased" payments. 88 Fed. Reg. at 78,552/3. Reducing the amount of payments will not reduce the incentives to close a sale. All it would mean is that firms providing administrative services make less (or no) money, *regardless* of what plan they sell. The Proposal therefore does not establish a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quotation marks omitted).

To the extent the Proposal asserts that *variations* in administrative payments to intermediary firms influence the ultimate choice of plan, 88 Fed. Reg. at 78,555/3, that also cannot be right. For example, many of the largest carriers in the industry make fewer and smaller administrative payments than their competitors. Those variations are the result of free-market choices. Yet these large carriers continue to have significant market share in the country, and Council members sell these plans in droves. *See generally* American Medical Ass'n, *AMA identifies market leaders in health insurance* (Dec. 12, 2023), https://tinyurl.com/jc35x88p; Nancy Ochieng et al., *Medicare Advantage in 2023: Enrollment Update and Key Trends*, KFF (Aug. 9, 2023), https://tinyurl.com/ykajezk5.

Finally, CMS's approach is itself discriminatory in ways that undermine the efficacy of its own proposal. CMS is proposing to regulate the rate of payments for services, but only when those payments are made to particular players in the industry (*i.e.*, agents and brokers). Presumably, anyone who is not an agent or broker could perform these same services and be paid for them at market rates. This suggests that CMS is not targeting problematic conduct, but rather is targeting unfairly a particular segment of an industry that it wants to harm.

For all of these reasons, CMS provides no evidence that the problem CMS wants to solve even exists, much less that it is "worthy of regulation." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 545 (D.C. Cir. 2020). CMS should not move forward with the Proposal on such a shaky foundation.

> **2.   CMS's competition-based reasoning is impermissible and misguided.**

CMS also claims that the Proposal promotes "competition and consumer choice" consistent with the current Administration's "commitment to promoting fair, open, and

---

[10] This reality even sets aside the fact that beneficiaries have multiple ways to learn about plan options and coverage—including from CMS, which provides seniors with many sources of information—separate and apart from agents and brokers.

**GIBSON DUNN**

January 5, 2024
Page 39

competitive markets."  88 Fed. Reg. at 78,477/3, 78,553/2.  By gutting the current fair-market system of administrative payments, CMS claims that it will "level the playing field for all plans," large and small.  *Id.* at 78,555/1; *see also id.* at 78,553/2 (similar).

However laudable that objective might be in other contexts, it is not a proper consideration here.  Because agencies are creatures of statute, agencies must point to a "textual commitment of authority . . . to consider" the factor at issue.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (holding that agency could not consider costs without express authorization).  But at least where agent and broker compensation is concerned, Congress gave CMS one overriding goal:  to "creat[e] incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs."  42 U.S.C. § 1395w-21(j)(2)(D).  That provision says nothing about government-mandated parity between large carriers and small carriers.

Imposing caps on administrative payments and setting uniform compensation rates is also the antithesis of competition.  As things stand, plan carriers may compete by offering additional plan benefits and different administrative payments for services, and firms, agents, and brokers can compete by providing the best services at the most reasonable prices.  Because administrative payments "must not exceed the value of those services in the marketplace," 42 C.F.R. § 422.2274(e), they are limited to what can be "fairly negotiated on the open market," *Medicare Programs; Contract Year 2022 Changes*, 86 Fed. Reg. at 5,864/1, and they can charge *less* than full fair-market value if doing so earns them an advantage, *see* 42 C.F.R. § 422.2274(e)(2) (administrative payments may be "at or below" fair-market value).  Free-market negotiation *is* competition.

By contrast, the Proposed Rule's caps—especially if applied to firms rather than just individual agents and brokers—will artificially *prevent* fair-market payments (or even payments *below* the maximum fair-market value) and, in turn, competition.  "[P]rice fixing . . . undermine[s] the free market," *N.C. State Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 502 (2015), and is "plainly anticompetitive," *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 650 (1980).  But the Proposal would place an artificial ceiling and floor on plans.  Plans cannot pay fair-market value for administrative payments if that would take the overall compensation over the cap.  And plans cannot pay *less* than CMS's prescribed compensation rate of $601 per initial enrollee, undercutting firms' ability to compete by offering their services at lower rates.  88 Fed. Reg. at 78,624/2 (proposing 42 C.F.R. § 422.2274(d)(1)(ii), which removes the current regulation's approval of compensation "at or below" fair-market value); *see also id.* at 78,554/2-3 (noting that CMS is setting a "single" compensation rate "for all plans"), 78,611/1 (noting the "requirement of uniform payment to agents and brokers").  The Proposal is therefore *anti*competitive.  As other federal agencies attuned to market forces could attest, "prices are best governed by market competition, not by price caps or price regulation."  Leigh M. Murray, *Sirius Mistake*, 59 Am. U. L. Rev. 83, 108 n.169 (2009) (noting that the "FTC and DOJ have expressly stated that they are not in the business of regulating

**GIBSON DUNN**

January 5, 2024
Page 40

prices"). The industry will not be "fair [and] open," Executive Order 14036 § 1 (July 9, 2021), but throttled by government fiat. The result will be a race to the bottom: If subjected to the Proposed Rule, Council members will exit the industry or, for those that remain in business, be forced to curtail significantly their services or find the least costly way to provide those services, at the expense of making every effort to provide an industry-best experience for agents and beneficiaries. CMS should reconsider the Proposed Rule because it undermines, rather than effectuates, the Administration's own stated policy aims.

> **3.    CMS's proposed increase to the compensation caps rests on an arbitrarily incomplete and undervalued list of services.**

Even assuming that subjecting administrative payments to a capped rate were permissible, CMS's proposal to raise the cap by $31 per initial enrollment arbitrarily excludes numerous vital administrative services and undercompensates even those few services that CMS includes.

CMS's decision to cherry-pick some administrative services but not others is arbitrary and unreasoned. The Proposal would permit compensation for only three administrative services—testing, training, and call recording. 88 Fed. Reg. at 78,556/1-2. According to CMS, these services are "appropriate" to reflect in the compensation cap "given the significant and predictable cost of these mandatory activities." *Id.* (citing 42 C.F.R. § 422.2274(b) (training and testing requirements), (g)(2)(ii) (recording requirements)). But the Proposal would leave uncompensated the remainder of the full suite of administrative services that Council members and others provide. *See supra*, at 40-43. And those other administrative services are just as necessary as training, testing, and call recording. FMOs, telesales companies, and other firms must provide "customer service" and incur "operational overhead" costs, for example, simply to exist. 42 C.F.R. § 422.2274(e)(1). Similarly, firms that perform marketing services must ensure that marketing materials comply with CMS requirements. It is irrational to exclude administrative payments for those services and costs when CMS's own rationale favors their inclusion. Rather, once an agency decides to engage in price regulation when supported by statutory authority, it cannot ignore costs relevant to the price merely because it finds calculating them to be inconvenient.

Moreover, the additional services that CMS excludes from the proposed caps are valuable. Making firms provide these services without reimbursement would leave them on the hook for millions of dollars. Although more data is needed to fully and accurately estimate the costs of administrative services that would be unrecoverable under the Proposal—meaning the dollar figures stated below should not necessarily be used as final data to calculate the cost of services—a preliminary partial analysis shows that CMS's $31 per enrollee proposal is unreliable and would underpay firms by orders of magnitude, and further shows that CMS has utterly failed in its obligation to perform a thorough analysis as required by the APA:

**GIBSON DUNN**

January 5, 2024
Page 41

- Overhead:  Council members must lease space for their business to operate.  The average cost of Class B office space—that is, office space that is neither state-of-the-art nor in need of substantial renovation—is about $30,370 nationwide per thousand square feet.  Commercial Edge, *National Office Report* (Dec. 2023), http://tinyurl.com/mrypy5ye.  Many Council members lease tens of thousands of square feet of office space, putting their annual rent in the hundreds of thousands or millions of dollars.

- Customer service:  Even in industries where licensed agents are not necessary, the average cost to provide customer service generally may be $2,600 to $3,400 or more per non-licensed customer-service agent per month—and that does not include factors such as call volume, support channels such as chats, or languages.  April Wiita, *How to Reduce Call Center Overhead Costs with On-Demand Customer Care*, Working Solutions (Apr. 23, 2023), http://tinyurl.com/npdsvtzd.  For Council members, these costs are even higher because licensing and training agents to service complex MA plans is technical, time-sensitive, and costly.  To determine the relevant costs of providing customer service in this industry, CMS would need to gather data about the number of customer-service personnel required per insurance agent selling MA plans.

- Technology:  Firms invest in technology that make telephone systems, call routing, call recording, and other processes work.  Technology also powers quote engines, enrollment features such as plan comparison tools, and personal shopping sites.  *E.g.*, Brokerage Inc., *Why do insurance agents need an FMO?* (Oct. 27, 2022), http://tinyurl.com/3r8hsksm.  Purchasing, developing, maintaining, and innovating in the future this technology is a costly endeavor.

- Sales centers:  Some Council members operate sales centers to communicate with beneficiaries about their plan options and questions.  Those sales centers need software to help with basic business processes such as call routing, dialing, and reporting.  That software needs to be purchased, licensed, installed, maintained, and paired with equipment.  All of that can range between $1,000 to $1,500 per agent, depending on the size of the sales center.  Andy Nguyen, *How much does call center software cost?*, Time Doctor (last visited Dec. 27, 2023), http://tinyurl.com/4scuz65a.  Using CMS's assumption that each agent recruits 10 enrollees per year, 88 Fed. Reg. at 78,597/2, that translates to between $100 to $150 per enrollment.

- Customer relationship management system:  CMS states in passing that the "cost of a customer relationship management (CRM) system (the software used to connect and log calls to potential enrollees) is about $50 per month."  88 Fed. Reg. at 78,556/1.  But a customer relationship management system is only one

**GIBSON DUNN**

January 5, 2024
Page 42

component of running an overall call system center, which requires hardware, telephony carrier costs, setup and implementation costs, customization, and more. *See* Mark Fairlie, *Calculating the Costs of Call Center Systems*, Business.com (Apr. 17, 2023), http://tinyurl.com/28jxperc. Moreover, even as to CRM software specifically, CMS cites no data to support its $50 estimate. A cursory search shows that CMS's underestimates the realistic cost. Basic plans by Genesys and Five9 range from $75 to $149 per month, while more advanced plans run from $135 to $229 per month. Genesys, *Pick the perfect plan for your business* (last visited Dec. 27, 2023), www.genesys.com/pricing; Five9, *Five9 Solution Bundles* (last visited Dec. 27, 2023), www.five9.com/opt/products/pricing.

- Agent recruitment: Some Council members hire agents to work for them as employees. The median cost to hire a licensed agent is $1,633, without counting salary or training costs. Zippia, *How To Hire A Licensed Agent* (last visited Dec. 27, 2023), http://tinyurl.com/2p98mwds. The mean annual wage for an insurance agent is about $76,950 per year. U.S. Bureau of Labor, *Occupational Employment and Wage Statistics* (May 2022), http://tinyurl.com/3dxaczws. And fully onboarding agents is an expensive proposition: Firms often spend millions of dollars teaching, training, and supervising new agents to bring them up to speed and make them productive agents. During an agent's learning curve, firms are often losing money through their investments in training the agent and through purchasing leads that new agents still ramping up do not convert into sales.

- Agent management: Once agents are onboarded, firms continue to spend money managing those agents. Many Council members have management employees dedicated to supervising, monitoring, and providing ongoing coaching and feedback to agents. In other words, firms do not simply hire agents and then take a hands-off, cost-free approach. Constructing, developing, and maintaining this layer of middle management is a costly investment.

- Customer acquisition and marketing: Many Council members market MA plans so that carriers reach new audiences and beneficiaries learn about more options. Marketing strategies take many forms—social media ads, e-mail campaigns, online educational materials, and physical letters mailed to potentially interested parties. Marketing budgets accordingly can vary widely. Research, analytics, and strategy alone can cost "at least $5,000" per campaign, with some content strategy requiring a "$50,000" commitment or more. Ingage, *How Much Are You Really Spending on Marketing & Sales Materials* (last visited Dec. 27, 2023), http://tinyurl.com/mrx28s5u. Producing marketing materials can cost an additional $500 to $3,000 per campaign in other industries, *id.*, and often costs much more than that in this industry given firms' need to coordinate with multiple carriers to obtain approval of marketing materials, *see supra*, at 32; 42 C.F.R. § 422.2261(a).

**GIBSON DUNN**

January 5, 2024
Page 43

For Council members that use direct-mail marketing to reach beneficiaries, moreover, the cost to directly mail materials can range from $0.30 to $10 per recipient, depending on design, copywriting, printing, and distribution choices. Hygrade Business, *How Much Does a Direct Mail Campaign Cost & How Can I Optimize Results?* (Sept. 12, 2018), http://tinyurl.com/2arhdbpk. Of course, these numbers reflect 2018 postage rates and production costs, which have increased substantially since then: first-class stamps cost 50 cents in 2018 and 63 cents today. All these numbers add up quickly when Council members mail many potential enrollees and beneficiaries because only a fraction of those contacts will lead to actual enrollments. All told, customer acquisition can cost hundreds if not thousands of dollars per successful new enrollment. *See, e.g.*, eHealth, Inc. Form 10-K at 55, SEC (2022) (reporting an estimated $888 variable marketing cost per approved member), http://tinyurl.com/3mpdmkpj; SelectQuote, Inc. Form 10-K at 51, SEC (2023) (reporting an estimated $1,224 operating expense per MA or Medicare policy), http://tinyurl.com/223dvstd.

- Compliance and quality assurance: Firms incur significant legal and compliance costs to staff legal departments, respond to CMS inquiries, handle EEOC matters in conjunction with employee termination or discipline, assess customer complaints, and, of course, interpret and ensure compliance with all of the many rules that CMS has promulgated and continues to propose. Firms also spend money to ensure that the quality of their services, such as call support, remains top notch. Though difficult, if not impossible, to quantify, these costs are significant.

- Data and information security: Firms also invest heavily to ensure that information in their possession is kept secure. For example, firms develop or purchase cybersecurity measures to keep electronic records private and confidential. And firms implement record-retention systems to keep electronic and private records in storage for years, as CMS requires. *See, e.g.*, 42 C.F.R. § 422.504(d) (10-year record retention requirement). Many document storage providers charge between $75 to $175 per month for off-site record storage, and that does not even count the costs for *electronic* record storage. Record Storage Systems, *Learn About Offsite Records Storage Costs* (last visited Jan. 3, 2024), http://tinyurl.com/mr3fjbva.

The Proposed Rule also undervalues the services that CMS purports to compensate. To calculate the cost of training and testing, CMS first determined that it costs $125 on average to complete training and certification through the America's Health Insurance Plans ("AHIP"). 88 Fed. Reg. at 78,597/1-2 & Table J5. CMS then determined that each agent recruits 10 enrollees: CMS estimates that MA non-employer enrollment is increasing by about 2 million per year, it guesses that 1 million of those enrollees use agents or brokers, and it estimates that about 100,000 agents or brokers sell Medicare. *Id.* CMS then divides a single agent's average cost of training ($125) by the number of enrollees one agent recruits (10) to produce a $12.50

**GIBSON DUNN**

January 5, 2024
Page 44

per-enrollee cost of training. *Id.* at 78,597/2. To calculate the cost of recording, CMS assumes that each agent earns $37 per hour and estimates that it takes 30 minutes to record and store calls, which works out to $18.50 per enrollment. *Id.* Combined, the cost of training, testing, and recording is $31 per enrollment. *Id.* Even setting aside CMS's lack of support for many of these assumptions, *see supra*, at 25-30, CMS's estimates undersell the costs of providing these services, both qualitatively and quantitatively:

- Training and testing: CMS proposes to account for the $125 cost that it takes to complete training through the AHIP certification program. 88 Fed. Reg. at 78,597/1-2. But Council members take a more comprehensive and holistic approach to training. Many of them use a learning management system for training programs. A learning management system costs $10,000 per year for the typical user, and can cost up to $70,000 for tailored plans. May Ohiri, *LMS Pricing in 2024*, EducateMe (Feb. 3, 2023), https://www.educate-me.co/blog/lms-pricing. Apart from learning systems, businesses "invest an average of $1,286 per employee every year for training and development purposes." Alex Ryzhkov, *Top Operating Costs*, *supra*.

  Moreover, CMS's training and testing costs do not include the costs of obtaining state licenses, which CMS acknowledges agents and brokers must have to sell plans. 88 Fed. Reg. at 78,556/2; *see* 42 C.F.R. § 422.2274(b)(1) (agents and brokers must be "licensed and appointed under State law"). CMS's proposed $12.50 per-enrollee increase reflects only AHIP's certification program, which is distinct from state licensing processes. 88 Fed. Reg. at 78,597/1-2. Licensing costs vary. For example, it costs $170 to obtain certain insurance licenses in California, and $50 in Texas. Alex Ryzhkov, *Top Operating Costs for Insurance Agencies*, *supra*. And these costs cover only application-processing and examination fees—not any training required to pass these tests. *Id.* Nor does it include wages for agents undergoing training without producing any revenue, which requires capital to sustain and at a cost.

- Recording: CMS's proposed $18.50 per-enrollment increase for recording costs captures only the labor cost of recording calls—*i.e.*, an agent's hourly wage multiplied by the time it takes to record and store calls. 88 Fed. Reg. at 78,597/2. Even if that assumption is accurate, it ignores entirely other costs associated with recording calls, such as purchasing recording equipment or software, setting up telephony services to take the calls, and maintaining the hardware necessary to record and store calls. *See* Andy Nguyen, *How much does call center software cost?*, *supra*. It also ignores costs to retain the recordings and produce them when requested.

**GIBSON DUNN**

January 5, 2024
Page 45

- <u>Renewed enrollments</u>:  CMS's $31 increase to the compensation cap reflects payments only for *initial* enrollments; CMS declined to make a "proportionate increase to compensation for renewals."  88 Fed. Reg. at 78,556/2.  But Council members incur costs for some services, such as recording video or telephone calls, for *initial* plan enrollments and *renewal* enrollments alike.  Council members accordingly receive payments for services provided in conjunction with renewals— often because carriers spread out administrative payments over the life of a policy to ensure that the right plan policies are sold from the start.  Providing services for renewals, such as recording calls, is no less a "significant and predictable cost" than when beneficiaries are initially enrolling, *id.*, so firms deserve payments for those recording costs even under CMS's own guiding lights.

For all of these reasons, a $31 per-initial-enrollee increase to CMS's payment limits does not come close to fully reimbursing Council members for the full suite of administrative services they provide to both new and renewing enrollees.  CMS should abandon its Proposal, which rests on an incomplete list of administrative services and undervalues even those services CMS purports to approve.

**E.      The Proposed Rule would restrict beneficiaries' choices by driving many firms, agents, and brokers out of business or forcing them to curtail significantly their services, narrow their offerings, or serve fewer clients.**

The cost of CMS's attempt to solve this nonexistent problem, especially if the Proposed Rule is applied broadly, would be enormous, not only for firms, agents, and brokers whose bottom lines would be squeezed, but also for beneficiaries who will have less plan choice than before.  The Proposed Rule would thus undercut CMS's statutory mandate.  And CMS has not even bothered to try to quantify these effects of its proposal.

If applied to firms rather than just individual agents and brokers, the Proposed Rule could be a death knell for a vital segment of the MA industry.  CMS would wipe out Council members' ability to get paid for many of their administrative services.  Although some carriers currently make free-market administrative payments than others based on what free-market forces support, *see supra*, at 38, eliminating *all* of those payments would be catastrophic.  By preventing Council members from receiving market-rate administrative payments, the Proposed Rule would eliminate a significant percentage of Council members' business—in some cases, more than one-third of their total revenue (not profit).  But some Council members, and other publicly traded companies in this industry, are *already* losing money on a year-to-year basis and cannot afford the drastic revenue cuts that would result from losing administrative payments.  The Proposal puts long-term profitability for current business models even further out of reach, and delays the path to profit in an industry that is still finding its footing.  With their revenue streams drying up, many Council members would go out of business.  Others that manage to survive would perform fewer—or none of—the valuable administrative services they perform currently.

**GIBSON DUNN**

January 5, 2024
Page 46

Ultimately, that result undercuts beneficiaries' access to robust plan options. As discussed above, Council members and other intermediaries are financially motivated to secure a variety of health plans for agents and brokers to offer to beneficiaries, and the typical beneficiary today has a robust "choice of 43 Medicare Advantage plans"—"more than double the number of plans offered in 2018." KFF *Beneficiary Choice Study*, *supra*. Under the Proposed Rule's system of compensation caps and unreimbursed administrative services, however, Council members and other intermediaries that survive the rule's impact will have less money to invest in contracting with carriers. Similarly, intermediaries operating on marginal profits will have less money to contract with agents and brokers. In turn, those intermediaries will have fewer plans to provide to fewer agents and brokers—and fewer people offering fewer plans means less beneficiary choice. Meanwhile, the market will depend more heavily on carriers to sell their own plans directly to individuals, in lieu of agents and brokers offering a wide variety of plans for beneficiaries to consider. CMS acknowledges this outcome: Under its Proposal, "plans may increase money allocated to outreach and advertising," *i.e.*, carriers may more often sell their own plans. 88 Fed. Reg. at 78,611/1. But CMS does not square that outcome with its stated aims. Although CMS notes that "people join plans because of outreach from a wide variety of sources," *id.*, CMS is undercutting the source that offers the greatest variety of options to beneficiaries (third parties such as Council members that sell a full slate of plans) in favor of the source that offers the fewer options to beneficiaries (carriers marketing only their own plans). All told, beneficiaries would have *less* choice, not more, under the Proposed Rule—contrary to Congress's commands. *See* 42 U.S.C. § 1395w-21(j)(2)(D). CMS should not move forward with a Proposal that would "thwar[t] the intent of Congress" by "accomplish[ing] the opposite of what Congress intended" in the statute. *Hernstadt v. FCC*, 677 F.2d 893, 906 (D.C. Cir. 1980) (reversing agency order and rejecting deference).

The Proposal would also reduce agents' and brokers' ability to enroll individuals in the plans that best meets their health care needs among the (now limited) options. Take one example. Agents and brokers "spend hours" with individuals helping them decide on the best plan for their specific needs. Susan Rupe, *Proposed change to Medicare Advantage agents' compensation draws fire*, Insurances Newsnet (Nov. 22, 2023), https://tinyurl.com/42pt69n2. Those meetings are productive: seniors "are more than twice as likely" to report that an agent "made sure they knew the basics of using coverage" when compared to receiving a call from their carrier at the start of a plan year, in large part because seniors need "one-on-one communication" and carriers have too many members to reach in a personalized way. Deft Research, *The Value of the Health Insurance Agent/FMO Model*, *supra*, at 3. Hours-long, personalized meetings between agents and potential enrollees take time and money. But if CMS artificially constrains Council members' ability to earn revenue from selling health plans, Council members will have to look for ways to cut costs to survive financially. That could include reducing the amount of time that agents and brokers spend discussing plan options with beneficiaries. This creates worse incentives, not better incentives, for enrolling

**GIBSON DUNN**

January 5, 2024
Page 47

individuals in the plans that best meet their health care needs.  That result also undermines Congress's objectives.  *See* 42 U.S.C. § 1395w-21(j)(2)(D).

Further still, the Proposal would deprive beneficiaries of important services.  Some administrative services, such as training and complying with marketing requirements, are non-negotiable.  Council members should not be expected to provide these services at a loss.  But other services, such as health risk assessments, are conditional.  Council members do not, and would not, perform these services absent receiving administrative fees.  Those services would disappear under the Proposed Rule if it were to apply broadly to firms.  Beneficiaries would thus lose the valuable and convenient opportunity to have an agent or broker perform a health risk assessment when already meeting with the beneficiary.  *See supra*, at 34.  Given that many Council members predominantly serve lower-income, rural, and disabled individuals, the Proposal would ultimately harm the beneficiaries that *most* need help to select the plan that best meets their needs—contrary to the current Administration's commitment to health equity.  *See* CMS, *Health Equity* (last visited Dec. 27, 2023), http://tinyurl.com/ycxh8msr.

CMS's proposal to raise the compensation cap by $31 per enrollee does nothing to avert the economic collapse threatened by the Proposed Rule.  As discussed *supra* at 39-45, that increase is based on an incomplete list of the administrative services provided by Council members, and it undercompensates even the three services that CMS attempts to compensate.  The $31 increase to the compensation caps is therefore a drop in the bucket that will not meaningfully reduce the risk of firms going out of business or reducing their services, all to the detriment of beneficiaries.[11]

CMS admits that one "drawback[]" of the Proposed Rule is that agents, brokers, and the firms they work for would be "unable to directly recoup administrative costs."  88 Fed. Reg. at 78,556/1.  CMS brushes aside this drawback by pointing to a single administrative cost—$50 per month per agent for a customer relationship management software—and proclaiming its "belie[f]" that there is not a "large risk of agents or brokers failing to cross" the break-even point.  *Id.* at 78,556/1.  Even setting aside the fact that $50 underestimates the cost of customer relationship management software, *see supra*, at 41, CMS's prediction about break-even points is impossible to make without any attempt to quantify the value of *all* of the administrative payments that agents, brokers, and the firms they work for will now forgo.  Nor does CMS attempt to explain how firms could make up for lost revenue when there is a ceiling on permissible payments under which all administrative services cannot possibly squeeze.  As Council members know too well, their administrative payments constitute a significant portion

---

[11] The Proposal's financial harms would be further exacerbated if it were to eliminate administrative payments that carriers agreed *before* 2025 to pay *after* plan year 2025, such as renewal-based payments for enrollments that precede the proposed effective date—further reason for, at a minimum, clarifying CMS's intent to avoid due process concerns.  *See supra*, at 14.

GIBSON DUNN

January 5, 2024
Page 48

of their revenue.  Many firms would have to *operate at a deficit* to continue to serve the market.  Plainly, they will not do so.

If CMS had studied the industry in full, all these severe consequences would come as no surprise.  Instead, CMS buried its head in the sand and failed to "apprise itself … of the economic consequences of [its] proposed regulation."  *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005).  CMS concedes that its Proposed Rule would "have potential economic effects" on carriers, firms, agents, brokers, and beneficiaries.  88 Fed. Reg. at 78,610/3.  CMS also concedes that it "lack[s] the data to quantify these effects."  *Id.*; *see also id.* at 78,597 (admitting that CMS does "not have any data" on the number of enrollments affected by agents or brokers and using a "50%" assumption).  CMS's candor is appreciated.  But it only confirms that CMS's efforts to justify its proposal are plainly insufficient.  CMS cannot just throw up its hands and fail to "make [the] tough choices" needed to properly estimate the economic impacts of its proposals.  *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011).

**F.  Alternative, reasonable solutions would address the agency's stated concerns.**

There is no need for CMS to go as far as it has proposed.  It is "well established that an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives."  *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984); *see also Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).  The Proposal flunks this elementary requirement.  There are obvious, viable alternatives that CMS could have—but did not—consider to address the problematic practices it claims to have identified.  The Council believes that CMS's best course is to abandon the compensation proposal entirely, but if the agency insists on pressing ahead, it should consider these alternatives to CMS's proposed industry-upheaving re-write of the existing compensation rules.

**1.  CMS could enforce existing rules that prevent consumer confusion and payments that exceed fair-market value.**

CMS could enforce existing rules that prohibit misleading communications to beneficiaries.  CMS asserts that purportedly improper financial incentives for firms, agents, and brokers are "contributing to behaviors that are driving an increase in MA marketing complaints" from beneficiaries, which complaints (in CMS's view) reflect an increase in beneficiaries receiving health plans that do not meet their needs.  88 Fed. Reg. at 78,552/2.  Increased telemarketing, CMS asserts, in "some instances" results in beneficiaries becoming "clearly confused" while talking to agents or brokers.  *Id.* at 78,552/3.

As CMS acknowledges in the next breath, however, the agency's "existing regulations already prohibit" plans, agents, and brokers "from engaging in misleading *or confusing*

January 5, 2024
Page 49

communications" with individuals. 88 Fed. Reg. at 78,553/1 (emphasis added). For example, MA plans cannot provide "inaccurate or misleading" information, cannot use unsupported "superlatives," and cannot engage in activities that could "confuse" beneficiaries. 42 C.F.R. § 422.2262(a). Third-party marketing organizations also must provide standard disclaimers to beneficiaries when selling plans. *Id.* § 422.2267(e)(41). To the extent CMS is concerned that firms, agents, and brokers' financial incentives have created a rise in consumer confusion and that consumer confusion is a reflection of beneficiaries receiving less-than-best health plans, the appropriate response is to prioritize enforcement of an existing, on-point regulation.

Moreover, CMS amended and strengthened its regulation of misleading or confusing communications twice in the last two years. *See Medicare Program; Contract Year 2024 Changes*, 88 Fed. Reg. at 22,234 (adding provision about misleading communications); *Medicare Program; Contract Year 2023 Policy and Technical Changes*, 87 Fed. Reg. at 27,704 (adding standard disclaimer requirements). The Administration touted these amendments as "critical steps" toward protecting people from "confusing" marketing "while also ensuring they have accurate and necessary information to make coverage choices that best meet their needs." CMS, *Fact Sheet: 2024 Medicare Advantage and Part D Final Rule* (Apr. 5, 2023), http://tinyurl.com/yrmr28ts. These changes were adopted less than nine months ago; CMS must allow them to take effect, and study their efficacy, before determining that the Proposed Rule is "necessary to adequately address the rise in MA marketing complaints" about beneficiary confusion. 88 Fed. Reg. at 78,553/1.

Additionally, if CMS thinks, after gaining more information about the value of the legitimate administrative services provided by FMOs and other third parties, that plans are making administrative payments in excess of fair-market value for services, it could investigate and enforce the existing regulation providing that administrative payments must not exceed "the value of those services in the marketplace." 42 C.F.R. § 422.2274(e)(1), (2). This alternative would seemingly address CMS's concerns about agents or brokers receiving "excess payments." 88 Fed. Reg. at 78,610/3. And this alternative would be feasible: In other contexts, such as limits on physician referrals, CMS has experience implementing and enforcing requirements that certain charges be "consistent with fair market value." 42 U.S.C. § 1395nn(e)(1)(B)(iv). As a result, if CMS were correct that administrative payments are excessive, it already has the tools to remedy that perceived problem without amending the current regulations.

> **2.     CMS could target specific practices that purportedly run afoul of current compensation requirements.**

At various points in the Proposal, CMS points to specific conduct that it believes skirts the compensation rules currently on the books. To determine whether that belief is grounded in reality, CMS would first have to collect information about the nature and amount of administrative payments to understand the industry and the issues. To the extent those

**GIBSON DUNN**

January 5, 2024
Page 50

concerns are legitimate and supported by evidence after further study, CMS should address those practices in a tailored way, rather than broadly changing compensation rules.

For example, CMS expresses concerns that "bonuses and perks" such as "golf parties, trips, and extra cash" are being paid to agents in exchange for enrollments, and that plans can "credibly account" for these payments as "administrative." 88 Fed. Reg. at 78,552/2. But CMS's current regulation counts as compensation "*bonuses*," "gifts," and "prizes or awards." 42 C.F.R. § 422.2274(a)(i)(B)-(D) (emphasis added). CMS does not explain how plans are credibly accounting for bonus payments as something other than bonuses. In any event, if the problem is that certain bonuses can nevertheless be construed as administrative payments, CMS could address that problem by clarifying that bonuses and perks are not permissible administrative payments, rather than subjecting all administrative payments (including payments that clearly are *not* bonuses and perks) to the compensation cap or removing the ability to recoup those costs at all.

CMS, however, fails to consider this targeted approach or explain why it would not provide a less burdensome solution to the problem it is purportedly trying to solve. This runs counter to CMS's obligation "to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008).

### 3. CMS could modify the compensation cap to account for all administrative services.

If CMS nevertheless presses ahead, it must at least increase the compensation cap by an amount that fairly reflects market rates for *all* administrative services—not an arbitrary subset of them.

As discussed above, CMS's decision to increase the compensation cap by only $31 per initial enrollee is inadequate and unreasoned. *See supra*, at 40-45. CMS cherry-picks three kinds of administrative services—testing, training, and recording—to add to the compensation cap. 88 Fed. Reg. at 78,556/2. But there are many other valuable administrative services that would be excluded from the compensation cap. *See supra*, at 40-45. And CMS does not even capture the full costs of providing testing, training, and recording services. *See supra*, at 43-45.

Instead of selecting the three administrative services that it found easiest to quantify, CMS could have attempted to calculate the fair-market rates for *all* administrative payments that are currently permitted under Section 422.2274(e), and then adjusted the new compensation cap by a corresponding amount. More data would be needed to determine an appropriate estimate, but suffice it to say that $31 per initial enrollee does not cut it. *See supra*, at 40-45. That alternative would at least reduce some of the most severe economic consequences flowing from CMS's recategorization of administrative payments, *see supra*, at

**GIBSON DUNN**

January 5, 2024
Page 51

45-48, while serving CMS's goal of ensuring that administrative payments are made to the right parties for the right reasons.

**III.     CMS's proposed limitation on contract provisions should be withdrawn or clarified.**

CMS also proposes to limit plans' ability to contract with agents, brokers, or third-party marketing organizations (including FMOs). 88 Fed. Reg. at 78,624/2. Specifically, the Proposed Rule would require MA organizations to "[e]nsure that no provision of a contract with an agent, broker, or other [third-party marketing organization] has a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." 88 Fed. Reg. at 78,624/2 (proposing amended 42 C.F.R. § 422.2274(c)(5)).[12]

This proposal is flawed for many of the same reasons the compensation provisions are flawed: CMS relies on data that is either hidden from public view or is unreliable, articulates a problem about financial incentives that does not withstand scrutiny, and does not consider alternatives. *See supra*, at 22-50. But CMS's proposed limitation on plans' contractual terms also suffers from two additional and related problems.

*First*, CMS has no statutory authority to limit contractual provisions that are unrelated to compensation. As discussed above, CMS has authority to regulate the "use of compensation" to create "incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D); *see supra*, at 15-16.

But the Proposed Rule on its face sweeps much broader than contractual provisions related to compensation. It prohibits *any* provision that has the effect of "creating an incentive that would reasonably be expected to inhibit" an agent's or broker's objective assessments of health plans. 88 Fed. Reg. at 78,624/2. If, for example, a contract's length or notice-of-termination provisions were deemed to have an impermissible effect for *any* reason, those provisions would apparently be unlawful—even though they have nothing to do with the compensation of agents or brokers for enrolling an individual in Medicare Advantage. CMS cannot stray outside of its statutory authority, which is limited to regulating the use of compensation, by dictating the terms of contracts generally.

---

[12] In the preamble, CMS states that it proposes to add this provision at "§ 422.2274(c)(13)." 88 Fed. Reg. at 78,554/3. In the proposed codified text, CMS would add this provision as § 422.2274(c)(5). 88 Fed. Reg. at 78,624/2. The Council will use the numbering from the proposed amended text—(c)(5), not (c)(13).

**GIBSON DUNN**

January 5, 2024
Page 52

*Second*, the Proposed Rule's limitations on contracts are impermissibly vague, sweeping in legitimate business practices and raising constitutional concerns.

The Proposed Rule would require MA organizations to "[e]nsure that no provision of a contract with an agent, broker, or other [third-party marketing organization] has a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." 88 Fed. Reg. at 78,624/2 (proposing amended 42 C.F.R. § 422.2274(c)(5)). Although CMS claims this proposal "gives plans further direction as to the types of incentives and outcomes that must be avoided without being overly prescriptive," *id.* at 78,554/3, the Proposed Rule produces only confusion. For example, are *non-financial* incentives covered by this provision, notwithstanding CMS's exclusive focus on "financial" incentives throughout the Proposal's compensation provisions? *E.g.*, *id.* at 78,553/1-2. If so, which non-financial incentives? Is *any* inhibition sufficient to trigger this prohibition, or only inhibitions that would be material enough to change an agent's or broker's assessment or recommendation of a health plan? And just how indirect can effects be?

If CMS adopts the Proposed Rule, then plans, FMOs, agents, and brokers will be left to guess whether their contracts are unlawful. The result will be counterproductive: Plans, FMOs, agents, and brokers may be chilled into refraining from perfectly legitimate conduct. For example, some plans' contracts with FMOs have termination clauses providing that if an agent or broker sells fewer than a specified number of policies in a year, the plan has the right to unilaterally terminate that agent or broker. That provision is perfectly sensible. The administrative burdens and costs of having a low-selling agent on the roster outweighs the benefits. And predictable performance standards in contracts are important so that it is clear what conduct could result in terminating an agreement. But the Proposed Rule might outlaw—or might not, it's hard to say—these important contractual provisions. It's bad enough to rewrite private parties' contracts. It's worse still to do so while leaving the industry with this much uncertainty.

The Proposed Rule's opacity is not only bad policy, but also raises constitutional concerns. The Due Process Clause prohibits laws that fail to give adequate notice of what they prohibit. That is because a "vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). The Proposed Rule fails this standard. Given the looseness of CMS's language—indirect, incentive, inhibit—it will be impossible for plans, FMOs, agents, and brokers to "settle upon a single definition" of what makes a contract impermissible. *Georgia Pac. v. OSHRC*, 25 F.3d 999, 1005 (11th Cir. 1994); *see also Davis*, 139 S. Ct. at 2325 (laws "must give people of common intelligence fair notice of what the law demands of them"). That uncertainty opens the door to "arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

**GIBSON DUNN**

January 5, 2024
Page 53

Although CMS provides "[e]xamples" of prohibited contract terms, the constitutional questions do not evaporate.  88 Fed. Reg. at 78,554/3.  CMS does not propose to codify these examples, *id.* at 78,624/2, so the operative language remains the broad, vague standard with outer limits that cannot be discerned.  Even if there is "some conduct that clearly falls within the provision's grasp," that does *not* make "a vague provision . . . constitutional."  *Johnson v. United States*, 576 U.S. 591, 602 (2015).

CMS should not adopt a rule that leaves so much to chance.  At a minimum, CMS should clarify that certain conduct is not covered by its new regulation, including contractual terms that—as discussed above—supply termination provisions tied to enrollments.

\*     \*     \*

CMS should withdraw the Proposed Rule's agent- and broker-compensation provisions or, at a minimum, adopt the changes identified above.

Thank you for your consideration of this comment on behalf of the Council for Medicare Choice.

Respectfully submitted,

/s/ *Eugene Scalia*
Eugene Scalia
Matthew S. Rozen
Aaron Smith
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
escalia@gibsondunn.com
mrozen@gibsondunn.com
asmith3@gibsondunn.com

# EXHIBIT 2

**GT** GreenbergTraurig

Andrew S.M. Tsui
Tel 202.331.3172
Fax 202.331.3101
Andrew.Tsui@gtlaw.com

January 5th, 2024

Chiquita Brooks-LaSure
Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-4205-P
Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, MD 21244-1850

Submitted *via* www.regulations.gov

> Re:   CMS-4205-P, Proposed Rule: Contract Year 2025 Policy and Technical Changes
> to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program,
> Medicare Cost Plan Program, and Programs of All-Inclusive Care for the Elderly;
> Health Information Technology Standards and Implementation Specifications

Dear Administrator Brooks-LaSure:

We write on behalf of various clients that will be profoundly affected by the proposed rule
concerning Contract Year 2025 Policy and Technical Changes to the Medicare Advantage
Program and the Medicare Prescription Drug Benefit Program (the "Proposed Rule"), issued by
the Centers for Medicare & Medicaid Services ("CMS").[1]

Our clients are among the most significant companies committed to assisting Medicare
beneficiaries with understanding their health insurance coverage options and selecting the
coverage that best suits their individual needs.   Collectively, they have assisted millions of
beneficiaries with enrollment into Medicare Advantage ("MA") and Medicare Prescription Drug
Plans ("PDP plans") in the past two years alone.   Our comments concern the latest in a series of
dramatic new proposals for reform in the MA marketplace – this one targeting independent agents,
brokers and other organizations that contract with MA and/or Medicare PDP plans.[2]   We
respectfully contend that this Proposed Rule (CMS-4205-P) demonstrates not only CMS's
misunderstandings with regard to the MA/PDP plan chain of enrollment, but based on these

---

[1] 88 Fed. Reg. 78,476 (November 15, 2023) (hereinafter, the "Proposed Rule").

[2] *See, e.g.*, 87 Fed. Reg. 79,452 (Dec. 27, 2022).

misunderstandings, grave errors in judgment requiring a questionable reading of the underlying statute for CMS to implement.

More specifically, we believe that: 1) CMS lacks the authority to regulate payments "other than compensation"; 2) Additional regulatory action is arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence, and unwarranted; 3) CMS's strawman proposal to effectively eliminate 42 C.F.R. §§ 422.2274(e) and 423.2274(e) is arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence; 4) CMS's proposal to effectively eliminate §§ 422.2274(e) and 423.2274(e) is unreasonable in the context of the entire regulations; 5) CMS's analysis of the "value of those services in the marketplace" and a $31 "fair market value" concession lacks credibility; 6) CMS's proposal to effectively eliminate §§ 422.2274(e) and 423.2274(e) fails to analyze such an elimination in the context of the Medical Loss Ratio ("MLR"); 7) CMS lacks authority to use agent and broker compensation as a means to "level the playing field"; and 8) CMS's RFA "qualitative" analysis lacks credibility and is internally inconsistent with the Proposed Rule.  As explained in greater detail below, these new proposals cannot withstand scrutiny under the Administrative Procedure Act ("APA") and threaten to devastate value-adding industry participants.  Above all, we believe the Proposed Rule will ultimately cause great harm to the Medicare beneficiaries seeking to exercise their choice to shop and enroll in context-appropriate MA and/or PDP plans that are tailored to suit their health care needs.  Indeed, we believe this harm represents a perverse outcome under the authorizing statute governing agent and broker compensation in the first place.

For these reasons and others, we urge CMS to withdraw the proposed changes to the agent and broker compensation framework and resist the temptation to claim authority that Congress has not conferred.

### A.   INTRODUCTION

Dating back to the 1970s, Medicare beneficiaries in the U.S. have had an option to receive their original, fee-for-service Medicare Part A and B benefits from private health plans.[3]  Since the enactment of the Medicare Modernization Act of 2003, beneficiaries choosing private health plans to administer their Part A and B benefits may do so under the Medicare Advantage program, designated as Medicare Part C.[4]  Two decades on, the number of Medicare beneficiaries who enroll in approved[5] MA plans has steadily increased.

---

[3] *Letter of Transmittal*, 2023 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, p. 161 (March 31, 2023), *available at*:  https://www.cms.gov/oact/tr/2023

[4] *See generally*, Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, 117 Stat. 2066.  *See also An Overview of the Medicare Part D Prescription Drug Benefit*, Kaiser Family Foundation (Oct. 17, 2023), *available at*: https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/

[5] *See id*.  *See also* 42 C.F.R. Part 422.

In 2007, 19 percent of Medicare beneficiaries were enrolled in an MA plan.[6]  Following the passage of the Medicare Improvements for Patients and Providers Act ("MIPPA"), Congress created limitations on the conduct of certain MA activities, with subsection (D) specifically relating to limitations on agent and broker compensation.[7]  Today, more than half (51 percent) of eligible Medicare beneficiaries—more than 30 million people—are enrolled in an MA plan.[8]  The Congressional Budget Office projects that by 2033, 62 percent of eligible Medicare beneficiaries will be enrolled in an MA plan.[9]  Put simply, MA plans have, and continue to, offer Americans a significant range of choices.

The Proposed Rule implicates the competitive and expanding marketplace for Americans that wish to exercise their choice among a wide variety of MA and/or PDP plans offered in the U.S.  Various MA plans offer coverage options that may differ from Original Fee-for-Service Medicare.[10]  In addition, MA plans may differ from one another in the marketplace.  Medicare PDP plans are similar in this regard.  The breadth and scale of differing coverage options spans from the scope of additional benefits offered to out-of-pocket spending limits.[11]

Independent agents and brokers therefore play an instrumental role assisting beneficiaries that wish to navigate a wide range of options to find plans in their area that best meet their individual health care needs.  The average Medicare-eligible consumer has access to 43 different MA plans plus options for Original Medicare—more than double the average number available in 2018.[12]  In 2024, the 709 PDPs will be offered across the 34 PDP regions nationwide.[13]  With so many options, it should come as no surprise that licensed experts that are trained to advise beneficiaries

---

[6] *See* Ochieng N. et al., *Medicare Advantage in 2023:  Enrollment Update and Key Trends*, KAISER FAMILY FOUNDATION (Aug. 9, 2023), *available at*: https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-enrollment-update-and-key-trends/

[7] *See* Medicare Improvements for Patients and Providers Act, Pub. L. 110-275, 122 Stat. 2494 (July 15, 2008) (creating Section 1851(j)(2)(D) of the Social Security Act (42 U.S.C.§ 1395w-21).

[8] *See* footnote 6, *supra*.

[9] *Id*.

[10] *See, e.g.*, *Understanding Medicare Advantage Plans*, Centers for Medicare & Medicaid Services, *available at*:  https://www.medicare.gov/Pubs/pdf/12026-Understanding-Medicare-Advantage-Plans.pdf.

[11] *See* Leonard, F. et al., *Traditional Medicare or Medicare Advantage:  How Older Americans Choose and Why*, COMMONWEALTH FUND (Oct. 17, 2022), *available at*: https://www.commonwealthfund.org/publications/issue-briefs/2022/oct/traditional-medicare-or-advantage-how-older-americans-choose

[12] Freed, M. et al., *Medicare Advantage 2023 Spotlight:  First Look Issue Brief*, KAISER FAMILY FOUNDATION (Nov. 10, 2022), *available at*:  https://www.kff.org/medicare/issue-brief/medicare-advantage-2023-spotlight-first-look/

[13] *See Fact Sheet:  An Overview of the Medicare Part D Prescription Drug Benefit*, KAISER FAMILY FOUNDATION (Oct. 17, 2023), *available at*:  https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/

have become indispensable parts of the chain of enrollment that supports beneficiaries where the CMS Plan Finder may fall short.  In fact, approximately one in three Medicare beneficiaries (more than twenty million beneficiaries), regardless of coverage, use insurance agents or brokers to choose a plan.[14]

The industry of "agents and brokers" is a complex ecosystem composed of a diverse array of individuals and entities performing a diverse array of services.  Agents and brokers provide enrollment services, as well as additional services other than enrollment itself.  Non-enrollment-related services may include a wide range of services, such as education, marketing, customer service, compliance oversight (*e.g.*, auditing, monitoring, reporting, marketing material review), health risk assessments, plan administration and more.  The scope of services provided will depend upon contractual terms between the agent or broker and the MA plan, but in all cases, agents and brokers incur a vast array of operational overhead to provide both enrollment and/or non-enrollment services.  Operational overhead includes costs for technological and IT support, recruiting, training, testing, certification, carrier appointment, call recording, and more.  Furthermore, the industry of "agents and brokers" also includes agent and broker organizations–such as agencies, brokerages, field marketing organizations ("FMOs"), and third-party marketing organizations ("TPMOs")–that may employ or contract with, and provide support directly to, individual agents and brokers, MA plans and/or Medicare beneficiaries.

In short, the myriad of distinctions that exist in the chain of MA plan enrollment between independent agents, agencies, brokers, and brokerages, as well as the differentiated ways in which these industry participants contract with MA plans and/or first-tier, downstream, and related entities ("FDRs") requires meaningful consideration and thorough analysis for any policy proposals to be credible, let alone reasonable.  For the reasons set forth below, we believe CMS has overlooked these critical distinctions that create the independence that agents and brokers apply to their role, and as a result, the Proposed Rule suffers from various misunderstandings based on a lack of information about how plans actually enroll beneficiaries in a manner that meets the intent of the statute.

### B.    ANALYSIS

1.  <u>CMS lacks the authority to regulate payments "other than compensation."</u>

First, the authorizing statute at § 1851(j)(2)(D) confers authority upon CMS to establish guidelines to "ensure that the use of *compensation* creates incentives for agents and brokers to *enroll* individuals in the MA plan that is intended to best meet their health care needs."  (Emphasis added).[15]  Section 422.2274(e) is titled "Payments *other than compensation*."  Such payments "*other than compensation*" are "[p]ayments made for services other than enrollment of beneficiaries" and provides, as examples, "training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments."  CMS's reliance

---

[14] *See id.*

[15] For simplicity, this comment will hereinafter only refer to the regulatory provisions applicable to MA plans, which are effectively identical to the provisions applicable to PDP plans in 42 C.F.R. § 423.2274.

on section 1851(j)(2)(D) to eliminate payments "other than compensation" is extra-statutory and not in accordance with law.

2. <u>Additional regulatory action is arbitrary and capricious, unsupported by substantial evidence, and unwarranted.</u>

The Medicare statute, existing implementing regulations, and sub-regulatory guidance like the Medicare Communications and Marketing Guidelines[16] already align independent agent and broker compensation with plans that best meet beneficiaries' healthcare needs. Additional regulatory action is unwarranted.

a. <u>Section 1851(j).</u>

CMS invokes 42 U.S.C. § 1851(j) of the Social Security Act (the "Act") in support of the agent and broker compensation proposals contained in the Proposed Rule.[17] Section 1851(j)(2)(D) of the Act states that CMS must establish guidelines to "ensure that the use of *compensation* creates incentives for agents and brokers to enroll individuals in the MA plan that is intended to best meet their health care needs." (Emphasis added.) Generally speaking, these "guidelines" take the form of regulations that establish a series of incentives specifically designed to ensure that any MA plan payments made to third party agents and brokers in the form of "compensation" align with the interests of beneficiaries' health care needs.

b. <u>42 C.F.R. §§ 422.2274 and 423.2274.</u>

Beginning in 2008, CMS established "certain limitations on agent and broker compensation and other safeguards."[18] More specifically, 42 C.F.R. § 422.2274(d) explains: "MA organizations must ensure they meet the requirements in paragraphs (d)(1) through (5) of this section in order to pay *compensation*. These *compensation* requirements *only apply to independent agents and brokers*." (Emphases added.)[19] The requirements as set forth in (d)(1)-(5) concern the following: (1) General rules; (2) Initial enrollment year compensation; (3) Renewal compensation; (4) Other compensation scenarios; and (5) Additional compensation, payment, and compensation recovery requirements (Charge-backs).

Notably, the provisions set forth in 42 C.F.R. §§ 422.2274(d)(5)(i)-(ii) require MA Plans to retroactively pay or recoup funds (expended in the form of agent/broker compensation) for retroactive beneficiary changes, and also require compensation recovery where beneficiaries make

---

[16] *See* Medicare Communications and Marketing Guidelines ("MCMG"), *available at*: https://www.cms.gov/files/document/medicare-communications-and-marketing-guidelines-3-16-2022.pdf

[17] *See*, *e.g.*, Proposed Rule at 78,477 (col. c); *id*. at 78,551 (col. c) ("Pursuant to section 1851(j)(2)(D) of the Act, the Secretary has a statutory obligation [. . .]")

[18] *Id*. *See also* 73 Fed. Reg. 54,226, 56,237 (Sept. 17, 2008).

[19] It bears mention that under 42 C.F.R. § 422.2260, TPMOs are defined as "organizations and individuals, *including independent agents and brokers*, who are compensated to perform lead generation, marketing, sales, and enrollment-related functions as part of the chain of enrollment." (Emphasis added). Because TPMOs may include independent agents and brokers, then "the requirements as set forth in (d)(1)-(5) may also apply to TPMOs, not merely subsection (g), titled "TPMO oversight."

plan changes within the first three months of enrollment, or at any other time a beneficiary is not enrolled in a plan, but a plan paid compensation based on that time period.

Taken together, the statute and implementing regulations clearly establish a robust regulatory framework of terms under which MA plans are incentivized to pay agents and brokers for their services enrolling beneficiaries into "the MA [or PDP] plan that is intended to best meet their health care needs." For example, MA plans need only pay agent/broker compensation at 50 percent or less of fair market value ("FMV") for each enrollment in a renewal year.[20] By way of another example, MA plans must "recover" agent/broker compensation when a beneficiary makes any plan change (regardless of the parent organization) within the first three months of enrollment [] . . . or at any other time period a beneficiary is not enrolled in a plan, but the plan paid compensation based on that time period."[21]

Paragraph (e), on the other hand, applies to "Payments *other than compensation* (administrative payments)." (Emphasis added.) Such administrative payments "*other than compensation*," which include (1) Payments made for services other than enrollment of beneficiaries (for example, training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments) must not exceed the value of those services in the marketplace; and (2) can be based on enrollment provided payments are at or below the value of those services in the marketplace."

Paragraph (f) applies to "Payments for referrals," which constitute payments that "may be made to individuals for the referral (including a recommendation, provision, or other means referring beneficiaries) *to an agent, broker, or other entity for potential enrollment into a plan*." The payment may not exceed $100 for a referral into an MA or MA-PD plan and $25 for a referral into a PDP plan." (Emphasis added.)

The balance of the regulation is set forth in paragraph (g), which concerns oversight of third-party marketing organizations ("TPMOs"), which generally applies to activities including "marketing, lead generation, and enrollment."

The Proposed Rule provides no reasonable basis for additional regulatory action that comports with the underlying statute or otherwise clarifies the relationships between these provisions. Until such time, these various provisions contained in the regulations should remain.

3.  <u>CMS's strawman proposal to effectively eliminate §§ 422.2274(e) and 423.2274(e) is arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence.</u>

There can be no serious dispute that, within the MA plan chain of enrollment, agents and brokers, and agencies and brokerages alike, incur a litany of operational overhead expenses in order to be able to perform beneficiary enrollment services in a competent, compliant, and *independent* manner. These independent agents and brokers also perform a myriad of services "other than [the] enrollment of beneficiaries" for which they deserve to be fairly compensated. To the extent an MA plan makes payment for actual, quantifiable, and industry-specific services "other than [the]

---

[20] *See* § 422.2274(d)(3).

[21] *See id*. § 422.2274(d)(5)(ii)(A)-(B).

enrollment of beneficiaries, these payments cannot credibly be described as "compensation," nor can the list of services omitted from the examples in the regulation itself escape consideration by CMS.  Singling out agents and brokers in this way is arbitrary and capricious.

To the extent CMS contends that agents and brokers categorically "misuse" administrative payments as "compensation" above fair market value, CMS creates a strawman argument and without providing any meaningful evidence that such misuse is an accurate or even significant part of the MA industry.[22]  CMS is wrong.

To this end, CMS mistakes correlation for causation and risks undercutting the interests of beneficiaries in need of—precisely—independent guidance.  Anecdotes, rumors, and innuendo concerning "MA marketing complaints," do not constitute an analysis concerning *agent/broker compensation* under the statute that the public can meaningfully respond to in federal rulemaking, which violates the APA.  *See Engine Mfrs. Ass 'n v. EPA,* 20 F.3d 1177, 1182 (D.C. Cir. 1994) (an agency must make public the "basis for . . . key assertions" in its analysis).  The APA requires the agency to make available to the public, in a form that allows for meaningful comment, the data the agency used to develop the proposed rule.  *See* 5 U.S.C. 553(b) (agency must give notice of proposed rulemaking); *Connecticut Light and Power Co. v. NRC*, 673 F.2d 525, 530-31 (D.C. Cir. 1982) (notice includes available data and studies in intelligible form so that public sees "accurate picture of reasoning" used by agency to develop proposed rule).

We query the existence of such data.  Rather than providing the public with any actual or "intelligible" data that allows commenters to see an "accurate picture of reasoning" for how CMS links "MA marketing complaints" to agent/broker administrative payments, let alone the misuse of agent/broker compensation, CMS offers only that "[a] common thread to the complaints is that agents and brokers are being paid, typically through various purported administrative and other add-on payments, amounts that cumulatively exceed the maximum compensation allowed under the current regulations."  This vague reference to a "common thread" is disappointing.  CMS offers no indication that it investigated this "common thread" in the complaints, commissioned any studies related to this "common thread" in the complaints, or otherwise acted upon any instance of this "common thread" in the complaints.  CMS provides no indication of the source of these so-called complaints, which are unlikely from beneficiaries.  Instead of offering the public an analysis of this data to support the conclusion that "MA marketing complaints" are solved by virtually eliminating administrative payments to independent agents and brokers, CMS offers next to nothing.

Moreover, CMS maintains significant amounts of data concerning agent and broker compensation collected directly from MA plans, and logic would require that CMS would refer to at least these agent and broker compensation data in the Proposed Rule—or somehow even utilize such data at all.  For example, 42 C.F.R.§ 422.2274(c)(6) requires MA Plans to, "[o]n an annual basis by October 1, have in place full compensation structures for the following plan year.  The structure must include details on compensation dissemination, including specifying payment amounts for

---

[22] *See, e.g.*, Proposed Rule at 78,5552 (col. b) ("CMS has also received complaints from a host of different organizations, including State partners, beneficiary advocacy organizations, and MA plans."  See *also id*. at 78,552 (col. b) ("We *believe* these financial incentives are contributing to behaviors that are driving an increase in MA marketing complaints received by CMS in recent years.") (Emphasis added.)

initial enrollment year and renewal year compensation." In addition, CMS publishes on its website annual agent/broker compensation data for MA Plans.[23] In short, CMS need not resort to vague references to "common threads"; CMS need only analyze the data it already collects or endeavors to collect. Indeed, Congress recently sent a letter to CMS specifically urging it to do just this.[24] Without more, the Proposed Rule fails to provide the public a meaningful opportunity to comment on the basis for CMS's key assertions, which violates rulemaking requirements under the APA.

CMS's singular reliance on a recent study by the Commonwealth Fund is misplaced and irresponsible.[25] This study, which involved four "online focus groups," was comprised of only 29 individuals (n=29). These statistical aspects of the study should be disqualifying from the start. Moreover, CMS erroneously assumes that the market rates for similar services in non-MA markets described in the study should be commensurate to rates in MA markets, but CMS provides no basis for this assumption. Although MA/non-MA services may appear similar, the marketplaces are dramatically different; in particular, considering CMS's heavy oversight of MA plans, the MA market requires significant administrative support to meet CMS requirements that do not apply to non-MA products. Notwithstanding these fundamental defects, CMS cites to this study and this study alone to reach extreme, conclusions on a national scope that could harm beneficiary access to MA plans that best meet their healthcare needs. This single study by the Commonwealth Fund cannot possibly establish a foundation for national policymaking.

CMS's contention that "complaints" are arriving at in an "escalated pace" is also baseless, and without additional information concerning the scope of time at issue, entirely misleading. In fact, our clients' data suggests otherwise, and that "complaints" (as measured by Complaints Tracking Modules or "CTMs") are, in fact declining. CTMs, which are a methodological component CMS uses to calculate "Star Ratings" on an annual basis for an *upcoming* plan year, indicates that CMS has ready access to such data. We believe that the CTM data that CMS has in its possession would show that beneficiary complaints (as a percentage of enrollments) are actually in decline from past years, even as CMS actively encourages seniors and other members of the public to complain.[26] We urge CMS to scrutinize its readily accessible databases of CTMs, especially those available

---

[23] *See* Agent Broker Compensation, *available at*:  https://www.cms.gov/medicare/health-drug-plans/managed-care-marketing/medicare-marketing-guidelines/agent-broker-compensation

[24] Letter from Frank Pallone, Jr., Committee on Energy and Commerce and Richard Neal, Committee on Ways and Means, to Chiquita Brooks-LaSure (Oct. 31, 2023) ("Prior to 2018, [MA/PDP plans] were required to provide the amount spent on direct sales, salaries, and benefits, as well as agents and brokers fees and commission in the annual [MLR] data collection . . . However, changes detailed [in 2019 rulemaking] significantly reduced the reporting requirements to four fields[.]"), *available at* https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/evo-media-document/cms.2023.10.31.pdf

[25] *See* Leonard, F., et al., *The Challenges of Choosing Medicare Coverage: Views from Insurance Brokers and Agents*, THE COMMONWEALTH FUND (Feb. 28, 2023), *available at*: https://www.commonwealthfund.org/publications/2023/feb/challenges-choosing-medicare-coverage-views-insurance-brokers-agents

[26] *See* Jaffe, S. *Uncle Sam Wants You . . . to Help Stop Insurers' Bogus Medicare Advantage Sales Tactics*, KFF HEALTH NEWS (Nov. 30, 2023). *Available at*: https://kffhealthnews.org/news/article/medicare-advantage-deceptive-sales-tactics-federal-crackdown/

App.063

for years 2022 and 2023 (not simply 2020-2021), and support its reasoning with actual, responsible, statistical data.[27]

Nevertheless, CMS casually notes only that it "has seen web-based advertisements,"[28] and "observed" the value of administrative payments "in recent years." The Proposed Rule offers no specificity concerning the time frame at issue, and simply concludes that "[t]hese types of complaints have escalated at a pace that mirrors the growth of administrative or add-on payments, which we contend are being misused as a means to compensate over and above the CMS-set compensation limits on payment to agents and brokers."

However, growth in MA – mathematically speaking – drives the growth of complaints and administrative payments, not necessarily misconduct or "misuse." Enrollment growth in the MA industry is no secret. The Journal of Health Affairs stated recently that "[t]he share of Medicare beneficiaries in MA plans has risen from 19 percent in 2007 to 50 percent in January 2023, and MA now enrolls 30.2 million beneficiaries."[29] And MA is projected to continue to increase year over year, which necessarily implicates higher numbers of "complaints," "web-based advertisements," or other "observations." Put another way, CMS also fails to provide information, analysis, or explanation to explain how increases in numbers are distinct from increases in *rates*. Relatedly, administrative payments necessarily increase as compliance requirements, quality assurance requirements, and audit activities increase. Consequently, the recent decline in CTMs, which are directly traceable to the increased reliance on administrative resources expended for compliance, quality assurance, and audits, will almost certainly reverse course if administrative payments are eliminated. Yet CMS provides no effort to contemplate these known effects. Without more, the Proposed Rule fails to provide the public a meaningful opportunity to comment on the basis for CMS's key assertions, which violates rulemaking requirements under the APA.

To the extent CMS "believes" that these administrative payments (*i.e.*, "payments other than compensation") are being categorically misused as "compensation," CMS has failed to indicate that it has undertaken correspondingly increased numbers of compliance activities in order to enforce existing authorities, let alone a single one. *See* 42 C.F.R. 422, Subpart O (Intermediate Sanctions and civil money penalties for MA plans). It strains credulity that a federal agency would rely on anecdotal allegations like these—not measurable enforcement activities—in the service of eliminating and amending long-standing regulatory provisions. This can only be explained as

---

[27] It bears mention that CMS has the ability to discern founded, as opposed to unfounded, CTMs in the same database.

[28] "Web-based advertisements" are generally within the province of lead generation and marketing, which is not a functionality served by agents and brokers. CMS's reference to this type of marketing is telling because it illustrates CMS's inclination to arbitrarily conflate different parts of the MA chain of enrollment and without support. Because no causal or logical connection exists between administrative payments to agents and brokers and "web-based advertisements," CMS's effort to target agents and brokers in the Proposed Rule falls apart – eliminating administrative payments to agents and brokers will do nothing to limit or affect advertising in the MA industry, web-based or otherwise.

[29] Xu, L., et al., *Medicare Switching: Patterns of Enrollment Growth In Medicare Advantage, 2006-22*, 42 HEALTH AFFAIRS 9 (Sept. 2023).

CMS's effort to create a strawman argument. Regulatory action like this is unwarranted and unsupported by substantial evidence. Without more, the Proposed Rule fails to provide the public a meaningful opportunity to comment on the basis for CMS's key assertions, which violates rulemaking requirements under the APA.

For the foregoing reasons, CMS's proposal to "eliminate the regulatory framework which currently allows for separate payment to agents and brokers" is premised on a categorical failure to understand and appropriately consider the most basic elements of the MA plan industry, and this failure will devastate beneficiary access to these critical components within the chain of MA enrollment. A federal agency like CMS cannot and should not accept an incomplete understanding of the MA enrollment chain to inform its rulemaking authority.

    4.  <u>CMS's proposal to effectively eliminate §§ 422.2274(e) and 423.2274(e) is unreasonable in the context of the entire regulations.</u>

CMS's proposal to effectively eliminate administrative payments entirely under subparagraph (e), without addressing how such an elimination will interact with the remaining subparagraphs of sections 422.2274 and 423.2274, is unreasonable. Targeting plan administrative payments to independent agents and brokers for eradication based on erroneous and unsupported "beliefs" about the MA chain of enrollment fail principles of both common sense and statutory construction.

CMS seeks to eliminate administrative payments only to "independent agents and brokers" as allegedly circumventing the compensation cap and allegedly influencing their decisions to engage in "high pressure sales tactics."[30] But this approach fails to recognize that such payments are not often made directly to *individual* agents and brokers who perform these enrollment activities, but rather are often made to the *entities* (*i.e.*, agencies, brokerages and/or FMOs) that employ or contract with these individual agents. These agencies, brokerages and /or FMOs, in turn, pay these agents and brokers (often on an hourly basis or a fixed fee for an enrollment), without regard to which plan the agent or broker enrolls a beneficiary. More frequently, individual agents and brokers have no knowledge as to whether administrative payments are even paid to the agencies, brokerages or FMOs that employ or contract with them, much less the amounts of those payments. Therefore, it is difficult to understand how eliminating these "administrative payments," which these independent agents and brokers are completely unaware, serve beneficiaries' interests. What is certain, however, is the Proposed Rule's rule negative impact on the ability of agencies, brokerages and FMOs to provide ongoing support to their agents and brokers, to the extent that these entities are considered "agents" or "brokers" themselves.

The Proposed Rule further acknowledges that FMOs "are a type of TPMO that employ agents and brokers to complete MA enrollment activities" and explains that CMS is "interested in the effect of payments made to" these FMOs.[31] This suggests first that CMS does not perceive the clear distinction between FMOs and TPMOs. More importantly, this statement suggests that that CMS does not intend for compensation limits to agents and brokers to apply to FMOs because CMS lacks information on the effect of payments being made to them. But CMS fails to acknowledge that under state law, many FMOs are licensed as agents and/or brokers. Therefore, by using the

---

    [30] *See* § 422.2274(d) ("These compensation requirements only apply to independent agents and brokers.")

    [31] *See* Proposed Rule at 78,553 (col. a).

word "agent and broker" inconsistently within the regulation, and without defining them as individuals, the Proposed Rule actually layers on additional levels of confusion, which may have the unintended effect of limiting payments to those FMOs and/or discouraging them from being licensed as agents or brokers (which, counterintuitively, CMS should promote).  To make matters more confusing, referral payments under subparagraph (f) apply to "an agent, broker, or other entity for potential enrollment into a plan."

CMS also does not clearly define the "administrative services" that CMS appears to believe differ from the regulations.   The preamble to the Proposed Rule explains that "examples of [administrative] services are training, material development, customer service, direct mail, and agent recruitment,"[32] whereas the underlying regulation describes "administrative services" as "services other than enrollment of beneficiaries" and includes as examples "training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments."[33]  The differences here lack any explanation.  To add insult to injury, in calculating the value of these services at $31, CMS ignores any of these aforementioned other costs CMS mentions elsewhere, explicitly identifies the costs of licensing, training and testing requirements at § 422.2274(b), and the recording requirements at § 422.2274(g)(2)(ii), but then ultimately fails to include licensing costs in its final $31 calculation. These inconsistences, coupled with an unreasonably narrow methodology to calculate "the value of those [administrative] services in the marketplace," is plainly arbitrary and capricious agency action.

CMS's regulatory gymnastics do not end there.  CMS on the one hand defines "administrative payments" as "[p]ayments *other than compensation*" in the title to sections 422.2274(e) and 423.2274(e) (emphasis added), but on the other hand goes on to provide that, "[b]eginning in 2025, administrative payments are included in the calculation of . . . *compensation."*  Apart from this glaring contradiction, CMS fails to explain how or why plans may not compensate independent agents and brokers under sections 422.2274(e) and 423.2274(e), but plans may compensate other TPMOs and even the MA plans themselves.

All told, CMS appears to confuse its own arguments by using vague, imprecise, and inconsistent terminology, definitions and examples–and interchangeably so–in the context of a lengthier regulation and its subparagraphs that utilize different terminology.  In context, the Proposed Rule introduces unreasonable levels of confusion, uncertainty, and ambiguity[34] into a marketplace already at the mercy of plan discretion for agent and broker compensation payments under sections 422.2274(d)(3) and 423.2274(d)(3).

    5.  <u>CMS's analysis of the "value of those [administrative] services in the marketplace" and a $31 "fair market value" concession lacks credibility.</u>

---

[32] *Id*.

[33] *See* §§ 422.2274(e)(1), 423.2274(e)(1).

[34] *See Chevron U.S.A., Inc. v. Nat. Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).

CMS's attempt to calculate an entirely new "value of those services in the marketplace" analysis based only upon (1) Cost of Training, and (2) the Burden Associated with Transcription and Recording is a study in misdirection, and problematic for several reasons.[35]

First, as explained previously, CMS provides no authority, let alone a reasonable explanation, for effectively limiting its calculation to two variables, while the current regulation plainly enumerates an extensive list of administrative payments under section 422.2274(e)(1) ("for example, training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments"). Each of these examples, which do not comprise an exhaustive list of "services other than enrollment of beneficiaries," should at a minimum be represented as metrics in some form. Yet, CMS inexplicably and without authority, simply eliminates these real costs from its so-called "value of those services in the marketplace" calculation.[36] We encourage CMS to perform a "value" analysis in the context of an actual marketplace, not an imagined one.

Second, CMS unreasonably relies upon general certification costs by a trade association (America's Health Insurance Plans or "AHIP") as a comprehensive point of reference for the costs of training "agents and brokers." In an actual marketplace, agents and brokers obtain additional and ongoing training and support through entities like FMOs and other organizations, which implicate administrative overhead that FMOs and other organizations incur to train agents and brokers. The *actual* costs to train an agent for MA plans to a level of skill and expertise, *and independence* beneficiaries should expect far outpace the general AHIP training and certification costs CMS uses as a singular reference point (~$125). *Actual* training costs necessarily include state licensing fees, carrier appointment costs, MA certification expenses and various training costs. Additionally, each of these costs include highly variable labor expenditures (wage-adjusted) and non-labor components (materials, software, systems training), and must also account for scale. Further still, many of these costs accrue even before an agent or broker makes her first enrollment, which is not guaranteed. By contrast, the calculation in the Proposed Rule simply divides an out-of-pocket AHIP certification and training cost by an estimated and questionable number of new MA enrollees, which lacks serious explanation. CMS's omissions here are glaring, and CMS's failure to include an accurate accounting of actual training and certification costs for agents and brokers enrolling beneficiaries in MA plans, is a profound lack of evidence in support of this new, proposed "value of those services in the marketplace" calculation.[37]

Third, CMS's calculations concerning the burden of recording and transcription are similarly perplexing. Typically, this cost is calculated based on technology fees and storage fees necessary to quote benefits and field applications (*i.e.*, a technologically relevant platform and mobile application infrastructure). Utilizing a time metric (30 minutes) only, and without support, is not only odd, but arbitrary, and would defy common sense in the MA chain of enrollment industry.

---

[35] *Id.* at 78,597. *See also* §§ 422.2274(e)(1), 423.2274(e)(1).

[36] Significantly, CMS removed the costs of licensing from this calculation, despite identifying licensing as a cost that should be included only sentences prior. *See* Proposed Rule at 79,556 (col. b); 78,597 (cols. a-b).

[37] *See Broker Compensation for Medicare Advantage and Part D Prescription Drug Plans*, Attached as Exhibit 1.

Fourth, these fundamental oversights demonstrate that CMS simply lacks any amount of expertise necessary to calculate these costs in a reasonable manner, which should mandate the involvement of actual accounting or financial expertise in this industry.  The calculation described in the Proposed Rule is so replete with factual inaccuracies that no reasonable expert could agree with it.  By way of example, a credible "value of [] services in the marketplace" analysis would not casually derive a national number of insurance agents enrolling MA beneficiaries based on educated guesses taken from a Bureau of Labor Statistics report.  Accordingly, we do not believe that CMS's attempt to horse-trade an inaccurate attempt at calculating a "value of those services in the marketplace" for an upward $31 FMV adjustment in agent and broker compensation passes muster.

6.  CMS's proposal to effectively eliminate §§ 422.2274(e) and 423.2274(e) fails to analyze such an elimination in the context of the Medical Loss Ratio ("MLR").

Starting in 2011, the Affordable Care Act (the "ACA") required that under Medicare Part C, MA plans attain a MLR (the share of premiums spent on medical care) of at least .85 (*i.e.*, 85 percent).  *See* 42 U.S.C. § 1857(e)(4).[38]  *See also* 42 C.F.R. § 422.2420.  Plans may utilize up to 15 percent for other administrative costs, which include agent and broker compensation and administrative payments.  Agent and broker compensation and administrative payments constitute "non-claims costs" in the numerator calculation of an MA Plan's MLR, which the Proposed Rule fails to address entirely with regard to agent and broker compensation.  Such non-claims costs, as defined in section 422.2401, include the following:

1.  Amounts paid to third party vendors for secondary network savings;
2.  Amounts paid to third party vendors for any of the following:
    a.  Network development
    b.  Administrative fees
    c.  Claims processing
    d.  Utilization management.[39]

CMS's proposal to the eliminate administrative payments from this 15 percent MLR limit – but without any corresponding adjustment to the 15 percent limit itself – is head-scratching.  If plans need not pay for "payments other than compensation," CMS will effectively redirect these administrative payments, not eliminate them.  The recipients of this steering exercise will undoubtedly be larger plans with correspondingly larger, in-house marketing and advertising capabilities.  This is hardly consistent with CMS's interests in limiting the presence of "larger, national plans."[40]  Nor does this do anything to support independent agents and brokers whose loyalty remains with beneficiaries, not "larger, national plans."[41]  We therefore query the conspicuous omission of any analysis in the Proposed Rule that would explain the known

---

[38] The requirements at section 1857(e)(4) of the Act also apply to the Medicare Prescription Drug Benefit Program because section 1860D-12(b)(3)(D) of the Act requires that the contractual requirements at section 1857(e) of the Act apply to the Part D program.

[39] 42 C.F.R. § 422.2420(b)(4)(i).

[40] *See* Proposed Rule at 78,553 (col. b).

[41] *Id.*

consequences of eliminating "payments other than compensation" in the context of the MLR. Lacking such an analysis, or obscuring its effects, CMS should abandon this proposal.

      7.  <u>CMS lacks authority to use agent and broker compensation as a means to "level the playing field."</u>

Section 1851(j)(2)(D), the sole authority from which CMS derives interpretive authority, states that CMS must establish guidelines to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the MA plan that is intended to best meet their health care needs." Nothing in the statute above authorizes CMS to "level the playing field" or suggests that CMS may engage in market manipulation by improperly re-engineering CMS's authority to "ensure that the use of *compensation* creates incentives for agents and brokers to enroll individuals in the MA plan that is intended to best meet their health care needs." 42 U.S.C. § 1851(j)(2)(D) (emphasis added.)[42] Put simply, if Congress directed CMS to select winners and losers in the MA plan marketplace through rulemaking, it would have said so. It did not.

In fact, the Proposed Rule makes CMS's market-engineering effort explicit, stating: "CMS has observed that the MA marketplace, nationwide, has become increasingly consolidated among a few large national parent organizations, which presumably have greater capital to expend on sales, marketing, and other incentives and bonus payments to agents and brokers than smaller market MA plans" and "[w]e believe that this approach would level the playing field for all plans represented by an agent or broker and promote competition." First, we are mystified by the source of these observations, let alone the confidence CMS has in what can only be described as inaccurate generalizations. Our clients' experiences do not resemble CMS's "observations." Further, although CMS is free to "observe" trends in the MA marketplace and act within the scope of authority conferred by the Social Security Act, antitrust and other anti-competitive conduct in the marketplace are matters reserved for the U.S. Federal Trade Commission (FTC) and the U.S. Department of Justice to address, not CMS. Accordingly, CMS's interests in "leveling the playing field" are extra-statutory as a matter of law.

Furthermore, CMS's reliance on Executive Order ("E.O.") 14036[43] in support of such extra-statutory action is misplaced. Even the language of the E.O. that the Proposed Rule quotes confers no such authority to "level the playing field," as CMS suggests. Rather, the quoted language "directs [HHS] to *consider* policies that ensure Americans can choose health insurance plans that meet their needs and compare plan offerings, furthering competition and consumer choice." (Emphasis added.)[44] In effect, this E.O. directs CMS to *consider*—not implement—policies affecting the way Americans can choose health insurance plans, the E.O. does not refer specifically to MA plans, and simply reiterates the language of section 1851(j)(2)(D). Most importantly, E.O.

---

[42] *See id.* at 78,556 (col. a).

[43] Exec. Order No. 14,036, 86 Fed. Reg. 36,987 (July 14, 2021), *available at*: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/07/09/executive-order-on-promoting-competition-in-the-american-economy/

[44] *See id. See also* Proposed Rule at 78,553 (col. b).

14036 does not confer any additional authority upon CMS to influence a competitive marketplace, let alone amend existing regulations that do not comport with the statute.

Above all, CMS has not established that a "playing field" needs to be "leveled" in the first place. CMS fails to provide support for the conclusion that large, national plans have engaged in any actual anti-competitive marketplace behavior towards smaller, regional plans, or that agent and broker compensation contribute to such behavior. Even anecdotally speaking, several regional plans in the U.S. are actually gaining membership.[45] Furthermore, other studies suggest that CMS's increased oversight over MA plans during the COVID-19 public health emergency may have artificially increased Star Ratings in 2022, which resulted in increased revenue for large, national plans in plan year 2023.[46] CMS has performed no meaningful analyses to reconcile these patterns that plainly exist in the market with the reforms set forth in the Proposed Rule. Instead, CMS simply takes aim at independent agent and broker compensation.

8. CMS's RFA "qualitative" analysis lacks credibility and is internally inconsistent with the Proposed Rule.

Under 5 U.S.C. § 601 et seq., an agency is required to determine, to the extent feasible, the rule's economic impact on small entities, explore regulatory options for reducing any significant economic impact on a substantial number of such entities, and explain their ultimate choice of regulatory approach. The proposed changes to the MA and Part D agent broker compensation regulations at 42 CFR 422.2274 and 423.2274 have knowable, measurable, and dramatic potential economic effects on agents and brokers, many of whom are small entities. However, the Proposed Rule appears to flout this requirement:

> The proposed changes to the MA and Part D agent broker compensation regulations at 42 CFR 422.2274 and 423.2274 have potential economic effects on agents/brokers, plans, and Medicare beneficiaries. *Since we lack the data to quantify these effects, we discuss them qualitatively.* Agents and brokers may lose certain excess payments that would be prohibited under the proposed regulation; on the other hand, they would receive an increased FMV calculation for compensation per enrollment.

Proposed Rule at 78,610 (col. c.) (emphasis added).

First, CMS's rationale for refusing to perform a meaningful RFA analysis makes no mention of the Proposed Rule's economic impact on small entities, nor does it explore options to reduce any significant economic impact on a substantial number of such entities. In fact, the Proposed Rule makes no mention whatsoever of small entity participation in the MA enrollment chain, which violates the RFA on its face. The resulting "qualitative" discussion amounts to a series of guesses.

---

[45] *See* Monthly Enrollment by Plan, *available at*: https://www.cms.gov/data-research/statistics-trends-and-reports/medicare-advantagepart-d-contract-and-enrollment-data/monthly-enrollment-plan

[46] *See* Cronick, D. et al., *Summary of 2022 Medicare Advantage and Part D Start Ratings*, WAKELY BRIEF, *available at*: https://www.wakely.com/sites/default/files/files/content/summary-2022-medicare-advantage-and-part-d-star-ratings20211013.pdf

Second, CMS's rationale for refusing to perform a meaningful RFA analysis is internally inconsistent and therefore amounts to an abuse of discretion and is otherwise not in accordance with law.  Most obviously, CMS itself is an active participant in the MA chain of enrollment, oftentimes serving as a form of agent or broker itself.[47]  In this way, CMS need look no further than the details this agency would need to generate a budget request for FY 2024, like the one attached, which would, at a minimum, provide a cost "floor" for industry writ large (recognizing the CMS costs would be significantly less than any private business).[48]  For example, CMS publishes a *robust* dataset on its own website detailing "Agent-Broker Compensation Data" for the entire nation, by cost year, which MA plans are annually required to report to CMS.[49]  By way of another example, CMS could reference financial data filed with the Security and Exchange Commission ("SEC") associated with customer acquisition costs.  At the same time, Members of Congress have specifically requested that CMS restore its data collection efforts to those that were in place prior to 2018.[50]  Further still, CMS cavalierly proposes a new "value of those services in the marketplace" analysis for administrative payments relying on multiple (flawed) dollar values derived from inapposite reference points to arrive at an exact trade for $31 in increased FMV.[51]  Simply put, a federal agency has a wide array of data at its disposal–even public financial statements–that would permit CMS to undertake *some* quantitative analysis in good faith.  In fact, at a minimum, CMS could have used its own costs as a "floor" (that informs CMS's own participation in the market) to guide some reasonable quantitative, analysis, but it did not.  CMS cannot have it both ways, and to the extent CMS contends it lacks data to perform some meaningful analysis of the Proposed Rule's economic impact on small entities, explore regulatory options for

---

[47] Notably, CMS itself effectively operates as both a referee and a *competitor* in this agent and broker marketplace, which alone invites scrutiny.  While CMS's participation is in no way problematic, it bears mention that CMS "competes" in a manner that also allows CMS to experience significantly reduced costs as compared to private industry participants.  For example:  CMS regulations require that all consumers be directed to 1-800-MEDICARE and Medicare.gov prior to solicitation from a private participant, which amounts to free marketing; CMS enrollment personnel staffing (via contract) 1-800-MEDICARE call-in centers are not required to be licensed, carrier-certified and appointed agents or brokers; CMS need not submit any marketing materials to carriers and HPMS prior to use; the MCMG requirements do not apply to CMS; CMS does not have mandated disclaimers that are designed to dissuade beneficiaries from listening to a product presentation; CMS is not required to pay for compliance-related administrative expenses; CMS does not incur compliance and compliance training requirements.  In sum, CMS's experience even as a quasi-marketplace agent and broker cannot form the basis of a reasonable calculation of "value of those services in the marketplace."

[48] For example, CMS could evaluate its own metrics related to television advertisement outreach and marketing, web-based marketing, 1-800-MEDICARE call center costs (associated with even non-licensed staff), trained within narrow limitations, social media, and more.  *See* https://www.cms.gov/files/document/cms-fy-2024-congressional-justification-estimates-appropriations-committees.pdf-0

[49] *See* 42 C.F.R. § 422.2274(c)(5).  *See also* https://www.cms.gov/medicare/health-drug-plans/managed-care-marketing/medicare-marketing-guidelines/agent-broker-compensation

[50] *See* footnote 24, *supra*.

[51] *See* Proposed Rule at 78,556; 78,596-97.

reducing any significant economic impact on a substantial number of such entities, and explain their ultimate choice of regulatory approach, the absence of any such analysis here is telling and violates section 601 of the RFA.

### C.   CONCLUSION

For the reasons stated above, we respectfully urge CMS to abandon this Proposed Rule.

Sincerely,

Andrew S.M. Tsui

Greenberg Traurig, LLP

Exhibit 1 (Attached)

# EXHIBIT 1

# Broker Compensation for
# Medicare Advantage and Part D Prescription Drug Plans

**Broker Compensation Is Restricted and Regulated by CMS**

The Centers for Medicare & Medicaid Services (CMS) regulates the compensation paid to licensed agents and brokers by insurance carriers operating Medicare Advantage (MA) and Part D prescription drug (PDP) plans. State-licensed agents and brokers provide the critical service of helping the nation's seniors and disabled individuals select and enroll in the most appropriate plan for them and their families.

**Types of Broker Compensation**

Under CMS regulations, insurance carriers may make the following types of payments to brokers and agents:

1. **Commissions**. CMS sets the maximum commission payable for MA and PDP plans to a predetermined fair market value (FMV) amount that is adjusted annually to reflect growth in Medicare costs.[1] The current commission amounts are:

>    For MA:          $611/enrollee in most states
>                     $689/enrollee in CT, PA, DC
>                     $762/enrollee in CA, NJ
>
>    For PDP:         $100/enrollee

Federal spending per Medicare Advantage enrollee is over $13,000 per year. Generally, commissions are capped at less than 5 percent of the average cost of the plan being sold.[2]

The June 2023 increase in commissions was approximately 1.67% in most states, about half the CPI inflation rate for the year.

Commission payments for each year that a beneficiary enrolls in the same or a "like" plan are also strictly regulated, at up to 50 percent of FMV, as defined by CMS.[3] The commissions paid by each carrier for each plan are publicly reported by CMS each year.[4]

2. **Non-Commission Payments to Brokers and Agents.** Insurance carriers may also pay brokers and agents for certain services that brokers or agents perform for the carriers. CMS provides examples of such services in regulation, including: "training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments".[5]

---

[1] "Fair market value (FMV) means, for purposes of evaluating agent or broker compensation under the requirements of this section only, the amount that CMS determines could reasonably be expected to be paid for an enrollment or continued enrollment into an MA plan." 42 C.F.R. § 422.2274(a), (d)(2).

[2] https://aspe.hhs.gov/sites/default/files/documents/14a262cfc2979b8cc1a9dffaee06b022/medicare-advantage-enrollment-spending-overview.pdf

[3] 42 CFR § 422.2274(d)(3).

[4] https://www.cms.gov/medicare/health-drug-plans/managed-care-marketing/medicare-marketing-guidelines/agent-broker-compensation

[5] 42 CFR § 422.2274(e)(1).

App.074

Payments for these services "must not exceed the value of those services in the marketplace," a similar standard to the one set forth for commissions. Unlike commissions, these payments do not have a set dollar amount because these payments reflect a broad variety of possible costs and services.

These non-commission payments are commonly categorized as:

a. **Administrative Fees.** Sometimes called an override, insurance carriers often pay brokers and agents an amount that partially or completely offsets costs for certain administrative items such as:
   - telephonic equipment required by CMS to maintain all customer call recordings for 10 years,
   - health risk assessments, in which a customer service representative obtains information from a beneficiary to properly assess the beneficiary's health risks for the insurance carrier,
   - health appointment reminders, and
   - other equipment and services.

b. **Marketing Fees.** Insurance carriers may also purchase marketing services from brokers and agents (as well as from other parties) with payments not to exceed the value of such services in the marketplace. As with all marketing of MA and PDP products, such marketing services must meet CMS' stringent marketing requirements, including the extensive regulations imposed each year on filing, review, and approval of marketing materials.[6,7] Such marketing may highlight the broker as a platform for choosing among multiple carriers, rather than focus on the plans of only a single carrier.

c. **Licensing Fees.** Insurance carriers may pay brokers and agents the costs of becoming licensed and appointed to sell the carriers' plans. Licensing and appointment are state-based requirements for the sale of health insurance, including MA and PDP products.

**Broker Compensation Does Not Divert Medicare Resources**
The Affordable Care Act (ACA) established an 85% medical loss ratio (MLR) for MA and PDP plans. Broker compensation does not reduce the resources available to pay for Medicare enrollees' health care because 85% of plan resources must be used for patient care, rather than for such other items as administrative expenses or profit.

Under CMS regulations, this 85% does not include commissions, marketing fees, or other non-patient-care fees paid to brokers and agents, which must instead fit within the remaining 15% administrative side of the MLR ratio.[8]

MLR regulations therefore already provide an upper bound on the amount of spending that may go from the Medicare Trust Funds and Medicare beneficiary premiums to administrative overhead and profit (such as commissions, marketing fees, or other non-patient-care fees paid to brokers and agents).

---

[6] 42 CFR § 422.2274(c)(7)
[7] 42 CFR § 422.2261
[8] 42 CFR § 422.220(b).

**App.075**

**Brokers Provide Valuable Service Not Available from Insurance Carriers**

Each insurance carrier only presents that carrier's own plans. To compare plans from more than one carrier, consumers can contact several carriers separately. A broker simplifies the process by presenting and advising on plans from several carriers in a single interaction. Therefore, many consumers prefer to work with brokers instead of separately contacting each insurance carrier to find the plan that is the better match for their personal needs.

Non-profit, local community insurance carriers are often highly rated for customer service and satisfaction, making them good choices for many beneficiaries. Other beneficiaries may find their particular needs are better met by regional or national insurance companies with different provider networks and plan designs. Both small and large carriers may have similar quality ratings. However, whether the carrier is local, regional, or national, all carriers sell only their own plans.

Brokers help beneficiaries determine whether the smaller local plans or the larger regional or national plans are the better fit for their particular circumstances. The larger brokers have developed sophisticated, proprietary plan-matching tools that can consider a person's preferred medical providers, nearest pharmacies, and prescribed drugs, combined with plan information such as Star Ratings and plan benefits, to identify which carriers and plans provide better coverage for a person's particular situation.

**Broker Business Model Depends on Customer Satisfaction**

CMS has implemented quality initiatives such as Star Ratings for plans to focus the industry on beneficiary satisfaction and retention. Incentives for both brokers and plans are aligned in assisting Medicare beneficiaries to select *the plan which best suits their needs*, as they benefit most when beneficiaries stay with their selected plan for as long as possible. When beneficiaries are unhappy with their plan selection, brokers and plans forfeit compensation.

**A.   Forfeited Commissions for Disenrollment.** If a beneficiary is dissatisfied with a plan and rapidly disenrolls in the first 90 days, then the broker receives no commission at all.[9] In addition, brokers may not earn commission payments, and must refund any commission payments already received, for any time period a beneficiary does not actually remain enrolled in a plan.[10] Therefore, brokers have a strong disincentive to spend resources in directing customers into plans that are a bad fit for the customer's needs or situation.

**B.   Customer Lifetime Value.** Brokers and agents spend a significant investment to acquire a customer. This initial investment typically exceeds the amount of commission received from carriers for a customer in the first year, and the broker or agent only makes a profit in the second and subsequent years the customer remains with the broker or agent.

---

[9] 42 CFR § 422.2274(d)(5)(ii)(A).

[10] 42 CFR § 422.2274(d)(5)(ii)(B).

**App.076**

For example, the customer acquisition costs reported by the three publicly traded major insurance agencies for the most recent full fiscal year exceed the $611 first-year commission for MA in most states:

|  | Fiscal Year 2022 (ended 12/31/2022) eHealth (EHTH) | Fiscal Year 2022 (ended 12/31/2022) GoHealth (GOCO) | Fiscal Year 2023 (ended 6/30/2023) SelectQuote (SLQT) |
|---|---|---|---|
| Medicare Customer Acquisition Cost (CAC)* | $888 | $684 | $1,224 |

*Derived from publicly reported data.[11]

To be profitable, brokers and agents need to find and keep satisfied customers, which comes from helping them find the plan that best fits their needs and budget.

Health plan selection can be complicated, and customers value the professional assistance that trained, licensed brokers and agents can offer. As each insurance carrier only offers its own plans, brokers are a valuable way for consumers to easily compare plans from several carriers at once while receiving advice from a licensed professional.

---

[11] eHealth, Inc. (EHTH) data from 2022 Form 10-K filing, page 55. SelectQuote, Inc. (SLQT) data from 2023 Form 10-K filing, page 51. GoHealth, Inc. (GOCO) data derived from 2022 Form 10-K filing as: $589,985,000 cost of submission (10-K p.54) divided by 862,656 Medicare submissions (10-K p.53). Each public company calculates and reports this type of information differently, so numbers are not directly comparable among the companies. One of the differences is that GoHealth's Customer Acquisition Cost ("CAC") is calculated on a *submitted* application basis whereas eHealth and SelectQuote calculate CAC on an *approved* application basis. The $611 first-year MA commission is on a *paid* application basis. Only a certain percentage of submitted applications become approved applications, and then paid applications, for which the brokers actually receive commission payments.

**App.077**

# EXHIBIT 3



6800 West 115th Street, Suite 2511
Overland Park, Kansas  66211

January 5, 2024

Chiquita Brooks-LaSure, Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
7500 Security Boulevard
Baltimore, Maryland 21244
Attn: CMS-4205-P

Submitted electronically via regulations.gov

Re:     *Medicare Program; Contract Year 2025 Policy and Technical Changes to the Medicare Advantage Program (RIN 0938-AV24)*

Dear Administrator Brooks-LaSure,

Thank you for the opportunity to comment on the proposed rule entitled, "Contract Year 2025 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicare Cost Plan Program, and Programs of All-Inclusive Care for the Elderly; Health Information Technology Standards and Implementation Specifications."[1]  Our comments below provide insights and feedback in response to CMS' proposal to eliminate the regulatory framework that allows for separate payment to agents and brokers for administrative services.  SelectQuote supports the effort to discourage and prohibit inappropriate incentives, such as lavish gifts, from being provided to consumer-facing agents and brokers.  However, we are concerned that in its attempt to target bad actors, CMS' proposal would harm consumers and limit choice.

SelectQuote is a publicly-traded, technology-enabled, distribution and consumer engagement platform for insurance products and health care services.  We have been serving consumers for over 30 years by making available highly trained and educated agents who provide personalized, impartial advice and guidance to beneficiaries, from policy research to enrollment.  We have enrolled millions of Medicare-eligible enrollees into Medicare Advantage and Medicare Part D prescription drug plans through our fully virtual team of more than 2,000 individual, U.S.-based agents, using our choice-based platform.

Full-service distribution and consumer engagement organizations like SelectQuote provide crucial services, free of charge to consumers, that help individuals make fully informed choices about their health care.  The current CMS proposal, if not clarified and narrowed, could significantly restrict the payment of fees for these services, potentially eliminating critical consumer-focused support.  As a result, individuals will be less informed and therefore less likely to choose plans that work for their individual needs.

---

[1] Medicare Program; Contract Year 2025 Policy and Technical Changes, 88 Fed. Reg. 78476 (proposed Nov. 15, 2023).

Additionally, a proposal that hampers a burgeoning market of virtual, full-service organizations that deploy highly-trained individual agents will inadvertently exacerbate health inequities among underserved populations.

CMS' concerns that individual agents are being incentivized to steer patients towards health plans that are not the best fit for their health needs can be addressed without jeopardizing patient choice or health equity.  Below we explain the value that consumer engagement organizations bring to beneficiaries, the negative consequences that will result from the proposed changes to agent and broker compensation rules, and potential solutions to curb abusive practices while ensuring alignment with beneficiaries.  We have included modified regulatory language implementing our proposals as Attachment A.

**I.      Full-service organizations educate and offer choice to consumers.**

When CMS adopted its first requirements for agent and broker compensation in 2008, the agent/broker industry looked much different from what it is today.  Individual agents were typically either captive to a single carrier or were independent, but only had the resources to represent one or two carriers.  Captive agents, by their very nature, do not educate consumers on other plans in the market; their enrollees make health care decisions with limited information.  Similarly, small independent agents do not have incentives or the necessary state appointments and carrier certifications to educate consumers on carriers that they do not represent, regardless of how commissions or administrative fees are structured.  They only are compensated if they enroll consumers in one of the few plans that they represent.

Consumer demands have changed dramatically since 2008.  Today, consumers are inundated with plan options that can be confusing and overwhelming.  In 2023, the average American had access to 43 Medicare Advantage plans.[2]  With the evolution of the Medicare Advantage market emerged organizations like SelectQuote, which leveraged decades of experience and insights in the insurance industry to provide new, sophisticated tools and resources to Medicare Advantage consumers and health plans.  We combat information overload and choice paralysis through education, engagement, and superior user experience.

SelectQuote is a direct-to-consumer, fully virtual organization that represents approximately 25 carriers nationally in the Medicare Advantage marketplace.  SelectQuote uses its proprietary technology to load explicit details about over 4,000 plans and products nationwide, which are used to impartially identify the best product based on the individual needs of consumers, including physician preferences and medications.  Our algorithm does not take into account the compensation SelectQuote expects to receive upon enrollment, nor do our agents have access to this information.  Our platform allows consumers to compare insurance plans in a transparent manner from the comfort of their homes and helps consumers make better choices by dispensing with the need for individuals to solicit individual quotes from multiple carriers or to rely on the limited number of options presented by a traditional insurance distributor.  Without access to detailed plan information from several carriers or an efficient way to assess whether a

---

[2] *See* Freed, Meredith et al., *Medicare Advantage 2023 Spotlight: First Look*, KFF (Nov. 10, 2022) https://www.kff.org/medicare/issue-brief/medicare-advantage-2023-spotlight-first-look/.

plan meets their individual needs, consumers tend to enroll based on recommendations from unknowledgeable individuals, or opt out of comparison-shopping entirely.[3]

SelectQuote also employs thousands of individual agents, each of whom is required to complete intensive and comprehensive training each year, for the significant number of plan options they can sell. Agents understand the nuanced differences between medication therapies, specialty and primary care provider networks, and individualized programs for specific disease states, in order to best serve the consumer. We provide each new agent with up to 10 weeks of proprietary in-house training, which is later supplemented by ongoing training during the agent's full-time employment. This coupling of our highly skilled agents with our state-of-the-art technology provides the consumer with greater transparency in pricing terms and choice, and an overall better consumer experience.

SelectQuote provides consumers with information and access to a broad array of carriers that has not traditionally been available. Traditional "street agents," which are contracted directly with carriers, are typically only able to provide deep knowledge and information to consumers with respect to one or two carriers, due to the limits of manual processes of smaller, less resourced organizations. Tools like Medicare.gov theoretically provide consumers with information on all available plans, but do not offer the detailed and individualized guidance needed to make an informed choice. Lack of knowledge and understanding of health care services is a widely acknowledged problem that particularly affects beneficiaries of Medicare programs, who are generally 65 or older. For example, the Centers for Disease Control and Prevention recognizes that seniors need improved health information and services to better manage their care.[4]

SelectQuote fills this gap by using our technology to help with health care decision making, such as ensuring doctors are in network and drugs are covered. For example, Medicare.gov does not provide a provider network list for managed care plans. Instead, consumers must manually access external links to each of the individual plan websites. These websites are hard for beneficiaries to navigate, often have outdated provider network lists, and do not offer any way for beneficiaries to aggregate or compare plan information. When consumers work with SelectQuote agents, the agents are able to quickly search for their primary care and specialist providers to identify in-network providers for all applicable plans.

Providing individuals the tools to understand the choices available to them in the complex Medicare Advantage environment continues to be a challenge. During the 2020 Annual Enrollment Period, 68% of Medicare Advantage enrollees did not conduct any type of comparison between or among plans available to them.[5] If CMS finalizes this rule as proposed, it risks limiting the development and growth of full service organizations that proactively educate consumers about the choices available to them—thus harming consumers.

---

[3] *See* Miller, Mark, *When Medicare Choices Get 'Pretty Crazy,' Many Seniors Avert Their Eyes*, N.Y. Times (Nov. 13, 2020; updated Sept. 15, 2021) https://www.nytimes.com/2020/11/13/business/medicare-advantage-retirement.html.

[4] U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, *Importance of Health Literacy* (last reviewed May 3, 2021) https://www.cdc.gov/healthliteracy/developmaterials/audiences/olderadults/importance.html.

[5] Ochieng, Nancy, et al., *A Relatively Small Share of Medicare Beneficiaries Compared Plans During a Recent Open Enrollment Period*, KFF (Nov 1, 2022) https://www.kff.org/report-section/a-relatively-small-share-of-medicare-beneficiaries-compared-plans-during-a-recent-open-enrollment-period-tables/ at Table 1.

**App.081**

**II.      If CMS eliminates market-value payments for administrative services and instead establishes capped payments for such services, consumers will be deprived of vital services.**

Under current regulations, CMS imposes a cap on "compensation" related to enrollment, but narrowly defines that term to include commissions, bonuses, gifts, prizes, and awards.[6]  Health plans may provide "administrative payments" outside of the compensation caps for "services other than enrollment of beneficiaries," which includes "training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments"— up to the "value of those services in the marketplace."[7] Fees for certain services also are explicitly excluded from the compensation cap.[8] Existing regulations, then, already ensure appropriate compensation for administrative services by limiting payments for those services to market value.

The proposed rule would implement two major changes to the agent/broker compensation regulations that have been in place for almost two decades.  First, it would eliminate the regulatory framework that currently allows for separate payment for administrative services to agents and brokers, so long as these payments are at or below market value.  Second, it would redefine "compensation" to include administrative fees and reimbursements and subject them for the first time to CMS's ceilings, which currently apply only to certain enrollment payments.[9]  CMS would raise the ceiling amount for initial enrollments by $31 (from $601 to $632 for an initial enrollment) per enrollee.  The $31 increase explicitly covers (a) fees for training, testing and certification, (b) costs for traveling to beneficiary appointments, and (c) all payments that are "tied to enrollment, related to an enrollment in an MA plan or product, or for services conducted as a part of the relationship associated with the enrollment into an MA plan or product."[10]  CMS has further stated that it is the intent of the proposed rule to include *all* administrative payments in the calculation of enrollment based compensation.[11]

SelectQuote provides a multitude of unaccounted-for-services and it is not clear whether CMS intends these to be considered "services conducted as part of the relationship associated with the enrollment into an MA plan or product" and captured in the $31 compensation cap adjustment.  These services bring value to each participant in the consumer engagement and enrollment process – the health plan, the agent and the consumer.  For example, SelectQuote provides a host of sales and compliance services to its health plan partners, including developing health plan compliance policies; publishing compliance alerts relevant to each plan; participating in health plan audit activities; and implementing CMS and health plan requirements for printed material, digital material, direct mail, and all in-field marketing activity.  We also provide agents extensive training, beyond that required for certification, including product, customer service and sales training throughout the year.  Finally, SelectQuote serves as a valuable educational resource to consumers.  Using the extensive and detailed training on each individual health plan product in a particular market, our agents educate consumers and help increase "personal health literacy" among the customers that we serve.[12]  We also continue to educate consumers

---

[6] 42 C.F.R. § 422.2274(a) "Compensation".

[7] *Id.* § 422.2274(e)(1).

[8] *Id.* § 422.2274(a) "Compensation".

[9] 88 Fed. Reg. at 78,554/3-56/3.

[10] *Id.* at 78,555/1-2, 78,624/1.

[11] *Id.* at 78,555/1.

[12] *See* U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, *What Is Health Literacy* (last reviewed July 11, 2023) https://www.cdc.gov/healthliteracy/learn/index.html

even *after* they enroll in a plan, to educate them on the details of their benefit coverage, including prescription drug coverage, co-pays, deductibles and more.  All of these services are provided at no cost to the consumer.  We urge CMS to either clarify that these types of services are not covered by the $31 compensation cap adjustment, or revise the rule as suggested in Attachment A.

In its determination that a $31 increase in the capped enrollment compensation would constitute fair market value for administrative services, CMS relied solely on its "estimated costs for training, testing, and call recording that would need to be covered by this single enrollment-based payment."[13]  It did not consider, by its own admission, any other administrative payments that could be swept into this broad definition of enrollment compensation.  The costs associated with the broad array of services we currently provide to health plans and beneficiaries far exceed the $31 proposed compensation adjustment.  In fact, SelectQuote's after-enrollment education program alone costs more than $30 per beneficiary.

If CMS implements a regulatory framework that includes all administrative payments under the enrollment compensation cap, but fails to recognize the true value of the associated services or clarify the exact type and scope of services that will be subject to restricted payments, full-service distribution and customer engagement businesses will be forced to reassess the viability of providing such a comprehensive set of vital consumer-based services.  Elimination of payment for such services would require health plans to bring many compliance and training functions in-house, likely at higher expense, and would deprive consumers of some of the services completely, as health plans will not provide tools that allow comparison and education about competitors' plans and products.  In effect, CMS would be limiting choice by encouraging carriers to increase their own individual marketing and restricting services to only the limited ones offered by captive and small, independent agent/brokers.

**III.     The proposed rule disproportionately harms disadvantaged groups.**

If SelectQuote is forced to limit or even terminate its offerings as a result of excessive restrictions on payments for the services we provide, a disproportionate number of underserved and vulnerable beneficiaries would be harmed.  SelectQuote is uniquely situated to access and serve vulnerable populations and individuals that other providers cannot or will not serve.  Due to the virtual nature of our business, we access underserved individuals who live in rural areas, or in urban areas where traditional field agents are less likely or willing to travel.  In fact, more than 47% of our policies are sold to individuals who live in rural areas.  Additionally, due to our national infrastructure, we are able to sell Medicare year-round and, hence, our agents are constantly being educated about the nuances of the different products on the market.  Most independent agents only sell Medicare products during the Annual Enrollment Period and, as a result, are not as well educated about the different and specialized products available.  Our infrastructure also allows us to educate our agents on the complexities of Special Needs Plans ("SNPs"), including Dual-Eligible SNPs ("D-SNPs"), that are notoriously complex and require a deeper level of understanding of the consumer's individualized needs, which results in a greater investment of time and resources to service—something smaller, independent agents are unable to tackle.  SelectQuote has used our infrastructure and expertise to help those most in need.  In 2023, 60% of our policies were low-income subsidy plans, even though only 25% of all Medicare beneficiaries participate in low-income

---

("Personal health literacy is the degree to which individuals have the ability to find, understand, and use information and services to inform health-related decisions and actions for themselves and others.").

[13] 88 Fed. Reg. at 78,556/2.

subsidy plans.  Additionally, 46% of our 2023 Medicare Advantage policies were SNPs, compared to only 19% of Medicare Advantage plans nationwide.

The market realities that accompany our work with underserved populations should not be mischaracterized.  For example, some studies may use the average duration of Medicare Advantage plan enrollment to measure whether individuals are choosing the best plan for their needs.  This metric, however, is misleading if it does not account for the population cohort of those individuals.  SelectQuote serves more D-SNP and SNP patients than most agent organizations.  Individuals who qualify for D-SNP and SNP products tend to change plans and products more frequently because they are subject to more frequent changes in (a) health status (due to the complexity of their conditions), and (b) overall coverage eligibility.[14]  Hence, because the needs of individuals we serve change frequently, so do their health plans.  This does not mean that SelectQuote is steering consumers to the wrong plan or product.  In fact, SelectQuote, in many instances, may be the only impartial source of information for individuals who live in rural areas and/or have special needs.  The crucial role we play for populations that others do not serve should be recognized and should not be inadvertently mischaracterized as bad behavior based on overly broad assumptions.

**IV.    CMS' reasons for redefining and capping compensation are flawed.**

CMS' justification for its proposed rule are based on the flawed premises that (a) plans are using increased administrative payments to "circumvent the regulatory limits on compensation;"[15] and (b) an increase in administrative payments could result in agents/brokers steering individuals toward plans that provide financial benefits to the agents/brokers, rather than those that are best for the health needs of the consumer.[16]

**A.      Administrative payments are being made for legitimate, vital services, not to circumvent regulatory limits.**

CMS did not consider many of the services that are being provided to plans as valuable and necessary administrative services.  As outlined above in Section II, CMS did not contemplate a whole array of services being provided by SelectQuote, such as beneficiary education, compliance functions, and the provision of modern technology platforms.  Health plans compensate SelectQuote for these valuable and comprehensive services.  Such compensation is not intended to avoid the regulatory limits on enrollment compensation, but is valued based on the scope and type of services provided.

**B.      Value-add services like health and behavior questionnaires should not be confused with Health Risk Assessments and should generate market value compensation.**

For those services that CMS does consider when assessing the Medicare Advantage services industry, it should ensure that it is distinguishing between legitimate services and those that truly are facades for circumventing payment restrictions.  For example, CMS criticizes plans for paying agents and brokers to conduct health risk assessments ("HRAs"), stating that "the HRAs completed by agents and brokers do not have the same value as those performed and interpreted by health care providers or in a

---

[14] *See generally* Corallo, Bradley, et al., *Medicaid Enrollment Churn and Implications for Continuous Coverage Policies*, KFF (Dec. 14, 2021) https://www.kff.org/medicaid/issue-brief/medicaid-enrollment-churn-and-implications-for-continuous-coverage-policies/.

[15] *Id.* at 78,555/3.

[16] *Id.* at 78,552/2.

**App.084**

health care setting" because agents agents/brokers lack the necessary health care knowledge, information technology capabilities, and provider relationships to link the HRAs with the providers.[17]  This criticism should not, however, ignore the fact that although it may be suboptimal for agents to conduct an HRA for the reasons stated, health plans can and do pay organizations like SelectQuote to conduct legitimate enrollee assessments that are separate and apart from the HRA.

The HRA, defined by regulation, is a clinical assessment conducted as part of a Medicare beneficiary's annual wellness visit pursuant to the Affordable Care Act.[18]  There are specific clinical requirements that must be met in connection with the HRA.  Other types of assessments, however, also can be conducted by carriers and their agents in order to better understand the overall care management needs of the enrollee.  For example, SelectQuote conducts a health and behavior assessment once individuals are enrolled in a plan in order to determine care coordination needs (e.g., coordination among specialists or specialty programs), the types of communications that might better engage the patient, and eligibility for special programs and services (e.g., nutrition management services, diabetes care programs, etc.).  SelectQuote may, for instance, identify that a patient is home-bound and that the health plan may need to arrange for transportation services or enroll the patient in virtual or home-based programs.  The health and behavior assessment provides the health plan valuable information that is needed to manage the care of the patient at a holistic level, as opposed to the explicit clinical needs that are identified by a clinician during an HRA.  SelectQuote trains its staff to perform these assessments.  Carriers pay SelectQuote to conduct these assessments in order to best address patient needs and lower the cost of health care by ensuring that patients receive the care that they need in the most suitable setting.

When individual agents are asked to conduct health and behavior assessments, SelectQuote does not pay the agent any additional compensation for completing the assessment.  Moreover, the assessment is typically conducted after enrollment has occurred, hence eliminating the likelihood that payment for conducting the assessment would incentivize an individual agent to inappropriately steer the enrollee to a particular plan.

As CMS assesses whether plans are inappropriately paying agents for conducting HRAs as one method of circumventing the payment limits, it should also take into consideration the need for legitimate services like health and behavior assessments.  The costs of this service also should be considered when determining an accurate value for administrative services.  Lastly, any method of payment restriction should seek to preserve this type of additional assessment, which ultimately allows for better and more efficient care for enrollees.

**C.      Increased administrative payments do not result in inappropriate steerage.**

CMS provides no evidence that administrative payments create incentives for agents and brokers to steer individuals towards plans that do not meet beneficiary needs.  In fact, business realities dictate that SelectQuote agents match consumers with plans that best meet their needs.

SelectQuote would not be a viable business if the majority of its enrollments did not lead to satisfied customers who renew their plans.  We dedicate significant resources to matching beneficiaries with plans, including developing costly technology that objectively evaluates health plans for fitness to an individual's particular needs, conducting the administrative tasks associated with enrollment, and

---

[17] *See id.* at 78,555/3.

[18] *See* 42 C.F.R. § 410.15.

spending hours of time with each consumer to understand their needs.  Given this significant upfront investment made with each individual, our business is only viable if consumers stay with the health plan they have chosen for multiple years.  We thus have every incentive to match consumers with the health plan that will make them happy and meet their needs on a long-term basis.

CMS also speculates that payments to third party organizations can "trickle down to influence agents and brokers."[19] *SelectQuote does not allow any "trickle down" of administrative payments to our agents.  Our agents have no knowledge of the administrative fees that SelectQuote may receive from individual plans and the individual agent's own compensation is not tied to any payments made by the plan to SelectQuote.  SelectQuote does not pay its agents commissions that are specific to individual health plans, nor do we pay any administrative fees to agents.*

As demonstrated, SelectQuote does not have a business incentive to direct individuals to plans that do not meet their needs, nor do we employ tactics that do so.

**V.    CMS has reasonable alternatives that would address its concerns.**

SelectQuote supports policies to improve the enrollment experience for Medicare beneficiaries. We share CMS' concerns about the use of lavish perks to individual agents and brokers in order to influence marketing tactics with consumers.  We believe, however, that the existing regulatory structure that allows for compensation for administrative services at market value adequately addresses these concerns.  In the alternative, CMS could modify the existing regulatory framework by restricting the types of payments made to individual agents and brokers who directly interact with consumers.

**A.    CMS could enforce existing rules that require market value payments for administrative services.**

CMS already limits payment for administrative services, both in kind and amount.[20]  Current regulations require that payments for administrative services be at or below the value of those services in the market.  As opposed to a fixed dollar amount intended as a one-size-fits all solution, the current framework recognizes differences that may affect the value and scale of services being provided, including geographic location and populations being served.  What may be adequate compensation in one context may be far below market value in another.  SelectQuote, for example, specializes in reaching underserved communities in rural areas.  This is difficult, requiring technical expertise, operational know-how, and significant resource expenditure.  The value of these services provided by SelectQuote, then, may be far different from the value of the same types of services provided to healthier populations who reside in urban centers with potentially greater access to care and information.

If CMS is concerned that health plans are disguising payments as administrative payments in order to evade the enrollment compensation cap, it should more rigorously enforce its already clear requirement that any administrative services must be appropriately priced.  If an agent cannot demonstrate that it is providing legitimate services at a rate that is at or below the value of those services in the marketplace, then the current regulation may be enforced.  This focused approach would be far more effective at targeting the unacceptable behavior, rather than making a sweeping change of

---

[19] 88 Fed. Reg. at 78,554/2.
[20] 42 C.F.R. 422.2274(e).

eliminating payments for all administrative services, even if they are legitimate and overwhelmingly beneficial for consumers in making important decisions in their health care journeys.

**B.      CMS could restrict compensation to individual agents to address steerage concerns.**

As detailed above, we are concerned that eliminating the regulatory framework for separate payment to agents and brokers for administrative services[21] will also eliminate valuable benefits that SelectQuote makes available to the community at large.  As an alternative to maintaining the current regulation applicable to administrative payments, CMS could address our concern by limiting the restriction on per-enrollee compensation for administrative activities only to those payments made to *individual agents who directly interact with consumers during an enrollment*.  CMS should not impose the same restrictions on third party marketing organizations, field marketing organizations, and other full-service organizations that may employ or contract with such individual agents.  The goal of the agent/broker compensation rules is to prevent individual agents and brokers from engaging in misleading or confusing communications with current or potential enrollees.  Imposing a cap on the amounts that an individual agent interacting directly with consumers may receive during an enrollment and prohibiting them from receiving extraneous payments or remuneration would be sufficient to prevent agents from steering consumers to particular plans because of the outsized influence from such compensation.  CMS should avoid measures that will prohibit the organizations that employ those individuals from providing legitimate training, marketing, compliance and sales support infrastructure and invaluable tools.  <u>Proposed modifications to the proposed rule that reflect this distinction are set forth in Attachment A.</u>

---

[21] 88 Fed. Reg. at 78554/3.

CMS should consider the value that established, well-resourced organizations bring to the market, especially to those regions and beneficiaries needing specialized outreach and care. CMS should retain the regulatory framework that limits compensation to full-service organizations for administrative services at market value, but caps the payment for such services to those individual, consumer-facing agents that interact with consumers and influence consumer behavior. Retention of the existing regulatory structure for full-service organizations will support further development of a segment of the industry that brings great value to consumers and enhances choice in the market.

Respectfully submitted,

Al Boulware
General Counsel and Corporate Secretary
SelectQuote, Inc.

10

**ATTACHMENT A**

This Attachment A provides a suggested example of one way we believe a final rule could be changed to address CMS' concerns about lavish perks that may influence brokers and agents, while preserving the ability of organizations like SelectQuote to provide valuable educational, training, and other administrative services that benefit consumers.   The text in this Attachment A is CMS' proposed regulation. The strikethrough represents suggested deletions, and the bold/underlined text represents suggested additions.

**§ 422.2274 Agent, broker, and other third- party requirements.**

\*       \*       \*       \*       \*

(a) \* \* \*

*Compensation.* (i) Includes monetary or non-monetary remuneration of any kind relating to the sale, renewal, or services related to a plan or product offered by an MA organization including, but not limited to the following:

(A) Commissions.

(B) Bonuses.

(C) Gifts.

(D) Prizes or Awards.

(E) ~~Payment of fees to comply with State appointment laws, training, certification, and testing costs.~~

(F) ~~Reimbursement for mileage to, and from, appointments with beneficiaries.~~

(G) ~~Reimbursement for actual costs associated with beneficiary sales appointments such as venue rent, snacks, and materials.~~

(II) ~~Any other payments made to an agent or broker that are tied to enrollment, related to an enrollment in an MA plan or product, or for services conducted as a part of the relationship associated with the enrollment into an MA plan or product.~~

**(E)   Any Administrative Payments to individual agents or brokers who outreach to existing or potential beneficiaries or answer or potentially answer questions from existing or potential beneficiaries.**

\*       \*       \*       \*       \*

(e)       Payments Other than Compensation (administrative payments)

**(1)       *Administrative Payments.*   Means payments made to an agent or broker that are tied to enrollment, related to an enrollment in an MA plan or product, or for services conducted as a part of the relationship associated with the enrollment into an MA plan or product, including without limitation payment of fees to comply with State appointment laws, training, certification, and testing costs; reimbursement for mileage to, and from, appointments with beneficiaries, and reimbursement for actual costs associated with beneficiary sales appointments such as venue rent, snacks, and materials.**

11

(1)**(2)** For plan years through 2024, **Administrative** Payments ~~for services other than enrollment of beneficiaries (for example, training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments)~~ must not exceed the value of those services in the marketplace.

(3)      Beginning in 2025, **Administrative Payments** ~~administrative payments~~ **to individual agents or brokers who outreach to existing or potential beneficiaries or answer or potentially answer questions from existing or potential beneficiaries** are included in the calculation of enrollment-based compensation **and Administrative Payments to all other persons or entities must not exceed the value of those services in the marketplace**.

12

# EXHIBIT 4

**BlueCross BlueShield** Association

750 9th Street, N.W.
Washington, D.C. 20001
www.BCBS.com

December 22, 2023
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-4205-P
P.O. Box 8013
Baltimore, MD 21244

Submitted via the Federal Regulations Web Portal, http://www.regulations.gov

**RE: Contract Year 2025 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicare Cost Plan Program, and Programs of All-Inclusive Care for the Elderly; Health Information Technology Standards and Implementation Specifications**

Dear CMS Desk Officers:

The Blue Cross Blue Shield Association (BCBSA) appreciates the opportunity to provide comments on the Proposed Rule: Contract Year (CY) 2025 Policy and Technical Rule as issued in the Federal Register on November 15, 2024 (87 FR 78476). We thank the Centers for Medicare & Medicaid Services (CMS) for its continued attention to policies that support the millions of beneficiaries who rely on MA coverage.

BCBSA is a national federation of independent, community-based and locally operated BCBS companies (Plans) that collectively cover, serve, and support 1 in 3 Americans in every ZIP code across all 50 states and Puerto Rico. BCBS Plans contract with 96% of hospitals and 95% of doctors across the country and serve those who are covered through Medicare, Medicaid, an employer, or purchase coverage on their own.

BCBS Plans collectively serve over 8 million total Medicare lives in MA, Part D and Medicare Supplemental (Medigap) plans. Today, BCBS Plans serve 4.6 million MA lives, which represents more than14% of the market, and 1.2 million PDP lives. We note that in a year when Star ratings declined across carriers due to changes to the outlier methodology, BCBS Plans endeavored to improve quality scores for enrollees:

- 17 BCBS Plans have average Star scores of 4 or higher for 2024, up from 15 in 2023
- 17 BCBS Plans have a higher % of enrollment in 4+ Star plans than the MA market average
- 13 BCBS Plans have 100% of MA enrollment in 4+ Star rated plans, up from 8 BCBS Plans in 2021

**App.092**

BCBS Plans are committed to the success of these programs and aligning quality measures with the broader goals of improving health outcomes and health equity. We support CMS' efforts to continually enhance the MA program and ensure beneficiary access to providers and benefits via this rulemaking.

**Overview of BCBSA's Comments**

Our comments are informed by BCBSA's and Plans' extensive experience in the MA market and specifically focus on:

- **Improvement Measure Hold Harmless.** BCBSA reiterates our recommendation to the CY 2024 Part C & D Technical proposed rule ("December 2022 proposed rule"), that CMS continue to apply the "hold harmless" policy to contracts with 4 Stars and above to achieve the intention of the quality improvement measure.
- **Part D Medication Therapy Management (MTM) Program.** BCBSA raises concerns about the proposed expansion of the MTM program proposed in the CY2024 Part C and D Technical Proposed Rule and urges CMS to instead work with Part D sponsors and stakeholders to ensure enrollees who would benefit the most from MTM services are engaged and successfully managed.
- **Mid-Year Notice of Supplemental Benefits.** BCBSA supports general communications to remind members about unused supplemental benefits, however we have concerns about the member confusion that may arise from this proposal and high administrative burden. We recommend CMS instead allow plans to send a mid-year, plan-level notification to members, informing them that supplemental benefits are available in addition to other messaging to encourage health behaviors.
- **Behavioral Health Specialties in MA Networks.** BCBSA supports the creation of combined behavioral health facility-specialty type as part of the MA network adequacy requirements. We also encourage CMS to expand the list of behavioral health specialty types for which the telehealth provider credit is available to go beyond the new "Outpatient Behavioral Health" facility-specialty type and include all behavioral health provider types.
- **Health Equity in Utilization Management (UM) Policies and Procedures.** BCBSA supports CMS' goal to introduce a health equity perspective into the review and analysis of UM policies and procedures and believe this is best achieved by requiring a member of the UM committee to have expertise in health equity. However, we have concerns that a requirement to publicly post a health equity analysis would not advance this goal. It could instead lead to inaccurate conclusions and, potentially, MA plan designs becoming less equitable if changes are informed by inaccurate interpretations.
- **Special Needs Plans.** BCBSA supports the proposed creation of a monthly integrated care special enrollment period (SEP) for dually eligible individuals but note concerns over potential unintended consequences that could create beneficiary confusion and continuity of care issues. Additionally, while we are supportive of efforts to integrate and streamline the D-SNP program, we express hesitation with current proposals surrounding aligned enrollment that would place limitations on the D-SNP plans available to beneficiaries and request further consideration from CMS.
- **Evidence of SSBCI benefits.** BCBSA supports CMS' intent to ensure that SSBCI benefits are appropriate and have a reasonable expectation to improve or maintain the health or overall function of chronically ill enrollees. However, BCBSA recommends

2

CMS modify this proposal to not require submission of bibliographic evidence for all SSBCI benefits, rather focusing on targeted SSBCI benefits with more limited evidence. CMS should develop a list of common SSBCI benefits that have established evidence, which if plans offer, no additional documentation would be needed.

- **Biosimilar Substitutions.** BCBSA supports the proposals to expand enrollee access to biosimilar products by allowing substitutions of biosimilar products regardless of whether these products are deemed "interchangeable" by the FDA.

In what follows, we expand on and offer additional detailed recommendations on the CY 2025 proposed rule. We appreciate your consideration of our comments. If you have any questions or want additional information, please contact Christiana Alexander at Christiana.Alexander@bcbsa.com.

Sincerely,

Kris Haltmeyer
Vice President, Policy Analysis
Blue Cross Blue Shield Association

3

**BCBSA DETAILED COMMENTS ON PROPOSED RULE: "CY 2025 PART C & D POLICY AND TECHNICAL RULE" (CMS 4201-P)**

**III. Enhancements to the Medicare Advantage and Medicare Prescription Drug Benefit Programs**

**A. Expanding Network Adequacy Requirements for Behavioral Health**

**Issue #1: Network Adequacy for Behavioral Health**

CMS is proposing to add to the list of provider specialties at § 422.116(b) and add corresponding time and distance standards at § 422.116(d)(2). Specifically, CMS is proposing to add Outpatient Behavioral Health as a new type of facility-specialty in § 422.116(b)(2) and to add Outpatient Behavioral Health to the time and distance requirements in § 422.116(d)(2). For purposes of network adequacy evaluations under § 422.116, Outpatient Behavioral Health can include, marriage and family therapists (MFTs) (as defined in section 1861(lll) of the Act), mental health counselors (MHCs) (as defined in section 1861(lll) of the Act), opioid treatment programs (OTPs) (as defined in section 1861(jjj) of the Act), Community Mental Health Centers (as defined in section 1861(ff)(3)(B) of the Act), or those of the following who regularly furnish or will regularly furnish behavioral health counseling or therapy services, including, but not limited to, psychotherapy or prescription of medication for substance use disorders: physician assistants, nurse practitioners, and clinical nurse specialists (as defined in section 1861(aa)(5) of the Act); addiction medicine physicians; or outpatient mental health and substance use disorder (SUD) treatment facilities.

**Recommendation #1:** BCBSA supports CMS creating a combined behavioral health facility specialty type as part of the MA network adequacy and time and distance requirements.

**Rationale:** BCBSA is focused on improving access to behavioral health services for all Americans. We believe reasonable network standards for MA enrollee access to behavioral health services is appropriate and agree with the creation of a combined facility-specialty Outpatient Behavioral Health category to incorporate additional provider types. Behavioral health services are delivered by a diverse set of the providers, and having flexibility as proposed would account for the full continuum of care. There is also not an equal distribution of behavioral health providers across the country, so flexibility in including different types of providers accounts for provider availability in any given market.

**Recommendation #2:** BCBSA recommends that CMS clarify that any provider who meets the statutory and regulatory requirements for education and experience under the behavioral health facility specialty type be included in the specialty type.

**Rationale**: Different markets, health plans and practitioners may have differing provider type definitions. However, it should be clear that any provider who meets the experience and education requirements should be allowed to be included in the combined specialty type definition. This would be in line with the CY 2024 PFS Final Rule, which clarifies that individuals who meet the statutory and regulatory requirements for education and clinical supervised experience for MHCs but are licensed to furnish mental health counseling in their State under a

4

**App.095**

title other than mental health counselor, clinical professional counselor, or professional counselor, are eligible to enroll in Medicare as MHCs. This is particularly important given the shortages of these providers across the country. Unintentionally excluding a provider type based on a nomenclature difference could limit access for Medicare beneficiaries.

**Recommendation #3**: BCBSA recommends that CMS monitor the Medicare provider enrollment process for MFTs and MHCs for potential backlogs and evaluate any impacts as it considers finalizing network adequacy proposals.

**Rationale**: Some health plans have found that the Medicare provider enrollment process for MFTs and MHCs is moving slowly, and it is taking longer than normal for these provider types to receive their Medicare ID numbers as a result. Given the role these providers can serve in expanding behavioral health access for Medicare beneficiaries, it is critical that this process be as smooth and efficient as possible to encourage maximum participation. Monitoring the process will ensure any potential issues are identified and accounted for if CMS finalizes this proposal.

**Issue #2: Behavioral Health Specialty Eligibility for Telehealth Provider Credit**

CMS proposes to add the new "Outpatient Behavioral Health" facility-specialty type to the list of the specialty types that will receive a 10-percentage point credit if the MA organization's contracted network of providers includes one or more telehealth providers of that specialty type that provide additional telehealth benefits.

**Recommendation:** BCBSA recommends that CMS expand the list of behavioral health specialty types for which the 10-percentage point telehealth provider credit is available to go beyond the new "Outpatient Behavioral Health" facility-specialty type and include all behavioral health provider types.

**Rationale:** BCBSA supports the inclusions already made for the specialty types for which the credit is available, including three behavioral health provider types. While BCBSA supports adding "Outpatient Behavioral Health" facility-specialty type behavioral health providers who provide telehealth as counting toward the 10-percentage point credit for MA plans, this should be further expanded to include all behavioral health provider types. BCBSA is committed to doing our part to help close the supply and demand gap in the behavioral health workforce, including through efforts to fund workforce development, support integration of behavioral health and primary care, and solutions to expand network breadth and diversity. While building the pipeline of behavioral health providers will take time, increasing the use of and access to telehealth is a more immediate solution that CMS should support through expanding the telehealth credit provider list. Further, expansion of the telehealth credit to all current behavioral health provider types is reflective of all modes of care delivery.

## B. Standards for Electronic Prescribing (§ 423.160)

## Issue: Updating Electronic Standards

CMS proposes to update the Part D e-prescribing standards using National Council for Prescription Drug Programs (NCPDP) SCRIPT standard version 2023011; the NCPDP RTPB

standard version 13 for prescriber real-time benefit tools (RTBTs) implemented by Part D sponsors; and the use of NCPDP Formulary and Benefit (F&B) standard version 60. These changes would be implemented on January 1, 2027.

**Recommendation:** BCBSA urges CMS to delay the date by when Part D sponsors are required to use these new standards to January 1, 2028.

**Rationale:** BCBSA supports the new standards adopted by the Office of the National Coordinator for Health Information Technology (ONC) and proposed in this rulemaking. The standards transitions required in these proposals, which impact all pharmacy transactions, would be occurring at a time where Part D claims processing is drastically changing and becoming more complex, due to the Part D benefit changes enacted into law in the Inflation Reduction Act (IRA). As pharmacy claims processing is often a vendor solution for Part D sponsors, implementing the standards transitions outlined in this Proposed Rule, along with IRA provisions and other regulatory requirements, will place tremendous demand on vendors. A one-year extension would provide Part D sponsors and their contracted vendors sufficient time to effectuate the required updates to e-prescribing standards, considering the collective changes to claims processing required due to the e-prescribing standards proposals included in this Proposed Rule and the IRA provisions redesigning the Part D benefit. In addition, with the backwards compatibility of the e-prescribing standards put forth in this Proposed Rule, a one-year extension would be expected to have little to no impact on information transfers, while allowing Part D sponsors additional time and flexibility to fully implement the standards transitions proposed.

### D. Improvements to Drug Management Programs (§§ 423.100 and 423.153)

**Issue #1: Avoiding Stigma in New Models for OMS Criteria**

CMS is working on models that can identify beneficiaries potentially at risk before their risk level is diagnosed as an OUD or the person experiences an opioid-related overdose. CMS solicits feedback on how to avoid the stigma and/or misapplication of identification of potential at-risk beneficiary (PARB) at high risk for a new opioid-related overdose or OUD using the variables in the model.

**Recommendation:** We recommend further analysis to ensure the correct factors and communication language are used prior to implementation.

**Rationale:** Further analysis is required to isolate factors or the combination of factors with the least amount of false positives. CMS also would need to identify the supporting literature to communicate new criteria to providers. Testing these elements to identify any potential

6

unintended bias will be critical to protecting against stigma and supporting the long-term efficacy of the approach.

**Issue #2: Definition of Exempted Beneficiary**

CMS proposes to amend the regulatory definition of "exempted beneficiary" by replacing the reference to "active cancer-related pain" with "cancer-related pain."

**Recommendation**: BCBSA supports the proposal to expand the definition of exempted beneficiary to more broadly refer to enrollees being treated for cancer-related pain.

**Rationale**: By expanding the definition to cancer-related pain beyond beneficiaries undergoing active cancer treatment, the definition better encompasses the range of patients with cancer-related circumstances who are in need of extended pain relief. This expansion also brings the definition better in line with the Centers for Disease Control and Prevention's clinical practice guidelines for prescribing opioids, which use the terminology "cancer-related pain treatment" to refer to the extenuating circumstances present in this situation.

**Issue #3: Implementation Considerations for New Models to Enhance OMS Criteria**

The Departments solicit comment on implementation considerations, such as effectively conducting case management, as described in § 423.153(f)(2), with prescribers of PARBs identified by the model; opportunities to promote medication for OUD (MOUD), co-prescribing of naloxone, or care coordination; or potential unintended consequences for access to needed medications.

**Recommendation:** We recommend clearly defined factors that can be proactively identified.

**Rationale:** Clearly defined factors that can be proactively identified will ensure that sponsors can conduct case management in advance. Therefore, factors that can only be assessed through medical claims/diagnosis codes will lead to less opportunity for sponsors to proactively intervene.

We discourage CMS from pursing any new criteria or communications to providers that may unintentionally discourage providers from diagnosing a beneficiary with OUD, therefore decreasing access to medication assisted therapy.

**F. Additional Changes to an Approved Formulary—Biosimilar Biological Product Maintenance Changes and Timing of Substitutions (§§ 423.4, 423.100, and 423.120(e)(2))**

**Issue #1: Substituting Biosimilar Biological Products for Their Reference Products as Maintenance Changes**

CMS proposes to include substitutions of biosimilar biological products other than interchangeable biological products for their reference products as maintenance changes. CMS is also proposing to define "biosimilar biological product" to mean a biological product licensed under section 351 (k) of the Public Health Services Act that, in accordance with section 351(i)(2) of the PHSA, is highly similar to the reference product, notwithstanding minor differences in

7

clinically inactive components, and has no clinically meaningful differences between the biological product and the reference product, in terms of the safety, purity, and potency of the product.

**Recommendation:** BCBSA supports the proposed change to allow substitutions of biosimilar biological products, regardless of whether those products are deemed interchangeable biological products as maintenance changes.

**Rationale:** Including substitutions of biosimilar biological products other than interchangeable biological products for their reference products as maintenance changes would help promote the utilization of more biosimilar products and encourage substitution of lower-cost alternatives. CMS' proposal would provide Part D sponsors with more flexibility than the current policy of treating such changes as *non*-maintenance changes, while keeping enrollee 30-day notice requirements of such maintenance changes. Coupled with the refinements CMS issued in the December 2022 proposed rule, these changes would support the goal to encourage greater use of biosimilar biological products for more financially favorable products, regardless of whether those biosimilar products are deemed "interchangeable" by the FDA.

**Issue #2: Updated Proposal Related to Timing of Substitutions**

CMS is proposing to revise paragraph (1) of the proposed definition of "maintenance changes" in § 423.100 of the December 2022 proposed rule to require Part D sponsors to make any negative formulary changes "within 90 days of" adding a corresponding drug.

**Recommendation:** BCBSA supports the proposed change to require maintenance changes "within 90 days of," rather than "at the same time as."

**Rationale:** CMS' proposal would impose less strict timing requirements for a maintenance change—whether it be related to plan sponsors removing or making negative changes to a brand name or reference product when adding a corresponding drug that is not an immediate substitution, or to a reference product when adding a biosimilar biological product other than an interchangeable biological product. This flexibility also would support Part D sponsors in adding a corresponding drug or biosimilar biological product other than an interchangeable biological product and would help mitigate any delay in enrollees accessing Part D drugs that could be lower in cost.

## H. Update to the Multi-Language Insert Regulation (§§ 422.2267 and 423.2267)

**Issue: Multi-Language Inserts**

To better align with the Medicaid program and to mitigate disparate sets of requirements by a forthcoming final rule put out by the Office of Civil Rights (OCR), CMS is proposing the following updates to the multi-language insert:

- Replace references to the MLI with references to a Notice of Availability
- Modify the language to reflect CMS's proposal that this notice be a model communication material rather than a standardized communication material and thus that CMS would no longer specify the exact text that must be used in the required notice

8

**App.099**

- Require MA organizations and Part D sponsors to provide enrollees a notice of availability of language assistance services and auxiliary aids and services that, at a minimum, states that MA organizations and Part D sponsors provide language assistance services and appropriate auxiliary aids and services free of charge.
- Adds new paragraphs (e)(31)(i) and (e)(33)(i), that the Notice of Availability must be provided in English and at least the 15 languages most commonly spoken by individuals with limited English proficiency of the relevant State and must be provided in alternate formats for individuals with disabilities who require auxiliary aids and services to ensure effective communication.

**Recommendation #1:** BCBSA supports the proposed alignment of a notice of availability, but requests flexibility that enforcement not begin until January 1, 2026.

**Rationale:** Plans should be able to use either the current top 15 languages in the country or the proposed top 15 languages in a state for 2025, and then transition to the state languages beginning in 2026.

**Recommendation #2:** We recommend that CMS provide all standard model materials going forward in the top 15 languages that are on the MLI.

**Rationale:** CMS currently displays a number of languages, but not all 15 required on the MLI. We believe providing all standard model materials in the top 15 languages will limit delays in turnaround times for beneficiaries, promote consistency, avoid risk of inaccuracies, minimize the administrative burden to plans and reduce costs.

**Recommendation #3:** BCBSA requests CMS allow additional flexibility for MA plans with multi-state employer group waiver plans (EGWPs). We propose that EGWPs be permitted to use the top 15 languages nationally rather than developing tailored communications for individuals in each state served.

**Rationale:** Members are inundated with mailing materials and plans already provide notices with availability of language assistance services and auxiliary aids.

## IV. Benefits for Medicare Advantage and Medicare Prescription Drug Benefit Programs

### B. Evidence as to Whether a Special Supplemental Benefit for the Chronically Ill Has a Reasonable Expectation of Improving the Health or Overall Function of an Enrollee (42 CFR 422.102(f)(3)(iii) and (iv) and (f)(4))

CMS is proposing that an MA organization that includes an item or service as SSBCI in its bid must be able to demonstrate through relevant acceptable evidence that the item or service has a reasonable expectation of improving or maintaining the health or overall function of a chronically ill enrollee.

As part of shifting responsibility this way, CMS is proposing, as relevant to an MA organization that includes SSBCI in its bid, to:

9

(1) require the MA organization to establish, by the date on which it submits its bid, a bibliography of "relevant acceptable evidence" related to the item or service the MA organization would offer as an SSBCI during the applicable coverage year

(2) require that an MA plan follow its written policies (that must be based on objective criteria) for determining eligibility for an SSBCI when making such determinations

(3) require the MA plan to document denials of SSBCI eligibility rather than approvals; and

(4) codify CMS's authority to decline to accept a bid due to the SSBCI the MA organization includes in its bid and to review SSBCI offerings annually for compliance, taking into account the evidence available at the time

**Issue #1: Evidence for SSBCI benefits**

**Recommendation #1:** BCBSA supports CMS' intent of this proposal to ensure that benefits are appropriate and have a reasonable expectation to improve or maintain the health or overall function of chronically ill enrollees. However, we have concerns about the downside and additional burden as the provision is currently written. Instead, BCBSA recommends CMS modify this proposal to not require submission of bibliographic evidence for all SSBCI benefits, rather focusing on targeted SSBCI benefits with more limited evidence. CMS should develop a list of common SSBCI benefits that have established evidence, which if plans offer, no additional documentation would be needed. If a plan offered something not on the list, it would be the plan's responsibility to demonstrate and develop a bibliography of evidence to support that benefit.

**Rationale:** If CMS is concerned about particular SSBCI benefits not showing how they improve or maintain overall function of a chronically ill enrollee, we recommend modifying this proposal to specifically target those benefits that are novel or emerging rather than every benefit (e.g. meal benefits are a common SSBCI offering with a breadth of relevant research). Some SSBCI benefits show improvements in member health and experience but proving them scientifically may be challenging. Efforts focused on social determinants of health (SDOH) demonstrate clear indicators of improving overall health and quality of life. However, scientific studies and literature on these efforts may be delayed due to the relatively new implementation of programs on a broader scale, such as the implementation of SSBCI benefits in MA only a few years ago. In some instances, data may not yet be published in literature that conforms to CMS' standards for relevant acceptable evidence. This may lead to plan sponsors offering less innovate and impactful benefits to members. These benefits are essential to addressing SDOH and reducing health disparities, priorities that BCBSA shares with CMS, and we are concerned that this new standard will result in fewer SSBCI offerings.

We recommend alternatively that CMS develop a list of common SSBCIs that have established evidence, including SSBCIs that CMS has previously informed plans were permitted examples, and if plans offer those benefits, then no additional documentation would be needed. If a plan wished to offer something not on the list, then it would be required to develop a bibliography of evidence to support that benefit. Otherwise, plans would need to perform duplicative, unnecessary work to document evidence for SSBCIs that are being widely offered. This would also save CMS from needing to conduct duplicative reviews of plans' common SSBCIs that likely all reference very similar sources.

**Recommendation #2:** BCBSA recommends CMS not require the submission of the bibliography of evidence during the June bid submission process, but rather requiring plans make their bibliographies available upon request.

**Rationale:** We believe that including the bibliography in the bid submission, while well-intended, will create additional administrative complexity for plans, CMS, and the desk review process. Instead, we suggest that CMS require plans to have their bibliographies available upon request, eliminating the need for a new data capture mechanism. Additionally, the current approach could result in the same SSBCI being denied for Plan X and accepted for Plan Y because Plan X's literature review did not meet expectations.

**Recommendation #3:** Beyond the recommendations above, we want to share our concerns about tying the bibliography to approval of the overall bid and request CMS clarify its intent.

**Rationale:** We request CMS clarify in the final rule that in the event CMS considers evidence submitted upon request for a SSBCI offering insufficient to meet the "reasonable expectation" standard, that the MAO will be given an opportunity to amend the bid, rather than having the entire bid rejected. We believe a denial of a Plans' entire bid would cause significant and unnecessary member disruption.

**Issue #2: Timing and Scope**
**Recommendation #1:** We also seek clarification on the effective date for this provision and recommend that CMS not finalize for implementation in the contract year (CY) 2025 bids.

**Rationale:** While the majority of the proposed rule provisions are effective for CY 2025, bids are due during CY 2024 for CY 2025. To ensure smooth implementation and alignment with the bid cycle, we ask that should CMS finalize this provision, it not be effective until CY 2026 (with bids due in CY 2025).

**Recommendation #2:** We request additional clarification on the parameters and body of evidence required to provide to CMS.

**Rationale:** We appreciate CMS including an overview of what will be viewed as "relevant acceptable evidence, however we request CMS provide specific examples or further explain the parameters on quantity of evidence. Providing "all" evidence from the past ten years is a very broad and expansive bucket, particularly for well researched benefits (e.g., meals).

**C. Mid-Year Notice of Unused Supplemental Benefits (§§ 422.111(l) and 422.2267(e)**

**Issue: Mid-Year Notice of Supplemental Benefits**

CMS proposes that, beginning Jan. 1, 2026, MA organizations must mail a mid-year notice annually, but not sooner than June 30 and not later than July 31 of the plan year, to each enrollee with information pertaining to each supplemental benefit available during that plan year that the enrollee has not begun to use. MAOs are not required to include supplemental benefits that have been accessed, but are not yet exhausted, in this proposed mid-year notice. CMS is proposing that each notice must include the scope of the supplemental benefit(s) (including SSBCI benefits) , applicable cost sharing, instructions on how to access the

benefit(s), applicable information on the use of network providers for each available benefit, list the benefits consistent with the format of the EOC, and a toll-free customer service number and, as required, a corresponding TTY number to call if additional help is needed.  CMS also proposes that this mid-year notice must include the proposed SSBCI marketing disclaimer to ensure that the necessary information provided in the disclaimer is also provided to the enrollee in the notice.

**Recommendation #1:** BCBSA supports general communications to remind members about unused supplemental benefits, but we have concerns about the high administrative burden and member confusion that may arise from individualized outreach to members that contains benefit information specific to each member. We recommend CMS instead allow plans to send a mid-year, plan-level notification to members, informing them supplemental benefits are available in addition to other messaging to encourage health behaviors.

**Rationale:** Members already receive numerous notices and outreach, so some members might find reminders about specific unused benefits to be abrasive and confusing. Additionally, given that not all supplemental benefits and messaging are applicable to all members (e.g., personal emergence response (PERS) or palliative care), this additional notice on benefits not yet utilized may further confuse beneficiaries and increase complaints.

**Recommendation #2:** We request CMS revise the proposed notice requirement to apply only to members who are identified by the plan as eligible for the SSBCI.

**Rationale:** We are concerned that if a mid-year notice goes out to all members, including those who are not eligible for certain SSBCI benefits, it will cause confusion and ultimately frustration and member abrasion. Instead, if the notice is only required to be sent to members that the plan has identified (through claims) as SSBCI-eligible, it will improve the member experience and better foster CMS' goal of informing members of any unused SSBCI benefits.

**Recommendation #3:** If CMS does not take our recommendation to apply to only members who are eligible for SSBCI benefits, we recommend that CMS tie the mid-year communication obligation to those supplemental benefits promoted in each plan's pre-enrollment marketing materials (e.g., dental, vision, hearing, meals, over-the-counter items, transportation, etc.). Additionally, we suggest that mid-year communication model be streamlined and include a link to the EOC for more complete benefit details.

**Rationale:** By focusing on those supplemental benefits used in pre-enrollment marketing materials, CMS' concern about misleading marketing will be addressed while reducing potential beneficiary confusion. As mentioned above, not all supplemental benefits and messaging are applicable to all members and without focus, plans could send a confusing laundry list of mandatory supplemental benefits that do not directly pertain to the health of the entire member population (e.g., emergency-department care, hospice care, human organ transplantation, etc.).

Rather than listing detailed information already communicated to members in the EOCs, we suggest that the mid-year communication model format be streamlined to include a link to the EOC for more complete benefit details and a one-paragraph description of each benefit followed by phone numbers, TTY numbers and URLs for more information on each benefit.

**Recommendation #4:** BCBSA requests CMS exclude MA plans with multi-state employer group waiver plans (EGWPs) from this mid-year notice requirement.

**Rationale:** EGWPs should be excluded/carved out of this mid-year communication requirement as their numerous benefit enhancements are often designed to align to their negotiated non-Medicare population member benefits and not used in marketing. If EGWPs are not excluded and all supplemental benefits are in scope, plans would be mailing members letters encouraging them to make use of need-based benefits like acupuncture, mastectomy sleeves, TMJ dysfunction treatment and more, many of which do not apply to the entire group population.

**Recommendation #5:** We ask that CMS clarify whether quarterly allowance benefits would also be included in the proposed mid-year notice.

**Rationale:** As BCBS Plans considers future compliance, it is unclear whether this mid-year notice applies to only annual supplemental benefits or to all available benefits.

**D. Annual Health Equity Analysis of Utilization Management Policies and Procedures**

**Issue #1: Health Equity Expertise on UM Committees**

CMS proposes to require that beginning January 1, 2025, the UM committee must include at least one member with expertise in health equity.

**Recommendation #1:** BCBSA supports the requirement for at least one member of the UM committee to have expertise in health equity provided that health plans have the flexibility to meet the requirement with existing members when possible.

**Rationale:** BCBSA supports CMS' goal to ensure UM policies and procedures are reviewed and analyzed through the health equity lens. We agree that this is best achieved by having participation on the UM committee by at least one member with expertise in health equity. We encourage CMS to permit health plans the flexibility to allow existing members who have health equity expertise to meet this requirement as opposed to uniformly requiring an additional member be added to the committee to fulfill the health equity expertise requirement. We are concerned that if a new member must be added, committees will grow in size without necessarily being better positioned to accomplish their goals. Larger committees can increase potential inefficiencies in decision-making due to a diffusion in responsibilities and diluted individual accountability. To ensure a more efficient UM committee, it is optimal to contain the size of the group where possible. So, in instances where a serving member also has a meaningful background in health equity, it may be better for the functioning of the committee to have that member represent both areas of expertise rather than adding an additional expert to the committee. This would not impair or limit the committee's ability to incorporate health equity considerations but would provide flexibility to promote efficiencies when possible.

**Recommendation #2:** BCBSA supports CMS' proposed definition for what constitutes "expertise in health equity."

**Rationale**: As CMS noted in the proposed rule, there is no universally accepted definition of expertise in health equity. Therefore, we urge CMS to maintain a definition that supports the

flexibility and variety of experiences and qualifications that lead to achieving expertise in health equity. We believe CMS' proposed definition, "…that health equity expertise includes educational degrees or credentials with an emphasis on health equity, experience conducting studies identifying disparities amongst different population groups, experience leading organization-wide policies, programs, or services to achieve health equity, or experience leading advocacy efforts to achieve health equity," supports this necessary flexibility and should not be defined any more restrictively. We are concerned that if the definition were instead more limited, it would eliminate qualified individuals who would otherwise be able analyze UM policies and procedures with a valuable health equity perspective.

**Issue #2: Annual Health Equity Analysis**

CMS proposes that the UM committee must conduct an annual health equity analysis of the use of prior authorization.

**Recommendation:** Although we support examining the equity impacts of prior authorization, we do not support the requirement to publicly report prior authorization metrics on payer websites.

**Rationale:** When information is publicly reported on payer websites, providers and patients are likely to misinterpret the metrics, leading to inaccurate conclusions on an MA plans ability to deliver equitable products to beneficiaries. Specifically, prior authorization denial rates are not necessarily attributable to or correlated with an enrollee's social risk factor status.  Furthermore, comparing prior authorization metrics across payers cannot be done accurately given expected variation in how plans interpret the calculation. Additionally, comparisons based on these metrics would not disentangle all the related factors (e.g., if the denial rate is high, does that mean there is a population bias, a policy bias, a provider bias, etc.?) to translate them into any meaningful actions. This would make comparisons and any related conclusions potentially misleading.

Prior authorization decisions are best reviewed on a case-by-case basis—not by reviewing summary metrics based on all prior authorization decisions. In addition to our concern over the general concept of making prior authorization metrics publicly available, we are concerned that the proposed data elements and sharing method may confuse patients and lead them to believe that prior authorization is unnecessary or even harmful—an outcome that is counter to the goal of providing patients with more actionable, accurate, transparent information about individual prior authorization decisions and how their data is used and shared among payers and providers. Instead, modifying existing prior authorization metrics such as expanding the current Medicare Part C reporting requirements to include health equity related prior authorization metrics would allow plans and CMS to identify whether the use of prior authorization causes any persistent disparities among enrollees with the specified social risk factors while not creating confusion for patients and be a more efficient pathway for CMS and health plans.

Finally, we are concerned that for some plans, the number of enrollees with the proposed specified social risk factors will be too low for an accurate or meaningful comparison against enrollees without the specified social risk factors. A small sample size can lead to skewed results and inaccurate conclusions which presents challenges in generalizing the results.

**Issue #3: Publication of an Annual Health Equity Analysis**

14

CMS proposes that by July 1, 2025, and annually thereafter, a health equity analysis be posted on the plan's publicly available website in a prominent manner and clearly identified in the footer of the website.

**Recommendation #1:** If CMS moves forward with a requirement for an annual health equity analysis of the use of prior authorization, we recommend an effective date beginning one year following finalization of the machine-readable file (MRF) schema.

**Rationale:** For plans to publish a health equity analysis that is in a MRF format with the data contained within that file being digitally searchable and downloadable, it will require CMS to develop an industry wide MRF schema. Implementation of the MRF requirement of the Transparency in Coverage (TiC) final rule reflected the importance of providing plans sufficient time following finalization of a schema for usable files to be published. Although the TiC files are significantly larger than the expected size of a health equity analysis, many of the processes to develop the health equity analysis MRF will mirror the TiC work. As CMS knows, the development and execution of those files was both time and resource intensive. Following finalization of a schema plans will have to package their data in the required format and test to ensure these files work as intended.

Therefore, following finalization of the schema, we recommend providing plans at least one year to develop the necessary technical solution to analyze, package and test the required data into an easily accessible MRF. We recommend establishing an effective date based on finalization of CMS' MRF schema. Providing plans with sufficient time following finalization of the schema will be essential for the successful use of these files by third parties and researchers.

**Recommendation #2:** If CMS moves forward with a requirement for an annual health equity analysis of the use of prior authorization, we recommend that the data elements reporting the average and median time elapsed should be calculated beginning with the time the plan sponsor has received all the necessary information to complete a prior authorization request.

**Rationale:** For the following two data elements, "the average and median time that elapsed between the submission of a request and a determination by the MA plan, for standard prior authorizations, aggregated for all items and services" and "the average and median time that elapsed between the submission of a request and a decision by the MA plan for expedited prior authorizations, aggregated for all items and services," CMS should start the timeframe from the point where the plan sponsor has all the information necessary to process the request. Prior authorization decisions by payers are contingent upon receiving all the necessary information from providers. Often, when a provider does not provide all information necessary to complete a prior authorization request, a payer will return the request and ask the provider for the missing information, only denying the request if the needed information is not forthcoming. Therefore, beginning the elapsed time from the submission of the request is not an accurate measure of how long it takes the MA plan to process the request.

**Issue #4: Inclusion of Additional Populations in the Health Equity Analysis**

CMS seeks comments on "additional populations CMS should consider including in the health equity analysis, including but not limited to: members of racial and ethnic communities,

members of the lesbian, gay, bisexual, transgender, and queer (LGBTQ+) community; individuals with limited English proficiency; members of rural communities; and persons otherwise adversely affected by persistent poverty or inequality."

**Recommendation #1:** We recommend that CMS not expand, at this time, the reporting requirements to the additional populations outlined. CMS should first determine the efficacy and utility of the reporting structure proposed in this rule before expanding the reporting to additional populations.

**Rationale:** Including additional populations outlined in the rule in the health equity analysis will be challenging because this data is not currently collected by CMS and therefore, would introduce additional challenges for plan sponsors. Data requirements required by CMS should always be limited to population demographics where CMS can substantiate that high-quality data is available. After CMS further examines the efficacy and utility of the reporting structure in this rule, they will better be able to identify any additional data that should be included in analysis that is both feasible and meaningful. Furthermore, if additional populations are added in the future, CMS should maintain alignment between the HEI reward population definition and this one.

**Recommendation #2:** If CMS moves forward with including these populations, we recommend that CMS allow plans the flexibility to choose which additional metrics are stratified based on the data available.

**Rationale:** Plans do not yet have reliable data on some of these additional populations such as LGBTQ+ members because there is no feasible way to collect and impute the data. In addition, the sample sizes are small in some cases and could raise privacy concerns for those beneficiaries. Plans should have discretion to determine when stratifying will provide meaningful information and not compromise the privacy of its members.

## VI. Medicare Advantage/Part C and Part D Prescription Drug Plan Marketing and Communications

### A. Marketing and Communications Requirements for Special Supplemental Benefits for the Chronically Ill (SSBCI) (§ 422.2267)

**Issue: Marketing of SSBCI benefits**

CMS proposes to expand section 422.2267(e)(34)(ii) to require that a MA organization must convey in its SSBCI disclaimer that even if the enrollee has a listed chronic condition, the enrollee may not receive the benefit because coverage of the item or service depends on the enrollee being a "chronically ill enrollee" as defined in § 422.102(f)(1)(i)(A) and on the MA organization's coverage criteria for a specific SSBCI item or service required by § 422.102(f)(4). MA organizations would not need to specifically detail the additional eligibility requirements (such as the coverage criteria) in the disclaimer, but rather convey that coverage is dependent on additional factors, not only on the fact that the enrollee has an eligible chronic condition.

**Recommendation:** BCBSA understands the intent for this proposal but wants to clarify that the goal of providing specific SSBCI benefits is to improve the health and wellbeing of the members

16

plans serve and not as a marketing tactic. We are supportive of members having transparency into available supplemental benefits that they are eligible to utilize but disagree that additional disclaimer requirements are an effective way to do this.

**Rationale:** While disclaimers may be an easy avenue for sharing information, this proposal will increase beneficiary confusion while not truly addressing CMS' concerns with deceptive marketing practices by bad actors. Alternatively, it could further confound how members can access these helpful SSBCI benefits and increase member abrasion already felt by receiving multiple notices and marketing outreach.

Additionally, it is unclear how CMS intends plans proceed when an advertisement includes multiple SSBCI benefits, for which there might be varying eligibility or condition requirements. The disclaimer language would be longer than the message itself and cloud helpful information that was meant to increase beneficiary education of available benefits.

### B. Agent Broker Compensation

### Issue #1: Limitation on Contract Terms

CMS proposes that, beginning in contract year 2025, MA organizations must ensure that no provision of a contract with an agent, broker, or TPMO has the direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent's or broker's ability to objectively assess and recommend which plan best meets the health care needs of a beneficiary.

**Recommendations:** BCBSA recommends that CMS provide additional clarity as to what specifically constitutes a "direct" and an "indirect" effect. We further recommend that CMS provide a full listing of these items to ensure any finalized requirements are as precise as possible to support successful and uniform interpretation and implementation.

**Rationale:** BCBSA supports CMS's goal of eliminating incentives that inhibit an agent or brokers' ability to objectively provide health plan recommendations to beneficiaries. However, we do have concerns about the potential lack of structure surrounding this proposal, which appears to grant some degree of subjective authority to CMS to stipulate health plan contract relationships, with potential oversight into the sensitive and proprietary contracts that plans may be developing. We would recommend clarification as to what will qualify as a direct and an indirect impact with respect to CMS's definition of incentivizing, to ensure that there are clear and objective standards for stakeholders to adhere to.

### Issue #2: Set Compensation Rates

CMS proposes to change the caps on compensation payments to set rates that would be paid by all plans across the board. Under this proposal, agents and brokers would be paid the same amount either from an MA plan directly or by an FMO.

**Recommendation:** BCBSA recommends that CMS not change caps to set compensation rates, but rather, work directly with stakeholders to determine a more appropriate means of rate setting.

17

**App.108**

**Rationale:** BCBSA understands and supports CMS's efforts to create a level playing field, however, we are concerned that there will be unintended consequences from this proposal which could disadvantage smaller, regional plans to the advantage of larger nationals. The proposed decrease in compensation unfortunately does not account for the realities of costs for smaller agents/brokers. These adjustments will place financial strain on individual agents/brokers and small agencies attempting to compete against larger agencies/call centers.

In addition to their standard operational costs, TPMOs also must pay to be appointed with each individual carrier they sell, as well as each legal entity under the carrier (including for MA and Medicare Supplement). Because of this additional financial obligation, TPMOs may find themselves in situations where they are forced to make decisions to either reduce the number of plans that they sell or to leave the market entirely, which ultimately impacts beneficiary choice and access. These circumstances will likely have the effect of creating an incentive for agents/brokers to prioritize paying appointment fees for organizations that provide the most beneficiary referrals, which is likely to benefit the largest health plans.

### Issue #3: FMV Adjustment for Administrative Payments

CMS proposes to add, beginning in 2025, that fair market value (FMV) will be adjusted to $31 to account for administrative payments included under the compensation rate, and to be updated annually in compliance with the requirements for FMV updates.

**Recommendations:** BCBSA recommends that CMS further engage with stakeholders to determine an appropriate rate and methodology for determining FMV. Additionally, we strongly recommend that CMS ensure any finalized requirements are as precise as possible to support successful and uniform interpretation and implementation.

**Rationale:** As previously mentioned, we acknowledge CMS' efforts to help to level the playing field for MA plans with regard to marketing spend, however, the proposed $31 FMV administrative payment is not adequate and is well below what is needed for most standard operational costs. This has the unintended effect of disproportionately harming smaller, regional plans, counter to CMS' original goal. Rather, it is likely the case that larger call centers that have the ability spread costs over a larger book of business, will be most apt to survive in such an environment. In aggregate, this proposal would make it harder for TPMOs to sell compliantly and would likely push many agents out of the market; in turn fostering less competition and reducing overall beneficiary choice. We recommend that CMS work with stakeholders to determine a process for calculating more appropriate FMV rates. We also encourage CMS to provide as much specification as possible in regard to any finalized FMV requirements, to ensure clarity and avoid stakeholder confusion.

### Issue #4: Timing, Scope, and Applicability

CMS states that proposals pertaining to limitations on contract terms as well as those on administrative payments will take effect beginning in 2025.

**Recommendation:** BCBSA seeks clarity on the proposed timing, scope, and applicability of the proposed changes to agent and broker compensation.

18

**Rationale:** We interpret the proposed guidance to apply for enrollments beginning January 1, 2025, regardless of when an agent submits the enrollment application. This would align with CMS' past approach, particularly around marketing and communications guidance targeting the AEP. Regarding scope, we understand that the proposed cap on administrative payments would apply to payments by MAOs directly to agents and brokers, or by FMOs directly to agents and brokers (i.e., the rule does not impact an MAO's payments to an FMO for services outside of administrative payments). Regarding applicability, we interpret the proposed cap on administrative payments to apply to initial enrollments, not renewals, which would be grandfathered in under existing rules. If CMS is able to comment on these interpretations, we would appreciate it.

---

## VII. Medicare Advantage/Part C and Part D Prescription Drug Plan Quality Rating System

### B. Adding, Updating, and Removing Measures (§§ 422.164 and 423.184)

**Issue #1: Moving MTM Program Completion Rate for Comprehensive Medication Review (CMR) (Part D) Measure to the Display Page if Expansion of Target Criteria is Finalized**

In the CY 2024 Part C & D Technical proposed rule[1] ("December 2022 proposed rule"), CMS proposed but did not finalize the following changes to the target criteria for the MTM program that would increase the number and percentage of Part D enrollees eligible for MTM from 4.5 million (9 percent) to 11.4 million (23 percent).

> (1) requiring plan sponsors to target all core chronic diseases identified by CMS, codifying the current 9 core chronic diseases in regulation, and adding HIV/AIDS for a total of 10 core chronic diseases
> (2) lowering the maximum number of covered Part D drugs a sponsor may require from 8 to 5 drugs and requiring sponsors to include all Part D maintenance drugs in their targeting criteria; and
> (3) revising the methodology for calculating the cost threshold ($4,935 in 2023) to be commensurate with the average annual cost of 5 generic drugs ($1,004 in 2020)

If the changes to eligibility for the MTM program proposed in the December 2022 proposed rule are finalized for CY 2025, in this proposed rule CMS proposes to move the MTM Program Completion Rate for CMR Star Rating measure to a display measure for at least 2 years due to substantive measure updates. Therefore, the measure would be removed from the Star Ratings entirely for the 2025 and 2026 measurement years and would return to the Star Ratings program no earlier than the 2027 measurement year for the 2029 Star Ratings.

**Recommendation #1:** BCBSA acknowledges the value in the intent to standardize MTM criteria across all plans. However, we believe there are alternative strategies that could ensure all Part D members have access to MTM services while maintaining a positive experience. BCBSA recommends CMS withdraw its proposal to expand the MTM program and instead work

---

[1] https://www.federalregister.gov/documents/2022/12/27/2022-26956/medicare-program-contract-year-2024-policy-and-technical-changes-to-the-medicare-advantage-program

with Part D sponsors and stakeholders to ensure enrollees who would benefit the most from MTM services are engaged and successfully managed.

**Rationale:** We commend CMS for its proposals to expand enrollee eligibility for MTM services that improve patient outcomes and quality of life. Blue Plans have first-hand knowledge of how high quality MTM services can positively influence patients' lives, and BCBSA supports efforts to incrementally expand these services to additional enrollees in need of medication management. A Blue Plan's analysis of internal MTM study results found a positive impact. Based on analysis of members from program year 2018, members who completed the CMR had a statistically significant lower prescription drug spend and had increased PCP visits after the CMR compared to members who did not have a CMR.

We have concerns that more than doubling the number of eligible enrollees for MTM programs (from 9% to 23 %) will be a significant administrative burden and place excessive stress on plan resources and pharmacist-capacity to serve enrollees under these new expanded criteria. Building this program capacity will drive MA plan and pharmacist resources to enrollees not based upon clinical guidelines but drug counts. The expansion could inadvertently shift the focus from quality of services to quantity of care, especially if the measure of success for MTM services remains the CMR completion rate. This measure does not hold pharmacists accountable for optimizing the member's health through follow-up visit or focus on but rather focuses on the prescription claim and timely filling of the prescription. This proposal would lower the number of drugs an enrollee takes to qualify for MTM, even though many enrollees taking five drugs are stable and are not in need of MTM. This dilutes the efforts of sponsors to target those who would benefit the most from MTM.

Plans that collaborate with local pharmacists may struggle to meet the increased demand, leading to fewer or shorter interactions with members. This could impact the quality of patient care and shift the emphasis away from resolving identified medication therapy problems. To meet the demand, plans may resort to vendor solutions for MTM services or increase their use of other healthcare professionals, potentially leading to a negative member experience.

Expanding this program would further duplicate overlapping telephone calls for MTM & members in the Transition of Care measure (TRC) for Medication Reconciliation post-acute care discharge. This will lead to communication fatigue for members thus having them not answer the call or ask to be placed on the plan's do not call list.

If these proposals are finalized, sponsors would be required to create new, lower-value program elements that could satisfy MTM requirements but would be significantly less likely to improve health outcomes. These lower-value programs could end up supplanting better care management programs currently in place for the proposed expanded MTM-eligible population.

Allowing sponsors to focus on the existing eligible population that has the greatest need for MTM services will focus sponsors' resources and maintain program integrity. CMS should help improve the engagement of eligible beneficiaries instead of expanding eligibility.

**Recommendation #2:** If CMS is intent on pursuing eligibility expansion, BCBSA recommends CMS have a 5-year-minimum phased-in expansion and take an incremental approach to expansion in future years.

**Rationale:** Taking an incremental approach would allow sponsors to prepare for implementation given the shortage of pharmacists to operationalize these changes. We encourage CMS to increase the chronic condition disease states incrementally, by requiring health plans to implement MTM for 6 chronic conditions versus 9 based on the groups the MTM program is best equipped to serve. In the next iteration, CMS could lower the maximum number of covered Part D drugs a sponsor may require from 8 to 7 or 6 drugs to increase eligibility in a more uniform manner.

**Recommendation #3:** Should CMS pursue eligibility expansion, BCBSA requests CMS to consider removing the 60-day opt-out period to remove beneficiaries from the denominator.

**Rationale:** As eligibility rates increase it is unlikely plan sponsors will be able to outreach to all enrolled beneficiaries within 60 days of enrollment. We would support beneficiaries opting out throughout the measurement year which removes the beneficiary from the denominator.

**Recommendation #4:** BCBSA urges CMS to study patient need for MTM services for those with HIV/AIDS and cancer before inclusion in the core chronic disease list.

**Rationale:** Blue Plans' experience in the MTM program and care management generally indicates patients with HIV/AIDS and cancer have MTM services provided directly by the Infectious Disease Specialist and Oncology teams, respectively, directly involved in patients' treatment. Adding these chronic diseases to the MTM eligibility standards would require the need for specialty pharmacists to support MTM services for these patients, in many situations where patients' MTM needs are being met. This may cause abrasion to beneficiaries and may result in beneficiaries disengaging from health plan outreach and intervention. Privacy rules in many states could also impede planned outreach to members with HIV/AIDS. A CMS analysis of patients' need for MTM services for those with HIV/AIDS and cancer would determine the appropriateness of adding these diseases to the core chronic disease list or if providing MTM program services would duplicate existing drug management services.

**Recommendation #5:** We encourage CMS to partner with the Pharmacy Quality Alliance (PQA) to identify alternative approaches to measuring the success of the MTM program.

**Rationale:** The focus should be on the member's health outcomes following MTM services, rather than the quantity of CMRs completed. This may include tying MTM services to other existing HEDIS and Star measure outcomes such as controlling blood pressure or diabetes control. We recommend CMS consider adopting an "expanded criteria" approach for MTM services as well as a 5-year minimum phased approach. We recommend CMS change the measure of success to focus on member health outcomes as a measure of quality and not an administrative task. This would allow PQA to propose a new marker of success for the MTM program, moving away from the CMR completion rate and aligning with HEDIS/Star measures that focus on chronic condition management. We also suggest delaying the implementation of the expanded criteria to give PQA time to propose another measure for the MTM program and allow two years for this measure to be displayed.

## C. Data Integrity (§§ 422.164(g) and 423.184(g))

**Issue #1: Completeness of IRE Data for Appeals Measures (Part C)**

CMS is proposing to use data from MA organizations, the Independent Review Entity (IRE), or CMS administrative sources to determine the completeness of the data at the IRE for the Part C appeals measures (Plan Makes Timely Decisions about Appeals and Reviewing Appeals Decisions) starting with the 2025 measurement year and the 2027 Star Ratings. For determining completeness, and to determine if a contract may be subject to a potential reduction for the Part C appeals measures' Star Ratings, CMS is proposing to compare the total number of appeals received by the IRE, including all appeals regardless of their disposition (for example, including appeals that are dismissed for reasons other than the plan's agreement to cover the disputed services and withdrawn appeals), to the total number of appeals that were supposed to go to the IRE.

**Recommendation:** BCBSA does not support CMS' proposal as the potential impact hinges in large part on the integrity of a plan sponsor's data capabilities. If CMS moves forward with this proposal, we urge CMS to make the 2025 measurement year (2027 Star Ratings) a transition year for this policy, where data is shared but plans are not penalized.

**Rationale:** CMS wants to implement a process to validate whether or not the plan is sending all partially favorable and unfavorable cases to the IRE by comparing IRE's data with the plan's data. If a plan sponsor does not pass the validation component, they automatically receive a 1 Star rating. It appears CMS expects no less than a 95% accuracy rate. The smallest-volume contracts will be most at-risk. For example, if a plan sponsor sends only 10 cases to the IRE for a contract and the Data Validation numbers don't match the IRE numbers, that contract's IRE metrics will automatically drop to 1 Star. Given the severity, plans would need to put additional actions/validation in place for a 2025 data submission that occurs in February of 2026.

As a result, should CMS move forward with this policy, we urge CMS to make the 2025 measurement year (2027 Star Ratings) a transition year for this policy. For example, CMS could implement the change for the 2025 measurement year to allow plans to gain experience with the new processes and raise concerns but not reduce the rating to 1 Star until after the transition year, beginning with the 2026 measurement year (2028 Star Ratings).

## F. Health Equity Index Reward (§§ 422.166(f)(3) and 423.186(f)(3))

**Issue #1: Calculating HEI after Contract Consolidation**

For the first year following consolidation, CMS proposes to assign the surviving contract of a consolidation the enrollment-weighted mean of the HEI reward of the consumed and surviving contracts using enrollment from July of the most recent measurement year used in calculating the HEI reward. CMS proposes that contracts that do not meet the minimum percentage of enrollees with the specified SRF thresholds or the minimum performance threshold described at §§ 422.166(f)(3)(vii) and 423.186(f)(3)(vii) would have a reward value of zero used in calculating the enrollment-weighted mean reward.

For the second year following a consolidation, CMS proposes that, when calculating the HEI score for the surviving contract, the patient-level data used in calculating the HEI score would be combined across the contracts in the consolidation prior to calculating the HEI score. The

22

HEI score for the surviving contract would then be used to calculate the HEI reward for the surviving contract following the methodology described in §§ 422.166(f)(3)(viii) and 423.186(f)(3)(viii).

**Recommendation #1:** BCBSA supports CMS' goal of preventing the use of contract consolidations for the sole purpose of maximizing bonus payments in the Star Ratings program. The current proposal is a logical application of this effort. However, CMS could further deter the practice of increased contract consolidations by expanding eligibility for the HEI reward factor to more MA plans. BCBSA reiterates our recommendations to the CY 2024 Part C & D Technical proposed rule ("December 2022 proposed rule") and in subsequent meetings with Centers for Medicare staff, that CMS should make an adjustment to the HEI reward factor methodology finalized in the CY 2024 rule, to ensure highly rated MA plans are eligible to receive this important incentive that will directly benefit their enrollees. As discussed in our comments, we believe that if an MA plan has enough HEI eligible enrollees to generate a Star Ratings score (based on CMS/NCQA criteria), that should be sufficient for inclusion in the potential reward.

**Rationale:** By expanding eligibility for the HEI reward to a broader pool of MA plans, CMS would reduce the likelihood that currently ineligible plans might pursue contract consolidations to "game" the system. Multiple high-performing plans are ineligible for the HEI reward despite having many members with SRFs and making significant investments and progress to address health disparities. By revising its HEI methodology and expanding eligibility to more plans, CMS could achieve two goals: first, its strategic priority of advancing health equity, and second, its goal of reducing gaming in the Star Ratings system via contract consolidations.

While we strongly agree with CMS that it is important to improve health outcomes for beneficiaries with SRFs, it will not always be possible for plans to serve enough enrollees with SRFs to qualify for the HEI reward. Alternatively, following the methodology for calculating Stars at the domain level would eliminate confusion about how to calculate a median percentile and incentivize all MA plans to address health disparities in the populations they serve.
We believe that if an MA plan has enough HEI eligible enrollees to generate a Star Ratings score (based on CMS/NCQA criteria), that should be sufficient for inclusion in the potential reward. In the Medicare 2023 Part C & D Star Ratings Technical Notes, a plan qualifies for a domain level Stars Rating if the plan has a measure for half +1 of the measures. We recommend following this methodology for the HEI calculation. This is an appropriate way to measure the HEI as it is consistent with current CMS practice on how to create scores for a domain of quality. The following describes how it could work in practice.

- First, there should be a minimum denominator population in the HEI and non-HEI populations such that you can calculate a statistically significant score. The NCQA scores require a minimum denominator threshold. We recommend CMS use a minimum of 500 or 1,000 total members enrolled in the contract. CMS then has two thresholds for reporting a score on a measure for a plan. We recommend CMS apply NCQA's criteria to both HEI and non-HEI populations. This will not require new policy development since it is current practice.
- Second, a contract must meet a minimum number of rated measures to generate an HEI score. This is consistent with CMS' policy on how to calculate a Stars score at the domain level. It is appropriate because the HEI is a new domain of measurement.

23

Unfortunately, the removal of the reward factor and corresponding addition of the more limited HEI reward will make it more challenging for plans to maintain and improve Star Ratings. This reduces available resources to develop innovative programs and services that improve health equity and directly benefit the people we cover and serve. High-performing plans that currently receive the reward factor, but are ineligible for the HEI, could face reduction in benefits for beneficiaries with social risk factors (SRFs), which runs counter to CMS' intent to incentivize high-performance plans to keep improving. Unlike national plans who may be able to offset impacts across multiple contracts across the country, regional and single-state plans are working to prioritize investments with existing resources. This is particularly true of plans in rural areas where workforce demands lead to access challenges, higher disease burden and worse severity. Regional and single-state plans also face the disadvantage of competing against national plans who have a wider scope of population members across multiple states to meet the median rate. We believe implementing the HEI provision as written will produce unintended consequences while missing an opportunity to truly address beneficiary need.

**Recommendation #2:** We seek additional clarification and examples on how the surviving contract's HEI reward factor would be calculated and "combined across contracts".

**Rationale:**  It is unclear how CMS intends to combine patient-level data "across contracts prior to calculating the HEI score" as the provision is currently written. CMS references the enrollment-weighted mean, but additional clarification and examples would be helpful to understand how this proposal would be implemented if finalized.

**Issue #2: Requesting a Technical White Paper on HEI Methodological Considerations**

**Recommendation:** We seek additional information on how to calculate the HEI reward in general, and ask that CMS develop a develop a technical white paper to assist stakeholders' understanding of CMS' HEI methodology – delving into the specific disparities observed within the LIS, dually-eligible, and disability populations, prioritizing the inclusion of a geographic breakdown of how the HEI is impacted in different regions to gain a more holistic understanding of its effects. Within this white paper, we also recommend CMS consider effects of a rural adjustment with stratification within the HEI SRF populations to account for the differences among contracts operating in different regions.

**Rationale:** We request CMS publish a comprehensive, technical white paper to outline how CMS developed and will conduct the HEI methodology. While we appreciate the simulations provided in the April 2023 Final Rule, we still have outstanding questions regarding how CMS came to its conclusions and changes to eligibility for beneficiaries with SRFs since CMS' modeling efforts in 2019. Additionally, as measurement begins Jan. 1, 2024, we would greatly appreciate additional clarity on which measures will be factored into the HEI. In drafting this white paper, we urge CMS to share the data and insights that informed the need for this HEI reform proposal and address issues such as SRF population characteristics, a geographic breakdown, and information about original enrollment in Medicare on the basis of disability.

To assist us in our understanding of CMS' HEI methodology, we request the white paper delve into the specific disparities observed within the LIS, dual-eligible, and disability populations. We request CMS share any additional data on the disparities observed within the current SRF populations so plans have greater awareness into the beneficiaries needs.

24

Stakeholders would benefit to see the percentages of SRF members regionally and understand rural versus urban differences. This would also assist and better inform plans when developing their strategies to address inequities (e.g., infrastructure to care for low-income beneficiaries in urban areas is incomparable) and without revenue to provide supplemental benefits we could be inadvertently driving higher disparities with potential benefit reductions.

Within this white paper, we also recommend CMS consider effects of a rural adjustment with stratification within the HEI SRF populations to account for the differences among contracts operating in different regions. Specifically, since we expect the effect of urbanity/rurality and region meaningfully varies across members with LIS/DE and disability, we recommend that measures used in the HEI be adjusted using findings outlined in the white paper. This would allow for more valid and accurate between-contract comparisons of the selected beneficiaries in the HEI reward factor.

Lastly, regarding the availability of data on permanent disability status, we think CMS should make reporting available that states the specific condition or conditions that made a beneficiary eligible to enroll for Medicare before the age of 65. Plans know their individual plan percentages and can estimate the median rate, but plans have not seen public reporting on the makeup of the whole country. Social Security splits conditions considered for permanent disability into 14 categories, each with many conditions under each category. Reporting even at this level would be beneficial as plans consider care management programs for their region.

## VIII. Improvements for Special Needs Plans

### C. Increasing the Percentage of Dually Eligible Managed Care Enrollees Who Receive Medicare and Medicaid Services from the Same Organization (§§ 422.503, 422.504, 422.514, 422.530, and 423.38)

**Issue #1: Replacing the Quarterly SEP With a New Dual/LIS SEP**

CMS proposes to replace the quarterly dual SEP with a new dual/LIS SEP. The proposed dual/LIS SEP would allow dually eligible and other LIS-enrolled individuals to enroll once per month into any standalone prescription drug plan.

**Recommendation:** BCBSA supports the creation of a new dual/LIS SEP; however, we recommend that CMS further assess the impacts of this proposal, with a particular focus on partial benefit dual eligible individuals.

**Rationale:** BCBSA believes that this proposal, with the restrictions proposed by CMS, has the potential to have positive impacts for many beneficiaries, including providing a more expedient means for beneficiaries to correct prior mistakes in plan selection. However, we recommend that CMS take time to evaluate the impacts of the proposed SEP changes more closely to ensure that enrollment churn does not increase due to more frequent SEPs. Other unintended consequences of a more frequent SEP may also be greater beneficiary confusion, as well as continuity of care issues, particularly for the partial benefit dual eligible population. CMS should take a measured approach in the development and implementation of any new SEP initiatives.

**Issue #2: Create a New Integrated Care SEP for Dually Eligible Individuals**

CMS also proposes to create a new integrated care SEP for dually eligible individuals. This new integrated care SEP would allow enrollment in any month into FIDE SNPs, HIDE SNPs, and AIP for those dually eligible individuals who meet the qualifications for such plans.

**Recommendation #1:** BCBSA supports the creation of a new integrated care SEP but recommends that CMS consider the full implications of allowing dually eligible individuals the ability to change to a different managed care plan from month-to-month.

**Rationale:** BCBSA believes beneficiary choice of plan is essential in promoting self-directed care and ownership of health outcomes. However, continuity of care is also imperative when managing care for one of the most vulnerable populations. While the proposed change promotes beneficiary choice, it does not address the challenges of information and data exchange between states and plans or information and data exchange from plan to plan in each state. Plans have a limited amount of time in which to engage beneficiaries and secure the data needed to develop a comprehensive care plan. Lags in data only serve to make this work more challenging.

**Recommendation #2**: BCBSA recommends CMS consider the impact the changes to the SEP for dually eligible individuals have on partial-benefit duals.

**Rationale**: In many states partially-eligible duals do not qualify for enrollment into a FIDE or HIDE SNP. This prevents these individuals from benefiting from the proposed SEP and the enhanced care coordination of an integrated plan.

**Issue #3: Enrollment Limitations for Non-Integrated Medicare Advantage Plans**

CMS proposes that beginning in PY 2027, for MAOs that also contract with a State as an MCO, D-SNPs offered by the organization must limit new enrollment to individuals enrolled in the D-SNP's affiliated MCO. For PY 2030, D-SNPs must only enroll individuals enrolled in (or in the process of enrolling in) the affiliated Medicaid MCO.

**Recommendation:** BCBSA recommends that CMS consider the full impact of the proposed D-SNP enrollment limitations for plans and beneficiaries.

**Rationale:** BCBSA appreciates CMS's efforts to streamline integrated products within markets but expresses concerns over the potential for D-SNP enrollment to be driven by Medicaid enrollment. For example, in a circumstance where a health plan loses a Medicaid bid, it would significantly impact that plans' D-SNP enrollment. In some states (e.g., Texas) there are certain plans that are required to be awarded Medicaid contracts, regardless of whether they meet certain quality measures, etc. In such states, this proposal could result in lower-quality Medicaid plans retaining their Medicaid membership while also gaining new D-SNP enrollees, of whom they may not be accustomed to serving.

**<u>D. Comment Solicitation: Medicare Plan Finder and Information on Certain Integrated D–SNPs</u>**

**Issue: Medicare Plan Finder Information Reporting Mechanism**

CMS is considering adding a limited number of specific Medicaid-covered benefits (for example, dental, NEMT, certain types of home and community-based services, or others) to the Medicare Plan Finder (MPF) when those services are available to enrollees through the D-SNP or the affiliated Medicaid MCO. CMS is considering potentially providing a mechanism by which D-SNPs can report necessary information annually and solicits comment on the practicality and means for accomplishing this.

**Recommendation:** BCBSA supports efforts to improve the MPF and recommends that CMS conduct working sessions with health plans to assist with the development of new reporting mechanisms, so that stakeholders can provide suggestions on the mode and timing as well as how to file some of the more complex benefits.

**Rationale:** Increasing transparency around supplemental benefit offerings empowers beneficiaries to make more informed choices about their benefit options. Currently, the MPF only displays benefits that are included in the MA plan benefit package (PBP). Making changes to the MPF to make benefits easier to understand, ultimately supports the beneficiary decision-making process.

## E. Comment Solicitation: State Enrollment Vendors and Enrollment in Integrated D–SNPs

**Issue #1: Medicaid Managed Care Enrollment Cut-Off Dates**

CMS invites comment from interested parties, including States, D-SNPs, and Medicaid managed care plans, about their specific operational challenges related to potential changes to Medicaid cut-off dates to align them with the Medicare start date.

**Recommendation:** BCBSA recommends CMS continue collecting information from stakeholders regarding the operational challenges states and plans would experience if Medicaid and Medicare cut-off dates were aligned. This process may also include consideration of best practices utilized by states during the Medicare-Medicaid Program (MMP) demonstration to better understand how to seamlessly integrate enrollment dates between programs.

**Rationale:** The enrollment process for Medicare and Medicaid are very different. Minimizing disruption to beneficiaries and the current/future enrollment process is important in maintaining dual benefit coverage. This process should consider the differences in programs such that the beneficiary-facing portal for enrollment is clear and understandable.

**Issue #2: State Enrollment Vendors for Enrollment in Integrated D-SNPs**

CMS is interested in learning more about reasons for implementing Medicaid managed care enrollment cut-off dates and the barriers, as well as potential solutions, to aligning Medicare and Medicaid managed care enrollment start and end dates. CMS is soliciting comments from interested parties, including States, D-SNPs, and Medicaid managed care plans, about specific operational challenges related to potential changes to Medicaid cut-off dates to align them with the Medicare start date.

**Recommendation #1:** BCBSA recommends addressing beneficiary confusion surrounding integrated enrollment with increased communication between CMS, states, and beneficiaries.

**Rationale:** A key challenge beneficiaries experience when enrolling in integrated D-SNPs is a lack of clarity about what integration means for their benefits. BCBSA Plans have experienced circumstances where beneficiaries are unaware of some of the implications of integrated enrollment, which may cause frustration when they are newly enrolled in an integrated plan and experience a change in provider network. For beneficiaries who were previously enrolled in FFS Medicare, this shift can be a challenging transition and lead to beneficiaries disenrolling from their MA plan and enrolling in another, potentially non-integrated plan, which can ultimately lead to misaligned enrollment and, further beneficiary confusion.

**Recommendation #2:** BCBSA supports aligning enrollment effective dates for Medicare and Medicaid.

**Rationale:**  Individuals enrolled in Medicare have the ability to enroll/disenroll before the end of a given month; however, the timing of state Medicaid enrollment/disenrollment processes can vary. BCBS Plans have at times experienced challenges aligning Medicare and Medicaid enrollments in the same month for members due to state Medicaid processes and strict deadlines for submission of enrollment documents. This has resulted in some members being misaligned (i.e., not enrolled in their Medicaid plan at the same time that they enroll in their Medicare plan) for lengthy periods of time, until the state can process their Medicaid enrollment. Processes like these are challenging for plans, states, and beneficiaries alike.

**Recommendation #3:** BCBSA supports adjusting the effective dates for Medicare enrollments to align with the proposed integrated care SEP (only if finalized) and recommends that CMS provide training and educational resources to support the enrollment process.

**Rationale:** Currently in Medicare, enrollment effective dates align with the first day of the first calendar month, while Medicaid utilizes a mid-month enrollment effective timeline. Realigning enrollment effective timelines will likely require substantial system updates by plan sponsors. To aid this process, CMS should consider providing training and education resources for SHIPs, 1-800-Medicare, and other beneficiary enrollment support to ensure their ability to accurately inform beneficiaries of changes to enrollment timing and implications for their coverage.

**Recommendation #4:** BCBSA recommends that CMS retain flexibilities to allow plans to contract directly with states.

**Rationale:** Many BCBS Plans have established histories of successful collaboration with states as third-party administrators. For these Plans, over the course of time, they have developed efficient operational processes and deep relationships with local state administrators, which has ultimately led to positive outcomes for beneficiaries. The demonstrated success of these contracts should not be disrupted, and plans and states should be allowed the ability to continue to utilize them.

## G. Contracting Standards for Dual Eligible Special Needs Plan Look-Alikes (§ 422.514)

**Issue #1: Reducing Threshold for Contract Limitation on D-SNP Look-Alikes**

28

CMS proposes a limitation on non-SNP MA plans with 70 or greater percent dually eligible individuals for contract year 2025. For contract year 2026, CMS proposes to reduce the threshold from 70 percent to 60 percent or greater dually eligible enrollment as a share of total enrollment. CMS also solicits comments on whether an alternative to reduce the threshold to 50 percent is more appropriate.

**Recommendation:** BCBSA supports lowering the D-SNP threshold from 80 percent to 60 percent over a two-year period.

**Rationale:** BCBSA supports improving program integration between Medicare and Medicaid and similarly supports efforts to ensure that beneficiaries have access to coordinated Medicare and Medicaid benefits. We believe this to be an essential step toward directly addressing concerns over the substantial growth in non-SNP MA plans with disproportionately high enrollment of dually eligible individuals. Similarly, aimed contract limitations such as these for D-SNP look-alikes will ultimately help to avoid beneficiary confusion in the enrollment process.

**Issue #2: Amending Transition Processes and Procedures for D-SNP Look-Alikes**

CMS proposes to apply existing transition processes and procedures to non-SNP MA plans that meet the proposed D-SNP look-alike contracting limitation of 70 percent or more dually eligible individuals in plan year 2025 and 60 percent or more dually eligible individuals in plan year 2026. For plan year 2027 and subsequent years, CMS proposes to limit the existing D-SNP look-alike transition pathway to MA organizations with D-SNP look-alikes transitioning enrollees into D-SNPs.

**Recommendation:** BCBSA recommends maintaining existing transition processes and procedures for enrollees in D–SNP look-alikes.

**Rationale:** Limiting D-SNP look-alike transitions only serves to constrict beneficiary choice and does not allow proper consideration of individual beneficiary needs. With proposed actions potentially being established to reduce the threshold for contract limitation for D-SNP look-alikes, CMS is effectively achieving its programmatic goals of enhanced programmatic integration and a better beneficiary experience. We believe further constriction to be overly restrictive and support maintaining current crosswalk exceptions.

**Issue #3: Alternative Proposal to Amend Transition Processes and Procedures for D-SNP Look-Alikes**

CMS is also considering an alternative proposal that would:
- Apply the 60-percent threshold beginning in plan year 2026
- Permit the use of current transition authority into non-SNP MA for plan year 2025; and
- Limit the use of transition authority to transition D-SNP look-alike enrollees into D-SNPs for plan year 2026 and beyond.

CMS solicits comment on whether this alternative is a better balance of their goals to prohibit circumvention of the requirements for D-SNPs and to encourage and incentivize enrollment in integrated care plans.

**Recommendation:** BCBSA is not supportive of this proposal and recommends maintaining existing transition processes and procedures for D-SNP look-alikes.

**Rationale:** Similar to previously provided rationale, BCBSA believes that a limitation of existing D-SNP look-alike transition pathways to be unnecessarily restrictive and counterintuitive to CMS's overall goals of enhancing the beneficiary experience and promoting the ability of individuals to select options that best suit their needs.

## Other Feedback

### Improvement Measure Hold Harmless (§§ 422.166(g)(1) and 423.186(g)(1))

**Issue: Applying the "Hold Harmless" Policy Only to 5 Star Contracts**

In the December 2022 proposed rule, CMS proposed to modify § 422.166 at paragraphs (g)(1)(i) and (ii) and § 423.186 at paragraphs (g)(1)(i) and (ii) to apply the improvement measure hold harmless provision to only contracts with 5 stars for their highest rating beginning with the 2026 Star Ratings.

**Recommendation:** As mentioned in our comments to the December 2022 proposed rule, BCBSA does not support this proposal and recommends CMS continue to apply the hold harmless policy to contracts with 4 Stars and above.

**Rationale:** CMS' proposal to only apply "hold harmless" policy to 5 Star plans would undermine the intent of the quality improvement measure by penalizing plans that achieve 4 Stars and then continue to make modest gains (but not enough to achieve 5 Stars) only to be relegated below 4 Stars. CMS implemented the QI measure as an effective way to create an extra incentive for MA plans to improve measure scores. Each measure is evaluated to determine if there was a statistically significant improvement year-over-year, and those scores are added together to create the QI score. As the QI measure was implemented, CMS smartly acknowledged that the approach would create an unintended consequence: A plan's QI measure would drop once the ratings improved because—as plans improve their scores—it gets more difficult/impossible to produce a statistically-significant improvement every year. In other words, a contract's Star rating could drop due to a drop in the QI score, even if the plan continued to make modest gains in each measure, but not enough to be statistically significant. Because of this unintended consequence, CMS implemented its existing "hold harmless" policy for plans with 4 Stars or above. This ensures a plan is not penalized for only making modest gains after reaching the 4-Star threshold. This change would significantly increase the volatility of Star ratings and reduce the incentive for improvement. Additionally, by CMS' own estimate, the elimination of the "hold harmless" provision for 4-Star plans would result in over $19 billion in cuts over the next ten years.  A significant portion of these savings would come from supplemental benefits being provided to disadvantaged populations, including dental, vision, meals, nutrition, transportation, and in-home supports. Removing those benefits for disadvantaged populations would harm the Administration's health equity goals.

# EXHIBIT 5

Regulations.gov

An official website of the United States Government. 🇺🇸

## Regulations.gov Branding

**SUPPORT**

Docket  /  Document (CMS-2023-0187-0001)  /  Comment

Comment Icon  **PUBLIC SUBMISSION**

# Comment on CMS-2023-0187-0001

Posted by the **Centers for Medicare&Medicaid Services** on Dec 15, 2023

View More Comments  1.85K      View Related Comments  3.39K      Share ▾

---

| Comment |
| --- |

I understand the need for standardization. That is to say all the overrides should be set to the same dollar amount. However, the amount needs to be enough to make it possible to pay for support staff etc... There is a good deal of overhead. To keep businesses functioning that allow for the agent to own their book, I think standard but higher dollar amount makes sense going forward. Perhaps 100$ to 200$ range to cover the costs of doing business and providing agents support.

| **Comment ID** |
| --- |
| CMS-2023-0187-0162 |

| Shape | **Tracking Number** |
| --- | --- |
| | lpk-198t-1hkn |

Give Feedback

|  Comment Details  |  **Submitter Info**  |
| --- | --- |

**Document Subtype**
Public Comment

**Received Date**
Nov 29, 2023

**App.123**

About    Bulk Data Download    Agencies    Learn    Reports    FAQ

Privacy & Security Notice    |    User Notice    |    Accessibility Statement    |    Support
Developers    |    FOIA

# EXHIBIT 6



# Medicare Advantage in 2023: Enrollment Update and Key Trends

**Nancy Ochieng** (https://www.kff.org/person/nancy-ochieng/),

**Jeannie Fuglesten Biniek** (https://www.kff.org/person/jeannie-fuglesten-biniek/),

**Meredith Freed** (https://www.kff.org/person/meredith-freed/), Anthony Damico, and

**Tricia Neuman** (https://www.kff.org/person/tricia-neuman/)

Published: Aug 09, 2023

    

Medicare Advantage enrollment has been on a steady climb for the past two decades following changes in policy designed to encourage a robust role for private plan options in Medicare. After a period of some instability in terms of plan participation and enrollment, The Medicare Modernization Act of 2003 created stronger financial incentives for plans to participate in the program throughout the country and renamed private Medicare plans Medicare Advantage. In 2023, 30.8 million people are enrolled in a Medicare Advantage plan, accounting for more than half, or 51 percent, of the eligible Medicare population, and $454 billion (or 54%) (https://www.cbo.gov/system/files/2023-05/51302-2023-05-medicare.pdf) of total federal Medicare spending (net of premiums). The average Medicare beneficiary in 2023 has access to 43 Medicare Advantage plans (https://www.kff.org/medicare/issue-brief/medicare-advantage-2023-spotlight-first-look/), the largest number of options ever.

To better understand trends in the growth of the program, this brief provides current information about Medicare Advantage enrollment, by plan type and firm, and shows how enrollment varies by state and county. A second, companion analysis (https://www.kff.org/?post_type=issue-brief&p=595123&preview=true) describes Medicare Advantage premiums, out-of-pocket limits, cost sharing, extra benefits offered, prior authorization requirements, and star ratings in 2023.

Key highlights include:

- More than half (51%) of eligible Medicare beneficiaries are enrolled in Medicare Advantage in 2023.

- The share of Medicare beneficiaries enrolled in Medicare Advantage varies widely across counties. In 2023, nearly one third (31%) of Medicare beneficiaries live in a county where at least 60 percent of all Medicare beneficiaries are enrolled in Medicare Advantage plans, while 10% live in a county where less than one third of all Medicare beneficiaries are enrolled in Medicare Advantage plans. The wide variation in county enrollment rates could reflect several factors, such as differences in firm strategy, urbanicity of the county, Medicare payment rates, number of Medicare beneficiaries, health care use patterns, and historical Medicare Advantage market penetration.

- Medicare Advantage enrollment is highly concentrated among a small number of firms. UnitedHealthcare and Humana account for nearly half (47%) of all Medicare Advantage enrollees nationwide, and in nearly a third of counties (32%; or 1,013 counties), these two firms account for at least 75% of Medicare Advantage enrollment.

## More than half of eligible Medicare beneficiaries are enrolled in Medicare Advantage in 2023

In 2023, more than half (51%) of eligible Medicare beneficiaries – 30.8 million people out of 60.0 million Medicare beneficiaries with both Medicare Parts A and B – are enrolled in Medicare Advantage plans. Medicare Advantage enrollment as a share of the eligible Medicare population has jumped from 19% in 2007 to 51% in 2023 (Figure 1).



Figure 1

## Total Medicare Advantage Enrollment, 2007-2023

NOTE: Enrollment data are from March of each year. Includes Medicare Advantage plans: HMOs, PPOs (local and regional), PFFS, and MSAs. About 60.0 million people are enrolled in Medicare Parts A and B in 2023.
SOURCE: KFF analysis of CMS Medicare Advantage Enrollment Files, 2010-2023; Medicare Chronic Conditions (CCW) Data Warehouse from 5 percent of beneficiaries, 2010-2016; CCW data from 20 percent of beneficiaries, 2017-2020; and Medicare Enrollment Dashboard 2021-2023.



Between 2022 and 2023, total Medicare Advantage enrollment grew by about 2.3 million beneficiaries, or 8 percent – a similar growth rate to the prior year (8%). The Congressional Budget Office (CBO) projects that the share of all Medicare beneficiaries enrolled in Medicare Advantage plans will rise to 62 percent by 2033 (Figure 2).



Figure 2

# Medicare Advantage and Traditional Medicare Enrollment, Past and Projected

● Medicare Advantage Enrollment  ● Traditional Medicare Enrollment

SOURCE: KFF analysis Medicare Chronic Conditions (CCW) Data Warehouse from 5 percent of beneficiaries, 2010-2016; CCW data from 20 percent of beneficiaries, 2017-2020; and Medicare Enrollment Dashboard 2021-2023. Enrollment numbers from March of the respective year. Projections for 2023 to 2033 are from the May Congressional Budget Office (CBO) Medicare Baseline for 2023.

**KFF**

**In 2023, nearly two-thirds of Medicare Advantage enrollees are in individual plans that are open for general enrollment.**

Nearly two-thirds (64%) of Medicare Advantage enrollees, or 19.6 million people, are in plans generally available to all beneficiaries for individual enrollment (Figure 3). That is an increase of 0.9 million enrollees compared to 2022. Individual plans have accounted for approximately the same share of total Medicare Advantage enrollment since 2018.



Figure 3

## Distribution of Medicare Advantage Enrollees by Plan Type, 2023

■ Employer/ union-sponsored group plans   ■ Special Needs Plans   ■ Individual plans, open for general enrollment

Employer/
union-sponsored
group
plans
18%

Special Needs
Plans
19%

Total Medicare Advantage
Enrollment, 2023 = 30.8 million

Individual
plans, open
for general
enrollment
64%

SOURCE: KFF analysis of CMS Medicare Advantage Enrollment Files, 2023.

**KFF**

**One in five (about 5.4 million) Medicare Advantage enrollees are in a group plan offered to retirees by an employer or union.**

While this is roughly the same share of total Medicare Advantage enrollment since 2010 (18%), the actual number has increased from 1.8 million in 2010 to 5.4 million in 2023 (Figure 4). With a group plan, an employer or union contracts with an insurer and Medicare pays the insurer a fixed amount per enrollee to provide benefits covered by Medicare. For example,

**App.130**

some states, such as Illinois (https://cms.illinois.gov/benefits/trail/state.html) and Pennsylvania (https://pebtf.org/Uploads/Publications/1688032911.pdf), provide health insurance benefits to their Medicare-eligible retirees exclusively through Medicare Advantage plans.



Figure 4

## Number of Beneficiaries in Employer Group or Union-Sponsored Health Plans, 2010-2023

*In millions*

NOTE: Employer group or union-sponsored health plans do not reflect arrangements where the employer provides a subsidy for retirees to use toward premiums or cost sharing for a plan purchased on an individual Medicare Advantage marketplace.
SOURCE: KFF analysis of CMS Medicare Advantage Enrollment Files, 2010-2023.

**KFF**

As with other Medicare Advantage plans, employer and union group plans may provide additional benefits and/or lower cost sharing than traditional Medicare and are eligible for bonus payments if they obtain required quality scores. The employer or union (and sometimes the retiree) may also pay an additional premium for these supplemental benefits. Group enrollees comprise a third or more of Medicare Advantage enrollees in five states: Alaska (99%), Michigan (40%), New Jersey (34%), Maryland (33%), and West Virginia (33%).

**More than 5.7 million Medicare beneficiaries are enrolled in special needs plans in 2023, double the enrollment in 2018.**

More than 5.7 million Medicare beneficiaries are enrolled in special needs plans (SNPs). SNPs restrict enrollment to specific types of beneficiaries with significant or relatively specialized care needs, or who qualify because they are eligible for both Medicare and Medicaid. Enrollment in SNPs increased by 24% between 2022 and 2023, and accounts for 19% of total Medicare Advantage enrollment in 2023.  Since 2018, SNP enrollment has doubled from 2.58 million to 5.74 million (Figure 5).

Most SNP enrollees (89%) are in plans for beneficiaries dually enrolled in both Medicare and Medicaid (D-SNPs). Another 9 percent of SNP enrollees are in plans for people with severe chronic or disabling conditions (C-SNPs) and 2 percent are in plans for beneficiaries requiring

a nursing home or institutional level of care (I-SNPs).

While D-SNPs are designed specifically for dually-eligible individuals, 1.9 million Medicare beneficiaries with Medicaid were enrolled in Medicare Advantage plans generally available to all beneficiaries (not designed specifically for this population) in 2020, while 2.9 million were in D-SNPs.



Figure 5
## Number of Beneficiaries in Special Needs Plans, 2010-2023
*In millions*

■ Dual Eligible Special Needs Plans (D-SNPs)  ■ Chronic or Disabling Conditions (C-SNPs)  ■ Institutional (I-SNPs)

NOTE: Numbers may not sum to the total due to rounding.
SOURCE: KFF analysis of CMS Medicare Advantage Enrollment Files, 2010-2023.

**KFF**

SNP enrollment varies across states. In the District of Columbia and Puerto Rico, SNPs comprise about half of all Medicare Advantage enrollees (48% in DC and 49% in PR). In 12 states, SNP enrollment accounts for at least one-fifth of Medicare Advantage enrollment (39% in MS, 31% in AR and LA, 30% in NY, 26% in FL and GA, 24% in CT, 22% in SC and AL, 21% in HI, and 20% in TX and AZ). Most (96%) C-SNP enrollees (about 446,000 people) are in plans for people with diabetes or cardiovascular conditions in 2023. Enrollment in I-SNPs has been increasing slightly, with approximately 103,000 enrollees in 2023, up from about 92,700 in 2022.

## The share of Medicare beneficiaries in Medicare Advantage plans varies by state and county

**The share of Medicare beneficiaries in Medicare Advantage plans varies across states, ranging from 2% to 60%.**

In three states (AL, HI, and MI) and Puerto Rico, 60 percent or more of all Medicare beneficiaries are enrolled in Medicare Advantage plans, and in 26 states (and Puerto Rico), Medicare Advantage enrollees account for at least half of all Medicare beneficiaries (Figure 6). In contrast, Medicare Advantage enrollment is relatively low (less than 40%) in 16 states and the District of Columbia, including four mostly rural states (SD, ND, WY, and AK) with less than 20 percent of beneficiaries enrolled in a Medicare Advantage plan. Overall, Puerto Rico has the highest Medicare Advantage penetration, with 94 percent of Medicare beneficiaries enrolled in a Medicare Advantage plan. A decade ago, the share of Medicare beneficiaries in Medicare Advantage plans did not exceed 50% in any state (other than Puerto Rico).



Figure 6

## Share of Beneficiaries Enrolled in Medicare Advantage in 2023, by State

Click on the buttons below to see enrollment data for 2013 and 2023:

2013  2023

< 20%   20%–30%   30%–40%   40%–50%   50%–60%   ≥ 60%

NOTE: Includes only Medicare beneficiaries with Part A and B coverage.
SOURCE: KFF analysis of CMS Medicare Advantage Enrollment Files and March Medicare Enrollment Dashboard, 2013 and 2023.

**KFF**

**The share of Medicare beneficiaries enrolled in Medicare Advantage varies widely across counties.**

For example, in Florida, 58% of all Medicare beneficiaries in the state are enrolled in Medicare Advantage, ranging from 20% in Monroe County (Key West) to 79% in Miami-Dade County (Figure 7). In Ohio, 54% of all Medicare beneficiaries are enrolled in Medicare Advantage, with the share ranging from 31% in Mercer County (Celina) to 67% in Stark County (Canton).

In 2023, 3 in 10 (31%) Medicare beneficiaries live in a county where at least 60 percent of all Medicare beneficiaries in that county are enrolled in Medicare Advantage plans (473 counties). That is substantially more than in 2010 when just 3 percent of the Medicare population lived in a county where 60 percent or more of Medicare beneficiaries were enrolled in a Medicare Advantage plan (83 counties). Many counties with high Medicare Advantage penetration are centered around relatively large, urban areas, such as Monroe County, NY (80%), which includes Rochester, and Allegheny County, PA (73%), which includes Pittsburgh. In contrast, 1 in 10 (10%) Medicare beneficiaries live in a county where less than a third of all Medicare beneficiaries in that county are enrolled in Medicare Advantage plans (967 counties). Counties with relatively low enrollment tend to be less populated rural areas. However, others, such Montgomery County, MD (25%) and Suffolk, NY (29%), which includes most of Long Island, are in more populous areas.

Variation in the share of eligible Medicare beneficiaries who are enrolled in a Medicare Advantage plan is likely explained by a combination of factors, including firm-level strategies to target particular geographic areas, the urbanicity of the county and state, variation in Medicare payment rates, the number and characteristics of people eligible for Medicare, health care use patterns, and the historical Medicare Advantage market penetration.

Figure 7

# Medicare Advantage Penetration, by County, 2023



< 20%    20%–30%    30%–40%    40%–50%    50%–60%    ≥ 60%

NOTE: Includes only Medicare beneficiaries with Part A and B coverage.
SOURCE: KFF analysis of CMS Medicare Advantage Enrollment Files, 2023 and March Medicare Enrollment Dashboard, 2023.

**KFF**

## Medicare Advantage enrollment is highly concentrated among a small number of firms

The average Medicare beneficiary is able to choose from Medicare Advantage plans offered by 9 firms in 2023 (https://www.kff.org/medicare/issue-brief/medicare-advantage-2023-spotlight-first-look/), and four in ten (40%) beneficiaries can choose among Medicare Advantage plans offered by 10 or more firms.

**UnitedHealthcare and Humana account for nearly half of all Medicare Advantage enrollees nationwide in 2023**

Despite most beneficiaries having access to plans operated by several different firms, Medicare Advantage enrollment is highly concentrated among a small number of firms. UnitedHealthcare, alone, accounts for 29% of all Medicare Advantage enrollment in 2023, or 8.9 million enrollees. Together, UnitedHealthcare and Humana account for nearly half (47%) of all Medicare Advantage enrollees nationwide. In nearly a third of counties (32%; or 1,013 counties), these two firms account for at least 75% of Medicare Advantage enrollment. These counties include East Baton Rouge (Baton Rouge), LA (81%), Clark County (Las Vegas), NV (79%), Travis County (Austin), FL (78%), and El Paso County (Colorado Springs), CO (77%).

BCBS affiliates (including Anthem BCBS plans) account for 14 percent of enrollment, and four firms (CVS Health, Kaiser Permanente, Centene, and Cigna) account for another 23 percent of enrollment in 2022.



Figure 8

## Medicare Advantage Enrollment by Firm or Affiliate, 2023

NOTE: All other insurers includes firms with less than 2% of total enrollment. BCBS are BlueCross and BlueShield affiliates and includes Anthem BCBS plans (Elevance). Non-BCBS Elevance plans are 2% of total enrollment.
SOURCE: KFF analysis of CMS Medicare Advantage Enrollment Files, 2023.

**KFF**

**UnitedHealthcare and Humana have consistently accounted for a relatively large share of Medicare Advantage enrollment.**

UnitedHealthcare has had the largest share of Medicare Advantage enrollment and largest growth in enrollment since 2010, increasing from 20 percent of all Medicare Advantage enrollment in 2010 to 29 percent in 2023. Humana has also had a high share of Medicare Advantage enrollment, though its share of enrollment has grown more slowly, from 16 percent in 2010 to 18 percent in 2023. BCBS plans share of enrollment has been more constant over time, but has declined moderately since 2014.

CVS Health, which purchased Aetna in 2018, has seen its share of enrollment nearly double from 6 percent in 2010 to 11 percent in 2023. Kaiser Permanente now accounts for 6 percent of total enrollment, a moderate decline as a share of total Medicare Advantage enrollment since 2010 (9%), mainly due to the growth of enrollment in plans offered by other insurers and only a modest increase in enrollment growth for Kaiser Permanente over that time. However, for those insurers that have seen declines in their overall share of enrollment, the actual number of enrollees for each insurer is larger than it was in 2010.



Figure 9

## Medicare Advantage Enrollment by Firm or Affiliate, 2010-2023

NOTE: All other insurers includes firms with less than 2% of total enrollment. BCBS are BlueCross and BlueShield affiliates and includes Anthem BCBS plans (Elevance). Non-BCBS Elevance plans are 2% of total enrollment. Percentages may not sum to 100% due to rounding.
SOURCE: KFF analysis of CMS Medicare Advantage Enrollment Files, 2010-2023.

**KFF**

**App.137**

For the seventh year in a row, enrollment in UnitedHealthcare's plans grew more than any other firm, increasing by more than 1 million beneficiaries between March 2022 and March 2023. Humana had the second largest growth in plan year enrollment, with an increase of about 512,000 beneficiaries between March 2022 and March 2023. BCBS plans had the third highest growth in plan year enrollment of 296,000 beneficiaries between March 2022 and March 2023. CVS Health had the fourth largest growth in plan enrollment with an increase of about 217,000, followed by Kaiser Permanente, increasing by about 51,000 beneficiaries between March 2022 and March 2023. However, Centene actually lost enrollees, declining by about 91,000 between March 2022 and March 2023.

Figure 10

## Medicare Advantage Enrollment by Firm or Affiliate, 2010-2023

| | March 2010 Enrollment | March 2022 Enrollment | March 2023 Enrollment | Change in Number of Enrollees from 2022 to 2023 |
|---|---|---|---|---|
| UnitedHealthcare | 2,149,961 | 7,903,784 | 8,942,883 | 1,039,099 |
| Humana | 1,750,602 | 5,033,104 | 5,545,949 | 512,845 |
| BCBS plans | 1,648,307 | 4,053,286 | 4,350,123 | 296,837 |
| CVS Health | 624,208 | 3,105,056 | 3,322,716 | 217,660 |
| Kaiser Permanente | 953,300 | 1,796,616 | 1,847,966 | 51,350 |
| Cigna | 322,979 | 550,136 | 573,058 | 22,922 |
| Centene | 683,848 | 1,373,712 | 1,282,631 | −91,081 |
| All other insurers | 2,621,701 | 4,597,203 | 4,887,976 | 290,773 |

NOTE: All other insurers includes firms with less than 2% of total enrollment. BCBS are BlueCross and BlueShield affiliates and includes Anthem BCBS plans (Elevance). Non-BCBS Elevance plans are 2% of total enrollment.
SOURCE: KFF analysis of CMS Medicare Advantage Enrollment Files, 2010-2023.

**KFF**

## Discussion

Medicare Advantage enrollment has increased steadily in recent years, with half (51%) of all eligible Medicare beneficiaries enrolled in Medicare Advantage plans in 2023. The share of Medicare beneficiaries enrolled in Medicare Advantage varies widely across counties. Three in ten Medicare beneficiaries live in a county where at least 60 percent of all Medicare beneficiaries are enrolled in Medicare Advantage plans. In contrast, 1 in 10 live in a county

where less than a third of all Medicare beneficiaries are enrolled in Medicare Advantage plans. Enrollment continues to be highly concentrated among a handful of firms, both nationally and in local markets, with UnitedHealthcare and Humana together accounting for 47 percent of enrollment in 2023 nationwide.

As Medicare Advantage takes on a more dominant presence in the Medicare program, and with current payments (https://www.medpac.gov/wp-content/uploads/2023/03/Ch11_Mar23_MedPAC_Report_To_Congress_SEC.pdf) to plans higher (https://www.kff.org/medicare/issue-brief/higher-and-faster-growing-spending-per-medicare-advantage-enrollee-adds-to-medicares-solvency-and-affordability-challenges/) for Medicare Advantage than for traditional Medicare for similar beneficiaries, it will become increasingly relevant to assess how well Medicare's current payment methodology for Medicare Advantage is working to enhance efficiency and hold down beneficiary costs and Medicare spending. Additional considerations include monitoring how well beneficiaries are being served in both Medicare Advantage and traditional Medicare, in terms of costs, benefits, quality of care, patient outcomes, and access to providers, with particular attention to those with the greatest needs. While there is a growing body of research (https://www.kff.org/medicare/report/beneficiary-experience-affordability-utilization-and-quality-in-medicare-advantage-and-traditional-medicare-a-review-of-the-literature/) comparing Medicare Advantage and traditional Medicare, gaps (https://www.kff.org/medicare/issue-brief/gaps-in-medicare-advantage-data-limit-transparency-in-plan-performance-for-policymakers-and-beneficiaries) in Medicare Advantage data limit the ability to evaluate whether higher spending is leading to better value for enrollees and taxpayers, better outcomes or reduced disparities.

Nancy Ochieng, Jeannie Fuglesten Biniek, Meredith Freed, and Tricia Neuman are with KFF. Anthony Damico is an independent consultant

## Methods

This analysis uses data from the Centers for Medicare & Medicaid Services (CMS) Medicare Advantage Enrollment, Benefit and Landscape files for the respective year. KFF uses the Medicare Enrollment Dashboard for enrollment data, from March of each year. Trend analysis begins at 2007 because that was the earliest year of data that was based on March enrollment.

KFF calculates the share of *eligible* Medicare beneficiaries enrolled in Medicare Advantage, meaning they must have both Part A and B coverage. The share of enrollees in Medicare Advantage would be somewhat smaller if based on the total Medicare population that includes 5.7 million beneficiaries with Part A only or Part B only (in 2023) who are not generally eligible to enroll in a Medicare Advantage plan.

In previous years, KFF calculated the share of Medicare beneficiaries enrolled in Medicare Advantage by including Medicare beneficiaries with either Part A and/or B coverage. We modified our approach in 2022 to estimate the share enrolled among beneficiaries eligible for Medicare Advantage who have both Medicare Part A and Medicare B. In the past, the number of beneficiaries enrolled in Medicare Advantage was smaller and therefore the difference between the share enrolled with Part A and/or B vs Part A and B was also smaller. For example, in 2010, 24% of all Medicare enrollees were in enrolled in Medicare Advantage versus 25% with just Parts A and B. However, these shares have diverged over time: in 2023, 48% of all Medicare enrollees were in enrolled in Medicare Advantage versus 51% with just Parts A and B. These changes are reflected in all data displayed trending back to 2010.

Additionally, in previous years, KFF had used the term Medicare Advantage to refer to Medicare Advantage plans as well as other types of private plans, including cost plans, PACE plans, and HCPPs. However, cost plans, PACE plans, and HCPPs are now excluded from this analysis in addition to MMPs. In this analysis, KFF excludes these other plans as some may have different enrollment requirements than Medicare Advantage plans (e.g., may be available to beneficiaries with only Part B coverage) and in some cases, may be paid differently than Medicare Advantage plans. These exclusions are reflected in all data displayed trending back to 2010.

Medicare projections for 2023-2023 are from the May Congressional Budget Office (CBO) Medicare Baseline for 2023. According to the CBO baseline, Medicare enrollment is based on individuals who are enrolled in Part B, which is designed to include only individuals who are eligible for Medicare Advantage and exclude those who only have Part A only (~5 million people in 2023) and cannot enroll in Medicare Advantage. However, it may include some individuals who have Part B only and also are not eligible for Medicare Advantage.

Enrollment counts in publications by firms operating in the Medicare Advantage market, such as company financial statements, might differ from KFF estimates due to inclusion or exclusion of certain plan types, such as SNPs or employer group health plans.

**GET THE LATEST ON HEALTH POLICY**

Sign Up For Email Alerts

Enter email address...

**SIGN UP** ›

**KFF**

© 2024 KFF

Powered by WordPress VIP

 CITATIONS AND REPRINTS   PRIVACY POLICY

KFF Headquarters: 185 Berry St., Suite 2000, San Francisco, CA 94107 | Phone 650-854-9400

Washington Offices and Barbara Jordan Conference Center: 1330 G Street, NW, Washington, DC 20005 | Phone 202-347-5270

www.kff.org | Email Alerts: kff.org/email | facebook.com/KFF | twitter.com/kff

*The independent source for health policy research, polling, and news,* KFF *is a nonprofit organization based in San Francisco, California.*

# EXHIBIT 7



**☰ MENU**



Center for
**Medicare Advocacy**
Advancing Access to Medicare and Health Care

Search this website 🔍

# Medicare Enrollment Numbers

JUNE 29, 2023



The Centers for Medicare & Medicaid Services (CMS) released the latest enrollment figures for Medicare on January 5th. As of March 2023, 65,748,297 people are enrolled in Medicare, an increase of almost 100,000 since the last report in September. Of those:

- 33,948,778 are enrolled in Original Medicare.
- 31,799,519 are enrolled in Medicare Advantage or other health plans. This includes enrollment in Medicare Advantage plans with and without prescription drug coverage.
- 51,591,776 are enrolled in Medicare Part D. This includes enrollment in stand-alone prescription drug plans as well as Medicare Advantage plans that offer prescription drug coverage. (Enrollment in private, for-profit Part D or MA-PD plans remains the only option for drug coverage in the Medicare program).

You can see the enrollment figures for CMS programs at
https://data.cms.gov/summary-statistics-on-beneficiary-enrollment/medicare-and-medicaid-reports/medicare-monthly-enrollment, including the number of Part D enrollees who receive the low-income subsidy.

---

FILED UNDER: ARTICLE

TAGGED WITH: MEDICARE ENROLLMENT, WEEKLY ALERT

---

## EASY ACCESS TO UNDERSTANDING MEDICARE

The Center for Medicare Advocacy produces a range of informative materials on Medicare-related topics.

**Sign Up for *CMA Alerts***

**Register for *Free Webinars***

> **Medicare Basics**

> **Medicare Reform**

> **CMA Alerts**

> **Fact Sheets & Issue Briefs**

> **CMA Webinars**

> **Connecticut Info & Projects**

> **Health Care Stories**

> **Se habla Español**

## JIMMO V. SEBELIUS

Medicare covers skilled care to maintain or slow decline as well as to improve.

Improvement Isn't Required. It's the law!

Read more.

## MEDICARE: BUILD BACK BETTER

By prioritizing Medicare beneficiaries and the health systems that serve them, we can avoid drastic national consequences. The Center for Medicare Advocacy proposes a five-part plan that will make Medicare a bulwark against the worsening health and economic challenges facing the American people.

Learn more.

## LATEST TWEETS

 **Center for Medicare Advocacy**  Follow  🐦 9,571  👤 5,341

⟲ Center for Medicare Advocacy Retweeted                                    

 **I AM ALS**  @iamalsorg · 21h

There are only a few days left to add a name to a flag as part of the ALS Awareness Month display in Washington, DC. Add your name or the name of a loved one by May 2nd:

💬   ⟲ 4   ♡ 7   Twitter

Load More

**STAY CONNECTED:**

Contact Us

Sitemap

Products & Services

Copyright/Privacy

© 2024 · Center for Medicare Advocacy

# EXHIBIT 8



**News Release**

# The Average Medicare Beneficiary Has a Choice of 43 Medicare Advantage Plans and 24 Part D Stand-Alone Plans for Coverage in 2023

Nov 10, 2022

---

**Contacts**

---

Chris Lee
KFF

---

For 2023, the typical beneficiary has a choice of 43 Medicare Advantage plans as an alternative to traditional Medicare, a new KFF analysis finds. That's an increase of 5 plans on average from 2022, adding even more choices to the Medicare Advantage marketplace, which is poised to become the dominant way Medicare beneficiaries get their health coverage and care.

In addition, the typical beneficiary has a choice of 24 Medicare Part D stand-alone prescription drug plans for 2023, a second KFF analysis finds, one more than in 2022.

These findings are featured in two briefs released by KFF today that provide an overview of the Medicare Advantage and Medicare Part D marketplace for 2023, including the latest data and key trends. Medicare's open enrollment period began Oct. 15 and runs through Dec. 7.

**Medicare Advantage**

More than 28 million Medicare beneficiaries – 48 percent of all eligible beneficiaries – are enrolled in Medicare Advantage plans, which are mostly HMOs and PPOs offered by private insurers. Enrollment is projected to cross the 50 percent threshold as soon as next year.

For 2023, a typical beneficiary has 43 Medicare Advantage plans to choose from in their local market, including 35 plans that offer Part D drug coverage. In total, 3,998 Medicare Advantage plans will be

available across the country.



The average Medicare beneficiary can choose from plans offered by nine firms in 2023, the same number as in 2022. Even so, Medicare Advantage enrollment is concentrated in plans operated by UnitedHealthcare and Humana, which together account for 46 percent of Medicare Advantage enrollment in 2022.

Two thirds (66%) of Medicare Advantage plans do not charge an additional premium beyond Medicare's standard Part B premium, up from 59 percent in 2022. In 2023, nearly all plans (97% or more) offer some vision, fitness, telehealth, hearing, or dental benefits, though the scope of coverage for these services varies.

**Part D**

The average Medicare beneficiary has a choice of 24 stand-alone Part D drug plans for 2023, one more than in 2022. The total number of Medicare Part D stand-alone prescription drug plans that will be offered in 2023 is rising by 5 percent to 801 plans. Fifteen firms offer the plans, the lowest number in any year since Part D started.

The estimated average monthly premium for Medicare Part D stand-alone drug plans is projected to be $43 in 2023, based on current enrollment, a 10 percent increase from $39 in 2022. This rate of

increase outpaces both inflation and the Social Security cost-of-living adjustment for 2023. In the stand-alone drug plan market, more than 8 out of 10 enrollees next year are projected to be in stand-alone plans operated by just four firms: CVS Health, Centene, UnitedHealth, and Humana.

Average monthly premiums for the 16 national stand-alone drug plans available in 2023 are projected to range from $6 to $111. Premiums are rising for 12 of the 16 plans, including four plans with increases exceeding $10.



**Average Monthly Premiums for the 16 National Part D Stand-alone Drug Plans in 2023 Are Projected to Range from a High of $111 Down to $6**

| Plan | Premium |
| --- | --- |
| AARP MedicareRx Preferred | $111 |
| Humana Premier Rx Plan | $83 |
| SilverScript Plus | $75 |
| Wellcare Medicare Rx Value Plus | $71 |
| Cigna Extra Rx | $63 |
| Elixir RxSecure | $46 |
| *National PDP average\** | $43 |
| AARP MedicareRx Saver Plus | $41 |
| Humana Basic Rx Plan | $40 |
| Humana Walmart Value Rx Plan | $33 |
| Cigna Secure Rx | $33 |
| SilverScript Choice | $33 |
| Wellcare Classic | $32 |
| AARP MedicareRx Walgreens | $30 |
| Cigna Saver Rx | $13 |
| Wellcare Value Script | $10 |
| SilverScript SmartSaver | $6 |

NOTE: PDP is prescription drug plan. Estimates are weighted by June 2022 enrollment; assume current PDP enrollees remain in their same plan; and make no assumptions about plan choices by new enrollees for 2022. *National average includes premiums for basic and enhanced PDPs.
SOURCE: KFF analysis of Centers for Medicare & Medicaid Services 2022-2023 Part D plan files.

**KFF**

**Inflation Reduction Act**

Beginning in 2023, under a provision in the Inflation Reduction Act (IRA), Part D enrollees will pay no more than $35 per month for covered insulin products in all Part D plans, and will pay no cost sharing for adult vaccines covered under Part D. Also, beginning in 2023, drug manufacturers will be required to pay rebates for drug prices that rise faster than the rate of inflation, which could help to dampen cost increases for Part D enrollees.

The new law also caps enrollees' out-of-pocket drug spending under Part D, as of 2024, and requires Medicare to negotiate prices for some drugs, with negotiated prices first available for some Part D

drugs in 2026. A recent KFF explainer summarizes these and other prescription drug provisions in the Inflation Reduction Act.

In addition to these two new Medicare Advantage and Part D analyses, KFF has updated its collection of frequently asked questions about Medicare Open Enrollment to help beneficiaries understand their options during the annual open enrollment period. Our updated overview of Part D has more information about Medicare's prescription drug benefit in 2023 and the IRA changes over time. Recent KFF analyses show that a relatively small share of Medicare beneficiaries compared plan options or switched plans during a recent open enrollment period.

**GET THE LATEST ON HEALTH POLICY**

Sign Up For Email Alerts

Enter email address...

SIGN UP ›

# KFF

© 2024 KFF

Powered by WordPress VIP

  CITATIONS AND REPRINTS   PRIVACY POLICY

KFF Headquarters: 185 Berry St., Suite 2000, San Francisco, CA 94107 | Phone 650-854-9400

Washington Offices and Barbara Jordan Conference Center: 1330 G Street, NW, Washington, DC 20005 | Phone 202-347-5270

www.kff.org | Email Alerts: kff.org/email | facebook.com/KFF | twitter.com/kff

**The independent source for health policy research, polling, and news,** KFF is a nonprofit organization based in San Francisco, California.

# EXHIBIT 9



# Medicare Open Enrollment

## When's the Medicare Open Enrollment Period?

Every year, Medicare's open enrollment period is **October 15 - December 7**.

## What's the Medicare Open Enrollment Period?

Medicare health and drug plans can make changes each year — things like cost, coverage, and what providers and pharmacies are in their networks. October 15 to December 7 is when all people with Medicare can change their Medicare health plans and prescription drug coverage for the following year to better meet their needs.

## How do people know if they need to change plans?

People in a Medicare health or prescription drug plan should always review the materials their plans send them, like the "Evidence of Coverage" (EOC) and "Annual Notice of Change" (ANOC). If their plans are changing, they should make sure their plans will still meet their needs for the following year. If they're satisfied that their current plans will meet their needs for next year and it's still being offered, they don't need to do anything.

## When can people get information about next year's Medicare plans?

Information for next year's plans will be available beginning in October.

## Where can people find Medicare plan information or compare plans?

1-800-MEDICARE or Medicare.gov.

## Where can CMS partners find information to help people with Medicare with open enrollment?

We have outreach and media materials for English-speaking, Spanish-speaking, and other audiences that can help you to help others with Medicare open enrollment.

Page Last Modified:  09/06/2023 04:57 PM
Help with File Formats and Plug-Ins

      

A federal government website managed and paid for by the U.S. Centers for Medicare & Medicaid Services.

7500 Security Boulevard, Baltimore, MD 21244

# EXHIBIT 10

≡   ⟵ **CMS**.gov   🔍

Newsroom

<span style="background-color: yellow">**Press Releases**</span>

# Biden-Harris Administration Prepares to Kick Off Medicare Open Enrollment and Releases 2024 Medicare Advantage and Part D Star Ratings

Oct 13, 2023     Medicare Part D

Share   f   t   in   🖶

Today, the Centers for Medicare & Medicaid Services (CMS) released the 2024 Star Ratings for Medicare Advantage (Medicare Part C) and Medicare Part D to help people with Medicare compare health and prescription drug plans ahead of Medicare Open Enrollment, which kicks off on October 15.

Thanks to the President's lower cost prescription drug law, people with Medicare Part D prescription drug coverage will continue to have improved and more affordable benefits in 2024, including a $35 cost-sharing limit on a month's supply of each covered insulin product, recommended adult vaccines at no cost, and additional savings on their Medicare Part D drug coverage costs. These savings include the expansion of the Low-Income Subsidy (LIS) program, also called Extra Help, which helps eligible enrollees afford their premiums and cost-sharing, and no cost sharing in the catastrophic phase of the Part D benefit for millions of people with very high drug expenses who reach the catastrophic phase. People who use an insulin pump that's covered under Medicare Part B's durable medical equipment benefit, or who get their covered insulin through a Medicare Advantage Plan, will also continue to have their insulin costs capped at $35 for a one-month supply of insulin.

Feedback

The Star Ratings for Medicare Advantage and Medicare Part D prescription drug plans are released annually and reflect the experiences of people enrolled in Medicare Advantage and Part D prescription drug plans. Plans are rated on a one-to-five scale, with one star representing poor performance and five stars representing the highest level of performance. The Star Ratings system supports CMS' efforts to empower people to make health care decisions that are best for them.

"The Medicare Advantage and Part D Star Ratings are important tools to help people find the right option for their needs and circumstances, and make informed health care decisions," said CMS Administrator Chiquita Brooks-LaSure. "CMS encourages people with Medicare to review their coverage options. As Medicare Open Enrollment approaches, many people with Medicare can expect to see improved benefits and lower prescription drug costs because of the historic Inflation Reduction Act."

People with Medicare can compare quality through the Star Ratings, along with other information, such as cost and coverage, on the online Medicare Plan Finder tool available on Medicare.gov. Approximately 74% of people currently in Medicare Advantage plans that offer prescription drug coverage are enrolled in a plan that earned four or more stars in 2024.

Approximately 42% of Medicare Advantage plans that offer prescription drug coverage will have an overall rating of four stars or higher in 2024.

For more information on the 2024 Medicare Advantage and Part D Star Ratings, including a fact sheet, please visit: http://go.cms.gov/partcanddstarratings.

**Medicare is Here to Help with Open Enrollment**

Medicare Open Enrollment begins October 15, 2023, and ends December 7, 2023, with coverage changes taking effect January 1, 2024. During this time, people with Medicare can compare coverage options, like Traditional Medicare and Medicare Advantage, and choose health and drug plans for 2024. Medicare Advantage and Part D plan costs and covered benefits can change from year to year, so people with Medicare should look at their coverage choices and decide on the options that best meet their health needs.

Since 2021, CMS has introduced a number of enhancements to Medicare.gov to optimize customer experience and create a more

welcoming and user-friendly experience. Improvements include a redesigned Medicare.gov home page, the addition of pricing details to the Medigap policy comparison, streamlined information on the Medicare Plan Finder, and a redesigned "Talk to Someone" section to find additional help and contacts.

Here are four ways people with Medicare can compare plans and look at savings options:

1. Go to Medicare.gov to learn the difference between Traditional Medicare and Medicare Advantage, and do side-by-side comparisons of costs and coverage for Medicare Advantage and prescription drug plans.
2. Call 1-800-MEDICARE. Help is available 24 hours a day, including weekends.
3. Access personalized health insurance counseling at no cost, available from State Health Insurance Assistance Programs (SHIP). Visit shiphelp.org or call 1-800-MEDICARE for each SHIP's phone number. Many SHIPs also offer virtual counseling.
4. Check eligibility for the Medicare Savings Programs and the Part D Low-Income Subsidy Program. If you have limited income and resources, you could qualify for Medicare Savings Programs, run by your state Medicaid program, or for the Part D Low-Income Subsidy Program. These programs could help save you money on health and prescription drug costs and could reduce your Part B premium and/or Part D premium to $0. For more information, contact your state Medicaid program or call 1-800-MEDICARE and ask about Medicare Savings Programs. To learn more about the Part D Low-Income Subsidy Program, visit: Medicare.gov/extrahelp or call 1-800-MEDICARE (1-800-633-4227).

###

Feedback

← Previous Newsroom article          Next Newsroom article →

**Related Releases**

Biden-Harris Administration Finalizes Rule Expanding Access to Care and Increasing Protections for People with Medicare Advantage and Medicare Part D

Apr 04, 2024

CMS Finalizes Payment Updates for 2025 Medicare Advantage and Medicare Part D Programs

Apr 01, 2024

Biden-Harris Administration Issues Final Guidance to Help People with Medicare Prescription Drug Coverage Manage Prescription Drug Costs

Feb 29, 2024

CMS Issues Additional Guidance on Program to Allow People with Medicare to Pay Out-of-Pocket Prescription Drug Costs in Monthly Payments

Feb 15, 2024

CMS Releases Proposed Payment Updates for 2025 Medicare Advantage and Part D Programs

Jan 31, 2024

Feedback

**Contact us**

CMS News and Media Group
Catherine Howden, Director

Media Inquiries Form
202-690-6145

# Get email updates

Sign up to get the latest information about your choice of CMS topics in your inbox. Also, you can decide how often you want to get updates.

**App.159**

SIGN UP

 

A federal government website managed and paid for by the U.S. Centers for Medicare & Medicaid Services.

7500 Security Boulevard, Baltimore, MD 21244

  

Feedback

# EXHIBIT 11

AREA OF FOCUS
Improving Health Care Quality

FEBRUARY 28, 2023

# The Challenges of Choosing Medicare Coverage: Views from Insurance Brokers and Agents



TOPLINES
_____

Many Medicare beneficiaries lack objective information about the trade-offs of different coverage options, relying instead on advice from insurance brokers and marketing claims

Most insurance brokers and agents advising Medicare beneficiaries say they earn much higher commissions for enrolling people in Medicare Advantage plans versus Medigap supplemental policies, with some variation

AUTHORS
_____

**Faith Leonard, Gretchen Jacobson, Michael Perry, Sean Dryden, Naomi Mulligan Kolb**

Agent Commissions in Medicare and the Impact on Beneficiary Choice

How Agents Influence Medicare Beneficiaries' Plan Choices

Traditional Medicare or Medicare Advantage: How Older Americans Choose and Why

Taking Stock of Medicare Advantage: Choice

# Medicare beneficiaries must weigh several trade-offs when deciding among their coverage options, whether they choose a private Medicare Advantage plan or traditional Medicare with supplemental coverage.

For example, Medicare Advantage plans typically provide benefits not included in traditional Medicare, such as eyeglass coverage, as well as a limit on out-of-pocket expenses for medical services. Traditional Medicare, on the other hand, allows beneficiaries to go to any doctor, hospital, or other provider that accepts Medicare, without the need for prior approval. For help in making these decisions, nearly one-third of beneficiaries age 65 and older said they turn to an insurance broker or agent.

Beneficiaries lack information, however, about how brokers and agents winnow down plan options and what role financial incentives might play in the advice they give. Given the wide use of brokers and agents and the potential impact of their guidance on beneficiaries' coverage choices, the Commonwealth Fund partnered with the public opinion research firm PerryUndem to learn their perspectives on the state of coverage choices, the challenges their clients face in choosing an option, and the ways in which their financial incentives align or conflict with beneficiaries' interests. In September 2022, PerryUndem held four focus groups with more than two dozen brokers and agents who sell Medicare Advantage plans, Medigap supplemental coverage plans, and Part D prescription drug plans. The participants were diverse with respect to age, gender, race, and ethnicity; the states in which they operated; and the number of years they had been selling Medicare private plans. (For focus group details, see "How We Conducted This Study.") Below we present key themes and findings from the focus group discussions.

Highlights

- In general, most brokers and agents in the focus groups recalled receiving higher commissions — sometimes much higher — for enrolling people in Medicare Advantage plans compared to Medigap supplemental plans for traditional Medicare, with some variation by geographic region and new enrollments versus renewals.

- Brokers and agents said they tend to sell the combination of traditional Medicare with a Medigap policy to beneficiaries with higher incomes, and Medicare Advantage plans to those with lower incomes.

- Most brokers and agents said they personally would choose traditional Medicare with Medigap, believing that combination offers better coverage and choices than Medicare Advantage, particularly as people age.

# Focus Group Findings

## Alignment of Financial Incentives with Beneficiaries' Interests

How brokers and agents are compensated for their services varies, and can be complex. Commonly, they contract with multiple insurance carriers that pay commissions based on beneficiary enrollment in the Medicare Advantage, Medigap, or Part D plans they sell. Brokers and agents are not required to contract with all available plans in an area, nor are they required to offer all plans to beneficiaries. Beginning in 2022, brokers and agents who don't offer all plans in an area are required to disclose that fact to their clients, though they are not required to disclose what proportion of plans in the area they sell, or how their compensation differs across plans. In addition to commissions, there are often opportunities for supplemental compensation for meeting enrollment benchmarks or carrying out other activities for plans, such as beneficiary health risk assessments.

***Most brokers and agents said they are paid more to enroll people in Medicare Advantage plans than in traditional Medicare.*** With some variation by geographic region, most focus group participants said, in general, they receive higher commissions for enrolling people in Medicare Advantage plans compared to Medigap supplemental plans for traditional Medicare. One broker recalled getting paid three times more to sell a Medicare Advantage plan. Even with the commission for stand-alone prescription drug plans added to the Medigap commission, most brokers and agents said Medicare Advantage commissions were much higher. Brokers and agents also said relative commissions differ for new

enrollments versus renewals, with some reporting that the latter can be higher, and more reliable, for Medigap.

---

> "A lot of times … you're pushing an Advantage plan when someone wants a freedom of choice [of doctor], which would be a supplement plan."
>
> **California broker**

---

***According to brokers and agents, the commission structure of Medigap plans incentivizes the sale of plans charging high premiums.*** Most beneficiaries with Medigap plans choose higher-premium plans that provide comprehensive coverage, such as plans G or F. That's because they value the peace of mind knowing that nearly all of traditional Medicare's cost sharing will be covered. But for beneficiaries on a tight budget, it may make more sense to have Medigap coverage, like plans K or L, that feature high cost sharing but low premiums and limits on out-of-pocket payments.

Such lower-premium plans, however, usually provide low fees for brokers and agents, since commissions for Medigap plans are often a percentage of the plan premium. As one broker said, "If I was to [enroll in Medicare] today … I might be inclined to take a Medicare supplement — but one that I offer rarely to my clients, which is a high-deductible plan." The commission structure thus may result in some beneficiaries paying more than they need to. Moreover, some research has concluded that this comprehensive Medigap coverage also leads to higher Medicare spending.

***Commissions for stand-alone Part D plans were viewed as too low and not worth the time — creating some problems for beneficiaries.*** While the federal Centers for Medicare and Medicaid Services (CMS) sets a maximum for Part D commissions, it doesn't set a minimum, leading some brokers to believe they're not being fairly compensated. "A lot of these carriers don't compensate you at all to do a prescription drug plan now," one broker said. Low commissions don't incentivize brokers and agents to help people in traditional Medicare reevaluate their Part D plan each year, even though a plan's coverage can change from year to year.

Some brokers described clients coming to them without a Part D plan or other drug coverage, despite being on Medicare for years, because their previous broker had never enrolled them in a Part D plan. These enrollees consequently have to pay a Part D late-

enrollment penalty each month for the remainder of their years on Medicare and cannot enroll in a Part D plan until the next open enrollment period.

***Brokers and agents can earn extra income from conducting beneficiary health risk assessments during the Medicare Advantage enrollment process.*** All focus group participants who sold Medicare Advantage plans said they got paid to complete health risk assessments when their clients enrolled in a new Medicare Advantage plan. Many characterized the assessments as easy ways to earn extra money, as they take only around five minutes to complete. It's unclear if the assessment completed by brokers and agents is provided to beneficiaries' primary care physicians, or whether it informs beneficiaries' care management or helps to expedite additional resources and benefits to them.

---

> ### "Medicare Advantage plans will give you a bonus for doing a health risk assessment, and that's been going up — now 75, 100 dollars on some."
>
> **Arizona broker**

---

***Insurers commonly provide bonus payments for reaching enrollment benchmarks.*** Brokers and agents said some Medigap and Medicare Advantage insurers provide "substantial" bonus commissions when enrollment targets are met. Describing one insurer's bonus program, a focus group participant said, "I think it was 20 policies within a three-month period. That bonus was actually a hundred bucks a policy." Bonuses could create an incentive for a broker or agent to steer clients to a plan regardless of whether it's the best one for their clients.

## Selection of Medicare Coverage

With 40 or more Medicare Advantage plans, 60 Part D plans, and many Medigap plans to choose from, brokers and agents help their Medicare clients winnow down their coverage options. However, what guides this process may not be transparent to beneficiaries.

***Brokers don't sell all plans in their geographic area; they said they choose which plans to offer based on how quickly insurers answer their questions, on feedback from clients, and, sometimes, on plan benefits.*** Brokers and agents decide which plans will fill their portfolios, even if that sometimes limits their clients' options. They are not required to search a minimum number of plans or to disclose the names of the plans they search. "I work with

companies that are easy for me to work with," one broker said. According to another, "I try to keep it simple . . . I mean, you really only need to have a few companies that you're comfortable with." One study found that online broker websites provide access to about two of five Medicare Advantage plans and two of three Part D plans available in an area.

**Brokers and agents said they tend to sell the combination of traditional Medicare with a Medigap policy to higher-income people, and Medicare Advantage plans to lower-income people.** Overall, the consensus across the focus groups was that traditional Medicare with Medigap provided coverage with fewer hassles, as long as beneficiaries can afford the Medigap plan premium. There was largely agreement that "over time, [costs] tend to average out."

**Some brokers and agents said clients have trouble getting Medigap plans when trying to switch from Medicare Advantage to traditional Medicare.** According to agents and brokers, finding their clients the right coverage the first time is important because switching coverage can be hard. They cited extensive underwriting as a barrier to purchasing a Medigap plan for beneficiaries switching from Medicare Advantage during a period when they lack "guaranteed issue" rights. Beneficiaries who are older or sicker can be denied coverage or forced to pay higher rates. One broker said ads sometimes mislead clients into believing "they can just switch to a Medicare supplement anytime that they want." Another broker noted that, in his state, only one plan allows switching without underwriting. "The rest of the carriers — you have to complete five pages [of health information]." Most focus group participants said there are few options for these clients, and brokers and agents said they often enroll these beneficiaries in a Medicare Advantage PPO, which offers more provider choice.

---

> "I have one client right now who went from a supplement to a Medicare Advantage [plan], and now she wants to go back to the supplement. And the supplement is going to cost her more now, three years later, than it did before."

**Florida broker**

---

**All brokers and agents who have served people dually eligible for Medicare and Medicaid said they enroll them in Special Needs Plans only.** People with low incomes who have serious illnesses or disabilities are often eligible for both Medicare and Medicaid. Their coverage options include Medicare Advantage Special Needs Plans designed for dual

eligibles, known as D-SNPs, as well as other Medicare Advantage plans, traditional Medicare, PACE plans, and Medicare–Medicaid plans. All the brokers and agents we spoke with said that D-SNPs were the best option for their dually eligible clients. Highlighting the many supplemental benefits these plans offer, one broker stated that "the D-SNP covers everything" and "basically have zero out-of-pocket costs."

**Most brokers and agents personally would choose traditional Medicare and Medigap over a Medicare Advantage plan.** When asked, most said that they believe traditional Medicare, with the addition of Medigap supplemental plans, offers better health care coverage and choices, particularly as people age. One broker explained their choice, "If I ever have a medical issue, I'd want to be able to go to any physician I want." A few participants, however, thought Medicare Advantage plans would be fine for their needs.

## Reasons for Growing Enrollment in Medicare Advantage

Despite many brokers' and agents' personal preference for traditional Medicare supplemented by a Medigap plan, the share of beneficiaries choosing Medicare Advantage continues to grow. Focus group participants offered their opinions about why Medicare Advantage enrollment is growing.

**According to brokers and agents, rising Medigap premiums are driving some beneficiaries to choose Medicare Advantage.** Brokers and agents said that some beneficiaries switched from traditional Medicare to Medicare Advantage because they couldn't afford to pay the Medigap premiums. They said Medigap plan premiums have increased more in recent years than they had historically, putting them out of reach for their clients. "We used to see smaller increases coming along," said one broker who had been in business for 15 years, "but now we're starting to see bigger jumps."

---

> "They're getting these price increases year in and year out on those supplement plans. And yeah, you bet, it has definitely shifted my focus."

**Arizona broker**

---

**Some brokers and agents said that, based on relative commission rates and information from CMS, it seemed to them as if the federal government wants more people to be in Medicare Advantage.** This observation, while not made in all the focus groups, was raised by several

brokers without prompting, with some other participants expressing agreement. A few said that it was "obvious" to them that the government wants more people in Medicare Advantage plans.

***Marketing efforts have led to beneficiary confusion and helped drive enrollment in Medicare Advantage, according to brokers and agents.*** Focus group participants characterized advertising for Medicare plans as "relentless," "overwhelming," and even "misleading," particularly Medicare Advantage commercials. They said that ads led some of their clients to enroll in plans that excluded their doctors from the provider network and other clients to unknowingly change plans. "I've had clients call me up in tears not realizing that their plan had been switched," said one broker. Some brokers said that their clients are made to think certain plans or benefits are available to them that are not. Brokers and agents said Medicare plan advertising requires them to spend a lot of time resetting client expectations. In some cases, they even lose clients who don't believe them or want everything the ads promise.

---

> "[The government] is pushing us out of Medigap altogether … to Medicare Advantage, and that's going to be the way of the future."

**Tennessee broker**

---

## Discussion

In our focus groups, insurance brokers and agents spoke about misaligned incentives and about what many view as a flawed Medicare coverage selection process in need of improvement. It is unclear how, or if, brokers' and agents' individualized process of winnowing plans affects their clients' choices. They also spoke about how the higher commissions they earn for Medicare Advantage enrollment have incentivized increasing enrollment in that program — despite many having a personal preference for traditional Medicare with supplemental coverage.

Another theme we heard was that a beneficiary's income often dictates whether people enroll in traditional Medicare with a Medigap plan or in a Medicare Advantage plan. Similarly, the enrollment of all dually eligible people in D-SNPs raises questions about the other coverage options available to dually eligible people, a population with diverse and significant health needs. For example, are brokers and agents offered similar commissions and financial incentives for other coverage options that might be a better fit for certain

**App.169**

dually eligible beneficiaries? Do brokers and agents have information about the advantages and disadvantages of different coverage options for dual-eligible individuals?

Lastly, the focus groups provided more evidence that, when it comes to learning about coverage options, marketing is not a substitute for education that informs people about their options and the trade-offs inherent in different choices. As noted by a number of brokers and agents, beneficiaries are often unaware of potential underwriting from Medigap insurers, and advertising seemed to confuse and mislead beneficiaries into believing incorrect information about coverage options. More support for tools such as the Medicare.gov plan finder, which allows beneficiaries to see the totality of plans available, and for one-on-one help from the State Health Insurance Assistance Program could help to make beneficiaries more informed. As the number of plans in Medicare continues to grow, it will become ever more critical to ensure that beneficiaries have objective information about coverage options and that brokers' and agents' financial incentives are aligned with beneficiaries' best interests.

---

## HOW WE CONDUCTED THIS STUDY

PerryUndem conducted four online focus groups on September 20–21, 2022, with a total of 29 insurance brokers and agents who sell Medicare Advantage plans, Medigap supplemental coverage plans, and Part D prescription drug plans. (See the demographics table.) Each focus group included seven to eight individuals and lasted 105 minutes.

All participating brokers and agents were selling Medicare plans at the time, and they lived across the country, with many selling plans in multiple states. Some brokers and agents worked in larger agencies and some in smaller shops; others worked independently. Some also sold life insurance, annuities, and other products to their Medicare clients.

PUBLICATION DETAILS

DATE

February 28, 2023

CONTACT

Faith Leonard, Program Associate, Advancing Medicare, The Commonwealth Fund

fleonard@cmwf.org

**App.170**

CITATION

Faith Leonard et al., "The Challenges of Choosing Medicare Coverage: Views from Insurance Brokers and Agents," feature article, Commonwealth Fund, Feb. 28, 2023. **https://doi.org/10.26099/wb6n-yf79**

AREA OF FOCUS

Improving Health Care Quality

TOPICS

**Quality of Care,
Coverage and Access,
Medicare,
Medicare Advantage,
Medicare Part D,
Health Insurance Marketplace**

# EXHIBIT 12

# PART C -MEDICARE ADVANTAGE and 1876 COST PLAN EXPANSION APPLICATION

**For all new applicants and existing Medicare Advantage organizations seeking to expand a service area: Coordinated Care Plans, Private Fee-for-Service Plans, Medicare Savings Account plans, and Employer Group Waiver Plans**

**For all existing Medicare Cost Plan contractors seeking to expand the contract service area**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
### Centers for Medicare & Medicaid Services (CMS)
### Center for Medicare (CM)
### Medicare Drug and Health Plan Contract Administration Group (MCAG)

**In accordance with 42 CFR 422.4(c) and Chapter 4 section 10.15 of the MMCM, in order to offer a Medicare Advantage Coordinated Care Plan (CCPs) in an area, a Medicare Advantage organization must offer qualified Part D coverage meeting 42 CFR 423.104 in that plan or in another Medicare Advantage plan in the same area. Therefore, CCP applicants may need to submit a separate Part D application (in connection with this Part C Application) to offer Part D prescription drug benefits as a condition for approval of this application.**

<u>DISCLAIMER: CMS will only accept applications appropriately submitted through the Health Plan Management System. CMS does not accept paper applications.</u>

PUBLIC REPORTING BURDEN: According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0935 (Expires: March 31, 2026). The time required to complete this information collection is estimated to average 33 hours per response, including the time to review instructions, search existing data resources, and gather the data needed, and complete and review the information collection. If you have any comments, concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to CMS, Attn: Reports Clearance Officer, 7500 Security Boulevard, Baltimore, Maryland 21244- 1850. Expiration: March 31, 2026.

**GENERAL INFORMATION** ....................................................... **5**

1.1.  Overview ................................................................................. 5
1.2.  Types of MA Products ............................................................. 5
1.3.  Important References ............................................................... 5
1.4.  Technical Support .................................................................... 6
1.5.  The Health Plan Management System (HPMS) ........................ 6
1.6.  Submitting Notice of Intent to Apply (NOIA) ......................... 7
1.7.  Additional Information ............................................................ 8
1.8.  Due Dates for Applications – Medicare Advantage and Medicare Cost Plans. 10
1.9.  Request to Modify a Pending Application.................................. 10
1.10.  Application Determination and Appeal Rights............................ 11

**INSTRUCTIONS** ......................................................... **11**

2.1.  Overview ................................................................................. 11
2.2.  Applicants Seeking to Offer New Employer/Union-Only Group Waiver Plans (EGWPs) ............................................................................ 12
2.3.  Applicants Seeking to Offer Employer/Union Direct Contract MAO.............. 12
2.4.  Applicants Seeking to Offer Special Needs Plans (SNPs) ................. 13
2.5.  Applicants Seeking to Offer New MA D-SNP Look-Alike Plans................... 14
2.6.  Applicants Seeking to Expand Medicare Cost Plans........................ 15
2.7.  Applicants Seeking to Serve Partial Counties ............................... 14
2.8.  Types of Applications.............................................................. 14
2.9.  Chart of Required Attestations by Type of Applicant ..................... 15
2.10.  Document (Upload) Submission Instructions.................................. 17
2.11.  MA Part D (MA-PD) Prescription Drug Benefit Instructions .......... 17

**ATTESTATIONS** ................................................... **18**

3.1.  Management, Experience, and History......................................... 20
3.2.  Administrative Management ..................................................... 20
3.3.  State Licensure ...................................................................... 21
3.4.  Program Integrity ................................................................... 23
3.5.  Fiscal Soundness .................................................................... 23
3.6.  Service Area ......................................................................... 24
3.7.  CMS Provider Participation Contracts & Agreements ..................... 28
3.8.  Contracts for Administrative & Management Services..................... 28
3.9.  Quality Improvement Program ................................................. 29
3.10.  Marketing ............................................................................. 30
3.11.  Eligibility, Enrollment, and Disenrollment................................... 31
3.12.  Working Aged Membership ...................................................... 32
3.13.  Claims .................................................................................. 33
3.14.  Communications between MAO and CMS .................................... 34
3.15.  Grievances ............................................................................ 36
3.16.  Organization Determination and Appeals ..................................... 37

3.17.  Health Insurance Portability and Accountability Act of 1996 (HIPAA) and CMS
       issued guidance on 07/23/2007 and 8/28/2007; 2008 Call Letter ................... 39
3.18.  Continuation Area ............................................................................................. 40
3.19.  Part C Application Certification ........................................................................ 41
3.20.  Access to Services (PFFS) ................................................................................. 41
3.21.  Claims Processing (PFFS and MSA) ................................................................. 45
3.22.  Payment Provisions (PFFS and MSA) ............................................................... 47
3.23.  General Administration/Management (MSA) ..................................................... 49
3.24.  Past Performance ............................................................................................... 51

**Document Upload Templates** ................................................. **52**

4.1.  History/Structure/Organizational Charts ........................................................... 52
4.2.  Minimum Enrollment Waiver Request Upload Document ................................... 53
4.3.  Two Year Prohibition Waiver Request Upload Document .................................. 54
4.4.  CMS State Certification Form ............................................................................ 55
4.5.  Part C Application Certification Form ................................................................ 61

4.6.  RPPO State Licensure Table ............................................................................... 62
4.7.  RPPO State Licensure Attestation ...................................................................... 63
4.8.  Partial County Justification Template .................................................................. 64

**APPENDIX I: Solicitations for Special Needs Plan (SNP)
Application** ......................................................................... **66**

5.1.  Overview ............................................................................................................ 66
5.2.  SNP Application Types ....................................................................................... 67
5.3.  Renewal SNPs that are Not Expanding their Service Area ................................. 68
5.4.  D-SNP State Medicaid Agency(ies) Contract(s): Attestation and Uploads ......... 69
5.5.  I-SNP: Attestations and Uploads ........................................................................ 70
5.7.  MOC: Attestation and Uploads .......................................................................... 71
5.8.  Health Risk Assessment: Attestations ................................................................ 72
5.9.  SNP Quality Improvement Program: Attestations .............................................. 74
5.10.  Past Performance Attestation ............................................................................ 76
5.11.  SNP Application Attestation……………………………………………....76
5.12.  I-SNP Upload Documents………………………………………………….77
5.13.  MOC Matrix Upload Document for Initial Application and Renewal………..80

**APPENDIX II: Employer/Union-Only Group Waiver Plans
(EGWPs) MAO "800 Series"** ............................................... **97**

6.1.  Background……………………………………………………………….97
6.2.  Instructions ......................................................................................................... 97
6.3.  Request for Additional Waivers/Modification of Requirements (Optional) ..... 98
6.4.  Attestations ........................................................................................................ 99

## APPENDIX III: Employer/Union Direct Contract for MA .... 104

| 7.1. | Background | 104 |
| 7.2. | Instructions | 104 |
| 7.3. | Request for Additional Waivers/Modification of Requirements (Optional) ... 105 |
| 7.4. | Attestations | 106 |
| 7.5. | Part C Financial Solvency & Capital Adequacy Documentation For Direct Contract MAO applicants | 110 |

# 1.   GENERAL INFORMATION

## 1.1.  Overview

The Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) significantly revised the Medicare + Choice managed care program, now called the Medicare Advantage (MA) program, and added outpatient prescription drugs to Medicare, offered by either stand-alone prescription drug plan sponsors or Medicare Advantage Organizations (MAOs). The MMA changes make managed care more accessible, efficient, and attractive to beneficiaries seeking options to meet their needs. Pursuant to 42 CFR 422.4, the MA program offers several kinds of plans and health care choices, including a coordinated care plans, Medicare Savings Account (MSA) plans, or Private Fee-for-Service (PFFS) plans.

People with Medicare not only have more quality health care choices than in the past but also have more information about those choices. The Centers for Medicare & Medicaid Services (CMS) welcomes organizations that can add value to these programs, make them more accessible to Medicare beneficiaries, and meet all the contracting requirements.

## 1.2.  Types of MA Products

The MA program is comprised of a variety of product types, including:

- Coordinated Care Plans (CCPs)
  - Health Maintenance Organizations (HMOs) with or without a Point of Service (POS) benefit
  - Local Preferred Provider Organizations (LPPOs)
  - Regional Preferred Provider Organizations (RPPOs)
  - Special Needs Plans (SNPs)
- Private Fee-for-Service (PFFS) plans
- Medical Savings Account (MSA) plans
- Employer Group Waiver plans (EGWPs)

Qualifying organizations may contract with CMS to offer any of these types of products. To offer one or more of these products, an application must be submitted according to the instructions in this application.

**Note: The MMA requires that CCPs offer at least one MA plan that includes a Part D prescription drug benefit (MA Part D or MA-PD) in each county of its service area. To meet this requirement, the applicant must timely complete and submit a separate Part D application in connection with this Part C Application. PFFS plans have the option to offer the Part D drug benefit. MSA plans cannot offer the Part D drug benefit.**

## 1.3.  Important References

<u>**MA Organizations**</u>

The following are key references about the MA program:

- Social Security Act: 42 U.S.C 1395 et seq.:
  http://www.ssa.gov/OP_Home/ssact/title18/1800.htm
- Medicare Regulations: 42 CFR 422:
- https://www.ecfr.gov/current/title-42/chapter-IV/subchapter-B/part-422Medicare
  Managed Care Manual: http://www.cms.gov/Regulations-and-
  Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html
- Marketing Guidelines: http://www.cms.gov/ManagedCareMarketing/

## Medicare Cost Plans

Information requested in this application is based on Section 1876 of the Social Security Act (SSA) and the applicable regulations of Title XIII of the Public Health Services Act.

The following are key references about the Medicare cost plans:

- SSA: 42 U.S.C. 1395mm: http://www.ssa.gov/OP_Home/ssact/title18/1876.htm
- Medicare Regulations: 42 CFR 417: https://www.ecfr.gov/current/title-42/chapter-
  IV/subchapter-B/part-417Centers for Medicare & Medicaid Services (CMS) Web site:
  http://www.cms.gov/MedicareCostPlans/

### 1.4.   Technical Support

CMS conducts special training sessions and user group calls for new applicants and existing contractors. All applicants are strongly encouraged to participate in these sessions, which are announced via the HPMS (see section 1.5 below) and/or the CMS main website.

CMS Central Office (CO) staff and Regional Office (RO) staff are available to provide technical support to all applicants during the application process. While preparing the application, applicants may submit an inquiry by going to https://dmao.lmi.org/ and clicking on the MA Applications tab.  Please note: this is a webpage, not an email address. Below is a list of CMS RO contacts (This information is also available at: https://www.cms.gov/RegionalOffices/).

### 1.5.   The Health Plan Management System (HPMS)

HPMS is the primary information collection vehicle through which MAOs and Medicare Cost Plan contractors will communicate with CMS during the application process, bid submission process, ongoing operations of the MA program or Medicare Cost Plan contracts, reporting and oversight activities.

Applicants are required to enter contact and other information collected in HPMS in order to facilitate the application review process. Applicants must promptly enter organizational data into HPMS and keep the information up to date. These requirements ensure that CMS has

current information and is able to provide guidance to the appropriate contacts within the organization. In the event that an applicant is awarded a contract, this information will also be used for frequent communications during contract implementation. Therefore, it is important that this information be accurate at all times.  Please note that it is CMS' expectation that the MA and Medicare Cost Plan Application Contact is a direct employee of the applicant.

HPMS is also the vehicle used to disseminate CMS guidance to MAOs and Medicare Cost Plan contractors. This information is then incorporated into the appropriate manuals. It is imperative for MAOs and Medicare Cost Plan contractors to independently check HPMS memos and follow the guidance as indicated in the memos.

### 1.6.   Submitting Notice of Intent to Apply (NOIA)

**<u>MA applicants</u>**

Organizations interested in offering a new MA product, expanding the service area of an existing MA product, or submitting a PFFS network transition application must complete a nonbinding NOIA. CMS will not accept applications from organizations that fail to submit a timely NOIA. Upon submitting the completed form to CMS, the organization will be assigned a pending contract number (H number) to use throughout the application and subsequent operational processes.

Once a contract number is assigned, the applicant should request a CMS User ID. An application for Access to CMS Computer Systems (for HPMS access) is required and can be found at: <u>https://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/HPMS/UserIDProcess.html</u>. Upon approval of the CMS User ID request, the applicant will receive a CMS User ID(s) and password(s) for HPMS access. Existing MAOs requesting service area expansions do not need to apply for a new contract number.

**<u>Medicare Cost Plans</u>**

No initial or new 1876 Cost Plan applications can be accepted by CMS during this application cycle. CMS will accept applications to expand service areas of existing 1876 Cost Plans for CY 2025 in accordance with 42 CFR 417.402. During the CMS review of these applications, the most current data will be employed to apply the Cost Plan Competition Requirements with regard to this type of application. CMS will make a determination whether an application of this type cannot be processed during this application cycle to the extent that the expansion application is for a requested service area or portions of a service area in which at least two competing Medicare Advantage local coordinated care plans or two Medicare Advantage Regional PPO coordinated care plans meeting specified enrollment thresholds are available.  If this is the case, the applicant will be informed and the application withdrawn from further processing and review.

Existing Cost contractors requesting service area expansions should not apply for a new Cost contract number.

### 1.7.   Additional Information

### 1.7.1.      Bid Submission and Training

On or before the first Monday of June of every year, all MAOs and Medicare Cost Plan contractors offering Part D* must submit a bid, comprised of the proper benefits and pricing for each MA plan for the upcoming year based on their determination of expected revenue needs. Each bid will have three components: original Medicare benefits (A/B); prescription drugs under Part D (if offered under the plan); and supplemental benefits. Bids must also reflect the amount of enrollee cost sharing. CMS will review bids and request additional information if needed.  MAOs and Medicare Cost Plan contractors must submit the benefit plan or plans they intend to offer under the bids submitted. No bid submission is needed at the time the application is due. Further instructions and time frames for bid submissions are provided at:
http://www.cms.gov/MedicareAdvtgSpecRateStats/01_Overview.asp#TopOfPage

In order to prepare plan bids, applicants will use HPMS to define their plan structures and associated plan service areas, and then download the Plan Benefit Package (PBP) and Bid Pricing Tool (BPT) software. For each plan being offered, applicants will use the PBP software to describe the detailed structure of their MA or Medicare Cost Plan benefit and the BPT software to define their bid pricing information.

Once the PBP and BPT software requirements have been completed for each plan being offered, applicants will upload their bids into HPMS. Applicants will be able to submit bid uploads via HPMS on their PBP or BPT one or more times between May and the CY bid deadline, which is the first Monday in June each year. CMS will use the last successful upload received for each plan as the official bid submission.

CMS will provide technical instructions and guidance upon release of HPMS bid functionality as well as the PBP and BPT software. In addition, systems training will be available at the Bid Training in spring 2024.

* Medicare Cost contractors are not required to offer Part D coverage but may elect to do so. A cost contractor that elects to offer Part D coverage is required to submit a Bid.

### 1.7.2.   System and Data Transmission Testing

All MAOs and Medicare Cost Plan contractors must submit information about their membership to CMS electronically and have the capability to download files or receive electronic information directly. Prior to the approval of a contract, MAOs must contact the MA Help Desk at 1-800-927-8069 for specific guidance on establishing connectivity and the electronic submission of files. Instructions are also on the MA Help Desk web page, https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/mapdhelpdesk/index.html. The MA Help Desk is the primary contact for all issues related to the physical submission of transaction files to CMS.

### 1.7.3.  Protecting Confidential Information

Applicants may seek to protect their information from disclosure under the Freedom of Information Act (FOIA) by claiming that FOIA Exemption 4 applies. The applicant is required to label the information in question "confidential" or "proprietary" and explain the applicability of the FOIA exemption it is claiming. When there is a request for information that is designated by the applicant as confidential or that could reasonably be considered exempt under FOIA Exemption 4, CMS is required by its FOIA regulation at 45 CFR 5.65(d) and by Executive Order 12600 to give the submitter notice before the information is disclosed. To decide whether the applicant's information is protected by Exemption 4, CMS must determine whether the applicant has shown that: (1) disclosure of the information might impair the government's ability to obtain necessary information in the future; (2) disclosure of the information would cause substantial harm to the competitive position of the submitter; (3) disclosure would impair other government interests, such as program effectiveness and compliance; or (4) disclosure would impair other private interests, such as an interest in controlling availability of intrinsically valuable records, which are sold in the market place. Consistent with our approach under other Medicare programs, CMS would not release information that would be considered proprietary in nature if the applicant has shown it meets the requirements for FOIA Exemption 4.

### 1.7.4.  Payment Information Form

Please complete the Payment Information form that is located at:
http://www.cms.gov/MedicareAdvantageApps/Downloads/pmtform.pdf.
The document contains financial institution information and Medicare contractor data.

Please submit the fully completed Payment Information form and the following documents to CMS:

- Copy of a voided check or a letter from bank confirming the routing and account information.
- W-9 Form.

The completed Payment Information Form and supporting documentation must be emailed to DPO_PAYMENT_ADMINISTRATOR@cms.hhs.gov by the date the completed applications are due to CMS.  The subject line of the email should be "Payment Information Form for [insert contract number]", and the plan should specify the effective date (month and year) in the body of the email.

If the applicant has questions about this form, please contact Louise Matthews at (410) 786-6903.

**1.8.  Due Dates for Applications – Medicare Advantage and Medicare Cost Plans**

Applications must be submitted by February 14, 2024. CMS will not review applications received after this date and time. Applicant's access to application fields within HPMS will be blocked after this date and time.

Below is a tentative timeline for the Part C (MA program) and Medicare Cost Plan application review process:

**APPLICATION AND BID REVIEW PROCESS\***

| Date | Milestone |
|---|---|
| November 11, 2023 | Recommended date by which applicants should submit their Notice of Intent to Apply Form to CMS to ensure access to Health Plan Management System (HPMS) by the date applications are released. |
| December 1, 2023 | CMS User ID form due to CMS |
| January 10, 2024 | Final Applications Posted by CMS |
| January 19, 2024 | Deadline for NOIA form submission to CMS |
| February 14, 2024 | Completed Applications due to CMS |
| April 2024 | Plan Creation module, Plan Benefit Package (PBP), and Bid Pricing Tool (BPT) available on HPMS. |
| April 2024 | PBP/BPT Upload Module available in HPMS |
| May 2024 | Release of CY 2025 Formulary Submission Module. |
| June 3, 2024 | Bids due to CMS. |
| Late August 2024 | CMS completes review and approval of bid data. |
| September 2024 | CMS executes MA and MA-PD contracts with organizations whose bids are approved and who otherwise meet CMS requirements. |
| Mid-October 2024 | Annual Coordinated Election Period begins for CY 2025 plans. |

**\* Note: All dates listed above are subject to change.**

**1.9.  Request to Modify a Pending Application**

Applicants seeking to withdraw or reduce the service area of a pending application (i.e., one being reviewed by CMS) must submit a written request to CMS on the organization's letterhead and signed by an authorized corporate official.  The following information must be included in the request:

- Applicant Organization's Legal Entity Name

- Full and Correct Address and Point of Contact information for follow-up, if necessary
- Contract Number (H#)
- Reason for withdrawal
- Exact Description of the Nature of the Withdrawal, for example:
  - o Withdrawal from individual Medicare market counties (keeping Medicare employer group counties, e.g., 800 series plan(s))
  - o Withdrawal from employer group counties (keeping the individual Medicare market counties)
  - o Withdrawal of the entire application.
  - o Withdrawal of specifically named counties from both individual Medicare and employer group markets

Applicants shall submit the request in PDF format to https://dmao.lmi.org/ under the MA Applications tab. *Please note: this is a webpage, not an email address.* Applicants should also send a copy of the letter via e-mail to the Regional Office Account Manager.

**1.10. Application Determination and Appeal Rights**

<u>**All applicants**</u>

If CMS determines that the applicant is not qualified and denies this application, the applicant has the right to appeal this determination through a hearing before a CMS Hearing Officer. Administrative appeals of MA and Cost Plan application denials are governed by 42 CFR 422, Subpart N. The request for a hearing must be in writing, signed by an authorized official of the applicant organization, and received by CMS within **15 calendar** days from the date CMS notifies the MAO of its determination (see 42 CFR 422.662.) If the 15th day falls on a weekend or federal holiday, the applicant has until the next regular business day to submit its request.

The appealing organization must receive a favorable determination resulting from the hearing or review as specified under Part 422, Subpart N prior to September 1, 2024 (tentative date) in order to qualify for a Medicare contract to begin January 1, 2025.

# 2.   INSTRUCTIONS

## 2.1. Overview

Applicants must complete the 2025 MA or Medicare Cost Plan Service Area Expansion application within HPMS as instructed. CMS will only accept submissions using this current 2025 version of the MA/Cost Plan application. All uploaded documentation must contain the appropriate CMS-issued contract number.

In preparing a response to the prompts throughout this application, the applicant must attest "Yes" or "No." In some instances, applicants will have the opportunity to attest "N/A" if the attestation does not apply. Applicants are also asked to provide various upload documents in

# EXHIBIT 13

July 21, 2022 | Insights & Analysis | Drug Pricing and Affordability

# 2024 Part D Bid Cycle Introduces New Considerations for Stakeholders

 Kylie Stengel     Ryan Urgo     Neil Lund

Lance Grady

## Summary

As Part D plans and manufacturers begin to prepare for the upcoming calendar year (CY) 2024 bid cycle, the evolving Part D market and policy landscape may significantly shape plan bid and formulary management strategies.

## Background

Every year, Part D plans submit bids, formularies, and benefit designs to the Centers for Medicare & Medicaid Services (CMS) for the plans they will offer enrollees for the next calendar year. The bids estimate the average cost of providing Part D benefits based on the interplay of factors such as expected plan membership (including patient demographics and conditions treated), the impact of federal subsidies (based on anticipated utilization), drug costs, manufacturer rebates, and the overall impact on net plan liability.

Part D bids, formularies, and benefit designs are due on the first Monday in June prior to the applicable coverage year; however, formulary negotiations between plans and manufacturers begin much sooner—typically late-summer or early fall in the year before the June submission deadline. For the CY 2024 bids and formularies, manufacturers and plans will be preparing for negotiations over the next

several months in anticipation of the June 2023 submission deadline.



Figure 1. Timeline for the CY 2024 Part D Contracting Cycle
Figure 1. Timeline for the CY 2024 Part D Contracting Cycle

In the current Part D bid cycle, a dynamic and uncertain legislative environment will converge with evolving Part D program trends to introduce new risks and opportunities for stakeholders as they prepare for their CY 2024 bids. In particular, 4 key trends will likely inform plan and manufacturer contracting strategies for 2024 and beyond.

## 1. Program-wide enrollment trends raise new considerations for patient access.

Overall enrollment in Medicare Advantage (MA) has grown significantly in recent years. In 2022, for the first time, a majority of Part D enrollees (52%) are enrolled in a Medicare Advantage Prescription Drug Plan (MA-PD). As recently as 2018, nearly 60% of Part D enrollment was in standalone Prescription Drug Plans (PDPs). Additionally, enrollment patterns have shifted notably among individuals receiving the Low-Income Subsidy (LIS). In 2013, 75% of Part D LIS enrollees were in PDPs, but in 2021 the share dropped to 47%. Similarly, enrollment in Special Needs Plans (SNPs, i.e., MA plans for certain beneficiaries based on the presence of a specific chronic condition, the setting of care, or dual-eligibility status) has grown substantially. Between 2018 and 2022, enrollment in SNPs grew by over 175% (from 2.6 million in 2018 to 4.6 million in 2022).

These enrollment trends could have distinct impacts on access to care. For example, MA plans may offer a more integrated approach across medical and pharmacy benefits but have differences in provider networks compared to traditional Medicare. Additionally, distinct program requirements, payment structures, and benefits for MA-PDs vs. standalone PDPs create differences in plan benefits

and formulary designs that impact patient access to therapies. Manufacturers should therefore consider customized contracting strategies for each Part D plan segment.

## 2. Part D policies in the Senate Finance Committee's newest drug pricing plan could increase plan liability and change the way formularies are managed in 2024 and 2025.

Key drug pricing provisions included in the most recent draft of the Build Back Better Act released by the Senate Finance Committee on July 6 would be relevant to the next 2 Part D bid cycles. Under the most recent text, Part D enrollee out-of-pocket (OOP) costs would be capped at the catastrophic threshold amount in 2024, and the low-income subsidy program would be expanded to enrollees with income up to 150% of the federal poverty level, which means the upcoming bid cycle would account for these provisions. Full Part D benefit redesign would begin in 2025, which would include an increase in plan liability in the catastrophic phase, a cap on beneficiary OOP costs at $2,000, the elimination of the coverage gap, and the creation of a new manufacturer discount throughout the benefit.

As plans consider the impact of a cap on beneficiary costs in the catastrophic phase and the likely increase in financial liability, they may reevaluate how they manage certain specialty treatments with high catastrophic-phase spending. The extent to which these changes may impact formulary management is likely to vary by therapeutic area.  Manufacturers will need to evaluate how lower beneficiary OOP costs due to these provisions may increase treatment adherence and weigh increases in adherence against other changes to formulary and benefit designs that may impact beneficiary access. Multi-year contracting initiated in the upcoming bid cycle will need to take these complexities into account. With legislative activity on drug pricing unfolding in parallel with the 2024 bid cycle, manufacturers should prepare for how plan liability and formulary management could change in response.

## 3. CMS's new pharmacy DIR policy in 2024 could create secondary effects for channel stakeholders.

In the recently finalized CY 2023 MA and Part D final rule, plans will be required to include all pharmacy price concessions in the Part D negotiated price and pass these price concessions through to beneficiaries at the point of sale beginning in 2024. Because pharmacy price concessions would no longer be included as direct and indirect remuneration (DIR) in plan bids, CMS estimated that the rule would increase premiums by $13.8 billion over the 10-year budget window (ranging from $0.89 to $2.47 each year).

The estimated premium effect may compel plan sponsors to reevaluate their approach to pharmacy reimbursement, administration fees, network strategy, and drug rebates as part of the CY 2024 bid

development process. Channel stakeholders, including pharmacies, manufacturers, and plans, should evaluate the implications of this new policy by therapeutic area and drug type to prepare for potential changes to CY 2024 formularies, plan designs, and financial liability.

## 4. Plans and manufacturers can pursue health equity priorities in the upcoming Part D bid cycle.

Improving health equity continues to be a high priority for the Biden administration, as demonstrated through recent initiatives such as the Department of Health and Human Services' Equity Action Plan and as outlined in the Center for Medicare and Medicaid Innovation's (CMMI) 10-year strategy white paper. Additionally, a recent Avalere analysis found that medication adherence in Part D is linked to race and socioeconomic factors, with differences in adherence levels among beneficiary groups by plan type, LIS status, and plan Star Ratings. Another Avalere analysis found that underrepresented groups had higher OOP costs compared to White beneficiaries.  At the same time, the Biden administration continues to be interested in ensuring health equity is addressed in the development of new models through the CMMI, which may include Part D models.

These initiatives and research highlight opportunities to improve health equity and patient access among various enrollee groups, including by beneficiary race, ethnicity, income, geography, and other social determinants of health factors. Understanding where opportunities exist to improve formulary access and adherence rates for certain beneficiary groups will be important for manufacturers when considering their 2024 contracting strategies and broader health equity goals.

As stakeholders begin to prepare for the 2024 bid cycle, being aware of the implications of these trends and environmental factors on formulary decisions and negotiations is particularly important. Understanding economic drivers for all parties will inform preparation, forecasting, and market strategy.

Avalere has deep policy and market access knowledge of the Part D landscape, expertise with Part D modeling, a proven history assisting a range of clients with analytics and research, and proprietary data sets that Avalere leverages to help clients navigate the Part D bid cycle. To learn more about how Avalere can support you in understanding impacts from recent trends and developments in Part D, connect with us.

## Methodology

Overall trends in enrollment growth between MA-PDs and PDPs were derived from an Avalere Health analysis of enrollment data released by the Centers for Medicare & Medicaid Services. Estimates of the percentage of LIS lives enrolled in MA-PDs vs. PDPs were derived from the Medicare Payment

Advisory Commission March Report to Congress. Trends in SNP enrollment growth were derived from an Avalere Health analysis of enrollment data released by the Centers for Medicare & Medicaid Services.

**Avalere Health** | An Inovalon Company | © 2024. Avalere Health LLC. All Rights Reserved.

# EXHIBIT 14

An official website of the United States Government. 🇺🇸

Regulations.gov Branding

SUPPORT

Docket  /  Document (CMS-2023-0187-0001)  /  Comment

Comment Icon  **PUBLIC SUBMISSION**

# Comment on CMS-2023-0187-0001

Posted by the **Centers for Medicare&Medicaid Services** on Dec 28, 2023

View More Comments  1.85K

View Related Comments  3.39K

Share ▾

Comment

RE: Contract Year 2025 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicare Cost Plan Program, and Programs of All-Inclusive Care for the Elderly; Health Information Technology Standards and Implementation Specifications" (CMS-4205-P).

We applaud CMS for this proposed rule and are thankful for the opportunity to submit our comment to you. We agree with most of what is proposed. The rule is good for seniors and good for the public.

FMOs ARE HELPFUL BUT NOT ESSENTIAL

National and Field Marketing Organizations (aka FMOs, IMOs, Uplines) build and coordinate networks of independent insurance agents who sell policies on behalf of insurance carriers. Unlike tele-sales brokers, they do not have agent employees. Instead, they oversee a network of independent agents who meet with clients and sell them insurance.

At their best, FMOs provide to their "downline" agents helpful sales, product, and administrative training. In practice, FMOs are paid handsomely to provide unessential and duplicative services.

Consider:

Carriers already have in place robust support, training, and compliance systems for contracted sales agents, including self-service portals, real-time chat support, and helpdesk ticketing systems.

Carriers already employ their own local broker account managers who support independent agents.

Carriers already require agents to complete their own unique, yearly training programs before they are deemed

**App.191**

"certified and appointed to represent the company."

Carriers – not FMOs – contract with and pay commissions to independent agents.

## OVERRIDES SHOULD BE LIMITED

Insurance carriers pay FMOs a recurring fee per sale – an "administrative override" – on top of the large commission already paid to the sales agent. In the case of tele-sales agencies, the agency is paid a sales commission and an override – a double dip.

Override levels vary by carrier. The more sales made in a FMO's distribution network, the higher the per-policy override, even though the level of effort and administrative complexity are dictated by the number of agents in the network, not the number of sales they make.

We applaud the agency's intent to bring uniformity and sobriety to these payments, but we believe a $31 override limit goes too far. Reasonable people can debate the true value of FMOs but without them, the industry would be worse off.

Instead, we recommend that CMS:

1. Limit administrative overrides to no more than $100 per year.

2. Require carriers to pay the same override amount in each policy year. At present, carriers pay a higher override when a member is new to the carrier, even if they're not new to Medicare. This encourages needless churn.

3. Prohibit carriers from paying override amounts that vary by enrollment volume. Today, the size of an FMO matters little. What matters is the volume of policies sold for a specific carrier by a specific FMO or tele-sales broker.

## SOME MARKETING "CO-OP" ARRANGEMENTS ARE ILLEGAL

In addition to larger administrative overrides, some carriers have invented new payment schemes – by their own description, "creative" arrangements – to incentivize incremental sales and curry favor with brokers.

Those who give co-op pay different amounts depending on the number of policies an agency sells, and on top of full-FMV sales commissions. These are nothing but incentives for selling more of a carrier's policies, even when another company's products would have better met the needs of a client. They are often used to curry favor with brokers and "buy" market share.

We implore CMS to pursue all available administrative and legal remedies to stop:

1. Volume based, non-commission co-op payments to FMOs and the agents who sell policies, including arrangements disguised in contracts as seemingly legitimate administrative payments. In the words of other commenters, these are bribes.

2. Arrangements meant to advantage one carrier over another. Paying to "move share" or "take share" are illegal, anti-competitive practices.

**App.192**

3. Excessive fair market value disguised in contracts as revenue sharing arrangements between agents, marketing vendors, and/or FMOs.

ENFORCEMENT IS NEEDED

Rules mean nothing without enforcement.

We remind CMS that they have the authority to level civil monetary penalties against those carriers who engage in these terrible practices. CMS may also suspend a carrier from enrolling new members until the agency is convinced this behavior has stopped. We remind state insurance regulators that, even in the context of Medicare Advantage, they have the authority to hold state-licensed insurance producers accountable for unfair and anti-competitive trade practices.

Please do not cave to industry lobbyists making false claims and offering misleading arguments. Change is long overdue.

---

**Comment ID**

CMS-2023-0187-0374

---

Shape  **Tracking Number**

lqp-jp82-x1bx

---

| **Comment Details** | **Submitter Info** |
|---|---|

**Document Subtype**

Public Comment

**Received Date**

Dec 28, 2023

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Page Count**

1



About    Bulk Data Download    Agencies    Learn    Reports    FAQ

App.193

file:///dcfas2/...mment%20Letter)/Comment%20Letters/Unnamed%20Commenter%20(potentially%20relevant%20$100%20suggestion).html[5/10/2024 2:07:02 PM]

Regulations.gov

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |   Support
Developers   |   FOIA

App.194

# EXHIBIT 15



DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850

**DATE:**      April 21, 2020 *(rev. from March 10, 2020)*

**TO:**         All Medicare Advantage Organizations, Part D Sponsors, and Medicare-Medicaid Plans

**SUBJECT:**   Information Related to Coronavirus Disease 2019 - COVID-19

On March 10, 2020, the Centers for Medicare & Medicaid Services (CMS) issued guidance notifying Medicare Advantage Organizations (MAOs) and Part D sponsors of a number of flexibilities they may implement during the coronavirus disease 2019 (COVID-19) public health emergency to support efforts that can help curb the spread of the virus and to help ensure MA and Part D enrollees do not experience disruptions in care or disruptions in pharmacy and prescription drug access. Since issuing this guidance, CMS has continued to receive requests for additional guidance regarding CMS's expectations with respect to other CMS and MAO and Part D sponsor policies and requirements during this public health emergency.  This memo supersedes and replaces the March 10, 2020 memorandum.

Due to the public health emergency posed by COVID-19 and the urgent need to ensure access to health care items and services covered by MA, Part D and Medicare-Medicaid plans, particularly in light of isolation and social distancing measures that are necessary to contain the spread of COVID-19, CMS is exercising its enforcement discretion to adopt a temporary policy of relaxed enforcement in connection with the policies discussed in this memo under the conditions outlined herein.

We believe that any guidance in this memorandum relating to CMS's enforcement discretion is a statement of agency policy not subject to the notice and comment requirements of the Administrative Procedure Act (APA).  5 U.S.C. § 553(b)(A).  CMS additionally finds that, even if this guidance were subject to the public participation provisions of the APA, due to the urgent need to ensure that MA and Part D enrollees do not experience disruptions in care or disruptions in pharmacy and prescription drug access during the public health emergency posed by COVID-19, prior notice and comment for this guidance is impracticable, and there is good cause to issue this guidance without prior public comment and without a delayed effective date.  5 U.S.C. § 553(b)(B) & (d)(3). Similarly, even if this guidance were subject to the public participation provisions of 42 USC § 1395hh(b)(1), CMS finds that these public participation provisions also do not apply to this guidance because, for the reasons explained above, 5 U.S.C. § 553(b) does not apply to this guidance pursuant to 5 U.S.C. § 553(b)(B). 42 USC § 1395hh(b)(2)(C).

CMS is issuing this information to Medicare Advantage Organizations and Part D Sponsors to inform them of the obligations and permissible flexibilities related to disasters and emergencies resulting from COVID-19.

We have received a number of suggestions and questions around various topics related to the impact of COVID-19 pandemic in the Medicare program, including, for example, changes to the star ratings to address expected disruption to data collection, mid-year benefit enhancements, prior authorization, risk

1

adjustment, and the applicability of changes to the FFS Medicare program during the public health emergency to Medicare Parts A and B, and Medicare Advantage. To date, we have addressed a number of these topics through regulation and other guidance documents, including this memorandum. While not all of these topics have been addressed in this guidance or otherwise, we are reviewing suggestions and questions and appreciate the public input.

## **Medicare Advantage Organizations**

### *Coverage of Testing and Testing-Related Services for COVID-19*

Under Section 6003 of the Families First Coronavirus Response Act and Section 3713 of the CARES Act, MAOs must not charge cost sharing (including deductibles, copayments, and coinsurance) for:

- clinical laboratory tests for the detection of SARS-CoV-2 or the diagnosis of the virus that causes COVID-19 and the administration of such tests;

- specified COVID-19 testing-related services (as described in section 1833(cc)(1)) for which payment would be payable under a specified outpatient payment provision described in section 1833(cc)(2)[1]; and

- COVID-19 vaccines and the administration of such vaccines, as described in section 1861(s)(10)(A).

The limit on cost sharing (including deductibles, copayments, and coinsurance) for COVID-19 testing and specified testing-related services applies to services furnished on or after March 18, 2020 and during the emergency period identified in section 1135(g)(1)(B) of the Act (that is, the public health emergency declared by the Secretary pursuant to section 319 of the Public Health Service Act on January 31, 2020, entitled "Determination that a Public Health Emergency Exists Nationwide as the Result of the 2019 Novel Coronavirus," and any extensions thereof) ("applicable emergency period"). In addition, MAOs may not impose any prior authorization or other utilization management requirements with respect to the coverage of these services when those items or services are furnished on or after March 18, 2020 and during the applicable emergency period.

### *Special Requirements*

Special requirements during a disaster or emergency related to Part A/B and supplemental Part C benefit access can be found at 42 CFR 422.100(m). A declaration by the governor of a state or protectorate is one of the triggering events for these special requirements.  Under the regulation, special requirements are in effect until the end date identified in the emergency declaration or for 30 days, if no end date is identified in the declaration. To date, declarations have been made in all 50 States, the District of Columbia, and the Territories.[2]

MAOs must follow the requirements for disasters and emergencies outlined in 42 CFR § 422.100(m).

---

[1] CMS has identified the specified services and outpatient payment provisions in section 1833(cc) of the Act in recent guidance:  https://www.cms.gov/outreach-and-educationoutreachffsprovpartprogprovider-partnership-email-archive/2020-04-07-mlnc-se#_Toc37139913.

[2] Medicare Advantage Organizations and Part D Sponsors may wish to consult https://www.nga.org/coronavirus/ for information on COVID-19 declarations by Governors.

Under 42 CFR § 422.100(m), MAOs must ensure access to benefits in the following manner:

    (i) Cover Medicare Parts A and B services and supplemental Part C plan benefits furnished at non-contracted facilities subject to § 422.204(b)(3), which requires that facilities that furnish covered A/B benefits have participation agreements with Medicare.

    (ii) Waive, in full, requirements for gatekeeper referrals where applicable.

    (iii) Provide the same cost-sharing for the enrollee as if the service or benefit had been furnished at a plan-contracted facility.

    (iv) Make changes that benefit the enrollee effective immediately without the 30-day notification requirement at § 422.111(d)(3). (Such changes could include reductions in cost-sharing and waiving prior authorizations as described below.)

These changes must be uniformly provided to similarly situated enrollees who are affected by the disaster or emergency.

*Permissive Actions*

Additional or Expanded Benefit Offerings. In response to the unique circumstances resulting from the outbreak of COVID-19, CMS is exercising its enforcement discretion to adopt a temporary policy of relaxed enforcement in connection with the prohibition on mid-year benefit enhancements (73 Federal Register 43628), such as expanded or additional benefits or more generous cost-sharing under the conditions outlined in this memorandum, when such mid-year benefit enhancements are provided in connection with the COVID-19 outbreak, are beneficial to enrollees, and are provided uniformly to all similarly situated enrollees. MAOs may implement additional or expanded benefits that address issues or medical needs raised by the COVID-19 outbreak, such as covering meal delivery or medical transportation services to accommodate the efforts to promote social distancing during the COVID-19 public health emergency.  CMS will exercise its enforcement discretion regarding the administration of MAOs' benefit packages as approved by CMS until it is determined that the exercise of this discretion is no longer necessary in conjunction with the COVID-19 outbreak. We expect MAOs to share information regarding these mid-year benefit enhancements with their CMS account managers.

Medicare Advantage Cost-Sharing.  We acknowledge the positive impact that waiving or reducing enrollee cost-sharing would have on patient experience and therefore encourage MAOs to waive or reduce enrollee cost-sharing for beneficiaries enrolled in their Medicare Advantage plans impacted by the outbreak.  For example, Medicare Advantage Organizations may waive or reduce enrollee cost-sharing for COVID-19 treatment, telehealth benefits or other services to address the outbreak provided that MAOs waive or reduce cost-sharing for all similarly situated plan enrollees on a uniform basis. CMS clarifies that this flexibility is limited to when a waiver or reduction in cost-sharing can be tied to the COVID-19 outbreak. CMS consulted with the HHS Office of Inspector General (OIG) and HHS OIG advised that should an Medicare Advantage Organization choose to voluntarily waive or reduce enrollee cost-sharing, as approved by CMS herein, such waivers or reductions would satisfy the safe harbor to the Federal anti-kickback statute set forth at 42 CFR 1001.952(l).

Telehealth. Medicare Advantage Organizations may also provide enrollees access to Medicare Part B services via telehealth in any geographic area and from a variety of places, including beneficiaries' homes. In response to the unique circumstances resulting from the outbreak of COVID-19, should a Medicare Advantage Organization wish to expand coverage of telehealth services beyond those approved by CMS in the plan's benefit package for similarly situated enrollees impacted by the outbreak, CMS will exercise its enforcement discretion regarding the administration of Medicare Advantage Organizations' benefit packages as approved by CMS until it is determined that the exercise of this discretion is no longer necessary in conjunction with the COVID-19 outbreak. CMS consulted with the HHS OIG and HHS OIG advised that should a Medicare Advantage Organization choose to expand coverage of telehealth benefits, as approved by CMS herein, such additional coverage would satisfy the safe harbor to the Federal anti-kickback statute set forth at 42 CFR 1001.952(l).

Model of Care Flexibility. CMS also recognizes that in light of the COVID-19 outbreak, an MAO with one or more special needs plans (SNPs) may need to implement strategies that do not fully comply with their approved SNP model of care (MOC) in order to provide care to enrollees while ensuring that enrollees and health care providers are also protected from the spread of COVID-19. CMS will consider the special circumstances presented by the COVID-19 outbreak when conducting MOC monitoring or oversight activities.  For example, CMS recognizes that there may be requirements in the MOC that require face-to-face contact with enrollees and would exercise enforcement discretion should a plan choose not to fulfill that MOC requirement in person.

Involuntary Disenrollment - Temporary Absence Flexibilities. Due to the public health emergency posed by COVID-19 and the urgent need to ensure that enrollees have continued coverage and access to sufficient health care items and services to meet their medical needs, CMS is exercising its enforcement discretion to adopt a temporary policy of relaxed enforcement with respect to MA organizations that choose to delay to a later date the involuntary disenrollment of enrollees who are temporarily absent from the service area for greater than 6 months when that absence is due to the COVID-19 national emergency. CMS will not enforce the requirement at § 422.74(d)(4) and will allow MA organizations to extend the period of time members may remain enrolled while temporarily absent from the plan service area through the end of the year, or the end of the public health emergency, whichever is earlier.  Individuals who remain absent from the service area will be disenrolled January 1, 2021, if the public health emergency is still in effect at that time, or 6 months after the individual left the service area, whichever is later. CMS reminds MAOs of their requirements under 42 CFR § 422.100(m) to provide coverage for care from non-contracted providers, as outlined above in this memo under "Special Requirements."

Involuntary Disenrollment – Loss of Special Needs Status. Due to the public health emergency posed by COVID-19, we are aware that plans may experience delays recertifying SNP eligibility because they are reliant on determinations and information from States or providers who, themselves, are experiencing workforce shortages.  For example, states have indicated to CMS they are unable to meet federal timeliness standards for renewing Medicaid eligibility due to these workforce shortages and office closures and the added challenge of the increased volume of applications. Because we feel it is important to ensure that enrollees have continued coverage and access to sufficient health care items and services to meet their medical needs, CMS will also exercise enforcement discretion during calendar year 2020 to adopt a temporary policy of relaxed enforcement with respect to MA organizations that

choose to delay to a later date the involuntary disenrollment of enrollees who are losing special needs status and cannot recertify SNP eligibility due to the COVID-19 national emergency. Under this policy, CMS will also not take action against MA organizations that have a policy of deemed continued eligibility and choose to delay to a later date the involuntary disenrollment of enrollees who fail to regain special needs status during the period of deemed continued eligibility (see § 422.52(d))[3] due to the COVID-19 national emergency. CMS will not enforce the requirement for mandatory disenrollment at § 422.74(b)(2)(iv) and will allow MA organizations to extend the period of deemed continued eligibility under § 422.52(d) during 2020. Individuals who do not regain eligibility must be disenrolled the later of January 1, 2021, or upon expiration of the usual period of deemed continued eligibility that begins the first of the month following the month in which information regarding the loss is available to the MA organization and communicated to the enrollee, including cases of retroactive Medicaid terminations.

SNPs are not required under existing regulations to have a policy of deemed continued eligibility; however, plans must apply the same policy consistently for all enrollees of the applicable SNP. For those SNPs that have elected not to have a policy of deemed continued eligibility, CMS encourages the SNP to consider establishing one.[4] For those plans that have a policy of deemed continued eligibility for a period of less than 6 months, CMS encourages the SNP to increase this to 6 months. SNPs may make these types of changes mid-year as long as the change is applied to everyone in the plan and the plan notifies its CMS account manager.

Additional Flexibilities. There may be other circumstances where an MAO may need to implement strategies or actions they deem reasonable and necessary, but which do not fully comply with program requirements, in order to furnish or provide coverage of Part A or B benefits to enrollees while ensuring the enrollees are also protected from the spread of COVID-19. CMS will consider the special circumstances presented by the COVID-19 outbreak when conducting monitoring or oversight activities.

CMS will notify Medicare Advantage Organizations and Part D sponsors through the Health Plan Management System when CMS is ending the enforcement discretion policies described herein.

Prior Authorization. Moreover, consistent with flexibilities available to Medicare Advantage Organizations absent a disaster, declaration of a state of emergency, or public health emergency, Medicare Advantage Organizations may choose to waive or relax plan prior authorization requirements at any time in order to facilitate access to services with less burden on beneficiaries, plans, and providers. Any such relaxation or waiver must be uniformly provided to similarly situated enrollees who are affected by the disaster or emergency. We encourage plans to consider utilizing this flexibility.

Finally, we remind Medicare Advantage Organizations that the Secretary has issued a waiver under Section 1135(b)(6) of the Social Security Act that permits to CMS authorize Medicare Administrative Contractors MACs to pay for Part C-covered services furnished to beneficiaries enrolled in Medicare

---

[3] If an SNP determines that the enrollee no longer meets the eligibility criteria, but can reasonably be expected to again meet that criteria within a 6-month period, the enrollee is deemed to continue to be eligible for the MA plan for a period of not less than 30 days but not to exceed 6 months.

[4] Guidance on loss of special needs status and deemed continued eligibility can be found in section 50.2.5 of Chapter 2 (Medicare Advantage Enrollment and Disenrollment) of the Medicare Managed Care Manual.

Advantage plans and subsequently seek reimbursement from Medicare Advantage Organizations for those health care services retrospectively. CMS has not authorized the MACs to take this action.

## Part D Sponsors

Section 1860D-4(b)(1)(C)(iii) of the Social Security Act requires that the Secretary's rules on pharmacy network access "include adequate emergency access for enrollees." Using that authority, CMS has previously provided information to Part D sponsors[5] about their ability to take certain actions in response to disasters or emergencies that are reasonably expected to result in disruption in access to covered Part D drugs, which potentially could now include COVID-19. Part D sponsors may also take the following actions to ensure pharmacy access during a disaster or state of emergency resulting from COVID-19.

***Reimburse Enrollees for Prescriptions Obtained from Out-of-Network Pharmacies***
Consistent with §423.124(a) of the Part D regulations, Part D sponsors must ensure enrollees have adequate access to covered Part D drugs dispensed at out-of-network pharmacies when those enrollees cannot reasonably be expected to obtain covered Part D drugs at a network pharmacy. Enrollees remain responsible for any cost sharing under their plan and additional charges (i.e., the out-of-network pharmacy's usual and customary charge), if any, that exceed the plan allowance.

***Home or Mail Delivery of Part D Drugs***
In situations when a disaster or emergency makes it difficult for enrollees to get to a retail pharmacy, or enrollees are prohibited from going to a retail pharmacy (e.g., in a quarantine situation), Part D sponsors are permitted to voluntarily relax any plan-imposed policies that may discourage certain methods of delivery, such as mail or home delivery, for retail pharmacies that choose to offer these delivery services in these instances.

***Prior Authorization for Part D Drugs***
As is the case for Medicare Advantage Organizations, consistent with flexibilities available to Part D Sponsors absent a disaster or emergency, Part D Sponsors may choose to waive prior authorization requirements at any time that they otherwise would apply to Part D drugs used to treat or prevent COVID-19, if or when such drugs are identified. Sponsors can also choose to waive or relax PA requirements at any time for other formulary drugs in order to facilitate access with less burden on beneficiaries, plans, and providers. Any such waiver must be uniformly provided to similarly situated enrollees who are affected by the disaster or emergency.  We encourage plans to consider utilizing this flexibility.

***Drug Shortages***
Part D plan sponsors should follow the existing drug shortage guidance in Section 50.13 of Chapter 5 of the Prescription Drug Benefit Manual in response to any shortages that result from this emergency.

---

[5] Prescription Drug Benefit Manual. Chapter 5, Section 50.12. Pharmacy Access During a Federal Disaster or Other Public Health Emergency Declaration. https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/MemoPDBManualChapter5_093011.pdf

*Vaccines*

Section 3713 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) specifies that a COVID-19 vaccine and its administration will be covered under Medicare Part B, and therefore would be excluded from Part D coverage.

*Additional Flexibilities*

Given both the rapidly changing landscape and the need for Part D sponsors to act quickly to ensure enrollee and employee safety during this pandemic, we encourage Part D sponsors to take the actions you deem reasonable and necessary to keep your enrollees and employees safe and curb the spread of this virus, while still ensuring beneficiary access to needed Part D drugs (example actions listed below). CMS fully supports plans taking actions to accommodate the efforts to promote social distancing. We recognize that there may be circumstances where a Part D sponsor may need to implement strategies or actions they deem reasonable and necessary, but which do not fully comply with program requirements, in order to provide qualified prescription drug coverage to enrollees while ensuring their enrollees and employees are also protected from the spread of COVID-19. CMS will consider the special circumstances presented by the COVID-19 outbreak when conducting monitoring or oversight activities.

To that end, due to the public health emergency posed by COVID-19 and the urgent need to ensure enrollee and employee safety during this pandemic, CMS is exercising its enforcement discretion to adopt a temporary policy of relaxed enforcement in connection with, but not limited to, the following:

- Waiving Part D medication delivery documentation and signature log requirements;
- Relaxing to the greatest extent possible prior authorization requirements, where appropriate; and/or
- Suspending plan-coordinated pharmacy audits.

*Part D Provisions of the CARES Act*

CMS is implementing section 3714 of the CARES Act by this program instruction, as authorized by section 3714(b).

**Cost and Utilization Management Requirements**

Part D sponsors must suspend all quantity and days' supply limits under 90 days for all covered Part D drugs (as defined in 42 CFR § 423.100) other than such limits resulting from <u>safety edits</u> (discussed below). Part D sponsors may otherwise continue to utilize their formularies, tiered cost-sharing benefit structures, and approved prior authorization (PA) and step therapy (ST) requirements. There are no alterations to mid-year formulary change requirements, and we remind sponsors that new drugs may be added and utilization management requirements removed at any time.

**Safety Edits**

Part D sponsors may continue to use, or may immediately implement, point-of-sale safety edits consistent with the requirements of 42 CFR § 423.153(c)(2) and this guidance. CMS generally does not consider safety edits implemented as quality assurance measures under 42 CFR § 423.153(c)(2) to be subject to the CMS formulary review and approval process and does not require notice from plans when new safety edits are implemented. Safety edits include, but are not limited to, the following:

- Quantity Limits (QLs) based on clearly stated maximum dosing limits specified in the FDA-approved label;

- QLs that are intended to prevent clinical abuse/misuse or hoarding by limiting quantities/days supply of specific Part D drugs that the sponsor determines are at risk while continuing to allow for dispensing of sufficient quantities/days supplies to treat medically accepted indications;
- Refill-too-soon edits (discussed further below);
- Point-of-sale claim edits for frequently abused drugs that are specific to an at-risk beneficiary in a drug management program as described in 42 CFR § 423.153(f)(3)(i); and/or
- Opioid safety edits (see below).

**Opioid Safety Edits**

Part D sponsors are expected to continue to apply existing opioid point-of-sale safety edits during the COVID-19 emergency, including the care coordination edit at 90 morphine milligram equivalents (MME) per day, optional hard edit at 200 MME per day or more, hard edit for seven-day supply limit for initial opioid fills (opioid naïve), soft edit for concurrent opioid and benzodiazepine use, and soft edit for duplicative long-acting (LA) opioid therapy. However, due to the increased burden on the healthcare system as a result of the COVID-19 pandemic, we encourage plans to waive requirements for pharmacist consultation with the prescriber to confirm intent to lessen the administrative burden on prescribers and pharmacists. Additionally, CMS is exercising its enforcement discretion to adopt a temporary policy of relaxed enforcement in connection with any Part D medication delivery documentation and signature log requirements related to these edits during the COVID-19 emergency, as noted above.

**"Refill-Too-Soon" Edits**

During the public health emergency for COVID-19 described in section 1135(g)(1)(B) of the Social Security Act, pursuant to section 3714 of the CARES Act, Part D sponsors must relax "refill-too-soon" edits. Sponsors continue to have operational discretion as to how these edits are relaxed as long as access to Part D drugs is provided at the point-of-sale. For purposes of section 3714 of the CARES Act, relaxed refill-too-soon edits are safety edits and Part D sponsors must not permit enrollees to obtain a single fill or refill that is inconsistent with a safety edit.

**90–day Supply**

Part D sponsors must permit enrollees to obtain the total days supply prescribed for a covered Part D drug (as defined in 42 CFR § 423.100) up to a 90-day supply in one fill (or one refill) if:

- Requested by the enrollee,
- PA or ST requirements have been satisfied; and
- No safety edits otherwise limit the quantity or days supply.

This requirement also applies to transition fills.

**Long-term Care Dispensing**

CMS intends to exercise enforcement discretion with respect to the requirement at 42 CFR § 423.154(a)(1)(i) that limits dispensing of solid oral doses of brand-name drugs, as defined in §423.4, to enrollees in long-term care (LTC) facilities to no greater than 14-day increments at a time. For enrollees residing in LTC facilities, Part D sponsors may permit pharmacies to expand the use of submission clarification code 21 (LTC dispensing, 14 days or less not applicable) to allow for greater than 14 day supplies for all applicable Part D drugs to provide more flexibility for LTC facilities and pharmacies to

coordinate with each other.

**Emergency Period**
These program instructions apply to fills and refills on or after March 27, 2020, and these requirements will remain in place for the remainder of the emergency period described in section 1135(g)(1)(B) of the Social Security Act.

## <u>Medicare-Medicaid Plans</u>

The guidance articulated in this memorandum for Medicare Advantage Organizations and Part D sponsors also applies for all Medicare benefits covered by Medicare-Medicaid Plans (MMPs) operating under three-way contracts as part of the Financial Alignment Initiative's capitated model demonstrations.

Additionally, we note that MMPs should have received guidance from their contract management teams about the submission and review of materials for enrollees regarding precautions to contain the spread of COVID-19 and information about the public health emergency. MMPs with questions about this guidance should contact their contract management teams.

## <u>Medicare Advantage Organizations and Part D Sponsors</u>

*Business Continuity Plans*
As required under 42 CFR § 422.504 (o) and § 423.505(p), Medicare Advantage Organizations and Part D sponsors must have business continuity plans to ensure restoration of business operations following disruptions, including emergencies. Medicare Advantage Organizations and Part D sponsors should review or update their business continuity plans to ensure that any necessary planning for business operations disruption due to a pandemic public health emergency is included.

*Involuntary Disenrollment - MA and Part D Premium and Grace Period Flexibilities*
To ensure that Medicare Advantage and Part D beneficiaries continue to have access to needed care during the COVID-19 national emergency, CMS would like to remind plans of their ability to apply flexible policies to members who are unable to pay plan premiums.  Plans are not required under existing regulations to disenroll members due to failure to pay plan premiums; however, plans must apply the same policy consistently for all enrollees of the applicable plan. For those plans that have elected a policy to disenroll for non-payment of premium, we encourage you to consider changing the policy so that the plan would not disenroll members for non-payment of premium.  If a plan chooses not to eliminate its disenrollment policy, we encourage the plan to increase the mandatory grace period (at least two months) to a longer period of time.  Plans may make these types of changes mid-year as long as the change is applied to everyone in the plan and the plan notifies its CMS account manager. Detailed information regarding disenrollment and non-payment of premiums requirements are at § 422.74(b)(1)(i) and section 50.3.1 of Chapter 2 of the Medicare Managed Care Manual for MA and at § 423.44(b)(1)(i) and section 50.3.1 of Chapter 3 of the Medicare Prescription Drug Benefit Manual for Part D.

*Marketing and Communication*

CMS wants to ensure that plans are able to quickly distribute information to their enrollees regarding COVID-19 (such as information on precautions and the public health emergency, reminders or announcements about benefits coverage as described in existing guidance, etc.). Plans are reminded that, based on the definitions of "marketing" and "communications" under MA and Part D regulations in Subpart V of Parts 422 and 423, COVID-19 messages to members of this sort would almost invariably be communications and thus not require HPMS submission and review prior to dissemination.

*Payment*

The rules governing CMS's payments to Medicare Advantage Organizations and Part D Sponsors remain unchanged, and are not affected by this memorandum.

Please note that nothing in this memorandum speaks to the arrangements between Medicare Advantage Organizations or Part D Sponsors and their contracted providers or facilities.

# EXHIBIT 16

National Association of Benefits and Insurance Professionals

# NABIP

Shaping the *future* of healthcare

January 5, 2024

The Honorable Chiquita Brooks-LaSure
Administrator, Centers for Medicare and Medicaid Services
Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

RE: CMS-4205-P

Submitted electronically via www.regulations.gov

Dear Ms. Brooks-LaSure:

I am writing on behalf of the National Association of Benefits and Insurance Professionals (NABIP), formerly known as NAHU, which is an association representing over 100,000 licensed health insurance agents, brokers, general agents, consultants and employee benefits specialists. We appreciate the opportunity to provide comments on the Center's recently published regulation titled, "Medicare Program: Contract Year 2025 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicare Cost Plan Program, and Programs of All-Inclusive Care for the Elderly; Health Information Technology Standards and Implementation Specifications."

NABIP members work daily to help millions of people and businesses purchase, administer and utilize health insurance coverage. Thousands of our members specialize in assisting Medicare beneficiaries with their coverage needs. As such, we are grateful for the opportunity to share feedback on this draft guidance. We've broken down our comments by topic presented in order of appearance in the proposed rule. The substantive content of our letter was developed based on feedback from the members of our national Medicare Working Group and our national Medicare Field Marketing Organization (FMO) Council.

**Improving Access to Behavioral Health Care Providers-Outpatient Behavioral Health Facilities**

To go along with increased behavioral health support funding in Medicare in the Consolidated Appropriations Act, 2023 (CAA 2023) and the related CAA 2023 implementation final rule, the proposed rule would add "outpatient behavioral health facilities" to the list of Medicare facilities subject to network adequacy requirements including time-and-distance requirements. The outpatient behavioral health specialty type also would be eligible to receive a 10 percent credit for the percentage of enrollees who reside within the time-and-distance standards when the MA plan includes one or more telehealth providers of that specialty.  NABIP members support this change.

**Special Supplemental Benefits for the Chronically Ill (SSBCI)**

Medicare Advantage plans may provide supplemental coverage of items or services for chronically ill individuals, but these services must have a reasonable expectation of improving or maintaining the health or overall function of the enrollee. CMS currently has the burden of generating evidence to determine whether the "reasonable expectation" standard has been met, but the proposed rule would give Medicare Advantage Plans the responsibility for making the determination and outlines criteria that must be used. It also amends the related disclaimer language.  NABIP members approve of these changes, as we believe they may increase access to services for chronically ill beneficiaries.

To address unused supplemental benefits available to chronically ill people, the new rule would require Medicare plans to provide a mid-year notice to enrollees, between June 30 and July 31, informing them of any unused supplemental benefits available to them that they did not use during the first six months of the year. CMS seeks comment on this proposal, particularly on the timing, if any, of the notice for enrollees who enroll in the plan mid-year.

NABIP members strongly support providing increased notice to beneficiaries about their unused benefits. In fact, our membership would prefer that CMS to provide quarterly updates about the status of these benefits, as they function on a use-or-lose it basis and many people do not use all or even any of their benefits. So, regular notification would be very helpful.  Further, NABIP suggests that these reminders should be written in plain language and include pictures, since our members who regularly work with this beneficiary population report that many supplemental benefit recipients have cognitive issues, or suffer from other conditions that impact literacy.  If notification is provided quarterly, then the notices should be sent mid-quarter, so that they accurately reflect the person's utilization status and provide enough time for the person to obtain their available benefits.

**Proposed Changes to Agent and Brokers' Compensation and Relationships with FMOs, MAOs, General Agencies, and other Entities Providing Administrative Service Support**

The proposed rule includes two significant changes to the way health insurance agents and brokers who serve the Medicare population would interact with Medicare plans and be compensated for their services.  The first would prohibit contract terms between Medicare Advantage plans and agents, brokers, or other third-party marketing organizations (TPMOs) that "may interfere with the agent's or broker's ability to objectively assess and recommend the plan which best fits a beneficiary's health care needs."

Almost all of the NABIP members who work in the Medicare space are servicing agents, whose businesses depend on long-standing customer relationships and satisfaction, as well as personal client referrals.  To a NABIP member, the health and well-being of their clients is paramount, and no contract term would influence a servicing agent's recommendation about which policy



would best fit a client's needs.  However, our members do have concerns with the proposed language regarding the terms of their contracts appointing them to sell specific Medicare Advantage plans.

First, contracts between plans and agents and brokers are those of adhesion, and individual servicing agents have no ability to change the terms with the carriers in their service area. Second, NABIP members are also concerned that the proposed language about prohibited contracts is arbitrary and lacks clear definitions and standards. We are concerned that it would be impossible for servicing agents to determine if their contracts were appropriate or not. Further, we are concerned about CMS's ability to enforce such subjective standards.  Finally, while contracts with different carriers vary and include differences in compensation, these differences in no way affect the assistance or advice NABIP members provide to their clients. Our membership notes that minor differences in plan contract terms do no more to influence a servicing agent's decision to represent a plan than a minor variation in CMS reimbursement rates affect a plan's decision to offer coverage in a given county.

NABIP members know that there are bad actors, and clearly CMS wants to ensure that unscrupulous marketing efforts cease.  NABIP members feel similarly, which is why we have some suggestions about how existing rules could be more uniformly and effectively enforced, thereby significantly curbing such practices.  For example, better communication between CMS and all carriers for which an agent is appointed about problem activities is needed.  Typically, agents are appointed with multiple issuers simultaneously, even if they focus most of their efforts selling one entity's products. When an agent breaks the rules, the affected carrier can terminate them for cause. However, since there is no communication between CMS and the other entities with which the agent is appointed about cause-based terminations, a problem agent can turn around and sell for the other carriers with which they hold appointments. The effective result is an unprincipled agent can remain in the marketplace for years without significant consequence.  Another concern in the marketplace are incentives that may be offered to a physician, which could be addressed by better and more uniform enforcement of the Stark law.

A key reason that problems exist in this marketplace is not the lack of existing rules, but CMS's lack of enforcement resources. To that end, NABIP members suggest that CMS work more directly with Medicare field marketing organizations (FMOs), as these entities are currently serving the marketplace by providing their down-stream servicing agents with training and compliance resources. Our members who represent these organizations are eager to work with CMS to ensure that the Medicare marketplace is serviced by committed and quality agents who adhere to all existing proscribed standards.  Further, we suggest that CMS increase carrier coordination and communication to enforce existing rules. Based on their appointment relationships as approved producers with health insurance issuers contracted with CMS to



provide Medicare Advantage and Part D services, Medicare-certified agents and brokers are required to comply with all applicable carrier requirements too.

The second major change proposed by CMS would be to revise what is considered "compensation" by eliminating any variance in compensation paid by plans, so that all agents and brokers would be paid the same amount whether from the Medicare Advantage plan or an FMO (except for referral payments). Further, the concept of "compensation" would extend to cover all agent-beneficiary activities, such as responding to follow-up questions during the year or gathering health risk assessment information to assist Medicare Advantage plans and beneficiaries.  Finally, the proposed rule would eliminate the separate regulatory provision for "administrative payments" to FMOs, since the proposed rule states these administrative fees "effectively circumvent the Fair Market Value ("FMV") caps on agent and broker compensation." Any administrative payment would be a component of the standardized, capped compensation paid to agents and brokers, which in 2025 would be just $31.  NABIP members strongly oppose all of these changes and believe they would cause havoc to the way Medicare Advantage plans are currently marketed and serviced, at great detriment to Medicare beneficiaries.

The new compensation standards contained in the proposed rule would effectively eliminate the existing model of servicing agents working with and through FMOs, thereby denying the marketplace all of the benefits these entities provide to both agents and brokers and Medicare beneficiaries.  The proposed rule appears to be based on some misunderstandings about how both sales, marketing, training and other sources of essential support are currently provided to servicing agents today, as well as a misunderstanding about how compensation currently flows in the Medicare Advantage marketplace and how different sources of funds are directed and utilized.  To help clear up some of these issues, NABIP offers the following overview of the way the Medicare Advantage marketing support structure for servicing agents and brokers works currently.

In today's marketplace, the vast majority of Medicare Advantage plans outsource virtually all of their sales and marketing support for servicing agents to FMOs.  FMO is a loose term for a brokerage upline agency that provides administrative support to a downstream group of servicing brokers.  The FMO label is not consistent either – there are use different terms and acronyms to describe a "FMO" in the industry, which can include NMO, NMA, PMO, FMO, SMO, IMO, SGA, MGA, GA and so forth.  Distinct names and anacronyms are used in different parts of the country, and in some cases different names are used based on the size of the organization and if the entity works with agents and carriers on a national basis, or if the FMO serves more local markets.

For the purposes of this comment letter, NABIP will refer to all entities that directly contract with and certified by one or more Medicare Advantage carrier to provide marketing support as



an FMO. However, it is important to note that while current CMS rules classify all FMOs as third-party marketing organizations, or TPMOs. While every group that NABIP is referring to as an FMO is this letter is also a TPMO, there are entities that also fall under the TPMO grouping that are NOT FMOs. TPMOs can also be an entity that is not contracted and certified with any Medicare Advantage carrier.

The TPMOs who do not qualify as FMOs are often the multi-vertical lead generators that buy and sell "lead" data across multiple industries, FMOs and brokers. The purchasing parties are often kept in the dark on how "their" lead is **also** being sold to other parties and brokers. These are the TPMOs that frequently run the problematic national MA/PDP beneficiary focused TV commercials. We fully support HHS' efforts on reigning in these types of TPMOs that operate outside of the CMS' regulations.

Many NABIP members in the Medicare space are servicing agents and brokers, or those individuals who work directly with Medicare beneficiaries. These agents and brokers choose to work with an FMO because they provide a wide range of support services that the servicing agent cannot obtain anywhere else including from the Medicare Advantage carrier whose products they are selling. Such services include things like compliance support, training, web services, enrollment technology, client relationship management (CRM) technology, sales leads, and full back-office service teams. Servicing agents voluntarily select their FMO and are free to move to a different FMO at any point.

Other NABIP members work for, own, or manage FMOs. FMOs provide essential assistance and support to servicing agents that most would assume are provided by the Medicare Advantage plans themselves. To help delineate typically outsourced functions, and the interrelated role of both the servicing agents and the FMOs that support them, we have prepared the following chart:

| Function | Servicing Agent Need | Role of the FMOs/GAs |
| --- | --- | --- |
| Contracting and Licensing | Agents must be licensed in every state in which they do business and, in most states, appointed with every carrier with which they do business. This is a time-consuming and expensive process. | Send recruiting links to interested agents and communicate the value proposition of the carrier. Assist in ensuring all contracts submitted are complete and in good order for carrier processing. |
| Continuing Education | Agents have to meet significant and ongoing continuing education requirements, and typically | Provides/sponsors continuing education courses and course content for servicing agents. Many FMOs sponsor annual |



National Association of Benefits and Insurance Professionals

| Function | Servicing Agent Need | Role of the FMOs/GAs |
|---|---|---|
| | accessing approved continuing education content is an expensive endeavor. | in-person forums for training and education. |
| Certifications | Agents must obtain national certifications and certification from each applicable carrier annually, which is both expensive and time-consuming. | Provides access to/sponsorship of carrier and FWA certifications. Communicate to agents on their Ready to Sell status. |
| Errors and Omissions Insurance | For the protection of both beneficiaries and their business endeavors, agents need to obtain and maintain errors and omissions insurance coverage. | Provides access to high-quality coverage to protect both clients and servicing agents. Group E&O discounts are sponsored programs. |
| Enrollment Support | Agents need resources to process their enrollments and serve the vulnerable senior population effectively. | Provides state-of-the-art technology and tools to support agents with enrollment, including iPads, online enrollment platforms, compliant phone and zoom-based enrollment technology, provider and drug look up features, plan comparison technology, access to Medicare blue button data with client consent to ease enrollment and improve accuracy, and more. |
| Call Recording | Agents were required to record all MA/PDP calls starting in 2023 and store them which requires access to expensive technology. | Provides technology to allow independent agents to record calls, to store them for 10 years and to be able to retrieve their recordings. |
| Client Relationship Management | Agents need technological resources to track client and | Provides CRM database technology and tools so that |



| Function | Servicing Agent Need | Role of the FMOs/GAs |
|----------|---------------------|---------------------|
| | potential client data, in order to best meet servicing needs. | servicing agents can better manage crucial client relationships. |
| Lead Generation and Sales Support | Agents need access to potential clients and sales training resources. | FMOs provide lead generation resources and sales, including resources for agents to purchase leads from vetted and reputable vendors, direct mail sources and lists, referrals and more. |
| Carrier Materials | Agents need training on carrier products and access to printed carrier materials. | Sponsorship of specific product training, and distribute carrier-specific printed materials and marketing tools. |
| Marketing Materials and Support | Independent agents need resources to develop and maintain compliant marketing materials. | Provide access to compliant and CMS-approved designs, agent website development and maintenance services, social media and electronic mail marketing tools and support. |
| Client Escalations | Servicing agents work with their clients year-round to address and resolve plan-based issues. | Serve as a direct link to affiliated carriers, providing escalation resources and client issue resolution support. |
| Compliance Resources | Medicare sales and service is subject to both federal and state-level regulation. Independent agencies need help to always stay on the right side of constantly evolving rules and requirements. | Provide 24/7 access to compliance officers, resources, training, industry overviews and guidance, and more. |

To provide all this critical support to servicing agents and brokers, Medicare Advantage plans currently pay the FMO between $200 and $300 per beneficiary.  This payment amount varies based on geographic conditions and by carrier, with smaller, regional entities typically paying

towards the higher end of the range.  The administrative fee paid by carriers to FMOs is entirely separate from the fair market value (FMV) compensation payment made to the servicing agent.

The proposed rule would reduce administrative payments to $31 per year and include it as part of the servicing agent's FMV compensation. If this change goes into effect as currently written, it would unravel the entire existing system of support provided by GAs and FMOs. Limiting FMOs to approximately 15 percent of their current funding would mean that all of these independent companies will no longer be financially viable.  Not only would that have a detrimental economic impact – as FMOs are thriving businesses located in every state and employing tens of thousands of people – it would also have a catastrophic impact on the entire Medicare Advantage population.

Medicare Advantage carriers routinely outsource agent support services today, as subcontracting saves the carriers money and provides better results for issuers, servicing agents, and consumers alike. However, if the proposed rule is adopted as written and FMOs are forced out of the marketplace, then the functions independent FMOs provide for multiple carriers simultaneously will need to be assumed by each carrier on an individual basis.  Not only will this increase carrier expenses, which in turn will ultimately negatively affect premiums and the Medicare Trust Fund, but consumers will also see a detrimental service impact.

Today, FMOs provide both servicing agents and their Medicare beneficiary clients the ability to easily compare and contrast between most, if not all, Medicare Advantage product offerings available in their area, all at the same time.  If sales, marketing, and enrollment services are brought back in-house to each carrier, then each carrier's product offerings will be isolated, and it will be much more difficult for independent servicing agents to represent multiple issuers. Furthermore, some issuers will likely choose to focus more on direct sales, meaning that the beneficiaries who engage with those issuers will only learn about one carrier's offerings.

Another concern is how different carriers will weather a forced transition to handling all sales, marketing, and agent services internally. Some will likely be able to ramp up broker support services more quickly and efficiently than others, incenting servicing agents and their clients to work with those carriers, rather than their competitors.  Also, not all Medicare Advantage carriers will have the ability, or appetite, especially initially, to contract with the thousands of independent servicing agents and brokers who will want to represent them.  The result will be less representation of carrier choices in the marketplace.

NABIP members understand that, as things stand today, it may not be clear to many why the administrative fees paid to FMOs efficiently pays for much needed enrollment, compliance, education, and customer communication services. To address the concerns that CMS has about the lack of transparency regarding administrative fees, and to ensure that administrative payments are fair and do not favor any one plan over another, NABIP proposes complete



disclosure and transparency of these administrative fees.  Further, we would support a flat rate for administrative service payments, so that there is no ability or incentive for a FMO to favor one issuer over another.  However, the administrative fee needs to be based on a fair market value rate, which is no less than $250 per beneficiary currently, and will need to be adjusted annually for inflation.

Besides the administrative fee, which goes to the FMO entirely, there are three other sources of funding that are being addressed by the proposed rule.  The first is the fair market value or FMV compensation that applies to independent servicing agents and brokers. The second is the fees that are paid to agents and brokers for performing health risk assessments for Medicare Advantage carriers.  The final source of funds is marketing monies that are paid by carriers to FMOs.  It is important to understand how and why each of these types of funding are being used in the marketplace today.

The FMV is the maximum rate that the CMS sets every plan year that Medicare Advantage carriers are allowed to pay servicing agents and brokers.  While a FMO may distribute this money to their downstream servicing agents, in virtually all cases they pass 100 percent of that rate along to the servicing agent or broker. By publishing the annual FMV rates, CMS ensures that servicing agents understand their FMV compensation level and sets the standard that they will receive all of that compensation for their work.  That is why the FMV rate is currently completely separate and distinct from any administrative fees a FMO receives from the Medicare Advantage carriers as part of their certified marketing support contracts with those carriers.  Legitimate FMOs use their administrative fees to carry out their contractual obligations with the Medicare Advantage plans they represent by providing marketing and back-office support to their downstream servicing brokers.

The second source of Medicare Advantage carrier funding that may go to servicing agents and brokers are health risk assessment fees, which in almost all cases ranges between $25-100 per assessment, with $200 being the maximum amount an agent could receive for assessment administration. These fees are paid by individual carriers and go directly to the servicing agent performing the assessment for a specific carrier. These fees are never retained, in whole or in part, by the FMO.  Further, servicing agents decide if they would like to perform health risk assessment services for carriers.

The amounts different carriers pay their agents to conduct health risk assessments are based on the type of plan, the complexity of the product, and the complexity of related questionnaire, since more complicated products and questionnaires require significantly more time and work on the administrating agent's part. The payments for D-SNP population assessments are generally higher than what a carrier will pay for an assessment with a typical Medicare beneficiary for several reasons.  First of all, carriers are paid more by CMS for D-SNP beneficiaries, so they can compensate agents slightly more for assisting with D-SNP



assessments.  Furthermore, health risk assessments for the D-SNP population require the collection of more data and involve a more rapid production timeframe.  The D-SNP population is also far more likely to have low literacy levels and/or chronic or progressive conditions that impact memory and cognition, making the process of completing D-SNP risk assessments with the beneficiaries much more difficult and time-consuming.

Many carriers believe that getting agents to complete these assessments with beneficiaries is the most efficient way of collecting the data. However, since completing health risk assessments is not a mandatory function for independent servicing agents, the related compensation needs to be competitive.  Further, the opportunity cost for agents to perform health risk assessments are high, particularly when the Medicare annual election period is looming. Therefore, the proposed rate of $13 per every assessment, with no consideration of the type of assessment, beneficiary population, and time involved is much too low.  If it stays at this level, most agents will not feel like it is worth their time to complete them, and it is unclear then how carriers will begin to make up this void in the data collection process.

Carriers use the information to determine if a qualified health professional needs to conduct a further evaluation of medical needs so that they can be properly placed into medical protocols or treatments to avoid more costly health events. They also assess the beneficiary in their home environment and determine if they have appropriate transportation for example. Without the assessments, valuable time is lost.

The final source of funding that potentially could flow through servicing agents and brokers are the "marketing funds" that are provided by Medicare Advantage carriers to FMOs. The amount of these funds varies by carrier and recipient FMO, and these funds are used for a wide range of purposes.  Some of these purposes include expenditures that in no way involve a direct flow of money to a servicing agent, such as using the money for lead generation lists, advertising buys, social media expenditures, and other broad-scale marketing expenses incurred by the FMO. However, in other cases, a FMO may use marketing funds to pay for things like hosting community events or reaching out to diverse populations of potential enrollees.  In those cases, marketing funds may be used to reimburse servicing agents for things like the cost of travelling to meet with potential clients in an underserved area.

Of concern is the lack of transparency and accountability when it comes to the use and distribution of "marketing funds."  These funds not only flow through to legitimate FMOs but are also provided by some carriers to TPMOs who do not perform FMO services.  Furthermore, some, but not all, Medicare Advantage carriers require FMOs to provide documentation and receipts regarding the use of such funds.  NABIP member FMO representatives indicate that agencies require similar documentation from servicing agents who seek and obtain reimbursement that flows from such funds, but this is a best industry practice, not a required one.  Some of our members also report that they have heard rumors of marketing funds being



used by some unscrupulous industry actors as a means of providing back-end incentives to agents and others, but we have no direct evidence of this practice.  Nevertheless, NABIP in no way condones the use of funds in such manner, and we propose that CMS take steps in any final rule to regulate the use of marketing funds.

To that end, we suggest that the distribution of all such funds from Medicare Advantage carriers to both FMOs and other TPMOs, be both reported and transparent. We suggest that CMS require that FMOs and TPMOs who are not directly contracted with Medicare Advantage carriers, such as lead generation agencies and call centers, maintain transparent documentation of both the receipt of such funds and their source, as well as how account for how all such funds are spent and distributed.  Finally, we suggest that it be required that any servicing agent or other entity that is provided with such funds to reimburse incurred marketing expenses be required to document and account for such expenditures in a transparent manner. Imposing such reasonable controls should ensure that marketing funds provided by the carriers to FMOs and other TPMO recipients are only used for reasonable and legal purposes.
to them that they did not use during the first six months of the year.


**Annual Health Equity Analysis of Utilization Management Policies and Procedures**

As per prior rulemaking, as of January 1, 2024, Medicare Advantage plans must have a utilization management review committee. The proposed rule would require the committee to include at least one member with expertise in health equity, such as "experience conducting studies identifying disparities amongst different population groups." The committee also would be required to conduct an annual health equity analysis of the plan's use of prior authorization on enrollees with one or more of the following social risk factors: (1) receipt of the low-income subsidy or being dually eligible for Medicare and Medicaid; or (2) having a disability. Each Medicare Advantage plan would also be required to publish its health equity analysis on its public website. Given that ensuring health equity is a core part of NABIP's mission to ensure all individuals have equitable, culturally competent, high quality health care and treatment, we strongly support the proposed new health equity requirements for Medicare Advantage plans.

In addition to the populations the proposed rule seeks comment on whether additional communities, such as LGBTQ+, limited English proficiency, or other persons should be included in the health equity analysis.  While NABIP members see the value of assessing health equity and these additional populations, we do caution CMS to consider the available sources of relevant data.  For example, a plan would not have a definitive way of knowing a beneficiary's LGBTQ+ status or their literacy level, and plan certainly would not have the authority to collect such data, especially during the prior authorization process.

Regarding the request for information about how CMS and the affected issuers should determine expertise in health equity, NABIP notes that the National Committee for Quality

**NABIP**

Shaping the *future* of healthcare

Assurance offers an equity designation for issuers.  Certain state-based exchanges require all approved issuers to complete this designation, since it is the most comprehensive being offered in the marketplace today, and CMS could take similar action.  Further, NABIP feels that health equity training and certification must be continuous and go beyond understanding how to collect data. It should also speak to how to analyze, interpret, and implement that data. Also, when assessing health equity. experience and qualitative measures are just as important as quantitative. Further, assessing health equity requires measuring community engagement.

Dr. Serio Aguilar-Gaxiola, founder and director of the UC Davis Center for Reducing Health Disparities, has led a body of work around how to measure meaningful community engagement as a core component to advancing health equity. Building off this work more broadly, Dr. Sergio partnered with the National Academy of Medicine to establish a measurement framework and taxonomy.[1] The conceptual model posits four broad categories or domains of measurable outcomes:

- Strengthened partnerships and alliances
- Expanded knowledge
- Improved health and health care programs and policies
- Thriving communities

Under each domain are potential and relevant indicators. The conceptual model presents nineteen mutually exclusive indicators divided across the four domains. We urge CMS to work in partnership with private sector to establish the measurable indicators that can reviewed within each of these four domains.

**Mid-Year Formulary Changes**

The proposed rule would let Part D plans make mid-year formulary changes to substitute an FDA-approved biosimilar biological product which has not been deemed interchangeable, for a reference product as a maintenance change (meaning it could apply to all plan beneficiaries mid-year with 30 days' notice). NABIP members support this proposal, as we believe it would help with prescription drug access due to supply-chain issues and also better align Part D practices with state/private market rules.  However, we suggest that it be accompanied with a special enrollment period (SEP) for individuals who are directly affected by the formulary change, so that they have the opportunity to change plans to one that covers their original medication.  In addition, when creating this SEP, it will be important to specify that Medicare

---

[1] Source: Assessing Meaningful Community Engagement: A Conceptual Model to Advance Health Equity through Transformed Systems for Health - National Academy of Medicine (nam.edu)

beneficiaries can rely on their brokers to assist them, since the broker provides year-round service to their clients.

**Increasing the Percentage of Dually Eligible Managed Care Enrollees Who Receive Medicare and Medicaid Services from the Same Organization**

The proposed rule would create new monthly special enrollment periods for standalone prescription drug plans and fully integrated care plans ("D-SNPs") available to dual-eligible and low-income subsidy ("LIS") individuals.  CMS would also limit cost-sharing in certain D-SNPs and gradually lower the enrollment threshold for MA plans that enroll dual-eligible individuals before the MA plan is considered a D-SNP "look-alike" plan. Our membership recognizes that this proposal would affect a very limited number of D-SNP plans, so we do not object to the creation of this new SEP.  However, our membership would like to caution CMS about the trend of increasing the number of available SEPs generally with the D-SNP community. Unfortunately, bad actors often use SEP periods as a mechanism for marketing bad practices and preying on a vulnerable community.

Thank you for the opportunity to comment on this draft regulation, as well as your willingness to consider the viewpoints of all stakeholders. If you have any questions or need additional information, please do not hesitate to contact John Greene, senior vice president of government affairs, at jgreene@nabip.org or (202) 595-3677.

Sincerely,

John Greene
Senior Vice President of Government Affairs
National Association of Benefits and Insurance Professionals (NABIP)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| Council for Medicare Choice, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>United States Department of Health and Human Services, *et al.*,<br><br>                    Defendants. | Case No. 4:24-cv-446-O |

## DECLARATION OF CRAIG UCHYTIL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, I, Craig Uchytil, declare as follows:

1.      I, Craig Uchytil, submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2.      I am over the age of eighteen and submit this Declaration from personal knowledge based on information reviewed or referenced herein.

3.      I am currently the President and CEO of e-TeleQuote Insurance, Inc. ("Company"), where I have been employed since November 2022.  I am responsible for leadership and oversight of company operations and the Company's approximately 375 health insurance-licensed employee agents.  And I am broadly familiar with the effect the challenged "Compensation Rule" will have on the Company.

4.      The Company is a third-party firm and a member of the Council for Medicare Choice ("Council").  The Company markets Medicare-related insurance products underwritten by

**App.220**

third-party health insurance carriers to eligible Medicare participants through our licensed health insurance agents.

5.      The Company contracts with approximately six carriers of health care plans under Medicare Advantage or prescription drug plans under Part D.  The Company collectively serves approximately 120,000 MA and Part D beneficiaries.  The Company's agents are compensated the same amount regardless of which plan a beneficiary might select.

6.      Fair-market value administrative payments are a critical part of the Company's business model.  Carriers agree by contract to these payments in exchange for the administrative services the Company provides.  These payments cover the costs necessary for the Company to provide many vital administrative services that help the Company's agents make a selection of plans available to, and to better serve, beneficiaries, such as:

    a.  Recruiting, licensing, and training agents.

    b.  Providing compliance and quality assurance programming.

    c.  Maintaining technological support services for agents.

    d.  Providing customer service support for membership.

7.      The Company's business model has been built upon the expectation of receiving administrative payments up to fair-market value since it was founded in 2011.  The Centers for Medicare and Medicaid Services ("CMS") has never subjected those payments to any limits other than the requirement that they not exceed fair-market value.

8.      The Company's contracts with plan carriers also often include marketing expense reimbursements, which typically offset a portion of the marketing expenses associated with acquiring a new client.  The Company's services help plans make carriers' options known and available to more beneficiaries. Those carriers pay the Company for this market expansion.  For

2

example, a plan carrier might agree to a marketing expense reimbursement that provides for the carrier to pay the Company an additional amount for each new member or existing member plan change that occurs.  These contractual arrangements reflect payment for services of value provided to the carrier, help to fund the Company's efforts to expand its outreach to eligible beneficiaries, and help the Company to innovate and improve its services.

9.     The uncertainty caused by the Compensation Rule's Fixed Fee and Contract-Terms Restriction will have an immediate and adverse effect on these essential components of our business.

10.    The Company is already in discussions with carriers that are seeking to modify their contracts and agreements for contract year 2025, which may need to conform to the Fixed Fee. Although the Fixed Fee leaves in place the current regulatory provision specifying that "compensation requirements only apply to independent agents and brokers," 42 C.F.R. § 422.2274(d), the Compensation Rule does not define "agent," "broker," or "independent agents and brokers," leaving uncertain whether those terms include firms like the Company.  Because of this uncertainty that CMS failed to clarify, carriers and firms could risk enforcement actions if they left in place their current contracts, administrative payments, and business practices.  To avoid that risk, the Company would need to change those contracts and payments in ways it otherwise would not.  And carriers are raising the potential need for such changes in contract negotiations.

11.    If it goes into effect and is applicable, the Fixed Fee and Contract-Terms Restriction will have a significant impact on the Company's revenues and the services it currently provides. The Company would receive less revenue from administrative payments than it otherwise would because the value of administrative payments that the Company currently receives at fair-market rates significantly exceeds the Rule's current fixed rate (which is estimated to be $726 per initial

3

enrollment in Contract Year 2025 and half that per renewal, *see* 89 Fed. Reg. at 30,626 (Table FC-2)). And because of that reduction in revenue, the Company would have to cut administrative services that it currently provides and that are funded by current fair-market administrative payments. For example, the Company would likely have to dramatically reduce the suite of support services it provides to its agents in an effort to remain profitable. And even then, the Rule's effects on the Company's revenue may be so severe that the Company might not be able to achieve long-term profitability and may be forced to exit the market entirely.

12.     One firm that provides administrative services—Assurance IQ, which used technology to match consumers with insurance plans that are purchased online or through an agent—recently exited the industry entirely. *See* Insurance Journal, *Prudential to Wind Down Direct-to-Consumer Assurance Business* (May 1, 2024), https:// www.insurancejournal.com/ news/ national/ 2024/05/01/ 772359.htm.

13.     If it goes into effect and is applicable, the Contract-Terms Restriction would also threaten the Company's core business model. In the Rule's preamble, CMS stated that "volume-based bonuses" will "likely run afoul of the provision." 89 Fed. Reg. at 30,621/1. To avoid the prospect of an enforcement action and liability, carriers may determine that they can no longer agree to contract terms providing for volume-based bonuses. Thus, if the Rule goes into effect, the Company may be forced to renegotiate contracts that currently include volume-based bonuses to eliminate those bonuses and to enter into new contracts that do not include volume-based bonuses but otherwise would have contained such bonuses absent the Rule.

14.     Furthermore, the Rule forces the Company to incur significant compliance costs. To comply with the Rule, the Company will need to divert attention and resources to review and renegotiate its existing contracts and consider restructuring its business relationships. Likewise,

if the Rule goes into effect and is applicable, the Company will be forced to divert its resources toward business model changes and reallocating resources, including investments and personnel time, that are compliant with the Rule.  The Company is currently working on these changes to prepare to be compliant with the Rule if it remains in effect.  Even if it is possible to change these contracts and reverse structural changes at some later date if the Rule is enjoined or vacated, the Company will, in the meantime, incur substantial costs to negotiate contracts and restructure its business practices to prepare to comply with the Rule.  And the Company would incur similarly substantial costs to unwind all of this work if the Rule were to be enjoined or vacated.

15.    The Company would have to institute significant recordkeeping changes to track administrative payments to ensure those payments do not exceed the new fixed rate.  Changes would need to be arranged immediately and implemented in advance of October 1, 2024.

16.    The Rule's effective date also means that the Company will soon be making significant business and investment decisions that will be materially different if the Rule remains in effect.  The annual enrollment period begins on October 15.  But the Company must prepare for that enrollment period well in advance.

17.    One example is the Company's hiring decisions.  Each year, the Company hires agents and brokers for the upcoming plan year.  Each year, the vast majority of the Company's hiring decisions must be completed by late July because after that date, the Company does not have time to adequately train agents that it hires.  But the Company's hiring decisions and investment decisions this year will look very different depending on whether the Rule is in effect or not.  The Company is currently hiring agents, and has hired fewer agents than normal because of the uncertainty regarding the Rule.  And if the Rule applies to the Company and is still in effect as of late July, then the decrease in administrative payments described above will reduce the

5

**App.224**

Company's revenues and budget.  In turn, the Company will be forced to significantly reduce the number of agents that it hires.  And the Company must finalize these decisions by the end of July because that is when it stops hiring agents in the ordinary course.

18.     In addition, the Company will soon sign contracts that in the ordinary course would provide for volume-based bonuses and administrative payments that would exceed the new fixed rate for Contract Year 2025 and subsequent Contract Years.  It is unclear whether and to what extent these contracts must adhere to the requirements of the new Rule.  Specifically, the Rule purports to grant a safe harbor because "existing" requirements "will continue to apply" before October 1, 2024, so contracts "that are not in compliance" with the Rule "will not be subject to remedial action for activities engaged in before October 1, 2024, even if they were related to 2025 contract year plans."  89 Fed. Reg. at 30,621/3.  But exempting "activities engaged in before October 1," *id.*, leaves open the question whether the Rule applies to *payments* made after October 1, 2024, even if those payments are made pursuant to pre-October 1 contracts.

19.     Because of this uncertainty, the Company may be forced to negotiate its contracts in ways it otherwise would not, solely to ensure that they comply with the Rule if it does apply.  As the October 15 start of the annual enrollment period approaches, it will become increasingly difficult to renegotiate any terms that may need to be changed to ensure compliance or that, alternatively, the Company may be able to obtain from carriers once the Rule is enjoined or vacated.  Based on my business experience and judgment, a ruling by this Court later than mid-July will leave insufficient time to complete any negotiations that are commenced once the validity and requirements of the Rule are determined by the Court.

**App.225**

20.    These injuries are directly and immediately traceable to the challenged Rule and would be remedied by a judgment vacating the challenged provisions of the Rule or its effective date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 20, 2024          _Craig Uchytil_
Louisville, Kentucky                   Craig Uchytil

7

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| Council for Medicare Choice, *et al.*, | |
| Plaintiffs, | Case No. 4:24-cv-446-O |
| v. | |
| United States Department of Health and Human Services, *et al.*, | |
| Defendants. | |

**<u>DECLARATION OF ROBERT REES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION</u>**

Pursuant to 28 U.S.C. § 1746, I, Robert Rees, declare as follows:

1.      I, Robert Rees, submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2.      I am over the age of eighteen and submit this Declaration from personal knowledge based on information reviewed or referenced herein.

3.      I am currently the Chief Sales Officer at eHealthInsurance Services, Inc. ("eHealth"), where I have been employed since 2020.  I am responsible for overseeing the entire sales organization at eHealth, including our Medicare sales, training, and retention departments. And I am broadly familiar with the effect the challenged "Compensation Rule" will have on eHealth.

4.      eHealth is an independent licensed insurance agency and web broker and a member of the Council for Medicare Choice ("Council"). eHealth operates a user-friendly online marketplace platform (www.eHealthlnsurance.com) and employs hundreds of licensed insurance

1

**App.227**

agents to provide our customers access to Medicare Advantage ("MA") and Part D plans (along with other related products).

5.     eHealth contracts with over 180 carriers of health insurance plans, including 55 carriers offering Medicare Advantage and prescription drug plans under Part D that represent the vast majority of the market.  As of December 31, 2023, eHealth had approximately 600,000 MA and 200,000 Part D active members.

6.     Fair-market value administrative payments are a critical part of eHealth's business model.  Carriers agree by contract to these payments in exchange for the administrative services eHealth provides.   These payments cover the costs necessary for eHealth to provide these administrative services, which help beneficiaries understand the ins and outs of the plan in which they plan to enroll.  eHealth's administrative services include, for example:

     a.     Recruiting, hiring and onboarding agents;

     b.     Training, licensing and oversight of agents;

     c.     Maintaining a robust compliance program that includes oversight of marketing materials, beneficiary calls, and investigatory functions;

     d.     Maintaining a system capable of recording every call with every beneficiary, and storing the data for 10+ years;

     e.     Onboarding and maintaining relationships with carriers, including facilitating the exchange of enrollment applications and quality assurance programs;

     f.     Building and maintaining an online marketplace;

     g.     Developing and improving technology, such as plan-comparison tools (available both online and to callers) that allow beneficiaries to compare

2

**App.228**

Medicare plans to check if switching plans could improve their insurance coverage, based on their particular needs, and expanding options for beneficiaries to communicate with agents;

    h.    Performing health risk assessments; and

    i.    Marketing plans to beneficiaries.

7.    eHealth's business model has been built upon providing the services above, with the expectation of receiving administrative payments at fair-market value in exchange. The Centers for Medicare and Medicaid Services ("CMS") has never subjected those payments to any limits other than the requirement that they not exceed fair-market value.

8.    eHealth's contracts with plan carriers often include repayment for additional marketing services, the cost of which depends on the number of customers the marketing is expected to reach. These agreements use, as permitted under existing regulations, the number of enrollments as a proxy for measuring the effectiveness of the marketing efforts. For example, a plan carrier might agree to a marketing campaign that is expected to reach 500,000 potential customers, and the carrier will pay eHealth for the cost of the campaign. These contractual arrangements reflect payment for services of value provided to the carrier.

9.    The Compensation Rule's Fixed Fee and Contract-Terms Restriction will have an immediate and adverse effect on these essential components of our business.

10.    Both eHealth and the carriers are already working on budgets that take the Fixed Fee into account, and these budgets will shape the contracts being negotiated between eHealth and the carriers. eHealth is already in discussions with carriers that are seeking to modify their contracts and agreements for contract year 2025 to conform to the Fixed Fee. Although the Fixed Fee leaves in place the current regulatory provision specifying that "compensation requirements

3

only apply to independent agents and brokers," CMS failed to clarify the meaning of "independent agents and brokers," and due to the ambiguity carriers and firms could risk enforcement actions if they left in place their current contracts, administrative payments, and business practices. To avoid that risk, eHealth must change those contracts and payments in ways it otherwise would not. And carriers are seeking such changes in contract negotiations.

11.    The Fixed Fee will impact eHealth's revenues and the services it currently provides. eHealth will receive less revenue from administrative payments than it otherwise would because the Rule's current fixed rate (which is estimated to be $726 per initial enrollment in Contract Year 2025 and half that per renewal, *see* 89 Fed. Reg. at 30,626 (Table FC-2)) is far less than the cost to provide the services. Indeed, the Fixed Fee fixes a payment rate per initial enrollee that is well more than $100 *below* eHealth's 2023 costs to acquire a new customer, which costs have historically been offset by administrative payments. If eHealth will no longer receive fair-market value for the administrative services it currently provides, eHealth will have to determine where and how to cut such services. For example, eHealth may have to reduce the number of carriers with whom it works (offering consumers less choice), reduce its compliance program, and/or reduce the training and oversight of its licensed sales agents. All of these cutbacks would negatively impact consumers.

12.    The ambiguity surrounding the Contract-Terms Restriction will also threaten eHealth's core business model. If the Rule goes into effect, eHealth will be forced to negotiate contracts to avoid any contract term that might have an "indirect" effect of incentivizing anything less than a completely objective assessment of a beneficiary's needs, which is a standard lacking any useful guidance.

13.     Furthermore, the Rule forces eHealth to incur significant compliance costs.  To comply with the Rule, eHealth will need to divert attention and resources to reviewing and renegotiating its existing contracts and restructuring its business relationships.  Likewise, eHealth will be forced to divert its resources toward building out its new business model and reallocating resources, including investments and personnel time, from services that eHealth will be forced to slash.

14.     The Rule's effective date also means that eHealth will soon be making significant business and investment decisions that will be materially different if the Rule remains in effect. The annual enrollment period begins on October 15.  eHealth must prepare for that enrollment period well in advance.  There are two examples of significant business decisions that must be made by mid-July and will be affected by the Rule.

15.     First, eHealth hires agents each year who can help with the busy annual enrollment period.  eHealth must complete the last of those hires by August to allow sufficient time to train those agents before the enrollment period begins in October.  In the ordinary course, eHealth starts to recruit agents about six weeks before their start date.  So for the August class of agents, eHealth will recruit them starting no later than July.  By mid-July, eHealth must therefore decide whether it will seek to hire a large August agent class, a small class, or no new agents at all.  That hiring decision will depend on the Rule.  If the Rule is still in effect in mid-July, then eHealth will have to budget for lower total amounts of administrative payments, which will reduce eHealth's hiring budget.  Absent an injunction, therefore, eHealth will recruit and hire a smaller class of agents than it would in an ordinary year.  Given that approximately 4.1 million Americans will turn 65 this year—setting a record for newly eligible Medicare beneficiaries—this year is not an ordinary year.

And after eHealth's hiring decisions are made in mid-July, it will be too late to hire, train, and appoint agents with carriers even if the Rule was later enjoined or vacated.

16.    eHealth has to make similar decisions about other business departments.  For example, if eHealth hires a large number of agents who will make more plan sales, then eHealth will need more personnel to work on marketing materials, ensure regulatory compliance, and process beneficiary complaints with respect to the sales.  Because these decisions about eHealth's business operations depend on the number of agents eHealth hires, these decisions must also be made by mid-July.

17.    Second, eHealth helps carriers advertise their plans and make marketing decisions in print, television, and online media.  Many of these ads will run in the weeks leading up to and through the annual enrollment period, which begins on October 15.  Well in advance of that date, however, eHealth has to decide how much advertising time or space to purchase, and must make the investments needed to produce the ads.

18.    For example, eHealth produces television commercials for carriers.  It takes about two months to produce a commercial in the ordinary course.  Accordingly, to produce a commercial that can air by the time the enrollment period begins, eHealth must start production no later than mid-August.  Even before that, eHealth must purchase advertising time for these television commercials.  And eHealth ordinarily decides how much advertising time to purchase by mid-July because advertisements are most cost-effective when they are purchased farther away from the date they run—especially in an election year.  The Rule's status as of mid-July will directly affect eHealth's business decisions and investments in advertising.  eHealth will purchase less advertising if the Rule remains in effect than if the Rule is enjoined, because eHealth would have a smaller marketing budget available.  Further still, if the Rule is not enjoined, eHealth will

App.232

either produce fewer commercials or stop production of commercials mid-shoot. And if eHealth cuts back its marketing of plans or production of commercials, then eHealth will lose revenue because it is performing fewer of the services for which carriers pay. After mid-July, none of that lost revenue would be recoverable: eHealth could not restart the process of producing commercials and purchasing ads in time for the upcoming annual enrollment process.

19.     As another example, when eHealth develops a print marketing campaign, in the ordinary course it must reserve print production capacity with vendors by the end of July for production to be complete by October 1, 2024. That lead time is necessary because the entire industry is trying to print their own marketing materials in advance of the October enrollment period, and printers have limited capacity. As with television ads, eHealth will print fewer marketing materials if the Rule is not enjoined, which in turn will cause eHealth to lose revenue that it cannot recover.

20.     In addition, eHealth will soon sign many contracts that in the ordinary course would provide for administrative payments exceeding the new fixed rate for Contract Year 2025 and subsequent Contract Years. It is unclear whether and to what extent these contracts must adhere to the requirements of the new Rule. Specifically, the Rule purports to grant a safe harbor because "existing" requirements "will continue to apply" before October 1, 2024, so contracts "that are not in compliance" with the Rule "will not be subject to remedial action for activities engaged in before October 1, 2024, even if they were related to 2025 contract year plans." 89 Fed. Reg. at 30,621/3. But exempting "activities engaged in before October 1," *id.*, leaves open the question whether the Rule applies to *payments* made after October 1, 2024, even if those payments are made pursuant to pre-October 1 contracts. eHealth will thus be forced to err on the side of caution and assume

**App.233**

the Rule's limitations apply to any payments made after October 1, 2024, regardless of when the contract providing for those payments was executed.

21.      Because of this uncertainty, eHealth will be forced to either negotiate its contracts in ways it otherwise would not, solely to ensure that they comply with the Rule or risk an enforcement action.  This is exceedingly disruptive to eHealth's business and will divert attention away from serving plans and the beneficiaries to whom they provide insurance.  As the October 15 start of the annual enrollment period approaches, it will become increasingly difficult to renegotiate any terms that may need to be changed to ensure compliance or that, alternatively, the Company may be able to obtain from carriers once the Rule is enjoined or vacated.  Based on my business experience and judgment, a ruling by this Court later than mid-July will leave insufficient time to complete any negotiations that are commenced once the validity and requirements of the Rule are determined by the Court.

22.      These injuries are directly and immediately traceable to the challenged Rule and would be remedied by a judgment vacating the challenged provisions of the Rule or its effective date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 20, 2024
Austin, Texas

Robert Rees

8

**App.234**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| Council for Medicare Choice, *et al.*, <br><br>　　　　Plaintiffs, <br><br>　v. <br><br>United States Department of Health and Human Services, *et al.*, <br><br>　　　　Defendants. | Case No. 4:24-cv-446-O |

**DECLARATION OF AUDRA SULLIVAN IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, I, Audra Sullivan, declare as follows:

1.　　I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2.　　I am over the age of eighteen and submit this Declaration from personal knowledge based on information reviewed or referenced herein.

3.　　I am the President of Vogue Insurance Agency LLC ("Vogue"), which is a Texas company headquartered in Arlington, Texas.  I am also a member of the National Association of Benefits and Insurance Professionals ("NABIP").  I am also the President of Fort Worth Association of Health Underwriters, Inc., which is NABIP's Fort Worth chapter.

4.　　Vogue is a brokerage agency.  It employs licensed and certified Medicare Advantage and Medicare Part D agents.  Its agents work directly with beneficiaries to help them make an informed decision about which health insurance plan is best for their needs and to enroll in that plan.  I am familiar with Vogue's business model and practices.  And I am broadly familiar

1

with the effect the challenged "Compensation Rule" will have on both Vogue and the individual agents and brokers employed by it.

5.     Vogue's agents are contractually approved to sell approximately many national and regional health care plans under Medicare Advantage or prescription drug plans under Part D. We serve approximately 800 MA and Part D beneficiaries every year.

6.     Vogue's financial success depends on long-standing customer relationships, long-term customer satisfaction, and personal client referrals. Vogue and its agents and brokers can do our job successfully—and profitably—only if customers are enrolled in the right plan for them and they renew their enrollments. When our agents help a beneficiary enroll in an MA or Part D plan, therefore, their only goal is to ensure the beneficiary is matched with the plan that is right for his or her health needs. Our agents do not recommend plans based on carriers' administrative payments or reimbursements. In fact, Vogue and its agents and brokers will work to enroll a beneficiary in the right MA or Part D plan even when they do not profit from the sale, if that plan provides the coverage a beneficiary needs.

7.     Vogue and its agents and brokers also work with and rely on a field marketing organization ("FMO") to provide valuable administrative services that Vogue could not afford to provide itself. The FMO's administrative services support our agents and enable them to focus their time and attention on assisting Medicare beneficiaries. Some examples of those services include:

      a.     Assisting with state license applications, which are expensive and time-consuming to obtain.

      b.     Providing continuing education courses to meet ongoing requirements.

      c.     Helping to obtain necessary certifications for agents from plan carriers.

App.236

     d.     Offering customer relationship management software that provides many vital functions all in one program: call recording, data storage, plan-comparison tools, and individualized plan assessment tools.

     e.     Marketing and organizing events with potential beneficiaries, such as local health fairs.

     f.     Assisting with writing business and building a team of agents.

     g.     Supplying carrier-specific and more general marketing materials.

     h.     Obtaining insurance coverage for agents.

     i.     Providing compliance training and advising, including updates and summaries on recent regulatory changes.

8.     The Compensation Rule's Fixed Fee and Contract-Terms Restriction will have an immediate and adverse effect on Vogue, its individual agents and brokers, and our ability to help beneficiaries.

9.     The Fixed Fee will force the FMO that Vogue partners with to cut back on or charge Vogue for the services it provides—and that Vogue needs to help beneficiaries enroll in plans—because the FMO will no longer receive adequate administrative payments.  Vogue cannot afford to pay for or provide all of these administrative services itself.  Without the invaluable administrative services provided by the FMO, Vogue would stop selling Medicare Advantage and Part D plans to our beneficiaries.

10.     More specifically, the Fixed Fee will hinder Vogue Insurance Agency's ability to satisfy its legal obligations.  Because the Fixed Fee will not cover the costs of the administrative services provided by the FMO we partner with, the FMO will reduce services such as assistance obtaining state licensing requirements, carrier certifications, and continuing education courses.

Without those services, Vogue and its agents and brokers would have to expend more time and money to satisfy legal obligations under State law and CMS's own regulations, such as licensing and training requirements.  In turn, Vogue Insurance Agency and its agents and its broker would have less time to engage with beneficiaries who are shopping for Medicare plans.

11.     Moreover, Vogue would have fewer support services available to help beneficiaries select and enroll in the plans that best meet their needs.  For example, if the Rule takes effect and prevents the FMO we partner with from receiving fair-market administrative payments for its call recording services, then the FMO will no longer provide those services to Vogue and its agents and brokers.  We cannot afford to purchase call recording services on our own.

12.     Similarly, the FMO provides proprietary software because of the administrative payments it receives.  That software is valuable to Vogue:  Agents and brokers discuss many plan options with beneficiaries, and the FMO's plan-comparison technology makes the challenging process of evaluating and selecting among those options much easier.  That software also allows agents and brokers to input a beneficiary's prescription drugs and other health care needs, which the software analyzes to produce a data-driven plan recommendation.  Vogue cannot afford these tools itself.  So if FMOs do not provide them, Vogue's agents and brokers will not be able to use these valuable tools when engaging with beneficiaries.

13.     Likewise, the FMO that we partner with provides software that stores up to 10 years' worth of data about beneficiaries and information about client interactions.  It would be cost-prohibitive for Vogue to store this information itself.   Plus, attempting to store this information would create cybersecurity liability risks.

14.     As another example, the Rule will drastically slash the amount that agents are paid for health risk assessments.  Health risk assessments are valuable services because they help plans

deliver better coverage and preventative care that lowers long-term costs.  Agents and brokers are specially trained by FMOs to perform these assessments.  Moreover, these health risk assessments are conducted during initial enrollment meetings with beneficiaries to discuss plans—a guaranteed opportunity to have conversations about the beneficiary's health needs early in the process at a convenient time, *i.e.*, when that beneficiary is already on the phone discussing potential enrollment, rather than in a subsequent visit on some unknown date.  But there is an opportunity cost for agents and brokers to perform health risk assessments.  Because these assessments are valuable and costly, carriers typically pay Vogue's agents and brokers about $25-100 per assessment, and sometimes up to $200.  The amount that carriers pay depends on the type of plan, the complexity of the plan, and the complexity of related enrollment processes (such as questionnaires).  More complicated products and health needs require significantly more time and work for agents.  Under the new Rule, however, carriers will no longer be able to pay full fair-market value for that service.  In turn, agents will likely perform fewer health risk assessments because they will not be worth the time required to complete them.  That will harm carriers, which will have fewer data to help beneficiaries, and harm beneficiaries, who will lose the opportunity to have convenient health risk assessments performed to match their needs to the plan that is right for them.

15.    All told, the combination of compensation that Vogue's agents and brokers receive under existing regulations and the costs of administrative services that those agents and brokers need to do their jobs effectively far exceeds the Fixed Fee's permitted amount (which is estimated to be $726 per initial enrollment in Contract Year 2025 and half that per renewal, *see* 89 Fed. Reg. at 30,626 (Table FC-2), of which $100 purportedly reflects the value of administrative services).

16. The Fixed Fee further threatens our ability to provide a wide array of plan options to beneficiaries. Because FMOs will provide fewer administrative services than they currently provide, more carriers will perform those services in-house. Further, not all carriers will have the ability to contract with thousands of servicing agents and broker who will want to represent them. In turn, our agents will not be able to contract with as many carries to offer as many plans as our agents do today. The result will be less beneficiary choice.

17. The Contract-Terms Restriction, meanwhile, lacks clear definitions and standards. Vogue cannot tell with reasonably certainty whether various contractual terms with carriers are appropriate or not. For example, many of our contracts require Vogue's agents and brokers to sell a defined number of plans to keep the contract. These contracts terms ensure that agents and brokers selling the plans are familiar with the plan. And the administrative burdens and costs of having a low-selling agent on the roster might outweigh the benefits for a carrier. But the Contract-Terms Restriction calls into question these longstanding, legitimate business practices. Because of that uncertainty, we may be forced to change our contracts with carriers to eliminate contract terms that otherwise would be included in our contracts—depending on how carriers interpret the Contract-Terms Restriction. That uncertainty impedes my business's ability to make investments and long-term plans.

18. Furthermore, the Rule would force us either to incur significant compliance costs or to cease selling MA and Part D plans. To continue selling MA and Part D plans, Vogue would be forced to divert attention and resources to reviewing contracts and restructuring our business relationships with FMOs and carriers. Vogue would also have to develop and invest in a recordkeeping and management system to keep track of carrier information (*e.g.*, each carrier's network doctors), client information (*e.g.*, prescription details), and carriers' payments and

6

**App.240**

contract terms (*e.g.*, commissions and reimbursements)—functions that Vogue currently relies on an FMO to provide.  Vogue would have to hire additional employees to enter and keep track of this information.  Additionally, Vogue would have to make additional investments in a new phone system, cloud network upgrades, and cybersecurity efforts because Vogue will no longer be able to rely on an FMO to provide these functions.  Given the direct burdens imposed by the Fixed Fee, Contract-Terms Restrictions, and the significant compliance costs that would be required to provide the services ourselves, Vogue would cease selling MA and Part D plans if the Rule takes effect and governs Contract Year 2025 plans.

19.     The Rule's effective date means that Vogue will soon be making significant business decisions that depend on whether the Rule remains in effect and governs Contract Year 2025.  Every year, by law, carriers submit to CMS bids to offer 2025 plans by the first Monday in June (here, June 3).  Vogue's agents and brokers then obtain certifications in June to meet CMS requirements.  These certifications are provided by third-party organizations such as AHIP.  After that, Vogue's agents and brokers must obtain *carrier-specific* certifications to sell that carrier's plans.  These certifications are provided by the carriers directly.  Carriers typically open these certification periods at the end of June or early July.  And around the same time—in June and July—carriers typically send Vogue, its agents, and brokers contract offers to sell 2025 plans.  At that point, Vogue and its agents and brokers decide which contracts to sign and, in turn, which certifications to obtain.  Vogue's agents and brokers cannot sell plans unless they are certified to do so.

**App.241**

20.     The Rule, however, has thrown Vogue into limbo.  If the Rule does not take effect or apply to Contract Year 2025, Vogue will—as usual—agree to contracts with many carriers and obtain certifications to sell those carriers' plans.  If the Rule is in effect and applies for Contract Year 2025, by contrast, Vogue will not sell MA or Part D plans.  But Vogue must make decisions about which plans to agree to sell and obtain the corresponding certifications by July.  Absent judicial relief before then, Vogue will have to assume either that the Rule will apply (in which case it would not obtain certifications to sell plans) or that it will not apply (in which case it would obtain certifications to sell plans)—and if Vogue's assumption is wrong, then it either will lose the opportunity to obtain certifications to sell plans as it normally would, or it will have wasted time and money to obtain certifications that it will not ultimately use.  Accordingly, in my business experience and judgment, a ruling after July will leave insufficient time to make the business decisions that are necessary to prepare for the 2025 Contract Year once the validity and requirements of the Rule are determined by the Court.

21.     These injuries are directly and immediately traceable to the challenged Rule and would be remedied by a judgment vacating the challenged provisions of the Rule or its effective date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 21, 2024
Fort Worth, Texas                                   Audra Sullivan

8

**App.242**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 21, 2024, I caused the foregoing motion to be filed with the Clerk for the U.S. District Court for the Northern District of Texas through the ECF system. Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

 Dated: May 21, 2024                          Respectfully submitted,


                                              */s/ Allyson N. Ho*
                                              Allyson N. Ho
                                              GIBSON, DUNN & CRUTCHER LLP
                                              2001 Ross Avenue, Suite 2100
                                              Dallas, TX 75201
                                              214.698.3100
                                              aho@gibsondunn.com