**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| Council for Medicare Choice, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>United States Department of Health and Human Services, *et al.*,<br><br>        Defendants. | Case No. 4:24-cv-446-O<br><br><br>**Relief Requested by July 10, 2024**<br><br><br>**Hearing Requested** |

**Plaintiffs' Reply Brief In Support Of**
**Motion For Preliminary Injunction And Stay Of Effective Date**

# TABLE OF CONTENTS

**Page**

I.      Plaintiffs Are Likely To Succeed On The Merits ................................................... 2

    A.      The Fixed Fee Is Unlawful ............................................................... 2

        1.      CMS Cannot Support The Unparalleled Ratemaking Power It Claims ........................................................................................ 2

        2.      CMS's Justifications For The Rule Do Not Withstand Scrutiny ....................................................................................... 6

        3.      The $100 Fixed Fee Increase Is Arbitrary And Capricious ......... 10

    B.      The Contract-Terms Restriction Is Unlawful .......................................... 12

    C.      Applying The Rule To Contract Year 2025 Is Unlawful......................... 13

II.     The Rule Will Irreparably Harm Plaintiffs And Their Members, And The Balance Of Equities And Public Interests Favor Relief....................................... 14

III.    This Court Should Not Limit Relief To Individual Plaintiffs Or Members ........ 16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Prods. & Chems., Inc. v. FERC*,
650 F.2d 687 (5th Cir. 1981) ........................................................................1, 7

*Air Prods. & Chems., Inc. v. GSA*,
2023 WL 7272115 (N.D. Tex. Nov. 2, 2023) ...................................................14

*All. for Hippocratic Med. v. FDA*,
78 F.4th 210 (5th Cir. 2023) ...........................................................................17

*Ass'n of Am. Physicians & Surgeons v. FDA*,
13 F.4th 531 (6th Cir. 2021) ............................................................................17

*Ass'n of Am. Physicians v. Tex. Med. Bd.*,
627 F.3d 547 (5th Cir. 2010) ...........................................................................17

*Burkhart v. Univ. Interscholastic League*,
2023 WL 2940026 (W.D. Tex. Apr. 13, 2023)..................................................13

*Career Colls. & Schs. of Tex. v. DOE*,
98 F.4th 220 (5th Cir. 2024) ............................................................................17

*Chamber of Com. v. DOL*,
885 F.3d 360 (5th Cir. 2018) .............................................................................8

*Chamber of Com. v. SEC*,
85 F.4th 760 (5th Cir. 2023) .....................................................................7, 9, 11

*Chem. Mfrs. Ass'n v. EPA*,
870 F.2d 177 (5th Cir. 1989) ..........................................................................6, 7

*Cmty. Care, LLC v. Leavitt*,
537 F.3d 546 (5th Cir. 2008) .............................................................................5

*Digit. Realty Tr., Inc. v. Somers*,
583 U.S. 149 (2018).............................................................................................3

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016).............................................................................................6

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)...........................................................................................12

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)......................................................................................10, 11

*Ford Motor Co. v. Tex. Dep't of Transp.*,
264 F.3d 493 (5th Cir. 2001) ...........................................................................13

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*FPC v. Hope Natural Gas Co.*,
　320 U.S. 591 (1944) ............................................................................................4

*Gonannies, Inc. v. Goupair.com, Inc.*,
　464 F. Supp. 2d 603 (N.D. Tex. 2006) ..............................................................15

*Greer's Ranch Café v. Guzman*,
　540 F. Supp. 3d 638 (N.D. Tex. 2021) ..............................................................15

*Handley v. Chapman*,
　587 F.3d 273 (5th Cir. 2009) ..............................................................................7

*J.H. Rutter Rex Mfg. Co. v. United States*,
　706 F.2d 702 (5th Cir. 1983) ..............................................................................4

*Luminant Generation Co. v. EPA*,
　675 F.3d 917 (5th Cir. 2021) ..........................................................4, 10, 11, 14

*Mexican Gulf Fishing Co. v. Dep't of Commerce*,
　60 F.4th 956 (5th Cir. 2023) ........................................................................1, 14

*Mock v. Garland*,
　75 F.4th 563 (5th Cir. 2023) ......................................................................12, 16

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
　628 F.2d 604 (D.C. Cir. 1980) ..........................................................................10

*Nat'l Fuel Gas Supply Corp. v. FERC*,
　468 F.3d 831 (D.C. Cir. 2006) ..........................................................................12

*Obduskey v. McCarthy & Holthus LLP*,
　586 U.S. 466 (2019) ............................................................................................3

*R.J. Reynolds Vapor Co. v. FDA*,
　65 F.4th 182 (5th Cir. 2023) ..............................................................................16

*SEC v. Sloan*,
　436 U.S. 103 (1978) .........................................................................................4, 5

*Skidmore v. Swift & Co.*,
　323 U.S. 134 (1944) ............................................................................................4

*Texas v. Biden*,
　10 F.4th 538 (5th Cir. 2021) ................................................................................7

*Texas v. United States*,
　328 F. Supp. 3d 662 (S.D. Tex. 2018) ..............................................................15

*Texas v. United States*,
　809 F.3d 134 (5th Cir. 2015) ............................................................................16

