UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICANS FOR BENEFICIARY CHOICE, et al., <br><br>    Plaintiffs <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; et al., <br><br>    Defendants. | § § § § § § § § § § § § § § § | Civil Action No. 4:24-cv-00439-O |
| COUNCIL FOR MEDICARE CHOICE, et al., <br><br>    Plaintiffs <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; et al., <br><br>    Defendants. | § § § § § § § § § § § § § § | Civil Action No. 4:24-cv-00446-O |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Americans for Beneficiary Choice ("ABC") and Council for Medicare Choice's ("CMC") (collectively, "Plaintiffs") Motions for a Stay of Effective Date (ECF Nos. 7, 19) and accompanying briefs (ECF Nos. 8, 20); the Government's Consolidated Response (ECF Nos. 24, 25); and Plaintiffs' respective replies (ECF Nos. 28, 30). For the reasons stated herein, Plaintiffs' Motions for a Stay are **GRANTED in part** and **DENIED in part**.[1]

---

[1] For clarity, the Plaintiffs' Motions for a Stay under section 705 are only denied in so far as they seek to stay the rules for the sharing of personal beneficiary information.

1

I.     **BACKGROUND**

   **A.  The Final Rule**

Medicare is a federal health insurance program for the elderly and persons with certain disabilities. Medicare Advantage ("MA") is a private alternative to traditional Medicare in which the government contracts with private health insurers to provide beneficiaries with the coverage they would otherwise receive under traditional Medicare. 42 U.S.C. § 1395w-22(a). Additionally, under Medicare Part D, the federal government contracts with private drug plan sponsors to provide drug benefits. *Id.* § 1395w-101. About fifteen years ago, Congress authorized the Centers for Medicare and Medicaid Services ("CMS") to set "guidelines" to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." *Id.* § 1395w-21(j)(2)(D); *see also id.* § 1395w-104(l)(2) (applying same to Part D).

Under this scheme, CMS regulates compensation that MA and Medicare Part D plans pay to independent agents and brokers who help beneficiaries select and enroll in private plans. In doing so, CMS places price caps on "compensation" paid to agents and brokers for enrollments. 42 C.F.R. § 422.2274(d)(2)–(3). The current price cap for new enrollments is $611. *Changes to MA for Contract Year 2024*, 89 Fed. Reg. 30448, 30621 (Apr. 23, 2024).

In addition to payments made to agents and brokers, insurance carriers also reimburse third-party firms for administrative services provided to agents and brokers as part of the MA enrollment process. These services include fielding and recording beneficiaries' calls; developing technology such as plan-comparison tools that agents deploy in the field; assisting agents and brokers with obtaining necessary licenses, certifications, and trainings; and launching marketing campaigns.

Until recently, CMS did not cap payments for administrative services because it did not classify payment for those services as "compensation." 42 U.S.C. § 1395w-21(j)(2)(D); *see* Medicare Program Revisions, 73 Fed. Reg. 54226, 54239 (Sept. 18, 2008); Medicare and Medicaid Programs, Contract Year 2022 Changes, 86 Fed. Reg. 5864, 5993 (Jan. 19, 2021). Instead, CMS only required that administrative payments not exceed "the value of those services in the marketplace." 42 C.F.R. § 422.2274(e)(1)–(2).

This changed when CMS shifted course this year and began to set fixed rates for a wide range of administrative payments that were previously uncapped and unregulated as compensation. To that end, CMS promulgated a new rule (the "Final Rule"). Changes to MA for Contract Year 2024, 89 Fed. Reg. at 30448. Key provisions of the Final Rule seek to regulate administrative payments as "compensation" and limit the total payments that carriers can make for administrative services to $100 (the "Fixed Fee"). *Id*. at 30621 (42 C.F.R § 422.2274(a), (e) and § 423.2274(a), (e)). The Final Rule also introduces new prohibitions on contract terms that health plan carriers may offer third-party firms or agents and brokers (the "Contract-Terms Restriction"). *Id.* at 30620 (42 C.F.R. § 422.2274(c)(13) and § 423.2274(c)(13). Under the Contract-Terms Restriction, health plan carriers must "ensure that no provision of a contract with an agent, broker, or other [third-party marketing organization] has a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." *Id.* at 30829. CMS provided examples of prohibited terms, which focus on schemes to circumvent existing compensation caps, such as volume-based bonuses. *Id.* at 30621. In conjunction with the Fixed Fee and Contract-Terms Restriction, the Final Rule also prohibits third-party firms from "distributing any personal beneficiary data that they collect" to any other third-party marketing organizations without consent

3

("Consent Requirement"). *Id.* at 30599. This prohibition covers a beneficiary's "name, address, and phone number," as well as "any other information given by the beneficiary for the purpose of finding an appropriate MA or Part D plan." *Id.* at 30604. Notably, this same data qualifies as "protected health information" for purposes of the Health Insurance Portability and Accountability Act ("HIPAA"). 45 C.F.R. § 164.105(c).

