**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| Council for Medicare Choice, *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>United States Department of Health and Human Services, *et al.*,<br><br>　　　　　　Defendants. | Civil Action No. 4:24-cv-446-O<br><br><br>**Hearing Requested** |

**Plaintiffs' Brief In Support Of Motion For Summary Judgment**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 4

I.    Firms Provide Administrative Services To Agents And Brokers Who Help Medicare Advantage And Part D Beneficiaries Select Plans ................................ 4

II.    CMS Regulates The "Use Of Compensation" For Agents And Brokers ............... 5

III.    CMS Proposes A New Rule That Asserts Authority To Fix Prices For Administrative Services And Proposes Vague New Restrictions On Contracts ...................................................................................................... 7

IV.    Brushing Aside The Public Comments And Record Evidence, CMS Hastily Promulgates A Final Rule Adopting Its Proposal Virtually Unchanged ................................................................................................... 10

V.    This Court Finds That The Fixed Fee And Contract-Terms Restriction Are Likely Unlawful And Stays Them Nationwide .................................................. 11

LEGAL STANDARD ........................................................................................ 14

ARGUMENT .................................................................................................... 14

I.    The Fixed Fee Is Unlawful ......................................................................... 16

    A.    The Rule Exceeds CMS's Statutory Authority And, At Minimum, CMS Failed To Explain Its New Understanding Of Its Statutory Powers ............................................................................................. 16

        1.    CMS Lacks Statutory Authority To Dictate The Rates That Plans Pay Firms, Agents, Or Brokers ........................................... 16

        2.    CMS Lacks Statutory Authority To Regulate Administrative Payments As "Compensation" ............................ 19

        3.    CMS Failed To Acknowledge The Change In Its Position Or Reasonably Account For Reliance Interests .......................... 21

    B.    CMS's Failure To Substantiate Its Reasons For The Rule And Subject Its Evidence To Public Scrutiny Is Arbitrary And Capricious And Violates The Requirements Of Notice-And-Comment Rulemaking ........................................................................ 22

        1.    CMS Failed To Substantiate The Fixed Fee's Premises ............. 23

        2.    CMS Admittedly Relied On Undisclosed Evidence .................. 24

        3.    CMS Ignored Criticisms Of The Flimsy Evidence It Disclosed ............................................................................. 26

    C.    The $100 Fixed Fee Increase Is Arbitrary And Capricious .................... 29

    D.    CMS Failed To Consider Alternatives ................................................. 33

**TABLE OF CONTENTS**
(continued)

**Page**

II.    The Contract-Terms Restriction Is Unlawful ...................................................... 35

A.    The Contract-Terms Restriction Exceeds CMS's Statutory
Authority ............................................................................................ 35

B.    The Contract-Terms Restriction Did Not Provide Fair Notice ............... 36

C.    The Contract-Terms Restriction Is Arbitrary And Capricious ............... 38

III.   The Court Should Vacate The Rule Nationwide .................................................. 40

CONCLUSION ............................................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Prods. & Chems., Inc. v. FERC,*
  650 F.2d 687 (5th Cir. 1981) ............................................................24, 25, 39

*Am. All. for Equal Rts. v. Founders First Cmty. Dev. Corp.,*
  2024 WL 3625684 (N.D. Tex. July 31, 2024) .........................................42

*Am. Council of Life Insurers v. DOL,*
  2024 WL 3572297 (N.D. Tex. July 26, 2024) ..................................4, 41, 42

*Am. Radio Relay League, Inc. v. FCC,*
  524 F.3d 227 (D.C. Cir. 2008) ...............................................................35

*Animal Legal Def. Fund v. Perdue,*
  872 F.3d 602 (D.C. Cir. 2017) ...............................................................31

*Azar v. Allina Health Servs.,*
  587 U.S. 566 (2019) ...............................................................................25

*Barrett v. United States,*
  205 F. Supp. 307 (S.D. Miss. 1962) .......................................................20

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) ...........................................................................42

*BP Am., Inc. v. FERC,*
  52 F.4th 204 (5th Cir. 2022) ..................................................................41

*Braidwood Mgmt., Inc. v. Becerra,*
  104 F.4th 930 (5th Cir. 2024) ................................................................41

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962) ...............................................................................24

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) ..............................................................33

*Calumet Shreveport Refin., LLC v. EPA,*
  86 F.4th 1121 (5th Cir. 2023) ......................................................23, 26, 29

*Career Colls. & Schs. of Tex. v. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024) .......................................................4, 41, 42

*Chamber of Com. of U.S. v. DOL,*
  885 F.3d 360 (5th Cir. 2018) ..........................................................18, 39

*Chamber of Com. of U.S. v. SEC,*
  443 F.3d 890 (D.C. Cir. 2006) ...............................................................24

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*Chamber of Com. of U.S. v. SEC,*
    85 F.4th 760 (5th Cir. 2023) .................................................8, 22, 23, 24, 26, 27, 30, 32, 35, 38

*Chamber of Com. of U.S. v. SEC,*
    88 F.4th 1115 (5th Cir. 2023) ...........................................................................................41

*Chem. Mfrs. Ass'n v. EPA,*
    870 F.2d 177 (5th Cir. 1989) ...................................................................................24, 25, 26

*In re Clarke,*
    94 F.4th 502 (5th Cir. 2024) .............................................................................................41

*Comcast Corp. v. FCC,*
    579 F.3d 1 (D.C. Cir. 2009)..............................................................................................30

*Corner Post, Inc. v. Bd. of Governors,*
    144 S. Ct. 2440 (2024).......................................................................................................41

*Data Mktg. P'Ship, LP v. DOL,*
    45 F.4th 846 (5th Cir. 2022) .............................................................................................41

*Desoto Gen. Hosp. v. Heckler,*
    766 F.2d 182 (5th Cir. 1985) ......................................................................................23, 27

*DHS v. Regents of Univ. of Cal.,*
    591 U.S. 1 (2020)...............................................................................................................21

*Diaz v. United States,*
    144 S. Ct. 1727 (2024).......................................................................................................20

*Digit. Realty Tr., Inc. v. Somers,*
    583 U.S. 149 (2018)...........................................................................................................18

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016).....................................................................................................21, 22

*Farmers Union Cent. Exch., Inc. v. FERC,*
    734 F.2d 1486 (D.C. Cir. 1984)...................................................................................29, 33

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012)...........................................................................................................36

*Ford Motor Co. v. Tex. DOT,*
    264 F.3d 493 (5th Cir. 2001) ............................................................................................36

*Franciscan All., Inc. v. Becerra,*
    47 F.4th 368 (5th Cir. 2022) .............................................................................................41

*Jersey Cent. Power & Light Co. v. FERC,*
    810 F.2d 1168 (D.C. Cir. 1987)........................................................................................17

iv

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*Kootenai Elec. Co-op., Inc. v. FERC,*
    192 F.3d 144 (D.C. Cir. 1999) ...............................................................................17

*Laffey v. Nw. Airlines, Inc.,*
    746 F.2d 4 (D.C. Cir. 1984) ...................................................................................29

*Lakeland Bus Lines, Inc. v. ICC,*
    810 F.2d 280 (D.C. Cir. 1987) ...............................................................................31

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ...........................................................................................19

*Luminant Generation Co. v. EPA,*
    675 F.3d 917 (5th Cir. 2012) .................................................................................24

*Mexican Gulf Fishing Co. v. Dep't of Com.,*
    60 F.4th 956 (5th Cir. 2023) ..............................................................23, 26, 27, 40

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023) ...................................................................36, 37, 42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...........................................................................................14, 39

*N.C. State Bd. of Dental Examiners v. FTC,*
    574 U.S. 494 (2015) ...............................................................................................40

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall,*
    628 F.2d 604 (D.C. Cir. 1980) ...............................................................................31

*Nat'l Ass'n for Gun Rts., Inc. v. Garland,*
    2024 WL 3517504 (N.D. Tex. July 23, 2024) .......................................................14

*Nat'l Fuel Gas Supply Corp. v. FERC,*
    468 F.3d 831 (D.C. Cir. 2006) ..........................................................................24, 39

*Obduskey v. McCarthy & Holthus LLP,*
    586 U.S. 466 (2019) ...............................................................................................18

*Ohio v. EPA,*
    144 S. Ct. 2040 (2024) .......................................................................................23, 40

*Owner-Operator Indep. Drivers Ass'n v. FMCSA,*
    494 F.3d 188 (D.C. Cir. 2007) ..........................................................................8, 22, 23

*In re Reynolds Investing Co.,*
    130 F.2d 60 (3d Cir. 1942) .....................................................................................20

*S. Union Co. v. Mo. Pub. Serv. Comm'n,*
    289 F.3d 503 (8th Cir. 2002) ..................................................................................16

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Sierra Club v. FERC*,
   38 F.4th 220 (D.C. Cir. 2022) .................................................................................29

*Spirit Airlines, Inc. v. DOT*,
   997 F.3d 1247 (D.C. Cir. 2021) .............................................................................30

*Texas Ass'n of Mfrs. v. CPSC*,
   989 F.3d 368 (5th Cir. 2021) .................................................................................37

*Texas v. Biden*,
   10 F.4th 538 (5th Cir. 2021) ...........................................................................23, 29

*Texas v. Cardona*,
   — F. Supp. 3d —, 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024) ................4, 41, 42

*Texas v. EPA*,
   389 F. Supp. 3d 497 (S.D. Tex. 2019) ...................................................................25

*Texas v. NRC*,
   78 F.4th 827 (5th Cir. 2023) ...................................................................................12

*Tice-Harouff v. Johnson*,
   2022 WL 3350375 (E.D. Tex. Aug. 12, 2022) .................................................25, 26

*United Steel v. MSHA*,
   925 F.3d 1279 (D.C. Cir. 2019) .............................................................................37

*VanDerStok v. Garland*,
   86 F.4th 179 (5th Cir. 2023) ...................................................................................35

*W. Coal Traffic League v. STB*,
   998 F.3d 945 (D.C. Cir. 2021) ...............................................................................30

*Wages & White Lion Invs., LLC v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) .................................................................................33

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)................................................................................................39

*Window Covering Mfrs. Ass'n v. CPSC*,
   82 F.4th 1273 (D.C. Cir. 2023)...............................................................................26

**Statutes**

5 U.S.C. § 553 .................................................................................................................8

5 U.S.C. § 553(b)(3) ......................................................................................................36

5 U.S.C. § 705 ...............................................................................................................11

5 U.S.C. § 706 .................................................................................................................8

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

5 U.S.C. § 706(2) ...................................................................................4, 14, 15, 40

11 U.S.C. § 330(a)(1) ..............................................................................................20

11 U.S.C. § 649 ........................................................................................................20

