IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE, et al. | |
|     Plaintiffs, | |
| v. | Civil Action No. 4:24-CV-439-O |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | |
|     Defendants. | |
| COUNCIL FOR MEDICARE CHOICE, et al. | |
|     Plaintiffs, | |
| v. | Civil Action No. 4:24-CV-446-O |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | |
|     Defendants. | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

LEIGHA SIMONTON
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

# Table of Contents

I.      Summary .................................................................................................. 1

II.     Background ............................................................................................. 3

        A.      Medicare Advantage and Part D .................................................. 3

        B.      Marketing Medicare Advantage Plans and Prescription Drug Plans ..................... 4

        C.      The Proposed Agent/Broker Compensation Rule ................................ 10

        D.      The Final Agent/Broker Compensation Rule ...................................... 14

        E.      The Lawsuit ..................................................................................... 18

III.    Legal Standard ...................................................................................... 19

IV.     Argument and Authorities ................................................................... 19

        A.      The statute grants the agency express authority to regulate how
                the Medicare Advantage and prescription drug plans it funds are marketed ........ 19

                1.      The statute grants CMS authority to regulate administrative
                        support costs ...................................................................... 19

                        a.      Congress expressly delegated authority to CMS to regulate
                                fair marketing, including compensation. ..................... 20

                        b.      Plaintiffs identify no textual outer boundary on the agency's
                                statutory authority that has been transgressed. ............ 22

                        c.      Plaintiffs' preferred economic policies cannot
                                override statutory text. ............................................... 32

                2.      The statute grants CMS the authority to prescribe contract
                        restrictions. ........................................................................ 34

        B.      The Final Rule is not arbitrary and capricious. ........................... 35

                        a.      The Final Rule is supported by sufficient evidence, is rational,
                                and accounted for reliance interests. ......................... 36

                        b.      The Final Rule is consistent with HIPAA ...................... 42

                        c.      No Due Process Clause violation is shown ................... 43

        C.      CMS complied with any applicable notice-and-comment requirements. ........... 45

a.     CMS disclosed all necessary information in the Proposed Rule. ..45

b.     The Final Rule is a logical outgrowth of the Proposed Rule. ........47

D.     Plaintiffs' requested relief is overbroad. ................................................................ 47

V.     Conclusion ................................................................................................................ 50

## Table of Authorities

### Cases

*Air Prods. & Chems. Inc. v. FERC*,
  650 F.2d 687 (5th Cir. 1981) ........................................................................46

*Am. Council of Life Insurers v. DOL*,
  No. 4:24-CV-482-O, 2024 WL 3572297 (N.D. Tex., July 26, 2024).........................47–48

*Am. Great Lakes Ports Ass'n v. Schultz*,
  962 F.3d 510 (D.C. Cir. 2020).....................................................................40

*Am. Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008).....................................................................45

*Atl. Ref. Co. v. F.T.C.*,
  381 U.S. 357 (1965)................................................................................21

*Bailey v. United States*,
  516 U.S. 137 (1995)................................................................................28

*Barrett v. United States*,
  205 F. Supp. 307 (S.D. Miss. 1962)..............................................................24

*Batterton v. Francis*,
  432 U.S. 416 (1977)............................................................................20, 21

*Benavides v. Chicago Title Ins. Co.*,
  636 F.3d 699 (5th Cir. 2011) .....................................................................28

*Bruesewitz v. Wyeth LLC*,
  562 U.S. 223 (2011)................................................................................29

*Burbridge v. CitiMortgage*,
  37 F.4th 1049 (5th Cir. 2022) .....................................................................27

*Burkhart v. UIL*,
  No. 1:22-CV-1026-RP, 2023 WL 2940026 (W.D. Tex. Apr. 13, 2023) ..........................44

*California v. Texas*,
  593 U.S. 659 (2021)................................................................................48

*Chem. Mfrs. Ass'n v. EPA*,
  870 F.2d 177 (5th Cir. 1989) .....................................................................46

*CTS Corp. v. Waldburger*,
    573 U.S. 1 (2014) ................................................................................................43

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019) ......................................................................................41

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
    867 F.3d 564 (5th Cir. 2017) ............................................................................44

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
    320 U.S. 591 (1944) ..........................................................................................34

*FCC v. Fox Tel. Stations, Inc.*,
    556 U.S. 502 (2009) ...................................................................................26, 27

*FCC v. Fox Tel. Stations, Inc.*,
    567 U.S. 239 (2012) ..........................................................................................43

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ...................................................................................36, 41

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) ...........................................................................49–50, 50

*Fleshman ex rel. Fleshman v. Heckler*,
    709 F.2d 999 (5th Cir. 1983) ............................................................................21

*Flight Training Int'l, Inc. v. FAA*,
    58 F.4th 234 (5th Cir. 2023) .............................................................................45

*Hancock v. Chicago Title Ins. Co.*,
    263 F.R.D. 383 (N.D. Tex. 2009) .....................................................................28

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) ..........................................................................................48

*Handley v. Chapman*,
    587 F.3d 273 (5th Cir. 2009) ............................................................................45

*Huawei Techs. USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021) .........................................................................39, 44

*I.C.C. v. Transcon Lines*,
    513 U.S. 138 (1995) ..........................................................................................21

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*,
    685 F.3d 353 (3d Cir. 2012) .............................................................................42

*In re Riley,*
    923 F.3d 433 (5th Cir. 2019) ..................................................................23, 24

*Jersey Cent. Power & Light Co. v. FERC,*
    810 F.2d 1168 (D.C. Cir. 1987)...................................................................33

*J.H. Rutter Rex Mfg. Co. v. United States,*
    706 F.2d 702 (5th Cir. 1983) ......................................................................32

*Kootenai Elec. Co-op., Inc. v. FERC,*
    192 F.3d 144 (D.C. Cir. 1999) ....................................................................33

*Lomax v. Ortiz-Marquez,*
    140 S. Ct. 1721 (2020)................................................................................24

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024)........................................................20, 21, 30, 33, 35

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) .......................................................................48

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)..............................................................................49, 50

*Mayfield v. U.S. Dep't of Lab.,*
    117 F.4th 611 (5th Cir. 2024) .........................................................21, 32, 34

*Mercy Hosp. of Laredo v. Heckler,*
    777 F.2d 1028 (5th Cir. 1985) ....................................................................28

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare,*
    742 F.2d 442 (8th Cir. 1984) ......................................................................34

*Perkins v. Lukens Steel Co.,*
    310 U.S. 113 (1940)...............................................................................32–33

*Rudisill v. McDonough,*
    601 U.S. 294 (2024)....................................................................................34

*Schweiker v. Gray Panthers,*
    453 U.S. 34 (1981)........................................................................20, 21, 31

*Sierra Club v. EPA,*
    939 F.3d 649 (5th Cir. 2019) ......................................................................35

*Shah v. Azar,*
    920 F.3d 987 (5th Cir. 2019) ......................................................................34

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995) .........................................................................................28

*S. Union Co. v. Mo. Pub. Serv. Comm'n*,
    289 F.3d 503 (8th Cir. 2002) .......................................................................33

*Sun Towers, Inc. v. Schweiker*,
    694 F.2d 1036 (5th Cir. 1983) .....................................................................19

*Tenth Street Residential Ass'n v. City of Dallas, Tex.*,
    968 F.3d 492 (5th Cir. 2020) .......................................................................49

*Tex. Clinical Labs, Inc. v. Sebelius*,
    612 F.3d 771 (5th Cir. 2010) .......................................................................19

*Tex. Med. Ass'n v. HHS*,
    --- F.4th ----, 2024 WL 4615744 (5th Cir. Oct. 30, 2024) .....................22, 48

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    265 F.3d 313 (5th Cir. 2001) .......................................................................47

*Thomas v. Reeves*,
    961 F.3d 800 (5th Cir. 2020) (en banc) ......................................................33

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .....................................................................................49

*Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*,
    No. 22-10414, 2023 WL 2573914 (5th Cir. Mar. 20, 2023) .........................3

*United States v. Dubin*,
    27 F.4th 1021 (5th Cir. 2022) (en banc) .....................................................28

*United States v. Texas*,
    599 U.S. 670 (2023) .....................................................................................47

*United States v. White*,
    869 F.2d 822 (5th Cir. 1989) .......................................................................27

*U.S. Anesthesia Partners of Tex., P.A. v. U.S. Dep't of Health & Hum. Servs.*,
    No. 2:23-CV-206-Z, 2024 WL 1257491 (N.D. Tex. Mar. 25, 2024) ...............36

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*,
    489 U.S. 749 (1989) .....................................................................................46

*VanDerStok v. Garland*,
    633 F. Supp. 3d 847 (N.D. Tex. 2022) ....................................................49, 50

*Vermont Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.*,
    435 U.S. 519 (1978)..........................................................................46

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)..........................................................................44

*Warth v. Sedin*,
    422 U.S. 490 (1975)..........................................................................49

*Watkins v. Scott Paper Co.*,
    530 F.2d 1159 (5th Cir. 1976) ........................................................28

## Statutes, Rules, and Other Authorities

5 U.S.C. § 553.............................................................................................45, 46

5 U.S.C. § 553(b)..............................................................................................45

5 U.S.C. § 556(e)..............................................................................................46

5 U.S.C. § 705...................................................................................................18

5 U.S.C. § 706(2)...............................................................................................19

11 U.S.C. § 330(a)(1).........................................................................................24

29 U.S.C. § 207(e)(2).........................................................................................24

42 C.F.R. § 417.532(a)(1)(iii)............................................................................40

42 C.F.R. § 417.550...........................................................................................40

42 C.F.R. § 417.552...........................................................................................40

42 C.F.R. § 422.118...........................................................................................43

42 C.F.R. § 422.258(d).........................................................................................3

42 C.F.R. § 423.104.............................................................................................4

42 C.F.R. § 422.2274............................................................................................8

42 C.F.R. § 422.2274(a)................................................................................18, 23

42 C.F.R. § 422.2274(a)(1)(iv)............................................................................8

42 C.F.R. § 422.2274(c)(13).........................................................................13, 34

42 C.F.R. § 422.2274(d) ................................................................................................27

42 C.F.R. § 422.2274(e) ...........................................................................................23, 27

42 C.F.R. § 422.2274(e)(1) .......................................................................................23, 27

42 C.F.R. § 422.2274(g) ............................................................................................18, 19

42 C.F.R. § 422.2274(g)(4) ........................................................................................18, 42

42 C.F.R. § 423.2274(a)(1)(iv) .......................................................................................8

42 C.F.R. § 423.2274(c)(13) ......................................................................................13, 43

42 C.F.R. § 423.2274(g) ............................................................................................18, 19

42 C.F.R. § 423.2274(g)(4) ........................................................................................18, 42

42 U.S.C. § 1395w-21(h) ...........................................................................................4, 12

42 U.S.C. § 1395w-21(h)(4) .......................................................................................21, 36

42 U.S.C. § 1395w-21(h)(4)(C) ....................................................................................18

42 U.S.C. § 1395w-21(h)(4)(D) ...................................................................20, 22, 31, 35

42 U.S.C. § 1395w-21(j)(1)(A) ................................................................................6, 18

42 U.S.C. § 1395w-21(j)(2)(D) ......1, 3, 6, 13, 22, 22–23, 24, 30, 31, 32, 33, 34, 35, 36, 38, 42, 43

42 U.S.C. § 1395w-22(a) .................................................................................................3

42 U.S.C. § 1395w-24(a)(1)(A) ......................................................................................3

42 U.S.C. § 1395w-24(a)(6)(B) ......................................................................................4

42 U.S.C. § 1395w-101 ..................................................................................................3

42 U.S.C. § 1395w-101(b)(1)(B)(vi) ........................................................................4, 18

42 U.S.C. § 1395w-104(*l*)(1) ...................................................................................6, 18

42 U.S.C. § 1395w-104(*l*)(2) .........................................................................................1

42 U.S.C. § 1395w-111(b)(1) ..........................................................................................3

42 U.S.C. § 1395w-111(d)(2) ..........................................................................................4

42 U.S.C. § 1395w-111(e)(2) ....................................................................4

42 U.S.C. § 1395w-111(g)(5)(B) ..............................................................31

42 U.S.C. § 1395w-115(a) ..........................................................................4

42 U.S.C. § 1395x(v)(1)(A) ......................................................................40

42 U.S.C. § 1395ww(o)(2)(B)(i)(I) ..........................................................31

45 U.S.C. § 717c(a) ...................................................................................34

45 U.S.C. § 1665d(a) .................................................................................34

45 U.S.C.§ 1665d(c) .................................................................................34

46 U.S.C. § 53910(f)(2) ............................................................................24

69 Fed. Reg. 46,866 (2004) ...................................................................4, 42

73 Fed. Reg. 28,556 (2008) .................................................................6, 31

73 Fed. Reg. 54,226 (2008) .......................................6, 8, 9, 25, 26, 30

73 Fed. Reg. 67,406 (2008) .........................................................7, 8, 25

76 Fed. Reg. 54,600 (2011) ...................................................................9, 47

77 Fed. Reg. 22,072 (2012) .........................................................................9

86 Fed. Reg. 5,864 (2021) ....................................................................25, 26

88 Fed. Reg. 78,476 (2023) (Proposed Rule) ..................10, 12, 13, 14, 46, 47

89 Fed. Reg. 30,448 (Final Rule)
..............................15, 16, 17, 18, 20, 25, 26, 30, 35, 36, 37, 38, 39, 40, 41, 43, 47

