# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

|  |  |
|---|---|
| Council for Medicare Choice, *et al.*, | |
| Plaintiffs, | Civil Action No. 4:24-cv-446-O |
| v. | |
| United States Department of Health and Human Services, *et al.*, | **Hearing Requested** |
| Defendants. | |

**Plaintiffs' Combined Reply Brief In Support Of Motion For Summary Judgment And Opposition To Defendants' Cross-Motion For Summary Judgment**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 3

    I.     The Fixed Fee Is Unlawful ................................................................................ 3

        A.     The Fixed Fee Exceeds CMS's Statutory Authority To Regulate The "Use Of Compensation" ................................................................ 3

              1.     CMS's Power To Regulate The "Use" Of Compensation Does Not Include The Unparalleled Ratemaking Power CMS Now Claims .......................................................... 4

              2.     CMS Cannot Regulate Administrative Payments As "Compensation" ...................................................................... 9

              3.     CMS's *Post Hoc* Invocation Of "General" Authority To Regulate Marketing Cannot Save The Fixed Fee ........................ 11

        B.     CMS Failed To Acknowledge The Change In Its Understanding Of Its Statutory Authority Or Reasonably Account For Reliance Interests ............................................................................................. 17

        C.     CMS's Justifications For The Rule Do Not Withstand Scrutiny ............ 19

              1.     CMS Failed To Substantiate The Fixed Fee's Premises And Relied On Undisclosed Evidence ............................................ 19

              2.     CMS Ignored Criticisms Of The Flimsy Evidence It Disclosed And Contrary Evidence Provided By Commenters ...................................................................... 22

              3.     CMS's Substantive Justifications For The Rule Are Inconsistent And Unsupported ............................................... 24

        D.     The $100 Fixed Fee Increase Is Arbitrary And Capricious ................... 26

        E.     CMS Failed To Consider Alternatives ................................................. 29

    II.     The Contract-Terms Restriction Is Unlawful ..................................................... 30

        A.     The Contract-Terms Restriction Exceeds CMS's Statutory Authority ......................................................................................... 30

        B.     The Restriction Does Not Provide Fair Notice ..................................... 31

        C.     The Restriction Is Arbitrary And Capricious ........................................ 34

    III.    The Court Should Vacate The Rule Nationwide .................................................. 36

CONCLUSION ................................................................................................................... 38

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
  295 U.S. 495 (1935)............................................................17

*Air Prods. & Chemicals, Inc. v. FERC,*
  650 F.2d 687 (5th Cir. 1981) ............................................20, 21

*Airlines for Am. v. Dep't of Transp.,*
  110 F.4th 672 (5th Cir. 2024) .............................................9

*Am. Petro. Inst. v. EPA,*
  52 F.3d 1113 (D.C. Cir. 1995)...........................................15

*Am. Radio Relay League, Inc. v. FCC,*
  524 F.3d 227 (D.C. Cir. 2008)......................................21, 29

*Ass'n of Am. Physicians & Surgeons, Inc v. Tex. Med. Bd.,*
  627 F.3d 547 (5th Cir. 2010) .............................................37

*Bruesewitz v. Wyeth LLC,*
  562 U.S. 223 (2011).........................................................7

*Bus. Roundtable v. SEC,*
  905 F.2d 406 (D.C. Cir. 1990)...........................................13

*Calumet Shreveport Refin., LLC v. EPA,*
  86 F.4th 1121 (5th Cir. 2023)............................................24

*Career Colls. & Schs. of Tex. v. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024) .............................................2

*Chamber of Comm. of U.S. v. SEC,*
  443 F.3d 890 (D.C. Cir. 2006)...........................................20

*Chamber of Comm. of U.S. v. SEC,*
  85 F.4th 760 (5th Cir. 2023) ...........................19, 22, 25, 28, 31

*Chamber of Comm. v. DOL,*
  885 F.3d 360 (5th Cir. 2018) ..........................................7, 24

*Chem. Mfrs. Association v. EPA,*
  870 F.2d 177 (5th Cir. 1989) ............................................20

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
  466 F.3d 134 (D.C. Cir. 2006)...........................................15

*Conn. Dep't of Pub. Util. Control v. FERC,*
  484 F.3d 558 (D.C. Cir. 2007)...........................................13

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Crypto Freedom All. of Tex. v. SEC*,
2024 WL 4858590 (N.D. Tex. Nov. 21, 2024)....................................................2, 36

*Del. Dep't of Nat. Res. & Env't Control v. EPA*,
785 F.3d 1 (D.C. Cir. 2015)..............................................................................23

*DHS v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020)..............................................................................................29

*Digit. Realty Tr., Inc. v. Somers*,
583 U.S. 149 (2018)............................................................................................5

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)..........................................................................................17

*ExxonMobil Pipeline Co. v. DOT*,
867 F.3d 564 (5th Cir. 2017) ............................................................................32

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)..........................................................................................18

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)..........................................................................................32

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)..........................................................................................28

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)..........................................................................................37

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)............................................................................................4

*Ford Motor Co. v. Tex. DOT*,
264 F.3d 493 (5th Cir. 2001) ............................................................................32

*FPC v. Hope Nat. Gas Co.*,
320 U.S. 591 (1944)............................................................................................5

*Georgia v. President of U.S.*,
46 F.4th 1283 (11th Cir. 2022) ..........................................................................6

*Handley v. Chapman*,
587 F.3d 273 (5th Cir. 2009) ............................................................................21

*Huawei Techs. USA, Inc. v. FCC*,
2 F.4th 421 (5th Cir. 2021)..........................................................................23, 33

*Hull v. Kapstone Container Corp.*,
2018 WL 4409798 (N.D. Tex. Sept. 17, 2018)..............................................30, 35

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*J.H. Rutter Rex Mfg. Co. v. United States*,
    706 F.2d 702 (5th Cir. 1983) ...................................................................6

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ..............................................................8, 9, 10

*Luminant Generation Co. v. EPA*,
    675 F.3d 917 (5th Cir. 2012) ................................................3, 8, 25, 27, 28

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
    512 U.S. 218 (1994) ...................................................................4

*Mexican Gulf Fishing Co. v. Dep't of Comm.*,
    60 F.4th 956 (5th Cir. 2023) ..........................................................22, 23

*Microsoft Corp. v. I4I Ltd. P'ship*,
    564 U.S. 91 (2011) ....................................................................7

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ........................................................21, 32, 33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...................................................................36

*Nat'l Asphalt Pavement Ass'n v. Train*,
    539 F.2d 775 (D.C. Cir. 1976) .........................................................21

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
    628 F.2d 604 (D.C. Cir. 1980) .........................................................27

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
    2024 WL 4858589 (N.D. Tex. Nov. 21, 2024)...........................................3, 36, 37

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
    116 F.4th 488 (5th Cir. 2024) .........................................................37

*Obduskey v. McCarthy & Holthus LLP*,
    586 U.S. 466 (2019) ...................................................................7

*Owner-Operator Indep. Drivers Ass'n v. FMCSA*,
    494 F.3d 188 (D.C. Cir. 2007) .........................................................20

*Panama Refin. Co. v. Ryan*,
    293 U.S. 388 (1935) ..................................................................16

*Perkins v. Lukens Steel Co.*,
    310 U.S. 113 (1940) ...................................................................6

*R.J. Reynolds Vapor Co. v. FDA*,
    65 F.4th 182 (5th Cir. 2023) ..........................................................29

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*In re Riley*,
    923 F.3d 433 (5th Cir. 2019) ....................................................................10

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1942) ..............................................................................13, 14

*Spirit Airlines, Inc. v. DOT*,
    997 F.3d 1247 (D.C. Cir. 2021) ...............................................................29

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024) .............................................................................14

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .................................................................................37

*Tex. Ass'n of Mfrs. v. CPSC*,
    989 F.3d 368 (5th Cir. 2021) ..............................................................33, 34

*Tex. Med. Ass'n v. HHS*,
    110 F.4th 762 (5th Cir. 2024) ..................................................................36

*Tex. Med. Ass'n v. HHS*,
    120 F.4th 494 (5th Cir. 2024) ..................................................................36

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    265 F.3d 313 (5th Cir. 2001) ..............................................................20, 21

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ....................................................................24

*Texas v. Biden*,
    589 F. Supp. 3d 595 (N.D. Tex. 2022) .....................................................18

*Texas v. Cardona*,
    — F. Supp. 3d —, 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024) .......................2, 22

*Texas v. EPA*,
    389 F. Supp. 3d 497 (S.D. Tex. 2019) ................................................20, 21

*Tice-Harouff v. Johnson*,
    2022 WL 3350375 (E.D. Tex. Aug. 12, 2022) ....................................20, 21

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .................................................................................37

*VanDerStok v. Garland*,
    633 F. Supp. 3d 847 (N.D. Tex. 2022) .....................................................37

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023) ....................................................................31

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*,
   435 U.S. 519 (1978) ............................................................................................. 20

*Wages & White Lion Invs., LLC v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ........................................................................... 19

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ................................................................................. 5, 34, 36

*Window Covering Mfrs. Ass'n v. CPSC*,
   82 F.4th 1273 (D.C. Cir. 2023) ........................................................................ 20

**Statutes**

5 U.S.C. § 553(c) ........................................................................................................ 21

42 U.S.C. § 1395mm(k) .............................................................................................. 16

42 U.S.C. § 1395w-21(b)(2)(B) ................................................................................. 14

42 U.S.C. § 1395w-21(h)(4)(A) ................................................................................. 15

42 U.S.C. § 1395w-21(h)(4)(D) ........................................................................... 14, 15

42 U.S.C. § 1395w-21(j)(1)(A) ................................................................................... 15

42 U.S.C. § 1395w-21(j)(2)(A) ............................................................................ 12, 14

42 U.S.C. § 1395w-21(j)(2)(C) ................................................................................... 11

42 U.S.C. § 1395w-21(j)(2)(D) ............... 1, 3, 4, 6, 9, 10, 11, 12, 13, 14, 25, 29, 30, 31, 32, 35, 36

42 U.S.C. § 1395w-21(j)(2)(E) ............................................................................ 12, 14

42 U.S.C. § 1395w-24(a)(6)(B)(iii) ........................................................................... 35

42 U.S.C. § 1395w-26(a) ............................................................................................ 12

42 U.S.C. § 1395w-26(b)(1) ................................................................................. 12, 15

42 U.S.C. § 1395w-26(b)(2) ....................................................................................... 16

**Regulations**

29 C.F.R. § 778.217(a) ................................................................................................ 11