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Wages & White Lion Invs., LLC v. FDA,*
  16 F.4th 1130 (5th Cir. 2021) ...............................................................................14

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ...............................................................................................13

*Window Covering Mfrs. Ass'n v. CPSC,*
  82 F.4th 1273 (D.C. Cir. 2023) ...............................................................................6

### Statutes

5 U.S.C. § 553 .........................................................................................................12

5 U.S.C. § 705 .........................................................................................................17

42 U.S.C. § 1395w-21(j)(2)(D) ...............................................................2, 3, 5, 9, 12, 13

### Regulations

42 C.F.R. § 422.510(a)(2) ........................................................................................13

42 C.F.R. § 422.2274(c)(13) ....................................................................................12

73 Fed. Reg. 54,226 (Sept. 18, 2008) ...................................................................2, 5

86 Fed. Reg. 5,864 (Jan. 19, 2021) ..........................................................................5

88 Fed. Reg. 78,476 (Nov. 15, 2023)..........................................................7, 8, 15, 16

89 Fed. Reg. 30,448 (Apr. 23, 2024) ...........................................7, 8, 9, 10, 11, 15, 16

### Other Authorities

*Medicare Marketing Guidelines* (Nov. 1, 2005)........................................................3

For all its length, CMS's Opposition essentially concedes that CMS engaged in a rushed rulemaking that Plaintiffs showed will have devastating consequences for the industry. This deeply flawed Rule is the product of an agency exercising authority it does not have, and doing so exceedingly poorly. And now, CMS seeks to justify that action with arguments that flout basic requirements for reasoned agency decisionmaking and judicial review.

CMS's view of its authority is breathtaking. It claims power to fix prices for private market transactions without reference to any statutory standard, any analysis of the cost or value of the services at issue, or any other economic data at all. CMS believes it can do so, moreover, while withholding from public scrutiny most of the evidence on which it purportedly relied, Opp. 43, ignoring clear Fifth Circuit precedent that agencies cannot "'promulgate rules on the basis of data that, (in) critical degree, is known only to the agency,'" *Air Prods. & Chems., Inc. v. FERC*, 650 F.2d 687, 699 n.17 (5th Cir. 1981). CMS even says that it is free to ignore legitimate criticisms of the handful of studies or data that CMS did disclose as critical to its decisionmaking process, Opp. 34, flouting the basic rulemaking requirement that agencies must "respond" to significant comments, *Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 972 (5th Cir. 2023). And CMS suggests that Congress meant for it to regulate agent's and broker's incentives without any need to assess "empirical[ly]" whether the incentives it seeks to address even exist. Opp. 33. In advancing these arguments CMS piles new APA transgressions on top of those committed in the rulemaking, relying on material and rationales not proffered in the Rule.

Meanwhile, CMS defends its vague Contract-Terms Restriction on the remarkable grounds that its notice of proposed rulemaking need not provide any notice of what conduct CMS intends to regulate: Instead, it can simply propose broad, inscrutable regulatory text and wait for the Final Rule's preamble—after the opportunity for public comment has passed—to give that text meaning.

1

If this Court finds these propositions outrageous and wrong—as it should—CMS's answer is that the Court is powerless to act:  CMS acted so swiftly that irreversible damage to Plaintiffs is done.  That, too, is false.  Although carriers submitted bids on June 3, they are still negotiating contracts with agents, brokers, and firms.  Some carriers have told CMS they want to pay full fair-market value for administrative services.  If the Rule is enjoined or stayed, the industry will be free to resume those fair-market payments for contract year 2025—saving firms, agents, and brokers from going out of business or scaling back the important services they provide.  This Court should preliminarily enjoin or stay the effective date of the Rule's challenged provisions.

## I.    Plaintiffs Are Likely To Succeed On The Merits

### A.    The Fixed Fee Is Unlawful

#### 1.    CMS Cannot Support The Unparalleled Ratemaking Power It Claims

CMS identifies *no* other agency with the expansive authority it now asserts:  to fix prices for vital services without considering "the cost of providing services," a "reasonable return on investment," or *any* other statutorily enumerated "factors" or "empirical or statistical studies." Opp. 28, 35 (quotation marks omitted).  CMS's authority to regulate how compensation is "use[d]," 42 U.S.C. § 1395w-21(j)(2)(D), does not confer that unprecedented power.

CMS vaguely claims that "use" sometimes has an "expansive" meaning, Opp. 25, but it never says what that meaning is or why it supports the Rule.  Regardless, as CMS concedes, the term must be read in "'context,'" *id.*, and context here forecloses CMS's reading.  Rather than authorize CMS to regulate "compensation," Congress qualified that term by adding the word "use."  CMS can thus regulate how compensation is employed—for example, "how compensation is disbursed," 73 Fed. Reg. 54,226, 54,239/1 (Sept. 18, 2008), or "compensation structure," *id.* at 54,238/2.  But it cannot "establish limitations" on the underlying "compensation" itself, *e.g.*, by fixing prices.  42 U.S.C. § 1395w-21(j)(2)(D).

CMS, by contrast, never explains what the word "use" adds if given the expansive meaning CMS prefers. Nor does it explain why Congress eschewed the more straightforward language it typically uses to authorize ratemaking. Mot. 11. CMS thus has no answer to the elementary principles that statutes ordinarily "'do not contain surplusage,'" *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 476 (2019), and different language implies "'a difference in meaning,'" *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161 (2018).