Plaintiffs filed two separate cases[2] seeking a section 705 stay or, in the alternative, a preliminary injunction of the Fixed Fee, Contract-Terms Restriction, and Consent Requirement.[3] Given the similarity of issues raised by the Plaintiffs in these cases, the parties agreed to a joint scheduling order and Defendants agreed to respond to both ABC and CMC's Motions in one consolidated response.[4] Plaintiffs filed their separate responses on June 7, 2024, making both ABC and CMC's Motions for a Stay ripe for review.[5]

### B. The Parties

Plaintiffs are ABC, Senior Security Benefits, LLC ("Senior Security"), CMC, Fort Worth Association of Health Underwriters, Inc. ("NABIP–Fort Worth"),[6] and Vogue Insurance Agency LLC ("Vogue"). Senior Security and Vogue are Individual Plaintiffs whose businesses are impacted by the Final Rule. ABC is a trade association who represents health industry stakeholders in litigation.[7] Individual Plaintiff Senior Security is a member of ABC.[8] CMC represents "independent, third-party firms that contract with multiple MA and Medicare Part D health plan

---

[2] *Ams. for Beneficiary Choice v. HHS*, No. 4:24-cv-00439-O and *Council for Medicare Choice v. HHS*, No. 4:24-cv-446-O. Notice, ECF Nos. 14, 18. For clarity, citations to ABC's brief and complaint will reference Case No. 4:24-cv-00439-O while citations to CMC's brief and complaint and Defendants' consolidated response will correspond to Case No. 4:24-cv-446-O.
[3] Only ABC challenges the sharing of personal data prohibitions. 42 C.F.R. §§ 422.2274(g), 423.2274(g). ABC Br. 9, ECF No. 8.
[4] Defs.' Resp., ECF No. 24.
[5] ABC Reply, ECF No. 28; CMC Reply, ECF No. 30.
[6] CMC and NABIP–Fort Worth will be referred to collectively as "CMC."
[7] ABC Compl. 6, ECF No. 1.
[8] *Id.* at 7.

carriers and either employ individual agents directly or provide administrative services to a network of independent-contractor agents or brokers."[9] NABIP–Fort Worth represents firms that provide administrative service to agents and brokers.[10] Individual Plaintiff Vogue is a member of NABIP–Fort Worth.[11]

## II. STANDING

Because Plaintiffs seek relief on behalf of their members, they must establish associational standing. As a defense, Defendants argue that Plaintiffs' Motions must be denied because the Plaintiffs lack associational standing.[12] The associational standing doctrine permits a traditional membership organization "to invoke the court's [injunctive or declaratory] remedial powers on behalf of its members." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). To do so, the organization must satisfy the three-prong *Hunt* test by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Here, Plaintiffs satisfy the three-prong *Hunt* test. First, ABC and CMC both seek relief on behalf of their members, Individual Plaintiffs, Senior Security and Vogue, who have standing to sue. First, Senior Benefits is a firm that provides administrative services to agents. Senior Security has standing to sue because the Final Rule will directly regulate how "plan issuers, agents, and brokers pay Senior Security for the critical training and administrative support services it

---

[9] CMC Compl. 4, ECF No. 1.
[10] *Id.*
[11] *Id.*
[12] Defs.' Resp. 48, ECF No. 24.

5

provides."[13] Likewise, Vogue, a brokerage agency, has standing to sue because the Final Rule may cause them to lose access to administrative services.[14]

Second, ABC's organizational purpose of "protecting the best interests of Medicare and other health insurance beneficiaries through legislative and regulatory advocacy and participation in litigation" and CMC's shared "organizational purpose of promoting firms, agents, and brokers, and the proven value they provide to plans and to beneficiaries"[15] are clearly germane to this suit challenging parts of the Final Rule. Third, because ABC and CMC seek the equitable remedies of injunctive and declaratory relief from the Final Rule, there is no need for all of their individual members to participate in the lawsuit.