15 U.S.C. § 717c(a) .................................................................................................17

15 U.S.C. § 1665d(a) ...............................................................................................17

15 U.S.C. § 1665d(c) ...............................................................................................17

15 U.S.C. § 3363(g) .................................................................................................17

29 U.S.C. § 207(e)(2) ..............................................................................................20

42 U.S.C. § 1395w-4(a)(1) ......................................................................................17

42 U.S.C. § 1395w-4(b) ...........................................................................................17

42 U.S.C. § 1395w-21(j)(2)(D) ..........................................................1, 5, 16, 20, 35

42 U.S.C. § 1395w-23(a)(1)(H) ..........................................................................2, 17

42 U.S.C. § 1395w-104(*l*)(2) ..............................................................................1, 5

42 U.S.C. § 1761(b)(4)(B) ...................................................................................2, 17

42 U.S.C. § 7384e(d) ...............................................................................................18

49 U.S.C. § 24308(a)(2)(B) .....................................................................................17

49 U.S.C. § 41737(a) ...........................................................................................2, 17

### Regulations

42 C.F.R. § 422.752(c)(1) ........................................................................................36

42 C.F.R. § 422.2262(a) ..........................................................................................34

42 C.F.R. § 422.2267(e)(41) ...................................................................................34

42 C.F.R. § 422.2274(a) ..................................................................................3, 10, 12

42 C.F.R. § 422.2274(a)(i) ..................................................................................6, 33

42 C.F.R. § 422.2274(a)(ii) .......................................................................................6

42 C.F.R. § 422.2274(c) ...........................................................................................12

42 C.F.R. § 422.2274(c)(13) ............................................................................3, 10, 35

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

42 C.F.R. § 422.2274(d) ...............................................................................11

42 C.F.R. § 422.2274(d)(2) .............................................................................5

42 C.F.R. § 422.2274(d)(3) .............................................................................5

42 C.F.R. § 422.2274(e) .......................................................................6, 10, 12

42 C.F.R. § 422.2274(e)(1) ..................................................................6, 19, 20, 33

42 C.F.R. § 422.2274(e)(2) ..........................................................................6, 33

42 C.F.R. § 423.2274(a) ...............................................................................11

42 C.F.R. § 423.2274(c) ...............................................................................11

42 C.F.R. § 423.2274(d) ...............................................................................11

42 C.F.R. § 423.2274(d)(2) .............................................................................7

42 C.F.R. § 423.2274(e) ...............................................................................11

**Rulemakings**

*Medicare Program; Changes for Contract Year 2025*,
   89 Fed. Reg. 30,448 (Apr. 23, 2024) (Final Rule)............1, 3, 6, 10, 11, 23, 24, 25, 27, 29, 30,
                                                              32, 33, 34, 35, 36, 37, 38, 39, 40

*Medicare Program; Contract Year 2025 Changes*,
   88 Fed. Reg. 78,476 (Nov. 15, 2023) (Proposal)...........................................7, 8, 9, 11, 32, 37

*Medicare Program; Contract Year 2024 Changes*,
   88 Fed. Reg. 22,120 (Apr. 12, 2023) ...................................................................34

*Medicare Program; Contract Year 2023 Policy and Technical Changes*,
   87 Fed. Reg. 27,704 (May 9, 2022) .....................................................................34

*Medicare Program CY2022 Changes*,
   86 Fed. Reg. 5,864 (Jan. 19, 2021) ..................................................................19, 21

*Medicare Program Revisions*,
   73 Fed. Reg. 54,226 (Sept. 18, 2008) ..........................................................1, 6, 16, 19, 21

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................14

**Other Authorities**

*Compensation*, Black's Law Dictionary (8th ed. 2004) .................................................20

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

Exec. Order 14036 (July 9, 2021) ................................................................39

*Use*, Black's Law Dictionary (8th ed. 2004) ...............................................18

## INTRODUCTION

This Court previously stayed provisions of a Centers for Medicare and Medicaid Services ("CMS") rule—the "Compensation Rule," *Medicare Program; Changes for Contract Year 2025*, 89 Fed. Reg. 30,448 (Apr. 23, 2024)—after finding a substantial likelihood that the Rule is unlawful. *See* Order Granting Stay 7, 17 (ECF No. 37) ("Order"). There is no legal or factual reason for the Court to change course now. The Rule threatens to upend the thriving markets for Medicare Advantage ("MA") and Part D plans by pricing out the firms, agents, and brokers who make that market possible by helping beneficiaries enroll in MA or Part D plans. And as explained below, the Rule is unlawful for the reasons previously recognized by the Court, as well as several other independent reasons, any one of which warrants vacatur.

CMS is authorized to set "guidelines" to "ensure that the **use of compensation** creates incentives for agents and brokers to enroll individuals in the [MA] plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added); *see id.* § 1395w-104(*l*)(2) (applying same to Part D). CMS initially acted within the bounds of this authority by regulating only how compensation is "use[d]"—not the amount of that compensation. *See Medicare Program Revisions*, 73 Fed. Reg. 54,226, 54,239/1 (Sept. 18, 2008). It later switched course, however, and began capping how much plans could pay individual agents and brokers.

CMS's new "Compensation Rule" takes this overreach further. For 15 years, CMS applied its price caps only to "compensation" for enrollments, but not to "administrative payments" intended to reimburse firms, agents, and brokers for training, marketing, and technology development expenses. The Compensation Rule, however, now: (1) re-labels administrative payments as compensation; (2) subjects them to the same price cap as compensation for enrollments; (3) converts that price *cap* into a *fixed fee*; and then (4) arbitrarily raises that fixed fee by just $100 to account for an entire segment of the industry that now would be squeezed into CMS's price-fixing

1

regime.  The Rule also prohibits certain contract terms, such as volume-based bonuses for firms that provide additional or more effective services.

In granting CMS authority to regulate how compensation is "use[d]," Congress authorized no part of this unprecedented power grab.  In the rare instances when Congress intends to empower agencies—including CMS—to set rates for private goods and services, it does so expressly by conferring authority to regulate (for example) "rates of payment" for services, "maximum allowable levels for administrative payments," or "guidelines ... to determine the reasonable amount of compensation."  42 U.S.C. § 1395w-23(a)(1)(H); *id.* § 1761(b)(4)(B); 49 U.S.C. § 41737(a).  But Section 1395w-21(j)(2)(D) says nothing about the rate, level, or amount of compensation.  CMS thus lacks the authority to fix prices for carriers' administrative payments to firms, agents, and brokers.  Nor can CMS redefine administrative payments to be compensation.  And even if it could, CMS failed to display awareness it was changing its "prior understanding" of what constitutes compensation and to account for "reliance interests" on its previous rules permitting administrative payments at fair-market value.  Order 9.  CMS instead "ignored comments and concerns that the Final Rule would harm long standing business models and possibly upend the industry."  *Id.*

Even if Congress had granted CMS ratemaking authority, CMS's $100 cap increase was the height of arbitrary rulemaking.  As this Court explained, CMS "never substantiated" that decision.  Order 8.  It plucked the $100 number from thin air without "studying the costs" of providing many legitimate and valuable administrative services for which plans currently pay firms.  *Id.*  Despite commenters offering administrative cost estimates and urging CMS to collect more data, CMS simply said that quantifying them would be too hard.  So it arbitrarily picked one of several competing recommendations from commenters while overstating how many commenters supported the $100 increase.  Because CMS "failed to consider and quantify" administrative costs,

the Fixed Fee is arbitrary and capricious.  *Id.* at 9.

CMS's asserted *need* for fixing administrative payments was itself a gossamer fabrication. CMS claimed to have received "complaints" that administrative payments were increasing rapidly, skewing agents' and brokers' incentives to enroll individuals in the right plans.  But CMS never disclosed those complaints to the public so the public could comment on them.  Nor did it try to substantiate them with evidence.  And its belated efforts to paper the record with supporting evidence and "post hoc rationalizations" in this litigation comes too late.  Order 11 n.22.  Meanwhile, CMS ignored comments critiquing the Rule's "central evidence"—as well as commenters who submitted contrary evidence indicating that payments are *not* increasing and that, in any event, firms' own financial success depends on enrolling Americans in the right health plan long-term. *Id.* at 11.

CMS's restriction on contract terms, too, is unlawful.  *See* Order 10-11.  Because the governing regulatory text is hopelessly open-ended and opaque, *see* 89 Fed. Reg. at 30,829/2 (§ 422.2274(c)(13)), CMS purported to provide examples of unlawful contract terms in the Rule's preamble.  But examples in a nonbinding preamble cannot provide the clarity that due process requires.  And even if they could, CMS violated the logical-outgrowth doctrine because it never previewed in the proposed rule its eventual proclamation that all "volume-based" bonuses are impermissible.  *Id.* at 30,621/1.  Either way, CMS "failed to provide fair notice" of what contract terms are prohibited.  Order 10.  CMS's attempts to explain its restrictions were also illogical and internally inconsistent, and thus arbitrary and capricious.

For all these reasons, this Court should vacate the Rule nationwide—specifically, its provisions amending 42 C.F.R. §§ 422.2274(a), (c), (d), (e), and 423.2274(a), (c), (d), (e).  Under the Administrative Procedure Act, a "reviewing court *shall* ... set aside" unlawful agency action.

5 U.S.C. § 706(2) (emphasis added).  That mandatory remedy—vacatur—means, in turn, that the "rule may not be applied to anyone."  *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).  Nationwide relief thus is compelled by Fifth Circuit precedent.  As this Court has recognized, "by its very nature, a vacatur [under the APA] is universal in scope because an unlawful regulation cannot be vacated as to only one party."  *Texas v. Cardona*, — F. Supp. 3d —, 2024 WL 3658767, at *47 (N.D. Tex. Aug. 5, 2024) (O'Connor, J.).  It is also the appropriate result here because the Rule "seeks to prescribe uniform standards" that apply "to all agents and firms that participate in the MA ecosystem—not just the parties" in this case.  Order 16; *see also, e.g.*, *Am. Council of Life Insurers v. DOL*, 2024 WL 3572297, at *8 (N.D. Tex. July 26, 2024) (O'Connor, J.) (declining to "cabin relief 'to the parties'" after "consideration of the broader industry").

## BACKGROUND

### I.    Firms Provide Administrative Services To Agents And Brokers Who Help Medicare Advantage And Part D Beneficiaries Select Plans

Medicare Advantage ("MA") is a private alternative to traditional Medicare.  Medicare Part D is a private market for prescription drug plans.  Both programs are thriving, boasting 30 million and 50 million beneficiaries, respectively, and a wide range of distinct plans to choose from (43 per beneficiary on average for MA, and 24 for Part D).  App. 129, 146.  These programs' remarkable success hinges on independent agents and brokers who help Americans choose the best plans for their needs.  It also depends on firms that employ or contract with those agents and brokers to provide them the administrative services they need to succeed.  App. 7.

Plaintiffs Council for Medicare Choice ("Council") and the Fort Worth Association of Health Underwriters, Inc. ("NABIP–Fort Worth")—a chapter of the National Association of Benefits and Insurance Professionals ("NABIP")—represent some of the largest of those firms.  They

include telesales centers, digital marketing firms, and third-party marketing organizations ("TPMOs") or field-marketing organizations ("FMOs").  App. 8.  All of them contract with *multiple* health plan carriers and provide *carrier-agnostic* support services to agents and brokers.  App. 7; *e.g.*, App. 365.  For example, Council members and NABIP–Fort Worth member firms field beneficiaries' calls, develop technology (*e.g.*, plan-comparison tools) that agents deploy in the field, and launch marketing campaigns.  App. 8.  In turn, agents and brokers—including individual members of NABIP–Fort Worth such as Plaintiff Vogue Insurance Agency ("Vogue"), a brokerage company that employs individual agents—have relied on these vital administrative services to help millions of Americans make informed choices between plans.  App. 375-79.

Providing these services costs money.  Firms must invest in technology; buy software and hardware; recruit and train agents; develop marketing campaigns; implement data-security systems; and more.  App. 42-45.  Given these heavy expenses, many member firms of the Council and NABIP–Fort Worth already operate on slim margins or are not yet profitable.  App. 47.

## II.   CMS Regulates The "Use Of Compensation" For Agents And Brokers

Since 2008, the Social Security Act has authorized CMS to set "guidelines" to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the [MA] plan that is intended to best meet their health care needs."  42 U.S.C. § 1395w-21(j)(2)(D); *id.* § 1395w-104(*l*)(2) (applying same to Part D).  CMS's existing regulations impose strict price caps on the "compensation" carriers may pay to "independent agents and brokers."  42 C.F.R. § 422.2274(d)(2)-(3).  For 2024, the compensation limit is set at $611 for new MA enrollments.