Balanced Budget Act of 1997,
Pub. L. No. 105-33, 111 Stat. 251 ......................................................4

Black's Law Dictionary (11th ed. 2019) (*Compensation*)............................23

Kurt H. Decker & H. Thomas Felix II,
*Drafting and Revising Employment Contracts* (1991) ....................23

Medicare Improvements for Patients and Providers Act of 2008,
Pub. L. No. 110-275, 122 Stat. 2494 ................................................6

Medicare Prescription Drug, Improvement, and Modernization Act of 2003,
    Pub. L. No. 108-173, 117 Stat. 2066 .................................................................................4

1 Works of James Wilson (J. Andrews ed. 1896).........................................................33

## I.     Summary[1]

When seniors enroll in Medicare, they face many complex choices, and they often turn to agents and brokers to help them make decisions about their enrollment.  These agents and brokers are valuable, providing advice that can save seniors thousands of dollars per year and ensure they get lifesaving care.  But they also pose a great risk:  insurance companies parcel out the Medicare funds that pay for agents and brokers and the systems that support them, so rules are necessary to ensure agents and brokers act in the best interest of seniors, not the insurers. Over fifteen years ago, then, Congress expressly delegated authority to the Centers for Medicare & Medicaid Services (CMS) to expand its fair-marketing guidelines so that they would "limit[]" Medicare Advantage and Part D drug plans' "use of compensation" to sell their health coverage to Medicare beneficiaries, so as to avoid incentivizing agents and brokers to act in any way other than in the best interest of seniors.  42 U.S.C. § 1395w-21(j)(2)(D); *id.* § 1395w-104(*l*)(2).

For about two months, CMS tried acceding to industry requests not to set specific dollar limits on compensation and relying on plans to set reasonable compensation that reflected a fair-market value.  Instead, Medicare Advantage and Part D drug plans rolled out unprecedented marketing budgets, dissipating the taxpayer funds they receive to compete not on benefits, but rather on who has the best or most wide-reaching sales pitch.  In response, CMS changed tacks. To protect both beneficiaries and the integrity of the Medicare Advantage and Part D programs, CMS in November 2008 translated its fair-market value principles into specific dollar limits on how much those plans could pay their agents and brokers for enrolling or renewing beneficiaries. CMS has enforced those dollar limits across four separate Presidential administrations without

---

[1] Plaintiffs in No. 4:24-CV-439-O are referred to as ABC, and Plaintiffs in No. 24-CV-446-O are referred to as CMC.  "AR__" cites are to the administrative record, which is on file at ECF 47 in the ABC case and ECF 44 in the CMC case.

any suggestion that they violated its statutory authority or that they needed to account for every possible cost agents and brokers might use their enrollment compensation to cover.

The same story played out in slow motion with respect to administrative payments for things like licensing and work travel. When CMS announced its final guidelines in 2008, it imposed a fair-market-value limit on compensation to support administrative activities, while promising to monitor administrative payments in case Medicare Advantage and Part D drug plans used them to get around other compensation limits. For years, CMS was satisfied that the fair-market-value limitations met the agency's statutory obligation to protect beneficiaries.

By 2023, however, CMS faced increasing reports that Field Marketing Organizations (FMOs), which insurers hire to conduct a variety of marketing services and can serve as go-betweens with many agents and brokers, were manipulating administrative payments to get around the compensation limits. After further investigation, CMS concluded that administrative payments were often structured as per-enrollee "overrides" and other add-ons, and that an agent or broker might walk away with double the compensation limit for each enrollment. To make matters worse, the generosity of those administrative payments varied by plan, incentivizing agents and brokers to funnel beneficiaries into higher paying plans instead of the best plan for the enrollee. These conclusions added to CMS's existing concerns about a recent spike in marketing misconduct, such as calls where CMS found that beneficiaries were pressured to enroll in plans they did not understand. To prevent further circumvention of the compensation limits and to realign agent and broker incentives with beneficiaries' health needs, in April 2024 CMS promulgated a Final Rule that consolidated administrative payments with the other categories of compensation and added $100 to the $611 national compensation limit per enrollment to account for any administrative payments.

In response, Plaintiffs sued—not just to challenge the Final Rule, but also to press a novel statutory theory that might, if accepted, eliminate CMS's authority to set *any* compensation limits, unraveling 15 years of beneficiary protections. Plaintiffs' cramped construction of 42 U.S.C. § 1395w-21(j)(2)(D) fails to account for its plain meaning, its context within the statutory structure, or its history. And Plaintiffs' attacks on the $100 increase to compensation ignore the agency's analysis that led it to triple the increase it initially proposed. The Court should deny Plaintiffs' motion for summary judgment and grant the agency's cross-motion.

## II.    Background

### A.    Medicare Advantage and Part D

Medicare is a federal health insurance program for the elderly and persons with certain disabilities, and authority to administer it has been delegated by the Secretary of Health and Human Services to CMS. Under Medicare Parts A and B, CMS pays eligible providers for a beneficiary's covered health costs. Under Part C, or Medicare Advantage, CMS contracts with private health insurers to provide beneficiaries the coverage they would otherwise receive through Parts A and B. *See* 42 U.S.C. § 1395w-22(a). And under Part D, CMS contracts with private drug plan sponsors to provide drug benefits. *Id.* § 1395w-101.

CMS pays Medicare Advantage plans a fixed monthly amount based on local per-enrollee benchmark rates that turn on the maximum amount CMS expects it would pay for an average enrollee. *See Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*, No. 22-10414, 2023 WL 2573914, at *1 (5th Cir. Mar. 20, 2023); *see also* 42 U.S.C. §§ 1395w-24(a)(1)(A), 1395w-111(b)(1); 42 C.F.R. § 422.258(d). (In Tarrant County in 2025, that rate is $1,148.68 per month.) For Part D, the government establishes the basic benefit with parameters like the deductible ($545 in 2025) and an out-of-pocket threshold ($2,000 in 2025), and subsidizes

approximately 75% of the cost of prescription drug plans.  42 U.S.C. § 1395w-115(a); 42 C.F.R.

§ 423.104.  The premise of both programs is that within the regulatory constraints, contracted

plans "compete not only on price but on quality to attract beneficiaries' enrollment and to keep

them enrolled over time."  69 Fed. Reg. 46,866, 46,867 (2004).

But healthy competition does not happen in a vacuum, and Congress instructed CMS to

closely monitor other aspects of these programs to protect beneficiaries and the public fisc—as

well as to ensure a level playing field to allow effective competition among plans.  Each year, for

example, CMS must inspect the actuarial analyses plans submit to support their bids and ensure

that the bids equitably reflect revenue requirements of benefits provided under the plan.  42

U.S.C. §§ 1395w-24(a)(6)(B), 1395w-111(d)(2), (e)(2).  And CMS also issues detailed guidance

on profit margins, in part to prevent anti-competitive pricing.[2]

## B.    Marketing Medicare Advantage Plans and Prescription Drug Plans

Another aspect of Parts C and D that Congress has long directed CMS to closely

supervise is plan marketing.  The law that added Part C to Medicare required contractors to

"conform to fair marketing standards" and directed CMS to review and approve all marketing

literature.  *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001, 111 Stat. 251, 285

(codified at 42 U.S.C. § 1395w-21(h)).  The same is true for Part D.  *See* Medicare Prescription

Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 101(a), 117 Stat.

2066, 2072–73 (codified at 42 U.S.C. § 1395w-101(b)(1)(B)(vi)).  In other words, while

Congress recognized that beneficiaries need to understand the differences between plans to

choose the best one for their needs, it recognized that plans might find it more lucrative to invest

---

[2] *See* Instructions for Medicare Advantage Bid Pricing Tools for Contract Year 2025 at 25–27, https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/bid-forms-instructions/2025 (PDF file within link for ZIP download).

in their sales pitches instead of plan design or providing health benefits, or use aggressive tactics to steer beneficiaries to more profitable plans. Those tactics are inconsistent with the goal of Parts C and D, which is for plans to compete on the substance of plan quality and price, not on marketing strategies.

Based on Congress's directive, CMS in 2005 issued over 160 pages of guidance that included restrictions on marketing payments. *See* Medicare Marketing Materials Guidelines at 138 (Rev. Nov. 1, 2005).[3] The guidelines required agreements with marketers in which "commission rate . . . should not vary based on the value of the business generated." *Id.* at 139. Plans were to "[p]rovide reasonable compensation in line with industry standards," fees had to "reasonably relate to the value of the services provided," and compensation could not be structured to provide "incentives to mislead beneficiaries, cherry pick certain beneficiaries, or churn beneficiaries between Plans" to win commissions. *Id.* at 138. The goal was to prevent payments that favored "the financial interests" of marketers rather than guiding beneficiaries to "select the Plan most appropriate to [their] needs." *Id.* at 137. And because perverse financial incentives could affect anyone involved with selling plans, the guidelines covered compensation to brokers, independent agents, and any "downstream contractor." *Id.* at 138.

The guidelines also addressed information sharing. Plans could not "[s]hare any member information, financial or otherwise, with any entity not directly involved in the outreach process." *Id.* at 90. Nor could they "[s]tore or use member financial information for any purpose other than the initial screening eligibility, the submission and follow-up of an application for benefits, for recertification purposes, and as required by law." *Id.* Those requirements added

---

[3] https://www.cms.gov/medicare/prescription-drug-coverage/prescriptiondrugcovcontra/downloads/marketingguidelines_110105.pdf

onto the privacy requirements in the recently-promulgated Health Insurance Portability and Accountability Act (HIPAA) regulations. *See, e.g.*, *id.* at 118.

In May 2008, CMS proposed expanding its compensation requirements to require that commissions or other compensation must be the same between years and among the different plans offered by the same Medicare contractor. *See* 73 Fed. Reg. 28,556, 28,583 (2008). Congress subsequently expanded CMS's express authority in 2008 in the Medicare Improvements for Patients and Providers Act, by instructing CMS to "establish limitations with respect to . . . [t]he use of compensation other than as provided under guidelines established by the Secretary." *See* Pub. L. No. 110-275, § 103(b), 122 Stat. 2494, 2500 (codified at 42 U.S.C. § 1395w-21(j)(2)(D)). Congress did not instruct CMS to wait until it could prove that specific bad practices had harmed beneficiaries, but instead required CMS to act affirmatively so that agents and brokers never had an incentive to harm beneficiaries in the first place: "Such guidelines shall ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." *Id.* The statute also expanded CMS's longstanding prohibition on door-to-door solicitation to include "[a]ny unsolicited means of direct contact of a prospective enrollee," including telephone calls. *Id.* § 103(a)(1)(A)(ii), 122 Stat. 2499 (codified at 42 U.S.C. § 1395w-21(j)(1)(A)). The same rules also apply to prescription drug plans. *Id.* § 103(a)(2), (b)(2), 122 Stat. 2499–500 (codified at 42 U.S.C. § 1395w-104(*l*)(1)).

Later in 2008, CMS issued two rules implementing the new statute. The first—issued in September 2008—was an interim rule that regulated compensation down to the months of the year for which agents and brokers could be paid. *See* 73 Fed. Reg. 54,226, 54,250–51, 54,253 (2008). Under the regulations, marketers were paid based on a six-year cycle, and CMS limited

the relative amount they could be paid the first year in order to "encourage[] agents to establish longer term relationships with their clients, rather than short term relationships." *Id.* at 54,238. CMS shifted away from the focus on "specific dollar values" in its May 2008 proposal, but nevertheless expected plans to "set compensation at levels that are reasonable and reflect fair market value for the services." *Id.* at 54,239.