29 C.F.R. § 778.217(c)(1) ........................................................................................... 11

42 C.F.R. § 422.752(c)(1) ........................................................................................... 32

42 C.F.R. § 422.2274(c)(13) ....................................................................................... 29

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

### Rulemakings

*Medicare Program; Changes for Contract Year 2025,*
  89 Fed. Reg. 30,448 (Apr. 23, 2024) (Final Rule)..........................3, 13, 19, 22, 23, 24, 25, 26,
                                                                27, 28, 29, 30, 31, 32, 33, 35, 36

*Medicare Program; Contract Year 2025 Changes,*
  88 Fed. Reg. 78,476 (Nov. 15, 2023) (Proposal)........................................................24, 31, 32

*Medicare Program CY2022 Changes,*
  86 Fed. Reg. 5,864 (Jan. 19, 2021) .........................................................................................10

*Medicare Program Revisions,*
  73 Fed. Reg. 67,406 (Nov. 14, 2008)........................................................................................9

*Medicare Program Revisions,*
  73 Fed. Reg. 54,226 (Sept. 18, 2008) ...................................................................................9, 10

*Regulation Best Interest,*
  84 Fed. Reg. 33,318 (July 12, 2019)..........................................................................................7

### Other Authorities

*Addressing Ethical Concerns Regarding Offers of Payment to Research*
  *Participants,* https://tinyurl.com/48aej5rr......................................................................11

CBO, *Medicare+Choice Provisions in the Balanced Budget Act* (Nov. 12, 1997),
  https://tinyurl.com/y8u4krwc;.................................................................................................15

*Compensation,* Internal Revenue Service, https://tinyurl.com/y3eene36......................................10

H.R. Conf. Rep. No. 105-217 (1997)..........................................................................................16

FINRA, *Gifts, Gratuities and Non-Cash Compensation* (Dec. 20, 2024),
  https://tinyurl.com/4apzfzyr...................................................................................................7

*Marketing,* Black's Law Dictionary (12th ed. 2024).................................................................15

*Medicare Marketing Guidelines* (Nov. 1, 2005), tinyurl.com/yc4fmyz6........................................8

## INTRODUCTION

CMS's latest attempt to defend the Compensation Rule only underscores its flaws. The agency essentially concedes that it engaged in a rushed rulemaking while ignoring the Rule's devastating consequences for the industry. It pivots to a whole new statutory justification for its action, since the original justification is so obviously unsatisfactory. And it seeks to justify its action with arguments that flout basic requirements for reasoned agency decisionmaking.

CMS's claimed authority is breathtaking. It claims power to fix prices for private market transactions without reference to any statutory standard, any analysis of the cost or value of the services at issue, or any economic data at all. Yet CMS still has no coherent textual theory of how its authority to regulate "[t]he use of compensation" to "ensure" that it "creates incentives for agents and brokers to enroll individuals" in appropriate health plans, 42 U.S.C. § 1395w-21(j)(2)(D), grants such sweeping authority to impose industry-wide price controls. Instead, in evident recognition of the flaws in its original statutory argument, CMS now shifts to the new theory that § 1395w-21 should be read as an exceedingly "broad" delegation with no "outer bound," Gov't Br. 31, and which prohibits all compensation except by CMS's grace.

This Court should reject these audacious claims. Text, context, and standard interpretive principles refute CMS's view that Congress vaguely bestowed expansive ratemaking authority on CMS—particularly when Congress conferred that authority *expressly* in other provisions of the same Act. At minimum, CMS cannot defend its bulldozing of Plaintiffs' reliance on CMS's prior regime, which permitted fair-market payments for administrative services.

CMS's contempt for administrative process is on par with its disregard for the lawful bounds of its authority. It claims it can engage in ratemaking while withholding from public scru-

1

tiny most of the evidence on which it purportedly relied, ignoring legitimate criticisms of the limited material it did disclose as critical to its decisionmaking, and speculating about agents' and brokers' incentives without any "empirical" evidence that the incentives it seeks to address even exist. Gov't Br. 37-38. In advancing these arguments, CMS piles new APA transgressions on top of those committed in the rulemaking, relying on material and rationales not proffered in the Rule.

This Court has already found that CMS's shoddy rulemaking process was likely unlawful. Order Granting Stay 10-11 (ECF No. 37). Now, it should again reject CMS's invitation to apply a toothless version of the APA that would relieve agencies of the most basic obligations.

CMS's defense of the Contract-Terms Restriction is more of the same. It doubles down on its misreading of "compensation" to claim, in effect, that it may regulate any contract terms tangentially related to the exchange of money. It defends its vague Contract-Terms Restriction on the grounds that it can propose broad, inscrutable regulatory text and wait for the Final Rule's preamble—after the opportunity for public comment has passed—to give that text meaning. But CMS admits that parties must be able to "'identify with reasonable certainty' the meaning of a regulation," Gov't Br. 44, and as this Court recognized, the Rule "failed to provide fair notice" of what contract terms are prohibited, Order 10. CMS also ignores three of Plaintiffs' four reasons for finding the Contract-Terms Restriction arbitrary and capricious. And the one CMS does address, it gets wrong: CMS claims it may adopt requirements for the purpose of promoting competition, even though the authorizing statute says no such thing.

Finally, CMS's attempts to narrow Plaintiffs' remedy are not to be taken seriously. Vacatur is an inherently universal remedy that acts on a rule's legal status. *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024); *Crypto Freedom All. of Tex. v. SEC*, 2024 WL 4858590, at *5 (N.D. Tex. Nov. 21, 2024) (O'Connor, J.); *Texas v. Cardona*, — F. Supp.

3d —, 2024 WL 3658767, at *47 (N.D. Tex. Aug. 5, 2024) (O'Connor, J.).  But even if party-specific vacatur *could* be appropriate in certain cases, this is not one of them because the Rule "seeks to prescribe uniform standards" for "all agents and firms … in the MA ecosystem—not just the parties" in this case.  Order 16.  And in claiming that associations have Article III standing only when *every* member demonstrates its own standing, CMS demonstrably misstates the law.

This Court should bring its order staying the Rule to its logical conclusion by granting summary judgment for Plaintiffs and vacating the Rule.  And while this Court could vacate the rule based on CMS's APA violations alone, Plaintiffs respectfully submit that the government's boundless regulatory pretensions merit a rebuke and reminder of the substantive limits to CMS's statutory authority as well.  *See Luminant Generation Co. v. EPA*, 675 F.3d 917, 925-26 (5th Cir. 2012) (finding agency action both arbitrary and capricious and statutorily unauthorized); *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 2024 WL 4858589, at *3 (N.D. Tex. Nov. 21, 2024) (O'Connor, J.) (holding that agency exceeded its authority without addressing alternative APA grounds).  CMS's reckless moonlighting as a ratemaking commission should come to an end.

## ARGUMENT

## I.    The Fixed Fee Is Unlawful

### A.    The Fixed Fee Exceeds CMS's Statutory Authority To Regulate The "Use Of Compensation"

CMS defends the Fixed Fee as an exercise of its purportedly "broad," "general Medicare Advantage rulemaking authority" to promulgate "'fair marketing standards.'"  Gov't Br. 19-21.  But the Rule itself invoked only CMS's far narrower, express authority to regulate MA plans' "use of compensation," 89 Fed. Reg. 30,448, 30,617/2 (Apr. 23, 2024) (quoting 42 U.S.C. § 1395w-21(j)(2)(D)).  As Plaintiffs showed—and CMS fails to rebut—the Fixed Fee goes beyond that authority in two ways:  (1) by imposing intricate dollars-and-cents price controls regulating the

*amount* MA plans pay firms, agents, and brokers, rather than just how compensation is "used"; and (2) by extending those price controls to administrative payments that CMS itself has recognized do not qualify as "compensation."

CMS thus lacks authority under the narrow statutory provision it invoked in the Rule. And its attempt to backfill that authority in litigation through its *post hoc* reliance on "general" authority unmoored from any textual limitation comes too late and misconstrues the Medicare statute in any event. Ultimately, the fact CMS is still casting about for statutory justifications confirms there are none. The Fixed Fee exceeds CMS's authority.

**1.    CMS's Power To Regulate The "Use" Of Compensation Does Not Include The Unparalleled Ratemaking Power CMS Now Claims**

CMS identifies no other agency with the expansive authority it now asserts: to fix prices for vital services without considering "reasonable costs," Gov't Br. 40, "'empirical or statistical studies,'" *id.* at 41, any statutorily enumerated "'factors,'" *id.* at 34, or any "outside limit [on] the Secretary's authority" whatsoever, *id.* at 31. CMS's authority to regulate how compensation is "use[d]," 42 U.S.C. § 1395w-21(j)(2)(D), does not confer that unprecedented power here.

**a.    Congress confers ratemaking authority expressly**. At the threshold, skepticism toward CMS's assertion of *implicit* ratemaking authority would not require this Court "to create a brand-new canon" or a "novel clear-statement rule." Gov't Br. 32-33. The Supreme Court already recognized decades ago that "[i]t is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion— and even more unlikely that it would achieve that" aim through "subtle device[s]." *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994). Rate regulation thus involves precisely the type of authority with major "economic and political significance" that Congress does not delegate in "cryptic … fashion" though "vague terms or ancillary provisions." *FDA v.*

*Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Declining to read such expansive authority into an at-best ambiguous provision does not require "overrid[ing] statutory text" in favor of "preferred economic policies." Gov't Br. 32. It simply requires applying reasonable, long-recognized inferences about congressional intent.

If anything, CMS's brief only further confirms that Congress does not authorize ratemaking by implication. Plaintiffs cited numerous examples illustrating that when Congress has intended to authorize ratemaking—including in the Social Security Act and other HHS-administered statutes—it has done so expressly, and has expressly delineated factors for the agency to consider when setting rates. Pls' Br. 17. In response, CMS fails to cite a single statute that has been found to authorize ratemaking by mere implication. When Congress "'includes particular language'" in a statute but "'omits it in another,'" courts "'presum[e] that Congress intended a difference in meaning,'" *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161 (2018), so the omission of any express reference to ratemaking here confirms that CMS lacks that power.