Ultimately, CMS's interpretation of its authority is so broad—and alarming—that it collapses under its own weight. The statute, CMS says, "prohibits *any* compensation ... except compensation allowed by" CMS. Opp. 25. But Congress authorized CMS only to "establish limitations" on the "use of compensation other than as provided under [CMS] guidelines," 42 U.S.C. § 1395w-21(j)(2)(D); a rule adopted in the belief that no compensation may be paid at all except by CMS's grace is a rule predicated on such an audacious misunderstanding of the agency's power that for this reason alone, it should be vacated in full.

The legislative context CMS cites also undermines its argument. Section 1395w-21(j)(2)(D) cannot be understood as "codif[ying]" a ratemaking authority that CMS purportedly asserted in its 2005 Medicare Marketing Materials Guidelines, Opp. 24, because CMS never asserted any such authority. Instead, CMS merely advised carriers—as part of their independent obligation to "comply with all relevant laws … including the Federal and any state anti-kickback statute," *Medicare Marketing Guidelines* 135 (Nov. 1, 2005), tinyurl.com/yc4fmyz6—that they should "[p]rovide reasonable compensation in line with industry standards," *id.* at 138. CMS never suggested that *it* had authority to regulate compensation, much less to fix specific *rates* of compensation. If the pre-Section 1395w-21(j)(2)(D) history shows anything, then, it is that Congress expected CMS to continue to permit market-value payments, not prescribe a universal fixed fee at

artificially depressed levels.  In any event, none of CMS's analysis about the 2005 Guidelines appears in the Rule, and thus is a "*post hoc* rationalization"—one of many in the brief—that this court "must disregard."  *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012).

Nor does CMS's rudderless approach to ratemaking find support in case law.  CMS cites *J.H. Rutter Rex Mfg. Co. v. United States*, 706 F.2d 702 (5th Cir. 1983), as evidence of the government's discretion to limit "how its own contractors spend taxpayer funds."  Opp. 28.  But *Rutter* is a procurement case addressing the government's own contracts with private parties.  It says nothing about CMS's authority to regulate contracts between private parties (here, carriers' contracts with firms, agents, and brokers).  Nor does *FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944), provide an example of ratemaking unmoored from any statutory "factors."  Opp. 28.  Quite the opposite:  Congress imposed a clear statutory standard ("'just and reasonable' rates") with specific requirements—*e.g.*, a "return to the equity owner" that is "commensurate with returns on investments"—dictated by decades of precedent.  320 U.S. at 603.  It thus confirms that the authority CMS claims to set rates without any statutory standard would be an extreme outlier.

CMS thus retreats to invoking "deference."  Opp. 24.  But it does not invoke *Chevron* deference, and absent that, even "consistent and longstanding" agency interpretations merit consideration only to the extent they have the "'power to persuade.'"  *SEC v. Sloan*, 436 U.S. 103, 117-18 (1978) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  The mere "existence of a prior administrative practice" "without a concomitant exegesis … obviously lacks 'power to persuade.'"  *Id.* at 118.  That CMS has been unlawfully capping compensation for years thus cannot make that practice lawful.  CMS's previous, more modest ratemaking practice avoided legal challenge only because it permitted fair-market payments.  App. 18.  Now that CMS's expanded approach has drawn litigation, it is the courts' "responsibility"—not CMS's—"to determine

whether that practice is consistent with the agency's statutory authority." *Sloan*, 436 U.S. at 118.[1]

Should the Court nonetheless defer to CMS's "contemporaneous interpretation" of its authority, Opp. 24, that would only confirm CMS *lacks* authority to set rates for administrative services. Since its first regulation under § 1395w-21(j)(2)(D), CMS has consistently recognized that administrative payments are "not considered compensation" because they do not "relat[e] to the sale or renewal of [a] policy." 73 Fed. Reg. at 54,238/1-2. CMS's gloss on this language as merely stating "that those payments are 'not considered compensation' *for purposes of the then-extant regulations*"—as opposed to reflecting an interpretation of the "statutory term," Opp. 29-30 (emphasis altered)—has no basis. In its prior statements, CMS explained that it was "implementing MIPPA"—the Act that established § 1395w-21(j)(2)(D)—when it defined administrative payments not to constitute "compensation." 73 Fed. Reg. at 54,238/1. CMS was plainly "construing" the statute. Opp. 29. Nor does CMS's longstanding regulation of administrative payments at fair-market value imply that CMS understood them as compensation. *Id.* at 30. Quite the opposite: CMS purported to regulate these payments so they would not be used "to circumvent the limits on compensation to agents and brokers," 86 Fed. Reg. 5,864, 5,994/1 (Jan. 19, 2021)—that is, CMS sought to ensure only that they would *not* be used as compensation.

CMS's previous interpretation also accords with the statutory context, Mot. 13, which CMS ignores entirely. Whatever varied meanings "compensation" may have in other contexts, in a statute focused on incentives for "agents and brokers" regarding "enroll[ment]," 42 U.S.C. § 1395w-21(j)(2)(D), the term logically refers to compensation *for enrollments*, not for any other economic activity that could conceivably have an indirect effect on agents' and brokers' incentives.