In sum, the Court holds that ABC and CMC have demonstrated associational standing and may pursue relief on behalf of their members.

## III. LEGAL STANDARD

"Motions to stay agency action pursuant to [section 705] are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Affinity Healthcare Servs. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010); *see also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (applying preliminary injunction factors). This requires the movant to show (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in the movant's favor; and (4) that issuance of a preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the movant, the party seeking

---

[13] ABC Compl. 7, ECF No. 1.
[14] CMC Compl. 4–5, ECF No. 1.
[15] *Id.* at 19.

relief bears the burden of proving all elements of the preliminary injunction. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). And while the decision to grant or deny injunctive relief is committed to the district court's discretion, such relief is considered an "extraordinary remedy," never awarded as of right. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (explaining that a court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction").

## IV. ANALYSIS

### A. Likelihood of Success on the Merits

Plaintiffs must first show a substantial likelihood that they will succeed on the merits of their claims. *Daniels Health Servs.*, 710 F.3d at 582. "To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Id.* The Court determines that Plaintiffs have shown a likelihood of success that the Fixed Fee and Contract-Terms Restrictions are arbitrary and capricious. However, the Court finds that ABC has not demonstrated a likelihood of success regarding the Consent Requirement.[16]

#### 1. The Fixed Fee and Contract-Terms Restrictions are Arbitrary and Capricious.

Section 706 of the APA provides that reviewing courts must set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017) (internal quotation marks and citation

---

[16] Because the Court holds that Plaintiffs have shown a likelihood of success that the Fixed Fee and Contract-Terms restrictions are arbitrary and capricious, it does not reach the merits of Plaintiffs' claims that the Final Rule exceeds statutory authority.

7

omitted). An agency must provide a more "detailed justification" for a "new policy [that] rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.* (*Fox I*), 556 U.S. 502, 515 (2009) (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). Plaintiffs are substantially likely to succeed on the merits because the Fixed Fee and Contract-Terms Restriction are arbitrary and capricious.

### a. CMS Failed to Substantiate Key Parts of the Final Rule.

CMS never substantiated its decision to raise the fixed fee by $100 to account for administrative payments. The $100 fee purports to provide "sufficient funds" for "necessary administrative tools and trainings" and "appointment fees." Changes to MA for Contract Year 2024, 89 Fed. Reg. at 30626. Yet commentors noted that this "ignores overhead; technology to power quote engines; software and hardware for call routing; hiring and training agents; marketing campaigns; data security systems, and many others, thus guaranteeing that firms will be left to provide those services at a loss."[17] Instead of responding to these warnings and studying the costs, CMS simply claimed that these expenses "would be extremely difficult to accurately capture." *Id.* at 30625. Even so, CMS cannot flout APA standards by merely insisting that administrative costs are unquantifiable. *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 776 (5th Cir. 2023) ("[B]y continuing to insist that the rule's economic effects are unquantifiable in spite of petitioners' suggestions to the contrary . . . fail[s] to demonstrate that its conclusion that the proposed rule. . . is 'the product of reasoned decision[-]making.'").

It is true that, "in reviewing an agency's action, a court may not 'substitute its judgment for that of the agency.'" *Ohio v. Env't Prot. Agency*, No. 23A349, 2024 WL 3187768, at *7 (U.S.

---

[17] CMC App. 43–44, ECF No. 21.

June 27, 2024) (citing *Fox I*, 556 U.S. at 513)). However, a court must still ensure that the agency has offered "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id.* (citing *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). Accordingly, CMS "cannot simply ignore . . . important aspect[s] of the problem" such as the costs of overhead, marketing, data security, and other administrative costs that CMS failed to consider and quantify when developing the Fixed Fee. *Id.* Because CMS failed to substantiate how they calculated the costs of administrative expenses; Plaintiffs are substantially likely to show that the Fixed Fee is arbitrary and capricious.

### b. The Final Rule Did Not Sufficiently Address Reliance Interests.

The Final Rule also insufficiently addressed reliance interests. "When an agency changes course, as [CMS] did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC v. Navarro,* 579 U. S. 211, 222 (2016)). "It would be arbitrary and capricious to ignore such matters" *Id.* But this is exactly what CMS did when it switched its position on administrative payments without providing sufficient explanations and notice. The Rule never mentions CMS's prior understanding that administrative payments are "not considered compensation" or are payments "other than compensation." Medicare Program Revisions, 73 Fed. Reg. at 54239; Medicare and Medicaid Programs; Contract Year 2022 Changes, 86 Fed. Reg. at 5993. Nor did CMS assess whether their reliance interest or competing policy concerns. CMS ignored comments and concerns that the Final Rule would harm long standing business models and possibly upend the industry. This further indicates that the Final Rule is arbitrary and capricious.