89 Fed. Reg. at 30,621/2.[1]

But CMS historically has limited what counts as compensation.  Before the Compensation Rule sought to amend the regulations, "[c]ompensation" included only "remuneration relating to the sale or renewal of a plan or product," 42 C.F.R. § 422.2274(a)(i), but expressly did *not* include" "[p]ayment of fees to comply with" state regulations or "[r]eimbursement" for "actual costs" associated with beneficiary sales, *id.* § 422.2274(a)(ii) (emphasis added).  CMS has long recognized that those latter payments are not "compensation."  73 Fed. Reg. at 54,239/1.  For that reason, they do not count towards the $611 cap.

CMS has separately regulated "[p]ayments other than compensation," which the current regulations call "administrative payments."  42 C.F.R. § 422.2274(e).  That includes all "payments made for services other than enrollment of beneficiaries"—"for example, training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments."  *Id.* § 422.2274(e)(1).  These administrative payments are not subject to CMS's price limits even when they are "based on enrollment."  *Id.* § 422.2274(e)(2).  Instead, CMS requires only that they not exceed "the value of those services in the marketplace."  *Id.* § 422.2274(e)(1).

Firms have long structured their business models in reliance on the expectation of fair-market payments for their services.  *E.g.*, App. 22, 365, 375-78.  They have negotiated contracts, secured loans, and even based initial public offerings on those expectations.  App. 22.  To date, those expectations have been realized:  Carriers currently pay firms fair-market value for administrative services.  App. 366.  And industry stakeholders need those expectations to be satisfied.

---

[1] CMS's regulations for MA, 42 C.F.R. § 422.2274, and Part D, *id.* § 423.2274, are materially identical.  This brief cites the MA regulations, but the arguments apply equally to Part D.  In addition, citations to the Code of Federal Regulations generally refer to the 2023 version that predates the Compensation Rule, unless the citations specifically reference the Compensation Rule's amendments to the regulatory text.

As noted, many firms within the industry are already teetering on the edge of profitability.  App. 47.  Meanwhile, brokerages such as Vogue and individual agents rely on firms remaining profitable and providing administrative services because they do not have the resources and infrastructure to provide all of those services themselves.  App. 375-76.

### III.   CMS Proposes A New Rule That Asserts Authority To Fix Prices For Administrative Services And Proposes Vague New Restrictions On Contracts

Despite MA and Part D's success, in late 2023 CMS unexpectedly proposed sweeping new requirements that sought to upend the industry's longstanding administrative payment practices. *Medicare Program; Contract Year 2025 Changes*, 88 Fed. Reg. 78,476 (Nov. 15, 2023) ("Proposal").  CMS rushed out this Proposal based on unidentified and unsubstantiated complaints about administrative payments that CMS claimed to have received from "State partners, beneficiary advocacy organizations, and MA plans."  *Id*. at 78,552/2.  The Proposal sought to dramatically expand CMS's compensation regulations in two ways.

*First*, CMS's proposed "**Fixed Fee**" sought for the first time to subject administrative services to the price limit on compensation.  It did this by redefining "compensation" to include all administrative payments.  88 Fed. Reg. at 78,554/3-56/3.  To account for *all* administrative services, CMS proposed to raise the price limit by a mere $31 per initial enrollment based on CMS's estimate of the cost of providing three types of administrative services:  training, testing, and recording.  *Id*. at 78,556/2-3.  CMS withheld additional payment for the myriad other services affected because it found them not "predictable" enough to quantify.  *Id*. at 78,556/2; *see also id.* at 78,596/3 (similar).  CMS did not deny that the other services are commonplace, valuable, and appropriate.  Nor did it attempt any further investigation to better ascertain what those services are or what they cost.  It simply proposed not to allow payment for the services, due to its limited knowledge of the market.

CMS also turned its price *cap* into a *fixed* price by requiring payment "at" the specified dollar amount, 88 Fed. Reg. at 78,624/1-2, rather than "at or below" it, 42 C.F.R. § 423.2274(d)(2).

*Second*, the "**Contract-Terms Restriction**" sought to bar any contract provision between plans and firms, agents, or brokers that has "a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." 88 Fed. Reg. at 78,624/2. Purportedly to clarify that vague proposal, CMS provided "[e]xamples" of prohibited terms, all of which focused on schemes to circumvent existing compensation limits—*e.g.*, "bonuses or additional payments" from plans to firms that are "passed on to agents or brokers based on enrollment volume." *Id.* at 78,554/3.

Under the APA, 5 U.S.C. §§ 553, 706, CMS was required to support its proposal with evidence; make that evidence available for public comment; and give a reasoned explanation for its choices. *E.g.*, *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 774-77 (5th Cir. 2023); *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007). Here, CMS purported to justify its Proposal based on four premises: (1) administrative payments are "increasing"; (2) "overall payments to agents and brokers" can vary from plan to plan; (3) some plans "may have used" those payments to "circumvent" limits on enrollment compensation; and (4) the increase in payments creates "questionable financial incentives" for agents and brokers. 88 Fed. Reg. at 78,552/2-3, 78,553/2, 78,555/1-3. But CMS failed to support any of these premises. For some, it cited *nothing*. For others, it vaguely referred only to supposed "complaints," "reports," "market surveys," and "information gleaned from oversight activities," yet failed to identify or submit any of these sources to public scrutiny. *Id.* The limited evidence CMS did offer was deeply flawed. For example, CMS cited an article summarizing personal anecdotes from a small survey

of agents and brokers, and cited undisclosed data about beneficiary complaints during an arbitrarily picked period in the middle of the COVID pandemic (2020-2021). *Id.* at 78,552/2-3, 78,554/1 & nn.136-37, 78,555/3 n.140; *see* App. 29-32.

Amidst three federal holidays and the MA and Part D open-enrollment period (the industry's busiest time of the year), CMS gave commenters just 60 days to respond to its Proposal, 88 Fed. Reg. at 78,476/1, ignoring requests to extend the comment period or further study the problem, *see, e.g.*, App. 11. Despite the truncated comment period, the Rule drew extensive comments and objections from the industry, including from the Council and NABIP. *E.g.*, App. 3-55, 58-74, 85, 112. Commenters asked CMS to clarify the Contract-Terms Restriction, App. 14-18, and warned that the provision was "too broad and potentially would prohibit conduct that is commonplace," App. 274. They also challenged the Rule as exceeding CMS's statutory authority, procedurally flawed, and arbitrary and capricious. *E.g.*, App. 10-55.

Some Plaintiffs further warned that applying the Fixed Fee to their members—and depriving firms of fair-market value for the vital services they provide—would devastate the industry: Firms would be forced to exit the market or severely curtail their services, reducing the plan options available to beneficiaries and their ability to make informed choices among those options. App. 47-50; *see also* App. 216-17 (explaining that carriers typically pay FMOs "$200 [to] $300 per beneficiary"). Carriers, meanwhile, cautioned CMS that the Rule's Fixed Fee would "risk stripping away the most important resource beneficiaries rely upon to make informed plan decisions—independent and local agents and brokers who have affiliations with multiple plans and offer beneficiaries more choice among plan options," App. 357—and urged CMS to "continu[e] to permit [carriers] to pay [firms] for their important services at fair market value," App. 272. Agents and brokers agreed that the Rule would "devastate [their] ability to serve beneficiaries

effectively" because the firms that "service the agents need the administrati[ve] fees ... to help support these agents in the field."  App. 288; *see also, e.g.*, App. 288-89, 291-94, 296-99 (similar). And individual beneficiaries told CMS to "not make any changes to the agent's job, our access to them, or their compensation" because those agents provide valuable services to help individuals navigate the healthcare system.  App. 301; *see also* App. 39 (survey noting that a "majority" of beneficiaries believed they "made the right choice" of plan in 2023).

## IV.   Brushing Aside The Public Comments And Record Evidence, CMS Hastily Promulgates A Final Rule Adopting Its Proposal Virtually Unchanged

Undeterred, CMS charged ahead and finalized the Fixed Fee, 89 Fed. Reg. at 30,829/1-3 (§ 422.2274(a), (e)), and Contract-Terms Restriction, *id.* at 30,829/2 (§ 422.2274(c)(13)), largely as proposed, based on the same flawed premises and information as the Proposal, *see id.* at 30,617/3, 30,618/1-3, 30,619/3 n.154.  CMS's sole substantive change to either proposal was to increase the fixed fee by $100 (rather than $31) per initial enrollee.  *Id.* at 30,626/1-3.  It disclosed no additional evidence.  Nor did it defend the evidence it had cited against commenters' critiques (including those from the Council and NABIP), or respond to commenters' warnings that the Rule would devastate an industry built on fair-market administrative payments.  *Id.* at 30,618/1, 30,619/3 & nn.154-55, 30,621/2, 30,802/1.  It also conceded that it still lacked the data to under-stand the actual costs of administrative services, *id.* at 30,625/3, even as it insisted that the $100 increase "should provide agents and brokers with sufficient funds ... to continue providing ade-quate service," *id.* at 30,626/3.

CMS likewise did not change the proposed regulatory text of the Contract-Terms Re-striction.  Instead, it attempted to clarify the Contract-Terms Restriction by listing additional ex-amples in the preamble to the Rule that dramatically expanded the reach of the restrictions. Whereas the Proposal's examples targeted volume-based bonuses only to the extent firms "passed

[them] on to agents or brokers," 88 Fed. Reg. at 78,554/3, the Final Rule dropped that limit.  In-

stead, CMS stated more broadly that *all* "bonuses for hitting volume-based targets for sales of a

plan" were banned—even, apparently, if paid to *firms* only, solely for administrative services, and

not passed on to individual agents and brokers.  89 Fed. Reg. at 30,621/1.

## V.   This Court Finds That The Fixed Fee And Contract-Terms Restriction Are Likely Unlawful And Stays Them Nationwide

Plaintiffs moved for a stay of the Rule's effective date and a preliminary injunction, assert-

ing that CMS's rule was "unlawful, arbitrary, and capricious."  Mot. 3 (ECF No. 20); 5 U.S.C.

§ 705.  In support of its response, CMS submitted a partial administrative record that revealed for

the first time many of the sources that CMS had purported to rely on in promulgating the Rule.

*See* Opp. to Prelim. Relief 1 n.1 (ECF No. 24); Record Certification 1 (ECF No. 23-1).  Those

never-before-seen sources included, for example, plan contracts (AR 11584, 11730, 11748); notes

of a call with plan representatives (AR 11379, 11760); statistics on beneficiary complaints (AR

11377); and a publicly available article on market concentration (AR 11479), all of which CMS

had neglected to cite or disclose in the Proposal or Rule.  Although CMS sought to file a handful

of these new documents under seal due to purported confidentiality concerns, Opp. 44, it filed the

rest publicly without any explanation of why it could not have disclosed them earlier in the litiga-

tion.  And even as to the materials that it did seek to file under seal, CMS failed to explain why it

could not have disclosed more information about or redacted versions of those documents, or why

it could not have explained during the rulemaking process that it was withholding relevant infor-

mation from public view, *see* Reply ISO Mot. for Prelim. Relief 6 (ECF No. 30).  In any event,

CMS's new evidence failed to shore up the Rule's basic evidentiary gaps.  Most notably, none of

the evidence demonstrated the costs of providing administrative services or analyzed the Rule's

effects on industry stakeholders that had long relied on fair-market payments.  *See* Order 11.