That expectation proved to be overly optimistic. CMS "received reports of compensation structures that are inconsistent with the intent" of the September 2008 rule, including contractors offering "extremely generous compensation" above historic compensation levels. *See* 73 Fed. Reg. 67,406, 67,408, 67,409 (Nov. 14, 2008). CMS quickly amended its regulations, in November 2008, to focus on dollar amounts, capping agent and broker compensation beginning in 2009 based on either (i) the inflation-adjusted amounts the plans paid in 2006, or (ii) the inflation-adjusted "market rate" paid by plans in the area in 2006 and 2007. *Id.* at 67,413. And "the compensation amount paid for selling or servicing an enrollee" for renewal years was to "be fair-market value for the work performed and no more, and no less, than 50 percent" of the compensation in the initial year. *Id.* at 67,408. CMS then published in December 2008 a $400 national maximum for Medicare Advantage commissions and a $50 national maximum for Part D commissions. *See* CMS, 2009 Medicare Advantage and Prescription Drug Program Agent and Broker Compensation Structures (Rev. Jan. 16, 2009).[4]

The September 2008 rule focused on compensation "related to the volume of sales," and so defined the specific "compensation" it addressed as "pecuniary or non-pecuniary remuneration of any kind relating to the sale or renewal of the policy," and not "salary or other

---

[4] https://www.cms.gov/medicare/health-plans/managedcaremarketing/downloads/compstructurerepmemo_011609.pdf

benefits related to employment" or "payment of fees to comply with State appointment laws, training, certification, and testing costs; and reimbursement for mileage to and from appointments with beneficiaries and reimbursement for actual costs associated with beneficiary sales appointments such as venue rent, snacks." 73 Fed. Reg. at 54,250, 54,251. CMS explained it defined "compensation" solely "[f]or purposes of this section" of the *regulation*—i.e., 42 C.F.R. § 422.2274—and CMS did not suggest that its rule had defined the *statutory* term "compensation." *See* 73 Fed. Reg. at 54,251. Indeed, the November 2008 rule separately addressed CMS's "concern[s]" about payments that fell outside its regulatory definition of compensation, such as payments for "training, material development, customer service, direct mail, and agent recruitment." 73 Fed. Reg. at 67,409. CMS was particularly worried about "amounts paid to FMOs" or other marketers that did not themselves sign up beneficiaries, but instead only provided a variety of marketing services for health insurers, including supporting their enrollment efforts. *Id.* Those organizations, CMS warned, "could engage in a 'bidding war' with respect to payments they retain, agree to contract to recruit agents, or perform other services only for [plans] that are the 'highest bidders' for their services." *Id.* at 67,410. Because such bidding wars could occur based on any compensation paid to these entities, the 2008 rules capped other payments to such organizations at their fair-market value, by providing that if a plan uses "a third party entity such as a Field Marketing Organization or similar type of entity to sell its insurance products," then "the amount paid to the third party must be fair-market value and may not exceed an amount that is commensurate with the amounts paid by [the plan] to a third party for similar services in each of the prior two years." *Id.* at 67,413, 67414 (codified at 42 C.F.R. §§ 422.2274(a)(1)(iv) (Part C), § 423.2274(a)(1)(iv) (Part D)).

Thus, by the end of 2008, CMS regulated all payments to agents, brokers, and third-party

marketing organizations based on fair-market value, regardless of whether they were payments

for the sale or renewal of a policy or administrative payments.  Consistent with the statute, CMS

also tightened its limitations on solicitations, explaining that the regulations' purpose was to

protect beneficiaries from "inappropriate or fraudulent marketing activities such as high-pressure

sales tactics or inappropriate use of beneficiary information."  73 Fed. Reg. at 54,214.

      While concerns about third-party marketing organizations—especially bidding wars—

persisted, CMS continued to rely on its fair-market-value cap to control administrative payments,

rather than setting a specific dollar cap, as it did for other compensation.  *See* 76 Fed. Reg.

54,600, 54,621 (2011) ("We are also concerned about amounts paid to [FMOs] or similar types

of entities for their services that do not necessarily flow down to the agent or broker who deals

with the beneficiary.  Specifically, we are concerned that these FMOs or other similar entities

could engage in a 'highest bidders' for their services."); *see also* AR11286–90 (OIG discussion

of concerns about FMO payments).  CMS thus amended its regulations in 2011 to be absolutely

clear that its "compensation rules would apply at all levels," including "payments made by plan

sponsors to the FMOs, as well as the FMOs['] agents."  76 Fed. Reg. at 54,623.  Over time, CMS

changed the specific requirements for agent and broker compensation, but it consistently

maintained its policy of calculating and publishing through guidance specific caps for sales and

renewal payments and imposing a separate fair-market-value cap on administrative payments.

*See, e.g.*, 77 Fed. Reg. 22,072, 22,168, 22,172 (2012).[5]

---

[5] *See also* CMS, Contract Year 2024 Agent and Broker Compensation Rates, Referral/Finder's Fees,
Submissions, and Training and Testing Requirements (June 21, 2023)
https://www.cms.gov/https/editcmsgov/research-statistics-data-and-systems/computer-data-and-systems/hpms/hpms-memos/hpms-memos-wk-4-june-19-23

C.    **The Proposed Agent/Broker Compensation Rule**

By 2023, the "bidding war" CMS had long warned about materialized, and CMS gave notice of a proposed rule addressing agent and broker compensation.  *See* Proposed Rule, 88 Fed. Reg. 78,476, 78,557 (2023).  While CMS recognized the important role agents and brokers play in the industry, it was concerned that significant changes in the market could disrupt agent and broker incentives.  *Id.* at 78,552.  Many plans had merged into large national parent organizations, outpacing smaller regional or local rivals in enrollment and market share and freeing up money to spend on marketing.  *Id.*  FMOs, too, consolidated "from mostly small regionally-based companies to a largely consolidated group of large national private equity-backed or publicly-traded companies."  *Id.* at 78,553.

CMS believed that this industry consolidation gave plans "greater opportunity . . . to use financial incentives outside and potentially in violation of the compensation cap."  *Id.* at 78,552.  And it meant that "smaller, local or regional plans that are unable to pay exorbitant fees to FMOs risk losing enrollees to larger, national plans who can."  *Id.* at 78,553.  Administrative fees skyrocketed, including among third-party marketers, which would in turn encourage additional consolidation and even more fees.  *See id.* at 78,553–54.  One community health plan explained to CMS in a meeting how payments to brokers could exceed $1,000 per enrollee, including $150 "override" payments to FMOs and other add-ons, as shown below.

| New member for Jan. 1 effective date | | |
|---|---|---|
| Dollar Amount | Incentive Payment | Description |
| $601 | CMS commission maximum | New Enrollee during AEP |
| $150 | HRA completion | This is paid to every member who completes an HRA, regardless of plan type or agent involvement |
| $150 | FMO payment | This is paid as a one-time field marketing payment for new enrollees for agents with this arrangement (larger brokers) |
| $100 | Referral payment | This is paid as a one-time referral bonus. Reports of this being offered to incent agents to move members between carriers. |
| $301 | Annual renewal payment | If the member had a November or December birthday, agents will receive renewal payment in addition on Jan. 1 |
| $1,302 | TOTAL payment for one member | |

(AR11379; *accord* AR11381.)  These add-ons were classified as "administrative payments"— thus evading the compensation cap otherwise set in the regulation.  Under CMS regulations at

the time, these administrative payments should have been limited to fair-market value, but CMS's investigation revealed that this kind of vague regulatory instruction no longer sufficiently limited the potential for problematic payments.

Financial data CMS obtained from other plans revealed that the estimate of a $150 override was, in fact, conservative.  It was true that smaller organizations with a smaller book of business (say, 50 beneficiaries) might receive just $110 per enrollee.  (AR11498, 11504.)  But as the size of the marketing organization increased, so did the payments.  FMOs with the largest book of business (say, 2,500 beneficiaries) might receive more than twice that of a smaller agencies.  (AR11498, 11504.)  The largest plans might be able to pay less (AR11584, 11586), but most plans paid FMOs large amounts nearly across the board, such as $200 (AR11610), $250 (AR11653, 11658), $275 (AR11673), or even $385 (AR11694).  And payments might vary depending on which product the agent or broker sold (AR11699)—with some insurers offering *no* commission for selling particular products (AR11701).

At one meeting with a large plan, the plan complained that the payments have "gotten out of control." (AR11760.)  Indeed, a plan that paid just $75 per enrollment in administrative fees to a particular FMO in 2014 paid $225 to the same FMO in 2023.  (*Compare* AR11730 *with* AR11748.)  One plan set up an airline-like rewards point system where agents earned points for completing tasks like enrollment milestones and climbed through different rewards tiers that awarded credits and other benefits like better marketing materials or discounts on certification fees.  (AR11752–54.)  And on top of the overrides, plans made other payments characterized as administrative.  One popular add-on was paying a fee to conduct "health risk assessments" for prospective enrollees, a service usually provided by primary care providers to assess enrollees for various diagnoses that can affect their treatment plan and increase the amount the government

pays to cover the enrollee.  (AR11376, 11755–57); 88 Fed. Reg. at 78,555.

As all this money filtered through the system, marketing organizations began promising agents and brokers golf parties and trips if they worked with certain plans.  88 Fed. Reg. at 78,552.  CMS observed, for example, the following ad promising a golf trip and cash door prizes (framed here as "Marketing Money" in an apparent attempt to get around CMS's rules):



(AR11378.)  "The result," CMS concluded, was that agents and brokers were "presented with a new suite of questionable financial incentives" that could influence their advice—"an environment[] not dissimilar to what prompted CMS to engage in the original agent and broker compensation requirements in 2008."  88 Fed. Reg. at 78,552.  And there was no end in sight. CMS explained that higher fees would create a vicious cycle where national FMOs insist on higher "administrative" fees that "smaller, local or regional" plans cannot afford.  *Id.* at 78,553.

CMS also linked these findings to its growing concerns based on its ongoing monitoring of trends in plan marketing.  CMS noted its prior findings that consumer complaints more than doubled from 2019 to 2022, as did complaints from State partners, beneficiary advocacy organizations, and plans.  *Id.* at 78,552; *see also* AR11377, 15094–97.  A common scenario was that "a beneficiary was encouraged or pressured to join" a plan, but "the plan was not what the enrollee expected or what was explained to them."  88 Fed. Reg. at 78,552.

To respond to these market realities, CMS proposed to modify its approach to agent and broker compensation, citing its express delegations of authority generally to regulate plan

marketing at 42 U.S.C. § 1395w-21(h), and marketing compensation, in particular at 42 U.S.C. § 1395w-21(j)(2)(D):

First, CMS proposed to add 42 C.F.R. §§ 422.2274(c)(13) and 423.2274(c)(13), to restrict unfair terms in plan agreements with agents, brokers, or marketing organizations. Tracking the statute, the regulations would prohibit any term with "the direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent's or broker's ability to objectively assess and recommend which plan best meets the health care needs of a beneficiary." 88 Fed. Reg. at 78,554. This proposal would balance plan flexibility with the statutory instruction to ensure that agents and brokers are incentivized to focus on beneficiary needs, rather than just their own pecuniary interest.

Second, CMS proposed to shift compensation restrictions for enrollment-based payments from a fair-market-value cap, under which insurers could set individual rates, to a uniform fair-market-value rate. This would address the variations on compensation between plans and products that CMS had observed and prevent insurers from incentivizing agents and brokers to "favor some [more lucrative] plans over others" instead of "enroll[ing] individuals in the . . . plan that is intended to best meet their health needs." *Id.* at 78,555. It would also "level the playing field" and "promote competition" that had been disrupted by market changes. *Id.*

Third, CMS proposed to consolidate administrative payments into the enrollment-based payments described above, rather than treating them separately. While administrative payments, like payments for enrollments and renewals, had long been subject to a fair-market-value limitation, CMS explained that the policy would prevent contractors from using separate payments for administrative services "effectively [to] circumvent the [fair-market-value] caps on agent and broker compensation." *Id.* at 78,555. CMS therefore proposed to increase the

compensation rate by $31 to account for two administrative services (taking into account the average costs for each): $12.50 per enrollee for training costs and $18.50 per enrollee for the costs of transcribing calls to them.  *Id.* at 78,597.

## D.    The Final Agent/Broker Compensation Rule

CMS received thousands of comments, and the information the commenters provided confirmed the need for regulation.  Providers and beneficiary groups from across the industry corroborated CMS's observation of a bidding war.  One physician's trade group observed that "[t]he consolidation of plans in the markets has led to larger plans being able to accommodate more substantial special broker incentives than smaller regional plans can afford."  (AR4480; *accord* AR6210 (highlighting plan consolidation in rural areas); AR10390 (noting "consolidation we already see that appears to be squeezing our smaller and/or regional/local plans"); AR11479 (four plans controlled 72% of the Medicare Advantage market in 2023).)

An FMO confirmed the increasing "consolidation of power in the hands of a few select companies."  (AR1841.)  Those companies continued their buying spree "by offering unlawful payments outside of" the regulations governing administrative payments, as well as "extra overrides disguised as 'marketing dollars'" (*id.*)—confirming CMS's research, 88 Fed. Reg. at 78,552; *see* AR15088–93.  As one commenter put it, "nationals are continuing to use abusive payment practices to pay [] money that smaller carriers cannot afford."  (AR874.)