CMS likewise comes up short in identifying other statutes that authorize ratemaking unmoored from statutory factors. Its sole purported example (at 34)—*FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944)—involves the opposite: Congress imposed a clear statutory standard ("'just and reasonable' rates") with specific requirements dictated by decades of precedent (*e.g.*, a "return to the equity owner" that is "commensurate with returns on investments"). 320 U.S. at 603. By contrast, § 1395w-21 contains neither an express reference to ratemaking nor a hint about the standards CMS is to employ when doing it. *Hope* thus confirms that CMS's claimed authority to set rates without any statutory standard is an extreme outlier.

Nor does CMS's rudderless approach to ratemaking find any support in government contracting cases. CMS cites *J.H. Rutter Rex Manufacturing Co. v. United States*, 706 F.2d 702 (5th Cir. 1983), as evidence of the government's discretion to limit "how its own contractors spend taxpayer funds." Gov't Br. 32. But *Rutter* is a procurement case addressing the government's own contracts with private parties. In that context, Congress naturally has "authority to fix the terms and conditions under which the Government will permit goods *to be sold to it*." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 129 (1940) (emphasis added). But those cases say nothing about CMS's authority to regulate contracts between private parties (here, carriers' contracts with firms, agents, and brokers). And even if they did, the "authority" to fix government-procurement contract terms "rests in Congress's hands in the first instance—not the President's," *Georgia v. President of U.S.*, 46 F.4th 1283, 1293 (11th Cir. 2022), so the government can regulate its contractors only to the extent authorized by Congress.

  **b.** **Ratemaking sweeps beyond the "use" of compensation**. CMS's attempt to ground ratemaking authority in the text of § 1395w-21(j)(2)(D) fares no better. It claims the statute's reference to "'compensation' sufficiently captures payments to authorize regulating payment amounts." Gov't Br. 32. But § 1395w-21(j)(2)(D) does not say that CMS may regulate "compensation" generally. It says only that CMS may regulate the "*use of* compensation." CMS can thus regulate how compensation is employed—for example, "how compensation is disbursed," 73 Fed. Reg. 54,226, 54,239/1 (Sept. 18, 2008), or "compensation structure," *id.* at 54,238/2. But it cannot "establish limitations" on the underlying "compensation" itself, *e.g.*, by fixing prices. 42 U.S.C. § 1395w-21(j)(2)(D).

  In regulating how compensation of brokers and agents is used, the statute followed a well-trod path. In the securities laws, too, restrictions are placed on uses of compensation that could

cause brokers to act contrary to their clients' interests, such as the conferral of commissions, bonuses, prizes, and gifts tied to securities sales. *See generally Regulation Best Interest*, 84 Fed. Reg. 33,318, 33,319/1-3 (July 12, 2019); FINRA, *Gifts, Gratuities and Non-Cash Compensation* (Dec. 20, 2024), https://tinyurl.com/4apzfzyr. The language Congress used in § 1395w-21(j)(2)(D) gives no reason to believe that Congress judged the divergence of interests between brokers and customers in the health insurance context to be so different, and so much more consequential, than the divergence in the markets for financial and retirement products, that CMS should be empowered to fix broker and agent compensation in a manner that is never done under the securities laws, nor under ERISA.

CMS still offers no definition of "use," nor any explanation of what that word adds to the statute under its interpretation. It says only that the word is "flexible" and "'chameleon-like.'" Gov't Br. 28-29. But the mere possibility that "use" might have some (unspecified) different meanings in different contexts is no reason to read it out of the statute entirely. If Congress had intended to confer power over all aspects of compensation, it could easily have omitted the phrase "use of" and simply directed CMS to regulate "compensation." *See* Pls' Br. 17. CMS's interpretation thus runs headlong into the rule that statutes ordinarily "'do not contain surplusage,'" *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 476 (2019), and "every word in a statute [must] be interpreted to have meaning," *Chamber of Comm. v. DOL*, 885 F.3d 360, 381 (5th Cir. 2018).

Dismissing this venerable canon, CMS suggests it is irrelevant that Congress "'could have been more terse.'" Gov't Br. 29. But the case it cites for this proposition—*Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011)—confirms the opposite: The presumption against surplusage "applies" with full force "if verbosity and prolixity can be eliminated by giving the offending passage … a competing interpretation." *Id*. at 236. To be sure, that was "not the case" in *Brusewitz*—and the

7

canon against surplusage thus did not apply—because "giv[ing] independent meaning" to one statutory phrase was possible "only at the expense of rendering the remainder of the provision superfluous." *Id.* Here, by contrast, Plaintiffs' interpretation "gives effect to every clause and word of [the] statute." *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 106 (2011) (citing *Brusewitz*, 562 U.S. at 236) (quotation marks omitted). CMS's interpretation does not, so Plaintiffs' must prevail.

The legislative context CMS cites further undermines its argument. Section 1395w-21(j)(2)(D) did not implicitly ratify a ratemaking authority that CMS purportedly asserted in its 2005 Medicare Marketing Guidelines, Gov't Br. 29, because CMS never asserted that authority at the time. The 2005 Guidelines merely advised plans to pay "reasonable compensation in line with industry standards" to ensure "compl[iance] with all relevant laws … including the Federal and any state anti-kickback statute." *Medicare Marketing Guidelines* 135, 138 (Nov. 1, 2005), tinyurl.com/yc4fmyz6. CMS did not claim that *it* had the authority to regulate compensation, much less to fix specific *rates* of compensation. If CMS's pre-2008 marketing guidance is relevant at all, it suggests that Congress expected CMS to continue permitting market-value payments—not to prescribe a universal Fixed Fee at an artificially depressed rate. In any event, none of CMS's analysis about the 2005 Guidelines appears in the Rule, and thus is a "*post hoc* rationalizatio[n]"—one of many in its brief—that this Court "must disregard." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012).

Nor does Plaintiffs' argument "upset" a "contemporaneous and longstanding" interpretation by the agency. Gov't Br. 30. Of course, courts may accord "respect" to an "Executive Branch interpretation [that] was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2258 (2024).

But CMS's current interpretation is neither. CMS's first regulation—issued shortly after the Medicare Improvements for Patients and Providers Act of 2008 ("MIPPA") authorized CMS to regulate the "use of compensation"—declined to cap or fix compensation at "specific dollar values." 73 Fed. Reg. at 54,238/2, 54,239/1. CMS then abandoned that approach and stated that compensation could not exceed "fair-market value," 73 Fed. Reg. 67,406, 67,410/1 (Nov. 14, 2008), and now proposes yet another innovation by redefining "compensation" and fixing the value of compensation, including administrative payments, at $711. So CMS's approach has not "remained consistent" over time, *Loper Bright*, 144 S. Ct. at 2258, and its purported authority to make rates is not "long-settled," Gov't Br. 30.

In any event, the regulatory excesses of the *Chevron* era have not been grandfathered into the Administrative State. To the contrary, the "Supreme Court has rejected the theory that agency practice can defeat a statute's text by 'adverse possession.'" *Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672, 676 (5th Cir. 2024). CMS's previous, more modest limits avoided legal challenge not because industry participants agreed that CMS had ratemaking power, but because CMS permitted fair-market payments that industry participants tolerated. That period of détente with industry says nothing about the legality of CMS's underlying regime.

### 2.    CMS Cannot Regulate Administrative Payments As "Compensation"

Should the Court nonetheless give weight to CMS's "contemporaneous and longstanding" views of its authority, Gov't Br. 30, that would only confirm that CMS *lacks* authority for a different reason: It cannot regulate payments for *administrative services*. Since its first regulation under § 1395w-21(j)(2)(D) in September 2008, CMS has consistently recognized that administrative payments are "not considered compensation" because they do not derive from beneficiary enrollment or "relat[e] to the sale or renewal of [a] policy." 73 Fed. Reg. at 54,238/1-2. CMS

doubled down in 2021, reiterating that such payments "are not compensation" because they are "not for the sale or renewal of a policy." 86 Fed. Reg. 5,864, 5,993/3-44/1 (Jan. 19, 2021).

CMS now downplays its longstanding definition as merely a "regulatory distinction" that CMS made without "constru[ing] the statutory term 'compensation.'" Gov't Br. 25-26. But its prior rulemakings make clear that CMS *was* construing the statute. Although § 1395w-21(j)(2)(D) *requires* CMS to regulate the use of compensation, CMS declined at first to regulate the use (or amount) of administrative payments based solely on its view that they "are … not considered compensation." 73 Fed. Reg. at 54,238/1-2. It then chose the same term used in the statute ("compensation") to define the boundaries of the regulation. And in doing so, it claimed to be "implementing" its new authority "under MIPPA"—the 2008 statute that added § 1395w-21(j)(2)(D)—to regulate "agent and broker compensation." *Id.* at 54,237/3; *see also id.* at 54,238/1-2 (under new "rule *implementing MIPPA*," "[s]alary [and] other benefits related to employment" were "not considered compensation" (emphasis added)). Had CMS nonetheless viewed the statutory term "compensation" to be broader than the regulation, and to include administrative payments, it would have been *required* to regulate those payments. *See* 42 U.S.C. § 1395w-21(j)(2)(D) (CMS "shall" establish guidelines). Yet it declined to do so without ever once suggesting it was abdicating authority available to it under the statute.

Even setting aside its previous interpretation, moreover, CMS is wrong that administrative payments are "compensation" whose use CMS may regulate under § 1395w-21(j)(2)(D). CMS contends that *In re Riley*, 923 F.3d 433, 442 (5th Cir. 2019), defined "'compensation'" "'broad[ly] enough … to include reimbursement.'" Gov't Br. 23. The issue, however, is not what "'compensation'" means "'generally,'" *id.*, but rather what it means *here*, "'in context,'" *Loper Bright*, 144 S. Ct. at 2261 n.4. The context here confirms that Congress was focused on payments made "*to*

10

*enroll* individuals" in the appropriate plan, 42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added), not any other economic activity that could conceivably affect agents' and brokers' incentives indirectly.