---

[1] Nor is this the sort of "'complex and highly technical'" question that CMS claims justifies respect for an agency's interpretation. Opp. 24 (quoting *Cmty. Care, LLC v. Leavitt*, 537 F.3d 546, 552 n.11 (5th Cir. 2008)). Whether Congress authorized CMS ratemaking is a pure question of law.

Finally, even if CMS's current interpretation were correct, CMS was still required to "'display awareness that it is changing position.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). It obviously cannot satisfy that requirement when to this day it still denies that it ever *took* a position on the meaning of compensation. Opp. 29.

### 2.    CMS's Justifications For The Rule Do Not Withstand Scrutiny

As to the reasonableness of the Fixed Fee, CMS's strained attempt to backfill its sloppy rulemaking with post hoc justifications and "evidence" it never subjected to public scrutiny is, in effect, a confession of error. Rather than attempt to show how it satisfied the APA's basic requirements, CMS repeatedly denies that those requirements exist, illustrating time and again its fundamental failure to accept the demands of the rulemaking process.

To start, CMS's brief cites droves of purported evidence that its Proposal never disclosed, including plan contracts, Opp. 32 (citing AR 11584, 11730, 11748); notes of a call with plan representatives, *id.* 12, 32 (citing AR 11379, AR 11760); and the statistics on beneficiary complaints, *id.* at 14, 33 (citing AR 11377), that Plaintiffs have repeatedly challenged CMS for failing to disclose earlier, App. 25-26; Mot. 14-15. The brief also cites a publicly available article on market concentration, Opp. 32 (citing AR 11479), that CMS never disclosed it was relying on. While CMS claims some of these documents are "confidential," Opp. 44, it cites them now so presumably it could have cited them then. And this cannot excuse CMS's failure to disclose its reliance on public sources or to make available sources like the complaint data and call notes that are reproduced in its public brief. In any event, an agency cannot "withhold critical information altogether" from commenters simply because documents include "proprietary" information. *Window Covering Mfrs. Ass'n v. CPSC*, 82 F.4th 1273, 1283-84 (D.C. Cir. 2023). CMS "could have redacted sensitive information" and released the materials to permit public input. *Id.* at 1284; *see also Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 202 (5th Cir. 1989) (similar).

CMS dismisses the obligation to "disclose … 'critical factual material'" as an "out-of-circuit" requirement.  Opp. 43.  But the Fifth Circuit has repeatedly recognized that "'[i]t is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of data that, (in) critical degree, is known only to the agency.'"  *Air Prods. & Chems., Inc. v. FERC*, 650 F.2d 687, 699 n.17 (5th Cir. 1981); *accord Chem. Mfrs.*, 870 F.2d at 202 (agency should have disclosed key economic analysis pursuant to "its duty to publish data" in rulemaking).  By contrast, CMS's sole Fifth Circuit authority on this point—*Handley v. Chapman*—said nothing about what materials must be disclosed in a notice of proposed rulemaking.  587 F.3d 273, 281 (5th Cir. 2009).

CMS likewise flunks APA 101 by denying (at 34) the bedrock requirement to "provide a response" to Plaintiffs' comments criticizing the handful of sources the agency *did* disclose.  *Chamber of Com. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023); *see* Mot. 15.  CMS claims the sources Plaintiffs criticized were not significant enough to warrant defending them.  Opp. 34.  But the Commonwealth Fund study was CMS's *central evidence* for its linchpin assertion that current payments have "significantly outpaced … market rates."  88 Fed. Reg. 78,476, 78,554/1 (Nov. 15, 2023).  Likewise, a purported increase in "marketing complaints" from 2020 to 2021 was CMS's key evidence for its "belie[f]" that "financial incentives are" to blame.  89 Fed. Reg. 30,448, 30,618/1 (Apr. 23, 2024).  These weren't just "interesting data points," Opp. 34, they were CMS's *best* evidence to justify its action.

On top of failing to respond to criticisms of its own key evidence, CMS also refused to acknowledge contrary evidence provided by commenters, Mot. 16, such as surveys showing MA beneficiaries are not bothered by agents' purported financial incentives.  CMS never disputes that it declined to engage this evidence at all.  That is an independent APA violation.  *Texas v. Biden*, 10 F.4th 538, 556 n.5 (5th Cir. 2021).

Substantively, CMS's defense of the Rule fares no better.  CMS promulgated an economic regulation, yet its justifications for the Rule are shot through with inconsistent and impossibly benighted economic reasoning.  Examples abound.  CMS claims that Congress's goal for Medicare Advantage was to "'harness the power of private sector competition'" to make Medicare more "'efficient,'" Opp. 5, 37, yet the Rule eliminates competition by setting a "'uniform'" price for everyone, Opp. 15 (quoting 88 Fed. Reg. at 78,555).  CMS frets that large carriers pay FMOs more money to sell their plans and that small and regional carriers cannot afford to keep up, Opp. 12, but then says that small carriers currently pay more than large carriers, Opp. 17, 19, and relies on complaints from *large* plans that they are paying too much (with no explanation why the large plans cannot just go to lower-priced FMOs), Opp. 13, 32.  And after page upon page accusing FMOs of instigating a "bidding war," Opp. 10, 37, CMS suddenly pivots and insists that carriers (not FMOs) have "ultimate control of what compensation flows to Plaintiffs," and that payments are imposed in contracts "of adhesion" that Plaintiffs are powerless to negotiate, Opp. 46.