9

### c.  The Contract-Terms Restriction Did Not Provide Fair Notice.

In this same vein, the Contract-Terms Restriction failed to provide fair notice of what was prohibited. *See FCC v. Fox Television Stations, Inc.* (*Fox II*), 567 U.S. 239, 253 (2012). The Contract-Terms Restriction prohibits any contract term that "has a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." Changes to MA for Contract Year 2024, 89 Fed. Reg. at 30829. In response to comments asking for clarity, CMS offered examples of prohibited conduct in the preamble. *Id.* at 30620–30621. While listing in the preamble examples of what conduct the Final Rule prohibits clarified the Contract-Terms Restriction to a certain extent, it also may have expanded the reach of the restriction without some meaningful identification of exactly what conduct is prohibited. This too is arbitrary and capricious. *See Mock v. Garland*, 75 F.4th 563, 585 (5th Cir. 2023) (setting aside a rule that provided "no meaningful clarity about what constitutes impermissible" conduct).

### d.  CMS Did Not Sufficiently Respond to Public Comments.

Finally, CMS also failed to sufficiently respond to public comments. Agencies are required "to consider all relevant factors raised by the public comments and provide a response to significant points within." *Chamber of Com. of U.S. v. SEC*, 85 F.4th at 774 (citing *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021). The agency must respond to comments that "can be thought to challenge a fundamental premise underlying the proposed agency decision " or points that "if true and adopted would require a change in an agency's proposed rule." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (cleaned up) (quoting *MCI WorldCom, Inc. v. FCC,* 209 F.3d 760, 765 (D.C. Cir. 2000)); *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (cleaned up) (quoting *Huawei*, 2 F.4th at 449).

Industry comments to the proposed rule included: (i) asking CMS to clarify the Contract-Terms Restriction,[18] (ii) warning that the use of a fixed fee compensation could harm the industry and push some participants to leave, in turn, reducing plan options that are available to beneficiaries,[19] and (iii) noting that many carriers typically pay more than $100 for administrative services.[20] Defendants claim that the sources Plaintiffs criticized were not significant enough to warrant defending them.[21] But many comments considered central points to the Final Rule, such as the Commonwealth Report, which is CMS's central evidence for its assertion that current payments have "significantly outpaced . . . market rates" or the $100 Fixed Fee. Medicare Program; Contract Year 2025, 88 Fed. Reg. 78476, 78554 (Nov. 15, 2023). Similarly, commenters asked CMS to clarify the Contract-Terms Restriction and explain how the Rule would apply to contracts predating its effective date. Accordingly, because CMS failed to address important problems to their central evidence, the Fixed Fee, and Contract-Terms Restriction that members of the public raised during the comment period, those aspects of the Final Rule are most likely arbitrary and capricious.

### e.  CMS's Response Does Not Remedy These Issues.

CMS responds to these deficiencies by citing to factual material that was not disclosed by CMS when it promogulated the Final Rule. While this material may substantiate some of CMS's claims, it does not adequately explain how or why CMS reached the $100 Fixed Fee, its reasoning for reversing a fifteen-year position, or its lack of responses to significant comments.[22] Because

---

[18] CMC's App. 13–17, ECF No. 21.
[19] *Id.* at 46–49.
[20] *Id.*
[21] CMS Resp. 34, ECF No. 24.
[22] This material also raises the issue of post hoc rationalizations and CMS's lack of disclosure during the rule making process. *Texas v. Becerra*, 575 F. Supp. 3d 701, 720 (N.D. Tex. 2021) (quoting *State Farm*, 463 U.S. at 43) ("In reviewing an agency's action, the Court considers only reasoning 'articulated by the agency itself at the time of the agency action and cannot consider post hoc rationalizations.'").

CMS failed to (i) substantiate key claims, (ii) consider reliance interest, (iii) provide fair notice, and (iv) respond to comments about the Fixed and Contract-Terms Restriction, the Final Rule is likely arbitrary and capricious. Thus, Plaintiffs have shown that they are substantially likely to succeed on the merits of their claims against the Fixed Fee and Contract-Terms Provision.