Unpersuaded by this previously undisclosed evidence, this Court granted Plaintiffs' motion in relevant part and stayed the Fixed Fee and Contract-Terms Restriction's effective date through the remainder of this case and any appeal.  Order 17 (citing 42 C.F.R. §§ 422.2274(a), (c), (d), (e), 423.2274(a), (c), (d), (e)).

At the outset, the Court rejected CMS's argument that the Council lacked standing.  Order 5-6.  The Council has associational standing to sue on its members' behalf because: (1) its members have standing to sue; (2) its organizational purpose of promoting firms, agents, brokers, and the value they provide to plans and beneficiaries is "germane to this suit"; and (3) the Council's request for injunctive and declaratory relief ensures "there is no need for all [its] members to participate in the lawsuit."  *Id.* at 6.[2]

Next, the Court found that "Plaintiffs are substantially likely to succeed on the merits because the Fixed Fee and Contract-Terms Restriction are arbitrary and capricious" for several reasons.  Order 8.  To start, "CMS never substantiated its decision to raise the fixed fee by $100" and ignored many of the costs that administrative payments are meant to capture.  *Id.* at 8-9.  Plus, CMS "insufficiently addressed reliance interests" in the current regime of fair-market payments by "switch[ing] its position … without providing sufficient explanations and notice."  *Id.* at 9.

The Court also found that the Contract-Terms Restriction "failed to provide fair notice" of

---

[2] The associational Plaintiffs continue to have standing for the same reasons.  The Council's and NABIP–Fort Worth's members are injured because they rely on the current system of fair-market payments, and they now face the cost and burden of having to modify their contracts and to restructure existing business models to make up for lost revenue.  *See* App. 366-67, 376-79.  Their organizational purposes are "clearly germane" to this lawsuit.  Order 5; *see* Compl. ¶ 19; App. 224, 228, 372-74, 384-86; *Texas v. NRC*, 78 F.4th 827, 837 (5th Cir. 2023) (noting this requirement is "undemanding").  And there is no need for individual members to participate because this suit raises pure questions of law under the APA.  Meanwhile, Vogue's standing has never been challenged.  Vogue will lose access to administrative services, and then will have to expend more time and money of its own to comply with the Rule or stop selling MA and Part D plans.  *See* App. 376-79; Order 5.

what it "prohibited."  Order 10.  And CMS's belated attempts to clarify its ambiguous restriction through examples in the Final Rule's preamble "may have expanded the reach of the restriction without some meaningful identification of exactly what conduct is prohibited," which was arbitrary and capricious.  *Id*.

Further still, the Court determined that CMS had failed adequately to respond to public comments about the Fixed Fee and Contract-Terms Restriction.  Order 10-11.  CMS ignored "many" comments that concerned "central points to the Final Rule," such as the Fixed Fee's effects on the industry and the fact that many carriers typically pay more than $100 for administrative services.  *Id.* at 11.  The Court rejected CMS's efforts to defend these omissions by smuggling in "factual material that was not disclosed by CMS when it [promulgated] the Final Rule."  *Id.*  Those materials did not adequately substantiate the Rule, *id.*, and CMS's belated arguments and evidence also "raise[d] the issue of post hoc rationalizations" that courts cannot consider when reviewing agency action, *id.* at 11 n.22.

"Because the Court [found] … a likelihood of success that the Fixed Fee and Contract-Terms restrictions are arbitrary and capricious," it declined to "reach the merits of [Plaintiffs'] claims that the Final Rule exceeds [CMS's] statutory authority."  Order 7 n.16.  In addressing the appropriate remedy for CMS's APA violation, however, the Court acknowledged that "Plaintiffs may ultimately succeed on their claims that the Final Rule exceeds CMS's statutory authority."  *Id.* at 17.  The Court thus emphasized that "remand[ing]" the Rule to CMS to attempt to cure its deficiencies "would be inefficient and a potential waste of judicial resources."  *Id.*

Instead of a remand, the Court issued "universal relief"—not restricted to the parties— staying the Rule's effective date pending a decision on the merits and any appeal.  Order 16-17.  Relief under the APA, this Court explained, is "typically 'not party-restricted and allows a court

to "set aside" unlawful agency action.'" *Id.* at 16.  And nationwide relief was particularly appropriate "here" because the Rule prescribes "uniform standards," and firms and agents "must be permitted to offer the same terms universally so that firms are not forced to negotiate terms that are not allowed in the rest of the market." *Id.*

After the Court entered a briefing schedule for further proceedings, CMS certified a complete administrative record that consisted not only of the preliminary administrative record, *see* AR 1-11760, but also more than 3,000 pages of additional, previously undisclosed materials such as public reports, a few YouTube videos, and a handful of anomalous beneficiary call recordings, *see* AR 11761-15097 (ECF No. 44-14).

## LEGAL STANDARD

Summary judgment is required if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In "APA cases challenging agency action, summary judgment 'serves as the mechanism for deciding' whether the action 'is supported by the administrative record and otherwise consistent with the APA standard of review.'"  *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 2024 WL 3517504, at *14 (N.D. Tex. July 23, 2024).  Under the APA, courts "shall ... hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in "excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law."  5 U.S.C. § 706(2).

## ARGUMENT

Unless courts enforce the "strict and demanding" "requirements for administrative action," an agency can "become a monster which rules with no practical limits."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).  The APA thus requires agencies to stay within Congress's prescribed boundaries, give the public a meaningful opportunity

to participate in the rulemaking process, respond to commenters' input, and support their decisions with substantial evidence and a reasoned explanation. CMS flouted those obligations here—as this Court recognized when it stayed the effective date of the Rule's Fixed Fee and Contract-Terms Restriction. Order 17.

The fundamental problems with CMS's Rule remain the same. The Rule asserts unprecedented authority to institute government price-fixing in place of fair-market rates for a range of valuable administrative services, with no acknowledgement that this power grab is a change of course. CMS's rationale for doing this remains feather weight—its unsubstantiated suspicions that administrative payments are growing, are used to circumvent existing payment caps, and skew agents' and brokers' incentives. CMS supported these suspicions only with undisclosed or unreliable data and ignored contrary evidence in its rush to forge ahead—and then attempted to oppose preliminary relief by invoking inapposite and previously concealed evidence, which only reinforced the extent of its violations. CMS's solution—fixing payments for vital administrative services at $100 without even studying their actual costs or market value—is the definition of arbitrary rate-setting. And CMS failed to consider more reasonable alternatives to arbitrarily dictating rates. CMS then supplemented its *ultra vires* price-fixing scheme with a vague Contract-Terms Restriction that fails to provide the industry with fair notice of its obligations.

The Rule thus is "arbitrary [and] capricious," "in excess of statutory jurisdiction, authority, or limitations," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). Any one of those flaws independently suffices to grant summary judgment in Plaintiffs' favor. This Court should "set aside"—*i.e.*, vacate—the Rule nationwide, providing the industry the relief it needs to continue functioning in a fair and efficient manner. *Id.* § 706(2).

15

## I.     The Fixed Fee Is Unlawful

### A.     The Rule Exceeds CMS's Statutory Authority And, At Minimum, CMS Failed To Explain Its New Understanding Of Its Statutory Powers

Congress gave CMS authority to establish guidelines to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs."  42 U.S.C. § 1395w-21(j)(2)(D).  The Fixed Fee exceeds that statutory authority in two ways:  (1) CMS has no authority to regulate the *amount* of compensation provided, much less to fix that compensation at a single, artificially depressed rate; and (2) CMS has no authority to regulate administrative payments as "compensation."  Even if Congress gave CMS expansive ratemaking power, moreover, CMS failed to acknowledge that it was changing its understanding of compensation and "insufficiently addressed reliance interests."  Order 9.

### 1.     CMS Lacks Statutory Authority To Dictate The Rates That Plans Pay Firms, Agents, Or Brokers

CMS's Fixed Fee hinges on an asserted power to engage in ratemaking for plans, firms, agents, and brokers in the industry.  But Congress gave CMS no such power.  CMS has the authority to regulate how compensation is "use[d]," 42 U.S.C. § 1395w-21(j)(2)(D)—not the *amount* of compensation that plans may pay firms, agents, or brokers.  CMS's first regulation implementing the statute respected this limit, and regulated only "how compensation is disbursed" or plans' "compensation structure," while declining to set "specific dollar values" on the *rate* of compensation.  *Medicare Program Revisions*, 73 Fed. Reg. 54,226, 54,238/2, 54,239/1 (Sept. 18, 2008).  Since then, however, CMS has unlawfully switched to setting rates, and the Rule expands this claimed authority.

"Rate regulation is a complex process," *S. Union Co. v. Mo. Pub. Serv. Comm'n*, 289 F.3d 503, 507 (8th Cir. 2002), and "[r]easonabl[y] balancing" the many "competing interests" at stake

can prove difficult and controversial, *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1183 (D.C. Cir. 1987) (en banc).  Congress thus does not "implicitly gran[t]" agencies "rate-making authority."  *Kootenai Elec. Co-op., Inc. v. FERC*, 192 F.3d 144, 149-50 (D.C. Cir. 1999).  Instead, when Congress intends to confer ratemaking authority, it does so unambiguously, and typically delineates factors the agency must consider when setting rates.  *See, e.g.*, 15 U.S.C. § 1665d(a), (c) (authorizing CFPB to regulate the "amount" of credit-card charges and fees); *id.* § 717c(a) (authorizing FERC to regulate "rates and charges").

The same is true when granting HHS and CMS ratemaking authority.  In the Social Security Act—the same statute containing Section 1395w-21(j)(2)(D)—Congress gave HHS and CMS power to cap payments to physicians at the lesser of "the actual charge for the service" or the price set under a "fee schedule," 42 U.S.C. § 1395w-4(a)(1)(A)-(B), (b), and to "establish separate rates of payment" for Medicare+Choice organizations, *id.* § 1395w-23(a)(1)(H).  In other contexts, Congress similarly gave HHS and CMS express authority to "prescribe maximum allowable levels for administrative payments that reflect the costs of" operating schools.  *Id.* § 1761(b)(4)(B).

Other compensation-related statutes confirm that Congress knows how to authorize agency regulation of the *amount* of compensation specifically.  For example, the Department of Transportation must "prescribe guidelines ... to determine the reasonable *amount of compensation* required to ensure the continuation of air service" by certain air carriers.  49 U.S.C. § 41737(a) (emphasis added).  The Surface Transportation Board prescribes "the amount of compensation" for Amtrak's use of facilities.  *Id.* § 24308(a)(2)(B).  The President prescribes "the amount of compensation" for natural gas deliveries in emergencies.  15 U.S.C. § 3363(g).  And Congress has distinguished *levels* of compensation from the *use* of compensation:  When establishing a fund for ill energy employees, Congress instructed that the "*amounts* in the compensation fund shall be *used* to carry

17

out the compensation program."  42 U.S.C. § 7384e(d) (emphases added).

Section 1395w-21(j)(2)(D) is nothing like these statutes.  It says nothing about rates, rate-making, a "fee schedule," or the "amount of compensation."  And it lacks the detailed list of factors Congress typically provides when directing agencies to institute price controls.  It merely states that CMS may regulate the "use" of compensation, meaning the "application or employment" of compensation.  *Use*, Black's Law Dictionary (8th ed. 2004).  By using different language from rate regulation statutes, Congress made clear that it "intended a difference in meaning."  *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161 (2018).  Reading Section 1395w-21(j)(2)(D) as *silently* authorizing rate regulation when Congress *expressly* gave that authority to other agencies, including CMS in parallel provisions of the Social Security Act, would fail to give effect to Congress's "withholding of terms within a statute."  *Chamber of Com. of U.S. v. DOL*, 885 F.3d 360, 381 (5th Cir. 2018).