Plans and researchers similarly corroborated CMS's observation that administrative "add-ons" classified as administrative payments caused plan payments to top $1,000 per enrollee. (AR8911, 7933.)  And major agencies reporting spending as much as $1,200 to acquire a single enrollee.  (AR8708–09, 9954.)

Commenters also confirmed that payments to third-party marketers varied by plan.  The

National Association of Benefits & Insurance Professionals (NABIP, of which CMC Plaintiff

"Fort Worth Association of Health Underwriters, Inc." is the Fort Worth Chapter) admitted that a

plan's payment "varies based on geographic conditions and by carrier, with smaller, regional

entities typically paying towards the higher end of the range." (AR10238–9.)  At least one large

plan noted "plans paying $500 or more in per-enrollment administrative payments to FMOs."

(AR6236.)  And information from a regional carrier employee supported the notion that large

carriers were pricing out smaller ones. (AR874.)  In sum, as one member of NABIP's Medicare

Advisory Group put it, "there is not a level playing field for [health insurance] carriers when it

comes to marketing funding and FMO/Agency override payments." (AR1305.)

 Several health researchers supported CMS's common-sense conclusion that standardizing

administrative payments would "reduce incentives for brokers to differentially steer beneficiaries

to higher paying plans and instead encourage the broker to help the beneficiary make the best

enrollment decision possible." (AR7933.)  But defining the standardized amount was trickier.

CMS received "many different figures and means of calculating an appropriate amount." *See*

Final Rule, 89 Fed. Reg. 30,448, 30,625 (2024).  Commenters, including some of the Plaintiffs,

listed pages of the "free" administrative support that agents, brokers, and FMOs said the

administrative payments covered, ranging from training and client management software to

estate planning coordination. *See id.* at 30,624; *see also* AR5870; 10236–38.  None was easy to

quantify.  One agent observed that health risk assessment payments ranged from $50 to $225.

(AR4984.)  Another FMO insisted it needed to spend $40,000 in training alone for each agent.

(AR4899.)

 The comments led CMS to conclude that "the true cost of most administrative expenses

can vary greatly" and that analyzing those costs would require "data and contracts that CMS

does not have access to." 89 Fed. Reg. at 30,625. Thus, CMS concluded, "a line-item

calculation" of actual administrative costs was "not practicable." *Id.* Instead, CMS relied on

setting top-line numbers that factored in input from commenters, including about current rates—

similar to how the enrollment-commission cap was calculated back in 2008. CMS explained that

focusing on a single top line would "create parity among agents, regardless of which plan, plan

type, or type of Medicare enrollment." *Id.* And this fit in with the broader goals of Medicare

Advantage by giving "agents and brokers themselves . . . the opportunity to decide which

services are truly essential and how much those services are worth." *Id.*

Calculating the right number, however, required a judgment call. Taking stock of

comments it had received, CMS agreed that the $31 it originally proposed was too low and

would be insufficient to allow agents and brokers to continue adequately serving beneficiaries—

a consequence CMS agreed it wanted to avoid. 89 Fed. Reg. at 30,625. Providers and suppliers

tended to think that the rule should be finalized as proposed. (*See, e.g.*, AR3010–11, 4480,

9519.) Smaller plans—and even the occasional agent—tended to suggest that $50 to cover

administrative expenses was enough. (*See* AR945, 4703, 9613; *cf.* AR1867.) Larger plans or

FMOs, by contrast, suggested plans should pay between $200 or $250 (or even higher). (*See*

AR6238, 8114, 10240.) This divide was striking given the evidence that smaller plans paid more

than larger plans. An NABIP Medicare Advisory Group member suggested a sliding scale

where smaller brokerages would receive $50 per enrollee, medium-sized brokerages would

receive $100 per enrollee, and larger brokerages would receive $200 per enrollee (with no

explanation of why larger brokerages needed *more* money per enrollee). (AR1305–6.)

In the end, CMS concluded that the $200 recommendations were too high, because they

factored in "the full price of all technology and systems," regardless of whether they were used

for Part C and D or other products.  89 Fed. Reg. at 30,626.  For example, CMS noted that call recording software mentioned by many commenters was used "when soliciting an enrollment for a non-Medicare, private market plan."  *Id.* at 30,625.  To ensure Part C and D "funds are not being used to subsidize other programs and industries," and reasoning that current administrative costs were overinflated, CMS settled on increasing the compensation rate by $100.  *Id.*

Commenters also supported CMS's requirement that contract provisions not create a perverse incentive that might inhibit agents and brokers from objectively recommending which plan best met a beneficiary's health care needs.  *Id.* at 30,621.  But they asked CMS to provide more information about what it wanted to prohibit.  *Id.* at 30,620.  CMS responded to those comments with additional examples of terms that CMS might find either permissible or impermissible.  *Id.* at 30,620–21.  Emphasizing the text of the regulation's incorporation of a reasonableness standard, CMS clarified that a plan need not only contract with agents who represent "all possible competitors in a market."  *Id.*  But it might be different if a plan provided a "contractual or financial incentive that would prevent the agent from choosing to . . . sell competitors' plans."  *Id.* at 30,620–21.  And CMS noted that volume-based payment incentives, for instance, might have the "indirect effect" of causing an agent to prioritize one plan over another based on how much business the agent did with them rather than beneficiary needs, and so "would likely run afoul of the provision."  *Id.* at 30,621.  CMS emphasized "that it is impossible to anticipate every scenario," and these were just "examples."  *Id.* at 30,620.

CMS also finalized a privacy proposal for which it had provided notice and an opportunity to comment.  In particular, CMS explained that it had learned about organizations selling and reselling beneficiary information without beneficiaries' knowledge, and that by speaking to one representative, a beneficiary might end up receiving calls from multiple other

unrelated entities.  While these entities might use "a quickly read" or fine-print disclaimer, CMS found that this was a "misleading marketing tactic[] because these entities are using beneficiary contact information in a manner in which the beneficiary did not intend."  *Id.* at 30,599.

Relying on its authority to set fair-marketing standards, 42 U.S.C. §§ 1395w-21(h)(4)(C) and 1395w-101(b)(1)(B)(vi), and consistent with the statute's prohibition on unsolicited contact, 42 U.S.C. §§ 1395w-21(j)(1)(A) and 1395w-104(*l*)(1), CMS added 42 C.F.R. §§ 422.2274(g) and 423.2274(g) to prohibit third-party marketing organizations from distributing personal beneficiary data without the beneficiary's consent.  89 Fed. Reg. at 30,599.  Specifically, "[b]eginning October 1, 2024, personal beneficiary data collected by a [third-party marketing organization] for marketing or enrolling them into [a Medicare Advantage] plan" may only be shared with another [organization] when prior express written consent is given by the beneficiary."  89 Fed. Reg. at 30,829 (new text of 42 C.F.R. § 422.2274(g)(4)); *see also* 89 Fed. Reg. 30,843 (new text of 42 C.F.R. § 423.2274(g)(4) with same rule for prescription drug plans).  In promulgating the regulation, CMS acknowledged that other agencies or laws regulate some aspects of data sharing, such as HIPAA, but that CMS's regulation was intended to supplement those protections and allowed CMS to "take steps within its authority" to protect beneficiaries.  89 Fed. Reg. at 30,601.

**E.**     **The Lawsuits**

Plaintiffs filed suit and moved to stay the Final Rule under 5 U.S.C. § 705 or else preliminarily enjoin its enforcement.  The Court granted the motions in part and denied them in part.  (*See* ABC Case ECF 37; CMC Case ECF 40 (Stay Order).)  The Court stayed the Final Rule's amendments to 42 C.F.R. § 422.2274(a), (c), (d), and (e) and 42 C.F.R. § 423.2274(a), (c), (d), and (e), holding that Plaintiffs were likely to succeed on their claims that those

amendments were arbitrary and capricious. (Stay Order at 7–12, 17.) The Court did not reach Plaintiffs' statutory arguments. The Court also permitted the amendments to 42 C.F.R. § 422.2274(g) and 42 C.F.R. § 423.2274(g) regarding data sharing to go into effect, finding that Plaintiffs had not shown a sufficient likelihood of success to warrant a stay. (Stay Order at 12.) After the administrative record was filed (ABC Case ECF 47; CMC Case ECF 44), Plaintiffs filed summary-judgment motions to which Defendants now respond while also filing a cross-motion.

### III.     Legal Standard

The Administrative Procedure Act (APA) authorizes courts to set aside agency actions if "arbitrary, capricious, an abuse of discretion" or otherwise "not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010) (quoting *Sun Towers, Inc. v. Schweiker*, 694 F.2d 1036, 1038 (5th Cir. 1983)); 5 U.S.C. § 706(2).

### IV.     Argument and Authorities

**A.     The statute grants the agency express authority to regulate how the Medicare Advantage and prescription drug plans it funds are marketed.**

Plaintiffs challenge two aspects of the Final Rule on statutory grounds. First, both Plaintiffs argue that CMS lacks authority to limit how much Medicare Advantage contractors pay in enrollment-based administrative fees. (ABC Br. at 12–19; CMC Br. 16–21). CMC also argues that the agency lacks statutory authority to restrict unfair terms in plan agreements with agents, brokers, or third-party marketing organizations. (CMC Br. at 35.)

**1.     The statute grants CMS authority to regulate administrative support costs.**

Plaintiffs argue that CMS lacks statutory authority to limit how much Medicare Advantage contractors pay in enrollment-based administrative fees. In actuality, CMS exercised

its broad authority to promulgate "fair marketing standards" that, at minimum, limit "compensation other than as provided under guidelines established by" CMS—and Congress has made clear that those guidelines, in turn, must "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D); *see also id.* § 1395w-21(h)(4)(D). Neither the individual words Plaintiffs pluck out of § 1395w-21(j)(2)(D) nor vague economic policy considerations can upset those broad delegations.

> **a.  Congress expressly delegated authority to CMS to regulate fair marketing, including compensation.**

In its Final Rule, CMS explained that 42 U.S.C. §§ 1395w-21(h)(4)(D) and 1395w-21(j)(2)(D) work together to direct CMS to set limits on compensation rates. 89 Fed. Reg. at 30,620. Since then, the Supreme Court decided *Loper Bright Enterprises v. Raimondo,* which instructs courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 144 S. Ct. 2244, 2273 (2024). But Congress "often" enacts statutes that "delegate[] discretionary authority to an agency," such as where it "expressly delegates to an agency the authority to give meaning to a particular statutory term," or "empowers an agency to prescribe rules to fill up the details of a statutory scheme" and "regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id.* at 2263 (cleaned up). This is particularly true in the Social Security Act, which conferred "exceptionally broad authority to prescribe standards for applying certain sections." *Schweiker v. Gray Panthers,* 453 U.S. 34, 43 (1981). When a provision expressly delegates such authority, "the Secretary adopts regulations with legislative effect," and a "court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner." *Batterton v. Francis,* 432 U.S. 416, 425 (1977). A court's only role is "to independently identify

and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Loper Bright*, 144 S. Ct. at 2268.

Applying the new *Loper Bright* framework here reveals multiple interlocking express delegations that support the Final Rule.  In 42 U.S.C. § 1395w-21(h)(4), Congress expressly delegated authority to regulate Medicare Advantage marketing, twice-over.  First, the statute authorizes the Secretary to prescribe "fair marketing standards" using the general Medicare Advantage rulemaking authority in § 1395w-26 and by "establish[ing]" further "limitations" under § 1395w-21(j)(2) that must "at least" cover certain delineated categories.  42 U.S.C. § 1395w-21(h)(4), (j)(2).  Authorizing the Secretary to prescribe standards or create limitations on a particular topic is a classic example of express delegation.  *See Batterton*, 432 U.S. at 419 ("standards prescribed by the Secretary"); *Schweiker*, 453 U.S. at 2637 ("in accordance with standards prescribed by the Secretary"); *Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 617 (5th Cir. 2024) (authority to "'delimit[]' the 'terms' of [the] [e]xception").  And this is particularly true when those standards pertain to "fair marketing," a capacious and undefined "phrase that leaves agencies with flexibility."  *Loper Bright*, 144 S. Ct. at 2263; *see also Atl. Ref. Co. v. F.T.C.*, 381 U.S. 357, 367 (1965) (by using phrase "unfair . . . acts or practices in commerce" without further definition, "Congress intentionally left development of the term 'unfair' to the Commission rather than attempting to define the many and variable unfair practices which prevail in commerce" (cleaned up)); *Fleshman ex rel. Fleshman v. Heckler*, 709 F.2d 999, 1003 (5th Cir. 1983) ("[T]he use of such an imprecise term as 'inequitable' without further definition certainly reflects the deliberate grant of broad discretion . . . .").