Further, because § 1395w-21(j)(2)(D) governs agents' and brokers' ability to earn payments for performing MA-related services, it is most analogous to statutes in the employment context, where "compensation" typically has a narrower meaning.  In that context, it is commonplace to distinguish between compensation (money paid for effort or labor) and reimbursements (payments made to offset costs incurred in rendering the service).  For example, Labor Department regulations provide that "[w]here an employee incurs expenses on his employer's behalf" and receives repayment, "[s]uch payment is not compensation for services rendered by the employees." 29 C.F.R. § 778.217(a), (c)(1).  Similarly, the IRS defines wages to constitute "compensation" for purposes of its W-2 form, but excludes *bona fide* reimbursements (for, *e.g.*, "traveling expenses") from that definition.  *Compensation*, Internal Revenue Service, https://tinyurl.com/y3eene36.  And when HHS pays research participants, its advisory committee distinguishes between "fair compensation for participants' time and effort" and "reimbursement of reasonable costs incurred." *Addressing Ethical Concerns Regarding Offers of Payment to Research Participants*, https://tinyurl.com/48aej5rr.  Whatever compensation may mean in other contexts, this Court should respect the well-established distinction between compensation and reimbursements in employment-related contexts.  *See* Pls' Br. 19-20.

### 3.    CMS's *Post Hoc* Invocation Of "General" Authority To Regulate Marketing Cannot Save The Fixed Fee

CMS evidently recognizes the difficulty of the statutory argument it has advanced to date, because now—for the first time—it seizes upon different statutory language that it has never seen fit to mention.  The Court need not "parse each word" of § 1395w-21(j)(2)(D) at all, CMS now

11

says, because other provisions of the statute give it virtually limitless authority to regulate MA plan marketing without regard to the "use of compensation"—or, for that matter, any "'outer bound'" in the statute's text whatsoever.  Gov't Br. 21-23, 30.

CMS is rightly dissatisfied with the "use of compensation" statutory argument it has pressed to date.  But it cannot defend the Rule on any other statutory ground, because "use of compensation" was the only stated basis for the Rule.  And of course, there is good reason CMS never concocted the new statutory argument it now presents—that language, also, does not authorize CMS to impose the Fixed Fee.

a.    **Statutory context**.  CMS's argument is based on several interlocking provisions of Title 42:

Section 1395w-21(j)(2) states that CMS "shall establish limitations" with respect to "at least" five specified activities.  Those include the authority invoked in the Rule—to regulate "use of compensation," 42 U.S.C. § 1395w-21(j)(2)(D)—as well as: (1) the scope of marketing appointments; (2) co-branding; (3) gifts; and (4) required training and testing of agents and brokers, *id.* § 1395w-21(j)(2)(A)-(C), (E).  The government claims the words "at least" make (j)(2) a "statutory floor" on the limitations CMS must promulgate, rather than a "statutory ceiling."  Gov't Br. 30.

Section 1395w-21(h)(4), which appears in a subsection titled "approval of marketing material and application forms," states that MA organizations "shall conform to fair marketing standards … included in the standards established under" § 1395w-26.

Section 1395w-26, in turn, authorizes CMS to establish "solvency standards" that are irrelevant here, 42 U.S.C. § 1395w-26(a), and "other standards ... for [MA] organizations and plans consistent with, and to carry out, this part," *id.* § 1395w-26(b)(1).  The government describes these provisions as establishing its "general Medicare Advantage rulemaking authority," Gov't Br. 21,

12

and reads § 1395w-26 together with § 1395w-21(h)(4) as granting it broad authority to regulate anything tangentially related to "marketing" by MA plans, *id.* at 21, 31.

Section 1395w-21(h)(4)(D) further specifies that the "fair marketing standards" referenced in subsection (h)(4) "shall only permit" MA organizations "to conduct the activities described in subsection (j)(2) in accordance with the limitations" established under subsection (j)(2). The government suggests that subsections (h)(4)(D) and (j)(2)(D) work in unison to authorize it to set fair marketing standards that limit "compensation amounts." Gov't Br. 31; *see also id.* at 20.

**b.    *Chenery* forecloses CMS's argument**. The threshold problem is that CMS never invoked this purported statutory authority in the Rule, and this Court must disregard the agency's *post hoc* rationalization. The Rule stated unambiguously that the Fixed Fee was promulgated pursuant to CMS's "statutory obligation to establish guidelines to ensure that the *use of agent and broker compensation* creates" the required incentives. 89 Fed. Reg. at 30,617/2 (emphasis added) (citing § 1395w-21(j)(2)(D)). The Rule's limited references to subsections (j)(2) and (h)(4) thus focused exclusively on subsections (j)(2)(D) and (h)(4)(D), neither of which contains the language on which CMS principally now relies. *Id.* at 30,617/2, 30,619/2, 30,620/1, 30,627/1; *see also* Gov't Br. 20, 22 n.6, 35 (stating that the Rule relied on subsections (j)(2)(D) and (h)(4)(D)). CMS did not mention fair marketing standards or the "at least" language in (j)(2). It did not cite § 1395w-26 at all. And it nowhere suggested that its authority over the "use of compensation" is merely one source of authority among many.

CMS's resort to newfound statutory authority is fatal. Agency action "must be measured by what the [agency] did, not by what it might have done." *SEC v. Chenery Corp.*, 318 U.S. 80, 93-94 (1942). Where an agency points to a "new basis for statutory authority [that] appears nowhere in" a rule, therefore, courts "'may not accept ... counsel's *post hoc* rationizatio[n].'"

*Conn. Dep't of Pub. Util. Control v. FERC*, 484 F.3d 558, 560 (D.C. Cir. 2007); *see also Bus. Roundtable v. SEC*, 905 F.2d 406, 417 & n.10 (D.C. Cir. 1990) (explaining that "[e]ven if other statutory provisions [cited by commenters] could support the Commission's asserted authority, we cannot supply grounds to sustain the regulations that were not invoked by the [agency] below" (footnote omitted)).  CMS's Rule must rise or fall on "the grounds upon which the agency acted in exercising its powers."  *Chenery*, 318 U.S. at 95.  And as discussed above (and as suggested by CMS's eleventh-hour switcheroo), the statutory authority CMS invoked in the Rule—§ 1395w-21(j)(2)(D)'s "use of compensation" language—cannot support the Rule.  *See supra*, at 6-9.

      **c.**    **Sections -21(j)(2), -21(h)(4), and -26 do not authorize the Rule**.  CMS is wrong, in any event, that § 1395w-21(j)(2) and (h)(4) and § 1395w-26 grant it unconstrained power to regulate beyond the use of compensation.  None includes the sort of express language or enumeration of factors that Congress consistently includes when it grants ratemaking authority.  *See supra*, at 4-6.  And none is an independent source of open-ended additional power.

      Subsection (j)(2) does establish a "statutory floor," but not in the way CMS thinks.  Gov't Br. 30.  By telling CMS to establish limitations regarding five specific matters, 42 U.S.C. § 1395w-21(j)(2)(A)-(E), Congress both authorized and compelled CMS to regulate in those matters.  By adding the phrase "at least," Congress merely preserved—but did not expand—CMS's power to impose other limitations as authorized elsewhere in the statute, such as the power to restrict military veterans' enrollment in certain plans.  *Id.* § 1395w-21(b)(2)(B).

      Subsection (h)(4) similarly is not a source of authority.  It simply directs MA plans to comply with lawful regulations established pursuant to other provisions—specifically, §§ 1395w-21(j)(2) and 1395w-26.  42 U.S.C. § 1395w-21(h)(4)(D).

But if § 1395w-21(h)(4) includes some authority to set "fair marketing" standards to prohibit "certain marketing practices," the Rule exceeds it because marketing practices are *what* someone is paid to do, not *how much* someone is paid. Even "capacious and undefined" phrases, Gov't Br. 21, must be given their best meaning, *see Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1577 (2024) (rejecting agency interpretation of the statutory phrase "just and proper"). By its plain text, § 1395w-21(h)(4) uncontroversially authorizes CMS to regulate "marketing"—that is, how carriers, agents, and brokers "promot[e] and sel[l] ... products or services." *Marketing*, Black's Law Dictionary (12th ed. 2024) (defining "marketing"). The statutory heading—"approval of marketing material and application forms," 42 U.S.C. § 1395w-21(h)—reinforces Congress's understanding that "marketing" means the process of promoting and selling plans. And Congress's own requirements illustrate this ordinary understanding of "marketing." For example, agents cannot promise cash or meals to enrollees, fill out enrollees' forms, sell unrelated products, or engage in door-to-door solicitation. *Id.* § 1395w-21(h)(4)(A)-(D), (j)(1)(A). By contrast, regulating the amount of compensation to firms, agents, and brokers—let alone administrative payments—does not regulate how carriers, agents, or brokers promote and sell plans to beneficiaries.

Finally, § 1395w-26—which CMS did not cite in the Rule, and addresses only obliquely in its brief (at 21)—is merely general rulemaking authority to promulgate solvency standards and "other standards ... for [MA] organizations and plans consistent with, and to carry out, this part." 42 U.S.C. § 1395w-26(b)(1). An agency cannot rely on such a "general grant of rulemaking power" to "trump specific portions" of the statute, ignore "statutorily specified" limitations, or "expand its authority beyond the aims and limits of the [statute] as a whole." *Am. Petro. Inst. v. EPA*, 52 F.3d 1113, 1119-20 (D.C. Cir. 1995); *see also Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006) (an "agency's general rulemaking authority

does not mean that the specific rule the agency promulgates is a valid exercise of that authority"). Here, the statutory provision confirms that it is not a source of open-ended power unmoored from other statutory limitations:  Regulations established under § 1395w-26(b)(1) must be "consistent with, and carry out," Congress's requirements for the MA program in *other sections*—here, § 1395w-21(h) and (j).  And as described above, § 1395w-21(h) and (j) do not support the Rule.

Further, § 1395w-26 is limited by § 1395w-26(b)(2)'s statement that any regulation "under this subsection shall be based on standards established under section 1395mm."  Section 1395mm governs "risk-sharing contracts," a predecessor to MA that Congress sunsetted when MA was adopted.  CBO, *Medicare+Choice Provisions in the Balanced Budget Act* (Nov. 12, 1997), https://tinyurl.com/y8u4krwc; 42 U.S.C. § 1395mm(k).  CMS's power under § 1395w-26(b) thus sweeps no broader than the type of regulations it previously promulgated in the risk-sharing context.  *See* H.R. Conf. Rep. No. 105-217, at 637 (1997) (noting that § 1395w-26(b) authorized standards "based on currently applicable standards" for risk-sharing contracts).  But § 1395mm says nothing about agent/broker compensation, and CMS fails to identify any historical antecedent to its newly claimed ratemaking power in any standard promulgated under § 1395mm.  To the extent the Rule is purportedly grounded in § 1395w-26(b), therefore, it is not "based on" any standard "established under section 1395mm," 42 U.S.C. § 1395w-26(b)(2), and it thus exceeds CMS's authority.