This repeated "internal inconsistency" is "characteristic of arbitrary and unreasonable agency action," *Chamber of Com. v. DOL*, 885 F.3d 360, 382 (5th Cir. 2018), and is shockingly shallow work for a rule that fundamentally remakes the market for critical services.

Ultimately, CMS still fails to support the Rule's key premises.  To show that administrative payments supposedly "are rapidly increasing," 89 Fed. Reg. at 30,618/1, for example, CMS compares:  (1) the rate that "[o]ne selected plan sponsor" paid "to sales agents" in 2008, AR 11286, to the rates that *some* FMOs are paid today, Opp. 32; and (2) a *single carrier*'s 2014 and 2023 rates, *id.*  The cherry-picked evidence comes nowhere near showing a trend—let alone a *recent* trend of *rapid* rate increases.  And CMS makes no effort to account for inflation or other factors that may explain these changes, such as carriers providing additional services in response to CMS's ever-

expanding regulatory requirements.  App. 33.

As for the premise that plans are using administrative payments to "circumvent" limits on enrollment compensation, 89 Fed. Reg. at 30,622/3—which CMS now calls the "key problem" targeted by the Rule, Opp. 31—CMS cites no evidence whatsoever, other than its conclusory assertion that administrative payments are too "high" because they can sometimes reach $400, *id.* at 32.  But without even identifying the services those payments cover or attempting to assess their market value, *see infra* at 10-11, CMS has no basis to conclude that they are excessive, much less that they are meant to circumvent existing compensation limits.

As for its other central assertion that administrative payments create "questionable financial incentives" for agents and brokers, 89 Fed. Reg. at 30,618/1, CMS disclaims any need for "'empirical'" evidence at all, Opp. 33.  But before launching a paradigm shift with devastating consequences for the industry and beneficiaries alike, CMS at least had to "adequately substantiat[e]" that a "genuine proble[m]" exists, *Chamber of Com.*, 85 F.4th at 777, by showing that the administrative payments forbidden by the Rule *actually* "creat[e] incentives for agents and brokers," 42 U.S.C. § 1395w-21(j)(2)(D), that could have a real, material impact on enrollment.

Given CMS's insistence that no evidentiary showing is required, it should be unsurprising that its evidence is unreliable.  For example, CMS claims that agents and brokers "admitted they were *recommending* plans *based on* relative commission rate."  Opp. 33 (emphases added) (citing AR 11314).  But the source cited is simply the Commonwealth Fund survey of agents and brokers who reported that "they receive higher commissions" for enrollments in MA plans than in Medigap supplemental plans.  AR 11314.  It says nothing about whether those commissions affected agents' and brokers' plan recommendations.  CMS's other "evidence" is a cursory comment from law professors, AR 7933, an anecdotal comment from a regional carrier that the Rule did not discuss,

App. 873, and the same flawed and previously undisclosed beneficiary complaint data that Plaintiffs have already thoroughly critiqued, Mot. 15-16; *supra*, at 6.  CMS now adds 2022 complaint data, but this Court "must disregard" that data because the Rule does not address it, *Luminant*, 675 F.3d at 931, and regardless, it continues to reflect COVID's effects on the 2021 enrollment period.

CMS's brief confirms:  This Rule is arbitrary and capricious.

### 3.     The $100 Fixed Fee Increase Is Arbitrary And Capricious

CMS has abandoned the original rationale for selecting a $100 increase to its fixed fee: that "the majority [of commenters] recommended higher rates beginning at $100," 89 Fed. Reg. at 30,625/3, and that "[s]everal commenters suggested that an increase of $100 would be an appropriate starting point and reflects the minimum monthly costs of necessary licensing and technology costs," *id.* at 30,626/1.  CMS's rationale was not only legally impermissible, since rulemaking is not a show of hands, *see* Mot. 18, but also factually untrue.  Contrary to CMS's assertion in the rulemaking, Plaintiffs found only one commenter cursorily recommending a $100 increase, *id.*, and CMS's Opposition does not dispute that.  Rulemaking predicated on non-existent data violates the APA.  *See, e.g.*, *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 617 (D.C. Cir. 1980).  And CMS's failure to substantiate, before this Court, a key representation in its rulemaking is Exhibit A for why agencies must expose their work to public scrutiny *before* adopting a rule.

CMS's new post-hoc rationale—which, again, this Court "must disregard," *Luminant*, 675 F.3d at 931—is that it has no "'general obligation'" to conduct "'empirical or statistical'" studies, Opp. 35 (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021)), and therefore did not need to account for the cost of the services at issue.  But whatever the agency's default obligations when "no commenter produce[s] … evidence" or data on the relevant issue, *Prometheus*, 592 U.S. at 427, that gave way the moment CMS grounded its response to the Rule's devastating effects in the flawed premise that $100 "should provide agents and brokers with sufficient funds … to

continue providing adequate service," 89 Fed. Reg. at 30,626/3.  Having sought to justify the Rule on the empirical ground that $100 is in fact sufficient to offset the costs of those services, CMS cannot now assert that a cost analysis is irrelevant.  *Luminant*, 675 F.3d at 925.