### 2. ABC Fails to Show Substantial Likelihood of Success on Their Claim Against the Consent Requirement.

In addition to arguing arbitrariness and capriciousness, ABC also challenges the Final Rule's Consent Requirement. 42 C.F.R. §§ 422.2274(g)(4) and 423.2274(g)(4). ABC contends that this requirement is in tension with HIPAA's broader purpose of facilitating data sharing.[23] ABC posits that the Consent Requirement is in tension with HIPPA because HIPPA already "broadly governs the handling of private health information and seeks not only to protect patient privacy, but to facilitate the exchange of data to support efficient care coordination, including with respect to benefit plans and coverage."[24] Defendants respond that "even if HIPAA might facilitate data sharing in some circumstances, that does not control whether CMS may limit certain harmful data-sharing practices under the Medicare statute."[25] The Court finds Defendants' argument persuasive at this stage. While this claim regarding the Consent Requirement may ultimately have merit, ABC's current briefing does not demonstrate a substantial likelihood of success at this stage to warrant the extraordinary measure of a section 705 stay on this claim.

---

[23] ABC Br. 20, ECF No. 8.
[24] *Id*. at 9.
[25] CMS Resp. 38, ECF No. 24.

### B. Plaintiffs have Demonstrated a Substantial Threat of Irreparable Harm.

Next, Plaintiffs must demonstrate a substantial threat of irreparable harm. The Fifth Circuit considers harm irreparable "if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984)). A showing of economic loss is usually insufficient to establish irreparable harm because damages may be recoverable at the conclusion of litigation. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). However, "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989). Or where costs are nonrecoverable because the government-defendant enjoys sovereign immunity from monetary damages, as is the case here, irreparable harm is generally satisfied. *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Irreparable harm must be concrete, non-speculative, and more than merely de minimis. *Daniels Health Servs.*, 710 F.3d at 585; *Dennis Melancon, Inc.*, 703 F.3d at 279 (cleaned up).

Plaintiffs have shown that their members and the Individual Plaintiffs are likely to suffer irreparable harm in at least two ways if the Final Rule is not temporarily stayed while litigation is pending. First, Plaintiffs contend that the Final Rule will alter their business operations. Namely, if the Final Rule is not stayed, stakeholders will have to amend ongoing agreements "at great expense."[26] Likewise, firms will have to alter how much they will spend on marketing activities and hiring new agents.[27] At bottom, Plaintiffs aver that "[if] the Rule remains in effect in mid-July, firms will hire fewer agents than usual and shrink their marketing budgets."[28] These "necessary

---

[26] ABC Br. 23, ECF No. 8.
[27] CMC Br. 22, ECF No. 20.
[28] CMC App. 225, 231-32, ECF No. 21.

alterations in operating procedures" constitute irreparable harm. *Career Colls. & Schs. of Texas v. DOE*, 98 F.4th 220, 237 (5th Cir. 2024) (finding irreparable harm where agency action forced plaintiff to abandon business plans).

Second, Plaintiffs estimate that parts of Final Rule could cost carriers upwards of "one-third of their total revenue (not profit)" and many of Plaintiffs' members have warned that they may go out of business if the Final Rule is not stayed.[29] Because CMS "enjoy[s] sovereign immunity from monetary damages," these lost revenues are likely unrecoverable and thus demonstrate irreparable harm. *Wages & White Lion*, 16 F.4th at 1142.

Plaintiffs' purported delay in seeking relief does not militate against a showing of irreparable harm.[30] It is true that, "[a]bsent a good explanation, a substantial period of delay" may weigh against a movant's request for injunctive relief "by demonstrating that there is no apparent urgency to the request." *Wireless Agents, L.L.C. v. T-Mobile, USA, Inc.*, No. 3:05-cv-0094-D, 2006 WL 1540587, at *4 (N.D. Tex. June 6, 2006) (cleaned up). "Courts generally consider anywhere from a three-month delay to a six-month delay enough to militate against issuing injunctive relief." *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-cv-3200-N, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) (collecting cases). Here, Plaintiffs waited only six weeks to seek a stay. This alleged delay does not undermine a finding of irreparable harm.