Interpreting Section 1395w-21(j)(2)(D) as authorizing CMS to fix prices would also read the word "use" out of the statute, contrary to the canon of statutory construction "requir[ing] that every word in a statute be interpreted to have meaning."  *Chamber of Com.*, 885 F.3d at 381.  If CMS has power both to set rates of compensation and to prescribe how that compensation is employed, then the word "use" has no meaning.  Congress could have simply instructed CMS to establish limitations with respect to "compensation," and stopped there.  The better reading, consistent with the principle that statutes ordinarily "'do not contain surplusage,'" *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 476 (2019), is that the word "use" is a meaningful limitation on the authority Congress granted:  CMS cannot regulate the *amount* of compensation, though it can regulate *how* agents and brokers put compensation into action.

### 2. CMS Lacks Statutory Authority To Regulate Administrative Payments As "Compensation"

The Rule also seeks to redefine administrative payments as "compensation" and subject all of those payments to CMS's new Fixed Fee as well.  But CMS lacks statutory authority to treat administrative payments as "compensation," and thus cannot subject those payments to a restriction on "compensation."

CMS has long understood that administrative payments are not compensation, as the latter term is ordinarily understood.  CMS currently defines administrative payments as "payments made for services *other than* enrollment of beneficiaries," to include, "for example, training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments."  42 C.F.R. § 422.2274(e)(1) (emphasis added).  When CMS first promulgated this regulation to "implemen[t] MIPPA"—the Medicare Improvements for Patients and Providers Act of 2008, which established Section 1395w-21(j)(2)(D)—CMS explained that these payments "are ... not considered compensation."  73 Fed. Reg. at 54,238/1, 54,239/1.  More recently, CMS reaffirmed that administrative payments are something "other than compensation" because they are "not for the sale or renewal of a policy."  *Medicare Program CY2022 Changes*, 86 Fed. Reg. 5,864, 5,993/3-94/1 (Jan. 19, 2021).  This Court "must exercise [its] independent judgment in deciding whether [CMS] has acted within its statutory authority," but to the extent CMS might seek "'respect' [for] Executive Branch interpretations," CMS's contemporaneous and (until now) consistent understanding that administrative payments are not compensation cuts in favor of Plaintiffs—not CMS.  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2265, 2273 (2024).

CMS's prior interpretation is correct on the merits, and accords with the ordinary meaning of compensation and longstanding caselaw.  At bottom, administrative payments seek to *reimburse* agents and brokers for the costs incurred in rendering a service other than enrollment, such as their

"operational overhead." 42 C.F.R. § 422.2274(e)(1).  Courts have long recognized that "compensation" in ordinary usage refers to payment for services rendered, not a reimbursement for costs incurred in rendering that service.  *See, e.g.*, *Barrett v. United States*, 205 F. Supp. 307, 308 (S.D. Miss. 1962) ("[R]eimbursements do not represent compensation for services but represent reimbursements for out-of-pocket expenses"); *accord Compensation*, Black's Law Dictionary 854 (8th ed. 2004) ("compensation" means "[r]emuneration and other benefits received in return for services rendered, esp[ecially] salary or wages").  Congress likewise has repeatedly distinguished between "compensation for services rendered *or* reimbursement for costs and expenses incurred." *In re Reynolds Investing Co.*, 130 F.2d 60, 61 n.1 (3d Cir. 1942) (emphasis added) (quoting former 11 U.S.C. § 649).  In the wage-and-hour context, for example, Congress has distinguished between "reasonable payments for traveling expenses, or other expenses," which are "reimburs[ements]" and "not … compensation." 29 U.S.C. § 207(e)(2).  Similarly, Congress has specified that bankruptcy professionals may be entitled to "reasonable compensation for actual, necessary services rendered … *and* … reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A)-(B) (emphasis added).  If "compensation" encompassed "reimbursements," as CMS claims, then these repeated statutory distinctions would be superfluous.

The "surrounding [statutory] context" further undercuts CMS's attempt to redefine administrative payments as compensation. *Diaz v. United States*, 144 S. Ct. 1727, 1735 (2024).  Congress charged CMS with establishing "incentives for agents and brokers to *enroll* individuals" in the most appropriate plan. 42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added).  Against that backdrop, the term "compensation" logically refers to compensation *for enrollments*, not for any other economic activity that could conceivably have an indirect effect on agents' and brokers' incentives.  Administrative payments for overhead, customer service, training, or other administrative

payments are for tasks that agents and brokers perform and that firms support, separate from the enrollment process.  For that reason, CMS has long—and correctly—understood such payments not to constitute "compensation":  They are not made "for the sale or renewal of a policy," 86 Fed. Reg. at 5,993/3-94/1, so CMS lacks authority to regulate even their use, much less their amount.

### 3.  CMS Failed To Acknowledge The Change In Its Position Or Reasonably Account For Reliance Interests

Even if CMS's current understanding of administrative payments *were* correct, the APA required CMS to at least "display awareness that it is changing position" and "tak[e] into account" any "reliance interests" that its prior interpretation may have engendered.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016).  CMS defaulted on both obligations with its flip-flop on administrative payments.

To start, as this Court previously recognized, the Rule "never mentions" CMS's "prior understanding" that administrative payments are "'not considered compensation'" and are payments "'other than compensation.'"  Order 9 (quoting 73 Fed. Reg. at 54,239/1; 86 Fed. Reg. at 5,993/3-94/1).  And in this litigation, CMS denied even having taken a position about whether administrative payments fall within the statutory term "compensation."  Opp. to Prelim. Relief 29. CMS could not have adequately considered the impact its changed position would inflict on industry reliance interests when it did not—and *still* does not—even "display awareness that it is changing position."  *Encino Motorcars*, 579 U.S. at 221.

Nor did CMS "sufficiently address reliance interests."  Order 9.  When an agency changes course, it must be cognizant that its prior policies "may have engendered serious reliance interests that must be taken into account" and weighed against "competing policy concerns."  *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020) (quotation marks omitted).  Since 2008, an entire industry developed around CMS's policies.  Companies with thousands of employees designed

their business models on the understanding that administrative payments and expenses were not subject to restrictive caps on compensation, but instead were other payments that could be recouped at market rates.  App. 22; *see also, e.g.*, App. 365-66 (explaining that firms are currently paid fair-market value for administrative services).  Businesses structured their contracts, secured loans, and even based initial public offerings on those expectations.  App. 22.  The Rule would gut these longstanding business models by eliminating a significant percentage of firms' business—in some cases, more than one-third of total revenue.  App. 47.  Some firms would go out of business, and others that manage to survive would perform fewer, or none of, the administrative services they perform currently.  App. 47.  Brokers and individual agents, in turn, would have fewer plans to offer and fewer administrative services available to help them enroll beneficiaries.  App. 366-67, 376-79.  Some would cease selling MA and Part D plans.  App. 379.

CMS "ignore[d]" these "serious reliance interests" when it moved from a regime of fair-market payments to artificially low price-fixing.  Order 9; *Encino Motorcars*, 579 U.S. at 221-22.  As this Court explained, CMS "insufficiently addressed reliance interests" on its prior policies and "ignored comments and concerns that the Final Rule would harm long standing business models and possibly upend the industry."  Order 9.  Accordingly, CMS's about-face regarding its understanding of "compensation"—assuming CMS had statutory authority to make that change—was arbitrary and capricious.

### B.    CMS's Failure To Substantiate Its Reasons For The Rule And Subject Its Evidence To Public Scrutiny Is Arbitrary And Capricious And Violates The Requirements Of Notice-And-Comment Rulemaking

Agencies must make policy in a rational manner.  They must show they are addressing a "genuine proble[m]," and that their proposed solution is "adequately substantiated."  *Chamber of Com.*, 85 F.4th at 777.  Agencies must also "reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary" from the public.  *Owner-Operator*, 494 F.3d at

199.  Moreover, an agency cannot rely on "flawed" evidence, *Desoto Gen. Hosp. v. Heckler*, 766

F.2d 182, 184 n.5, 185 (5th Cir. 1985), "cherry-pick only the statistics it likes," *Texas v. Biden*, 10

F.4th 538, 556 n.5 (5th Cir. 2021), "fail to address statistics that already exist in th[e] record," *id.*,

nor adopt a rule that runs "counter to the evidence before" it, *Calumet Shreveport Refin., LLC v.*

*EPA*, 86 F.4th 1121, 1140 (5th Cir. 2023).  Finally, an agency must provide a "reasoned response"

to significant comments and contrary evidence, *Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024)—

otherwise, the "'opportunity to comment is meaningless,'" *Mexican Gulf Fishing Co. v. Dep't of*

*Com.*, 60 F.4th 956, 972 (5th Cir. 2023).

CMS flouted these bedrock requirements at every turn.  It failed to substantiate the Fixed

Fee's key premises—relying on hidden evidence or no evidence at all—and it failed to respond to

criticisms of the evidence it did disclose.  *See* Order 8-12.  Each of these failures independently

violates the APA.

### 1.    CMS Failed To Substantiate The Fixed Fee's Premises

The Fixed Fee rests on four premises:  (1) administrative payments "are rapidly increas-

ing"; (2) "overall payments to agents and brokers" can vary from plan to plan; (3) some plans

"may have used" administrative payments to "circumvent" limits on enrollment compensation;

and (4) these payments create "questionable financial incentives" for agents and brokers.  89 Fed.

Reg. at 30,618/1, 30,621/2, 30,622/3.  But CMS did not even attempt to support the first two

premises: that administrative payments are rapidly increasing and that overall payments to agents

and brokers can vary from plan to plan.  Instead, it cited nothing at all.  It simply stated them as

fact.  CMS thus failed to "adequately substantiat[e]" that a "genuine proble[m]" "exists."  *Chamber*

*of Com.*, 85 F.4th at 777.  "Professing that [a rule] ameliorates a real industry problem but then

citing no evidence demonstrating that there is in fact an industry problem is not reasoned deci-

sionmaking." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006) (Kavanaugh, J.).

CMS cannot now backfill the missing evidentiary support. An agency's action may only "be upheld, if at all, on the same basis articulated in the order by the agency itself." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962)). Accordingly, courts "must disregard any *post hoc* rationalizations" in litigation and evaluate a rule's lawfulness "solely on the basis of the agency's stated rationale at the time of its decision" and the "administrative record already in existence, not some new record made initially in the reviewing court." *Id.*; *see also* Order 11 n.22 (similar). Because the Rule arbitrarily and capriciously did not "adequately substantiat[e]" that a "genuine proble[m]" exists, *Chamber of Com.*, 85 F.4th at 777, CMS cannot unring that bell.

### 2.     CMS Admittedly Relied On Undisclosed Evidence

For the Rule's two remaining premises—that plans made administrative payments to circumvent CMS's compensation cap, and that these payments create questionable financial incentives—CMS mainly cited non-public "complaints," "reports," "market surveys," and "information gleaned from oversight activities" that it has never identified or publicly disclosed. 89 Fed. Reg. at 30,617/3, 30,618/1-3, 30,619/3 n.154, 30,622/2-3. By failing to subject that evidence to public scrutiny, CMS violated the APA's notice-and-comment requirement.