Second, 42 U.S.C. § 1395w-21(j)(2) specifically instructs the Secretary to limit "[t]he use of compensation other than as provided under guidelines established by the Secretary," which guidelines must "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." By prohibiting contractors from using compensation except when expressly allowed by the guidelines, Congress expressly delegated broad authority to CMS to regulate such compensation. *See I.C.C. v. Transcon Lines*, 513 U.S. 138, 141 (1995) (express delegation when statute barred common carriers from extending credit except "under the regulations of the [agency] governing the payment for transportation and service and preventing discrimination"); *cf. Tex. Med. Ass'n v. HHS*, --- F.4th ----, 2024 WL 4615744, at *4 (5th Cir. Oct. 30, 2024) ("fairly broad delegation" to establish through rulemaking the "methodology the group health plan or health insurance issuer offering group or individual health insurance coverage shall use").

### b.   Plaintiffs identify no textual outer boundary on the agency's statutory authority that has been transgressed.

In response to these broad delegations of authority, Plaintiffs offer competing and contradictory readings of how the words "compensation," "guidelines," and "use" in § 1395w-21(j)(2)(D) should somehow be read to exempt administrative payments from regulation or disallows regulation of payment amounts at all. (ABC Br. at 12–20; CMC Br. 16–21.)[6] But these competing readings are wrong on the merits, would invalidate different aspects of the Final Rule, and would potentially call into question other parts of CMS's beneficiary protections. And ultimately, the Court need not weigh in on the precise meaning of every word of § 1395w-

---

[6] CMS did not, as ABC suggests, rely on Executive Order 14036 as a source of legal authority for the Final Rule. (ABC Br. at 19.) CMS relied on its statutory authority under 42 U.S.C. § 1395w-21(j)(2)(D) and 42 U.S.C. § 1395w-21(h)(4)(D) and never contended that the Executive Order provides any independent legal authority to promulgate the Final Rule.

21(j)(2)(D) because that provision prescribes only minimum fair-marketing standards, not the maximum, and so is not a relevant "outer bound" to the agency's authority at all.

"Compensation" (challenge to 42 C.F.R. § 422.2274(a) and (e)).  Both Plaintiffs argue that any authority to regulate "compensation" extends only to payments for "services," not to "repayment of costs" like administrative fees.  (ABC Br. at 13–14; CMC Br. at 19–20.)  With this theory, Plaintiffs target the revised definition of "compensation" at 42 C.F.R. § 422.2274(a) and the removal of the carve-out from the regulatory definition of "compensation" for "services other than the enrollment of beneficiaries" at 42 C.F.R. § 422.2274(e)(1).  CMC goes even further and suggests that the statutory term "compensation" also excludes "payments made for services *other than* enrollment of beneficiaries."  (CMC Br. at 19 (quoting 42 C.F.R. § 422.2274(e)(1)).)

A key problem for Plaintiffs' proposed line between reimbursements and payment for services is that the Fifth Circuit has rejected it.  "[T]he plain meaning of 'compensation' is broad enough that it would generally be understood to include reimbursement."  *In re Riley*, 923 F.3d 433, 442 (5th Cir. 2019) (statute authorizing "reasonable compensation" of bankruptcy attorney included reimbursing attorney for advancing filing fees, credit counseling fees, and credit report fees).  So does at least one of the dictionaries on which Plaintiffs rely.  *See Compensation*, Black's Law Dictionary (11th ed. 2019) (defining compensation to "include[] . . . expense reimbursement" (quoting Kurt H. Decker & H. Thomas Felix II, *Drafting and Revising Employment Contracts* § 3.17, at 68 (1991)).)  ABC admits that *Riley* holds that "compensation in some circumstances '*can* permit the reimbursement of some expenses,'" but suggests that it does so only when the reimbursement "is itself an element of the service" being paid for.  (ABC Br. at 14) (emphasis in original) (quoting 923 F.3d at 442).  But that line appears nowhere in

*Riley*, which concluded that the plain meaning of compensation "generally" includes

reimbursement, and then looked to other parts of the statute to determine whether they contained

limitations that the word "compensation" alone would not.  *See* 923 F.3d at 442–43.

Plaintiffs also respond with a few statutes in which Congress distinguished between

compensation for services and reimbursements for associated costs, and one 60-year-old case

that relied on a circular definition of "reimbursements."  (CMC Br. at 20 (citing *Barrett v. United

States*, 205 F. Supp. 307, 308 (S.D. Miss. 1962) ("reimbursements" are "reimbursements"), 29

U.S.C. § 207(e)(2), and 11 U.S.C. § 330(a)(1)); ABC Br. at 14 (also identifying 46 U.S.C.

§ 53910(f)(2)).)  But these examples are irrelevant here, where Congress did not draw a similar

line.  *Riley* rejected that the division between reimbursement and compensation in another

statute, 11 U.S.C. § 330(a)(1), affected its construction of "compensation."  *See* 923 F.3d at 441–

42 ("reject[ing]" bankruptcy court's rationale that because § 330(a)(1) permitted

"'reimbursement' of expenses" for other parties, "compensation" in § 330(a)(4) could not

include attorney's expenses).  If distinguishing between compensation and reimbursements in a

neighboring provision was not enough to overcome the plain meaning of "compensation" in

*Riley*, Plaintiffs' citations to far-flung parts of the U.S. Code here matter even less.

To fill that logical gap, CMC goes further and suggests that "compensation" necessarily

must mean "compensation for *enrollments*."  (CMC Br. at 20) (emphasis in original).  But

§ 1395w-21(j)(2)(D) authorizes limits on "compensation other than as provided under" CMS's

guidelines, not limits on "compensation for enrollment other than as provided under guidelines."

CMC "may not narrow a provision's reach by inserting words Congress chose to omit."  *Lomax

v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020).  CMC strains to find a textual basis in the

second sentence of (j)(2)(D), which requires the compensation guidelines to "ensure that the use

of compensation creates incentives for agents and brokers to enroll individuals" in suitable plans. But that sentence focuses on the "incentives" that compensation creates, not the specific object of compensation itself, reflecting the fact that many compensation structures might end up influencing enrollment behavior. *See* 89 Fed. Reg. at 30,618 (identifying that plans might create "financial incentives that could lead FMOs to encourage sales agents to enroll Medicare beneficiaries in plans that do not meet their health care needs" (citation omitted)); *see also* 73 Fed. Reg. at 67,410 (expressing concern that an FMO might "perform other services only for MA and PDP organizations that are the 'highest bidders' for their services"). CMS's longstanding limits on administrative payments "ensure that plans do not use these administrative payments as a means to circumvent the limits on compensation to agents and brokers." 86 Fed. Reg. 5,864, 5,994 (2021). And even if CMC were correct, the second sentence of clause (j)(2)(D) does not suggest that enrollment incentives are the *only* end CMS's compensation guidelines may try to accomplish. Rather, it sets the minimum requirement that they *must* accomplish. *See* 89 Fed. Reg. at 30,617 (suggesting regulatory changes needed "ensure compliance with statutory requirements" in clause (j)(2)(D)).

CMC then argues that because CMS's initial September 2008 interim rule stated that administrative payments are "not considered compensation," and that a later rule stated that they were for something "other than compensation," CMS must have understood the statutory term "compensation" to exclude administrative payments. (CMC Br. at 19 (quoting 73 Fed. Reg. at 54,238–39 and then 86 Fed. Reg. at 5,993–94).) CMC leaves out the fact that two months after publishing the September 2008 rule, CMS limited administrative payments to fair-market value after explaining the industry had misunderstood its September regulations. *See* 73 Fed. Reg. at 54,226. The rules CMC cites did not construe the statutory term "compensation" and lack any

discussion about the text or context that one would expect when construing a statute.  The

September 2008 rule discusses only the "definition of compensation under our *rule*" and

announces (again without purporting to construe the statute) that those payments are "not

*considered* compensation."  73 Fed. Reg. at 54,226 (emphasis added).  And the 2021 rule simply

tracks the regulatory text.  86 Fed. Reg. at 5,993–94.  Moreover, CMC's suggestion that CMS

somehow lost statutory authority to ever regulate administrative payments by not immediately

regulating to the outer limits of the statute threatens to turn statutory construction into a game of

adverse possession and violates the black-letter rule that "[n]othing prohibits federal agencies

from moving in an incremental manner."  *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 522

(2009).

For similar reasons, CMS respectfully submits that the Court was mistaken in its Stay

Order to hold that CMS changed positions without acknowledging its "prior understanding that

administrative payments are 'not considered compensation' or are payments 'other than

compensation.'"  (Stay Order at 9 (quoting 73 Fed. Reg. at 54,239 and then 86 Fed. Reg. at

5,993).)  Because CMS never previously offered a construction of the statute itself, CMS did not

need to explain the supposed change in statutory interpretation that Plaintiffs argue the agency

made.  (CMC Br. at 21; ABC Br. at 28–29.)  And the Final Rule is shot through with

acknowledgements that CMS was eliminating its prior *regulatory* distinction between

compensation and administrative payments.  In its summary of the rule, CMS acknowledged that

the Final Rule would "eliminate the regulatory framework which currently allows for separate

payment to agents and brokers for administrative services," which it explained would "better

align with statutory requirements to ensure that the use of compensation creates incentives for

agents and brokers to enroll individuals in the plan that best fits a beneficiary's health care

needs." 89 Fed. Reg. at 30,450. In the body of the rule, the agency went on to summarize that it had proposed to "revis[e] the scope of what is considered 'compensation' and . . . eliminate the regulatory framework which currently allows for separate payment to agents and brokers for administrative services." *Id.* at 30,620. And when discussing its administrative payment policy, the agency stated that it "proposed to incorporate 'administrative payments' currently described at § 422.2274(e)(1) into compensation, and to amend § 422.2274(e)(2) to clarify that administrative payments would be included in the calculation of enrollment-based compensation beginning in Contract Year 2025" so that contractors "cannot utilize the existing regulatory framework allowing for separate payment for administrative services to effectively circumvent the FMV caps on agent and broker compensation." *Id.* at 30,622. CMS thus "display[ed] awareness that it is changing position" (with respect to its regulatory concept of "compensation") and explained why. *Fox*, 556 U.S. at 515 (emphasis removed). The APA requires nothing more.

"Guidelines" and "Use" (challenge to 42 C.F.R. § 422.2274(d) and (e)). Plaintiffs then assert that even if CMS can regulate administrative payments, it cannot do so based on a particular cap at revised 42 C.F.R. § 422.2274(d) and (e). ABC argues that this kind of numeric requirement exceeds CMS's authority to promulgate compensation "guidelines." (ABC Br. at 16.) CMC argues that by instructing CMS to promulgate guidelines governing the "use" of compensation rather than the "rate" of compensation, Congress intended that the agency limit only "*how* agents and brokers put compensation into action" rather than *how much* Medicare Advantage contractors pay them. (CMC Br. at 18 (emphasis in original).)

ABC cites no authority applying its cramped view of "guidelines" to limit agency authority, instead relying on dicta on other issues. *See Burbridge v. CitiMortgage*, 37 F.4th 1049, 1052 (5th Cir. 2022) (discussing contract deadlines, not regulatory guidelines); *United*

*States v. White*, 869 F.2d 822, 829 (5th Cir. 1989) (discussing effect of nonbinding "policy statements" in Sentencing Guidelines); *Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1184, 1188–90 (5th Cir. 1976) (quoting statement from district court on intent of particular agency guidelines on issue on which the Fifth Circuit reversed).

It is not surprising that ABC cannot support its position. "Guidelines"—especially in the insurance space—routinely include numeric requirements. *See Hancock v. Chicago Title Ins. Co.*, 263 F.R.D. 383, 385 (N.D. Tex. 2009) (discussing "rate-setting guidelines" by state insurance agency that "sets the mandatory premium rates for title insurance policies"), *aff'd sub nom. Benavides v. Chicago Title Ins. Co.*, 636 F.3d 699 (5th Cir. 2011). In Medicare itself, the agency for years published a "schedule of reasonable cost guidelines," including specific dollar amounts it would pay hospitals for particular services. *See Mercy Hosp. of Laredo v. Heckler*, 777 F.2d 1028, 1036 (5th Cir. 1985) (noting Medicare reasonable cost guidelines permitted "$1.50 travel expense allowance"). The agency still issues thousands of pages of detailed guidelines in its Provider Reimbursement Manual. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 90 (1995) (affirming agency authority to issue such "guideline[s]"). And the Medicare Marketing Guidelines that likely informed the statute's choice of the word "guidelines" included specific dollar limits on gifts. *See* 2005 Medicare Marketing Guidelines at 145 (permitting gifts "valued at $15 or less"). Plaintiffs are therefore wrong that "no one would call a fixed quantitative cap on payments . . . a guideline." (ABC Br. at 16.)