**d.** **CMS's interpretation raises nondelegation problems**.  Further still, CMS's interpretation of these statutory provisions supercharges non-delegation concerns.  If CMS has power to promulgate regulations not expressly authorized by § 1395w-21's text and without any "'outer boundary,'" Gov't Br. 30, then CMS has "unlimited authority to determine the policy and to lay down [a] prohibition" as it "see[s] fit," *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 415 (1935).

16

CMS vaguely suggests a limiting principle that this purported residual power must be administered consistent with CMS's "general authority to promulgate fair-marketing standards." Gov't Br. 31. But if the only limitation on CMS's asserted residual power is "fairness," that too would result in a paradigmatically unbounded delegation. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 531, 539 (1935) (delegation to enforce "fair competition" unconstitutional).

CMS identifies no meaningful limiting principle for its capacious view of the statute. The best it can muster is that the statute "might" bar CMS "from prohibiting *all* marketing compensation." Gov't Br. 31. But CMS's ability to think of one extreme example of something the statute *might* implicitly forbid does not mean its statutory interpretation reflects a coherent limit on its power or an intelligible principle for exercising that power. Nondelegation principles thus foreclose CMS's (non-committal) view that it can promulgate whatever standards it wants as long as it allows *some* minimal (even if inadequate) payment for marketing activities.

### B. CMS Failed To Acknowledge The Change In Its Understanding Of Its Statutory Authority Or Reasonably Account For Reliance Interests

Even if CMS's current understanding of its statutory authority were correct, CMS failed to acknowledge that it was changing its understanding of compensation and "insufficiently addressed reliance interests." Order 9. That is an independent reason to declare the Rule unlawful.

CMS's current interpretation of its statutory authority is new. After asserting for years that administrative payments were "not compensation," *see supra*, at 9-10, CMS now claims that such payments *are* "compensation," Gov't Br. 23-25. To effect that change, CMS had to "'display awareness that it is changing position'" and "'tak[e] into account'" any "'reliance interests'" that its prior positions may have engendered. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016). But as this Court recognized previously, CMS *still* has not acknowledged its change in position. *See* Order 9. Instead, it continues to stubbornly deny that it ever took a position on what

17

compensation means under the statute. Pls' Br. 21-22. Because that denial cannot be squared with CMS's past statements, *see supra*, at 9-10, the Fixed Fee is arbitrary and capricious.

CMS also defaulted on the other half of its APA obligation: to "adequately assess" and "address" Plaintiffs' reliance interests. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1139 (5th Cir. 2021). CMS's prior regime of fair-market payments fostered the development of an entire industry, Pls' Br. 21-22, but as this Court recognized, CMS did not "assess" whether "reliance interest[s] or competing policy concerns" cut against its flip-flop on those payments, even in the face of "comments and concerns that the Final Rule would harm long standing business models and possibly upend the industry." Order 9. CMS offers no new arguments to warrant a different conclusion now. Its sole paragraph discussing Plaintiffs' reliance interests, Gov't Br. 41, relies on the same statements from the regulatory preamble that CMS cited in opposing preliminary relief, *see* Opp. to Mot. for Preliminary Relief 36. That argument is still unavailing.

CMS retorts that it "expressly disavowed any desire to 'driv[e]' firms out of the industry." Gov't Br. 41. But whatever CMS may have "desire[d]," a rule that in *effect* would shut down an industry demands "a more 'detailed justification'" to sustain impairing "'serious reliance inter-ests.'" Order 8 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

Nor did CMS engage in the "specific, meaningful consideration of ... reliance interests" that the APA requires, *Texas v. Biden*, 589 F. Supp. 3d 595, 620 (N.D. Tex. 2022), merely by raising the $31 increase it originally proposed to $100 and stating that its new price-control regime will "give agents and brokers 'the opportunity to decide which services are truly essential and how much those services are worth,'" Gov't Br. 41. Increasing a too-low fee to a still-too-low fee, while asking agents and brokers to ration services, does not "fully explore" (*Biden*, 589 F. Supp. 3d at 620) the extent to which companies took out "loans," made "initial public offerings," and

hired "thousands of employees" in reliance on the prior regulatory regime (App. 22). CMS's bald disclaimer to the industry that hard times are coming fails to provide the requisite "'detailed justification'" the APA demands. Order 8.

**C.    CMS's Justifications For The Rule Do Not Withstand Scrutiny**

Were more evidence needed that CMS lacks the ratemaking authority it claims, it is supplied by the agency's total inability to sensibly perform the task. This Court recognized that the Fixed Fee was likely "arbitrary and capricious" because CMS "never substantiated" key aspects of its reasoning and responded to "these deficiencies by citing to factual material that was not disclosed" in the rulemaking process. Order 7-11. Moreover, CMS "failed to sufficiently respond to public comments" in the rulemaking. *Id.* at 10. And substantively, CMS's defense of the Rule is rife with inconsistent reasoning and *post hoc* reliance on flimsy evidence. Now, CMS simply doubles down on the same arguments this Court previously rejected. CMS's failure to comply with the APA's bedrock requirements independently justifies vacating the Fixed Fee.

**1.    CMS Failed To Substantiate The Fixed Fee's Premises And Relied On Undisclosed Evidence**

As Plaintiffs noted, Pls' Br. 23, the Fixed Fee rests on four premises: that (1) administrative payments "are rapidly increasing"; (2) "overall payments to agents and brokers" can vary from plan to plan; (3) some plans "may have used" administrative payments to "circumvent" limits on enrollment compensation; and (4) these payments create "questionable financial incentives" for agents and brokers. 89 Fed. Reg. at 30,618/1, 30,621/2, 30,622/3.

For the first two premises, CMS cited nothing at all in the rulemaking, and thus failed to "adequately substantiat[e]" that a "genuine proble[m]" "exists." *Chamber of Comm. of U.S. v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023). CMS now claims nonetheless that "facts ... in the record" substantiate these premises. Gov't Br. 36. But to prove that point, CMS cites droves of purported

evidence that its Proposal never disclosed, including contracts that "CMS reviewed" but did not reveal to the public, *id.*; "observations of market participants" and "health care researchers," *id.* at 37; a publicly available article about market concentration and "deals," *id.*; and "web-based advertisements" that "CMS reviewed," *id.*  CMS's failure to "'reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary'" represents a "'serious procedural error'" that violates the APA's notice-and-comment-rulemaking requirement.  *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007); *see also Chamber of Comm. of U.S. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006).  Although CMS claims some of these documents are "sensitive" and that it should not have to choose between relying on them and disclosing them "to the world," Gov't Br. 46-47, it does not dispute the agency's ability to release "redacted" versions, *Window Covering Mfrs. Ass'n v. CPSC*, 82 F.4th 1273, 1283-84 (D.C. Cir. 2023), or at least "explain *why*" confidentiality concerns led the agency to shield them from public scrutiny, *Tice-Harouff v. Johnson*, 2022 WL 3350375, at *9 (E.D. Tex. Aug. 12, 2022); *see* Pls' Br. 26.

CMS instead dismisses the obligation to disclose critical factual materials as an artifact of "out-of-circuit precedent" whose application here would be "novel" and contrary to the APA. Gov't Br. 45-46 (citing *Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 525 (1978)). But binding circuit precedent forecloses CMS's position.  In *Chemical Manufacturers Association v. EPA*, 870 F.2d 177 (5th Cir. 1989), for example, the Fifth Circuit expressly recognized an agency's "duty to publish data." *Id.* at 202.  Although *Chemical Manufacturers* found no violation because the agency harmlessly used updated data from a source it had disclosed in the proposed rule, *see* Gov't Br. 46 (citing 870 F.2d at 202), the court's discussion makes sense only if there was a duty to disclose relevant evidence in the first place.  Similarly, CMS hand-waves *Air Products & Chemicals, Inc. v. FERC*, 650 F.2d 687 (5th Cir. 1981), because it involved a "formal

adjudication," Gov't Br. 46, but to support its holding that an agency cannot rely on "evidence known only to it," the Fifth Circuit there cited authorities applying that principle to "'rule-making proceeding[s],'" 650 F.2d at 699 n.17. District courts in the Fifth Circuit routinely hold agencies to their APA obligation to disclose the "technical basis" and "critical factual material" underlying a rule in time for public comment. *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019); *Tice-Harouff*, 2022 WL 3350375, at *1, *9; *see also* Order 11 n.22 (noting that CMS's litigation conduct "raises the issue of … CMS's lack of disclosure during the rule making process").

By contrast, CMS's Fifth Circuit authorities on this point (Gov't Br. 45, 47) said nothing about what materials must be disclosed in a notice of proposed rulemaking. *See Handley v. Chapman*, 587 F.3d 273, 281 (5th Cir. 2009) (holding that agency reasonably explained policy change); *Tex. Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 326 (5th Cir. 2001) (holding harmless agency decision not "to solicit" a third round of comments before promulgating rule). The only "novel[ty]" here, Gov't Br. 46, is CMS's view that the APA permits the agency to sandbag commenters in litigation on evidence undisclosed in the rulemaking.

First principles support the precedent cited by Plaintiffs. Unlike the elaborate procedural requirements *Vermont Yankee* rejected, which were "not anchored" in the APA, *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 239 (D.C. Cir. 2008), the requirement to disclose critical evidence is squarely rooted in the APA's text. Section 553 requires the agency to provide "interested persons an opportunity to participate in the rule making" through submission of comments, which the agency must "conside[r]" in formulating a final rule. 5 U.S.C. § 553(c). For this requirement to be "'meaningful,'" the public "must be aware of the information the agency finally decides to rely on in taking agency action." *Nat'l Asphalt Pavement Ass'n v. Train*, 539 F.2d 775, 779 n.2 (D.C. Cir. 1976); *accord Mock v. Garland*, 75 F.4th 563, 583 (5th Cir. 2023) (agency must

21

"provid[e] the public with a meaningful opportunity to comment"); *Cardona*, 2024 WL 3658767, at *1, *17. Here, keeping the public in the dark about the key factual information that purportedly justified CMS's overhaul of an industry unlawfully deprived the industry of a meaningful opportunity to respond.