CMS concedes that it failed to undertake that analysis, Opp. 36, which refutes CMS's reasons for concluding that "requests for more than $100 were too high," Opp. 34.  CMS speculated that recommendations of more than $100 "may" have been inflated to include the "full price" of technology used for MA plans, Part D plans, and unspecified "other markets."  89 Fed. Reg. at 30,626/1-2.  But contrary to the demands of reasoned decisionmaking, *Chamber of Com.*, 85 F.4th at 777, CMS never substantiated that speculation.  And even if CMS guessed correctly, it would have had to know the full price of technology and the costs of all other administrative services to determine how much commenters' high-end proposals supposedly overshot true costs.  CMS instead threw up its hands.  Mot. 17.  CMS's protestation that it lacked the "data and contracts" needed to evaluate true costs, Opp. 34, is a reason why CMS should have studied the market more carefully before attempting the concededly "trick[y]" task of top-down price fixing, *id.* at 17.

Finally, CMS's repeated assertion (at 18, 30, 36-38) that the $100 fixed fee gives agents and brokers "the opportunity to decide which services are truly essential and how much those services are worth," 89 Fed. Reg. at 30,624/2, is downright Orwellian.  With this, CMS is saying that the Rule will force agents and brokers to forgo some services and to make do with "truly" essential services only.  But CMS cannot know whether it has cut too close to the bone—depriving funding for services it admits are "necessary to sell the best plans to beneficiaries," Opp. 38— without determining what those necessary services are and the costs of providing them.  Agents' supposed "opportunity to decide" is, in truth, reckless government compulsion.

Ultimately, each of these shifting rationales is flawed for distinct reasons.  But Plaintiffs

need only defeat one.  Where, as here, an agency "has relied on multiple rationales" but "has not done so in the alternative," and "at least one of the rationales is deficient," vacatur is generally appropriate.  *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006).  Plaintiffs are thus likely to prevail on the merits of their challenge to the Fixed Fee.

### B.      The Contract-Terms Restriction Is Unlawful

CMS barely addresses the additional, independent flaws in its impermissibly vague Contract-Terms Restriction.  Opp. 39-41.  But its brief discussion only reinforces that the Restriction is nothing but an unlawful end run around the APA's notice-and-comment requirements.

According to CMS, to implement Congress's directive to establish "guidelines" that "ensure that the use of compensation creates [appropriate] incentives," 42 U.S.C. § 1395w-21(j)(2)(D), CMS need only "mirro[r]" that vague statutory objective in an equally vague regulation, Opp. 40—here, by banning all contracts with "the direct or indirect effect of creating an [improper] incentive," 42 C.F.R. § 422.2274(c)(13).  The proposed regulation need not identify *what contract terms* create those incentives.  Instead (says CMS), no constraint on vagueness *even applies*, and if it does, CMS can simply cure that vagueness by offering "additional examples" of prohibited conduct in the "preamble" to the Rule, without ever subjecting its prohibition of that conduct to "a new round of notice and comment."  Opp. 39-40.

CMS's hide-the-ball approach turns notice-and-comment rulemaking on its head.  The APA requires agencies to give notice of the "substance of the proposed rule."  5 U.S.C. § 553(b)(3).  That requirement is obviously defeated—and meaningful public comment is impossible—if the regulatory text omits "'fair notice of what is prohibited.'"  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  And the logical outgrowth doctrine, Opp. 40-41—which is grounded in the same "'fair notice'" considerations and merely allows an agency to adjust its proposal in ways the public could "have reasonably anticipated," *Mock v. Garland*, 75 F.4th 563, 583-84 (5th

Cir. 2023)—has no possible application where the proposal is too vague for the public to "antici-pate" what conduct it regulates. CMS thus easily fails that standard because it never explains how the new examples in the Rule's preamble could have been anticipated from the Proposal.

Even if the due process limits on vagueness did not apply in this context, therefore, the Rule would violate the APA. But CMS is simply wrong that due process limits are inapplicable. Unlike the "'civil sporting cod[e]'" in *Burkhart v. Univ. Interscholastic League*, 2023 WL 2940026, at *6 (W.D. Tex. Apr. 13, 2023), the Contract-Terms Restriction is a "penal" regulation, Opp. 39, because CMS can cancel carriers' contracts if they act "inconsistent with" the regulations, 42 C.F.R. § 422.510(a)(2), and "impose civil money penalties," *id.* § 422.752(c)(1). Such penal-ties warrant "strict … review" for vagueness. *Ford Motor Co. v. Tex. DOT*, 264 F.3d 493, 508 (5th Cir. 2001). And CMS's contention that the Rule merely "mirrors" the statute, Opp. 40, cuts *against* CMS's argument that it satisfied due process, since Congress intended CMS to "establish" "guidelines" to give meaning to its otherwise vague statutory text, 42 U.S.C. § 1395w-21(j)(2)(D).