### C. The Balance of Equities and the Public Interest Favor Issuing a Stay.

The final two elements necessary to support injunctive relief—the balance of the equities (the difference in harm to the respective parties) and the public interest—"merge" when the Government is a party. *Nken*, 556 U.S. at 435. In this assessment, the Court weighs "the competing claims of injury and . . . consider[s] the effect on each party of the granting or withholding of the

---

[29] CMC App. 46, ECF No. 21.
[30] Defs.' Resp. 24, ECF No. 24.

requested relief," while simultaneously considering the public consequences of granting injunctive relief. *Winter*, 555 U.S. at 24 (internal citations omitted).

The harms ABC, CMC, and their members face by failing to maintain the status quo are substantially more severe than those faced by CMS. The Court is not convinced that the current compensation framework—which has been in place for over fifteen years—is so flawed that it requires these sweeping new requirements now or that beneficiaries would be unfairly prejudiced by granting a stay pending final judgment.

Additionally, the Court has already concluded that Plaintiffs have each established credible threats of irreparable injury absent relief from enforcement of the Fixed Fee and Contract-Terms Restriction. Generally, there is "no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (citing *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)). In this respect, the government-public-interest equities evaporate upon an adverse decision touching upon the merits. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 43–44 (D.D.C. 2013) (Jackson, J.) (expounding that public interest arguments are "derivative of . . . [the] merits arguments and depend in large part on the vitality of the latter"). This remains true "even in pursuit of desirable ends" that the Government may seek here. *Wages & White Lion Invs.*, 16 F.4th at 1143 (quoting *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021)).

For these reasons, the Court holds that the balance of equities weighs in favor of granting Plaintiffs' Motions for a Stay and that the public interest is not disserved by affording such relief.

\*   \*   \*   \*   \*   \*   \*

Having considered the arguments, evidence, and applicable law, the Court holds that the relevant factors weigh in favor of a section 705 stay of the Fixed Fee and Contract-Terms Restriction.

### D. Relief Should Not be Party Restricted

Section 705 of the APA permits the reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action" that is pending review. 5 U.S.C. § 705. Preliminary relief under section 705 is typically "not party-restricted and allows a court to 'set aside' unlawful agency action." *Career Colls. & Schs. of Texas*, 98 F.4th at 255. Indeed, by "postpon[ing] the effective date of an agency action," a section 705 stay stops the portions of the rule which are deemed to be almost certainly unlawful. *Id.* (citing 5 U.S.C. § 705). Additionally, a section 705 stay does not need to be issued concurrently with agency action. *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 255–56 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024) (expressing strong doubt that section 705 should be limited to "contemporaneous agency actions.").

Against this backdrop, universal relief makes sense here. The Final Rule seeks to prescribe uniform standards and applies to all agents and firms that participate in the MA ecosystem—not just the parties to these cases. Because the Fixed Fee and Contract-Terms Restriction are likely unlawful against the Plaintiffs, they are also almost certainly unlawful as to other industry actors. *See Career Colls. & Schs. of Texas*, 98 F.4th at 255. What's more is that ABC and CMC represent various insurance agencies, brokerage, and field-marketing organizations. These members do not need relief only for themselves but also for the carriers that engage with them. These entities must be permitted to offer the same terms universally so that firms are not forced to negotiate terms that are not allowed in the rest of the market. At bottom, limiting relief to only the parties before the

court would likely distort the market "prove unwieldy and. . . only cause more confusion." *Mock*, 75 F.4th at 587. Therefore, the Court will not limit its relief to only the parties in this case.

The Court is aware that remand to the promulgating agency can be an appropriate remedy when a rule is set aside as being arbitrary and capricious. *See Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). However, given that Plaintiffs may ultimately succeed on their claims that the Final Rule exceeds CMS's statutory authority, the Court finds that remand at this time would be inefficient and a potential waste of judicial resources. Defendants and all parties deserve a prompt resolution. Accordingly, the Court will expedite a ruling on the merits at the parties' request.

## V.     CONCLUSION

For the reasons stated above, Plaintiffs' Motions are **GRANTED in PART** and **DENIED in PART**. The Court **STAYS** the effective date of the Fixed Fee and Contract-Terms Restriction in the Final Rule —specifically, those amending 42 C.F.R. § 422.2274(a), (c), (d), (e) and § 423.2274(a), (c), (d), (e) during the pendency of this suit and any appeal. The Parties **SHALL** submit a joint schedule for summary judgment briefing by no later than **July 17, 2024.**

**SO ORDERED** on this **3rd day of July 2024.**

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

17