To "ensure that agency regulations are tested through exposure to public comment," the APA requires agencies to disclose the "critical factual material" on which they rely. *Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006). As the Fifth Circuit has recognized, "'it is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of data that, (in) critical degree, is known only to the agency.'" *Air Prods. & Chems., Inc. v. FERC*, 650 F.2d 687, 699 n.17 (5th Cir. 1981); *accord Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 202 (5th

24

Cir. 1989) (noting an agency's general "duty to publish data" in rulemaking).  An agency thus "commits serious procedural error" when it "fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019); *see also Tice-Harouff v. Johnson*, 2022 WL 3350375, at *1, *9 (E.D. Tex. Aug. 12, 2022) (the "'most critical factual material that is used to support the agency's position on review must have been made public in the [underlying] proceeding'").  The error is serious because the public loses the chance to provide input and the agency loses the "chance to avoid errors and make a more informed decision." *Azar v. Allina Health Servs.*, 587 U.S. 566, 582 (2019).

CMS's failure to disclose the complaints, reports, market surveys, and oversight infor-mation on which it purportedly relied is a direct violation of the APA.  The Council and other stakeholders thus called out these omissions in their rulemaking comments.  App. 26-27.  But rather than disclose its sources and reopen the comment period, CMS compounded its violation by not even bothering to respond.  *See* 89 Fed. Reg. at 30,617/3, 30,618/1-3, 30,619/3 n.154.

The extent of CMS's procedural violations became even more apparent at the preliminary-relief stage.  To attempt to rehabilitate the Rule, CMS cited a raft of previously undisclosed infor-mation about: plan contracts, Opp. 32 (citing AR 11584, 11730, 11748); notes of a call with plan representatives, Opp. 12, 32 (citing AR 11379 (App. 305), AR 11760); and statistics on beneficiary complaints, Opp. 14, 33 (citing AR 11377 (App. 303)).  CMS also invoked a publicly available article on market concentration, Opp. 32 (citing AR 11479 (App. 316)), that the Rule never dis-closed or cited.  And at the summary judgment stage, CMS added even more materials to the administrative record.  AR 11761-15097.  CMS disclosed none of this supporting evidence during the rulemaking proceeding, even though Plaintiffs urged CMS to do so.  App. 26-27; Mot. 14-15.[3]

---

[3] Even in this litigation, CMS disclosed only a handful of beneficiary complaints.  AR 15094-97.

CMS has asserted that some (but not all) of these documents are "confidential," Opp. 44, but that is no excuse under the APA. Just as CMS cited and even quoted these purportedly confidential documents in its publicly filed brief, *e.g.*, Opp. 12-14, it easily could have done the same in the rulemaking. Moreover, some of the undisclosed materials—including an article on purported market concentration, App. 316, and YouTube videos, App. 339-44—have *always* been public, and therefore easily could have been produced during the rulemaking. In any event, even a "contractual provision" purportedly requiring the government to keep a private party's "data confidential" "cannot, absent unusual circumstances, relieve an agency of its duty to publish data." *Chem. Mfrs.*, 870 F.2d at 202. Agencies thus cannot "withhold critical information altogether" from commenters simply because documents include "proprietary" information. *Window Covering Mfrs. Ass'n v. CPSC*, 82 F.4th 1273, 1283-84 (D.C. Cir. 2023). At a minimum, CMS "could have redacted sensitive information" and released the materials to permit public input. *Id.* at 1284. Instead, CMS failed to disclose evidence entirely—and on top of that, "did not explain *why*" it was not citing or publishing that evidence. *Tice-Harouff*, 2022 WL 3350375, at *9. By denying the public's right to examine the information on which the agency is acting during the rulemaking stage—when the public can comment on it—CMS further violated the APA.

### 3.    CMS Ignored Criticisms Of The Flimsy Evidence It Disclosed

The limited evidence CMS *did* disclose was equally flawed. Under the APA, an agency cannot adopt a rule that runs "counter to the evidence" before it, *Calumet*, 86 F.4th at 1140, and must "provide a response" to comments, *Chamber of Com.*, 85 F.4th at 774; *see Mexican Gulf*, 60 F.4th at 973 (agency "violate[d] the APA" because it "did not address" an issue raised by comments). CMS's limited evidence, by contrast, is low-quality and unreliable, and CMS "failed to sufficiently respond to public comments" questioning the evidence's efficacy. Order 10.

For example, CMS's "central evidence" for the Rule, Order 11, was a Commonwealth

Fund "research articl[e]" purportedly showing that MA plans offer "higher payments" for admin-
istrative services, 89 Fed. Reg at 30,619/3; *see also id.* at 30,619/3 nn.154-55, 30,622/2 n.157.  As
commenters told CMS, however, the article does not support that proposition.  App. 29-30.  The
Commonwealth Fund merely surveyed 29 agents and brokers in online focus groups and reported
that "most ... recalled receiving higher commissions" under MA than under Medigap (a form of
private supplemental insurance).  App. 167, 173.  That anecdotal evidence is neither statistically
valid nor relevant—it says nothing about whether those commissions affected agents' and brokers'
plan recommendations—and the MA-to-Medigap comparison in no way shows that MA payments
are increasing (much less at troubling rates).  App. 29, 66.  Nor did the study analyze payments *to
firms* at all.  This "flawed" study is "woefully inadequate" to support CMS's upheaval of a thriving
industry.  *Desoto*, 766 F.2d at 184 n.5, 185.  At minimum, CMS had to "provide a response" to the
Council pointing out these flaws.  *Chamber of Com.*, 85 F.4th at 774; *see Mexican Gulf*, 60 F.4th
at 973 (agency "violate[d] the APA" because it "did not address" an issue raised by comments).
It did not even acknowledge those comments, much less explain whether and why CMS disagreed
with them.  89 Fed. Reg at 30,619/3 & nn.154-55; *see* Order 11.

The Rule also cited flawed data about a purported increase in beneficiary "complaints"
from 2020 to 2021 as support for the proposition that agents and brokers have skewed "financial
incentives."  89 Fed. Reg. at 30,618/1.  But even assuming that this reported increase in complaints
is real, CMS never justified its cherry-picked choice of that unrepresentative period from the height
of COVID-19, App. 31, even though data from other years were available.  Commenters explained
that the pandemic likely influenced the number of complaints to CMS in 2020, App. 31, because
during that period CMS adopted a "number of flexibilities" for MA plans (*e.g.*, notification waiv-
ers), App. 198; *see also* App. 31.  But CMS never responded; it cited no evidence of a larger,

continuing trend; it never presented the complaint data it considered; and it ignored comments demonstrating that complaints have "gone down each year since 2021." App. 31-32; *see also* App. 65. CMS also ignored comments from firms reporting, based on their own investigations of complaints made to Medicare, that the percentage of "founded complaints"—i.e., meritorious complaints—is "generally between 10 and 20 percent." App. 31.

Other record evidence further undercuts CMS's shaky foundation. Commenters reported that "administrative payments are *not* steeply increasing," or even "keeping pace with inflation." App. 34. And firms have strong incentives to offer a diverse array of plans so participants can select the plan that best suits their long-term needs. Even under current regulations, firms cannot recoup the costs of the services they provide in a single year—they profit only if beneficiaries renew their enrollments, generating additional annual payments. Consequently, to operate profitably they must connect beneficiaries with plans they will be satisfied with and elect to renew. App. 37. Further, firms that are Council and NABIP–Fort Worth members provide *carrier-agnostic* services, like call support or plan-comparison tools, that avoid favoring any particular plan. App. 39. Meanwhile, the individual agents and brokers who interact with beneficiaries are wholly unaware of—and thus unaffected by—carriers' payments to firms. App. 39, 347-48. Perhaps these reasons are why, in a survey of MA beneficiaries, "[m]ost of the participants who used brokers did not seem bothered" about agents' potential "financial incentives." App. 39. Individual beneficiaries also urged CMS to "not make any changes to the agent's job, our access to them, or their compensation" because "without [the agent] there's no way [the beneficiary] could manage the many Medicare intricacies." App. 301; *see also* App. 39 (noting that a "majority" of beneficiaries believed they "made the right choice" of plan in 2023). Rather than grappling with this evidence and either reconsidering the rule or explaining why the evidence was not persuasive enough to

justify changing course, CMS ignored it.  By adopting a rule that runs "counter to the evidence"

before it, *Calumet*, 86 F.4th at 1140, and failing to address evidence that was "already … in th[e]

record," *Biden*, 10 F.4th at 556 n.5, CMS violated the APA.

### C.    The $100 Fixed Fee Increase Is Arbitrary And Capricious

CMS compounded its error by raising its new fixed fee by just $100 to supposedly account

for the numerous administrative payments the Rule now subjects to that limit.  89 Fed. Reg. at

30,626/2.  That decision was arbitrary and capricious.  *See* Order 8.

In the limited areas where Congress has authorized agencies to set prices, agencies typi-

cally set rates based on the "cost of providing service[s]" plus "a reasonable return on … invest-

ment," *Sierra Club v. FERC*, 38 F.4th 220, 228-29 (D.C. Cir. 2022)—a process that requires "elab-

orate economic models" and "voluminous records" of data, *Laffey v. Nw. Airlines, Inc.*, 746 F.2d

4, 21 (D.C. Cir. 1984), *overruled on other grounds*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc); *see,

e.g.*, *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1491-95 (D.C. Cir. 1984) (describ-

ing FERC "ratemaking formula[s]" for capturing pipeline service costs and rates of return based

on evidence compiled in 76 days of hearings).  CMS's novel foray into ratemaking for adminis-

trative services was the diametric opposite.

To start, CMS "never substantiated its decision to raise the fixed fee by $100" because it

never even attempted to account for the cost of the vast majority of vital services that commenters

identified.  Order 8; *see* App. 44-45.  The $100 increase purports to provide "sufficient funds" for

"necessary administrative tools and trainings" and "appointment fees."  89 Fed. Reg. at 30,626/3.

But it ignores overhead; technology to power quote engines; software and hardware for call rout-

ing; hiring and training agents; marketing campaigns; data security systems, and many others, thus

guaranteeing that firms will be left to provide those services at a loss.  App. 44-45, 214-16.  "In-

stead of responding to these warnings and studying the costs," Order 8, CMS claimed it would be

"extremely difficult" to "accurately capture" the full costs of these services, 89 Fed. Reg. at 30,625/3, so it did not even try.  As this Court recognized in granting preliminary relief, however, "CMS cannot flout APA standards" by claiming that its job was too hard.  Order 8.  "[I]nsist[ing]" that the costs "are unquantifiable in spite of ... suggestions to the contrary" is not "reasoned decisionmaking."  *Chamber of Com.*, 85 F.4th at 776.  And if CMS truly could not quantify these services' costs, it should have refrained from ratemaking altogether, rather than risk destroying a necessary industry.

Selecting $100 for the few services CMS did consider was equally arbitrary.  *See* Order 9.  In lieu of the rigorous economic modeling and voluminous records that agencies with actual ratemaking authority consider, CMS polled commenters and then purported to pick the "majority" recommendation, without ever analyzing whether the comments it relied on were supported by evidence.  89 Fed. Reg. at 30,625/3.  But "[a]gency rulemaking is [not] a democratic process by which the majority of commenters prevail by sheer weight of numbers."  *W. Coal Traffic League v. STB*, 998 F.3d 945, 950 n.4 (D.C. Cir. 2021).  CMS's selection among commenters' "competing proposals" without "rationally analyz[ing] the various issues" is the very essence of arbitrary and capricious rulemaking.  *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1256 (D.C. Cir. 2021) (vacating agency decision "embracing a 'middle-of-the-road approach'" without reasoned explanation).  So, too, is plucking a number out of the air to impose a limit on industry without a "satisfactory explanation."  *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) (vacating 30% market-share cap on cable operators).