As for CMC's theory, the word "use" is much more flexible than what CMC posits. The Supreme Court has instructed courts to be sensitive to the "different meanings attributable to" the word "use." *Bailey v. United States*, 516 U.S. 137, 143 (1995); *accord United States v. Dubin*, 27 F.4th 1021, 1038 (5th Cir. 2022) (en banc) (Elrod, J., dissenting) (warning against facile

reliance on dictionary definitions "to interpret that chameleon-like word, 'use'"), *vacated and remanded*, 599 U.S. 110 (2023).  The choice of such a flexible word reflects that Congress legislated against the backdrop of the agency's existing Medicare Marketing Guidelines, which already regulated a range of compensation behaviors, such as by prescribing paying compensation outside of the schedule the contractor created through contract, prescribing maximum compensation within those schedules, prohibiting compensation schedules that provided certain bad incentives, and instructing contractors to withhold or withdraw payments in particular circumstances.  2005 Medicare Marketing Guidelines at 138–39.  By using a capacious word like "use," Congress made sure to capture the existing limits on both the amount of compensation paid and the practical effects of particular compensation schemes.  And this flexibility is confirmed by the negative construction in which Congress required CMS to limit the "use of compensation" except "under guidelines established by [CMS]."  In doing so, the statute prohibits *any* use of compensation except those allowed by the guidelines.  That comports with the common understanding of the phrase "use of" in this kind of negative construction.

CMC's main response is that because Congress could have instructed CMS to issue regulations limiting the *amount* of compensation even if it omitted the phrase "use of," the Court should assume that Congress meant to preclude regulations governing compensation amounts.  (CMC Br. at 18.)  But "the rule against giving a portion of text an interpretation which renders it superfluous does not prescribe that a passage which could have been more terse does not mean what it says."  *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 236 (2011).  As explained above, the phrase "limit the use of compensation" captures both limits on the amount of compensation as well as other compensation regulations, and so the rule against surplusage does not apply.

Both ABC and CMC's theories also fail to account for the statutory context.  Congress

clarified that the guidelines regulating the use of compensation must "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). There are many circumstances where the amount of payment could create perverse incentives for agents and brokers—for instance if (as CMS found here) payments depend on which plan an individual enrolls in. 89 Fed. Reg. at 30,621.

Finally, ABC and CMC's theories upset contemporaneous and longstanding statutory understandings. When the 2008 rule "shift[ed] the focus from [the] specific dollar values" contained in the proposed rules, 73 Fed. Reg. at 54,239, contractors announced that they would pay "extremely generous compensation" above historic levels, *id.* at 67,408-09. In response, CMS quickly amended its regulations to set specific dollar caps to "to better ensure that agents and brokers enroll beneficiaries in a plan that is intended to best meet the beneficiaries' health care needs." *Id.* at 67,409; *see* CMS, 2009 Medicare Advantage and Prescription Drug Program Agent and Broker Compensation Structures. CMS has imposed those dollar caps for the past fifteen years without any suggestion they exceeded its statutory authority. CMC admits that its reading calls into question those fifteen years of agency regulations. (CMC Br. at 16.) The Court should reject this novel attack on a long-settled statutory understanding. *See Loper Bright*, 144 S. Ct. at 2258 ("respect" for executive construction of statute "especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time").

<u>Statutory floor not ceiling</u>. The Court need not accept Plaintiffs' invitation to parse each word of § 1395w-21(j)(2)(D), because Plaintiffs mistake a statutory floor for a statutory ceiling, and so that provision is not a relevant "outer boundary" to the Secretary's authority to

promulgate the Final Rule. Even before Congress enacted § 1395w-21(j)(2)(D), the agency exercised its general authority to promulgate fair-marketing standards under § 1395w-21(h)(4)(D) to publish 160 pages of guidance, including directly restricting marketing payments, *see* Medicare Marketing Materials Guidelines at 138, and to propose additional limits on compensation amounts, *see* 73 Fed. Reg. at 28,583. Section 1395w-21(j)(2)(D) instructs that the agency "at least" limit under those fair-marketing standards the "use of compensation other than as provided under" the Secretary's "guidelines." It thus is not an "*outer bound*" on the prior delegation as required to limit an express delegation under *Loper Bright*, but a statutory *minimum* on the regulations Congress required the Secretary to promulgate. It is thus another instance where Congress instructed the Secretary to use a particular "broad authority to prescribe standards for applying certain sections," *Schweiker*, 453 U.S. at 43, and to accomplish a particular goal without suggesting those goals circumscribe the outside limit of the Secretary's authority. *See* 42 U.S.C. § 1395w-111(g)(5)(B) (authorizing Secretary to set performance standards for Part D plan payment that include "at least" an identified list); *id.* § 1395ww(o)(2)(B)(i)(I) (similar for value-based payments to inpatient hospitals).

That is not to say § 1395w-21(j)(2)(D) might never impose a limit on the Secretary's discretion. In some circumstances, § 1395w-21(j)(2)(D) might prohibit the Secretary from prescribing lax marketing standards that still permitted plans to use compensation that in fact "create[s] incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that" is not "intended to best meet their health care needs." Or, as ABC suggests (ABC Br. at 15), it might bar the Secretary from prohibiting *all* marketing compensation rather than delineating permitted compensation. But by its plain text, it does not proscribe any compensation regulations that extend beyond that minimum, and so Plaintiffs' statutory

arguments fail.

        c.      **Plaintiffs' preferred economic policies cannot override statutory text.**

Without any firm textual support, Plaintiffs turn to economic theory. "[R]ate regulation,'" they assert, "is . . . difficult and controversial" (CMC Br. at 16–17 (internal citation omitted)), and so in order to avoid a "command economy interpretation of the statutory text" (ABC Br. at 15), the Court should promulgate a novel clear-statement rule under which Congress must "confer[] ratemaking authority . . . unambiguously" on an agency and must "delineate[] factors the agency must consider" (CMC Br. at 17).

The Court need not reach Plaintiffs' suppositions about the economic underpinnings of the U.S. Code, because by limiting the "use of compensation" beyond those permitted by guidelines, the statute sufficiently authorizes the agency to reach the amount of marketing payments. The word "compensation" sufficiently captures payments to authorize regulating payment amounts. *See Mayfield*, 117 F.4th at 618 (agency could set particular salary limits to qualify for FLSA exemptions covering "executive, administrative, or professional" employees because these terms "connote a particular status or level for which salary may be a reasonable proxy"). And Congress delineated at least one relevant factor:  whether the marketing compensation sufficient matches agent and broker incentives with beneficiaries' interests. 42 U.S.C. § 1395w-21(j)(2)(D). That is enough to authorize limits on marketing payments, especially here, where CMS is not determining how much private parties may charge each other, but rather is limiting how its own contractors spend taxpayer funds. *See J.H. Rutter Rex Mfg. Co. v. United States*, 706 F.2d 702, 712 (5th Cir. 1983) ("Like private individuals and businesses, the Government enjoys the unrestricted power . . . to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." (quoting *Perkins v.*

*Lukens Steel Co.*, 310 U.S. 113, 127 (1940)).  Indeed, when Congress enacted § 1395w-21(j)(2)(D), CMS was already regulating its insurers' marketing "fee schedule" under its general fair-marketing authority and had proposed even more stringent limitations on those fees.  Just because Congress did not mandate marketing compensation caps does not mean that imposing such caps exceeds CMS's authority.

In any event, Plaintiffs fail to shoulder the heavy burden to create a brand-new canon.  As *Loper Bright* recently reaffirmed, courts "construe the law with '[c]lear heads . . . and honest hearts,' not with an eye to policy preferences that ha[ve] not made it into the statute."  144 S. Ct. at 2268 (quoting 1 Works of James Wilson 363 (J. Andrews ed. 1896)).  They therefore "need not—indeed, *must* not—indulge malleable, atextual canons that beckon [them] to advance policies unexpressed in the statute itself."  *Thomas v. Reeves*, 961 F.3d 800, 821 (5th Cir. 2020) (en banc) (Willett, J., concurring) (emphasis in original).

The public-utility cases on which CMC relies do not apply Plaintiffs' rule and are silent about the supposed controversy here.  (*See* CMC Br. at 16–17 (citing *S. Union Co. v. Mo. Pub. Serv. Comm'n*, 289 F.3d 503, 507 (8th Cir. 2002) (discussing state statute governing rates for natural gas, electricity, water, and sewer services); *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1183–84 (D.C. Cir. 1987) (explaining that the agency was not barred from applying a particular non-statutory principle to balance "competing interests" in rate-setting for power company); *Kootenai Elec. Co-op., Inc. v. FERC*, 192 F.3d 144, 148–50 (D.C. Cir. 1999) (under *Chevron* step II, court would uphold federal agency's choice to impose market rate rather than cost-based rate).)  Those cases dealt with public utilities and, while the government requires public utilities to sell their services, the government imposes no such requirement on agents, brokers, and FMOs to sell Medicare plans, rendering "[c]ases concerning public utilities []

inapposite." *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984); *cf. Shah v. Azar*, 920 F.3d 987, 998 (5th Cir. 2019) (explaining that "participation in the federal Medicare reimbursement program is not a property interest").

The same is true of most of the statutes CMC cites. Most deal with private parties, not how government contractors spend government funds. (*See* CMC Br. at 17 (citing 45 U.S.C. § 1665d(a), (c) (regulating private credit-card fees) and § 717c(a) (regulating utility charges)).) While Plaintiffs point to a few Medicare payment requirements, they do not show that Congress could not instead instruct CMS to regulate compensation based on a broader statutory goal. *See Mayfield*, 117 F.4th at 619 ("Even if Congress acted intentionally by omitting a salary requirement from the EAP Exemption, that does not mean that the power it conferred excludes the option of imposing the requirement."). And Plaintiffs are simply wrong to suggest that Congress has always "delineated factors the agency must consider" when regulating prices. *See Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944) (rejecting efforts to constrain agency's authority to set "just and reasonable" rate when statute provided "no formula by which the 'just and reasonable' rate is to be determined"). Plaintiffs' authorities, then, fall far short of showing the type of "long-settled judicial understandings of congressional practice" or background constitutional principle that might in some circumstances justify departing from the text. *Rudisill v. McDonough*, 601 U.S. 294, 315 (2024) (Kavanaugh, J., concurring).

### 2.    The statute grants CMS the authority to prescribe contract restrictions.

CMC briefly argues that the Final Rule's prohibition on contract terms that inhibit agents' or brokers' ability to objectively assess and recommend which plan best meets beneficiary needs, at 42 C.F.R. § 422.2274(c)(13), sweeps beyond CMS's authority to regulate the "use of compensation" under § 1395w-21(j)(2)(D). (CMC Br. at 35.)  But the two examples

CMC cites—terms governing administrative payments and contract renewals—do not extend

beyond § 1395w-21(j)(2)(D).  CMC's argument that § 1395w-21(j)(2)(D) excludes terms

governing administrative payments fails for the reasons already discussed above.  And

conditioning contract renewal based on a party achieving "higher rates of enrollment" conditions

*any* compensation on behavior that might be "creating an incentive" for an entity "to prioritize

sales of one plan over another based on those financial incentives and not the best interests of the

enrollees."  89 Fed. Reg. at 30,622.  That falls comfortably within the agency's authority to limit

the "use of compensation" in such a way as to guard against perverse incentives.

Nor is CMC correct that CMS failed to identify statutory authority for its proposal.  CMS

explained previously in the rule that its regulations were authorized under 42 U.S.C. §§ 1395w-

21(h)(4)(D) and 1395w-21(j)(2)(D), *see* 89 Fed. Reg. at 30,619, and reiterated its authority under

§ 1395w-21(j)(2)(D), before launching into its discussion of the contract limitations and other

specific policies, *id.* at 30,620.  Nothing more was required.  *Cf. Loper Bright*, 144 S. Ct. at 2268

(noting it is court's role "to independently identify and respect such delegations of authority").

## B.    The Final Rule is not arbitrary and capricious.

Plaintiffs next argue that the Final Rule is arbitrary and capricious.  Agency action is

arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, offered an explanation

for its decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise."  *Sierra Club v.

EPA*, 939 F.3d 649, 663–64 (5th Cir. 2019).  But "[t]he arbitrary and capricious standard is

'narrow,' and we must 'be mindful not to substitute [our] judgment for that of the agency.'"  *Id.*

Rather, "[a] court simply ensures that the agency has acted within a zone of reasonableness and,

in particular, has reasonably considered the relevant issues and reasonably explained the decision." *U.S. Anesthesia Partners of Tex., P.A. v. U.S. Dep't of Health & Hum. Servs.*, No. 2:23-CV-206-Z, 2024 WL 1257491, at *5 (N.D. Tex. Mar. 25, 2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

### a. The Final Rule is supported by sufficient evidence, is rational, and accounted for reliance interests.

Plaintiffs' main arbitrary-and-capricious argument is that CMS failed to substantiate its findings that administrative payments "are excessive" and "are rapidly increasing," or that "overall payments to agents and brokers" can vary from plan to plan, with the implication of those findings being that contractors were using administrative payments to circumvent prior payment limits and create questionable financial incentives. (CMC Br. at 23 and 39; ABC Br. at 22.) But CMS explained each premise, and these facts are well documented in the record.