### 2. CMS Ignored Criticisms Of The Flimsy Evidence It Disclosed And Contrary Evidence Provided By Commenters

As this Court noted at the preliminary-relief stage, CMS "failed to sufficiently respond to public comments" questioning CMS's evidence. Order 10. CMS thus defaulted on its obligation to "provide a response" to comments criticizing the flimsy evidence CMS did disclose. *Chamber of Comm.*, 85 F.4th at 774; *accord Mexican Gulf Fishing Co. v. Dep't of Comm.*, 60 F.4th 956, 973 (5th Cir. 2023) (agency "violate[d] the APA" because it "did not address" an issue raised by comments). For example, CMS failed to grapple with the Commonwealth Fund study's potential statistical invalidity (and general irrelevance); explain why cherrypicked, COVID-era complaint data validly reflects agents' and brokers' purported bad incentives (as opposed to general frustration with MA during the pandemic); or consider commenters' contrary evidence that beneficiaries generally like their plans and the services they receive from agents and brokers. Pls' Br. 27-28.

CMS concedes it never responded to these comments. Gov't Br. 39. Even now, it offers no substantive response. Instead, it claims that because it was trying to answer the "ultimate issue" whether administrative payments affect agent and broker incentives, the sources it cited were not significant enough to require a defense. *Id.* But the Rule belies that *post hoc* claim.

The Commonwealth Fund study, for example, was the *only* evidence CMS cited in asserting that "explicit" incentives cause agents and brokers "to prioritize enrollment into some plans over others." 89 Fed. Reg. at 30,619/3 & n.154. Aside from a vague reference to "information" from other unspecified sources, the study was also the *only* evidence cited for the proposition that

administrative payments "have significantly outpaced the market rates for similar services provided in non-MA markets." *Id.* at 30,619/3 & n. 155. Those assertions go directly to the Rule's main premise that such payments "are rapidly increasing" and skewing incentives. *Id.* at 30,618/1.

Likewise, a purported increase in "marketing complaints" from 2020 to 2021 was CMS's key evidence for its "belie[f]" that "financial incentives are" to blame. 89 Fed. Reg. at 30,618/1. CMS drew a direct link from its perception that "beneficiary complaints" were skyrocketing to purported "beneficiary confusion" arising from "pressure" applied by agents and brokers hoping to "earn 'administrative payments.'" *Id*. at 30,618/1-2. If, instead, the pandemic in fact drove that rise, CMS's key assumption would be obliterated.

Accordingly, the Commonwealth Fund study and CMS's reliance on marketing complaints were not just "potentially interesting data points." Gov't Br. 39. They were CMS's *best* evidence (by attrition) to justify its rule. When commenters questioned that evidence's veracity, CMS could not simply cite the evidence again as its primary authority while ignoring criticisms of the same evidence. "Administrative law does not permit such a dodge." *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015). While CMS is right (at 39) that an agency does not violate the APA if it "clearly thought about the commenters' objections and offered reasoned replies," *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 450 (5th Cir. 2021) (cleaned up), CMS "violate[d] the APA" here because it "did not address" comments at all, *Mexican Gulf*, 60 F.4th at 973.

On top of failing to respond to criticisms of its own key evidence, CMS independently violated the APA by refusing to address contrary evidence submitted by commenters that undercut CMS's narrative of mass beneficiary confusion and dissatisfaction. As commenters pointed out, a survey of MA beneficiaries revealed that most "'did not seem bothered'" by agents' and brokers'

potential "'financial incentives,'" App. 39, and beneficiaries urged CMS "not [to] make any changes to the agent's job, our access to them, or their compensation" because agents' and brokers' assistance was invaluable in managing "the many Medicare intricacies," App. 301; *see* Pls' Br. 28-29. CMS was required to engage with this countervailing evidence and, if it found the evidence did not warrant a change in approach, explain why. Instead, CMS was (and is) silent. By adopting a rule that runs "counter to the evidence," *Calumet Shreveport Refin., LLC v. EPA*, 86 F.4th 1121, 1140 (5th Cir. 2023), and failing to address evidence that was "already … in th[e] record," *Texas v. Biden*, 10 F.4th 538, 556 n.5 (5th Cir. 2021), CMS violated the APA.

### 3.    CMS's Substantive Justifications For The Rule Are Inconsistent And Unsupported

Substantively, CMS's defense of the Rule fares no better. To start, its justifications for an economic regulation are shot through with inconsistent economic reasoning. CMS claims that Congress's goal for MA was to "'harness the power of private sector competition'" to make Medicare more "'efficient,'" Gov't Br. 42, yet the Rule eliminates competition by setting a "uniform" price for everyone, *id.* at 13 (citing 88 Fed. Reg. 78,476, 78,555 (Nov. 15, 2023)). CMS frets that large carriers pay FMOs more to sell their plans and that small and regional carriers cannot afford to keep up, *id.* at 10, 15, but then says small carriers currently pay more than large carriers, *id.* at 16, and relies on complaints from *large* plans that they are paying too much (without explaining why large plans cannot just go to lower-priced FMOs), *id.* at 37. This repeated "internal inconsistency" is "characteristic of arbitrary and unreasonable agency action," *Chamber of Comm.*, 885 F.3d at 382, and is shallow work for a rule that fundamentally remakes the market for critical services.

Moreover, CMS still fails to support the Rule's key premises. For example, to show that the "'value of administrative payments'" in "'recent years'" is "well above levels a decade ago,"

Gov't Br. 36 (quoting 89 Fed. Reg. at 30,618/2), CMS compares the rate that "[o]ne selected plan sponsor" paid to "sales agents" in 2008, AR 11286, to the rates that some FMOs are paid today, *see* Gov't Br. 36-37 (citing AR 11730, 11748).  That cherry-picked evidence does not show a trend—let alone the "recent" trend of "rapidly increasing" administrative payments that CMS purported to target in the Rule.  89 Fed. Reg. at 30,618/1-2.  And CMS makes no effort to account for inflation or other factors that may explain these changes, such as carriers providing additional services in response to CMS's ever-expanding regulatory requirements.  App. 33.

As for its assertion that administrative payments create "questionable financial incentives" for agents and brokers, 89 Fed. Reg. at 30,618/1, CMS disclaims any need for "empirical evidence," Gov't Br. 38.  Instead, CMS argues that the word "incentives" in § 1395w-21(j)(2)(D) empowers CMS to regulate whatever compensation practices it believes create negative "incentives" for the industry, regardless of whether that suspicion is grounded in fact.  *Id.*  But this argument appeared nowhere in the Rule, and courts "disregard [such] *post hoc* rationalizations" by the government in litigation.  *Luminant*, 675 F.3d at 925.  In any event, CMS is wrong.  Under the APA, if there "are not genuine problems, then there is no rational basis" for the agency to promulgate a regulation purporting to fix them.  *Chamber of Comm.*, 85 F.4th at 777-78.

CMS's insistence that no evidentiary showing is required undercuts CMS's alternative claim that the record by happenstance "corroborate[s] its reasoning."  Gov't Br. 38.  In fact, the record refutes CMS's supposition that contract terms between carriers and FMOs somehow "'influence'" individual agents.  *Id.*  Administrative payments "do not flow down to the individual agents" selling plans, App. 23, and individual agents are "simply unaware" of them, App. 39.  The government's speculative theory of "'trickle down'" economics, Gov't Br. 38, is thus illogical and contradicted by the record.

CMS's belatedly-identified supposed evidence is not credible anyway. For example, the "focus group" report CMS invokes, Gov't Br. 38 (citing AR 11314), is simply the Commonwealth Fund survey of agents and brokers who reported that they "receiv[e] higher commissions" for enrollments in MA plans than in Medigap supplemental plans. AR 11314. It says nothing about whether those commissions affected agents' and brokers' plan recommendations—and, in turn, provides no support to "link administrative payments to how agents and brokers behave." Gov't Br. 38.[*] CMS's other evidence is a cursory comment from law professors, AR 7933, and an anecdotal comment from an individual plan employee singling out purported practices of a Florida-based agency, AR873, neither of which the Rule discussed. Finally, CMS's invocation of prior "complaints" from beneficiaries is only half true. Gov't Br. 46. The Rule cited complaint data from 2019-2021, 89 Fed. Reg. at 30,618/1, but CMS now relies on complaint data from *2022*, Gov't Br. 12. If CMS had disclosed this data during the rulemaking proceeding as required, *see supra*, at 19-22, commenters could have engaged with it—and CMS could have responded at the time, rather than impermissibly advancing *post hoc* rationales in this litigation. Regardless, the 2022 complaint data continues to reflect COVID's effects on the 2021 enrollment period. CMS's brief thus confirms that this Rule is arbitrary and capricious.

### D. The $100 Fixed Fee Increase Is Arbitrary And Capricious

CMS's unsupported diagnosis of a major industry problem is complemented by its equally arbitrary and capricious solution: a $100 increase to the Fixed Fee to purportedly account for all of the administrative services that its new definition of "compensation" now encompasses. 89

---

[*] CMS's continued reliance on the Commonwealth Fund study as evidence "support[ing] the agency's reasoning," Gov't Br. 38, also forecloses CMS's assertion that the same study was not important enough to dignify a response to comments critiquing it, *see supra*, at 22-23.

Fed. Reg. at 30,6262/2.  As this Court previously recognized, "CMS never substantiated its decision to raise the fixed fee by $100."  Order 8.

CMS has abandoned the original rationale for selecting a $100 increase to its fixed fee: that "the majority [of commenters] recommended higher rates beginning at $100," 89 Fed. Reg. at 30,625/3, and that "[s]everal commenters suggested that an increase of $100 would be an appropriate starting point and reflects the minimum monthly costs of necessary licensing and technology costs," *id.* at 30,626/1; *see* Gov't Br. 40 (denying that the $100 increase was based on a "'head count'" of commenters' suggestions).  CMS's original rationale was not only legally impermissible—since rulemaking is not a show of hands, *see* Pls' Br. 30—but also factually untrue.  Contrary to CMS's assertion in the rulemaking that "[s]everal" comments specifically proposed a $100 increase, 89 Fed. Reg. at 30,626/1, Plaintiffs found only one commenter that cursorily recommended a $100 increase.  App. 195.  CMS has twice declined to dispute that point.  *See* Pls' Stay Reply 10; Pls' Br. 31.