Apart from being impermissibly vague, the Contract-Terms Restriction is also unlawful for the same reasons as the Fixed Fee, and because it is based on extra-statutory objectives—namely, promoting competition. Mot. 19. CMS claims that competition "is baked into" the law implicitly, Opp. 37, but for an agency to regulate for purposes of achieving a particular policy goal, the "tex-tual commitment must be a clear one," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Section 1395w-21(j)(2)(D) says not a word about promoting competition.

### C.     Applying The Rule To Contract Year 2025 Is Unlawful

After ignoring Plaintiffs' comments requesting clarity about the Rule's application to *pre-October* contracts that provide for *post-October* payments, and brushing aside Plaintiffs' warnings about due process, *see* Mot. 21, CMS has finally responded. The agency confirms that the worst is true—the Rule applies to contracts executed any time after June 3 that call for payments in

CY2025—and it dismisses Plaintiffs' due process concerns.  Opp. 42.  But counsel's belated responses are "post hoc rationalization[s]," *Luminant*, 675 F.3d at 931, that cannot erase the agency's refusal to "respond to significant issues raised by public comments," *Mexican Gulf*, 60 F.4th at 972; *see* Mot. 21.  On that basis alone, the Rule's application to CY2025 is unlawful.

## II. The Rule Will Irreparably Harm Plaintiffs And Their Members, And The Balance Of Equities And Public Interests Favor Relief

Rather than dispute the Rule's devastating and immediate financial impacts on firms, agents, and brokers, CMS claims those harms do not count.  Opp. 45.  But CMS's theory—that "strictly financial harm" cannot support preliminary relief, *id.*—flouts precedent.  "[F]inancial injur[ies]," including loss of "revenue," count as "irreparable" harm when the loss is "likely unrecoverable" absent immediate relief.  *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).  The government "enjoy[s] sovereign immunity for any monetary damages," so Plaintiffs lack a remedy for lost revenues.  *Id.*  CMS identifies none.  That is irreparable harm.[2]

Contrary to CMS's speculation, it is not "too late" to grant meaningful relief.  Opp. 3, 46-47. Carriers do not "control … compensation" for all Plaintiffs unilaterally, *id.* at 46—an assertion that is specious in an Opposition that otherwise portrays carriers as pawns in a "bidding war" conducted by FMOs.  *E.g.*, *id.* at 10, 11, 35, 37; *see supra*, at 8.  In truth, Plaintiffs and their members negotiate directly with the larger firms, App. 222, and market forces drive their contracts with agents and brokers, App. 241.  If CMS's limit on administrative payments is enjoined, carriers will have to resume paying fair market rates or forfeit contracts.  Some have already indicated that they prefer to pay market rates for firms' "important services."  AR 6006-07.

Nor will carriers' June 3 "bids" to CMS prevent them from paying market rates.  Opp. 46-

---

[2] By contrast, in *Air Products & Chemicals, Inc. v. GSA*, the plaintiffs' financial injuries were not irreparable because they were "subject to a … contract with the government" that allowed them to "'see[k] legal redress.'"  2023 WL 7272115, at *14 (N.D. Tex. Nov. 2, 2023).

47.   Carriers' bids reflect their marketing budgets, but do not constrain how they will *allocate* those budgets.   CMS assumes that under the Rule, carriers will simply pay less for the same administrative services, but as Plaintiffs have explained, that ignores the obvious consequence of mandating below-market rates:   If TPMOs cannot profitably provide administrative services, they will not provide them, and agents and brokers who rely on those services will cease selling MA and Part D plans, App. 46-47, 241.   Carriers will be forced to shift to other marketing methods, App. 47, and "*increase* money allocated to outreach and advertising," 88 Fed. Reg. at 78,611/1, with *higher* customer acquisition costs, *see* App. 34; Supp. App. 27.   A preliminary injunction, by contrast, would allow carriers to shift those same dollars back to TPMOs, *lowering* costs.   There is thus no evidence that carriers will be unable to pay fair-market rates if permitted to do so.

In any event, speculation that injunctive relief *might* "not cure the alleged harm" is "irrelevant to whether … irreparable harm exists."   *Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 651 (N.D. Tex. 2021) (O'Connor, J.).   A "likelihood" of harm suffices.   *Id.*   In the unlikely worst-case scenario that CMS's predictions prove correct, and carriers do not adjust their contracts, CMS will have lost nothing from the entry of injunctive relief.

CMS's concerns about "delay" are thus irrelevant.   Opp. 46.   They are also baseless.   CMS published the Rule in the Federal Register on April 23.   89 Fed. Reg. at 30,448.   Despite the need to coordinate multiple trade organizations, Plaintiffs filed their motion just *three weeks* later—far faster than in any "delay" case CMS cites.   *Gonannies, Inc. v. Goupair.com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (six-month delay); *Texas v. United States*, 328 F. Supp. 3d 662, 739 (S.D. Tex. 2018) (collecting cases where delay ranged from three months to three years).

Finally, any "rush" or "disruption," Opp. 3, 47, is entirely of CMS's own making.   Despite claiming to address "pre-existing concerns" about longstanding trends, Opp. 14; *see* 88 Fed. Reg.

at 78,552/2, CMS waited to propose its rule until November 2023, then finalized it less than six weeks before the bid deadline for CY2025.  Commenters warned CMS, AR 6011, of the dangers of this concededly "narrow timeline," 89 Fed. Reg. at 30,621/3, yet CMS chose to apply the Rule to 2025 anyway.  Having manufactured an emergency, CMS may not insulate its unlawful rule by objecting to expedited relief.  Preventing CMS's "'perpetuation of unlawful agency action'" is "of highest public importance," *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 195 (5th Cir. 2023), and outweighs any countervailing concerns.