Even if CMS's headcount were relevant, the record is clear that the "majority" of commenters did *not* favor a $100 increase.  What CMS actually said is that the "majority" of commenters recommended rates "*beginning* at $100," 89 Fed. Reg. at 30,625/3-26/1 (emphasis added)—

30

meaning that most suggested rates *above* $100.  As to the bottom of that range, the best CMS mustered was that "[s]everal" commenters specifically suggested $100. *Id.*  But CMS never identified those commenters, and Plaintiffs identified only a single comment that squarely recommended a $100 limit—a barebones comment with no supporting data or explanation, App. 195—as well as an anonymous, four-sentence comment speculating that "[p]erhaps $100 *to $200*" might "cover the costs of doing business and providing agents support," App. 127 (emphasis added).  When Plaintiffs pointed this out in their preliminary injunction briefing, Mot. 18, CMS did not even attempt to deny it, *see* Reply ISO Mot. for Prelim. Relief 10.  The *sole* support for limiting the increase to $100 is thus nothing but fiction.  Rulemaking without data is bad enough—and on its own violates the APA.  *See, e.g.*, *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 617 (D.C. Cir. 1980) (holding agency action unlawful where agency "had no data" to support its decision).  But trying to cover up the lack of data by misrepresenting the record during the rulemaking is particularly egregious, and warrants this Court's stern condemnation.  *See Animal Legal Def. Fund v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017) ("Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking."); *Lakeland Bus Lines, Inc. v. ICC*, 810 F.2d 280, 287-88 (D.C. Cir. 1987) (reversing agency order because it "relied on an inaccurate factual premise").

The Council, by contrast, did provide concrete cost estimates of specific services, App. 43-44, and NABIP explained that carriers typically pay FMOs "between $200 and $300 per beneficiary," which reflects current fair-market rates, App. 216.  Yet CMS refused to engage meaningfully with these comments, which reflected that "many carriers typically pay more than $100 for administrative services."  Order 11.  Instead, CMS speculated that recommendations of more than $100 "may" have been inflated to include the "full price" of technology and systems used for MA

plans, Part D plans, and unspecified "other markets."  89 Fed. Reg. at 30,626/1-2.  But CMS never substantiated that speculation by citing any evidence.  *Id.*  And even if CMS guessed correctly, it would have had to know the full price of technology and the costs of all other administrative services to determine how much commenters' high-end proposals supposedly overshot true costs.  CMS cannot throw up its hands and refuse to study costs.  *Chamber of Com.*, 85 F.4th at 777.

CMS also cannot justify the $100 Fixed Fee by claiming that it gives agents and brokers "the opportunity to decide which services are truly essential and how much those services are worth."  89 Fed. Reg. at 30,624/2.  Translated, that means the Rule will force agents and brokers to forgo some services and to make do with "truly" essential services only.  But CMS cannot know whether it has deprived funding for essential services without studying what services are necessary to sell the best plans to beneficiaries and the costs of providing those services.  Agents' supposed "opportunity to decide" is, in truth, reckless government compulsion.

Finally, CMS ignored the consequences of withholding adequate payment for these services.  As this Court recognized, CMS failed to engage with commenters who "warn[ed] that the use of a fixed fee … could harm the industry and push some participants to leave, in turn, reducing plan options that are available to beneficiaries."  Order 11.  Instead, in its Proposal, CMS conceded that it "lack[ed] the data to quantify [the Rule's] effects" on the industry.  88 Fed. Reg. at 78,610/3.  Commenters then made clear that the Rule would drive firms out of the industry or force them to sharply curtail services, depriving beneficiaries of the informed choices that CMS purports to be protecting in the Rule.  App. 47-48; *see also supra*, at 9.  But CMS did not obtain and analyze data about costs, which would have informed CMS about the Rule's impact on stakeholders.  Instead, CMS conceded the "lack of any cost analysis" in the Final Rule, too.  89 Fed. Reg. at 30,802/1.  CMS's failure to "provide a response" to those concerns, *Chamber of Com.*, 85 F.4th at 774, and

its "ducking [of] serious evaluation of the costs that could be imposed upon companies" by the Rule, *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1152 (D.C. Cir. 2011), just adds to the Rule's arbitrariness.

### D.    CMS Failed To Consider Alternatives

It is "well established that an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Farmers Union*, 734 F.2d at 1511 (footnote omitted); *see also Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1139 (5th Cir. 2021) (an agency's "reasoned analysis must consider … less disruptive alternatives"). Here, there were at least two reasonable alternatives to the Fixed Fee that CMS could have considered in response to the purported problems CMS asserted. Yet the Rule shows no appreciation that these alternatives exist, much less that CMS rationally rejected them.

*First*, rather than attempt to fix prices without statutory authority and with inadequate data, CMS could have chosen to target for enforcement the specific practices that it claims to have observed in violation of current compensation requirements. For example, if CMS were correct that carriers are using excessive administrative payments to "circumvent" the limitations on compensation, 89 Fed. Reg. at 30,622/2, CMS could address those payments simply by enforcing its existing restriction on administrative payments in excess of "the value of those services in the marketplace," 42 C.F.R. § 422.2274(e)(1), (2). Similarly, the Rule criticizes plans for paying agents "bonuses and perks" such as "golf parties, trips, and extra cash" in exchange for enrollments. 89 Fed. Reg. at 30,617/3. But existing CMS regulations already count "[b]onuses," "[g]ifts," and "[p]rizes or awards" as "compensation." 42 C.F.R. § 422.2274(a)(i)(B)-(D). To the extent CMS believed that plans could "credibly" deem bonus payments something other than compensation, 89 Fed. Reg. at 30,617/3, CMS could address this problem by clarifying that bonuses and perks are not permissible administrative payments, rather than subjecting *all* administrative

payments (including those that clearly are *not* bonuses and perks) to the Fixed Fee or removing the ability to recoup those costs at all.

*Second*, CMS could enforce existing rules that are responsive to CMS's concerns that allegedly improper financial incentives "are contributing to behaviors that are driving an increase in beneficiary marketing complaints." 89 Fed. Reg. at 30,618/1. "In some instances," CMS claimed, beneficiaries were "pressured" into an inappropriate plan even though "the beneficiary was clearly confused." *Id.* But CMS acknowledged just sentences later that the agency's "existing regulations already prohibit plans, and by extension their agents and brokers, from engaging in misleading or confusing communications with current or potential enrollees." *Id.* at 30,618/2. Indeed, plans cannot provide "inaccurate or misleading" information, cannot use unsupported "superlatives," and cannot engage in activities that could "confuse" beneficiaries. 42 C.F.R. § 422.2262(a). Third-party marketing organizations also must provide standard disclaimers to beneficiaries when selling plans. *Id.* § 422.2267(e)(41). CMS has strengthened these requirements twice in the last two years. *See Medicare Program; Contract Year 2024 Changes*, 88 Fed. Reg. 22,120 (Apr. 12, 2023) (adding provision about misleading communications); *Medicare Program; Contract Year 2023 Policy and Technical Changes*, 87 Fed. Reg. 27,704 (May 9, 2022) (adding standard disclaimer requirements). To address purported beneficiary "confusion," then, CMS could have simply enforced its existing regulations and studied their efficacy—*before* finalizing this devastating Rule.

Commenters proposed these alternatives. App. 50-52. In response, CMS deflected. It said it would "consider" these comments as grounds for *additional* regulations in "*future* rulemaking." 89 Fed. Reg. at 30,626/3 (emphasis added). In so doing, CMS admitted that it had not considered these options as they were offered—as *alternatives* to proceeding with the Payment Cap. CMS's

failure to consider these "responsible alternatives" and "to give a reasoned explanation for its re-jection" of them is another reason the Rule is arbitrary and capricious. *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008).

## II.   The Contract-Terms Restriction Is Unlawful

The Contract-Terms Restriction is also unlawful for several reasons. It bans contract terms that are not about "compensation," and thus falls outside CMS's statutory authority. It gives no fair notice of what it prohibits. *See* Order 10. And it is arbitrary and capricious. *See id.* at 11.

### A.   The Contract-Terms Restriction Exceeds CMS's Statutory Authority

The Contract-Terms Restriction exceeds CMS's authority for one of the same reasons as the Fixed Fee: It applies to contract terms that are not "compensation," and thus fall outside CMS's authority to regulate the "use of compensation." 42 U.S.C. § 1395w-21(j)(2)(d). To start, the Contract-Terms Restriction sweeps in the same administrative payments as the Fixed Fee. *See* 89 Fed. Reg. at 30,829/2 (§ 422.2274(c)(13)) (applying to all contract terms among carriers, agents, brokers, and FMOs, including those providing for administrative payments). But those payments are not "compensation," so CMS cannot regulate them. *See supra*, at 19-21. Moreover, as the Council told CMS, the Contract-Terms Restriction also regulates much more than that. App. 53. For example, CMS would prohibit plans' contracts with FMOs that contain "renewal" terms con-tingent on "higher rates of enrollment." 89 Fed. Reg. at 30,620/2. But whether a contract is re-newed or expires does not implicate the *use of compensation*; it concerns the contract's existence. Because the Contract-Terms Restriction captures more than what was "approved by Congress," it is unlawful. *VanDerStok v. Garland*, 86 F.4th 179, 189 (5th Cir. 2023). At a minimum, CMS was required—but failed—to respond to commenters questioning CMS's statutory authority to adopt such a sweeping ban on contract terms. *Chamber of Com.*, 85 F.4th at 774.

### B.       The Contract-Terms Restriction Did Not Provide Fair Notice

As this Court explained, "the Contract-Terms Restriction failed to provide fair notice of what was prohibited." Order 10.  The Restriction itself is impermissibly vague, and CMS's attempt to clarify it in the Rule's preamble was too little and too late to save it.

A law violates due process when it "fails to provide ... fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  And the APA's requirement that agencies give notice of the "substance of [a] proposed rule," 5 U.S.C. § 553(b)(3), is defeated if the regulatory text "provides no meaningful clarity about what" conduct is unlawful, *Mock v. Garland*, 75 F.4th 563, 585 (5th Cir. 2023).

The Contract-Terms Restriction flouts these principles by vaguely banning any contract term that "has a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary."  89 Fed. Reg. at 30,829/2.  That text leaves regulated entities to guess what terms might create those incentives (including indirectly).  And that is a serious problem for regulated entities, because guessing wrong could result in CMS "impos[ing] civil money penalties" against them.  42 C.F.R. § 422.752(c)(1).  Laws that permit such penalties warrant "strict … review" for vagueness, *Ford Motor Co. v. Tex. DOT*, 264 F.3d 493, 508 (5th Cir. 2001), and the Contract-Terms Restriction flunks it.  It is impossible to know whether many contract terms fall on the permissible or prohibited side of the line, App. 14-18, 367, which opens the door to "seriously discriminatory enforcement" based on CMS's whims, *Fox Television Stations*, 567 U.S. at 253.

Ostensibly acknowledging the "importan[ce]" of "clear" rules, CMS attempted to backfill the regulation's vague text by offering "examples" of prohibited conduct in the Rule's preamble.

89 Fed. Reg. at 30,620/3-21/1.  But a "preamble ... lacks the force and effect of law," *United Steel v. MSHA*, 925 F.3d 1279, 1284 n.2 (D.C. Cir. 2019), so it is no substitute for a clear regulation. Besides, the preamble only made CMS's vagueness problem worse because it "may have expanded the reach of the restriction without some meaningful identification of exactly what conduct is prohibited."  Order 10.  CMS could only suggest that certain contract terms "likely" or "could" be prohibited by the Contract-Terms Restriction, "depending on the facts and circumstances."  89 Fed. Reg. at 30,620/3-21/1.  CMS's carefully hedged language thus offered no "useful guidance" to carriers or firms.  App. 367.