The key problem CMS sought to address was the use of administrative payments to circumvent CMS's agent and broker compensation rules, leading to unfair marketing under 42 U.S.C. § 1395w-21(h)(4) and incentivizing agents and brokers to prioritize their own financial well-being rather than beneficiary needs, in violation of 42 U.S.C. § 1395w-21(j)(2)(D). *See* 89 Fed. Reg. at 30,619, 30,622. In the Final Rule, CMS explained that one driver of its regulation was "the value of administrative payments offered to agents and brokers . . . that CMS has observed in recent years," *id.* at 30,618, later citing (among other things) "information gleaned from oversight activities," *id.* at 30,622. That oversight information includes the FMO contracts CMS reviewed that revealed administrative fees that varied from $100 to nearly $400 per enrollee, as already discussed—up to two-thirds the commission for enrolling a new beneficiary. And those plan documents, as well as the OIG report CMS cited, suggest that these numbers are well above levels a decade ago. *See* 89 Fed. Reg. at 30,618 (citing AR11286); *compare, e.g.*,

AR11730 *with* AR11748.  That evidence from oversight activities was reinforced by

observations made in the comments by market participants (*see, e.g.*, AR6236), as well as

NABIP (AR10238 (admitting that payments "var[y]")).

CMS's conclusion that these and other add-on payments inflated agent and broker

compensation specifically is supported again by the observations of market participants, as well

as health care researchers and the dollar amounts identified in public filings—and by a Plaintiff

in this lawsuit—as typical spending in acquiring new enrollees.  (AR7933, 8708–09, 8911, 9954,

11379, 11381; CMC App.366 ¶ 11.)  Even the representative of a large plan admitted that the

rates are "out of control."  (AR11760.)  CMS concluded that the "higher overall cost as

compared to other industries, combined with the otherwise inexplicable difference in payments

for administrative activities for some MA organizations compared to others, further points to the

payment for these administrative activities being used as a mechanism to effectively pay agents

and brokers enrollment compensation amounts in excess of" the cap.  89 Fed. Reg. at 30,622.

CMS also cited concerns about market concentration.  It observed that "the MA

marketplace, nationwide, has become increasingly consolidated among a few large national

parent organizations," 89 Fed. Reg. at 30,617, which besides being well-known in the industry

and reported by plans (AR874), providers (AR6210, 10390), and at least one FMO (AR1841), is

also supported in the record by publicly reported deals (AR11479, 11481).  CMS reasoned that

consolidation allows plans with "greater capital . . . to use financial incentives outside and

potentially in violation of CMS's rules to encourage agents and brokers to enroll individuals in

their plan over a competitor's plans."  89 Fed. Reg. at 30,617.  And web-based advertisements

for administrative payments that CMS reviewed supported this notion, (AR11378), which is

further supported not only by the experience of market participants (AR874), including NABIP

members (AR1305), but also the fact that the usual economies of scale have apparently broken down, with larger FMOs often being paid *more* per enrollee (AR11584, 11586, 15088–93).

Plaintiffs then claim that there is nothing to link administrative payments to how agents and brokers behave. (ABC Br. at 14; CMC Br. at 15–16.) In demanding empirical evidence of this link, Plaintiffs misunderstand the statutory standard: the statute authorizes CMS to promulgate compensation guidelines based on the "incentive" compensation structures create for agents and brokers. 42 U.S.C. § 1395w-21(j)(2)(D). In the Final Rule, CMS reasonably concluded based on the record before it that it was likely that terms in contracts between FMOs and plans "can trickle down to influence agents," including by using administrative payments to "'reward[]' agents who enroll beneficiaries into a specific plan." 89 Fed. Reg. at 30,620. And CMS explained that because plans pay for administrative costs like travel expenses "on a 'per enrollment' basis," whichever organization does so "at the highest rate would effectively be offering a higher commission per enrollee," creating "a conflict of interest for the agent" without violating existing regulations. *Id.* at 30,619–20.

While CMS's stated rationale is all it needed under the statute, other parts of the record corroborate its reasoning. For example, as one plan employee explained: "[a]gency reactions to companies who pay low overrides, or none at all, is often to steer agents away from selling those plans at all." (AR873; *see also* AR7933.) The focus group report that the agency cited, where agents and brokers admitted they were recommending plans based on relative commission rate, likewise supported the agency's reasoning. 89 Fed. Reg. at 30,622 (citing AR11314). In light of that evidence, CMS reasonably connected the increase in consumer complaints it had previously observed to this incentive structure. *See id.* at 30,618 (citing AR11377).

Plaintiffs try to dismiss this explanation and the underlying factual bases either as *post*

*hoc* rationalizations (ABC Br. at 27), or claim CMS failed specifically to reply to critiques of what the Court called in its Stay Order CMS's "central evidence," the focus group discussed in the Proposed Rule.  (Stay Order at 11.)  As the above discussion shows, CMS sufficiently explained the factual basis for its conclusions and while the focus group was one piece of evidence it considered, it was not the "central evidence."  Comments "require [a] response, only if they raise points which, if true . . . and which, if adopted, would require a change in an agency's proposed rule."  *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021). The agency therefore did not need to respond to commenters who quibbled with the fact that the focus group CMS cited in its Proposed Rule was the size of a typical focus group and thus (by definition), was not a one-to-one representative match of every agent and broker in the market. (ABC Br. at 23; CMC Br. at 26–27.)  Nor did CMS need to get into whether the complaints were caused mostly by COVID-19 or by aggressive marketing.  (CMC Br. at 27–28.)  While these are potentially interesting data points, they did not go to the ultimate issue CMS needed to answer under the statute:  how do administrative payments affect agent and broker incentives?

Plaintiffs are also wrong that CMS failed to explain and support why it priced administrative payments at $100.  (CMC Br. at 29–33; ABC Br. at 32–33.)  While commenters suggested various price points ranging from $50 to $500, 89 Fed. Reg. at 30,625, CMS concluded that requests for more than $100 were too high because they factored in "the full price of all technology and systems," regardless of whether they were used for Part C and D or other products.  For example, CMS noted that call recording software mentioned by many commenters was used "when soliciting an enrollment for a non-Medicare, private market plan," so to ensure Part C and D "funds are not being used to subsidize other programs and industries," and to discount for the fact that current administrative costs were overinflated, CMS settled on

increasing the compensation rate by $100 to account for administrative payments. 89 Fed. Reg. at 30,626. This is not the "head count" CMC accuses CMS of conducting (CMC Br. at 30), but rather a reasonable judgment call taking into consideration public comments, along with agency analysis accounting for a bedrock statutory principle of Medicare that Medicare funds should not subsidize non-Medicare coverage. *See* 42 U.S.C. § 1395x(v)(1)(A); *see also* 42 C.F.R. §§ 417.532(a)(1)(iii), 417.550, & 417.552; *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 516 (D.C. Cir. 2020) ("A degree of agency reliance on comments from affected parties is not only permissible but often unavoidable." (cleaned up)). And it is consistent with the premise of the Final Rule that a bidding war had caused administrative payments to bulldoze the usual competitive forces and that current prices were overinflated.

Plaintiffs cast the Stay Order as requiring CMS to "account for the cost of the vast majority of the vital services that commenters identified" and assert that the agency "claimed its job was too hard." (CMC Br. at 30 (citing Stay Order at 8).). The government respectfully disagrees with that characterization of its methodology and the APA. CMS explained why the comments it had received all pointing to different administrative costs convinced it that "the true cost of most administrative expenses can vary" and that analyzing those costs would require "data and contracts that CMS does not have access to," making "a line-item calculation" of actual administrative costs "not practicable." 89 Fed. Reg. at 30,625. And CMS explained that focusing on a single top line instead of ruling particular costs in or out fit in with the broader goals of Medicare Advantage by giving "agents and brokers themselves . . . the opportunity to decide which services are truly essential and how much those services are worth." *Id.*

Thus, a bottom-up analysis of reasonable costs is not the only possible way to calculate a fair payment rate, and "[t]he APA imposes no general obligation on agencies to conduct or

commission their own empirical or statistical studies." *Prometheus*, 592 U.S. at 427. As it did in when setting the initial compensation rates in 2008, CMS looked to the range of administrative fees that carriers reported paying, and discounted them to account for the fact that some of the administrative costs commenters pointed to were in fact subsidizing sales in non-Medicare markets. *See* 89 Fed. Reg. at 30,626. It is not the role of the Court to determine whether CMS's decision to survey the market instead of using a reasonable cost methodology "was 'the best one possible' or even whether it was 'better than the alternatives.'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019). The fact that CMS explained a reasonable approach to a complex problem, as directed by Congress, is enough.

Plaintiffs are also wrong to suggest that CMS ignored their reliance interests. (CMC Br. at 21–22; *see also* ABC Br. at 28–32). In fact, CMS acknowledged comments suggesting that too low of an administrative payment would drive firms out of the industry, expressly disavowed any desire to "drive[]" firms out of the industry, and explained that the feedback had convinced the agency that its original $31 proposal was "too low," leading it to triple the amount to $100. 89 Fed. Reg. at 30,625. And in response to comments that "FMOs would no longer provide agents and brokers with . . . extra services," CMS stated that its Final Rule would give agents and brokers "the opportunity to decide which services are truly essential and how much those services are worth." 89 Fed. Reg. at 30,624.

Finally, Plaintiffs contend that CMS wrongly considered what they call an "antitrust rationale." (ABC Br. at 18–20.) The Final Rule does not purport to enforce the Sherman Act or any other similar law, nor does it impose antitrust liability on anyone. The notion, however, that CMS was somehow forbidden from considering the effect of competition in the Medicare Advantage space in any fashion is meritless. Competition as a general matter—as opposed to

more specialized antitrust concerns—is baked into Medicare Parts C and D at multiple levels.

Indeed, the very "purpose of Medicare Advantage is to harness the power of private sector

competition to stimulate experimentation and innovation that would ultimately create a more

efficient and less expensive Medicare system." *See* 69 Fed. Reg. at 46,868; *see also In re*

*Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 685 F.3d at 363.  More specifically, 42 U.S.C.

§ 1395w-21(j)(2)(D) instructs CMS to analyze how compensation incentivizes agent and broker

behavior, and market structure is certainly relevant to understanding how those incentives play

out.  That is why, since it first implemented the statute, CMS has been so concerned about an

FMO bidding war.  Plaintiffs cite to no statute that suggests that CMS, when analyzing the

incentives agents and brokers face, must blind itself to the market context in which those

incentives operate.  Instead, they assert without any authority that CMS may only address that

broader structure by "auditing" Medicare Advantage contractors and "recouping overpayments."

(ABC Br. at 20.)  Program integrity tools like those are of course important to the proper

functioning of Medicare Advantage, but Plaintiffs never explain why those programs would

mark the outer bound of agency authority under § 1395w-21(j)(2)(D).  They do not.

### b.    The Final Rule is consistent with HIPAA.

ABC targets the Final Rule's consent requirement to share personal beneficiary data

under 42 C.F.R. §§ 422.2274(g)(4) and 423.2274(g)(4), which this Court allowed to go into

effect after finding ABC had not demonstrated a substantial likelihood of success on the merits.

(Stay Order at 12.)  ABC repeats its argument to the effect that the requirement is in tension with

HIPAA's broader purpose of facilitating data sharing.  (ABC Br. at 35–37.)  But just because

HIPAA might facilitate data sharing in some circumstances, that does not control whether CMS

may limit certain harmful data-sharing practices under the Medicare statute.  CMS expressly

took steps to avoid any conflict with HIPAA, such as by explaining that CMS was not

"attempting to classify this information as [Personally Identifiable Information] or [Protected

Health Information]," and explained it could nevertheless "take steps within its authority" to

protect beneficiaries.  89 Fed. Reg. at 30,604.  *Id.*  After all, "no legislation pursues its purposes

at all costs," *CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014), and CMS has regulated sharing

beneficiary information as far back as 2005, just after HIPAA was passed.  *See* Medicare

Marketing Materials Guidelines in 2005, at 138.  Indeed, Part C regulations have long required

plans to safeguard the confidentiality and accuracy of enrollee records, independent of HIPAA.

*See* 65 Fed Reg. 40,170, 40,218–19, 40,323 (2000); 42 C.F.R. § 422.118.  ABC does not dispute

CMS's conclusion that third-party marketers were sharing beneficiary information in ways that

surprised the beneficiaries, nor that the statutes CMS identified in the Final Rule authorized

CMS's imposition of a consent requirement to stop this practice.  Nothing more is needed.