Agency rulemakings based on fictitious evidence—and especially affirmative misrepresentation of the record—violate the APA.  *See* Pls' Br. 31; *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 617 (D.C. Cir. 1980).  CMS's inability to even attempt to substantiate, before this Court, a key representation in its rulemaking is thus a confession of error, and Exhibit A for why agencies must expose their work to public scrutiny *before* adopting a rule.

CMS's new, *post hoc* rationale—which, again, this Court "must disregard," *Luminant*, 675 F.3d at 931—is that it was not required to conduct a "bottom-up analysis of reasonable costs," but instead could propound "a single top line" of $100, regardless whether that figure bears any relationship to the actual cost of necessary services.  Gov't Br. 40-41.  In CMS's view, it had no obligation to gather "'empirical or statistical'" evidence of "particular costs" or perform a "'line-

27

item calculation.'" *Id*.

Such cavalier disregard for the most fundamental considerations in ratemaking is further evidence that CMS should not be, and was not, entrusted by Congress with ratemaking authority over agents and brokers. And CMS's sole support for its startling proposition—*FCC v. Prometheus Radio Project*—merely addressed the scope of an agency's default obligations when "no commenter produce[s] … evidence" on the relevant issue. 592 U.S. 414, 427 (2021). Any excuse CMS may have had for eschewing reliance on data gave way when commenters submitted evidence that CMS was drastically undervaluing the true costs of providing administrative services, App. 46-47, and when CMS purported to ground the Rule in the empirical claim that $100 would be "sufficient" to permit agents and brokers "to continue providing adequate service," 89 Fed. Reg. at 30,626/3. Having sought to justify the Rule on the empirical ground that $100 is in fact sufficient to offset the costs of those services, CMS cannot now assert that a cost analysis is irrelevant. *Luminant*, 675 F.3d at 925. And on the merits, CMS could not "'simply ignore'" commenters' concerns and refuse to "stud[y] the costs" by insisting they were too "'difficult to accurately capture.'" Order 8-9.

CMS concedes that it failed to undertake such a cost study, which means it has no basis now to assert that "requests for more than $100 were too high." Gov't Br. 39. CMS speculated that recommendations of more than $100 "may" have been inflated to include the "full price" of technology used for MA plans, Part D plans, and unspecified "other markets." 89 Fed. Reg. at 30,626/1-2; *see* Gov't Br. 39. But contrary to the demands of reasoned decisionmaking, *Chamber of Comm.*, 85 F.4th at 777, CMS simply posited, but never substantiated, this speculative theory. And even if CMS guessed correctly that "call recording software" was being used to enroll individuals in non-Medicare plans, CMS could not possibly know how much to "discount" the high-

28

end estimates proposed by commenters without knowing the technology's full price and the costs of all administrative services. Gov't Br. 39. Yet CMS dismissed the need for any such analysis as too "difficult" to "accurately capture" such costs and landed on $100 as a matter of convenience and supposition. 89 Fed. Reg. at 30,625/3. As this Court explained, "CMS cannot flout APA standards by merely insisting that administrative costs are unquantifiable." Order 8.

### E. CMS Failed To Consider Alternatives

Finally, CMS does not even attempt to dispute that the Rule's flaws are "exacerbated by its failure to consider alternatives." *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 191 (5th Cir. 2023); *see also DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (agencies "must consider the 'alternative[s]' that are 'within the[ir] ambit'"). Commenters detailed "at least two reasonable alternatives" to redefining and fixing compensation at artificially low levels: CMS could have (1) "target[ed] for enforcement the specific practices that it claims to have observed in violation of current compensation requirements"; or (2) "enforce[d] existing rules that are responsive to CMS's concerns that allegedly improper financial incentives" distort agent and broker behavior. Pls' Br. 33-34. Yet the Rule showed no genuine engagement with these alternatives. Instead, CMS merely offered to "'consider'" such comments as grounds for *additional* regulations in "'future rulemaking'"—not as alternatives to *this* rulemaking. *Id.* at 34. Statements that an agency "'plans to assess'" proposed alternatives at some unknown time in the future "fal[l] well short of what is needed" under the APA. *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). CMS's failure to consider these "'responsible alternatives'" and "'to give a reasoned explanation for its rejection'" of them is thus another reason to invalidate the Rule. *Am. Radio Relay League, Inc.*, 524 F.3d at 242.

While CMS's Rule was laconic and dismissive on this point, CMS's brief is altogether

silent. It offers no defense of CMS's failure to consider these alternatives. Because CMS "fail[ed] to respond to an argument in the opposing party's motion for summary judgment," CMS has "concede[d]" the point. *Hull v. Kapstone Container Corp.*, 2018 WL 4409798, at *2 (N.D. Tex. Sept. 17, 2018). That provides an independent (and now unrebutted) basis to vacate the Rule.

## II.    The Contract-Terms Restriction Is Unlawful

The Contract-Terms Restriction is also unlawful several times over. It bans contract terms that CMS has no authority to regulate. It gives no fair notice of what it prohibits. *See* Order 10. And it is arbitrary and capricious. *See id.* at 11.

### A.    The Contract-Terms Restriction Exceeds CMS's Statutory Authority

Like the Fixed Fee, the Contract-Terms Restriction applies to contract terms that are not "compensation," and thus fall outside CMS's authority to regulate the "use of compensation." 42 U.S.C. § 1395w-21(j)(2)(D).

*First*, the Contract-Terms Restriction covers the same administrative payments as the Fixed Fee. *See* 89 Fed. Reg. at 30,829/2 (§ 422.2274(c)(13)) (applying to all contract terms among carriers, agents, brokers, and FMOs, including those providing for administrative payments). These payments are not "compensation," so CMS may not regulate their use. *See supra*, at 9-11; Pls' Br. 35.

*Second*, the Contract-Terms Restriction also exceeds CMS's authority because it regulates contract terms that have nothing to do with money. It bars *any* contract term that "has a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." 89 Fed. Reg. at 30,829/2. So on its face, that regulation sweeps up contract terms that do not involve "compensation" (even as CMS understands that term).

30

CMS's own examples drive this home.  For instance, the Rule prohibits plan agreements with FMOs that condition "renewal" on "higher rates of enrollment."  89 Fed. Reg. at 30,620/2. CMS insists that such renewal terms fall within its authority because they "conditio[n] *any* compensation on behavior that might" misalign incentives.  Gov't Br. 35.  But a renewal term governs whether plans and FMOs will continue to do business at all, not what carriers pay firms, agents, or brokers.  Under CMS's theory, it could regulate any contract terms because contracts, as a whole, govern business relationships that involve payments.  That proves too much, and nullifies Congress's phrase "use of compensation."  42 U.S.C. § 1395w-21(j)(2)(D).

Similarly, CMS has said that the Contract-Terms Restriction bans terms in which FMOs "provide an agent or broker leads or other incentives based on previously enrolling beneficiaries into specific plans."  88 Fed. Reg. at 78,554/3.  But leads do not even fall within CMS's broad (and erroneous) reading of "compensation," because they are neither payments nor reimbursements.  *See* Gov't Br. 23-24.  The Contract-Terms Restriction thus captures more than what was "approved by Congress."  *VanDerStok v. Garland*, 86 F.4th 179, 189 (5th Cir. 2023).

At the very least, CMS needed to respond to commenters' concerns about its statutory authority to promulgate the Restriction.  App. 53.  CMS claims that it did so when it "reiterated its authority under § 1395w-21(j)(2)(D), before launching into its discussion of the contract limitations."  Gov't Br. 35.  But simply reciting the statute it failed to follow is hardly a "show[ing] that it has 'reasonably considered the relevant issues and reasonably explained the decision.'"  *Chamber of Comm.*, 85 F.4th at 774.  That sinks the Restriction too.

### B.    The Restriction Does Not Provide Fair Notice

The Contract-Terms Restriction is unlawful because it "failed to provide fair notice of what was prohibited."  Order 10.  CMS's efforts to clarify the Restriction in the Final Rule's preamble

only made it murkier. Plus, the preamble terms are not a logical outgrowth of the Proposal.

The Contract-Terms Restriction fails both due process and the APA's notice-and-comment requirements because it is so standardless that it provides no meaningful clarity about what it prohibits. Pls' Br. 36; *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *Mock*, 75 F.4th at 585. CMS claims there is "no vagueness issue because both the statute and regulation focus on" agents' and brokers' incentives. Gov't Br. 43. But that cuts in *Plaintiffs'* favor, not CMS's. Congress directed CMS to "establish" "guidelines" to give meaning to the statute's otherwise vaguely stated objective, 42 U.S.C. § 1395w-21(j)(2)(D), so it is no answer to promulgate an equally vague rule that does not identify *what contract terms* create prohibited incentives.

Nor is it an answer to tell regulated parties that they will find out what the regulation means in a "hypothetical future adjudication," Gov't Br. 44, particularly when doing so risks CMS "impos[ing] civil money penalties," 42 C.F.R. § 422.752(c)(1). As CMS admits, "a regulation is … vague if a party cannot 'identify with reasonable certainty' the meaning of [the] regulation." Gov't Br. 44 (quoting *ExxonMobil Pipeline Co. v. DOT*, 867 F.3d 564, 578-79 (5th Cir. 2017)). And laws that permit such penalties warrant "strict … review" for vagueness. *Ford Motor Co. v. Tex. DOT*, 264 F.3d 493, 508 (5th Cir. 2001). The Contract-Terms Restriction does not meet that standard because regulated entities cannot tell which contract terms the Restriction bans. App. 14-18, 367. So the Restriction risks exactly the type of "'seriously discriminatory enforcement'" that the Due Process Clause forbids. *Fox Television Stations*, 567 U.S. at 253.

CMS's efforts to save the Contract-Terms Restriction in the Rule's preamble only exacerbated the due process problems. CMS offered "examples" of prohibited contract terms, 89 Fed. Reg. at 30,620/3-21/1, and claims that these examples "gave regulated parties *more* notice of what is prohibited," Gov't Br. 44. But more *words* does not mean more *notice*. The preamble cagily

32

suggests that some contract terms "likely" or "could" be prohibited, "depending on the facts and circumstances." 89 Fed. Reg. at 30,620/3-21/1. Yet CMS never clarifies what "facts and circumstances" *would* make a contract term unlawful. A regulation "provides no meaningful clarity" where, as here, the rule attempts to set forth an objective test but the preamble declares that agency decisions "are made 'on a case-by-case basis.'" *Mock*, 75 F.4th at 585. As this Court recognized, CMS's amorphous, noncommittal examples "may have expanded the reach of the restriction without some meaningful identification of exactly what conduct is prohibited." Order 10.

To the extent the preamble does cure the vagueness problem, moreover, it creates a separate APA violation. Under the logical outgrowth doctrine, an agency's "Proposed and Final Rule must be alike in kind so that commentators could have reasonably anticipated the Final Rule." *Mock*, 75 F.4th at 584. For example, in the case CMS cites (at 44), a proposal "to define a covered company as one already subject to agency or congressional prohibitions" gave commenters reason to anticipate that the agency "was considering designating companies without pre-designation process." *Huawei*, 2 F.4th at 448. But here, CMS unpredictably "change[d]" course. *Tex. Ass'n of Mfrs. v. CPSC*, 989 F.3d 368, 381 (5th Cir. 2021) (quotation marks omitted). The Proposal sought to ban volume-based bonuses *only* if they were "passed on to agents or brokers." 88 Fed. Reg. at 78,554/3. That limited ban was of a piece with the Proposal's purported focus on payments that purportedly "circumvent[ed]" CMS's existing limits on compensation. *Id.* at 78,477/3. But the Final Rule declared that *all* "bonuses for hitting volume-based targets for sales of a plan" are likely prohibited. 89 Fed. Reg. at 30,620/3-21/1. This sudden expansion of the stated scope of the Contract-Terms Restriction was "not reasonably foreseeable," and therefore violated the logical outgrowth doctrine. *Tex. Ass'n of Mfrs.*, 989 F.3d at 383.

Finally, precedent forecloses CMS's suggestion that because the preamble is not subject to

33

notice-and-comment requirements, changes to the examples provided in the Rule's preamble cannot violate the logical outgrowth doctrine.  Gov't Br. 44-45.  In *Texas Association of Manufacturers*, the petitioners did "not object to a substantive change in the text of the Proposed Rule and the Final Rule," and instead challenged the agency's "change in the justification for" the rule.  989 F.3d at 382.  The Fifth Circuit held that the agency violated the logical outgrowth doctrine because "the Commission did not provide fair notice when it changed its justification"—a change reflected only in the preamble to the rule.  *Id.*  So, too, here.  CMS's attempt to marginalize the preamble is especially inappropriate given the heavy reliance it places on the preamble's supposed clarification of the Rule.  The government cannot have it both ways.

At bottom, CMS cannot propose a vague rule, wait for the comment period to close, and only then ordain that the real rule is actually much broader.  The Contract-Terms Restriction violates due process and the APA.

### C.    The Restriction Is Arbitrary And Capricious

The Contract-Terms Restriction is also arbitrary and capricious in a handful of ways.  Order 10-11.  Like the Fixed Fee, it was driven by unfounded hunches, undisclosed evidence, and indifference to its effects.  *See supra*, at 19-25.  And, as Plaintiffs explained, the Contract-Terms Restriction suffers from four other problems: (1) CMS never substantiated its claim that volume-based bonuses likely have the indirect effect of creating improper incentives; (2) CMS irrationally bars some contract terms but not others; (3) CMS seeks to regulate competition, even though Congress specifically told it to pursue a different aim; and (4) CMS failed adequately to respond to comments asking CMS to clarify what qualifies as direct and indirect incentives.  Pls' Br. 38-40.

In its brief, CMS fails to respond to the first, second, and fourth arguments—and therefore concedes them.  CMS never addresses the Rule's approach to volume-based bonuses other than its

34

recitation of the Rule, Gov't Br. 7, 17; ignores the Rule's internally inconsistent approach to plans' contracts with agents who represent some but not all plans; and doubles down on the Rule's silence in response to comments seeking a clear and objective definition of direct and indirect incentives. By "fail[ing] to respond to an argument in [Plaintiffs'] motion for summary judgment," CMS has "concede[d]" these arguments. *Hull*, 2018 WL 4409798, at *2. And these conceded arguments are each independent grounds to declare the Contract-Terms Restriction arbitrary and capricious.

As for the argument CMS did address—that CMS improperly seeks to regulate competition, Pls' Br. 39-40—CMS's response is misguided. CMS asserts that "[c]ompetition as a general matter … is baked into Medicare Parts C and D at multiple levels" and that "market structure is certainly relevant to understanding … incentives." Gov't Br. 41-42. But for an agency to regulate for purposes of achieving a particular policy goal, the "textual commitment must be a clear one." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Consistent with that principle, when Congress wants CMS to act with regard to competition, it says so expressly. For example, "[i]n order to promote competition," Congress bars CMS from "requir[ing]" MA organizations to execute contracts with particular hospitals and from "requir[ing]" particular price structures under those contracts. 42 U.S.C. § 1395w-24(a)(6)(B)(iii). By contrast, Congress is silent about competition here. Instead, it authorized only one statutory aim when CMS regulates the "use of compensation": ensuring "incentives for agents and brokers to enroll individuals in the [MA] plan that is intended to best meet their health care needs." *Id.* § 1395w-21(j)(2)(D).

Even if CMS were right that market competition can be relevant to agents' and brokers' incentives, CMS colored outside of those lines by seeking to "promote" competition for its own sake. 89 Fed. Reg. at 30,619/3. CMS explained that it "aimed to deter anti-competitive practices … that prevent beneficiaries from exercising fully informed choice *and* limit competition." *Id.* at

35

30,618/3-30,619/1 (emphasis added).  But only the first of these goals (informed choice) has a tie to CMS's mandate.  The second (limiting competition) does not.  By off-roading to promote competition, CMS "relied on [a] facto[r] which Congress has not intended it to consider."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Whitman*, 531 U.S. at 468.

In any event, a rule mandating uniform contracts between all carriers and all firms is the opposite of marketplace competition.  *See* Pls' Br. 40; App. 12.  When Congress expressly sought to "promote competition" in the MA program, it prohibited CMS from mandating various contract terms, including "particular price structure[s] for payment" by MA plans to hospitals.  42 U.S.C. § 1395w-24(a)(6)(B)(iii).  Yet here, CMS picks winners and losers among various contract terms that the market would support.  The agency's interference hampers, not helps, competition.

## III.    The Court Should Vacate The Rule Nationwide

Precedent forecloses CMS's attempt to revisit this Court's holding that relief should be "universal," not limited "to only the parties in this case."  Order 16-17.  It does not matter that "Plaintiffs sued" and other industry participants did not, Gov't Br. 48, because "universal vacatur" is "required in this circuit," *Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 780 (5th Cir. 2024), even though that remedy *always* extends relief to stakeholders that did not sue.  The APA is explicit that Court "'shall—not may—hold unlawful and set aside [the] agency action.'"  *Crypto Freedom All. of Tex. v. SEC*, 2024 WL 4858590, at *5 (N.D. Tex. Nov. 21, 2024) (O'Connor, J.); *see also, e.g., Nat'l Ass'n of Priv. Fund Managers v. SEC*, 2024 WL 4858589, at *10 (N.D. Tex. Nov. 21, 2024) (O'Connor, J.) (similar).

Even if "'party-specific'" vacatur were "'appropriate'" in some cases, Gov't Br. 48 (quoting *Tex. Med. Ass'n v. HHS*, 120 F.4th 494, 510 (5th Cir. 2024)), this case—like *Texas Medical*

*Association*, which *affirmed* universal relief, 120 F.4th at 511—is not one of them.  The Rule "seeks to prescribe uniform standards," and individualized relief would "distort the market" and "'cause … confusion'" by forcing carriers and Plaintiffs "to negotiate terms that are not allowed in the rest of the market."  Order 16-17.  In "keeping with standard practice," the Rule should be vacated "in its entirety."  *Nat'l Ass'n of Priv. Fund Managers*, 2024 WL 4858589, at *10.

Meanwhile, CMS's discussion of Article III standing is a distraction.  It is well established that an association need only "identify *at least one* member that has suffered or will suffer harm," as the Council and NABIP–Fort Worth indisputably have done here.  *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 497 (5th Cir. 2024); *see Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (same); *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 859-60 & n.45 (N.D. Tex. 2022) (O'Connor, J.).  CMS's cases involving *individuals* who lacked an injury-in-fact, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), or could not show causation, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024), did not abrogate (or even address) that standard.  But even if more were required, the record establishes that "*each* of the Council's members will be harmed" by the Rule, App. 385 (emphasis added), and "NABIP–Fort Worth's members will be harmed" as well, App. 373.  And regardless, Plaintiff Vogue's undisputed standing is enough to permit this Court to order relief.  *See* Pls' Br. 42 n.4.

Finally, the Council easily satisfies the "'undemanding'" germaneness requirement.  *Ass'n of Am. Physicians & Surgeons, Inc v. Tex. Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010).  The Council's "purpose is to promote firms, agents, and brokers, and the proven value they provide to plans and to beneficiaries."  App. 384.  This purpose is "clearly germane" to this suit, Order 6, which seeks "to protect firms' ability to continue to provide administrative services to agents and brokers" and "to receive fair-market payments for those services from carriers," App. 385.

## CONCLUSION

The Court should grant summary judgment for Plaintiffs and should declare unlawful, vacate, and set aside the challenged provisions of the Rule on a nationwide basis.

Dated:  December 20, 2024

Allyson N. Ho
Texas Bar No. 24033667
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2971
aho@gibsondunn.com

Charles W. Fillmore
Texas Bar No. 00785861
H. Dustin Fillmore III
Texas Bar No. 06996010
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX  76102
Telephone: (817) 332-2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

Respectfully submitted,

*/s/   Allyson N. Ho*
Eugene Scalia (*pro hac vice*)
Matthew S. Rozen (*pro hac vice*)
Aaron M. Smith (*pro hac vice*)
M. Christian Talley (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036-4504
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
escalia@gibsondunn.com
mrozen@gibsondunn.com
asmith3@gibsondunn.com
ctalley@gibsondunn.com

*Counsel for Plaintiffs*

38

## CERTIFICATE OF SERVICE

I certify that on December 20, 2024, I caused the foregoing document to be filed with the Clerk for the U.S. District Court for the Northern District of Texas through the ECF system. Participants in the case who are registered ECF users will be served through the ECF system, as identified in the Notice of Electronic Filing.

_/s/ Allyson N. Ho_
Allyson N. Ho