## III.   This Court Should Not Limit Relief To Individual Plaintiffs Or Members

The Court should reject CMS's invitation to limit relief to the parties.  Opp. 47.  "[N]ation-wide relief"—including a "preliminary injunction"—"is appropriate," at a minimum, where necessary to "'provide complete relief to the plaintiffs'" or where "'limiting the relief to only those before the [C]ourt would prove unwieldy and … cause … confusion.'"  *Mock*, 75 F.4th at 587; *e.g.*, *Texas v. United States*, 201 F. Supp. 3d. 810, 836 (N.D. Tex. 2016) (O'Connor, J.).  Here, TPMOs represented by the Council and NABIP–Fort Worth need relief not only for themselves but also for the carriers that pay them.  And those carriers must be permitted to offer the same terms to *everyone* so that these firms are not forced into the impossible position of trying to nego-tiate terms that are unavailable to the rest of the market.  NABIP–Fort Worth's agent, broker, and brokerage members, including Vogue, also need relief for the firms that serve them.  App. 237.  And firms need fair market payments for services provided to all of their carrier clients—not just a few—to profitably continue to offer the services those clients need.  An injunction limited to the parties accordingly would be insufficient, so the Court should grant "nationwide" relief.  *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015).

Nationwide relief is especially appropriate under 5 U.S.C. § 705.  Contrary to CMS's as-sertions, Opp. 49—which no court has endorsed—binding Fifth Circuit precedent confirms that

"[n]othing in the text of Section 705, nor of Section 706, suggests that either preliminary or ulti-mate relief under the APA needs to be limited to [plaintiff] or its members." *Career Colls. & Schs. of Tex. v. DOE*, 98 F.4th 220, 255 (5th Cir. 2024). Nor does the fact that CMS rushed its Rule into effect before Plaintiffs could obtain relief, Opp. 50, alter the Court's authority to stay the Rule prospectively. *Career Colls.*, 98 F.4th at 255. Nothing in § 705 "limits stays to contemporaneous agency actions." *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 255 (5th Cir. 2023).

At a minimum, the Court should extend relief to all of the Council's and NABIP–Fort Worth's members—not just individual Plaintiff Vogue. Opp. 48. Both organizations have stand-ing to seek relief for their members because this action falls squarely within their stated "organi-zational purpose of promoting firms, agents, and brokers, and the proven value they provide to plans and to beneficiaries." Compl. ¶ 19. Contrary to CMS's aspersions, Plaintiffs' complaint openly "disclose[d]" that "purpose," Opp. 48, and their publicly available websites do, too. *E.g.*, Supp. App. 2 (the Council "works to ensure health insurance options for Medicare beneficiaries and to promote affordable access to the U.S. healthcare system"), 6 (NABIP–Fort Worth seeks "to promote the common business interest of those engaged in the insurance industry" and "to place the sale and service of insurance upon the highest possible standard"). Those statements easily satisfy the "'undemanding'" requirement that this action be "germane" to Plaintiffs' purpose. *Ass'n of Am. Physicians v. Tex. Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010). And CMS's own authorities recognize that "directly on-point" Supreme Court "precedent," *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 542 (6th Cir. 2021), forecloses CMS's broadside attack on associational standing. Opp. 49. Nor is there anything nefarious about the Council's members pooling resources to resist CMS's unprecedented, unlawful attempt to reorder their industry. *Id.*

For all these reasons, the Court should grant a preliminary injunction and a § 705 stay.

17

Dated:  June 7, 2024                              Respectfully submitted,


                                                  /s/   Allyson N. Ho

Allyson N. Ho                                     Eugene Scalia (*pro hac vice*)
Texas Bar No. 24033667                            Matthew S. Rozen (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP                        Aaron M. Smith (*pro hac vice*)
2001 Ross Avenue, Suite 2100                       M. Christian Talley (*pro hac vice*)
Dallas, TX  75201                                 GIBSON, DUNN & CRUTCHER LLP
Telephone: (214) 698-3100                          1050 Connecticut Avenue, N.W.
Facsimile: (214) 571-2971                          Washington, D.C.  20036
aho@gibsondunn.com                                 Telephone: (202) 955-8500
                                                  Facsimile: (202) 467-0539
Charles W. Fillmore                               escalia@gibsondunn.com
Texas Bar No. 00785861                            mrozen@gibsondunn.com
H. Dustin Fillmore III                            asmith3@gibsondunn.com
Texas Bar No. 06996010                            ctalley@gibsondunn.com
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX  76102
Telephone: (817) 332-2351
chad@fillmorefirm.com
dusty@fillmorefirm.com


                                *Counsel for Plaintiffs*

18

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2024, I caused the foregoing document to be filed with the Clerk for the U.S. District Court for the Northern District of Texas through the ECF system.  Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

*/s/ Allyson N. Ho*
Allyson N. Ho