Even if the preamble were somehow relevant and clear on its own terms, moreover, CMS would then face a different problem: the "logical outgrowth" doctrine.  Under that doctrine, an agency's proposed rule must provide "fair notice" of the eventual Final Rule.  *Mock*, 75 F.4th at 583.  A final rule is not a "logical outgrowth of the proposed rule" unless "interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period."  *Texas Ass'n of Mfrs. v. CPSC*, 989 F.3d 368, 381-82 (5th Cir. 2021) (quotation marks omitted).

Here, CMS's examples of what contract terms it sought to ban "change[d]" in unanticipated ways.  *Texas Ass'n of Mfrs.*, 989 F.3d at 381.  The Proposal sought to prohibit volume-based bonuses *only* if they were "passed on to agents or brokers."  88 Fed. Reg. at 78,554/3.  But the Final Rule went much further, proclaiming that *all* "bonuses for hitting volume-based targets for sales of a plan" are likely prohibited.  89 Fed. Reg. at 30,620/3-21/1.  Because the Rule's prohibition is not "alike in kind" to the Proposal, firms lost their chance to "comment on the expanded rule" by, for example, explaining that volume-based bonuses are unremarkable payments that reflect additional or more effective services.  *Mock*, 75 F.4th at 584, 586; *see* App. 366 (explaining that carriers

agree to volume-based payments for marketing services because the number of enrollments is a proxy for measuring the marketing campaign's effectiveness).  That is exactly the problem the logical-outgrowth doctrine is meant to prevent.  CMS cannot escape notice and comment by proposing a vague rule, waiting for the comment period to close, and only then explaining that the real rule is actually much broader.

### C.    The Contract-Terms Restriction Is Arbitrary And Capricious

The Contract-Terms Restriction is also arbitrary and capricious in many ways.  Order 10-11.  Like the Fixed Fee, it was driven by unsubstantiated suspicions, undisclosed evidence, and blithe disregard for regulatory effects.  *See supra*, at 22-29.  It also suffered several independent flaws.

*First*, the concerns the Contract-Terms Restriction was meant to address are just as unsupported as those underlying the Fixed Fee.  For example, CMS expressed concern about plans offering "bonuses for hitting volume-based targets for sales of a plan."  89 Fed. Reg. at 30,621/1.  In the agency's view, such "volume-based bonuses" would "*likely* have the indirect effect of creating an incentive for the TPMO to prioritize sales of one plan over another based on those financial incentives and not the best interests of the enrollees."  *Id.* (emphasis added).  But CMS did not analyze which plans offer volume-based bonuses, what those contract provisions commonly entail, or—ultimately—whether firms receiving volume-based bonuses actually prioritize some plans over others.  Without answering these questions, CMS cannot know whether these provisions are problematic.  Because CMS never showed that volume-based bonuses are "genuine problems," there was "no rational basis" to outlaw them.  *Chamber of Com.*, 85 F.4th at 777.

More broadly, CMS wrings its hands about large plans starting "bidding war[s]" to get "anti-competitive contract terms" with third-party firms such as FMOs.  89 Fed. Reg. at 30,619/1.  In support, CMS refers to unspecified "reports that some larger FMOs are more likely to contract

with large national plans." *Id.* at 30,618/3.  But CMS did not disclose or cite any such reports in the Proposal or the Final Rule.  This is yet another example of CMS "[p]rofessing that [a rule] ameliorates a real industry problem but then citing no evidence demonstrating that there is in fact an industry problem," which "is not reasoned decisionmaking," *Nat'l Fuel Gas Supply Corp.*, 468 F.3d at 843, and flunks notice-and-comment requirements as well, *see Air Prods. & Chems.*, 650 F.2d at 699 n.17.

*Second*, even if the problems CMS identified were real, its solution is irrational.  Take CMS's position that it is fine for plans to contract with agents who have not been "appointed" to "represent all possible competitors in a market," but that it is not okay for plans to "offe[r] a bonus or other payment" to an agent "in exchange for declining to represent a competing plan" in a market.  89 Fed. Reg. at 30,620/3.  In each case, agents represent some but not all plans.  No law requires an agent to represent all plans.  And CMS concedes that in each case, the (unsubstantiated) incentives regarding beneficiary enrollment are purportedly the same:  The agents are "inherently more likely to enroll beneficiaries into the plan(s) with which" they contracted.  *Id.*  Yet the Rule approves one and forbids the other.  That "internal inconsistency" is "characteristic of arbitrary and unreasonable agency action," *Chamber of Com.*, 885 F.3d at 382, and requires invalidating the Contract-Terms Restriction in full.

*Third*, CMS acted arbitrarily and capriciously by seeking to regulate competition—an extra-statutory aim that Congress never gave it the authority to consider.  An agency acts arbitrarily and capriciously when it "relie[s] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43; *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (similar).  The Contract-Terms Restriction targets so-called "anti-competitive" contract terms based on vague Executive Branch "policy goals" of "promot[ing] a fair, open, competitive marketplace."  89 Fed.

Reg. at 30,618/3, 30,621/1 (citing Exec. Order 14036 (July 9, 2021)).  But Section 1395w-21(j)(2)(D) says not a word about promoting competition.  In any event, a rule mandating one-size-fits-all contracts between all carriers and all firms—rather than a rule permitting contract terms that the market can bear—is the antithesis of competition.  *See* App. 12; *cf. N.C. State Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 502 (2015) ("price fixing ... undermine[s] the free market").

*Fourth*, the Contract-Terms Restriction is arbitrary and capricious because CMS "failed to sufficiently respond to public comments" about it.  Order 10-11; *see Ohio*, 144 S. Ct. at 2055 (holding agency response inadequate where it "did not address the [comments'] concern so much as sidestep it").  For example, commenters asked CMS to clarify "what will qualify as a direct and an indirect impact with respect to CMS's definition of incentivizing, to ensure that there are clear and objective standards."  App. 112.  CMS never even attempted an answer, even in the non-binding and unhelpful preamble.  *See* 89 Fed. Reg. at 30,620/3-21/1.  Because CMS "bur[ied] its head in the sand" and "duck[ed] the hard questions," the Contract-Terms Restriction is arbitrary and capricious, even if CMS could conjure plausible responses now.  *Mexican Gulf*, 60 F.4th at 973.

## III.    The Court Should Vacate The Rule Nationwide

Given all the flaws identified above, the Court should set aside—*i.e.*, vacate—the Rule on a nationwide basis, as it did at the preliminary-relief stage.  *See* Order 16 (staying Rule nation-wide).

Under the APA, courts "*shall* ... hold unlawful and set aside" agency action that, like the Rule, is arbitrary and capricious, "in excess of [CMS's] statutory jurisdiction," or promulgated "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D) (emphasis added).  That language is mandatory: The Court is "required" to set aside unlawful agency action.

40

*BP Am., Inc. v. FERC*, 52 F.4th 204, 213 (5th Cir. 2022).  That is true whether the unlawful action arises from "substantive defects," such as a lack of statutory authority or an arbitrary and capricious rule, or from procedural defects, such as violations of notice-and-comment requirements. *Chamber of Com. of U.S. v. SEC*, 88 F.4th 1115, 1118 & n.2 (5th Cir. 2023).  Accordingly, Fifth Circuit precedent does not "require consideration of the various equities at stake before determining whether a party is entitled to vacatur." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024).  Indeed, "[v]acatur is the *only* statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) (emphasis added); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors*, 144 S. Ct. 2440, 2462 (2024) (Kavanaugh, J., concurring) ("When a federal court sets aside an agency action, the federal court vacates that order").

When a court sets aside a rule, Fifth Circuit precedent likewise confirms that relief must be nationwide, and not restricted to the parties.  The consequence of vacatur is to "formally nullify and revoke" an unlawful rule.  *Data Mktg. P'Ship, LP v. DOL*, 45 F.4th 846, 859 (5th Cir. 2022). It follows that the "scope of ultimate relief under Section 706" of the APA "is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).  As the Fifth Circuit has repeatedly confirmed, "vacatur operates on the status of agency action in the abstract"; thus, "setting aside agency action under § 706 has 'nationwide effect.'"  *Braidwood Mgmt.*, 104 F.4th at 951; *see also In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024) (when "plaintiffs prevail on [an] APA challenge, [a] court must 'set aside'" the agency action "with nationwide effect").  So as this Court has correctly concluded, "party-specific relief is not even contemplated by the APA." *Am. Council of Life Insurers*, 2024 WL 3572297, at *8; *see also Cardona*, 2024 WL 3658767, at *47 ("by its very nature, a vacatur is

universal in scope").[4]

Universal relief also makes practical sense.  Agency "protests against nationwide relief are incoherent" where, as here, it promulgates a "[r]ule to prescribe uniform federal standards." *Career Colls.*, 98 F.4th at 255; *see also Am. Council of Life Insurers*, 2024 WL 3572297, at *8 (issuing "complete relief" where a rule sought to "establish a uniform definition").  As this Court previously recognized, CMS's Rule "seeks to prescribe uniform standards" that apply "to all agents and firms that participate in the MA ecosystem—not just the parties to these cases."  Order 16.  Thus, Plaintiffs need relief not merely for themselves, "but also for the carriers that engage with them," who "must be permitted to offer the same terms universally so that firms are not forced to negotiate terms that are not allowed in the rest of the market."  *Id.*  Agents and brokers such as Vogue also need relief for the firms that serve them.  App. 375-76.  And firms need fair-market payments for services provided to all of their carrier clients—not just a few—to continue profitably providing the services those clients need.  Party-restricted relief is thus not the appropriate remedy because it would "prove unwieldy and … only cause more confusion," *Mock*, 75 F.4th at 587—in addition to contradicting well-established Fifth Circuit precedent.

---

[4] Because vacatur under the APA is inherently universal, CMS's prior attempts to narrow the scope of relief by challenging some Plaintiffs' associational standing are irrelevant.  *See* Opp. 48.  Vogue's standing has (correctly) never been challenged, *see supra*, at 12 n.2, and if "at least one plaintiff has standing, the suit may proceed," *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023).  Because at least one Plaintiff has standing, this Court has jurisdiction, and it can vacate the Rule nationwide under settled APA principles.  In any event, this Court already found that the associational Plaintiffs have standing, Order 5-6, and nothing has changed in the interim, *see supra*, at 12 n.2; *see generally Am. All. for Equal Rts. v. Founders First Cmty. Dev. Corp.*, 2024 WL 3625684, at *2 (N.D. Tex. July 31, 2024) (O'Connor, J.) (finding associational standing where association sought relief on behalf of one pseudonymous member who had standing to sue).

## CONCLUSION

The Court should grant summary judgment for Plaintiffs and should declare unlawful, vacate, and set aside the challenged provisions of the Rule on a nationwide basis.

Dated:  September 27, 2024

Allyson N. Ho
Texas Bar No. 24033667
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2971
aho@gibsondunn.com

Charles W. Fillmore
Texas Bar No. 00785861
H. Dustin Fillmore III
Texas Bar No. 06996010
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX  76102
Telephone: (817) 332-2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

Respectfully submitted,

*/s/   Allyson N. Ho*
Eugene Scalia (*pro hac vice*)
Matthew S. Rozen (*pro hac vice*)
Aaron M. Smith (*pro hac vice*)
M. Christian Talley (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036-4504
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
escalia@gibsondunn.com
mrozen@gibsondunn.com
asmith3@gibsondunn.com
ctalley@gibsondunn.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 27, 2024, I caused the foregoing document to be filed with the Clerk for the U.S. District Court for the Northern District of Texas through the ECF system.  Participants in the case who are registered ECF users will be served through the ECF system, as identified in the Notice of Electronic Filing.


<u>/s/ Allyson N. Ho</u>
Allyson N. Ho