### c.    No Due Process Clause violation is shown.

CMC also argues that contract-term limits violate due process because they are

"impermissibly vague," relying on *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253

(2012).  (CMC Br. at 36-38.)  But in *Fox*, the agency departed from its prior precedent to apply,

in an administrative adjudication, a new legal precedent to punish a broadcaster for something

that the broadcaster had no reason to know would be illegal.  *Id.*  This case does not involve any

administrative adjudication, and in any event, there is no vagueness issue because both the

statute and regulation focus on whether agents and brokers have an "incentive" to recommend

plans based on a beneficiary's "health care needs."  *Compare* 42 U.S.C. § 1395w-21(j)(2)(D)

*with* 42 C.F.R. § 423.2274(c)(13).

CMC suggests that the agency might create perverse "incentives" for agents and brokers

who may fear individual adjudications of potential civil monetary penalties.  (CMC Br. at 36.)
But Plaintiffs can of course assert as a defense to any hypothetical future adjudication that any
contract term at issue meets the regulation's substantive standard.  The Court need not set aside
the entire rule and thus hobble the agency's ability to account for the impact of contract terms on
agent and broker incentives.  CMC might wish its members could conduct business without
worrying about their impact on beneficiaries, but that is not the statute Congress wrote.

After complaining that the regulation is too general, CMC also criticizes the agency for
providing additional detail in preamble.  (CMC Br. at 37.)  But CMC gets the significance of the
preamble text backwards—a regulation is only vague if a party cannot "identify with reasonable
certainty" the meaning of a regulation after "reviewing the regulations *and other public
statements issued by the agency*."  *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d
564, 578–79 (5th Cir. 2017) (emphasis added); *accord Vill. of Hoffman Ests. v. Flipside,
Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5, 498 (1982) (directing courts to "consider any limiting
construction" an "agency has proffered" that may clarify a provision challenged as vague).
Thus, by providing examples in preamble text to guide regulated parties, CMS gave regulated
parties *more* notice of what is prohibited.  *See Burkhart v. UIL*, No. 1:22-CV-1026-RP, 2023 WL
2940026, at *6 (W.D. Tex. Apr. 13, 2023) (rule against "encouraging participation" by high
schoolers in college activities not too vague, especially when examples of impermissible activity
were provided).  Nor does providing a few additional examples to clarify the agency's intent
without amending regulation text require a new round of notice and comment.  *See Huawei*, 2
F.4th at 448 ("[T]he final rule's adoption of changes responsive to Huawei's comments
underlines that the rule logically emerged from the rulemaking.").  In any event, the examples
simply "explain what an agency thinks a statute or regulation actually says" and so were not

subject to APA notice-and-comment requirements.  *See Flight Training Int'l, Inc. v. FAA*, 58

F.4th 234, 242 (5th Cir. 2023).

Finally, to the extent CMC repeats its argument that CMS cannot take competition into

account, that is incorrect, for the same reasons discussed above.  Congress structured Medicare

Parts C and D so that plans freely competing on plan price and quality; marketing, by contrast, is

highly regulated.

## C.    CMS complied with any applicable notice-and-comment requirements.

Plaintiffs also critique the agency for allegedly not complying with procedural

requirements in 5 U.S.C. § 553, but as explained below, these arguments fail.

### a.    CMS disclosed all necessary information in the Proposed Rule.

Plaintiffs rely principally on out-of-circuit precedent to argue that the agency failed to

disclose certain "critical factual material" for comment.  (*See* ABC Br. at 37 (relying on *Am.*

*Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 246 (D.C. Cir. 2008)).)  In the Fifth Circuit,

however, the APA at 5 U.S.C. § 553 "establishes the maximum extent of procedural scrutiny a

reviewing court may apply to agency rulemaking."  *Handley v. Chapman*, 587 F.3d 273, 281 (5th

Cir. 2009).  That provision requires an agency to disclose for comment only the "time, place, and

nature of public rule making proceedings," the "legal authority under which the rule is

proposed," the "terms or substance of the proposed rule or a description of the subjects and

issues involved," and a plain-language summary of the proposal online.  *See* 5 U.S.C. § 553(b).

Because "[o]ne searches the text of APA § 553 in vain for a requirement that an agency disclose

other agency information as part of the notice or later in the rulemaking process," any

requirement to disclose specific factual material "cannot be squared with [its] text."  *Am. Radio*

*Relay League, Inc.*, 524 F.3d at 246 (Kavanaugh, J., concurring in judgment).  While CMC cites

a footnote from a Fifth Circuit case under the formal adjudication standards in 5 U.S.C. § 556(e), *Air Prods. & Chems. Inc. v. FERC*, 650 F.2d 687, 698–99 (5th Cir. 1981), and then another case finding that the agency did not violate § 553 despite relying on different data than it originally disclosed, *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 202 (5th Cir. 1989), it identifies no Fifth Circuit decision finding that an agency violated § 553 by not disclosing certain data.

This would be a curious case to be the first to apply such a novel rule, given both the breadth of private information Plaintiffs contend that the agency needed to consider, and the fact that the "information gleaned from oversight activities" that Plaintiffs fault CMS for not disclosing consist of sensitive contracts between FMOs and Medicare Advantage contractors that raise serious privacy and trade-secret concerns.  *See U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 770 (1989) ("The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures," which "arguably has its roots in the Constitution.").  The Court should therefore decline Plaintiffs' invitation to graft additional procedural requirements onto § 553.  *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 525 (1978) (reviewing courts must not "engraft[] their own notions of proper procedures upon agencies entrusted with substantive functions by Congress").

Even if the Court does read this procedural requirement into the APA, however, CMS disclosed sufficient materials for comment.  As discussed, the heart of CMS's rule was its incentive analysis—which CMS included in the Proposed Rule.  88 Fed. Reg. at 78,553.  And it discussed other factors bearing on its analysis, such as complaints it was aware of and the focus group.  *See id.* at 78,554.  While it did not disclose the highly confidential plan contract information, the agency did disclose that it was relying on "information gleaned from plan

oversight activity." *Id.* at 78,556.  Plaintiffs cite no case suggesting that an agency must choose between using sensitive data obtained through oversight and disclosing that sensitive data to the world—which would risk significant harm to regulated entities.  "[T]he public 'need not have an opportunity to comment on every bit of information influencing an agency's decision.'" *Tex. Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 326 (5th Cir. 2001).

### b.    The Final Rule is a logical outgrowth of the Proposed Rule.

ABC also suggests that CMS might have violated the logical outgrowth requirement by stating in the Final Rule's preamble that "'the full payments shall be made 'directly to the agents and brokers,' thereby 'prohibit[ing] separate administrative payments.'"  (ABC Br. at 39–40 (quoting 89 Fed. Reg. at 30,624, 30,622).)  But ABC agrees there is no violation if the Final Rule is simply a prediction of the practical effects of its rule rather than a separate legal requirement. (*Id.* at 40.)  Because that is the agency's understanding, consistent with its longstanding interpretation of the compensation regulations to apply no matter to whom payment is made paid, the Court need not intervene.  *See* 76 Fed. Reg. at 54,623 (agency's "compensation rules would apply at all levels," including "payments made by plan sponsors to the FMOs").

## D.    Plaintiffs' requested relief is overbroad.

If the Court is inclined to enter some form of relief, it should not extend that relief beyond the parties or the specific parts of the Final Rule it finds invalid.  *See United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch, J., concurring) ("[A] district court should 'think twice—and perhaps twice again—before granting' such sweeping relief" as universal vacatur."). Plaintiffs suggest that the Court *may not* grant only party-specific relief, quoting this Court's statement in another case that "party-specific relief is not even contemplated by the APA." (CMC Br. at 41 (quoting *Am. Council of Life Insurers v. DOL*, No. 4:24-CV-482-O, 2024 WL

3572297, at *8 (N.D. Tex., July 26, 2024)).) But the Fifth Circuit recently explained that "party-specific vacatur is definitely appropriate" in some situations. *See Tex. Med. Ass'n*, 2024 WL 4615744, at *10. Indeed, party-specific relief is the default judicial remedy, and the APA does not forbid courts from exercising their traditional authority. *See California v. Texas*, 593 U.S. 659, 672 (2021) ("Remedies . . . ordinarily operate with respect to specific parties" not "on legal rules in the abstract." (cleaned up)).

CMC points to the Court's earlier conclusion that universal preliminary relief was better than party-specific preliminary relief because the Final Rule affects more than just the parties, and insurers should be able to offer the same terms to all market participants. (CMC Br. at 42 (citing Stay Op. at 16).) But there is at least one significant difference between Plaintiffs and other industry members subject to the rule: Plaintiffs sued. Nothing prevented other agents and brokers or FMOs from joining this lawsuit, and if the Fort Worth chapter of the National Association of Benefits and Insurance Professionals wants to reach beyond its territorial jurisdiction (CMC App.228) to set policy for the 20,000 members of its national organization (CMC App.371), it could have convinced the national organization to join in this suit. *See Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (limiting relief when parties' authority was territorially restricted). The same is true for agents and brokers or FMOs beyond the three members of CMC and ABC that the parties have identified. (CMC App.383 (identifying two members of CMC); ABC PI App. at A1 (identifying one member of ABC who is also an individual plaintiff).) The Court should not allow these relatively few parties to define the legal rights of the entire industry absent those industry members' participation. *See Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (noting there is generally "no reason" why those who are not parties to a suit "should be obliged to honor an incidental legal determination the suit

produced" (cleaned up)).  And if Plaintiffs truly need a court order extending to absent parties like health insurance carriers (CMC Br. at 42), they should have complied with Federal Rule of Civil Procedure 19(a), which governs that situation.

Moreover, the Court's earlier concerns about market disruption were at least in part premised on its conclusion that the three associational plaintiffs—CMC, ABC, and NABIP-Fort Worth—demonstrated that, as a preliminary matter, they had standing to pursue relief on behalf of all of their members.  (Stay Order at 16.)  As the Court noted, to have associational standing, the association plaintiffs must show, among other things, that "(a) its members would otherwise have standing to sue in their own right; [and] (b) the interests it seeks to protect are germane to the purpose."  (*Id.* at 5 (quotation omitted).)  ABC fails that test because it has not submitted any affidavit or other evidence with its summary-judgment brief to meet its burden to demonstrate standing.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiff must show "specific facts" demonstrating standing by "affidavit or other evidence").

Nor has any associational plaintiff shown that "the individual members of the group *each* have standing."  *See Tenth Street Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 500 (5th Cir. 2020) (emphasis added).  This Court has previously acknowledged this precedent while following dicta from *Warth v. Sedin*, 422 U.S. 490, 511 (1975), suggesting that if one member of an association has standing, the association can pursue relief on behalf of all members.  *See VanDerStok v. Garland*, 633 F. Supp. 3d 847, 859–60 (N.D. Tex. 2022).  *Warth*'s dicta, however, has been overtaken by more recent standing cases.  In *TransUnion LLC v. Ramirez*, for example, the Supreme Court explained that "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not," and so examined the alleged injuries of each category of plaintiff.  594 U.S. 413, 431 (2021) (cleaned up).  And in *FDA v. Alliance for*

*Hippocratic Medicine*, the Supreme Court rejected the standing of unregulated doctors to challenge how an agency regulated other doctors. 602 U.S. 367, 381 (2024). Those holdings reiterate that Article III turns on each specific plaintiff's showing an injury that "affect[s] the plaintiff in a personal and individual way," not just a plaintiff's affiliations with other injured parties. *Lujan*, 504 U.S. at 561 & n.1.

Finally, while the Court held preliminarily that ABC's purpose to lobby and sue the government, and CMC's purpose to support its members, sufficed to show this lawsuit was germane to their organizational purposes (Stay Order at 6), more should be required at the summary-judgment phase. It is circular for an organization to have standing to sue simply because it was created to sue, and mere advocacy is not enough to make lawsuits germane to the organization's purpose. *See VanDerStok*, 633 F. Supp. 3d at 859–60 (requiring organization to show how organization's purposes were "germane to the protection of [its member's] financial interests"). Such a broad interpretation of association standing would allow it to become a way to obtain class relief without complying with either the Federal Rules of Civil Procedure or Article III. Indeed, rather than bothering with class certification, the *TransUnion* plaintiffs could have simply joined a litigation lobbying shop. The Court should reject such an ahistorical interpretation of Article III. *Cf. Hippocratic Medicine*, 602 U.S. at 399–405 (Thomas, J., concurring).

## V.    Conclusion

The Court should deny Plaintiffs' motions and grant the agency's cross-motions.

Respectfully submitted,

LEIGHA SIMONTON
UNITED STATES ATTORNEY

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:     214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

<u>Certificate of Service</u>

On November 8, 2024, I electronically submitted the foregoing document with the clerk

of court for the U.S. District Court, Northern District of Texas, using the electronic case filing

system of the court.  I hereby certify that I have served all parties electronically or by another

manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney